**No. 16-3014**

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

————————————

ADLYNN K. HARTE; ROBERT W. HARTE; J.H., A MINOR, BY AND THROUGH HIS PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE; L.H., A MINOR, BY AND THROUGH HER PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE,

*Plaintiffs-Appellants*,

v.

THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON, KANSAS; FRANK DENNING, SHERIFF, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY; MARK BURNS, DEPUTY, IN HIS INDIVIDUAL CAPACITY; EDWARD BLAKE, DEPUTY, IN HIS INDIVIDUAL CAPACITY, MICHAEL PFANNENSTIEL, DEPUTY, IN HIS INDIVIDUAL CAPACITY; JAMES COSSAIRT, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LARRY SHOOP, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LUCKY SMITH, DEPUTY, IN HIS INDIVIDUAL CAPACITY; CHRISTOPHER FARKES, DEPUTY, IN HIS INDIVIDUAL CAPACITY; THOMAS REDDIN, LIEUTENANT, IN HIS INDIVIDUAL CAPACITY; TYSON KILBEY, DEPUTY, IN HIS INDIVIDUAL CAPACITY

[*Caption Continued On Inside Cover*]

————————————

On Appeal from the United States District Court
for the District of Kansas, Judge John W. Lungstrum
No. 2:13-cv-02586

————————————

## APPELLANTS' APPENDIX
## VOLUME III OF IV
## Pages A462 to A658

————————————

CHERYL A. PILATE
MELANIE S. MORGAN
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO 64106
(816) 471-6694
cpilate@morganpilate.com

JEFFREY M. HARRIS
ROBERT M. BERNSTEIN
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
rbernstein@bancroftpllc.com

*Counsel for Plaintiffs-Appellants*

April 7, 2016

LAURA VRABAC, DEPUTY, IN HER INDIVIDUAL CAPACITY; JIM WINGO, SERGEANT, MISSOURI HIGHWAY PATROL, IN HIS INDIVIDUAL CAPACITY,

*Defendants-Appellees*,

and

NATE DENTON, DEPUTY, IN HIS INDIVIDUAL CAPACITY,

*Defendant*.

# TABLE OF CONTENTS

## VOLUME I

### District Court Documents

District Court Docket ................................................................................A1

Second Amended Complaint (July 21, 2014) (R.59)............................................A51

Memorandum & Order Denying Wingo's Motion to Dismiss
(Oct. 9, 2014) (R.100)........................................................................A91

Memorandum & Order Granting Summary Judgment Motions
(Dec. 18, 2015) (R.340) ....................................................................A99

Judgment (Dec. 18, 2015) (R.341)...........................................................A150

Memorandum & Order Regarding Attorney Fees (Jan. 5, 2016)
(R.345) ......................................................................................A152

Notice of Appeal (Jan. 13, 2016) (R.347)...................................................A155

Memorandum & Order Regarding Attorney Fees (Jan. 22, 2016)
(R.352) ......................................................................................A158

### Exhibits

JCSO E-mails Regarding Adoption of KN Reagent Field Tests
(Jan. 25, 2010 & Mar. 19, 2010)............................................................A162

Justin Kendall, *Tomato-growing Operation 'Busted' in Missouri
Marijuana Roundup*, Pitch, April 21, 2011 ................................................A165

Certificates of Completion for Wingo Marijuana-grow Training
(June 21, 2011)...............................................................................A167

Draft News Release for April 20, 2012, Press Conference
(April 5, 2012) ..............................................................................A171

News Release for April 20, 2012, Press Conference (April 20, 2012)...............A172

E-mail From Erickson Announcing Press Conference
(April 19, 2012) .............................................................................A174

E-mail From Pfannenstiel Regarding Staffing for Operation Constant
    Gardener (April 19, 2012) ...............................................................A176

Overland Park Police Department Canine Report
    (April 20, 2012, 8:56 a.m.) .............................................................A177

E-mails Between Reddin and Pfannenstiel on Results of Operation
    Constant Gardener (April 20, 2012) ...............................................A179

Press-conference Notes for Sherriff Denning
    (April 20, 2012, 11:49 a.m.) ...........................................................A180

E-mail From Denning Instructing Staff to Cancel Press Conference
    (April 20, 2012, 12:50 p.m.) ...........................................................A182

E-mails From Senior Officers Commending Deputies on Operation
    Constant Gardener 2012 (April 20, 2012, 8:30 p.m.) ....................A183

Transcripts of News Reports on Operation Constant Gardener
    (April 20-21, 2012) .........................................................................A184

Case Communication Between Blake and Crime Lab
    (April 30, 2012) ..............................................................................A198

Johnson County Sheriff Criminalistics Laboratory Report
    (May 1, 2012).................................................................................A200

E-mails Between JCSO and Doug Peavey on Improper KN Reagent
    Field Test (Aug. 21, 2012) .............................................................A202

E-mails Between Reddin and Officers on Continued Gardening Store
    Surveillance (Jan. 22, 2013) ..........................................................A204

Minutes From JCSO Executive Team Meeting (April 1, 2013) ........................A205

JCSO Policy Memorandum on Field-test Kits (Oct. 28, 2013).........................A206

Results of Blake's Basic Competency Test for Field-test Kits
    (Dec. 16, 2013) ..............................................................................A210

JCSO Slides for Drug Field-test Training (Aug. 2014) ......................................A212

# VOLUME II

## Expert Materials & Photographs

Michael Bussell Declaration and Expert Report (Oct. 17, 2014) .......................A221

Michael Bussell Declaration and Expert Report (Jan. 20, 2015) .......................A248

Photographs of Brewed Teavana Tea (Oct. 15, 2014-Jan. 21, 2015)..................A264

Michael Bussell Declaration and Attached Photographs of Tea
    (Nov. 16, 2015) ....................................................................................A343

Michael Bussell Declaration and Attached Photographs of Harte
    Home (Nov. 16, 2015) ..........................................................................A367

Lynn Peavey Company QuickCheck Instructor's Guide for Drug
    Field-testing .......................................................................................A390

Photographs of Weapons, Gear, and Equipment (R.327-58)..............................A396

# VOLUME III

## Articles on Field Tests

Matt Johnson, *Narcotic Field-Testing*, Law & Order, June 1, 2003..................A462

Jacob Sullum, *No, I'm Not Using Slang.  It Really Is Tea*, Reason,
    Mar. 4, 2009 .......................................................................................A467

John F. Kelly et al., *The Non-Specificity of the Duquenois-Levine
    Field Test for Marijuana*, Open Forensic Science Journal, 2012..................A468

John Kelly, *False Positives Equal False Justice*, 2008 .....................................A473

Other News Articles Regarding the Unreliability of Drug Field Tests
    (R.327-64)...........................................................................................A513

## Depositions & Declarations

Peter Ruddick Deposition Excerpts ..................................................................A534

Thomas Reddin Deposition Excerpts ...............................................................A537

Mark Burns Deposition Excerpts....................................................................A544

Christopher Farkes Deposition Excerpts .......................................................A556

Tyson Kilbey Deposition Excerpts ................................................................A560

Edward Blake Deposition Excerpts ...............................................................A562

Michael Pfannenstiel Deposition Excerpts ...................................................A574

Laura Vrabac-Harris Deposition Excerpts ....................................................A579

Frank Denning Vol. I Deposition Excerpts ...................................................A581

Frank Denning Vol. II Deposition Excerpts...................................................A588

James Cossairt Deposition Excerpts ..............................................................A592

James Wingo Deposition Excerpts.................................................................A601

Larry Shoop Deposition Excerpts..................................................................A626

Robert Harte Declaration and Attachments ..................................................A645

Bradley Kustin (Addie Harte's Brother) Declaration ...................................A657

## VOLUME IV:  SEALED VOLUME

### <u>Exhibits</u>

Wingo E-mails Regarding June 21, 2011, Marijuana Grow Training
(Jan. 2011-June 2011) .................................................................................A659

Wingo Letter Inviting Law-enforcement Agencies to April 4, 2011,
Briefing to Discuss Operation Constant Gardener 2011 ..............................A667

Wingo E-mails Regarding Planning Operation Constant Gardener
2011 (April 2011)........................................................................................A668

Wingo Follow-up E-mails Assessing Operation Constant Gardener
2011 (April 2011)........................................................................................A676

Missouri State Highway Patrol News Release Regarding Operation
Constant Gardener 2011 (April 20, 2011) ...................................................A685

Wingo E-mails on Continued Gardening Store Surveillance
(July 2011-March 2012) ................................................................A686

Wingo Spreadsheet Entry Regarding Robert Harte's Visit to
Gardening Store ...........................................................................A695

JCSO Investigation Reports on Harte Family (April 2012) ..............................A696

Search-Warrant Affidavit and Search Warrant for Harte Residence
(April 17, 2012) ...........................................................................A705

### <u>Depositions & Declarations</u>

Robert Harte Deposition Excerpts ........................................................A711

Adlynn Harte Deposition Excerpts ........................................................A722

Lisa Jameson (Hartes' Next-door Neighbor) Declaration ..................................A725

David Morantz (Hartes' Neighbor) Declaration ...........................................A727

Adlynn Harte Declaration and Attachments ...............................................A729

 NATIONAL CRIMINAL JUSTICE REFERENCE SERVICE

 OFFICE OF JUSTICE PROGRAMS
BJA BJS NIJ OJJDP OVC SMART

## PUBLICATIONS

### NCJRS Abstract

The document referenced below is part of the NCJRS Library collection.
To conduct further searches of the collection, visit the NCJRS Abstracts Database .

How to Obtain Documents

| | |
|---|---|
| **NCJ Number:** | NCJ 201166  🔍 FIND IN A LIBRARY |
| **Title:** | Narcotic Field-Testing |
| **Author(s):** | Matt Johnson |
| **Journal:** | Law and Order  Volume:51  Issue:6  Dated:June 2003  Pages:131 to 132 |
| **Date Published:** | 06/2003 |
| **Page Count:** | 2 |
| **Annotation:** | This article discusses the features, uses, and training for narcotic field-testing. |
| **Abstract:** | Currently, several companies offer field-testing chemistry in various methods for identifying specific illicit drugs. The field-testing methods range from the earliest of single-ampoule test to the single and multiple-ampoule test pouches. There are even "aerosols" for narcotic identification, such as those offered by Mistral Security, Inc. All of these field-testing kits are proving to be useful tools in narcotics law enforcement. In determining when to use field-testing, officers must not initiate field-testing without prior indications to establish probable cause that drug laws have been violated. A field test of a suspicious substance can then be tested to "confirm" (not establish) probable cause for a narcotics violation. Substance-specific field-testing requires a basic knowledge of various illicit drugs, including their appearance and common packaging methods. Good training and experience will enable the officer to use a substance-specific test to confirm the probable cause. Officers must be trained in the use of specific field tests, since a number of legal substances may yield the same test results as an illegal substance. If there is any doubt after a field test, the sample should be sent to the crime lab for more thorough testing. |
| **Main Term(s):** | Police policies and procedures |
| **Index Term(s):** | Drug law enforcement ; Field drug analysis ; Investigative techniques ; Police field training ; Drug law enforcement training |
| **Publisher URL:** | http://www.lawandordermag.com |
| **Type:** | Instructional Material ; Issue Overview |
| **Country:** | United States of America |
| **Language:** | English |

**To cite this abstract, use the following link:**
https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=201166

* A link to the full-text document is provided whenever possible. For documents not available online, a link to the publisher's web site is provided.

Office of Justice Programs 🔗 ∀

- Bureau of Justice Assistance 🔗 ∀          ▪ Office of Juvenile Justice and Delinquency Prevention 🔗 ∀
- Bureau of Justice Statistics                    Office of Sex Offender Sentencing, Monitoring, Apprehending,
- National Institute of Justice 🔗 ∀             Registering, and Tracking 🔗 ∀
- Office for Victims of Crime 🔗 ∀

Contact Us | Feedback | Site Map
Freedom of Information Act | Privacy Statement | Legal Policies and Disclaimers
USA.gov | CrimeSolutions.gov
Department of Justice | Office of Justice Programs



# Narcotic Field-Testing


Magazine

**Law & Order**
June 1, 2003 | Johnson, Matt

Narcotic field-testing "chemistry" has in one way or another been around for years. ODV, Inc. developed and introduced "self-contained" chemistry ampoules in 1969 in response to the demands of U.S. Customs, providing all of law enforcement one more opportunity or "tool" for the "toolbox."

Today, several companies can be found offering field-testing chemistry in various methods from the earliest of single-ampoule test to the single and multiple-ampoule test pouches. You can even find "aerosols" for narcotic identification such as those offered by Mistral Security Inc. All of these are proving to be useful tools in our profession.

A number of years ago, during a "field-test" certification seminar, the instructor, in accordance with this particular company's training protocol recommended "poly" testing or in essence simply testing an "unknown" substance and moving on to another test based on the "color-reaction" observed with the first test. Although somewhat practical for a laboratory setting, this method of testing isn't the easiest at three in the morning standing alongside of the roadway.

In recent years we have learned through experiences both good and bad that officers need to be trained to use narcotic field-testing chemistry in a manner that ensures "substance specific testing." We are all too familiar with the "looks like a duck, walks like a duck - it's a duck" expression; this simplistic way of thinking applies to modern day field-testing, keeping in mind the phrase "field-testing" it's not "lab testing."

Unfortunately due to logistics and budgets most departments don't have the availability of a qualified forensic chemist who can respond to the roadside to provide reasonably assured identification of a particular substance. So what is "substance-specific" field-testing?

First, a clear and concise relevant fact needs to be established. Field-testing does not

establish probable cause. Field-testing is the confirmation of probable cause. Other circumstances already should have occurred before the use of a specific field-test is utilized.

If you are working in an undercover capacity and purchase a small bag of white powder described as cocaine from a suspect you have in essence established "probable-cause" that a crime has been committed. Field-testing that white powdered substance with a cocaine/crack cocaine specific test-pouch and observing a "positive" reaction within the test-pouch only confirms your probable cause. Unfortunately, lack of training and lack of understanding of the abovementioned concept has caused many headaches for law enforcement executives and prosecutors.

Substance-specific field-testing requires a basic knowledge of various illicit drugs including their appearance and common packaging methods. If an item "looks" like crack-cocaine and is packaged in a manner consistent with that of crack-cocaine there is a good chance its crack-cocaine, hence the use of a cocaine field-test pouch as opposed to a "defined-system" of various tests that lead to positive results in a cocaine test pouch.

Granted, a number of illicit substances can have the appearance and be packaged in a manner that would indicate it to be any number of substances, but generally speaking good training and experience will allow the officer to use a substance-specific test to confirm the probable cause. When in doubt don't put yourself in an irreversible bind send it to the crime lab!

We have all heard the famous words, "How hard can it be to use those test pouches? Just break the ampoules and shake it, right?" Wrong. Not providing proper training to a field-test user is like issuing a canister of pepper-spray and providing no training on its use, limitations, etc. The lack of training on both tools can lead to liability concerns. On several occasions, officers have been overheard talking about the use of cobalt thiocyanate to confirm their "suspicions" of a substance believed to be cocaine or crack-cocaine, "if it turns blue, its definitely cocaine or crack."

Although it is true that cocaine will develop a blue presence with the application of cobalt, so will several other non-illicit substances. Try applying cobalt on a small amount of diphenhydramine (Benadril); you will get the same color result that you would with cocaine. In this particular case, the proper use of an ODV pouch #904 would provide the user with more reliable results.

The test consists of a 3 ampoule self-contained pouch that requires the user to break the ampoules in a systematical manner that would develop a specific color upon the

breakage of each chemical-filled ampoule. In this case this particular field-test would require a blue color after breakage of the first ampoule and then a pink color after the second ampoule and finally a pink over blue color after the third ampoule, the point being that the test must follow the prescribed sequence and must indicate the prescribed colors in accordance with the directions.

If you don't get a pink solution on the second ampoule, do not proceed to the third ampoule. Simply discard the test. This sounds easy, but without proper training and instruction given inconclusive test results may be considered positive by some users and vice versa.

Training for the proper use of field-testing applications begins with a solid foundation of drug identification training including packaging and associated paraphernalia. A basic 8-hour drug identification course will suffice. Most companies offer "factory" training for their products and it is highly recommended that officers and investigators attend.

ODV, Inc offers a course on the proper use of their field-testing products that covers basic drug identification as well as the dos and don'ts of field-testing. Having completed such training will only prepare you that much more for court. Have copies of all drug related course certificates available and with you when attending court where the use of field-tests were a factor in the case.

Field-testing requires a basic set of principles and rules to follow to ensure proper use. Unfortunately, most officers and investigators underutilize field-testing in their day-to-day duties.

One of the best investigative techniques available to narcotic investigators is that of garbage or refuse examination. Finding pieces of burnt or raw marijuana would be evident in nature and could easily be field-tested to confirm your probable cause, but take the case of finding a small three-inch drinking straw with small white particles adhering to the inside of the straw, what now?

Sending such an item to the local crime lab could be not only costly for the department's budget but could be very time consuming. Officers and investigators need to think outside the realm of traditional use of field-testing and get creative with their use.

An officer could conduct a field-test to confirm his/her probable-cause by simply using a sterile cotton swab dipped into sterile water and running the swab through the straw, breaking the swab at the tip and inserting it into a cocaine test pouch. This would provide the same accurate results as field-testing powder-cocaine provided the

straw did in fact contain particles of cocaine. The same principles apply to field-testing of various pieces of drug paraphernalia.

The use of narcotic field-tests and their associated principles are simple in nature but often incorrectly used due to a lack of training. With proper training and instruction field-testing can be a great tool for the narcotics investigator. Although the use of field-testing has been commercially available to law enforcement for more than 30 years, such capabilities are by far underutilized in our profession.

## [Author Affiliation]

Matt Johnson is a narcotics investigator and has taught numerous narcotic field-test seminars nationwide. He may be reached via email at ravedrugs@aol.com.

Copyright Hendon Publishing Company Jan 2009. Provided by ProQuest LLC. All inquiries regarding rights or concerns about this content should be directed to Customer Service. For permission to reuse this article, contact Copyright Clearance Center.

HighBeam Research is operated by Cengage Learning. © Copyright 2014. All rights reserved.

www.highbeam.com

P-002307

Case 2:13-cv-02586-JWL   Document 327-56   Filed 11/17/15   Page 2 of 2

- Civil Liberties
- Drug Policy
- Criminal Justice

- Like on Facebook
- Google +1
- Share on Twitter
- Share on LinkedIn
- 
- Email
- 🖂 Send to Kindle
- 

# No, I'm Not Using Slang. It Really Is Tea.

Jacob Sullum|Mar. 4, 2009 3:17 pm

According to a new report (PDF) sponsored by the Marijuana Policy Project, field tests commonly used by police to identify marijuana and other drugs yield false positives in response to a variety of legal substances, resulting in the arrest and detention of innocent people. Worse, "millions of people have been, and continue to be, prosecuted and convicted of marijuana charges without proof that they possessed marijuana." The author, forensic drug expert John Kelly, says an investigation he conducted in collaboration with former FBI scientist Frederic Whitehurst "reveals a drug testing regime of fraudulent forensics used by police, prosecutors, and judges which abrogates every American's Constitutional rights."

Some of the cases Kelly cites may ring a bell. In April 2007, for instance, the NarcoPouch 928 drug test kit falsely fingered Don Bolles, drummer for the punk band The Germs, for GHB possession, reacting to a sample of Dr. Bronner's Magic Soap. "Subsequent testing," Kelly notes, "found that a wide variety of natural soaps as well as soy milk test positive for GHB." In August 2008, Ron Obadia and Nadine Artemis were detained at Toronto International Airport en route to the U.S. because the Duquenois-Levine color chemical test indicated that the raw chocolate they carried contained hashish. "Subsequent lab testing proved there was no hashish in the chocolate," Kelly writes. "They were released but stuck with a $20,000 legal bill." The same thing happened*again* the following month.

According to Kelly, "millions of people have been arrested, prosecuted, and convicted of marijuana charges on the basis of the Duquenois-Levine (D-L) color chemical test, both with and without a microscopic exam." Experiments with the D-L test described at the end of the report found that "patchouli, spearmint, and eucalyptus tested positive for marijuana, while lavender, cypress, and oregano (which previous studies showed produced false positives with the D-L test) gave inconclusive results." In tests using just the NarcoPouch KN Reagent kit, 33 of 42 substances—including vanilla, anise, chicory, and peppermint—tested positive for cannabis.

Nick Gillespie noted the Bolles case in 2007.

Jacob Sullum is a senior editor at *Reason* magazine and a nationally syndicated columnist.

Follow Jacob Sullum on Twitter

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com) /3/2014

22321                                                                                    SH004723

**A467**

4                    *The Open Forensic Science Journal*, 2012, 5, 4-8

Open Access

# The Non-Specificity of the Duquenois-Levine Field Test for Marijuana

John F. Kelly[*,1], Krishna Addanki[2] and Omar Bagasra[*,2]

[1]*1832 Biltmore Street NW Apt 35 Washington DC, 20009, USA*

[2]*South Carolina Center for Biotechnology, Claflin University, Orangeburg, SC 29115, USA*

**Abstract:** The purpose of this study is to determine the specificity, or lack thereof, of the Duquenois-Levine (D-L) field test kit in the identification of marijuana. Out of the forty-two samples tested, patchouli, spearmint, and eucalyptus tested positive for marijuana using the D-L field test. From these results, it can be concluded that the test is non-specific and can yield false positives. Therefore, it cannot be legitimately used for the prosecution or conviction of an individual for violations of the anti-marijuana laws as it does not provide proof beyond a reasonable doubt of the presence of marijuana. In fact, law enforcement personnel and the test kit manufacturer claim that the D-L field test is a specific, identification test with near perfect accuracy. In court, police officers testify falsely to the identification of marijuana in a seized substance based solely on the D-L test and other non-specific, screening tests leading to convictions. The result is the denial of the Constitutionally-guaranteed right to a fair trial, due process and countless wrongful marijuana convictions.

**Keywords:** Duquenois-Levine field test, False positive, Marijuana, NIK pouch test.

## INTRODUCTION

There are no published studies on the specificity of the Duquenois-Levine (D-L) field test or its capacity to render false positives. Manufacturers until recently have claimed that the test does render false positives, and therefore does not identify marijuana *per se*. But this assertion was not based on a published study. In 1996, Captain Allan C. Rothberg of the Philadelphia Police Department reported that in 1986, he, in conjunction with the DEA and the NIK field test manufacturer, had transformed controlled substance field tests into specific identification tests. "With well over 100,000 field tests (which included cocaine and heroin tests as well as marijuana tests) done to date", he wrote, "the accuracy has never dropped under 99+%" [1]. Rothberg provided no explanations or data to support his claim either in his unpublished report or when he was contacted by us. When we contacted the manufacturer in 2010, we were told that: "Independent testing has shown the presumptive test kits are about 99% reliable" [2]. The so-called independent testing cited by the manufacturer was Captain Rothberg's report as well as sworn affidavits and testimonies by law enforcement personnel that the (D-L) test does not render false positives. For instance, Terry Mills, while Supervisor of Drug Identification for the Georgia Bureau of Investigation, claimed to have never found a false-positive in more than 1,000 D-L tests [3]. Susan Hart Johns, while a drug analyst for the Illinois State Police, swore she found no false positives in 3-4,000 D-L tests [4]. As with Rothberg, there were no data to support these assertions.

However, it was theoretically possible that the D-L field test as opposed to the lab test was specific and did not render

*Address correspondence to these authors at the South Carolina Center for Biotechnology, Claflin University, 400 Magnolia Street, Orangeburg, SC 29115, USA; Tel: +803-535-5253; Fax: +803-535-5776; E-mails: obagasra@claflin.edu, kjohn39679@aol.com

false positives since no one had experimentally tested the field test. To address this question, we conducted the following experiments with both the D-L and KN Reagent field tests.

## MATERIALS AND METHODS

In 2008, the NIK NarcoPouch 908 D-L field test kit was used to analyze numerous non-marijuana substances (including plant extracts, chocolate, medications, etc.) following the prescribed procedures by NIK which are as follows:

1.  Remove clip, insert suspect material into test pack, reseal with clip and tap gently to assure material falls to the bottom of pack.

2.  With the printed side of the test facing you, break ampoules from left to right. Break by squeezing the center of the ampoule with tips of thumb and forefinger.

3.  Break left ampoule, agitate vigorously for at least one minute.

4.  Break middle ampoule and agitate gently. A blue-violet or purple color will develop within a few seconds to a minute if marijuana is present. Allow sufficient time for the blue-violet or purple to develop, but do not allow it to become too dark.

5.  As soon as the blue-violet or purple color develops, break the right ampoule. Tap the pouch once or twice and the blue-violet or purple color will be extracted into the lower layer. Upper layer color is unimportant.

6.  The formation of the proper blue-violet or purple color and its extraction into the lower layer is a positive test for marijuana.

## RESULTS

Patchouli, cypress, and eucalyptus tested positive for marijuana; while lavender, spearmint, oregano, and thyme gave inconclusive results. All other non-marijuana

1874-4028/12                    2012 Bentham Open

substances including Hershey's chocolate, over the counter medicine and a few detergents tested negative. Below are the pictures of Positive, False Positive, Inconclusive, and Negative test results. (See Fig. (1), Positive Result, False Positive Result, Inconclusive Test Result of Spearmint with D-L Test Image, Negative Test Result of Olive Oil with D-L Test Image).

## DISCUSSION

The NarcoPouch 908 D-L field test kit was found to be nonspecific and subjective. The positive testing of patchouli, spearmint, and eucalyptus for marijuana demonstrates the ability of this field test kit to produce false positives. Additionally, inconsistent and inconclusive testing results of lavender, cypress, and oregano demonstrate that the results of this field test are at the discretion of the tester's color discrimination abilities. In other words, the "proper blue-violet or purple" color which yields a positive test for

marijuana is different for each testing official; what is blue-violet or purple enough for a positive test result to one official may not be blue-violet or purple enough for another. This means the field tests cannot be legitimately used to identify marijuana in a seized substance. The significance of this finding cannot be over emphasized particularly in light of the fact that police officers around the country now testify and "identify" the presence of marijuana in a seized substance solely on the basis of marijuana field tests such as the D-L. Since the D-L field test cannot identify the presence of marijuana, this raises the serious possibility of tens of thousands of wrongful drug convictions.

Moreover, the DEA now claims that the D-L test does not render false positives and is "error-free", according to recent testimony by DEA senior chemist Heather Hartshorn [5]. Judge J. William Ryan called her testimony "ridiculous on its face' and noted that: "Any claim of infallibility is troubling. 'Scientists, along with all other individuals,



**1 a) Positive Test Result of Marijuana sample with the D-L Test**



**1 b) False Positive Test Result of Patchouli Plant Extract with the D-L Test**



**1 c) Inconclusive Test Result of Spearmint Plant Extract with the D-L Test**



**1 d) Negative Test Result with Olive Oil Plant Extract with the D-L Test**

**Fig. (1). (a) Positive Test Result.** The image is a result obtained on testing marijuana. The formation of the proper blue-violet or purple color and its extraction into the lower layer demonstrates a positive test result for marijuana using the D-L Test. **(b)** The image is a result obtained on testing Patchouli Plant Extract. The formation of the proper blue-violet or purple color and its extraction into the lower layer in both cases demonstrates a positive test result for Patchouli Plant Extract using the D-L Test. **(c) Inconclusive Test Result of Spearmint Plant Extract with the D-L Test.** The image is a result obtained on testing Spearmint Plant Extract Two distinct layers are present; however, the color in the top layer is brownish purple and the color in the bottom layer is brown thus rendering an inconclusive test result. **(d) Negative Test Result with Olive Oil.** The image is a result obtained on testing Olive Oil Plant Extract The absence of a blue-violet or purple color demonstrates a negative test result for marijuana.

*Kelly et al.*

evidence cognitive limitations that lead to frequent judgment error and that set surprisingly harsh restrictions on the capacity to manage complex information and to make decisions.' (David Faust. *The Limits of Scientific Reasoning*, 1, U. Minn. Press, 1984). Further, it is beyond cavil that such a claim of infallibility is anathema to the essence of science as understood in the last 100-plus years. Thomas Kuhn and Karl Popper, contemporary philosophers of science whose conceptions of the nature of science represent opposite-ends of the current spectrum, the former's scientific revolutions-as-paradigm-to-anomalies-to-revolution versus the latter's perpetual subjection of theory to falsifiability/testability, as well as thinkers a century-prior, all point to error as an inherent component of the scientific endeavor. (E.g., Popper, K.R., *Conjectures and Refutations: The Growth of Scientific Knowledge*, 116-117, Basic Books, 1963 ("[O]ur latest and best theory is always an attempt to incorporate all the falsifications ever found in the field, by explaining them in the simplest way; and this means ... in the most testable way"); Nietzsche, F.W. ("There are no facts, only interpretations") [6].

Hartshorn presented no data to support her claims of infallibility but persisted in her testimony that the D-L test in concert with two other screening tests is error-free as well as her testing. Combining screening tests does not add up to a specific identification test. Each retains its own non-specificity and error rate, and even if each test is positive for marijuana, each one could be a false positive. Hartshorn admitted that the D-L and the other two tests in isolation rendered false positives. But when they are combined they are error free as is her testing. This is possibly perjury especially since at least two DEA studies, including one at her lab that found a 20% error rate, have reported that the D-L test renders false positives [7] and what she claimed is scientifically impossible.

Hartshorn's unsubstantiated claims of infallibility echoed those of former and current DEA lab directors. For instance, on April 9, 1999, Joseph P. Bono, then-director of the DEA's Mid-Atlantic Laboratory and recent president of the American Academy of Forensic Sciences, submitted a sworn affidavit to the courts that all DEA analyses and tests are "incapable of producing a false positive. . . In other words, even if the test results are inaccurate, the results will not indicate the presence of a controlled substance when none is present in the unknown sample. Even if the instruments used in the testing are not properly calibrated, if no controlled substance is present in the exhibit, then no controlled substance will be identified . . . even when an instrument is not functioning properly, it will not identify cocaine, or any other controlled substance, as being present in a sample, unless that controlled substance is actually present" [8].

Bono's successor at this lab, Richard Fox, was more specific in his sworn affidavit which stated, in part, that: "There is no other plant material that will give a positive result for all three tests (including the D-L and two other screening tests) . . . Neither the analyst in this case, nor any other DEA analyst, has ever misidentified marijuana. . . As such, the uncertainty measurement associated with the conclusions reached by the analyst resulting in the identification of marijuana is zero" [9].

Fox's successor, James Malone, has testified, in part, as follows in a marijuana case in Washington, D.C. [10].

> *Prosecutor: To your knowledge, while you've been at the lab, has the laboratory ever misidentified a controlled substance?*
>
> *James Malone: No.*
>
> *P: Are you aware of anything which shows that a mis-calibrated system or chromatographer in this case, but any system that was not calibrated correctly would create a false positive for cocaine or a controlled substance?*
>
> *JM: No.*
>
> *Judge: But Mr. Chawla's position was, can it ever - can a mis-calibrated machine ever give a false positive?*
>
> *JM: No. A mis-calibrated machine isn't going to give you a positive cocaine if there's not cocaine.*
>
> *P: More specifically, if the reagent isn't working, is it going to show that the substance isn't marijuana? In other words, if the reagent isn't working, what's the result of the Duquenois-Levine going to be?*
>
> *JM: It's going to be negative.*
>
> *P: Would I get a positive out of a Duquenois-Levine test? If I used a reagent that wasn't working anymore and tried to run a Duquenois-Levine with that reagent, what would happen?*
>
> *JM: You wouldn't get a false positive, no.*

In short, the DEA now claims to have transformed the D-L test from a 99+% accurate test to a 100% accurate identification test that renders no false positives. Since DEA analysts claim to identify marijuana on this basis in court, this also raises the possibility of tens of thousands of wrongful marijuana convictions.

Thus, the current positions and operations of law enforcement personnel and the DEA are a serious concern and challenge to the legal and forensic science communities as they defy scientific and legal studies as well as court decisions that the D-L test alone or in combination with other tests is non-specific and does not provide constitutionally-required proof beyond a reasonable doubt of the presence of marijuana in a seized substance.

The D-L test is actually a combination of two individual tests. With the Duquenois test, a petroleum ether or chloroform extract of the plant extract is added to an ethanolic solution of vanillin and acetaldehyde, followed by the addition of concentrated hydrochloric acid. Marijuana gives a deep blue-violet color. With the Levine modification, the blue-violet test mixture obtained in the Duquenois test is shaken with chloroform. With marijuana, the blue-violet color is transferred into the chloroform layer. However, at least 50 legal substances have been shown to give the same color reactions.

                                                                                    P - 000215

As early as 1938, the French pharmacist Pierre Duquenois, who developed the Duquenois test, found that it was not specific and gave false positives. Yet, he reported that the test was specific. Although he claimed it was specific, he worked to modify the original test into the D-L test to eliminate false positives which he was unable to do [11].

In 1975, Dr. Marc Kurzman *et al.*, conducted a study, in collaboration with 13 other scientists, which concluded that: "The microscopic and chemical screening tests presently used in marijuana analysis are not specific even in combination for 'marijuana' defined in any way" [12]. Regarding the D-L test, Kurzman reported that: "the Levine modification test has now been proven to be simply a test for moderate weight molecular resorcinol, common plant chemical substances. The original Duquenois test was recognized in the 1960's as being highly non-specific. DeFaubert Maunder has reported finding (in a limited plant sampling) 25 plant species besides Cannabis which will give a positive Duquenois-Levine test. Smith has also found that 12 of 40 common plant oils and extracts will give a positive Duquenois-Levine test" [13].

Kurzman, who is also an attorney, proved his conclusion by winning dismissals and acquittals for his marijuana defendants on the basis that the tests were not specific and did not prove the presence of marijuana beyond a reasonable doubt [12].

The inadequacy of the D-L test has been noted by Armaki and his co-authors, "the unsatisfactory color tests Beam, Duquenois, and Chamrawy ... lack in adequate specificity..." [14]. Turk and his co-workers also reported that "the presently used colorimetric tests respond to a variety of vegetable extracts and to certain pure substances (i.e. false positives)" [15]. R.N. Smith found that 12 of 40 plant oils and extracts gave a positive D-L test [16].

M.J. de Flaubert Maunder questioned the reliability of the D-L test *per se* and of the 240 substances he tested, 25 tested positive for marijuana, i.e. false positives [13]. Maunder himself cautioned that the test "should never be relied upon as the only positive evidence ..." [13]. C.G. Pitt, R.W. Hemdron, and R.S. Hsia determined that the D-L test "is chemically based primarily on the presence of 1,3-dioxybenzene (resorcinol) partial structure" [17]. In other words, the D-L test will be positive for many resorcinols - commonly occurring plant substances and also found in common drug products. For example, Pitt found that *Sucrets* give a violet coloration for the test. They also tested a number of common monocyclic resorcinols and icyclic resorcinols (chromanols) and found them to give a positive D-L test. Pitt concluded that the D-L test is useful as a "screen" test but not sufficiently selective to be relied upon for "identification" [17].

Various courts have also found that the marijuana tests alone or in combination do not prove the presence of marijuana beyond a reasonable doubt. In 1973, the Supreme Court of Wisconsin ruled that "standing alone (the D-L/microscopic exam) is not sufficient to meet the burden of proving the identity of the substance beyond a reasonable doubt" [16]. The court also pointed out that even the prosecution's expert witness, Michael Rehburg, testified

"that neither of these tests was specific for marijuana. . . . It is without dispute in this record that functional group tests used by Rehburg . . . are not exclusive or specific for marijuana" [17].

In 1979, a trial judge in North Carolina blocked the conviction of C. Richard Tate by the use of the D-L test. The trial judge found that the D-L test was "not specific for marijuana" and had "no scientific acceptance as a reliable and accurate means of identifying the controlled substance marijuana" and allowed the defendant to suppress use of the test results on that basis [18]. This finding was upheld by the North Carolina Court of Appeals as well as the North Carolina Supreme Court which found that: "The determination that the test used was not scientifically acceptable because it was not specific for marijuana was amply supported by the facts. . . The trial court's ruling that the results of the tests conducted on green vegetable matter by using the Duquenois-Levine color test in the Sirchie drug kit were inadmissible in evidence was supported by the court's findings that the test is not scientifically accepted, reliable or accurate and that the test is not specific for marijuana because it reportedly also gives a positive reaction for some brands of coffee and aspirin. . . . The conclusion to exclude the test results is amply supported by these findings of fact . . . and the test results were properly suppressed ..." [19].

In 1979, the U. S. Supreme Court, in *Jackson v. Virginia*, found, in effect, that non-specific drug tests that render false positives such as the D-L, cannot prove the presence of marijuana, and therefore cannot be the basis for prosecution, let alone conviction [20].

## CONCLUSION

The devastating effect of admitting conclusory reports and the results of nonspecific drug tests such as the D-L test as evidence has been eloquently enunciated by Professor Edward Imwinkelried [21]. He wrote: "It is not only unnecessary for the courts to accept conclusory drug identifications based on nonspecific tests, it is also unwise for them to do so. The essence of the scientific method is formulating hypotheses and conducting experiments to verify or disprove the hypotheses. A proposition does not become a scientific fact merely because someone with impressive academic credentials asserts it is a fact. Testimony should not be treated as an expert, scientific opinion without a truly scientific basis, such as experimentation. Conclusory drug identification testimony is antithetical and offensive to the scientific tradition, and courts should not allow *ipse dixit* to masquerade as scientific testimony.

". . . It would eviscerate the *Jackson* standard to sustain conclusory drug identification in the teeth of the judicially noticeable fact that every test used to identify the substance is nonspecific. Even more importantly, sustaining such drug identifications places a judicial imprimatur on testimony that cannot justifiably be labeled scientific. The rejection of such identifications is necessitated not only by due process but also by the simple demands of intellectual honesty. After *Jackson*, sustaining conclusory, nonspecific drug identification evidence is both bad science and bad law" [21].

## ACKNOWLEDGEMENTS

Research support was provided by the Investigative Fund from The Nation Institute (JK) and a grant from National Institute of Justice (OB). We would like to acknowledge the inspiration of Dr. Frederic Whitehurst.

## CONFLICT OF INTEREST

Declared none.

## REFERENCES

[1]     Allan, C.R. *Narcotic Field Tests: A case study in successful implementation.* Unpublished report, 1995.

[2]     Personal communication from T. Allen Miller Products Manager, Forensics Investigation & Examination for Safariland 13386 International Parkway Jacksonville, FL 32218 July 14, 2010.

[3]     *The People of the State of New York v Juan Escalera*, Criminal Court of the City of New York, County of New York, 143 Misc. 2d 779; 541 N.Y.S. 2d 707; 1989, *Memorandum in Support of Conversion of Complaint to Information*, Judge Michael A. Gary, April 25, 1989 Affidavit, Terry Mills, Georgia Bureau of Identification, April 11, 1989.

[4]     *Ibid.*, Affidavit, Susan Hart Johns, Bureau of Forensic Science/Illinois State Police, April 11, 1989.

[5]     *In Re O.W.* D.C. Superior Court/Family Court, 09-DEL 1997, April 2, 2010

[6]     *Ibid.*

[7]     Hughes, R.; Warner, V. A study of "false positives" in the chemical identification of marihuana –drug enforcement administration laboratory notes. *Microgram*, Vol. IX, No. 7, July, 1976.

[8]     Declaration of Joseph P. Bono, Lab Director/DEA Mid-Atlantic Laboratory, Washington, D.C. April 9,1999, pp. 3-4.

[9]     Affidavit of Richard Fox, Lab Director/DEA Mid-Atlantic Laboratory, June 7, 2006, Washington, D.C., p. 1.

[10]    *USA v. Darryl M. Williams and Kevin Ross*, D.C. Super. Ct. Crim. Nos.2010 CMD 3630 and 2010 CMD 3631, Sept. 17, 2010, Tr. pp. 59, 60, 72.

[11]    Duquenois, P.; Moustaha, H.N. Identification and Assay of Cannabis Indicia. *J. Egypt. Med. Assoc.*, **1938**, *21*, 21.

[12]    Kurzman, M.; Fullerton, D. with contributions by Michael O. McGuire, Winning Strategies for Defense of Marijuana Cases: Chemical and Biological Issues, *J. Chem. Def.*, **1975**, *1*, 487.

[13]    De Faubert Maunder, M.J. Two simple colour tests for Cannabis, *UNODC Bulletin on Narcotics*, Issue 4 - 005, (1969), 37-42.

[14]    Aramaki, H.; Tomiyasu, N.; Yoshimura, H.; Tsukamoto, H. Forensic chemical study on Marijuana. *Chem. Phar. Bull. Japan*, 1968, *16*, 822.

[15]    Turk, R.F.; Dharir, H.; Forney, A. A simple chemical method to identify Marijuana. *J. Forensic Sci.*, **1969**, *14*, 389.

[16]    Smith, R.N. A Brief Note on the Response of Some essential Oils and Extracts to the Duquenois-Levine Test. *J. Forensic Sci.*, **1974**, *14*, 191.

[17]    Pitt, C.G.; Hemdron, R.W.; Hsia, R.S. The specificity of the duquenois color test for Marijuana and Hashish. *J. Forensic Sci.*, **1972**, *17*(4), 693-700.

[18]    *State v. Wind*, 60 Wis. 2d 267 (Supreme Court of Wisconsin, 1973) 208 N.W. 2d 357. See also *City of Eagan v. Mittledsorf*, Dakota County Court, Minnesota (1974) file f/4-1-8556; *State v. Byers*, (Municipal Court, Minneapolis, Minnesota, 1974) case #1371173; and *State of Missouri v. Richard Gilmore*, Missouri 3d Circuit District Court, October 9, 1974.

[19]    *State of North Carolina v. C. Richard Tate*, 300 180 N.C. S.E. 2d (1980)

[20]    *Jackson v. Virginia* 443 U.S. 307 (1979).

[21]    Imwinkelried, E.J. Jackson v. Virginia: Reopening the pandora's box of the legal sufficiency of drug identification evidence. *KY Law J.*, 1984, *76*(1), 11-12.

Received: October 12, 2011                    Revised: December 27, 2011                    Accepted: December 28, 2011

© Kelly *et al.*; Licensee *Bentham Open.*

This is an open access article licensed under the terms of the Creative Commons Attribution Non-Commercial License (http://creativecommons.org/licenses/by-nc/3.0/) which permits unrestricted, non-commercial use, distribution and reproduction in any medium, provided the work is properly cited.

A472                                                                                   P - 000217



P-002488



FALSE POSITIVES
EQUAL
FALSE JUSTICE

John Kelly

P-002489

## Written by John Kelly, ©2008

This report was made possible by a grant from the Marijuana Policy Project in collaboration with the Mintwood Media Collective.

Experiments were performed by Dr. Omar Bagasra and his assistant Krishna Addanki. Research material was provided by Dr. Frederic Whitehurst.

## To obtain additional copies of this report or further information, please contact:

**The Mintwood Media Collective**
1858 Mintwood Place, NW, #4
Washington, DC 20009
Phone: 202-986-6186
http://www.mintwood.com

**John Kelly**
Phone: 202-328-0178
Email: kjohn39679@aol.com

**The Marijuana Policy Project**
P.O. Box 77492
Capitol Hill
Washington, D.C. 20013
http://www.mpp.org

FALSE POSITIVES EQUAL FALSE JUSTICE                                      **1**

# EXECUTIVE SUMMARY

This two-year scientific/legal investigation reveals a drug testing regime of fraudulent forensics used by police, prosecutors, and judges which abrogates every American's Constitutional rights. The report is a call to action by former FBI chief scientist and narcotics officer, Dr. Frederic Whitehurst and writer and forensic drug expert, John Kelly, for lawmakers to enact a moratorium on the use of these tests and to create the necessary oversight and control of drug testing to protect the public's basic freedoms. While the report does not examine blood or urine drug tests, it does examine in depth lab tests as well as field tests used by police, jails, schools, border guards, parents and others to determine if a suspected substance is in fact an illegal drug.

Even before the attacks of September 11, 2001, there's been a decades-long rise in the security scrutiny Americans undergo ostensibly for our own good. We live in a society where the government does not trust the unsearched general public to sit in the same room with its leaders nor tell the truth about drug use. Unfortunate events have given rise to an unprecedented reliance on technology to prove true or false, safe or unsafe, rather than honest interaction as civilizations have relied on for centuries.

One only has to look at the decades-old War on Drugs to see how we've handed over personal privacy and reason to law enforcement in the name of reducing the perceived harmful impacts of drug use. Tragically, the extensive array of lab and field drug tests used today, while intended to aid the government in law enforcement, too often mislead police with false results that punish Americans with wrongful prosecutions and incarcerations.

Contained in this report are the results of experiments performed with field drug test kits that expose and document that they render false positives with legal substances. Based on the false positives, people continue to be wrongfully charged with, and prosecuted for, drug crimes. It is all too clear from the new research that there are numerous victims of false positives who have had a traumatic and costly experience that sometimes involves being held in jail for days, weeks or longer while waiting for more accurate confirmation tests to exonerate them. It is also revealed that the false positive based arrests can lead to costly lawsuits for local and state governments by outraged victims.

*False Positives Equal False Justice* documents that law enforcement officials, forensic drug analysts, and prosecutors knowingly employ the flawed Duquenois-Levine and KN Reagent tests as well as mere conclusory police reports to wrongfully prosecute and convict millions of individuals for anti-marijuana law violations. These wrongful prosecutions and convictions violate Supreme Court rulings, specifically *Jackson v. Virginia* and *Daubert v. Dow Merrell Pharmaceuticals, Inc.*, which prohibit the use of inaccurate, nonspecific tests and/or conclusory reports because they do not prove the presence of marijuana in a seized substance. In other words, millions of people have been, and continue to be, prosecuted and convicted of marijuana charges without proof that they possessed marijuana.

*False Positive Equals False Justice* is a siren alerting policy makers at all levels of government to end the use of field drug tests which have been proven to be unreliable. The former law enforcement officials, researchers, organizations and businesses that made this report possible must not have uncovered the truth in vain. It is imperative that law enforcement agencies take notice and voluntarily end the use of these flawed drug tests. The essential need of protecting the innocent must outweigh the convenience of a field drug test that only gives accurate information some of the time.

2                                                          FALSE POSITIVES EQUAL FALSE JUSTICE

*It is fortunate for us that the identification of marijuana has never been legally challenged. However, this situation may not last too long.*

  –UN Narcotics Report, 1961

*The Duquenois test, the most widely used chemical test, is a somewhat enigmatic reaction whose mechanism is poorly understood.*

  –John Thornton and George Nakamura, 1972

*We take judicial notice of the frightening rise of illicit drug use . . . in this country which is rapidly approaching epidemic proportions. However, we cannot allow this fact to result in a lessening of the state's requirements of proving each element of the crime beyond a reasonable doubt, for this requirement has long been a metaphysical cornerstone of our criminal law.*

  –Slettvet v. State, 280 N.E. 2d 806, 809 (Ind. 1972)

## Prologue

Although the NIK NarcoPouch 908/Duquenois-Levine Reagent field test kit is the most widely used field test for identifying marijuana, there are no published studies as to its validity, reliability, or specificity, i.e., its capacity to render false positives. This is of particular concern because the company that produces the kit has written that: "The results of a single test may or may not yield a valid result. . . There is no existing chemical reagent test, adaptable to field use that will continually eliminate the occurrence of an occasional invalid test results [sic]. A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance."[1] At the same time, the company claims that it has conducted and continues to conduct hundreds of validity and specificity studies but has not published any of these studies and, indeed, refuses to release this information.[2]

This in an unacceptable state of affairs from both a legal and scientific standpoint because millions of people have been arrested, prosecuted, and convicted of marijuana charges on the basis of the Duquenois-Levine (D-L) color chemical test, both with and without a microscopic exam. Under the Supreme Court decision known as *Daubert*, all drug tests must be valid which is to say they do what they claim they do. In this case, identify marijuana to the exclusion of all other drugs. Under the Supreme Court decision known as *Jackson*, all drug tests must be specific, i.e., they do not test positive for legal substances, if they are the sole basis for prosecution and conviction. In other words, if the D-L test is not specific, it cannot be the basis for a prosecution or conviction.

## Introduction

On her way home for Christmas break in 2003, Bryn Mawr honor student, Janet Lee was arrested at the Philadelphia airport. Her checked luggage had three condoms filled with a white powder which the cobalt thio-cyanate (C-T) test indicated was cocaine. Lee insisted that the condoms contained flour and were squeeze-toy stress relievers she used during exams. But her protests were in vain, and she spent the next three weeks in jail on drug charges that could bring up to 20 years in prison. Fortunately for her, a jail guard recognized her from volunteer work and contacted their volunteer group which obtained an attorney who demanded more extensive testing. These tests confirmed that the powder was flour. Two years later, Lee was awarded $180,000 by the city.



The NarcoPouch 928 GHB Reagent Test rendering a false positive after testing Dr. Bronner's Magic Soap.



The NarcoPouch 928 GHB Reagent Test rendering a negative result.

**A477**

FALSE POSITIVES EQUAL FALSE JUSTICE                                                              3

On April 4, 2007, Don Bolles, drummer for the punk band, *The Germs,* was arrested and jailed for three and a half days because the bottle of Dr. Bronner's Magic Soap found in his possession tested positive for the drug GHB. Police tested the soap at the scene using the NarcoPouch™ 928 field drug kit. Subsequent testing found that a wide variety of natural soaps as well as soy milk test positive for GHB.



The NIK Duquenois-Levine rendering a false positive after testing a chocolate bar.

On August 22, 2008, Ron Obadia and Nadine Artemis were arrested, handcuffed to a chair, and interrogated for hours at the Toronto Airport after their raw chocolate tested positive for hashish with the Duquenois-Levine color chemical test. They were placed in separate rooms and were told that they faced "life in prison" if they didn't confess. Each of them was also told that the other already had confessed. Subsequent lab testing proved there was no hashish in the chocolate. They were released but stuck with a $20,000 legal bill. They subsequently attempted to again travel to the U.S. on September 11, 2008. This time, Obadia was arrested by U.S. authorities and charged with possession of hashish after his raw chocolate tested positive with the Duquenois-Levine test. He was arrested and released and again after thousands in legal costs, he was totally exonerated.

## In the Beginning

"Beginning in 1972," according to the *Journal of Criminal Defense,* "Bob Shapiro and James Shellow . . . made the 'chemical defense' famous. . . By insisting that forensic chemists conduct accurate and comprehensive analyses, Messrs. Shapiro and Shellow have wrought a revolution in forensic chemistry. The federal government and the states have had to free people on the basis of evidence that just a few years ago would have been sufficient grounds for conviction. Drug enforcement laboratories have had to go back to school to study chemistry. Defense lawyers have had to learn what the 'chemical defense' is and how to use it. In short, every courthouse in America, advertently or inadvertently, has been affected by the 'chemical defense'"[5]

The journal added that: "In the April, 1976 issue of *Microgram,* the Drug Enforcement Administration's official publication, a warning appears on the front page reminding forensic chemists always to distinguish between isomers of cocaine. The implication of this warning is clear: Messrs. Shapiro and Shellow have caused the D.E.A. to subscribe to drug analyses that are both rigorous and responsible."[6]

Proof that this revolution is dead came in 2007, when U.S. District Court Judge William Alsup declared *ex cathedra* that the combination botanical exam/Duquenois-Levine test for marijuana, the so-called Thornton/Nakamura protocol, and the cobalt thiocyanate (C-T) test for cocaine (Both of which are considered "no good" by Shapiro and Shellow.) were valid, confirmatory tests which had never rendered false positives.[7] The epitaph on the revolution's tombstone came on February 13, 2008 when U.S. Attorney Joseph P. Russoniello wrote U.S. District Judge Jeremy Fogel that: "The DEA does not have 'protocols' as such. The DEA does not have guidance set forth in one particular document type or "protocol" which provides, for example, detailed instruction on how one is to test methamphetamine using a particular instrument."[8] Russoniello also reported that the DEA conducts no independent, blind proficiency testing of its drug analysts, and in 2007, DEA labs analyzed 57,523 exhibits.

Ironically, it was in 1972, that the Thornton/Nakamura protocol for proving the presence of marijuana was established, laying the seeds for the quick demise of the chemical defense revolution at its birth. It is with the Thornton/Nakamura protocol, in particular the Duquenois-Levine (D-L) test that I begin as its history documents that millions of individuals have been, and continue to be, convicted of possessing and using marijuana without proof that they indeed possessed it.

As it enters its 70th year, the D-L test has yet to be validated despite being involved in the arrests, prosecutions, and convictions of millions of individuals. The handful of forensic studies done to demonstrate the accuracy and reliability of the D-L test and justify its use in cases are themselves invalid and seriously flawed. For instance, typi-

4                                                        FALSE POSITIVES EQUAL FALSE JUSTICE

cal of forensic science articles on drug tests was a seemingly authoritative 2000 study funded by National Institute of Standards and Technology (NIST) and co-authored by Alim A. Fatah of the Office of Law Enforcement at NIST which claimed to have validated the D-L test. Indeed, the title of the article published in *Forensic Science International* was "Validation of twelve chemical spot tests for the detection of drugs of abuse."[10] To validate a drug test means to demonstrate that it is specific, i.e., the test identifies that specific drug to the exclusion of all other drugs. According to the authors themselves, they did not validate these 12 tests because they found they were non-specific, i.e., rendered false positives. "A positive CST (color spot test)," they wrote, "may indicate a specific drug or class of drugs is in the sample, but the tests are not always specific for a single drug or [class]"[11] The term "not always specific" – as well as "relatively specific" which was also used by the authors – is unscientific, illogical, deceptive, and indicates unreliability. How can a test be specific sometimes and not specific at other times? If it's not always specific, it's nonspecific which is what they found: "For example, cobalt thiocyanate (A.1) is used to detect cocaine. However, many other drugs will also react with this reagent and each analyte that tested positive with cobalt thio-cyanate, produced a strong blue color (the same as cocaine)."[12] Speaking of the D-L test, they wrote that "mace, nut-meg and tea reacted with the modified Duquenois-Levine [test],"[13] i.e., produced false positives. It should be noted also that there are literally millions of compounds that were not checked to determine whether they rendered false positives with the D-L test.  Moreover the authors ignored scientific articles which have reported more than a hundred substances which render false positives with the D-L test. This omission violated elementary scientific research and publication principles and requirements.

Even if they had somehow found the tests to be specific, it would have been meaningless because, as they admitted, the D-L test is subjective: "[A]ctual color [may] vary depending on [the] color discrimination of the analyst."[14] In other words, an analyst's or police officer's vision (including that of the authors) could cause a false positive or even a false negative. Without resolving this impediment to accuracy and objectivity, they should not have concluded the test was valid even as screen test. People are arrested and jailed on the basis of this test. By definition, subjective means unreliable.  So the results of the D-L test are inadmissible as evidence under *Daubert*. The D-L test adversely affects the life, liberty, and pursuit of happiness of millions of individuals. This study is part of this adversity as it is cited by drug analysts, prosecutors, and judges in justifying its use and admitting its results as evidence.  It was recently so cited in the *USA v Diaz* case in San Francisco which is a drug case involving the death penalty. Indeed, citing this and other invalid studies, U.S. District Judge William Alsup declared: "Despite the many hundreds of thousands of drug convictions in the criminal justice system in America, there has not been a single documented false-positive identification of marijuana or cocaine when the methods used by the SFPD Crime Lab (which include the D-L test) are applied by trained, competent analysts."[15] A few months before Alsup's declaration, the U.S. District Court for the Southern District of New York decreed that: "False positives – that is, inaccurate incriminating test results – are endemic to much of what passes as forensic science."[16] Even a manual that accompanies the D-L field kit states that: "There is no existing chemical reagent system, adaptable to field use that will completely elimi-nate the occurrence of an occasional invalid test result."[17]

The best known D-L "validation" study was published in 1972 by John Thornton and George Nakamura.[18] It in-stantly became the gold standard and protocol across the country for marijuana identification and still is. Like the NIST study, this report is internally contradictory, inconsistent, and scientifically flawed. On the front page of this article it states that the D-L test is a "confirmation" test "of marijuana."[19] By definition, confirmatory tests are valid and reliable; prove the presence of a drug beyond a reasonable doubt; and are specific, i.e., identify the drug to the exclusion of all other drugs and do not render false positives. They are also selective, i.e., do not render false negatives.

However, the imprecise, unscientific language and syntax of the article and its actual data contradict its conclusion that the D-L test is a confirmatory test. For instance, the authors wrote: "The occurrence of cystolithic hairs are an important criterion of the identification of marijuana leaf fragments. . . In any event, cystolithic hairs cannot be used as a sole criterion for marijuana identification. The Duquenois-Levine test is found to be useful in the confirma-tion of marijuana, since none of the 82 species possessing hairs similar to those found on marijuana yield a positive test."[20] The term "found to be useful" is imprecise and scientifically inadequate. The D-L test is either a confirmato-ry test or it is not. Vague imputations are unacceptable conclusions. This is especially true with these studies because

FALSE POSITIVES EQUAL FALSE JUSTICE                                                    5

drug analysts look to these studies to assure that their tests are valid, and prosecutors cite these studies to convince judges to admit the results of these tests into evidence.

Even the sample of plants checked for cystolithic hairs and tested with the D-L test was woefully inadequate. The authors themselves wrote that there were more than 31,000 plants – actually there were at least 195,000 – which may have cystolithic hairs and test positive for marijuana. The authors also reported that there were two non-marijuana substances found to render false positives with the D-L test which the authors did not test. This means they did not prove specificity. Nonetheless, the authors claimed that the D-L test is specific: "The specificity of the Duquenois reaction has been established, empirically at least, over the past three decades (Ed. Note: No citations). No plant material other than marijuana has been found to give an identical reaction."[21] They added that: "The original Duquenois reaction was adopted as a preferential test by the League of Nations Sub-Committee on Cannabis (Duquenois, 1950). A modification of the test has been proposed by the United Nations Committee on Narcotics (1960) as a universal and specific test for marijuana. The modification referred to is the addition of chloroform to the final colored complex, a technique suggested by the U.S. Treasury Department Bureau of Narcotics (Butler, 1962). This modification of the test would seem to insure the specificity of the reaction, as the reactive phenolic materials other than the constituents of marijuana resin do not give colors soluble in chloroform. This has lead [sic] the UN Committee on Narcotics to conclude that there is nothing other than marijuana which will give exactly the same Duquenois reaction (Farmilo et al, 1962)."[22] All of these assertions have now been proven false.

As was the case with the NIST sponsored study, the article itself is invalid and cannot be legitimately cited by drug analysts or prosecutors because the D-L test is subjective since it depends on the color discrimination of the tester. This is the type of peer review that should have led the journal to reject the article. Subsequent to its publication, scores of substances were found to render false positives with the D-L test, and the UN declared that the D-L test was only a screening test and that the only valid test for marijuana and cocaine is gas chromatography/mass spectrometry (GC/MS). There has been no published response to this turn of events from Thornton, Nakamura, or anyone else in the forensic drug testing field.

The devastating effect of admitting conclusory reports and the results of nonspecific drug tests such as the D-L test as evidence has been eloquently enunciated by Professor Edward Imwinkelried.  He wrote: "It is not only unnecessary for the courts to accept conclusory drug identifications based on nonspecific tests, it is also unwise for them to do so. The essence of the scientific method is formulating hypotheses and conducting experiments to verify or disprove the hypotheses. A proposition does not become a scientific fact merely because someone with impressive academic credentials asserts it is a fact. Testimony should not be treated as an expert, scientific opinion without a truly scientific basis, such as experimentation. Conclusory drug identification testimony is antithetical and offensive to the scientific tradition, and courts should not allow *ipse dixit* to masquerade as scientific testimony.

". . . It would eviscerate the *Jackson* standard to sustain a conclusory drug identification in the teeth of the judicially noticeable fact that every test used to identify the substance is nonspecific. Even more importantly, sustaining such drug identifications places a judicial imprimatur on testimony that cannot justifiably be labeled scientific. The rejection of such identifications is necessitated not only by due process but also by the simple demands of intellectual honesty. After *Jackson*, sustaining conclusory, nonspecific drug identification evidence is both bad science and bad law."[23]

## USA v. Diaz

A glaring example of intellectual dishonesty and a judicial imprimatur on bad science and bad law was U.S. District Court Judge William Alsup's admission into evidence of the results of the D-L test in the on-going *U.S. v. Diaz* case in San Francisco. Section 702 of the Federal Rules of Evidence assigns to district courts the role of gatekeeper and charges the courts with assuring that expert testimony and forensic tests rest on a reliable foundation and are relevant to the task at hand. (*USA v Hermanek*, 289 F. 3d 1076 [9th Cir. 2002])

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*, (509 U.S. 579, 593-94 [1993]), the Supreme Court created a flexible, factor-base approach to analyzing the reliability and validity of forensic tests and expert testimony. These factors include: (1) whether a method can or has been tested; (2) the known or potential rate of error; (3) whether the meth-

6                                                         FALSE POSITIVES EQUAL FALSE JUSTICE

ods have been subjected to peer review; (4) whether there are standards controlling the technique's operation; and, (5) the general acceptance of the method within the relevant community.

The Supreme Court further explained that a district court has "considerable leeway in deciding in a particular case how to go about determining whether expert testimony is reliable." (*Kumho Tire v. Carmichael*, 525 U.S. 137, 152 [1999]). Alsup's interpretations, analyses, and rulings in the case of *USA v Diaz* demonstrate that this "leeway" is an open sesame, a recipe for disaster, error, and injustice. Regarding marijuana, Alsup wrote that: "Together, cystolithic hairs and clothing hairs were botanical features unique to marijuana."[24] This is patently false. If it were true, i.e., that certain hairs were unique to marijuana, this would be the only test necessary for confirming the presence of marijuana. In a study, cited by Alsup himself, George Nakamura reported 82 plants resembling marijuana with cystolithic hairs[25]. Even using the presence of cystolithic hairs as a screening test, one has to show the presence of calcium carbonate deposits, or they are not cystolithic hairs. Again, this was pointed out as a requirement by Nakamura's study. The SFPD crime lab does not perform this simple test, yet Alsup ruled that it did not matter. The lab's analysts could simply report that they saw cystolithic hairs, and this would suffice as valid evidence useable as such at trial.

The D-L test suffers from additional deficiencies not addressed by Alsup. For instance, the sequence of colors observed in the D-L test is also used by some forensic analysts to help "identify" marijuana. In 1950, Duquenois completed a United Nations study in which he noted, "The reaction is very specific if one considers the succession of tints. . ."[26] However, it was subsequently noted in another UN study that "the speed of the reaction was so great that it was usually impossible to observe the gradual changes of color described by the authors of the test (green to grey to indigo to violet). It should be mentioned that in some types of Cannabis the initial color was found to be pink instead of green."[27] The authors of this report observed that: "It is probably fortunate for us that the identification of marijuana has never been legally challenged. However this situation may not last too long."[28]

Several studies have found that the observed colors and intensities of the D-L test are time dependent and that using a fixed time longer or shorter than twenty minutes to observe the test results increased the number of false positives with non-marijuana substances. The SFPD lab protocols state that the analyst should start noting the color development "about 10 seconds after adding the Duquenois reagent and concentrated hydrochloric acid."[29] In other words, the lab consciously employs an inaccurate, unreliable version of the test.

Another study, provided to Alsup, concluded that: "The microscopic and Duquenois-Levine chemical test should be used as a screening method only."[30] Judge Alsup failed to mention many articles showing that the marijuana identification tests used by the SFPD lab are unreliable and invalid even though most of these articles were provided to him by defense attorneys. Perhaps the most comprehensive deconstruction of the combination D-L/botanical examination test prescribed by  George Nakamura and cited by Alsup was  the article "Winning Strategies for Defense of Marijuana Cases: Chemical and Botanical Issues" by Marc G. Kurzman, Dwight S. Fullerton, and Michael O. McGuire in the *Journal of Criminal Defense*.[31]

Kurtzman et al wrote that:

"It is usually concluded by forensic analysts that the microscopic test, combined with the Duquenois-Levine color test, is therefore  specific for marijuana. Applying the four criteria discussed before … we clearly see that specificity has not been established.

" 1. The plant sampling used by Nakamura was not representative of all flowering plants... Second, Nakamura considered only the dicots, and not the monocots ( some of which are commonly mixed in samples of presumed marijuana) including at least 50,000 species.

2. The Duquenois Levine color test has subsequently been shown to be quite non-specific.

3. Nakamura cautions the analyst to depend 'not only on the presence of cystolith hairs, but on its association with the ... nonglandular hairs ... and if present, the fruits and hulls, the glandular hairs and the flowering tops ...' These additional features have never been proven to be specific for marijuana nor claimed to be by Nakamura. For example, it has been reported that many plants have glandular hairs 'which, particularly if they are crushed and fragment-

**A481**

FALSE POSITIVES EQUAL FALSE JUSTICE                                                7

ed may be confused with the glandular hairs of marijuana. Included among these plants are lavender, oregano, and other members of the Labiatae (mint) family and tobacco, all of which are commonly misidentified as marijuana.'

4. … If… one takes the time to learn which plant families have cystolith hairs, stalking glandular hairs, and sessile hairs … the results are remarkable. Families cited as having species with cystolith hairs, 24; with sessile hairs-glands, 80; with all three hair types, 13; with filament hairs, 18. Families cited by Nakamura as having species with cysto-liths specifically resembling those of Cannabis, 13; the number of those families also containing species with stalked glandular hairs, 11"[32]

As Kurtzman et al noted: "For purposes of discussion, let's assume that we could eliminate 99% of all the 200,000-500,000 flowering plants by using marijuana screening tests, including gross observation of the fragmented plant. That still leaves 2,000-5,000 different plant species which could pass."[33]

Kurtzman et al concluded that "the Duquenois-Levine color test is not specific for marijuana, and if it is to be used at all, it should be used with a specific time limit and with a visible spectrophotometer to reduce the number of non-Cannabis samples giving positive tests."[34] The SFPD lab does neither.

The SFPD lab botanical exam only seeks to confirm the presence of the cystholithic and clothing hairs. It does not look for flowering tops, fruits or hulls. Nor does it test the presumed cystolithic hairs for calcium carbonate which Nakamura wrote was essential. Thus, even by Nakamura's standards, the SFPD test falls short. Judge Alsup stated several times that the cystolithic hairs are "unique" to marijuana which is why the botanical exam is a valid, confir-matory test just by itself. Nakamura himself pointed out that the cystolithic hairs are not unique to marijuana which is why the botanical exam is inadequate, certainly by itself. No one has ever published that cystolithic hairs are unique to marijuana.

Dr. Frederic Whitehurst analyzed the Thornton/Nakamura protocol in 2008. He wrote that "[I]n papers published in 1969 and 1972, George Nakamura proposed an analytical protocol or procedure for identifying marijuana that is widely used in forensic labs to this day. Nakamura, whose 1972 paper was co-authored by John Thornton, pro-posed a botanical examination in combination with the Duquenois-Levine reagent test to confirm the presence of marijuana.

"Since marijuana is a dicotyledon, Nakamura first microscopically examined 600 species of dicotyledons from which he identified 82 which had the so-called "bear claw" and "clothing" cystolith hairs of marijuana. He then subjected each of these samples to the Duquenois-Levine chemical test, and only the marijuana sample tested posi-tive for marijuana.

"This was okay as far as it went, but it didn't go nearly far enough because there were about 199,400 dicotyle-dons which Nakamura did not examine or test. As he he noted: 'Representative species that bear cystolith hairs or hairs accompanied by independent calcified growth in the leaf, most of which are similar in structure to those of Cannabis, are listed below. No attempt was made to prepare a comprehensive listing because of the sheer mag-nitude of the task of examining 31,874 dicotyledons. (It has since been discovered that there are some 200,000 dicotyledons)."[35]

This means there are almost 200,000 dicotyledons which may have cystolith hairs and may test positive for mari-juana. So his experiment cannot be considered a validation of the protocol. Further undermining the validity of the proffered protocol was Nakamura's remark that "[M]icroscopic identification of marijuana, therefore, depends upon not only the presence of cystolith but on its association with the clothing, or nonglandular hairs, on the other side of the leaf, and, if present, the fruits and their hulls, the glandular hairs, and the flowering tops as set forth in the U.S. Treasury Manual."[36]

As Whitehurst observed: "Nakamura's dependence upon not only the cystolithic hairs but also 'if present, the fruits and their hulls, the glandular hairs and the flowering tops' is troubling to the analyst who is left with a choice of a protocol without clear parameters. Do we need to see the fruits, their hulls, the glandular hairs and flowering tops or can we simply stop with the crystolithic hairs?. . .

P-002497

8                                                              FALSE POSITIVES EQUAL FALSE JUSTICE

"When we identify marijuana, we declare that the features we see, the data we collect, is unique to marijuana to the exclusion of all other plants. Can we say that today?

"Can a law enforcement officer without any training, experience or education in at least botany, not to mention the taxonomic features of plants, say that what he is seeing in the evidence he has just seized is marijuana to the exclusion of all other plants? Can the forensic lab examiner after having detected the presence of bear claws as well as clothing hairs on leaf surfaces and then subjecting the material to the Duquenois-Levine test say that those tests uniquely identify marijuana to the exclusion of all other plants?

"The obvious answer is 'no,' yet this is what happens daily in the United States ultimately resulting in tens of thousands of convictions."[37]

Whitehurst concluded that: "As Kurzman's paper was written in 1975, it would seem that the use of the hairs on marijuana leaves and the purple alchemy of the D-L test would have long since been successfully challenged and would no longer be useful as evidence in courts of law. In some jurisdictions, identification is even carried out by law enforcement officers with no more than visual, not microscopic, analysis and suspected marijuana is never even sent to a crime lab.

"A review of the scientific literature concerning the identification of marijuana utilizing the microscopic analysis of crystolithic hairs on the top and bottom of alleged marijuana leaves as well as the chemical test known as the D-L test reveals that we have no idea how likely are the observed results if the samples did or did not have a common source. There has not been enough basic research nor has the protocol been properly validated. The Kurzman mystery here is simply how is it that this protocol is still being utilized to decide whether human being should be confined to cages and, at times, to death chambers?"[38]

As explained in *Fitness for Purposes of Mass Spectrometric Methods of Substance Identification*: "Moreover, it must be realized that a 'positive' confirmation test thus obtained is not an unambiguous identification of Y (unknown substance). It only shows that the test result is not against the presumptions. Other substances may be able to give results that are the same or indistinguishable from those of Y. Therefore, unambiguous identification of Y is achieved if all other (relevant) substances can be excluded, so that Y remains the only possible candidate  [even]  if one focuses only on those that have some relevance to the field of analysis [data] on thousands of substances per field is necessary."[39]

Moreover, Nakamura's testing methods were different from and more extensive than the SFPD lab's marijuana tests, and thus do not speak directly to the validity or reliability of the SFPD lab's methods and tests. For example, Nakamura tested for the presence of calcium carbonate in the hairs of samples since it is present in marijuana leaves. As noted, the SFPD lab does not even test for calcium carbonate in its suspected marijuana evidence. Nakamura also employed photomacrography to measure and compare the sizes of marijuana hairs. The SFPD lab seldom uses photo comparisons or any measurement techniques.

The authors of the Kurzman article, one of whom was Dr. Dwight Fullerton, then-assistant Professor of Medicinal Chemistry at the College of Pharmacy, University of Minnesota, go on to review the many findings of false positives with the D-L test and conclude that "the Duquenois-Levine color test is not specific for marijuana, and if it is to be used at all, it should be used with a specified time limitation and with a visible spectrophotometer to reduce the number of non-Cannabis samples giving positive tests."[40]

The inadequacy of the D-L test has been noted by Armaki and his co-authors, "the unsatisfactory color tests [named] Beam, Duquenois, and Chamrawy ... lack in adequate specificity..."[41] Turk and his co-workers also reported that "the presently used colorimetric tests respond to a variety of vegetable extracts and to certain pure substances (i.e. false positives)."[42] R.N. Smith found that 12 of 40 plant oils and extracts gave a positive D-L test.[43]

M.J. de Flaubert Maunder further questioned the reliability of the D-L test *per se* by stating that it depended on the subjective judgment of the analyst. "[A] positive test," he wrote, "is not recorded until this color (pink/mauve) has been identified, and because it is almost impossible to describe in absolute terms it is best recognized by experience, as are the color transitions in the acid solution."[44]

**A483**                                                                          P-002498

FALSE POSITIVES EQUAL FALSE JUSTICE                                                     9

A chemical identification test should be independent of the experience or judgment of the analyst as long as the analyst knows how to correctly carry out the test and follow the protocol. Otherwise, a second analyst could not necessarily replicate the procedures and findings of the first analyst.

Maunder further reported a number of substances which "gave a red to blue chloroform solution which, without careful observation of the speed and sequence of color development after the addition of the acid, may be difficult to distinguish from the cannabis color. None of these materials gave precisely the same color behavior as fresh cannabis, but most could not be readily distinguished from the reaction with old, or trace amounts, of cannabis."[45]

Maunder found another difficulty with the D-L test when the suspected substance is powdery or sticky. He reported that in this case, one will get a false positive for marijuana, if they do not use two thicknesses of absorbent paper and sufficient petroleum ether (PE) to moisten the lower paper and apply the test to the lower paper. "If the PE solution is not filtered in this manner," he wrote, "most powders will leave enough residue on the paper to give sufficient water soluble material for a false positive."[46]

Even with the use of two papers, Maunder found that agrimony and henna could give false positives. About agrimony he wrote that "although the color developed on the paper is a paler hue, it could be mistaken for that given by cannabis." Similarly, the color sequences with henna "are not easily distinguishable from cannabis and the chloroform layer is the correct pink color" indicating marijuana.[47]

While Maunder claimed that the D-L test provided "adequate confirmation" for the presence of marijuana, his own findings indicated that it is at best, a presumptive or screening test. Of the 240 substances he tested, 25 tested positive for marijuana, i.e. false positives. This means the D-L test is non-specific to marijuana and is not a confirmatory test. Maunder himself cautioned that the test "should never be relied upon as the only positive evidence," and elsewhere recommended the use of gas liquid chromatography and thin layer chromatography.[48]

C.G. Pitt, R.W. Hemdron, and R.S. Hsia determined that the D-L test "is chemically based primarily on the presence of 1,3-dioxybenzene (resorcinol) partial structure."[49] In other words, the D-L test will be positive for many resorcinols – commonly occurring plant substances and also found in common drug products.

For example, Pitt et al found that *Sucrets* (which contain a resorcinol) give a violet coloration for the test. Pinosylvin (from pine wood) and equol (from horse urine) "are other examples of resorcinols which contain at least part of the structural features required for a positive Duquenois test."[50] They also tested a number of common monocyclic resorcinols and icyclic resorcinols (chromanols) and found them to give a positive D-L test.

"In conclusion," wrote Pitt, "it is believed that if the criteria for a positive Duquenois test are rigorously adhered to, and botanical evidence is not available, the ubiquitousness of phenols in nature and their diversity in structure makes it mandatory to supplement the colorimetric test with chromatographic evidence. This conclusion is substantiated by the recent report that certain commercial brands of coffee give a positive Duquenois-Levine test."[51] Pitt added that the D-L test is useful as a "screen" test but not sufficiently selective to be relied upon for "identification."[52]

## Unequal Justice under the Law

At least four court decisions disagreed with Alsup's ruling that the combination botanical/D-L test is a valid confirmatory test for marijuana. In 1973, a court in Wisconsin ruled that: "An expert opinion that the substance is probably marijuana (based on microscopic examination, D-L test and a thin-layer chromatograph) is not sufficient to meet the burden of proving the identity of the substance beyond a reasonable doubt."[53] Similar rulings were decreed in 1974 in two courts in Minnesota and in Missouri.[54]

As noted, in *Daubert v. Merrell Dow Pharmaceuticals, Inc,* the Supreme Court created a flexible, factor-base approach for analyzing the reliability and validity of forensic tests and expert testimony. These factors include: (1) whether a method can or has been tested; (2) the known or potential rate of error; (3) whether the methods have been subjected to peer review; (4) whether there are standards controlling the technique's operation; and, (5) the general acceptance of the method within the relevant community. The SFPD lab does not test or validate its methods; does not establish error rates; does not subject its methods to peer review; and, does not exercise controls or standards in its

10                                   FALSE POSITIVES EQUAL FALSE JUSTICE

drug testing. Moreover, the five tests in question here have not been validated as confirmatory tests in the field in general i.e., the tests have not been shown to reliably identify either cocaine or marijuana.. In short, there is no evidence that the hypotheses the SFPD lab is relying upon have been adequately tested by themselves or documented validation studies.

The Scientific Working Group for the Analysis of Seized Drugs also stipulates that: "When a category A technique (instrumentation such as mass spectrometry) is not used, then at least three different validated methods shall be employed . . . Two of the methods shall be based on uncorrelated techniques from Category B (includes thin layer chromatography and for cannabis only, macroscopic examination and microscopic examination . . . A minimum of two separate samplings should be used in these three tests … All Category B techniques shall have reviewable data . . . Cannabis exhibits tend to have characteristics that are visually recognizable. Macroscopic and microscopic examinations will be considered, exceptionally, as uncorrelated techniques from Category B when observations include documented details of botanical features . . . Examples of reviewable data are . . . recording of detailed descriptions of morphological characteristics of cannabis only . . . Laboratories shall have documented policies establishing protocols for technical and administrative  review . . .

"Method validation is required to demonstrate that methods are suitable for their intended purpose. For qualitative analysis, the parameters that need to be checked are selectivity, limit of detection and reproducibility . . . Minimum acceptability criteria should be described along with means for demonstrating compliance. Valid documentation is required. Laboratories adopting methods validated elsewhere should verify these methods and establish their own limits of detection and reproducibility."[55]

The *Standard Practice for Quality Assurance of Laboratories Performing Seized-Drug Analysis* of the American Society of Testing Materials stipulates that: "Analysts shall take measures to be assured that identifications are correct and relate to the right submission. This is best established by the use of a least two appropriate techniques based on different principles and two independent samplings. Documentation must contain sufficient information to allow a peer to evaluate the notes and interpret data."[56]

According to the United Nations Division of Narcotics Drugs *Recommended Methods for Testing Cannabis*: "When possible, three entirely different techniques should be used, for example, color test and any two of the available chromatography techniques (TLC, GLC, or HPLC). The analysis of cannabis represents a special problem to the forensic chemist."[57]

According to the UN's *Recommended Guidelines for Quality Assurance and Good Laboratory Practices*: "Before an analytical procedure can be used to analyze submitted specimens, it must be fully validated in terms of sensitivity (limits of detection), specificity (freedom from interferences), and reproducibility (ability to provide consistent results)…. Before a specimen can be reported positive for one or more drugs of abuse, it should be subjected to two independent tests using separate aliquots of the specimen. If feasible, the two tests should involve different analytical techniques. Specific criteria for what constitutes a positive test should be established and clearly stated in the SOP manual. The criteria should include requirements for acceptable results and quality control samples. Also, before any specimen can be reported positive, the test results should be thoroughly reviewed by at least two individuals who are familiar with the analytical methods. The review should include examination of the test results, acceptability of all quality control results, proper and complete documentation of sample handling (chain of custody), correct calculation of quantitative measurements and absence of clerical error . . . undeclared or 'blind' proficiency testing (is recommended)."[58]

The UN's *Rapid Testing Methods of Drugs of Abuse* adds that: "Colors formed by the test reagents should be compared with a color reference chart if possible because color evaluation by individuals is a subjective  judgment and can lead to misinterpretation of results."[59] The Scientific Working Group for the Analysis of Seized Drugs' Quality Assurance/Validation of Analytical Methods agrees with the UN on this point: "Since the results of color tests are detected visually, care must be taken that the analyst be thoroughly tested for the visual ability to detect very slight color changes."[60]

P-002500

FALSE POSITIVES EQUAL FALSE JUSTICE                                                  11

Several court rulings have denied the admissibility of forensic evidence and expert testimony for lack of adherence to the requirements for scientific reliability and validity. In *United States v. Monterio* (407 F. Supp. 2d 351, 373-374, D. Mass. 2006), the court ruled that even if the general methodology of toolmark identification passes muster under Daubert, the testimony of an expert must still be excluded under Rule 702 if witness has not complied with the documentation and peer review standards of his own profession. The court further found that the examiner's case note of a "positive ID" was insufficient documentation because the examiner "did not make any sketches or take any photographs."

In *United States v. Green* (405 F. Supp. 2d 104, 120, D. Mass. 2006), the court ruled that a firearm examiner's testimony was excluded under Rule 702 and Daubert in part because "the absence of notes and photographs in the initial examination make it difficult, if not impossible, for another expert to reproduce what [the government's expert] did…. Reproducibility is an essential component of scientific reliability." In *Ramirez v. State* (810 So. 2d 836, 847, Fla. 2001) a toolmark examiner's testimony was ruled inadmissible because "there is no objective criterion that must be met, there are no photographs, no comparison of methodology to review and the final deduction is in the eyes of the beholder, i.e., the identification is a match because the witness says it is a match." In *People v. Gomez* (596 P. 2d 1192, Colo. 1979) a trial court excluded color and microcrystal drug test results because duplicative testing consumed the sample (preventing reproduction by the defense expert) and the analyst took no photographs of the color or microcrystal tests.

The SFPD's lab's drug testing lacks documentation of microscopic or other testing results; fails to conduct or document any reliability or validity testing; fails to follow proper protocol with respect to color tests; lacks peer review; allows for no independent review or replication; and, conducts no blind proficiency testing. Therefore, the SFPD's lab's drug testing techniques and expert testimony based on the application of their techniques are scientifically deficient and do not fulfill the *Daubert* requirements for reliability and validity and admissible evidence. Their specific protocols and tests must be able to uniquely identify cocaine and marijuana to the exclusion of all other substances. But the many flaws in their protocols and the absence of adequate validation supporting them means the testability requirement of *Daubert* has not been satisfied.

Reviewability and reproducibility are at the heart of verification and the scientific method. Regarding the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Ninth Circuit court declared that: "Something doesn't become 'scientific knowledge' just because it's uttered by a scientist nor can an expert's self-serving assertions that his conclusions were 'derived by the scientific method' be deemed conclusive, else the Supreme Court's opinion could have ended with footnote 2. As we read the Supreme Court's teaching in Daubert, therefore, though we are largely untrained in science and certainly no match for any of the witnesses whose testimony we are reviewing, it is our responsibility to determine whether those experts' proposed testimony amounts to 'scientific knowledge,' constitutes 'good science,' and was 'derived by the scientific method.'"[61]

Judge Kozinski's Ninth Circuit opinion regarding *Daubert* noted that a gate keeping court must decide in part whether " '… scientists have derived their findings through the scientific method or whether their testimony is based on scientifically valid principles….' (*Daubert*, 43F. 3d at 1316) In its gate keeping role, the court should view reliability as follows: 'This means that the expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.'"[62]

According to the government's Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG), for independent reviewability and validation: "Documentation shall contain sufficient information to allow a peer to evaluate case notes and interpret the data…. Analytical documentation should include procedures, standards, blanks, observations, test results, and supporting documentation including charts, graphs, and spectra generated during an analysis."[63]

Defense experts in the *Diaz* case testified that the specific methodology employed by the SFPD lab could not be peer reviewed or reproduced because the lab's protocols are too vague to show what was actually done and the conclusory and cryptic lab notes and reports did not fill the gaps in any way. In short, there was no way to verify the

12                                   FALSE POSITIVES EQUAL FALSE JUSTICE

SFPD's lab's findings, and the scientific validity of the subsequent testimony was based solely on the word of the SFPD's lab witness which is unacceptable under *Daubert*.

Moreover, in this case, there were no files to review. They were all destroyed, along with the drugs, the testing results, and the lab notes. Inexplicably, the lab's narcotics SOP still allows for the identification of drugs without the use of GC/MS. That methodology cannot be established as reliable under *Daubert* or Rule 702 and should have been excluded from evidence.

According to a ruling in *Paoli R.R. Yard PCB Litigation*, (35 F. 3d 717,745 [3d Circuit 1994]): "[A]ny step that renders the analysis unreliable .... Renders the expert's testimony inadmissible. This is true whether this step completely changes a reliable methodology or merely misapplies that methodology." The lack of reviewability, such as was incurred in the *Diaz* case, rendered it impossible to tell whether what might otherwise be a reliable methodology and test was misapplied. Thus, the prosecution's expert's testimony on marijuana should have been prohibited by Judge Alsup.

Scientific requirements and recent court rulings disagree that these tests do not need specificity and exclusivity, and that the tester's experience makes their results admissible.  A test's validity and reliability have to be able to stand alone, independent of the experience of the analyst, and the analyst's experience cannot add or subtract from its validity and acceptability as admissible evidence. As the Supreme Court recently declared: "Since *Daubert* . . .  parties relying on expert  evidence have had notice of the exacting standards of reliability such evidence must meet." (*Weisgram v. Marley Co.*, 528 US 440,455; 120 S. Ct. 1011, 1021; 145 L. Ed. 2d. 958 (2000))

In 1999, the Seventh Circuit Court ruled that: "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are reliable and relevant under the test set forth by the Supreme Court in Daubert." (*Clark v. Takata Corp*. 192 F. 3d 750, 759n. 5 [7th Cir. 1999)

Also in 1999, the Justice Court of New York ruled that: "A marijuana field test is sufficient in the bringing of a charge, but more than the results of such a test even coupled with an experienced officer's identification of the drug, are necessary to sustain a conviction."[64] The court also referenced a 1998 opinion regarding the experience of the tester: "In *Angel*, the Court  essentially reiterated its findings in *Swamp*. It once more noted the legal sufficiency of a field test in the bringing of a charge,  but held that more than the mere results of such a test (even coupled with an experienced officer's identification of the drug as in *Angel*) would be necessary to find guilt, even in a Family JD (juvenile delinquency) fact-finding hearing. . . . In the instant case, the *People* argue that the testimony simply as to the field test results, particularly when coupled with the officer's identification experience and testimony, should nevertheless be sufficient enough to sustain a conviction under this section (of the law). . . . the court finds such evidence alone is insufficient for such purposes."[65] The court found the defendant not guilty

Another reason for not relying on a tester's experience was given by nine other courts and summarized by the Criminal Court of the City of New York:  "Nonetheless, most lower courts which have considered the need for expert evidence in marijuana cases have held that a laboratory report must be filed to convert a complaint into an information . . . . Their rationale is, notwithstanding the police officer's averments in the complaints, that what they recovered is marijuana, a significant percentage of laboratory reports subsequently filed with the court do not support the officers' allegations."[66] In other words, experienced testers often produce inaccurate reports.

In 1978, the Supreme Court of Illinois reported that: "During the period March 1970 to March 1971, 1,674 samples of marijuana, morphologically identified as such, were submitted to the Wisconsin Crime Laboratory for confirmatory testing. Only 85.6 percent of these were in fact marijuana. Therefore, 14.4 percent, or one in every seven samples, turned in as suspected marijuana were not marijuana.' (Stein, Laessig, & Indriksons, An Evaluation of Drug Testing Procedures Used by Forensic Laboratories and the Qualifications of Their Analysts, 1973 *Wis. L. Rev.* 727, 770 (hereinafter Drug Testing Procedures). At the very least, these statistics demonstrate that even if it is possible, as Carrico claimed, to reliably identify cannabis in the manner he claimed to have used (feel, smell, sight and touch), such means are highly prone to error in the hands of anyone but an expert, because of the number of plants whose gross morphological characteristics closely resemble Cannabis sativa L." (*The People of the State of Illinois, Appellant,*

FALSE POSITIVES EQUAL FALSE JUSTICE                                                13

*v. Peppe Park, Appellee,* No. 49728, Supreme Court of Illinois, 72 Ill. 2d 203; 308 N.E. 2d 795; 1978 Ill. LEXIS 303; 20 Ill. Dec. 586/Filed May 26, 1978)

The Committee Note to the 2000 Amendments of Rule 702 expressly says that "[i]f the witness is relying solely or primarily on experience, then the expert must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it'."[67]

In 2004, the Eleventh Circuit Court found that: "Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility . . . . If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical reasons, subsumed by the qualification prong." (*US v. Frazier* 387 F. 3d 1244 [11th Cir. 2004])

A court ruling in Alabama added that: "While the inquiry into 'reliable principles and methods' has been a familiar feature of admissibility analysis under *Daubert*, the new Rule 702 appears to require a trial judge to make an evaluation that delves more into the facts than was recommended in *Daubert*, including as the rule does an inquiry into the sufficiency of the testimony's basis ('the testimony is based on sufficient facts or data') and an inquiry into the application of the methodology to the facts ('the witness has applied the principles and methods reliably to the facts of the case') . . . . Neither of these two latter questions that are now mandatory under the new rule – the inquiries into the sufficiency of the testimony's basis and the reliability of the methodology's application – were expressly part of the formal admissibility analysis under *Daubert*." (*Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330 [M.D. Alabama 2001])

Recent cases show that the need for reviewability and reproducibility is not simply an academic concern. For some 40 years, the FBI lab employed unexamined the technique known as Comparative Bullet Lead Analysis (CBLA) to convict about 2,500 suspects of shooting crimes including murder. When CBLA's premises were finally checked, they were found to be false, and therefore CBLA was an invalid technique of no application to a suspect's guilt. In fact, an article in Science magazine in August 2005 reported that, with the exception of DNA identification, all forensic tests were unvalidated and testimonies based on these tests were a major cause of wrongful convictions.[68]

# COCAINE/CRACK

*A devastating piece of evidence proving the unreliability of both the SFPD's marijuana protocol and its cocaine protocol is that in May 1995, the American Society of Crime Laboratory Directors audited the lab after a SFPD narcotics examiner was caught on tape faking narcotics lab results. That audit states, in part,: "Although when used by properly trained and experienced examiners, crystal tests may be a valid method for confirmation of drugs, ASCLD/LAB no longer accepts crystal tests without instrumental confirmation as a basis for the identification of drugs. The laboratory standard of operating procedures manual are not used or understood by the laboratory staff and should be deleted until they are implemented. The laboratory should also review its current microscopic procedure for the identification of marijuana to ensure that it represents current generally accepted practice.*

    –Michael Burt 2007[69]

Alsup's interpretations and rulings regarding cocaine tests were equally erroneous. For instance, Alsup stated that E.G.C. Clarke's book, *Isolation and the Identification of Drugs,* (which San Francisco Police Department (SFPD) crime lab director James Mudge described as the 'bible' of narcotics analysis) reported that microcrystalline tests are primary methods for the confirmation of the presence of cocaine. Nothing could be further from the truth. Clarke wrote, which Alsup actually quoted, that the microcrystalline test is "a means of final identification to confirm a provisional diagnosis made from chromatographic or spectrometric evidence," however, it is "unsuitable as a primary method of identification of an unknown substance."[70] In fact, microcrystalline tests *per se* are considered only presumptive or screening tests.

Alsup, who wrote erroneously elsewhere that GC/MS are "supplemental tests," twisted this passage of Clarke's book to conclude that: "This (Clarke's book passage) comports with the SFPD's procedure, however, which used

**A488**                                                                    P-002503

14                                         FALSE POSITIVES EQUAL FALSE JUSTICE

the cobalt thiocyanate color test as the primary or preliminary method of screening an 'unknown compound.' Microcrystalline tests were used for the final identification of suspected narcotics."[71] In other words, he equated a color screening test (which he admitted can give false positives) with a validated, instrumental test (GC/MS), to erroneously, illogically conclude that microcrystalline tests were valid confirmatory tests for cocaine. On this basis, he ruled that the results of such tests provided the basis for valid and reliable expert testimony and evidence for use at trial.

Alsup failed to mention that a 1995 audit of the SFPD crime lab, by the American Society of Crime Laboratory Directors (ASCLD), informed the lab that "ASCLD/LAB no longer accepts crystal tests without instrumental confirmation as a basis for the identification of drugs."[72] The lab did not conduct any instrumental confirmation in this case.

Alsup also failed to mention the conclusion of Clarke's passage that: "Final identification must depend on the comparison of the crystals formed from the unknown with those prepared from an authentic sample of the drug and the same reagent…the microcrystal test is of little use in the general search for an unknown drug."[73] Similarly, a UN study, also cited by Alsup and the SFPD lab as supporting its tests, stated that: "Standard cocaine should be analyzed concomitantly."bv Alsup also cited the *Standard Guide for Microcrystal Testing in the Forensic Analysis of Cocaine*, published by *ASTM International*, as supporting the SFPD's lab's use of microcrystal tests. The ASTM standard guide recommended the use of an "authenticated cocaine sample" and stated that: "The reagents utilized for the microcrystal tests are to be tested for reliability using an authenticated cocaine standard. Only when it is determined that the reagents are producing the expected response, may the reagents be used in this response."[75] (Alsup actually quoted this statement.)

The SFPD lab, admitted by Alsup, does not require its analysts to compare the crystals generated from suspected samples of cocaine with authentic samples of cocaine crystals. Nor does it test the reagents against known samples before each use which Alsup admitted "is recommended by the literature."[76] The SFPD lab only compares photos of the crystals. And even though he had a copy of the *UN Recommended Methods for Testing Cocaine*, he did not mention its conclusions that: "It must be stressed that positive results for color tests are only presumptive indications of the possible presence of cocaine. The color tests for cocaine are especially prone to produce false positives."[77] The UN publication added that: "The warning given for color and odor tests applies equally to the microcrystal test."[78]

Alsup was also provided copies of the passage of the *Mandatory Guidelines for Federal Workplace Drug Testing Programs* of the Department of Health and Human Services, Substance Abuse and Mental Health Services Administration which states that: "At this time gas chromatography/mass spectrometry (GC/MS) is the only authorized confirmation method for cocaine, marijuana, opiates, amphetamines, and phencyclidine."[79]

Judge Alsup and the SFPD lab referenced several articles which they claimed showed that the techniques used by the SFPD lab had been scientifically validated. One was Charles Fulton's article, *The Identification of Cocaine and Novocaine*.[80] This study involved only the testing of cocaine and novocaine. It did not determine whether other similar drugs would give false positives and was insufficient to satisfy the testing requirements of Daubert or the validation requirements of the forensic drug community.

Moreover, it is not at all clear that this study showed that cocaine crystals can be distinguished from novocaine crystals, let alone the "millions" (SFPD analyst Deborah Madden's testimony) of chemicals that exist. For instance, Fulton reported that "[i]f only a very small drop of reagent is added [to a sample of novocaine] with a stirring rod there is immediate crystallization in bushy feathered crystals, irregular plates, etc., the precipitate having considerable resemblance to that of cocaine."[81] In other words, novocaine gave a false positive. This is the platinic chloride crystallization test which the SFPD lab claims is a fail-safe method for positively identifying the presence of cocaine. In his decision, Alsup wrote that: "No other substance (other than cocaine) was known to create this result when platinic chloride was applied."[82] This study also reported that gold chloride added to cocaine would not cause crystals to form. The gold chloride test is a second crystallization test used by the SFPD lab to identify cocaine.

A second study, *Cocaine Diastereoisomers*, cited by Alsup, only conducted crystal testing on a few synthetically made (not street grade) samples of the cocaine diastereoisomers and could hardly qualify as a validation of the forensic

FALSE POSITIVES EQUAL FALSE JUSTICE                                    15

crystalline test. Moreover, the photograph at page 16 of the article, showing a gold chloride crystal of cocaine looks nothing like the photograph presented by the prosecution or the photograph of the gold chloride/cocaine crystal in the SFPD's Standard Operating Procedures manual which is used as a comparison standard by which the laboratory confirms a positive result.[83]

This article concludes that "[t]he principal disadvantages of this technique are that the presence of other compounds in the sample can distort the microcrystalline precipitate and that the technique requires a certain degree of expertise on the part of the chemist."[84] The SFPD lab's SOP does not provide for a procedure for removing other compounds or adulterants from suspected cocaine samples before applying the gold chloride crystallization test.

The third study cited by Alsup, *Further Studies on Spot Tests and Microcrystal Tests for the Identification of Cocaine*, concluded that: "To date we are not aware of any chemical that produces a false positive relative to cocaine provided that the correct set of tests is performed properly. Yet, the current list of chemicals is extensive, and not all of the chemicals have been compared to cocaine; also, new chemicals are continuously being synthesized. Further, because a number of variables discussed above could prevent an analyst from reaching an accurate conclusion, the use of a more analytical procedure should be considered."[85] Alsup and the lab claimed that more analytical procedures were not needed in the identification of cocaine by crystal tests.

This study also reported that: "Reaching an accurate conclusion using microcrystal tests will depend on the level of experience of the analyst the proper use of standards and controls, the presence of adulterants and/or diluent in the seized in the seized samples, the reaction pH, the temperature and humidity, and the concentration of the reagent and of the chemicals."[86] The SFPD lab's SOP does not specify procedures for dealing with adulterants or diluents (which could affect the crystallizations), nor does the SOP control for the temperature or humidity. SFPD crime lab analyst Deborah Madden testified that these variables were of no concern. She claimed that in her 30 years experience, she had not known of any situation where the temperature or humidity affected the formation of the crystals, and that the crystals created by positive gold chloride and platinic chloride microcrystal tests always looked the same.

During her testimony, Madden was shown a photograph of a gold chloride-cocaine crystal from an article which Alsup and the lab claimed supported the validity of the lab's cocaine tests. The picture looked different from the X-shaped crystals both Madden and director James Mudge had described as indicating cocaine as well as from the comparison photo in the lab's SOP manual. No explanation was provided for this discrepancy.

Alsup concluded that "to the extent the SFPD procedures fell short of the procedures recommended by the literature, the deficiencies were not sufficient to undermine their reliability for *Daubert* purposes."[87] Thus, he cited the scientific literature when it served his purposes only.

The *Daubert* decision required that Alsup consider the error rate of the cocaine tests. Alsup ruled that: "Thus, as to the chemistry itself, this order finds that the error rate of the procedures used by the SFPD Crime Lab to identify cocaine is close to zero."[88] Alsup provided no basis for his conclusion, and SFPD lab director James Mudge testified that there were no known error rates for the testing of cocaine with microcrystalline tests.[89]

District courts also accept results from cocaine field kits. The most widely used field test for cocaine and crack is the Scott test which is a three step color test, each step involving the addition of a certain reagent and observation of the color that consequently develops. In the first step, blue precipitates appear. In the second, these precipitates completely disappear. In the third step, blue appears again, but in the lower layer. Published reports suggest that diphenhydramine hydrochloride, chloropromazine, promazine  hydrochloride, scopolamine, promethazine with phencyclidine, and a combination of phencyclidine with either promazine, dibucaine, or methaprilene as well as other medicines and designer drugs give false positives with the Scott test which is also used to identify crack cocaine. It has also been shown that too much heroin or dibucaine also give false positives. In February 2004, three boys were arrested in this manner by police in Tokyo; ultimately it became clear that their substance was not cocaine but a legal drug.[90]

Charles Fulton points out in *Modern Microcrystal Tests for Drugs* that: "No color test for cocaine is known to the writer that is worth the trouble of making it. This even applies to the blue precipitate with cobalt thiocyanate (color

16                                        FALSE POSITIVES EQUAL FALSE JUSTICE

precipitation test), used by some for distinguishing cocaine from procaine or as indication of cocaine in the presence of procaine; too many other local anesthetics are now on the market besides these two."[91] Peter Baker and Geoffrey F. Phillips reported that: "Field tests are only for preliminary sorting. . . Winek and Eastly evaluated the (Scott test) and considered it useful for pure materials suspected of being cocaine, but found false positive reactions with some drug mixtures that did not contain cocaine. These authors recommended that confirmation of drug identity should always be sought by an alternative (chromatographic) technique . . . Basos and Hoffman, in a brief review of field testing, emphasized that all field tests should be confirmed in the laboratory, a point which the reviewers have emphasized."[92]

C.L. O'Neal et al reported that: "The actual color produced by the reagents for each drug may vary depending on many factors: the concentration of the drug, whether the drug is in salt or free base form, which salt form is present, any additional diluents or contaminants present in the sample, the color discrimination of the analyst and the conditions under which the test is preformed. . . For example, cobalt thiocyanate is used to detect cocaine. However, many other drugs will also react with this reagent and each analyte that tested positive with cobalt thiocyanante produced a strong blue color."[93]

In *Chemical Analysis, A Series of Monographs on Analytical Chemistry and its Applications*, edited by P. J. Elving, J.D. Winefordner, Volume 75, in the chapter entitled, "Spot Test Analysis" by Ervin Jungreis, the author tells us that the cobalt thiocyanate spot test indicates a positive reaction for: cocaine hydrochloride, codein phosphate, atropine, heroin, nicotine salicylate, opium, scopolamine hydrobromide, meperidine, methadone hydrochloride, methylphenidate hydrochloride, procaine hydrochloride, methapyrilene hydrochloride, and phenobarbital sodium.[94]

In the UN's *Rapid Testing Methods of Drugs of Abuse*, published in 1994, the following comments appear under field testing techniques for cocaine:

For the cobalt thiocyanate test: "A similar colour may occur in the presence of other controlled (methaqualone, phencyclidine) and non-controlled drugs/precursors."

"There are millions upon millions of other white crystalline materials which have not been ruled out as giving false positives with the cobalt thiocyanate test."

For the modified cobalt thiocyanate test (Scott Test): "Only a very few non-controlled or controlled drugs will give a similar colour sequence."[95]

J.D. Prall for one reported that diphenhy-dramine hydrochloride, chlorpromazine hydrochloride, and other medicines showed the same color sequence as cocaine.[96] M. Ishiguro et al found the same false positive with promazine hydrochloride and scopolamine.[97] S.K.Lorch reported that promethazine alone or phencyclidine alone did not behave like cocaine in the test, but that mixing them together caused a false positive. Lorch also found that the combination of phencyclidine with either promazine, dibucaine, or methapyrilene showed a false positive.[98] F.W. Grant et al stated that tests for cocaine based on cobalt thiocyanante (used by the SFPD lab) showed an unacceptable incidence of false positives and false negatives.[99]

Another cause of false positives was sample size. Y. Tsumura et al reported that proper sample size is critical for correct decisions, since too much heroin or dibucaine showed exactly the same color sequence as cocaine and thus gave false positives, and too much cocaine showed persisting precipitates in the second step, yielding a false negative. The appropriate sample size was 1 mg or smaller. Only two mg of heroin or dibucaine gave false positives. On the other hand, 3 mg or more of cocaine gave a false negative. They also found that freebase (crack) cocaine could give false negatives even when the sample size was appropriate, and it could not be distinguished from a newer substance of abuse, 5-methoxy-N,N-disopropyltryptamine (5-MeO-DIPT, foxy).[100]

Tsumura also found four chemicals that show the same color sequence as crack cocaine: chloropromazine HCL, diphenhydramine HCL, 5-methoxy-N,N-disopropyltryptamine HCL (5-MeO-DIPT) and promethazine HCL. They reported that if the complete disappearance of precipitates at the second step was considered requisite for a cocaine-positive decision, a crack cocaine sample would give a false negative. On the other hand, if the persistence of precipi-

FALSE POSITIVES EQUAL FALSE JUSTICE                                                                     17

tate at the second step was not considered an obstacle to a positive decision, all four of the chemicals would give false positives.[101] Thus it became clear that the persisting precipitate is one cause of false decisions.

Finally, cocaine is sometimes mixed with various materials to increase its volume or for camouflage, and it was found that these materials may cause an incorrect decision in the Scott test. There are, of course, a number of problems with determining what blue means. First is whether the looker is color blind. Second is the inability of the human eye to resolve wavelengths of light. The blue reaction from the cobalt thiocyanate test with cocaine may give another color blue than that from another material, and yet the individual observing the blue may not be able to tell the difference in the colors.

## JUDICIAL ANARCHY

Recently, Senator James Webb stated that "the criminal justice system as we understand it today is broken, unfair . . ."[102] Nowhere is this more apparent than in the disparate and contradictory court decisions regarding the admissibility of the results of the D-L and C-T tests. Not only have different courts contradicted themselves on admissibility but certain courts have admitted the results of the D-L test while ruling that it does not prove the presence of marijuana beyond a reasonable doubt. This is a real conundrum which needs exposure and unraveling as it translates into unequal justice under the law and a denial of due process not seen since the days of free states and slave states. It literally means that a person in one state can be convicted of possessing marijuana on the basis of the D-L test while a resident of another state cannot be convicted on the basis of the D-L test. This is nothing short of anarchy disguised as law and order. The Supreme Court of Illinois in *The People of the State of Illinois v. Pepe Park* illustrated this confused, unconstitutional reality. In denying the admission of ipse dixit reports, the court found "that police officers may not be presumed to possess the requisite expertise to identify a narcotic substance . . . because it simply is far too likely that a nonexpert would err in his conclusion on this matter, and taint the entire fact-finding process."[103] In this respect, the court cited a study that found 241 incorrect identifications of marijuana by arresting police officers. This study, said the court, demonstrated "that even if it is possible, as (deputy sheriff Billy) Carrico claimed, to reliably identify cannabis in the manner he claimed to have used (feel, smell, sight and touch) such means are highly prone to error in the hands of anyone but an expert, because of the number of plants whose gross morphological characteristics closely resemble Cannabis sativa L."[104]

In the same decision, the court erroneously claimed that "[T]o determine accurately that a particular substance contains cannabis, all that is necessary is a microscopic examination combined with the Duquenois-Levine test."[105]

On June 7, 1973, the Supreme Court of Wisconsin upheld the marijuana conviction of Jay Jacob Wind which was based on the D-L test even though "standing alone (the test) is not sufficient to meet the burden of proving the identity of the substance beyond a reasonable doubt. . . . If this were a possession case, the tests would be insufficient."[106]

The court admitted that: "It is quite true that the tests (botanical exam, D-L) used by Mr. Michael Rehburg, a chemist and witness for the prosecution, were not specific for marijuana. . . . He admitted, however, the tests he performed were merely functional group tests and could not distinguish between Cannabis Indica and Cannabis Sativa L.; but more important, that neither of these tests were specific for marijuana. . . . It is without dispute in this record that functional group tests used by Rehburg separate out compounds that belong to a homologous series but are not exclusive or specific for marijuana. See also: *ALI-ABA Course of Study on Defense of Drug Cases* (1970) and in particular the following articles which warn that chromatography and the Duquenois Test are not specific for marijuana: Oteri, Examination of Laboratory Experts 242; Sullivan, *Police Laboratory Testing Procedures 102*; Jatlow, *Identification and Analysis of Drugs 90* . . ."[107]

In 1977, the D.C. Court of Appeals ruled that: "At the close of the government's evidence, the defense did not move for judgment of acquittal but presented its witness, Dr. Sorrell Schwartz, a professor of pharmacology at the Georgetown University Medical Scholl with impressive credentials. He testified that all the tests performed by the government's analyst were screening tests and even in conjunction with one another could not specifically identify marijuana. . . .

18                                        FALSE POSITIVES EQUAL FALSE JUSTICE

"Dr. Schwartz recommended mass spectrometry as a relatively simple and inexpensive test which is specific; this test is not performed by the government presently. The government analyst agreed in his testimony that the Duquenois-Levine test is a screening test; he was not asked to characterize thin-layer chromatography. . . .

"Appellant's expert, with long experience in laboratory techniques, severely criticized the government's chemist for subjecting the substance to too short a period of microscopic examination and for allowing insufficient time for the chemical tests to develop. Appellant's expert stated in conclusion that the techniques used by the government expert would have been insufficient to have permitted positive identification of the substance in a scientific publication."dd

The Court of Appeals also noted that the trial judge had ruled that "I am not satisfied with his (prosecution's expert) testimony to support specific identification of the substance. . . ."[109]

In 1979, a trial judge in North Carolina blocked the conviction of C. Richard Tate by use of the D-L test. The trial judge found that the D-L test was "not specific for marijuana" and had "no scientific acceptance as a reliable and accurate means of identifying the controlled substance marijuana" and allowed the defendant to suppress use of the test results on that basis.[110] This finding was upheld by the North Carolina Court of Appeals as well as the North Carolina Supreme Court which found that: "The determination that the test used was not scientifically acceptable because it was not specific for marijuana was amply supported by the facts. . . The trial court's ruling that the results of the tests conducted on green vegetable matter by using the Duquenois-Levine color test in the Sirchie drug kit were inadmissible in evidence was supported by the court's findings that the test is not scientifically accepted, reliable or accurate and that the test is not specific for marijuana because it reportedly also gives a positive reaction for some brands of coffee and aspirin. . . . The conclusion to exclude the test results is amply supported by these findings of fact . . . and the test results were properly suppressed . . ."[111]

In 1989, the Criminal Court of New York ruled that: "In the documentation submitted by the *People* in support of their motion, the Duquenois-Levine test is described as an extremely reliable test for the presence of marijuana, developed in 1937, modified in 1962 and currently in wide use in forensic laboratories. The particular test kit used by Police Officer Rodelli has also been purchased by law enforcement agencies in nearly every State as well as the United States Armed Forces. . .

"Henry Mills, supervisor of drugs for the Division of Forensic Science, Georgia Bureau of Investigation, asserts that in his 19 years of laboratory experience he has 'not found a "false positive" – i.e., an instance where a substance was positive on the modified Duquenois-Levine color test but "negative" for marijuana after microscopic examination.' Susan Hart Johns, research and development program administrator for the Illinois State Police, claims a similar experience: in more than 2,000 laboratory tests, she did not have a "false-positive" (purple in the lower chloroform layer) when using the modified Duquenois-Levine test on leafy plant material. And a test conducted by the New York City Police Department as part of its officer training program was apparently to the same effect: in every 1 of 25 instances (19 non-marijuana substances and 6 marijuana samples), the field test gave the correct results. . .

"Finally the *People* point to a 1976 study by the Mid-Atlantic Regional Laboratory of the Drug Enforcement Administration, U.S. Department of Justice, which found the modified Duquenois-Levine test highly selective for marijuana and concluded that if the test is properly performed the 'possibility of a false positive becomes negligible.'(At 97.). . . . (Hughes and Warner, "A Study of 'False Positives' in the Chemical Identification of Marijuana" – Drug Enforcement Administration Laboratory Notes, *Microgram* Vol. IX, No. 7 (July 1976)."[112]

"In this case," continued the court, "the *People's* affidavits and submissions represent ample proof that the Duquenois-Levine test is generally accepted as reliable by experts in the field, including those in the Federal Government. This court's own research has also found confirmatory reports of the test's reliability. (See, Fochtman, Winek, "A Note on the Duquenois-Levine Test for Marijuana," 4 *Clinical Toxicology* 287 [1971]; Moenssens, Moses and Inbau, Scientific Evidence in Criminal Cases op.cit.) Defendant has not cited any contrary findings. Moreover, appellate courts from other jurisdictions have affirmed the reliability of such field test procedures as sufficient to prove the identity of marijuana at trial. (*State v Hill*, 638 SW3d 827 [Tenn Crim App 1982]; accord, *State v Sadusky*, 54 Ohio Misc 49, 376 NE2d 1363 [Akron Mun Ct 1977]; *State v Shoultz*, 564 P2d 257 [Okla Crim App 1977];

FALSE POSITIVES EQUAL FALSE JUSTICE                                                    19

*Matter of Smith,* Ohio Ct App, Mar. 31, 1982, docket No. 9-81-34).” (*The People of the State of New York v. Juan Escalera,* 143 Misc. 2d 779; 541 N. Y. s. 2d 707; 1989 N.Y. Misc.)[113]

Despite finding that the botanical exams and D-L tests were not valid confirmatory tests, the courts in Wisconsin and D.C. ruled that their results were admissible as scientific evidence because of the tester's experience. As the Wisconsin court ruled: “The test for marijuana need not be specific or exclusive to meet a scientific test of certitude. . . . we do not believe that the test need be specific for marijuana in order to be probative. An expert opinion that the substance is probably marijuana even if the test is not exclusive is probative and admissible. . . . The government chemist testified at trial that he had performed one microscopic and three chemical tests on the substance. These four tests led him to conclude that the material was 100% marijuana. This conclusion was given greater weight by the expert's extensive experience in marijuana identification.”[114]

The Wisconsin Court of Appeals disagreed with Judge Alsup's finding that the cobalt thiocyanate color test is a valid confirmatory test for cocaine. The court reviewed a possession of cocaine conviction using the cobalt thiocya-nate test.  The circuit court trial judge, Dominic Amato, like Judge Alsup, stated that: “And the only thing I can lay upon the record is that with regard to this test, experts from the Crime Lab have indicated to this Court in other cases that these tests are highly accurate and they wouldn't be used the way we have been using them, and they wouldn't have been accepted all this period of time, but for the fact of their high, high degree of accuracy where a false positive is so remote that it deals with mere possibilities, [sic] and possibilities are, all of us in this room could win the Illinois lottery.”[115]

The Appeals Court found that the cobalt thiocyanate test “is not specific for cocaine. It is also known as a nonspe-cific, presumptive, color screening test. . . . Nonspecific, presumptive screening tests for drugs such as the test em-ployed in this case, may result in what are called false positives, i.e., false identification of cocaine when the sub-stance is some other alkaloid. ‘The Scott field test was designed to distinguish cocaine from other alkaloids, but is deficient in distinguishing cocaine from other drug mixtures such as lidocaine and PCP [phencyclidine].’ . . .

“Eigenfield probably administered an accurate cobalt thiocyanate test, but because the test is nonspecific, and by his testimony he stated that the test is presumptive, the test results cannot meet the rigorous burden of proof beyond a reasonable doubt, since it was not a scientifically specific test for cocaine. It could have been another drug. Thus, this court holds that the State failed to meet the burden of proof establishing the second element of the offense that Jackson was charged with, possession of a controlled substance – cocaine. . . .

“For the above stated reasons, the trial court abused its discretion in allowing into evidence the cobalt thiocyanate color screening test that is known to be nonspecific and presumptive as positive proof beyond a reasonable doubt that the substance seized was cocaine establishing Jackson's guilt for possession of a controlled substance – cocaine. . . . For these reasons, the trial court is ordered on remand to vacate the judgment of conviction and dismiss this matter.”[116]

In its decision, the court articulated the array of problems with color tests. It noted that: “Examples of the intended use of color field tests such as the test used in this case, and their strengths and weaknesses are noted as follows:

“Although color change tests are both easy and fast to conduct, they have major weaknesses. To begin with, color change tests are nonspecific:

“If we assume that there are 20 distinguishable colors, then there are 8,000 possible responses in three-color tests and 160,000 possible responses in four-color tests. Statistically, 250 different compounds (out of 2,000,000) would give the same three-color tests and 12 would give the same four-color tests.

“Color tests are often used as field screening procedures in the interpretation of test results. One analyst might identify a color as a light red while another analyst would record the test result as a pink. There are techniques for dealing with this problem. Many manufacturers furnish color charts that can be placed next to the plate or tube for direct comparison. In addition, the Inter-Society Color Council-National Bureau of Standards (ISCC-NBS) has developed a set of color charts for the same purpose. Finally, the analyst can photograph the test results with high

P-002509

20                                           FALSE POSITIVES EQUAL FALSE JUSTICE

quality color film. The production of the charts and photograph at trial enables the trier of fact to make a direct comparison and doublecheck the analyst's evaluation of the test result.

"In 1982, a United States Army forensic chemist had this to say of color field tests:

'Field tests were designed to assist law enforcement agencies in drug investigations. They are simple and quick procedures for testing materials suspected of containing drugs which help the agent determine if a substance  requires additional analysis by forensic laboratory personnel. Field tests were never intended to be used as a positive method of drug identification.'

"He later stated in the same report:

'In summary, field tests are not confirmatory for drugs. They were never intended to be confirmatory nor should they be used as such in courts-martial or elimination boards. A laboratory analysis by a trained forensic chemist in [sic] required for positive identification of any drug. As a footnote, twenty to thirty percent of all substances initially field tested positive for a drug and subsequently submitted to this laboratory for analysis are devoid of any drugs or contain a drug different than the one indicated by the field test.'"[117]

The Supreme Court of the State of Illinois articulated how the use of invalid drug tests undermines the rule of law: "One of the chief safeguards of our liberty is the requirement that, before punishing an individual as a criminal, the executive branch of government must prove . . . that the individual has violated the laws . . . Any relaxation of this standard poses the gravest possible threat to our basic institutions.  While we must also take care not to unnecessarily impede the State from dealing effectively with the vexatious problems of illegal drug traffic which plague our society, the requirement that the State provide more substantial evidence than it did here is but a minor burden."[118]

Thus we see that the law enforcement, forensic, and legal landscapes are fraught with arbitrariness and questionable practices as well as conflicting policies and court decisions as regards tests for controlled drugs and admissible evidence under the Supreme Court decisions of *Jackson* and *Daubert*. This is manifested in forensic falsehoods as well as directly contradictory judicial opinions and decisions across and within jurisdictions. The result is an unconstitutional lack of equal justice under the law for suspected and convicted drug offenders. In California, a defendant can be convicted for marijuana offenses on the basis of the D-L test; in North Carolina, he cannot be so convicted. At the same time, technological advances in the detection of illegal drugs are being largely ignored and unused in place of microcrystalline and chemical color tests that do not even employ colorimeters. This despite the fact that instrumental analyses are the accepted valid, reliable methods; whereas the validity of microcrystalline and chemical color tests have never been established. In the United States, where there were more than 872,720 marijuana arrests in 2007, the most widely used test is the Thornton/Nakamura protocol which is non-specific, non-selective, unreliable, and invalid. In San Francisco alone, some 12,000 people, who are arrested each year for suspected cocaine and crack offenses, have their seized evidence examined by a nonspecific, 4-minute microcrystalline test of unproven validity and reliability and capable of rendering false positives.

Despite their widespread use, the results of these two tests alone are inadmissible as evidence under *Jackson* and *Daubert* and cannot be legitimately used even for prosecution let alone conviction. Nonspecific, invalid tests cannot prove the presence of a controlled drug beyond a reasonable doubt as required by law.

In a 1983 law review article, Stephen G. Thompson observed that: "Modern criminal justice is premised upon the requirement that a criminal defendant be proved guilty beyond a reasonable doubt before punishment be meted out. The standard of proof is severe; its severity is based upon a collective societal judgment that the risk of error be borne by the state. As fundamental and unquestionable as this principle may seem, it is frequently tested when the interests of society appear urgent, immediate, and identifiable. In these instances, society often creates policies and systems which threaten the presumption of innocence."[119]

As a result of the perceived urgency of the Drug War, certain drug testing is a good example of the use of forensic evidence that in effect routinely deprives suspects and defendants of the presumption of innocence and results in wrongful prosecutions and convictions as well as unwarranted guilty pleas. The reason for this is that the most com-

**A495**                                                                                        P-002510

FALSE POSITIVES EQUAL FALSE JUSTICE                                    **21**

monly used drug tests as now employed do not accurately reflect the true or actual identity of the evidentiary substance, i. e. they do not detect. They do not prove the presence of an illegal drug, certainly not beyond a reasonable doubt.

# EPILOGUE

*What the drugs themselves have not destroyed, the warfare against them has. And what once began, perhaps, as a battle against dangerous substances long ago transformed itself into a venal war on our underclass. Since declaring war on drugs . . . we've been demonizing our most desperate citizens, isolating and incarcerating them and otherwise denying them a role in the American collective. All to no purpose. The prison population doubles and doubles again; the drugs remain.*

> – Ed Burns, Dennis Lehane, George Pelecanos, Richard Price, and David Simon, creators of the HBO series, *The Wire*, in an op-ed published in *Time Magazine*, March 5, 2008.

The Drug War is a one-way railroad, a railroading, a non-stop conveyor belt to instant criminality, warped lives, and prison, particularly for young African American males.  What is not known is that greasing the rails and oiling the belt are drug tests that do not prove beyond a reasonable doubt  the presence of illegal drugs. The stealth Weapon of Mass Destruction of the Drug War is the D-L test which has diminished the life, liberty, and happiness of millions for 70 years and continues to do so at a record pace. I say stealth because law enforcement officials, judges, prosecutors, and drug analysts have cast an invisibility cloak over the test and covered up its inaccuracy while acting as if it were flawless. As reported above, in December 2007, U.S. District Court Judge William Alsup, speaking of the D-L and other invalid drug tests, ruled in a case involving the death penalty that: "Despite the many hundreds of thousands of drug convictions in the criminal justice system in America, there has not been a single documented false-positive identification of marijuana or cocaine when the methods used by the SFPD Crime Lab are applied by trained, competent analysts."[120] For 70 years, the overwhelming majority of defense attorneys have swallowed this lie whole hog and never challenged the D-L test on behalf of their defendants.

According to The Sentencing Project, prior to the Drug War, African Americans were nearly twice as likely to be arrested for drug offenses as whites. For every 100,000 residents, there were 684 black arrests compared to 387 white arrests, producing a 77% higher rate for black arrests. Between 1980 - 2003, there were more than 31 million drug arrests in the U.S. and  black drug arrests rose by 225%, compared to an increase of 70% in white drug arrests. By 2003, African Americans were arrested at a rate that was 238% higher than whites, i.e., African Americans  were 3.4 times more likely to be arrested than whites for drug offenses.[121]

Between 1980-2003, black arrest rates increased by more than 500% in 11 large cities with Tucson recording a 1184% increase, nearly three times the growth in white drug arrest rates. In Milwaukee, black arrest rates for drugs had risen by 206% by 2003, while white rates declined by almost 67%.  Similarly, drug arrest rates grew by 729% by 2003 while the white rate declined by 24%. Overall, in 21 cities, the black/white ratio of arrests more than doubled.[122]

There is no data indicating a greater use of drugs among African Americans than among whites. Data from the Substance Abuse and Mental Health Services Administration of the Departments of Health and Human Services documents that African Americans use drugs at a rate proportional to their share of the general population since they comprise 12% of the population and 12% of regular drug users.[123]

Again, according to The Sentencing Project, in 1980, the rate of drug arrests in the U.S. was 256 per 100,000, comprising 5.9% of all arrests. By 1990, this figure had nearly doubled to 11.1%, and currently, one of every eight arrests or 12.5% is for a drug offense. Between 1980 and today, the number of annual drug arrests increased by 218%, from 518,000 to more than 1.8 million. Overall, there have been more than 37 million arrests for a drug offense since 1970 of which 31 million have occurred since 1980.[124]

As of 2006, almost half of American adults have tried marijuana, and the number of people who use it  regularly is about 15 million. Nearly 44% of all drug arrests are marijuana arrests, and approximately 830,000 people were arrested on marijuana charges in 2006, 90% merely for possession. This number increased by 15% over 2005. In 2007, 872,720 people were arrested on marijuana  charges, 88% for mere possession.[125]

22                                       FALSE POSITIVES EQUAL FALSE JUSTICE

Approximately 82% of the growth in drug arrests has been for marijuana. The significance of this change for the racial composition of drug arrests is that marijuana offenses produce a smaller (though still disproportionate to drug use) proportion of African Americans than do cocaine or heroin. On average, during the late 1990s, slightly fewer than one-third of persons arrested for marijuana offenses were African American, while half of persons arrested for a heroin or cocaine offense were black. As The Sentencing Project pointed out: "Given the extreme variations in city-level drug arrests that we have observed, it is unlikely that changes in drug use or drug selling alone can account for this variation."[126]

Human Rights Watch has summarized the effects of the excessive and racially disproportionate targeting and imprisonment of drug offenders as follows:

• African Americans constituted 53.5% of all persons who entered prison because of a drug conviction

• Blacks were 10.1 times more likely than whites to enter prison for drug offenses

• A black man was 11.8 times more likely than a white man to enter prison for drug offenses

• A black woman was 4.8 times more likely than a white woman to enter prison for drug offenses.

• Among all African Americans entering prison, almost two out of five (38.2%) were convicted of drug offenses, compared to one in four whites (25.4%)[127]

In 2003, 59,535 adult African Americans entered prison with drug convictions in 34 states. There is no official data on the Drug War. Between 1974 and 2001, an estimated 2,166,000 blacks were incarcerated on all charges in state and federal prisons. Since the mid-1980s, the nations' drug problem has been perceived to be primarily an urban black problem, even though available data suggest there may be six times as many white drug offenders as black. According to the 2006 national household survey of drug use and health conducted by the U.S. Department of Health and Human Services, 5,553,800 whites reported using crack cocaine at least once in their lifetime as opposed to 1,537,000 blacks. For all races, 8,554,000 used crack cocaine at least once in their lifetime as opposed to an estimated 35,298,000 who have used powder cocaine, and an estimated 20,118,000 who have used stimulants.[128]

"Whether intended or not, a variety of seemingly "race neutral" policies have contributed to growing racial disparity. Due to the intersection of racially skewed policing and sentencing policies, the federal crack cocaine mandatory sentencing laws, for example, have produced highly disproportionate rates of incarceration for low-level offenses. Similarly, school zone drug laws produce severe racial effects due to housing patterns, whereby drug offenses committed near the urban areas that contain many communities of color are prosecuted more harshly than similar offenses in rural communities populated largely by whites."[129]

Since the 1970s, there has been a 500% rise in the number of people incarcerated in prisons and jails resulting in a total of 2.2 million prisoners, 900,000 of whom are African Americans. As of 2001, one in six black men had been incarcerated, and at the current rate, one in three black males born today can expect to spend time in prison. African Americans are incarcerated at nearly six (5.6 exactly) times the rate of whites. The national incarceration rate for whites is 412 per 100,000 residents, compared to 2,290 for African Americans. These figures indicate that 2.3% of all African Americans are incarcerated, compared to 0.4% of whites. One in nine (11.7%) black males between the ages of 25-29 are currently incarcerated in prison or jail. The black rate of incarceration ranges from a high of 4,710 per 100,000 (4.7% of the population) in South Dakota to a low of 851 (0.85% of the population) in Hawaii. Hawaii, at 851 per 100,000 population, maintains a rate 15% higher than the state with the highest rate for whites, Oklahoma, at 740 per 100,000 population. While more than 1% of African Americans in 49 states and the District of Columbia are incarcerated, there is not a single state with a rate of incarceration that high for whites.[130]

Since 1980, tens of millions of dollars, countless hours, and all manner of attempts have been expended opposing the Drug War but to little avail. Indeed, it gets worse. As seen in a recent e-mail from an attorney in North Carolina whose Supreme Court has ruled that their most commonly used test for marijuana is nonspecific and invalid: "I had a trial yesterday for simple possession of marijuana. The officer testified that he asked the defendant to stick out his tongue because through his training and experience people who smoked marijuana had a white pasty film on their tongues, and my client, of course, had this white film."

A497                                                         P-002512

FALSE POSITIVES EQUAL FALSE JUSTICE                                                    **23**

The North Carolina Supreme Court decision shows that law enforcement officials, prosecutors, and judges know the lab tests as well as the "white pasty film" test and its like are unacceptable and invalid, yet they continue to use them to wrongfully prosecute and convict. This is because there is an invisibility cloak around their actions vis-à-vis the public and an ignorance on the part of defense attorneys. This is why we propose to spotlight this situation, not only to rectify it, but as a novel attempt to affect the Drug War. Given the enormous dependence on these tests, a moratorium on their use would cause an uproar that would, in turn, force a renewed public debate, if not a comprehensive investigation, about the Drug War. Revelations about the injustice and unwarranted suffering caused by the Drug War, as well as the waste of national resources, can't help but begin to resolve this travesty of justice and human outrage.

Despite Supreme Court rulings that the results of nonspecific, unreliable, invalid drug tests cannot be used by the police and prosecutors, the vast majority of drug arrests and convictions are based on these invalid tests that do not prove the presence of marijuana beyond a reasonable doubt. The result is untold thousands of wrongful arrests and convictions. At the same time, these burgeoning arrests and convictions, while costing hundreds of millions, have not reduced the use of drugs one iota.

## REFERENCES

1. NIK Public Safety System of Narcotics Identification, Armor Forensics 13386 International Parkway Jacksonville, FL 32218 AH-NIK-1004, 2004, at 5

2. id.

3. (Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse NIJ Standard 0604.01, U.S. Department of Justice/Office of Justice Programs, National Institute of Justice/Office of Science and Technology NCJ 183258 (July 2000) 1-13

4. id.

5. P.M. Leavitt and E.S. Guralick, A chemist in the Courtroom: An Interview with Professor Robert Shapiro About Drugs, Forensic Chemists and the Law, Journal of Criminal Defense, (1977), 235-275

6. id.

7. USA v. Edgar Diaz et al No. CR05-0167 WHA U.S. District Court for the Northern District of California, 2006 U.S. Dist. LEXIS 910684

8. U.S. Attorney Joseph P. Russoniello to U.S. District Court Judge Jeremy Fogel, February 13, 2008

9. id.

10. C.L. O'Neal, D.J. Crouch, A.A. Fatah, Validation of Twelve Chemical Spot Tests for the Detection of Drugs of Abuse, 109, Forensic Science International, (2001), 189-201

11. id.

12. id.

13. id.

14. id.

15. id. supra  at 7

16. US v. Bentham, 414 F. Supp. 2d 472 (S.D. N.Y. 2006)

17. id. supra at 1

24                                          FALSE POSITIVES EQUAL FALSE JUSTICE

18. J.J. Thornton and G.R Nakamura,  The Identification of Marijuana, Journal of Forensic Science Society, V.12, (1972) 461

19. id.

20. id.

21. id.

22. id.

23. E. J. Imwinkelried, Jackson v. Virginia: Reopening the Pandora's Box of the Legal Sufficiency of Drug Identification Evidence, Kentucky Law Journal, 76 (1) (1984)

24. id. supra at 7

25. G.R. Nakamura  Forensic,  Aspects of  Cystolith Hairs of Cannabis and Other Plants Journal of the AOAC, Vol.52, (1969) 5

26. P. Duquenois, Chemical and Physiological Identification of Indian Hemp, 2(3), UN Bulletin on Narcotics, 30 (1950)

27. Methods for the Identification of Cannabis, UN Secretariat, ST/SOA/SER.S/1 (1960 - addendum, June 1971)

28. id.

29. SFPD Crime Lab Controlled Substances SOP, Version 06/23/05, Rev.5 Approved MB

30. Frederick W. Fochtman and  Charles L. Witek,   A Note on the Duquenois-Levine Test for Marijuana, Clinical Toxicology, 4 (2), (June 1971) 287-289

31. Marc G. Kurtzman, Dwight S. Fullerton and Michael O. McGuire "Winning Strategies for Defense of Marijuana Cases: Chemical and Botanical Issues" Journal of Criminal Defense Vol. 1 (1975) 487

32. id.

33. id.

34. id.

35. Frederic Whitehurst, Forensic Analysis of Marijuana and the Kurzman Mystery; A Case  Study of Flawed Logic in the Determination of Guilt. Texas Tech Law Review,

41:1 Fall 2008, 1-16

36. id. supra at 25

37. id. supra at 35

38. id. supra at 35

39. R.A. de Zeeuw, Fitness for Purposes of Mass Spectrometric Methods in Substance Identification, Journal of Forensic Sciences, 50:3 (May 2005)

40. id. supra at  31

41. H. Aramaki, N. Tomiyasu, H. Yoshimura & H. Tsukamoto, Forensic Chemical Study on Marijuana, 16, Chemistry and Pharmacy Bulletin of Japan, (1968), 822

42. R.F. Turk, H. Dharir, & R.B. Forney, A Simple Chemical Method to Identify Marijuana, 14, Journal of Forensic Sciences, (1969), 389

43. R.N. Smith, A Brief Note on the Response of Some Essential Oils and Extracts to the Duquenois-Levine Test, 14, Journal of Forensic Sciences, (1974), 191

FALSE POSITIVES EQUAL FALSE JUSTICE                                                           25

44. M.J. de Faubert Maunder, Two Simple Colour Tests for Cannabis, UNODC Bulletin on Naarcotics, Issue 4 – 005, (1969), 37-42

45. id.

46. id.

47. id.

48. id.

49. C.G. Pitt, R.W. Hemdron & R.S. Hsia, The Specificity of the Duquenois Color Test for Marijuana and Hashish, Journal of Forensic Sciences, 17 (4) (1972) 693

50. id.

51. id.

52. id.

53. State v. Wind No. State 53, Supreme Court of Wisconsin 60 Wis 2d 267, 208 N.W. 2d 357 1973 Wisc.

54. City of Egan v. Mittledorf, file #4-1-8556 Dakota County, Minn. 1974; State v. Byers  Case # 371173 Mun. Ct. Minneapolis, Minn. 1974; State v. Gilmore, Mo. 3d Cir. Dist. Ct., Oct. 9, 1975

55. Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) Recommendations, U.S. Department of Justice, DEA, 2nd Edition, 2006-07-09

56. Annual Book of ASTM Standards 2006 section 14.02 Designation:E2327-04 (Reapproved 2003) Standards of Practice for Quality Assurance of Laboratories Performing Seized-Drug Analysis (1010-1013) and Standard Guide for Microcrystal Testing in the Forensic Analysis of Cocaine/ASTM International

57. Recommended Methods for Testing Cannabis, Manual for Use by National Narcotics Laboratories, Division of Narcotic Drugs, Vienna ST/NAR/8 (United Nations New York 1987) pp. 2-3)

58. Recommended Guidelines for Quality Assurance and Good Laboratory Practices, United Nations Division of Narcotic Drugs, Vienna (1992) pp. 23, 25, 29

59. Rapid Testing Methods for Drugs of Abuse, Manual for Use by National Law Enforcement and Narcotics Laboratory Personnel United Nations Manual ST/NAR/13/REV. 1 (UN New York 1994)

60. id. supra at 55

61. USA v. Frazier 387 F. 3d 1244 (11th Cir. 2004)

62. id.

63. id. supra at 55

64. The People of the State of New York v. Jason F. Justice Court of New York, Village of Horseheads, Chemung County  181 Misc. 2d  653; 694 N.Y. S. 2d 908; 1999 N.Y. Misc. LEXIS 348

65. id.

66. The People of the State of New York v. Juan Escalera  Criminal Court of  the City of New York, New York County 143 Misc. 2d  779; 541 N.Y. S. 2d 707; 1989 N.Y. Misc. LEXIS 632

67. Federal Rules of Evidence  Committee Notes on Rule 702 (2007)

68. Michael J. Saks and Jonathan J. Koehler The Coming Paradigm Shift in Forensic Identification Science, Science, 309 (August 2005) 892

69. id. supra at 7

70. E. G. C. Clarke, Isolation and Identification of Drugs, The Pharmaceutical Press, London, 1969

71. id. supra at 7

72. id. supra at 7

73. id. supra at 70

74. U.N. Recommended Methods for Testing for Cocaine, Manual for Use by the National Narcotics Laboratories, UN Division of Narcotic Drugs, Vienna, ST/NAR/7 United Nations New York, 1986, 1-32

75. id. supra at 56

76. id. supra at 7

77. id. supra at 74

78. id. supra at 74

79. Mandatory Guidelines for Federal Workplace Drug Testing Programs, Department of Health and Human Services, Substance Abuse and Mental Health Services Administration Federal Register, V. 69, No. 71, April 13, 2004, 19644-19673

80. Charles Fulton, The Identification of Cocaine and Novocaine UNODC Bulletin on Narcotics, Issue 2, 1953

81. id.

82. id. supra at 7

83. id. supra at 7

84. A.C. Allen, D.A. Cooper, W.O. Kiser, and R.C. Cottrell, The Cocaine Diastereoisomer, Journal of Forensic Sciences, V. 26, Issue 1, January 1981

85. J. Swiatko, P.R. DeForest, and Zedeck, M.S. Further Studies on Spot Tests for Identification of Cocaine, Journal of Forensic Sciences, V. 48, Issue 3, May 1, 2003

86. id.

87. id. supra at 7

88. id. supra at 7

89. id. supra at 7

90. Asahi Newspaper, Feb 7, 2004

91. Charles Fulton, Modern Microcrystal Tests for Drugs, Wiley-Interscience, New York, 1969

92. Peter Baker and Geoffrey F. Phillips, The Forensic Analysis of Drugs of Abuse, The Analyst, V.108, No. 1288, July 1983, 777-807

93. id. supra at 10

94. In Chemical Analysis, A Series of Monographs on Analytical Chemistry and its Applications, edited by P. J. Elving, J.D. Winefordner, Volume 75, in the volume entitled, "Spot Test Analysis," by Ervin Jungreis, John Wiley & Sons, 1985

95. id. supra at 59

96. J.D. Prall  An Additional Screening Test for Cocaine, Microgram 8 (1975) 130-134

97. M. Ishiguro, S. Inde, M. Ochiai, S. Nanba,  Screening of Cocaine by Color Test, Report Central Custom's Lab,

FALSE POSITIVES EQUAL FALSE JUSTICE                                                27

27 (1987) 135-145

98. S. K. Lorch,  Specificity Problem with the Cocaine-Specific Field Test, and its Solution, Microgram 7 (1974) 100-101  See also: S.K. Lorch,  Specificity Problem with the Cocaine-Specific Field Test. II. Non-phenothiazine False Positives and the Separation of Phencyclidine-promazine Combinations. Microgram 7 (1974) 129-130

99. F.W. Grant  A Simple Field Test for Cocaine not Relying on Cobalt Thiocyanate,  Microgram 8 (1975) 10-11

100. Y. Tsumura, T. Mitome, and S. Kimoto,   False Positives and False Negatives with a Cocaine-specific Field Test and Modification of Test Protocol to Reduce False Decision, Journal of Forensic Science International, 155, (2005) 158-164

101. id.

102. See Washington Post, Dec. 29, 2008

103. The People of the State of Illinois v. Peppe Park, No. 49728, Supreme Court of Illinois, 72 Il. 2d. 203;  308 N.E. 2d 795; 1978 Il. LEXIS 303, 20 IL Dec. 588

104. id.

105. id.

106.   State v. Wind No. State 53, Supreme Court of Wisconsin 60 Wis 2d 267, 208 N.W. 2d 357 1973 Wisc.

107. id.

108. Moore v. the United States, 374 A. 2d 299 (D.C. App. 1977)

109. id.

110. State of North Carolina v. C. Richard Tate No. 77, Supreme Court of North Carolina 300 N.C. 180;  265 S.E. 2d 223; 1980 N.C. LEXIS 1046

111 id.

112. id. supra at 66

113. id. supra at 66

114. id. supra at 106

115. Wisconsin v. Jackson 468 N.W. 2d 431 (Wis. Sup. Ct. 1991)

116. id.

117. id.

118. id. supra at 103

119. S. G. Thompson, The Constitutionality of Chemical Test Presumptions of Intoxication in Motor Vehicle Statutes, San Diego Law Review, v. 20, No. 2 (1983), 301-338

120. id. supra at 7

121. Disparity By Geography: The War on Drugs in America's Cities, The Sentencing Project, Ryan S. King, May 2008 and  Uneven Justice: State Rates of Incarceration By Race and Ethnicity, Marc Mauer and Ryan S. King, July 2007 (www.sentencingproject.org)

122. id.

123. id.

**28**                                    FALSE POSITIVES EQUAL FALSE JUSTICE

124. id.

125. id.

126. id.

127.  Jamie Fellner, Punishment and Prejudice: The Racial Costs in the War on Drugs, Human Rights Watch, May 2000.

128. id. supra at 121

129. id. supra at 121

130. id. supra at 121

                              P-002518

FALSE POSITIVES EQUAL FALSE JUSTICE                                            29

# Experiments Shed Light on the False Positives

In 2008 and 2009 Dr. Omar Bagasra and his assistant Krishna Addanki tested the specificity of the NIK Duquenois-Levine Reagent System and the NarcoPouch™ KN Reagent tests with 42 non-marijuana substances following the procedure prescribed by each manufacturer. The following chart depicts the substances and the results from each test.

1. Remove clip, insert suspect material into test pack, reseal with clip and tap gently to assure material falls to the bottom of pack.

2. With the printed side of test facing you, break ampoules from left to right. Break by squeezing the center of the ampoule with tips of thumb and forefinger.

3. Break left ampoule, agitate vigorously for at least one minute.

4. Break middle ampoule and agitate gently. A blue-violet or purple color will develop within a few seconds to a minute if marijuana is present. Allow sufficient time for the blue-violet or purple to develop, but do not allow it to become too dark.

5. As soon as the blue-violet or purple color develops, break the right ampoule. Tap the pouch once or twice and the blue-violet or purple color will be extracted into the lower layer. Upper layer color is unimportant.

6. The formation of the proper blue-violet or purple color and its extraction into the lower layer is a positive test for marijuana.

Patchouli, spearmint, and eucalyptus tested positive for marijuana; while lavender, cypress, and oregano (which previous studies showed produced false positives with the D-L test) gave inconclusive results. The conclusion is that the NIK NarcoPouch 908 test is a nonspecific test that can give false positives. It cannot, therefore, be legally used for the prosecution or conviction of an individual for violations of the anti-marijuana laws.

The National Institute of Justice under the Department of Justice has established the following standards for literature accompanying drug field test kits.

a) A statement that the kit is intended to be used for presumptive identification purposes only, and that all substances tested should be subjected to more definitive examination by qualified scientists in a properly equipped crime laboratory.

b) A statement that users of the kit should receive appropriate training in its use and should be taught that the reagents can give false-positive as well as false-negative results.

c) A discussion of the possibility of reagent and/or sample contamination and consequent misleading results.

d) A discussion of proper kit storage in buildings and vehicles.

Each reagent container shall have a label that either directly or by reference:

a) Identifies the reagent.

b) Identifies the drug or drugs it can detect.

c) Is prominently marked "Danger" where appropriate.

d) Gives a discard date where appropriate.[3]

Aside from identifying the drug it can detect, the NIK NarcoPouch 908 does not provide any of this information. The failure to identify the dangers of the chemicals in the NIK NarcoPouch 908 is of particular concern given the following precautions and descriptions of these chemicals by the NIJ.

Acetaldehyde – EXTREMELY FLAMMABLE, TOXIC. May cause cancer. May cause heritable genetic damage. Harmful by inhalation, in contact with skin, and if swallowed. May cause sensitization by inhalation and skin contact. Possible risk of harm to unborn child. Causes severe irritation. Lachrymator. Photosensitizer. Target organs:

30                                              FALSE POSITIVES EQUAL FALSE JUSTICE

kidneys, liver. May develop pressure. Keep away from sources of ignition. In case of contact with eyes, rinse immediately with plenty of water and seek medical advice. Wear suitable protective clothing, gloves, and eye/face protection.

Vanillin – None.

Ethanol – FLAMMABLE. May irritate in body tissues. Use with adequate ventilation. Avoid breathing vapor. Do not get on eyes, skin, or clothing. Wash thoroughly after handling. Do not swallow or inhale. Wear suitable protective clothing and gloves.[4]

Hydrochloric acid – ACID, TOXIC, CORROSIVE. Liquid and mist cause severe burns to all body tissue. May be fatal if swallowed or inhaled. Inhalation may cause lung damage. Do not get on skin or clothing. Wash thoroughly after handling. Wear suitable protective clothing, gloves, and eye/face protection. Use only with adequate ventilation.

Chloroform – FLAMMABLE, TOXIC, POISON. Suspected cancer hazard. Exposure can cause damage to liver, kidneys, and central nervous system (CNS). Harmful if swallowed. Causes eye irritation. Harmful to skin and respiratory system. Toxic and corrosive gases are formed on contact with flames or hot glowing surfaces. Wear suitable protective clothing and gloves.

FALSE POSITIVES EQUAL FALSE JUSTICE                                    31

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|---|---|---|---|---|
| 1 | ORGANIC VANILLA EXTRACT FLAVORGANICS A1 | | POSITIVE REDDISH ORANGE PHOTO – A1 | NEGATIVE |
| 2 | ORGANIC PEPPERMINT EXTRACT FLAVORGANICS A2 | | NEGATIVE PALE YELLOW PHOTO – A2 | NEGATIVE |
| 3 | ORGANIC ANISE EXTRACT FLAVORGANICS A3 | | POSITIVE THICK RED PHOTO – A3 | NEGATIVE |
| 4 | ORGANIC HAZELNUT EXTRACT FLAVORGANICS A4 | | NEGATIVE PALE YELLOW PHOTO – A4 | NEGATIVE |
| 5 | ALCOHOL-FREE COFFEE FLAVOR FRONTIER A5 | | NEGATIVE DARK BLACK PHOTO – A5 | NEGATIVE |
| 6 | ALCOHOL-FREE ANISE FLAVOR FRONTIER A6 | | NEGATIVE PALE WHITE PHOTO – A6 | NEGATIVE |

**A506**

P-002521

32                                              FALSE POSITIVES EQUAL FALSE JUSTICE

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|-------|---------|---------|------------------------|-------------------------------------|
| 7 | ALCOHOL-FREE MINT FLAVOR<br>FRONTIER<br>A7 | | NEGATIVE<br>PALE WHITE<br>PHOTO – A7 | NEGATIVE |
| 8 | AGRIMONY FLOWER ESSENCES<br>BACH<br>A8 | | NEGATIVE<br>PALE YELLOW<br>PHOTO – A8 | NEGATIVE |
| 9 | VINE FLOWER ESSENCES<br>BACH<br>A9 | | NEGATIVE<br>PALE YELLOW<br>PHOTO – A9 | NEGATIVE |
| 10 | VINE FLOWER ESSENCES<br>BACH<br>A10 | | POSITIVE<br>ORANGE<br>PHOTO – A10 | NEGATIVE |
| 11 | CHICORY FLOWER ESSENCES<br>BACH<br>A11 | | POSITIVE<br>BRICK RED<br>PHOTO – A11 | NEGATIVE |
| 12 | CHICORY FLOWER ESSENCES<br>BACH<br>A12 | | POSITIVE<br>RED<br>PHOTO – A12 | NEGATIVE |

**A507**

FALSE POSITIVES EQUAL FALSE JUSTICE

33

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|-------|---------|---------|------------------------|------------------------------------|
| 13 | OLIVE FLOWER ESSENCES BACH A13 | | POSITIVE RED PHOTO – A13 | NEGATIVE |
| 14 | CERTIFIED ORGANIC PEPPERMINT WYNDMERE A14 | | POSITIVE ORANGE PHOTO – A13 | NEGATIVE |
| 15 | CERTIFIED ORGANIC PEPPERMINT WYNDMERE A15 | | POSITIVE RED PHOTO – A15 | NEGATIVE |
| 16 | PATCHOULI SIMPLERS A16 | | POSITIVE DENSE BRICK RED PHOTO – A16 | NEGATIVE |
| 17 | ROSE ABSOLUTE SIMPLERS A17 | | POSITIVE THICK RED PHOTO – A17 | NEGATIVE |
| 18 | GINKGO ZAND GOLD LABEL BOTANICALS A18 | | POSITIVE BRICK RED PHOTO – A18 | NEGATIVE |

**A508**

P-002523

34                                          FALSE POSITIVES EQUAL FALSE JUSTICE

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|---|---|---|---|---|
| 19 | AMERICAN GINSENG GAIA HERBS B2 | | POSITIVE ORANGE PHOTO – B2 | NEGATIVE |
| 20 | BAYBERRY NATURE'S ANSWER B3 | | NEGATIVE DARK BLUE PHOTO – B3 | NEGATIVE |
| 21 | ST. JOHN'S WORT LEMON BALM ECLECTIC INSTITUTE B4 | | POSITIVE DARK RED PHOTO – B4 | NEGATIVE |
| 22 | BERGAMOT ORGANICS B5 | | POSITIVE BRICK RED PHOTO – B5 | NEGATIVE |
| 23 | EUCALYPTUS ORGANICS B6 | | POSITIVE ORANGE PHOTO – B6 | NEGATIVE |
| 24 | PATCHOULI ORGANICS B7 | | POSITIVE BRICK RED PHOTO – B7 | NEGATIVE |

**A509**

FALSE POSITIVES EQUAL FALSE JUSTICE                                    35

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|---|---|---|---|---|
| 25 | CINNAMON LEAF ORGANICS B8 | | POSITIVE BRICK RED PHOTO – B8 | NEGATIVE |
| 26 | EUCALYPTUS ORGANICS B9 | | POSITIVE ORANGE PHOTO – B9 | NEGATIVE |
| 27 | BASIL ORGANIC OSHADHI B10 | | POSITIVE ORANGE PHOTO – B10 | NEGATIVE |
| 28 | CHAMOMILE ROMAN WYNDMERE B11 | | NEGATIVE CLOUDY WHITE PHOTO – B11 | NEGATIVE |
| 29 | EUCALYPTUS ORGANICS B12 | | POSITIVE ORANGE PHOTO – B12 | NEGATIVE |
| 30 | LEMON GRASS ORGANICS B13 | | POSITIVE CLOUDY ORANGE PHOTO – B13 | NEGATIVE |

P-002525

36                                    FALSE POSITIVES EQUAL FALSE JUSTICE

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|---|---|---|---|---|
| 31 | LAVENDER WYNDMERE B14 | | POSITIVE CLOUDY ORANGE PHOTO – B14 | INCONCLUSIVE |
| 32 | CLOVE BUD FRONTIER B15 | | POSITIVE RED PHOTO – B15 | NEGATIVE |
| 33 | ORGANIC CYPRESS SIMPLERS B16 | | POSITIVE RED PHOTO – B16 | POSITIVE |
| 34 | ORGANIC OREGANO SIMPLERS B17 | | POSITIVE DARK RED PHOTO – B17 | INCONCLUSIVE |
| 35 | ORGANIC SPEARMINT SIMPLERS B18 | | POSITIVE ORANGE PHOTO – B16 | INCONCLUSIVE |
| 36 | ORGANIC CLOVE SIMPLERS B19 | | POSITIVE BRICK RED PHOTO – B19 | NEGATIVE |

FALSE POSITIVES EQUAL FALSE JUSTICE                                    *37*

| S. NO | PRODUCT | PICTURE | NARCOPOUCH™ KN REAGENT | NIK DUQUENOIS-LEVINE REAGENT SYSTEM |
|---|---|---|---|---|
| 37 | ORGANIC CINNAMON LEAF SIMPLERS B20 | | POSITIVE BRICK RED PHOTO – B20 | NEGATIVE |
| 38 | ORGANIC PATCHOULI SIMPLERS B21 | | POSITIVE DENSE ORANGE PHOTO – B21 | POSITIVE |
| 39 | GINGER OSHADHI B22 | | POSITIVE DENSE ORANGE PHOTO – B22 | NEGATIVE |
| 40 | FRANKINCENSE OSHADHI B23 | | POSITIVE DENSE RED PHOTO – B23 | NEGATIVE |
| 41 | EUCALYPTUS OSHADHI B24 | | POSITIVE DENSE ORANGE PHOTO – B24 | POSITIVE |
| 42 | CLOVE OIL LORANN OILS INC. B25 | | POSITIVE BRICK RED PHOTO – B25 | NEGATIVE |



# NACDL NEWS

## National Academy of Sciences Reports 'Serious Deficiencies' In Nation's Crime Labs

By Jack King and Ivan J. Dominguez

The National Research Council of the National Academies of Science, Engineering and Medicine has finally released its long-awaited report on the state of forensic science in the United States. Finding an inconsistent system rife with "serious deficiencies," lacking practitioner and laboratory independence, standards, oversight, and certification, the NRC called for major reforms, including the establishment of a wholly independent federal agency, the National Institute of Forensic Science (NIFS), to address the manifold problems with the current science and system.

The report's release was the subject of a sedate news conference Feb. 18 at the National Academies in Washington, D.C. "The forensic science community is plagued by fragmentation and inconsistent practices in federal, state, and local law enforcement jurisdictions," said Judge Harry T. Edwards, who summarized the report's findings at the news conference. "The quality of forensic science practice varies greatly, and the quality of practice often suffers for lack of adequate training and continuing education, the absence of rigorous mandatory certification requirements for practitioners, the absence of mandatory accreditation of laboratories, failure to adhere to performance standards, and the lack of effective oversight." Edwards sits on the U.S. Court of Appeals for the D.C. Circuit and served as a co-chair of the committee that produced the report.

"We concluded that no existing agency has the capacity or the appropriate mission to take on the role and responsibilities needed to govern and improve the forensic science community. Therefore, the committee's principal recommendation is that Congress needs to authorize and fund the creation of an independent federal entity," the NIFS, Edwards stated.

The report explicitly recognizes that there is a world of difference between forensic science as an investigatory tool or method and proof of innocence or guilt in court. One example of this type of forensic work cited in the report is forensic odontology. "[F]orensic odontology might not be sufficiently grounded in science to be admissible under *Daubert*, but this discipline might be able to reliably exclude a suspect, thereby enabling law enforcement to focus its efforts on other suspects," according to the report.

"It's a landmark report," said Marvin E. Schechter, an NACDL member and report author who served on the NAS/NRC committee. "It will cause a sea change in the way prosecutors and

*Continued on page 14*

## 'False Positives' Report Calls Drug Field Tests Useless; 'Untold Thousands of Wrongful Arrests'

By Jack King

Possession of chocolate can get you arrested and could cost, you thousands in legal expenses. So can oregano, thyme, and a host of other harmless food, drug, and cosmetic items. Unfortunately, some people find that out the hard way.

Ron Obadia and his partner Nadine Artemis, co-owners of Living Libations Inc., a Canadian organic products business, are not drug smugglers. But on Aug. 22, 2008, they were arrested, handcuffed, and interrogated for hours at the Toronto airport after a brick-sized sample of their raw organic chocolate product field-tested positive for THC with the most widely used color reagent test.

A Royal Canadian Mounted Police officer accused the couple of attempting to smuggle hashish, which it resembled somewhat, into New York. They were locked in separate rooms and their one-year-old baby was taken away from them, which particularly upset Artemis. The RCMP told them they faced life in prison. Each was told the other had already confessed. Both adamantly denied their chocolate contained any marijuana.

Eventually they were released on bond and their child returned to them. "We're not the kind of people who have a criminal lawyer on speed-dial," Artemis said later.

Still eager to market their products in New York, the couple tried again three weeks later to enter the United States, this time by car near Buffalo. Knowing that they were now suspected smugglers, they hired an immigration lawyer to drive ahead of them and let U.S. Immigrations and Customs Enforcement (ICE) know that they were entering on legitimate business. Agents were waiting with a narcotics canine, which went over the car and their belongings and alerted on a bottle of tea tree oil, an organic plant product from Australia. The oil tested positive and, knowing that the couple had been arrested for trying to smuggle hashish, ICE decided it was "hash oil." Of the 40-odd other products in their sample cases, the chocolate again tested positive.

Subsequent laboratory tests found that none of the products seized contained illicit drugs.

Their two attempts to break into the U.S. market have cost Obadia and Artemis $20,000 in legal fees.

### Reagent Field Tests Not Specific to Drugs

What is going on here?

To answer that, Obadia and Artemis joined forensic science writer John Kelly, chemist Krishna Addanki of Claflin University, and a representative of Dr. Bronner's Magic Soap Company at a news conference held by the Marijuana Policy Project on March 3 at the National Press Club in Washington, D.C. The event was the release of Kelly's report, *False Positives Equal False Justice*, with actual demonstrations of drug field testing in order to raise public awareness of the false-positive problem. Kelly claims the widely marketed field test kits are worse than useless, and that even when used properly can cause great harm to innocent persons. According to his report, thousands of common foods, over-the-counter drugs, cosmetics,

and household products will falsely test positive in police drug field tests because the reagent tests themselves are not drug-specific.

For example, the 70-year-old Duquenois-Levine reagent test — the one that caused all the grief for Obadia and Artemis — is used by nearly every federal, state, and local police agency in the United States and the RCMP in Canada. According to tests done by Addanki and his advisor Dr. Omar Bagasra, besides cocoa products, the D-L test also reacts positively to eucalyptus, patchouli, and cypress. Another test, the ODV Inc. KN Reagent test (NarcoPouch 909, "A Test for Marijuana, THC, or Hashish," according to the packaging), not only reacts positively to cannabis products, but also to numerous aromatic herbs and essential oils, including thyme, oregano, anise extract, vanilla, peppermint, ginseng, and (in a test conducted by NACDL) even a strip of newspaper.

Duquenois-Levine tests (ODV NarcoPouch 908) conducted by NACDL staff indicated strong positive reactions to a Hershey's Dark Chocolate Kiss, the inside contents of a plain chocolate M&M, and shavings from a chocolate Thin Mint Girl Scout cookie.

Rob Kampia, executive director of the Marijuana Policy Project, explained why false positives on common food products like chocolate are a "big deal" for innocent citizens, particularly in the 13-odd states where medical use of marijuana is recognized. California, for example, has about 300 storefront dispensary operations. Many sick people do not smoke and consume THC products orally in confections and baked goods obtained at the medical marijuana dispensaries.

"If you look at their counter space, about half is taken up with whole marijuana, which people will buy to smoke or vaporize, and about half is food products — cookies, brownies, et cetera, for patients who don't want to inhale marijuana. They'd rather eat it. It's legal to eat it under state law in California, but it's illegal under federal law, and illegal for recreational users to be carrying around these 'edibles.' So when you have faulty field tests being used all across the country, including California, you have a situation where police come upon someone and they have to test the cookies." Innocent people could be detained, arrested, held, and even prosecuted because a food product tested positive for an illicit drug.

"No one should be using these faulty field tests that we're experimenting with here today, and the companies producing

Continued on page 14



KN Reagent test of a sample of a common commercial brand of oregano. The instructions on the test's packaging state: "Orange-red to a very dark red is indicative of the presence of marijuana, hashish, THC and other cannabis products." The KN test does not react to cocoa products.

## NACDL, Civil Liberties and Religious Groups Seek Warrant Requirement For Police GPS Surveillance

By Ivan J. Dominguez

The National Association of Criminal Defense Lawyers (NACDL) and a diverse group of civil liberties and religious organizations have weighed in on the question of whether police need a warrant in order to conduct surveillance of personal vehicles by secretly attaching global positioning satellite (GPS) transmitters. The case in New York's highest court has profound implications for the privacy rights of individuals and organizations.

Low-cost GPS transmitters can be secretly attached to a vehicle and pinpoint the vehicle's location on public or private property, within a few feet or yards, to virtually any computer with an Internet connection. The devices are useful for tracking a vehicle or person in real-time, but the data also can be permanently stored and subjected to pattern analysis, revealing not just a person's whereabouts, but his habits, associations, who his friends are, where he shops, banks and goes to church, and a host of other information. The coalition argues that court supervision should be required to protect First and Fourth Amendment privacy rights.

In *People v. Weaver*, which was argued March 24 in the New York Court of Appeals, the court will be considering whether a police officer, in his own discretion, may undertake GPS surveillance of individuals without any judicial oversight at all. The court below held that there is no obligation to obtain a warrant prior to undertaking such monitoring. Members of the public have no way of knowing if their movements are subject to electronic surveillance from which there is no legal protection.

The civil liberties alliance filed an *amicus curiae*, or "friend of the court," brief arguing such unfettered surveillance is unconstitutional and ill-advised as a matter of public policy. The groups include NACDL, the New York State Association of Criminal Defense Lawyers, the New York State Defenders Association, the Electronic Frontier Foundation (EFF), the American-Arab Anti-Discrimination Committee, the Sikh American Legal Defense and Education Fund, the Council on American-Islamic Relations (CAIR), and the Union for Reform Judaism. They urge the court to condition GPS monitoring upon judicial issuance of a warrant.

The brief was written by Susan J. Walsh, a partner at Moskowitz, Book & Walsh, LLP in New York City, NACDL Executive Director Norman L. Reimer, and NACDL Assistant Director of Public Affairs & Communications Ivan J. Dominguez.

"By its nature, GPS is a valuable tool because it permits long-term, sustained surveillance. But its potential for abuse is staggering. To allow this kind of personal data collection without judicial oversight is an Orwellian nightmare. The minimal time required to obtain a warrant based on probable cause restores balance and cannot credibly be said to impede legitimate law enforcement objectives," explains lead counsel Walsh.

A dissenting opinion in the case below rejected the analogy that the use of GPS is the functional equivalent of being fol-

Continued on page 17

6/16/2014                Addiction Inbox: Common Field Test for Marijuana is Unreliable, Critics Say

 2     More     Next Blog»                    Create Blog   Sign In

# ADDICTION INBOX

### THE SCIENCE OF SUBSTANCE ABUSE

Dirk Hanson

Articles and health studies about drugs, addiction and alcoholism, including the most recent scientific and medical findings.

---

WEDNESDAY, AUGUST 10, 2011

## Common Field Test for Marijuana is Unreliable, Critics Say

**A**



### 75-year old pot assay is due for an update.

We've all seen it on cop shows: The little plastic bag, the officer breaking the seal on a small pipette and inserting a bit of marijuana, then a firm shake, and voila, the liquid in the test satchel turns purple: Guilty.

Here's an interesting twist they don't tell you about: **The so-called Duquenois-Levine test—the dominant method for field-testing marijuana since 1930—is considered by many to be wildly inaccurate, and frequently doesn't hold up in court.** One U.S. Superior Court judge referred to the test as "pseudo-scientific."

Subscribe in a reader

I'm on
ScienceSeeker

twitter


The Chemical Carousel
Dirk Hanson
Buy New $12.92
Buy from amazon.com
Privacy Information

*Winner of the 2012 College on Problems of Drug Dependence/NIDA Media Award*

*"The most comprehensive single work on the topic for the lay reader.... The*

http://addiction-dirkh.blogspot.com/2011/08/common-field-test-for-marijuana-is.html

1/10

The test itself works fine. The problem is that, in addition to identifying marijuana or hashish, the Duquenois-Levine, or D-L, frequently reads positive for tea, nutmeg, sage, and dozens of other chemicals—including resorcinols, a family of over-the-counter medicines, which, according to John Kelly at *AlterNet,* includes Sucrets throat lozenges. **This does matter, because in New York, Washington, D.C., and elsewhere, inner-city minority kids are getting busted for pot in record numbers**. Lacking a reliable test protocol, marijuana is whatever the officer says it is. In a classic case that continues to bedevil the testing industry, a middle-aged woman was busted for marijuana while bird watching. A "leafy substance" turned purple on the Duquenois-Levine (D-L) test, and the woman was arrested. The material turned out to be sage, sweetgrass, and lavender, and the woman was engaging in a Native American purifying ritual using a smudge, a concept with which the arresting officers were unfamiliar.

So, when push comes to shove, a positive D-L rarely establishes the presence of marijuana beyond a reasonable doubt, without further confirmatory testing. For at least 20 years now, a visual inspection and a NarcoPouch, as the D-L field test is called, were enough to bring on the felony charges. State courts have squabbled over the matter, but state legislatures have been reluctant to intervene, in large part because sending samples to a lab for confirmatory testing is prohibitively expensive, particularly when the busts are small. The D-L test saves money.

According to the official drug policy of the United Nations, a positive marijuana ID requires gas chromatography/mass spectrometry analysis. And even this far more sophisticated test has angered courts in Washington and Colorado, the *UK Guardian* reports, "because the DEA doesn't have standard lab protocols to govern its use." In part, the judges are furious because plea-bargaining depends upon valid drug possession evidence. So, the officers themselves, when it comes to testifying in court, become de facto expert witnesses, able to identify illegal drugs on sight. Ah, those were the days. But now, cannabis-based products come in a bewildering variety of sizes, shapes, colors, smells, and chemical compositions.

But c'mon, if it looks like bud and it smells like bud... except that the research shows there are 120 terpenoid-type compounds involved in the odor of marijuana. No two varieties smell exactly alike. There *is* no characteristic marijuana smell—there are hundreds of characteristic marijuana smells. Nonetheless, in 2009 the National Academy of Sciences called the testing of controlled substances "a mature forensic science discipline," according to *AlterNet*.

In a 2008 article for the *Texas Tech Law Review*, Frederic Whitehurst, Executive Director for the Forensic Justice Project and formerly with the FBI, concluded: **"We are arresting vast numbers of citizens for possession of a substance that we cannot identify by utilizing the forensic protocol that is presently in use in most crime labs in the United States."** In another section of the article, Whitehurst asks: "Why is this protocol still being utilized to decide

*Chemical Carousel is an important look at the contemporary science of the addicted brain." --Jonathan Taylor, EROWID*

*"A savvy, big-hearted exploration of the latest investigations into addiction science."--Kirkus Discoveries*

*The Chemical Carousel: What Science Tells Us About Beating Addiction.* **By Dirk Hanson**

Notes, bibliography, index. 472 pages. ISBN 1439212996. Published by **BookSurge.** Available in Kindle format. For more, see *The Chemical Carousel web site.*

**RECENT FREELANCE ARTICLES**

**"Drowning in Light."** *Nautilus Magazine*. March 6, 2014.

**"Neuroessentialism: The 'Dark Side' of Focus on Brain Plasticity?"** *The Dana Foundation*, January 23, 2014.

whether human beings should be confined to cages and at times, to death chambers?" And as Stewart J. Lawrence and John Kelly write in the *Guardian*, "using manifestly flawed drug identification tests to charge defendants, or pressure them to plead guilty, is hard to square with a defendant's right to due process."

Photo Credit: http://www.howardcountydui.com/

**You might also like:**

Congress and the Civil War Over Marijuana

Bill to Legalize Marijuana Offered in U.S. House

Praising Marijuana Prohibition

Linkwithin

POSTED BY DIRK HANSON AT 4:45 PM

+1  +2  Recommend this on Google

LABELS: CALIFORNIA POT LAWS, CANNABIS, DRUG LAWS, DRUG WAR, MARIJUANA, MARIJUANA FIELD TEST, MARIJUANA TESTING, POT BUST

**NO COMMENTS:**

Post a Comment

**LINKS TO THIS POST**

Create a Link

Newer Post                    Home                    Older Post

Subscribe to: Post Comments (Atom)

---

**"Gambling Machines That *Prevent* Addiction."** *Scientific American Mind. November/December 2013.*

**"Taranturaptor, Pandaroo, and Other Animal Hybrids We Wish Existed.*"* Wired. June 3, 2013. (Contributor)*

**"Speaking in Tongues: Glossolalia and Stress Reduction."** *The Dana Foundation.* October 23, 2013.

**"When the Trip Never Ends."** *The Dana Foundation.* April 29, 2013.

**"The Year in Synthetic Drugs."** *Salon.* December 26, 2012.

**"Women's Response to Alcohol Suggests Need for Gender-Specific Treatment Programs."** *Scientific American.* December 16, 2011

**"Shoplifting and Suicide."** *The Dana Foundation.* February 11 2013.

**"Smoking's Ties to Schizophrenia."** *The Dana Foundation.* May 2,

OFFICE OF JUSTICE PROGRAMS
BJA BJS NIJ OJJDP OVC SMART

# PUBLICATIONS

## NCJRS Abstract

The document referenced below is part of the NCJRS Library collection.
To conduct further searches of the collection, visit the NCJRS Abstracts Database .

How to Obtain Documents

| | |
|---|---|
| NCJ Number: | NCJ 047274   🔍 FIND IN A LIBRARY |
| Title: | STUDY OF FALSE POSITIVES IN TH CHEMICAL IDENTIFICATION OF MARIHUANA |
| Author(s): | R B HUGHES ; V J WARNER |
| Corporate Author: | American Soc for Testing and Materials<br>Promotions Manager<br>United States of America |
| Journal: | JOURNAL OF FORENSIC SCIENCES Volume:23 Issue:2 Dated:(APRIL 1978) Pages:304-310 |
| Date Published: | 1978 |
| Page Count: | 7 |
| Annotation: | THE RELIABILITY OF THE MODIFIED DUQUENOIS-LEVINE TEST FOR THE IDENTIFICATION OF MARIHUANA WAS EXAMINED BY SUBJECTING 50 HERBAL SUBSTANCES TO BOTH THIN-LAYER CHROMATOGRAPHY AND THE MODIFIED VERSION OF THE TEST. |
| Abstract: | HERBAL SUBSTANCES INCLUDED CHEMICAL, PLANT, OR ESSENTIAL OILS. PROCEDURE USED FOR THE MODIFIED DUQUENOIS-LEVINE TEST INVOLVED EVAPORATION OF TEST SUBSTANCE RESIDUE FROM A PETROLEUM ETHER SOLUTION. RESIDUE WAS THEN DISSOLVED IN DUQUENOIS REAGENT AND 1 ML HYDROCHLORIC ACID WAS ADDED. COLOR CHANGES WERE OBSERVED OVER A 2-MINUTE AND A 10-MINUTE TIME INTERVAL. AFTER 10 MINUTES, 1 ML CHLOROFORM WAS ADDED FOR COLOR TRANSFER TO THE CHLOROFORM LAYER. RESULTS OF THE THIN-LAYER CHROMATOGRAPH AND THE DUQUENOIS-LEVINE TEST FOR COMPOUNDS ANALYZED WERE COMPARED WITH RESULTS OBTAINED FOR CANNABINOL, TETRAHYDROCANNABINOL, AND CANNABIDIOL FOUND IN A MARIHUANA SAMPLE. A NUMBER OF THE SUBSTANCES TESTED PRODUCED POSSIBLY CONFUSING RESULTS. HOWEVER, ADDITION OF CHLOROFORM AT 2 MINUTES GREATLY INCREASES THE SELECTIVITY OF THE TEST AND THE POSSIBILITY OF FALSE POSITIVES BECOMES NEGLIGIBLE. ONLY A LIMITED NUMBER OF FRESH COFFEES MIGHT GIVE MISLEADING RESULTS WITH THE MODIFIED TEST. HOWEVER NONE OF THE COMPOUNDS OR MIXTURE OF COMPOUNDS TESTED WILL COINCIDENTALLY CHROMATOGRAPH AND DEVELOP THE SAME COLORS, AS MARIHUANA WHEN SPRAYED WITH FAST BLUE B SALT AFTER THIN-LAYER CHROMATOGRAPHY ANALYSIS. IT IS CONCLUDED THAT WHERE MORPHOLOGICAL STRUCTURES ARE NOT READILY OBSERVABLE, BOTH THE MODIFIED TEST AND THIN-LAYER CHROMATOGRAPHY MUST BE DONE TO IDENTIFY A SUBSTANCE AS HAVING ORIGINATED FROM THE CANNABIS PLANT. HOWEVER IF THE GLANDULAR, CLOTHING, AND UNICELLULAR CYSTOLITHIC HAIRS ARE PRESENT EITHER THE MODIFIED TEST OR CHROMATOGRAPHY WITH FAST BLUE B ARE POSITIVE EVIDENCE THAT CANNABIS IS PRESENT IN THE SAMPLE. SUBSTANCES TESTED AND TEST RESULTS ARE PRESENTED IN A TABLE, AND REFERENCES ARE INCLUDED. (JAP) |
| Index Term(s): | Chromatography ; Marijuana ; Evidence identification and analysis ; Research ; Techniques ; Drug analysis |
| Sale Source: | US Drug Enforcement Admin<br>800 K Street, N.W., Suite 500<br>Washington, DC 20001<br>United States of America |
| Type: | Report (Study/Research) |
| Country: | United States of America |
| Language: | English |

**To cite this abstract, use the following link:**
https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=47274

* A link to the full-text document is provided whenever possible. For documents not available online, a link to the publisher's web site is provided.

Office of Justice Programs 🔗 ⌄

- Bureau of Justice Assistance 🔗 ⌄
- Bureau of Justice Statistics
- National Institute of Justice 🔗 ⌄
- Office for Victims of Crime 🔗 ⌄

- Office of Juvenile Justice and Delinquency Prevention 🔗 ⌄
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking 🔗

Contact Us | Feedback | Site Map
Freedom of Information Act | Privacy Statement | Legal Policies and Disclaimers
USA.gov | CrimeSolutions.gov
Department of Justice | Office of Justice Programs

**The Washington Post**

**The Watch**

# A partial list of things that field testing drug kits have mistakenly identified as contraband

**By Radley Balko**  February 26

Last week, my Post colleague Abby Phillip wrote about Joseph Ray Burrell, a Minnesota man who spent more than two months in jail because a police drug field test incorrectly identified a bag of vitamins in his car as amphetamines.

It isn't the first time one of these field tests has caused a wrongful arrest. Or the second. Or the third. In fact, I've been compiling a running list of all the materials that one or more of these field tests has mistaken for drugs. It includes . . .

- Sage

- Chocolate chip cookies

- Motor oil

- Spearmint

- Dr. Bronner's Magic Soap

- Tortilla dough

- Deodorant

- Billiards chalk
- Patchouli
- Flour
- Eucalyptus
- Breath mints
- Loose-leaf tea
- Jolly Ranchers

Why, it's almost as if these field tests will say whatever law enforcement officers want them to.

Six years ago, the Marijuana Policy Project put out a study to demonstrate the high error rate in these tests and to draw attention to the fact that false positives can lead to wrongful arrests. It didn't seem to do much good.

Radley Balko blogs about criminal justice, the drug war and civil liberties for The Washington Post. He is the author of the book "Rise of the Warrior Cop: The Militarization of America's Police Forces."

P-004084

6:10AM  [Fri] Feb 27, 2015, $385 online now. Do you know more about a story?   Real Estate  Cars  Jobs  Dating  Newsletters  Fairfax Media Network

# Drug accused woman freed after substance found to be iced tea

March 18, 2010                                                                                                   Read later

Steve Butcher

Email article     Print

A Filipina arrested last weekend at Melbourne Airport and charged with drug importation was freed today after the substance was found to be iced tea.

Maria Cecilia Silva, 29, who had protested her innocence, was released in tears from the dock in Melbourne Magistrates Court after the prosecution announced that the charge would be withdrawn.

She had been charged with importing a commercial quantity of a border control drug and had been in custody since Saturday.

The court heard the three 800-gram packages of iced tea bought in the Philippines, tested positive on Saturday to a swab and again, in a presumptive test.

A drug dog also indicated a positive result for narcotics when it checked the packages.

But defence barrister Michael Pena-Rees told the court final analysis of the substance by the Australian Federal Police found it was lemon-flavoured iced tea.

He said there had previously been incidents of the tea being wrongly identified as a drug, which in this case was wrongly identified as methylamphetamine and then amphetamine.

Magistrate Jack Vandersteen, who awarded costs of $5000 to Ms Silva, said no criticism could be made of investigators, which the defence agreed with.

Once freed, Ms Silva was in tears and clung to a female prison guard who led her through the court to a friend who was waiting to embrace her.

"She's traumatised, she's lost a lot of weight and she'll be seeing a doctor," Mr Pena-Rees said.

"She's a wedding planner in the Philippines, her mother is a wedding singer and her father is a wedding musician - it's a family business.

"She's a totally innocent young lady who has experienced five days in a horrendous situation having her liberty taken away and placed in cells with some serious offenders."

Mr Pena-Rees said he understood that there have been similar problems with packets of iced tea on previous occasions.

Philippines embassy vice-consul Alex Go said the bungle had distressed not only the woman but her family. He urged Customs officials to take measures to ensure similar mistakes did not occur in the future.

"We hope of course that mistakes like this will not happen frequently because you can imagine the distress not only of the person involved, but also the relatives in the Philippines," he said.

"We respect, of course, the right of Australian customs to conduct searches of travellers coming in. The process was quick, and at every stage from the time she was apprehended we have been informed and we were monitoring the event.

"We hope this will serve as a lesson to everybody to be more careful."

Mr Go said he was unsure how customs officials had mistaken the iced tea, which was popular in the Philippines' hot weather, for a banned substance.

He said iced tea was a common grocery item in the Philippines and came in various forms, including pre-mixed drinks and powder form.

Ms Silva had brought the iced tea from the Philippines for a friend.

"That's what she told the Customs," Mr Go said. "She said she'd bought it from the grocery store and had the receipt."

In a joint statement issued today, Customs and Border Protection and the Australian Federal Police said the incident was "regrettable".

"Customs and Border Protection and the Australian Federal Police responded appropriately to indicators that suggested the passenger was carrying a

A521                                                                                          P-004089

Case 2:13-cv-02586-JWL Document 327-64 Filed 11/17/15 Page 11 of 22

prohibited substance, the statement said. Document: 01019599309 Date Filed: 04/07/2016 Page: 68

"Further forensic testing undertaken by the Australian Federal Police returned a negative result for illicit substances and as such the charges were dropped.

"Customs and Border Protection and the Australian Federal Police agree that the incident was regrettable, however, upon the full forensic testing being completed, charges were dropped immediately and the woman was released."

With Megan Levy and AAP

## Recommended



Why Kim Kardashian should pose nude more often
*Life & Style*



Senator Ricky Muir reveals new position on Abbott...
*Federal Politics*



Man found dead on footpath in Collins Street, roads...
*Victoria*



'Peppa Pig' episode banned in Australia for sending...
*Essential Kids*



Preschooler walks 2.4km home alone
*Essential Baby*

## Promoted Stories



11 Totally Macabre and Unnerving Wikipedia Pages You...
*Answers.com*



Man posing for selfie struck, killed by Amtrak train
*Fox News*



Wendy Breaks Down Suge Knight's Confrontation Story
*BET*



This Is Awesome! Watch What Happens In Zero Gravity...
*4daysin*



Adultery Is Now Legal in South Korea
*Newser*

Recommended by

Email article    Print

Case 2:13-cv-02586-JWL Document 327-64 Filed 11/17/15 Page 12 of 22

2/26/2015                         No, I'm Not Using Slang. It Really Is Tea. - Hit & Run : Reason.com

Appellate Case: 16-3014    Document: 01019599309    Date Filed: 04/07/2016    Page: 69

support reason

Click here to Shop now at Amazon.com
A portion of your order will help support reason.com

Click here to login.

Follow $8$+1    Like 236k

| HOME | REASON**TV** | HIT & RUN | MAGAZINE | POLL | SUBSCRIBE | DONATE | SHOP | SEARCH |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

Aging    Net Neutrality    2016 Presidential Campaign    ISIS    College    Marijuana    More

Reason In Your Inbox!

SIGN UP

# No, I'm Not Using Slang. It Really Is Tea.

Jacob Sullum | Mar. 4, 2009 3:17 pm

Share 20   $8$+1   0    Tweet 2

According to a new report (PDF) sponsored by the Marijuana Policy Project, field tests commonly used by police to identify marijuana and other drugs yield false positives in response to a variety of legal substances, resulting in the arrest and detention of innocent people. Worse, "millions of people have been, and continue to be, prosecuted and convicted of marijuana charges without proof that they possessed marijuana." The author, forensic drug expert John Kelly, says an investigation he conducted in collaboration with former FBI scientist Frederic Whitehurst "reveals a drug testing regime of fraudulent forensics used by police, prosecutors, and judges which abrogates every American's Constitutional rights."

Some of the cases Kelly cites may ring a bell. In April 2007, for instance, the NarcoPouch 928 drug test kit falsely fingered Don Bolles, drummer for the punk band The Germs, for GHB possession, reacting to a sample of Dr. Bronner's Magic Soap. "Subsequent testing," Kelly notes, "found that a wide variety of natural soaps as well as soy milk test positive for GHB." In August 2008, Ron Obadia and Nadine Artemis were detained at Toronto International Airport en route to the U.S. because the Duquenois-Levine color chemical test indicated that the raw chocolate they carried contained hashish. "Subsequent lab testing proved there was no hashish in the chocolate," Kelly writes. "They were released but stuck with a $20,000 legal bill." The same thing happened *again* the following month.

According to Kelly, "millions of people have been arrested, prosecuted, and convicted of marijuana charges on the basis of the Duquenois-Levine (D-L) color chemical test, both with and without a microscopic exam." Experiments with the D-L test described at the end of the report found that "patchouli, spearmint, and eucalyptus tested positive for marijuana, while lavender, cypress, and oregano (which previous studies showed produced false positives with the D-L test) gave inconclusive results." In tests using just the NarcoPouch KN Reagent kit, 33 of 42 substances—including vanilla, anise, chicory, and peppermint—tested positive for cannabis.

Nick Gillespie noted the Bolles case in 2007.

"A thrilling and fascinating book, which could change your view of human history and human destiny."
—Steven Pinker, author of *The Blank Slate*



"*The Moral Arc* displays the impressive depth of Michael Shermer's scholarship, wisdom, and empathetic humanity, and it climaxes in a visionary flight of futuristic optimism. A memorable book: a book to recommend and discuss late into the night."
—Richard Dawkins, author of *The Selfish Gene* and *The God Delusion*

On sale now

## TOP STORIES

Featured    Most Visited    Most Commented



**The FCC Just Voted to Regulate the Internet Like a Utility**
2.26.15 1:22 pm



**ATF Tries to Ban Common Rifle Ammo As "Armor-Piercing" Despite Its Own Statutory Definition**
2.25.15 8:36 pm

**The Black Family in 1965 and Today**
2.26.15 12:01 am



**FCC Commissioner Ajit Pai: Net Neutrality is a "Solution That Won't Work to a Problem That Doesn't Exist"**
2.25.15 11:04 am



**Screwed by Seniors**
2.06.15 9:00 am

Jacob Sullum is a senior editor at *Reason* magazine and a nationally syndicated columnist.

*Follow Jacob Sullum on* Twitter

Media Contact    Reprint Requests

A523                                              P-004098

2/26/2015

Case 2:13-cv-02586-JWL   Document 327-64   Filed 11/17/15   Page 13 of 22

No, I'm Not Using Slang. It Really Is Tea. - Hit & Run : Reason.com

Appellate Case: 16-3014    Document: 01019599309    Date Filed: 04/07/2016    Page: 70

EMAIL    SHARE    PRINT

RELATED

**VID: Silk Road, Online Freedom, and Why the Prosecution (and Conviction) of Ross Ulbricht Should Worry Us All**
Nick Gillespie | 2.21.15

**Gun Rights and Civil Rights Go Hand-in-Hand**
Zach Weissmueller | 2.07.15

**Police Use Radar Device To See Inside Your House**
Ronald Bailey | 1.20.15

Civil Liberties, Drug Policy, Criminal Justice

**You May Like**                                 Sponsored Links by Taboola

**Forget Iran, Iraq, Ukraine: This is Where War WWIII Starts**
Money Morning Newsletter

**Americans Can't Believe Controversial Site Is Legal**
Instant Checkmate People Search

**See Why Tesla Was Stabbed In The Back 3 Times For This Endless Energy Secret**
Power Innovator eBook

**5 Foods to Never Eat After the Age of 45**
Beyond Diet Guide

**Warren Buffett Reveals How Anyone With $40 Could Become A Millionaire**
The Motley Fool

**14 Benefits Most Seniors Didn't Know They Had**
Newsmax

---

**You might like:**

A.M. Links: Uptick in Entry of Syrian Refugees to U.S. Expected, Fighting in Ukraine Continues, Biden's Being Biden

Wendy Breaks Down Suge Knight's Confrontation Story

The Grassley Center for Seppuku Studies

Does Toppling Qaddafi Make U.S. Involvement in Libya Legal?

Recommended by

VIEW COMMENTS (39) | LEAVE A COMMENT

You must have an account and be logged in to comment.
Click here to register, or here to login if you already have an account

---

## GET REASON MAGAZINE

Get Reason's print or digital edition before it's posted online



**The Future of Money: 4 new ways we'll pay for stuff in 15 years**

**Matt Welch: Kiss your financial privacy goodbye**

**How the Fed Got Huge**

**Jacob Sullum: Obama's dumb, rash, and unilateral war.**

**And much more.**

SUBSCRIBE

## 70 Year Old Grandma Looks 40



Before                                    After

**Dr OZ:"Better than a facelift"**  ▶

### REASONTV: FEATURED VIDEOS



**FCC Commissioner Ajit Pai: Net Neutrality is a "Solution That Won't Work to a Problem That Doesn't Exist"**
Nick Gillespie
Todd Krainin



**Glenn Greenwald's Plan to Poke, Prod, and Piss Off the Powerful**
Todd Krainin



**Black Open Carry: Why Gun Rights and Civil Rights Need Each Other**
Zach Weissmueller

VIEW ALL »

---

**Forthcoming Prisoner Rema...**
Jesse Walker | 03.04.2009

HIT & RUN HOME

**The Constitutional Right...**
Damon Root | 03.04.2009

VIEW HIT & RUN ARCHIVES

**Do You Approve of Obama's Job Performance? Vote**

# ● StoptheDrugWar.org

Published on *StoptheDrugWar.org* (http://stopthedrugwar.org)

# Press Release: Government&#039;s Drug War Test Kits Give False Positives on Organic and Natural Products

- Post to:
- Twitter [1]
- ▪ Share [2]
- Digg [3]
- StumbleUpon [4]
- Reddit [5]

by borden [6], October 10, 2008, 12:00am, (Issue #555 [7]) Posted in:   Drug Testing [8]    Press Release [9]

- [Spanish] Comunicado de prensa: Equipos para exámenes de lucha contra la droga del gobierno dan falsos positivos con productos orgánicos y naturales [10]
- [Portuguese] Nota à imprensa: Kits para exames do combate às drogas do governo dão falsos positivos com produtos orgânicos e naturais [11]

Drug testing violates personal privacy. Now, at least one widely-used drug testing kit has been proven to be a scam too.

For decades law enforcement agencies including local police, DEA and US Customs have used what is known as "presumptive field drug-test" kits to confirm that suspected materials are illegal drugs. The tests, which use powerful acids to react with suspected substances, change color to indicate the presence or absence of drugs. However, there is now conclusive evidence the field drug tests falsely indicate the presence of drugs when used on numerous natural products such as soap, soy milk, essential oils and chocolate. Developed over 60 years ago, these tests are made by the giant homeland security company Armor Holdings, a subsidiary of BAE Systems. At a cost of less than five dollars each, the field drug tests can be found in nearly every police car, border checkpoint, jail and in most schools.

2/26/2015

Case 2:13-cv-02586-JWL   Document 327-64   Filed 11/17/15   Page 15 of 22
Press Release: Government's Drug War Test Kits Give False Positives on Organic and Natural Products

Appellate Case: 16-3013   Document: 01019599309   Date Filed: 04/07/2016   Page: 72



NarcoPouch Squad Pack Kit, the Armor Holdings product responsible for the Don Bolles false positive

In August and September of this year, Canadians Ron Obadia and Nadine Artemis, founders of Living Libations who make raw organic chocolate and natural personal care products, were arrested while trying to cross the US border, after a false-positive drug test on their chocolate products. Their eight month old son was taken from them, and US border agents interrogated them separately and attempted to coerce confessions, even telling them their partner had confessed to smuggling hash. The couple eventually was cleared of all drug charges from the August incident after confirmation lab tests showed there were no drugs. But they were re-arrested in September while again trying to cross the US border for a US natural products trade show, despite high level communication and permission between their Canadian attorney and US Customs officials. Mr. Obadia now faces charges of exporting a controlled substance, where the only evidence is an NIK (Armor Holdings brand) field test for marijuana that was administered by Customs officials that falsely indicated that their raw organic chocolate in their hand luggage was hash. Mr. Obadia's attorney Mark Mahoney intends to subpoena Armor Holdings for all internal records and documents regarding false-positives, and a complete account of the incidents is on their web site [12].

Similar false positives have resulted in arrests over other natural products. In 2007, a false-positive for the date rape drug GHB occurred when Newport Beach (CA) police tested Dr. Bronner's [13] peppermint soap. Based on the faulty field test, well-known musician Don Bolles was jailed for three and half days [14] over Easter weekend. After the Bronner family helped post bail and hired an attorney, the charges were dropped when more accurate crime lab tests showed there was no GHB in their soap. Further investigation by Dr. Bronner's found that any natural soap, including brands such as Tom's of Maine and Neutrogena, will falsely test-positive for GHB using the field drug test. Dr. Bronner's is also covering Mr. Obadia and Ms. Artemis's attorney costs going forward.

"We are alarmed by the growing number of people who have been taken to jail for simply possessing organic products," says Ronnie Cummins, Executive Director of the Organic Consumers Association [15] (OCA). "This is an attack on people who have adopted an organic natural lifestyle, whether it's the food they eat, the soap they clean with or the perfumes they use. What kind of world do we live in where nursing mothers' have their babies taken from them and are subjected to coercive interrogations to generate false confessions, over healthy organic foods like raw chocolate," says Cummins, who cofounded the 800,000 supporter strong OCA. The American Civil Liberties Union's Drug Law Reform Project [16] is also contemplating a class action challenge to the drug war testing industry.

- 1 comment [17]

Like   2 people like this. Be the first of your friends.

**Permission to Reprint:** This article is licensed under a modified Creative Commons Attribution license [18].

Looking for the easiest way to join the anti-drug war movement? You've found it [19]!

StoptheDrugWar.org • P.O. Box 9853 • Washington DC 20016

Phone (202) 293-8340 • Fax (202) 293-8344 • Email • Privacy Policy

---

**Source URL:** http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w

**Links:**

[1] http://twitter.com/home?status=Press Release: Government&#039;s Drug War Test Kits Give False Positives on Organic and Natural Products http://bitly.com/9hhsl4

[2] http://www.facebook.com/sharer.php?u=http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w&amp;t=Press Release: Government&#039;s Drug War Test Kits Give False Positives on Organic and Natural Products

[3] http://digg.com/submit/?url=http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w

[4] http://www.stumbleupon.com/submit?url=http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w&amp;title=Press Release: Government&#039;s Drug War Test Kits Give False Positives on Organic and Natural Products

[5] http://reddit.com/submit?url=http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w&amp;title=Press Release: Government&#039;s Drug War Test Kits Give False Positives on Organic and Natural Products

[6] http://stopthedrugwar.org/user/dborden

[7] http://stopthedrugwar.org/chronicle/555

[8] http://stopthedrugwar.org/taxonomy/term/111

[9] http://stopthedrugwar.org/taxonomy/term/98

[10] http://stopthedrugwar.org/node/15117

[11] http://stopthedrugwar.org/node/15149

[12] http://www.livinglibations.com/media-information

[13] http://www.drbronner.com

[14] http://www.drbronner.com/punk_rock_soap_opera.html

[15] http://www.organicconsumers.org

[16] http://www.aclu.org/drugpolicy/

[17] http://stopthedrugwar.org/chronicle/2008/oct/10/press_release_governments_drug_w#comments

[18] http://stopthedrugwar.org/license

[19] http://stopthedrugwar.org/subscribe

- Log In
- Register



JUSTICE TIMES.COM

REPORTS ON JUSTICE & INJUSTICE

Your Non-Partisan Watchdog

- Home
- Amend The Constitution
- Bankruptcy

Search & Hit Enter

## Recent Posts

- Unjust Prosecutions
- Faulkner County Sheriff's Race
- Do politicians buy votes with your taxes?
- Illegals Get A Right Citizens Do Not Have
- Zimmerman to Replace Roberts as JP District 10

## Recent Comments

- Maillard on Is Obama Really Transparent?
- Melda Asifa on Florida Checking Pawn Shops for Violations of Consumer Rights
- Fredrick Maragni on Is Obama Really Transparent?
- sofie on Fair Access Amendment
- Beverley Butte on You Are in Famous Company If You File Bankruptcy

# When Drug Tests Are 100% Wrong

November 19, 2008
By Ronomundo

*by D. L. Sletrab*

**Editor's NOTE:** *This article was written by a person who has never used a single street drug but has a passion for simple justice and freedom.*

The War on Drugs – War On The 10th Amendment – An Ongoing Miscarriage of Justice

A528          P-004112

# The Innocent Suffer — But It Affects Us All

What do **Ron Obadia**, **Nadine Artemis** and **Hashish** have in common? Let us reword the question. What do **Organic Tea Tree Oil**, **Frankincense Oil**, **CoQ10**, **Raw Chocolate** and **Hashish** have in common? Answer: They all test positive for THC. NOTE: Tetrahydrocannabinol, also known as THC, Δ9-THC, Δ9-tetrahydrocannabinol (delta-9-tetrahydrocannabinol), Δ1-tetrahydrocannabinol (using an older chemical nomenclature), or dronabinol, is the main psychoactive substance found in the Cannabis plant.

The Canadian and United States Federal Governments' war on drugs is expensive and has failed. What have the taxpayers gained? Is the country free from drugs? Street pharmacists operate everywhere. Sometimes the innocent pay. That is what this story is about. However, we don't just cover the tragedy, we offer a solution. We point out that Canadian and U.S. Governments are out of control and getting worse by the day.

**If we took a poll, we could ask the following questions:**

- Would you like to have a nation where drugs are not as much of a problem as they are today? Answer: Most would say yes.
- Would you like to reduce the amount of money the government wastes? Answer: Most would say yes.
- Would you say the Federal Government's War on Drugs was a success? Answer: Most would say no.
- Would you say that it was good police work to arrest people on the basis of a chemical test that was not admissible in court because it gives 100% false positives on certain non-drug substances? Answer: Who would be stupid enough to say to that one?

This is the story of Ron Obadia, Nadine Artemis, their baby and their business.

The official biography of Nadine Artemis begins when she first pulls out flasks of essential oils to recreate Nina Ricci's L'Air du Temps for a school science fair project.

See video below for more information about; Nina Ricci's L'Air du Temps

Chocolate Yoga, a practice invented by Ron Obadia is gaining popularity in Toronto… it affects the brain in a way that allows one to reach blissful states. ~ Flare Magazine

Ron Obadia and Nadine Artemis own the Living Libations Beauty Care & Chocolate Company attempted to fly to the United States in August of 2008 They ran into something completely unexpected: Drug-sniffing dogs at the Toronto airport. When their dogs took a special interest in their raw, unrefined chocolate with hemp seeds and super food extracts, they were arrested, handcuffed and put through hours of tortuous interrogation. Such begins the journey of Ron Obadia and Nadine Artemis, the Chocolate Freedom Fighters from Canada.

**A529**

P-004113

Ron, Nadine & Baby

Accused of trafficking two and a half pounds of hashish (which was really just raw, homemade chocolate), Ron and Nadine were arrested, physically separated into interrogation rooms and handcuffed to chairs. Their six-month old baby was forcibly taken from them, and they were immediately subjected to intense interrogation.

Their chocolate looked suspicious, they were told, because it wasn't in a commercial wrapper. If it's not Hershey's, it must be drugs! An on-the-spot drug test from the NIK company (which makes portable drug testing kits) returned a positive result, the Canadian police claimed, and that's all the evidence they need to arrest anyone.

As you'll learn later, however, it turns out the NIK drug testing kits return false positives nearly 100% of the time if the results are interpreted incorrectly, as they were in this case.

### NIK Drug Testing Kits:

National Police Supply, 1340 Specialty Drive, Suite H, Vista, CA 92081

Monday through Friday, 9am to 5pm Pacific Time

Email: sales@nationalpolicesupply.com

Phone: (760) 599-4410 – Fax: (760) 599-4440

Emboldened by the positive drug test on the two pounds of raw chocolate, Canadian drug agents scrambled to action. They hadn't seen a big drug bust in a long time, and excitement was brewing over the possibility of nabbing someone with a whopping two pounds of hashish! Thus, the tyrants of law enforcement went to work on Ron and Nadine, using Guantanamo Bay tactics to try to force them to admit to being hashish drug traffickers.

Over the next several hours, Ron and Nadine were interrogated by the Canadian equivalent of FBI agents who verbally assaulted them using every lying, deceitful police interrogation tactic in the book. They screamed at Ron and Nadine, threatened them with years in prison and even told each of them that the other had already confessed to drug trafficking, trying to trick them into admitting to crimes they never committed. (There is no law that says police have to tell the truth when they are interrogating you, even for false arrest, by the way.)

Through the entire episode, Ron and Nadine resisted the tactics, held their ground and continued to hold positive intentions. "As I was sitting in the cell," Ron told NaturalNews, "I kept focused on light and truth. I felt like no matter what was happening around me, I was opening up a gateway of light and total truth."

After the interrogation, the threats of "life in jail" and other dishonest tactics used by law enforcement to try to get them to "admit" to drug trafficking, they were finally released on bail. Their baby son was returned to them, and they went home. For the next 30 days, they were subjected to surprise visits by Children's Aid employees (the Canadian version of Child Protective Services), who were told by law enforcement authorities that Ron and Nadine were drug smugglers.

Over this 30 day period, as felony drug trafficking charges were pending against them, Ron and Nadine managed to connect with legal help. Their lawyer, Marcy Segal, was able to persuade the Crown Attorney to send the chocolate "hashish" sample to a proper lab for testing. And wouldn't you know it: The test showed that chocolate is chocolate, not hashish.

The charges were dropped, but no apology was ever offered to the couple. Instead, Canadian law enforcement authorities declared, "You must have been smoking something before you came to the airport."

**A530**

P-004114

(No doubt someone in this story was on crack, but it doesn't seem to be Ron and Nadine...)

NaturalNews, one of our sources for this article, has acquired the actual document delivered to law enforcement official in Toronto, declaring there to be absolutely no drugs in Ron and Nadine's possession. You can view the PDF of this document.

Following their being cleared by the lab tests, they were determined to return to the United States and attend the Raw Spirit Festival in Sedona Arizona. Their lawyer had contacted U.S. authorities in advance, advising them that Ron and Nadine were bringing chocolate through their security checkpoints as they crossed from Canada to the United States. "Watch out, it's chocolate!"

They were told everything was understood, and the chocolate would be allowed through. Imagine their surprise, however, when Ron and Nadine were once again arrested at the airport and accused of — guess what? — smuggling hashish disguised as chocolate!

U.S. law enforcement authorities boost their careers when they take part in big drug busts, and 2.5 pounds of hashish was a huge bust by anyone's accounting. So they had every incentive to try to make this bust stick.

Desperate to prove themselves right, the American drug enforcement police ripped though Ron and Nadine's luggage and clothing, opening every vial, asking questions about all the "strange" things they found there.

What kind of strange things? Sea salt. Zeolites. Tea tree oil. Essential oils. Hemp seeds. Probiotics. Raw cacao nibs. You know, dangerous super foods and supplements.

They were questioned at great length about all these "strange" substances. Apparently, law enforcement personnel have actually never seen super foods! Subsisting on a diet of processed foods and diet soda, they apparently believe real food is a foreign substance… a criminal substance, in fact. It is a strange world, indeed, when those who claim to uphold the laws of the land have zero familiarity with food harvested from the land…

After being charged with felony crimes, accused of trafficking illegal drugs, interrogated, isolated from his family and denied the right to travel as a free citizen, Ron Obadia is now facing over $22,000 in legal bills.

Even after the real drug test conclusively proved there were NO drugs in the raw chocolate, there was no apology from Canadian law enforcement officials. No offer to reimburse Ron and Nadine for their legal expenses. They were simply let go and told to go home. Charges are still pending from the American side (they were about to board an international flight), and it may require another $10,000 in legal bills just to clear their names in America.

As a result, Ron and Nadine are virtual prisoners in their own country. Accused of crimes they did not commit, these raw foodies only committed the "crime" of daring to carry real food that wasn't packaged in a brand-name wrapper.

At one point, one of the police officers screamed at Ron, saying, "If you wanted chocolate, why didn't you just buy a Snickers bar!" The proper answer to that question, of course, is so far beyond the intellect of typical law enforcement personnel that I won't even bother explaining it here. To these cops, Burger King is fine cuisine, candy bars are super foods and hashish is anything that looks brown and unusual.

Ran and Nadine were never able to attend the Raw Spirit Festival. They spent the day being interrogated for crimes they did not commit.

**Buy Chocolate for Freedom!**

Ron and Nadine desperately need your support to not just pay off their legal bills, but to sue Canadian law enforcement officials for false arrest.

We need to raise $50,000 in order for this to be pursued. It's an important mission, and if successful, it could send a message to border agents everywhere to keep their hands off the chocolate!

SunWarrior has already pledged $1,000 in help. You can help support Ron and Nadine by buying their delicious chocolate from LivingLibations.

Ron & Nadine does not actually contain hashish, by the way. It's made from wholesome super foods and delicious, raw ingredients! They also carry some outstanding beauty products made with high-grade essential oils and all-natural ingredients.

Please Buy Chocolate for Freedom and help support Ron and Nadine right now. You can contact them at:
ron@livinglibations.com 416-920-8471.

A531                                                          P-004115

You can also donate right now: Send via PayPal to chocolate@livinglibations.com
You can also donate via ChipIn.com If you don't stand up for chocolate, what will you stand up for?

What Ron and Nadine experienced here is just one symptom of a War on Drugs that's utterly out of control. While completely ignoring the real drug dealers (Big Pharma and psychiatrists who put kids on amphetamines), tyrannical law enforcement personnel target innocent natural health advocates who refuse to eat Snickers bars and Big Macs.

Carrying "unusual" food with you at the airport is now a crime that can get you thrown in jail and cost you $20,000 or more in legal bills. And that's when you're innocent!

The War on Drugs has done virtually nothing to stem the tide of illegal street drugs, but it's sure given lots of money and power to another group: The DEA and other drug enforcement tyrants whose careers (and paychecks) depend on continuing their politically-motivated crusade against innocents.

Marijuana arrests are out of control, with nearly 8 million Americans having been arrested for pot possession over the last decade (http://www.projectcensored.com/top-stor...). Meanwhile, the U.S. spends between $10 and $12 billion a year enforcing those laws, and that doesn't count the exploding prison population, where now an astonishing 11 percent of all black men between the ages of 30 and 34 are in prison.

A startling 2.3 million Americans are sitting in prison cells right now, and many are there for victimless crimes such as smoking marijuana. And yet, amazingly, powerful institutions in society directly promote highly addictive drugs to virtually everyone:

- Daily caffeine through coffee and energy drinks for teens
- "Speed" amphetamines for children diagnosed with ADHD
- Highly addictive painkillers like Oxycotin, which are now openly abused by teens
- Over-the-counter cold medicines, now widely used to manufacture meth (crank, ice, etc.)

The real point to all of this, of course, is not to stop Americans from using drugs; it's to force Americans to use patented drugs that earn profits for powerful corporations. The job of the DEA is primarily to eliminate Big Pharma's competition by criminalizing non-patented drugs while protecting patented ones.

In order to concentrate power into their own hands, they must create fear and terrorize the population, which is why the DEA keeps raiding California medical marijuana clinics, by the way… even though they are legal in the State of California!

The real criminals in society today are not the lazy pot heads toking up a joint in the basement. The real criminals are those who terrorize us, take away our freedoms and steal our money while bailing out the rich. And guess who does all three? Your government, of course!

Ron and Nadine are unwittingly playing a Ghandi-like role in this grand governmental comedy. By perservering their arrest and interrogation and proving their obvious innocence in the face of outrageous stupidity, they bring focus to the idiocy of modern law enforcement and the real threat posed to innocents by our nation's ill-fated War on Drugs.

Real power comes from health and wisdom, and yet the people running our governments today have neither; so they must fabricate false power through the use of firearms, fear and intimidation. These are the weapons of the weak, and they will ultimately fall to the strength and courage of enlightened, health-infused individuals like Ron and Nadine from Living Libations.

———————————

It is well past time for government to get out of the drug business other than to protect us from harmful substances and fraudulent business practices. The drug business is best left to the following regulators.

1. The drug companies who should not be protected, approved or disapproved by any legislation or government regulation. Reason: This opens the door to lobbyists who then in turn buy power with their money.
2. The physicians who must take responsibility to make sure they "do no harm" in their prescriptions. Physicians should be seeing even people who take drugs for recreational purposes.
3. Pharmacists who must dispense the controlled substances.
4. Law enforcement only when they find someone dealing in controlled substances that is not a pharmacist. Let us get rid of the street pharmacists who do not provide liability, purity and health monitoring.
5. Attorneys who must go after any of the players who break outside the system. There are plenty of product liability lawyers out there. Gives them something

A532                    P-004116

beneficial to do. We need to change many of our drug laws from criminal infractions to civil infractions. It will save the taxpayers a lot of money and free up law enforcement to ensure security of the people.

6. Finally, let each State make their own rules as to which substances require what types of regulation.

The heavy hand of the Federal Government needs to focus on more important things that they can be successful with. The war on drugs has been a horrible failure that has filled up our prison systems and drained taxpayer's pocketbooks. Any 13 year old can get whatever they want from a street pharmacist and they can do it 24×7×365.

The States can decide how much tax they want to put on recreational substances and charge street pharmacists with failure to pay the recreational sales taxes and failure to have a license to sell drugs.

––––––––––––––

This is why we need the following three solutions as soon as possible:

1. Fair Access Amendment
2. Fair Tax Act
3. Read The Bill Act
4. One Subject at a Time Act

*If you are concerned about our nation, please decide how you can participate. At a minimum, please submit your thoughts and comments: We are looking for a PHP programmer who can help us design a one click plug in for people to be able to contact their elected officials. Please advise if you know of someone who could do this in exchange for an equity position with Justice Times.*

Please consider joining our small group of investigative writers. You can research and write in your spare time and share the advertising revenue.

We are also considering investors who would like to be paid off the top from all incoming revenues instead of the typical business model of "if there is any profit, we will share it with you unless we vote to keep it."

"If you're threatened with a lawsuit and can't afford a lawyer or aren't sure you can trust the lawyer you have, visit Jurisdictionary® to get step-by-step tips and tactics for winning with or without a lawyer."

# Soccer.com® Official Site

Amazing Deals On 2015 Soccer Gear. $3.99 Shipping On Orders Over $99!

○　○

Share / Save ☑ 🔄 📧 ...

Tags: 10th Amendment, CoQ10, Fair Access Amendment, fair tax act, Frankincense Oil, Hashish, One Subject at a Time Act, Organic Tea Tree Oil, product liability lawyers, Raw Chocolate, read the bill act, War on Drugs

## One Response to *When Drug Tests Are 100% Wrong*

1. free pdf editor | CNN.com on November 28, 2008 at 6:34 PM

   [...] When Drug Tests Are 100% Wrong by D. L. Sletrab Editor's NOTE: This article was written by a person who has never used a single street drug but has a passion for simple justice and freedom. The War on Drugs – War On The 10th Amendment – An Ongoing Miscarriage of Justice The Innocent Suffer – But It Affects Us All What do Ron ... [...]

## Leave a Reply

You must be logged in to post a comment.

## Categories

- Age Discrimination
- Amend The Constitution
- American Culture
- Automotive Justice

# Transcript of the Videotaped Testimony of

# **Peter V. Ruddick**

January 28, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

January 28, 2015                                                                   Peter V. Ruddick
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

137

1  subject, who driving a Kia, and accompanied by
2  two children visited the Green Circle on
3  August 9th, 2011.  Do you see that?
4     A.  Yes.
5     Q.  Now do you note anything about the
6  passage of time between those two dates, between
7  the sighting and the tip?
8     A.  There's several months.
9     Q.  Okay.  Was that something you noted at
10 the time you reviewed the affidavit?
11    A.  I can't recall.  I don't think we talked
12 about it.  I don't remember whether I noticed a
13 time gap or not.
14    Q.  Okay.  Does that time gap have any
15 significance to you?
16    A.  Well, not -- no, not really.
17    Q.  Would you know of any reason why this
18 tip would not have been followed up on much
19 earlier or provided much earlier?
20    A.  I don't know why it wouldn't have been
21 provided earlier.  If, in fact, you know, there
22 was a grow operation that takes awhile.
23    Q.  Do you know what --
24    A.  And that's why the time doesn't strike
25 me now as particularly significant and probably

---

138

1  didn't strike me then as particularly
2  significant, but I don't remember seeing that,
3  honestly.
4     Q.  Okay.  Do you know --
5     A.  Or I thought, I don't remember making
6  note of that.
7     Q.  Okay.  Do you know what the life cycle
8  is or the growing cycle is of a marijuana plant?
9     A.  No.
10    Q.  So you have no idea how long that takes?
11    A.  No.
12    Q.  We talked earlier about staleness in
13 information used to support a warrant.  Do you
14 believe that a tip from someone eight months ago
15 would be getting stale?
16    A.  Not this tip in this scenario, no.
17    Q.  Okay, and why do you say that?
18    A.  That's just what I explained, a grow
19 operation might take some time to develop.  Of
20 course, that assumes that whatever supplies were
21 bought were an initial step in it.
22    Q.  You don't know how long it would take to
23 develop?
24    A.  No, I don't.
25    Q.  Because you don't know anything about

---

139

1  the growth cycle of marijuana plants?
2     A.  Well, I know some very generic knowledge
3  about how long it takes to grow plants in
4  general.
5     Q.  Okay, what about a marijuana plant?
6     A.  An overnight affair, no, I don't have
7  any specific knowledge about growing marijuana.
8     Q.  Okay.  Now as far as the significance of
9  this information, why would leaving a store with
10 a small bag of merchandise be significant?
11    A.  It wouldn't be significant to me
12 standing alone.
13    Q.  Okay.  Is anything known about that
14 merchandise other than it fit in a small bag?
15    A.  Do I know?
16    Q.  Uh-huh.
17    A.  No.
18    Q.  Did you ask about that?
19    A.  Ask Officer Burns what was in this
20 plastic bag?
21    Q.  If he had any further knowledge, if
22 anyone did any checking at the Green Circle to
23 see what they might have purchased?
24    A.  I don't recall asking that.  I don't
25 recall asking Burns anything more.  It doesn't

---

140

1  mean it didn't happen, but I don't recall it and
2  I don't -- I doubt that that would have happened.
3     Q.  Okay.  Do you know what types of things
4  were for sale in the Green Circle that might fit
5  in a small bag?
6     A.  No.
7     Q.  Well, it wouldn't be grow lights, would
8  it?
9     A.  I have no idea.
10    Q.  Okay.  Well, would grow lights fit in a
11 small bag?
12    A.  An LED light might.  I don't know.  I
13 didn't make any assumptions about what was in the
14 bag.
15    Q.  Okay.  Well, do you know what kind of
16 lights are used in a marijuana grow?
17    A.  No.  Well, I've seen pictures of them,
18 but I don't have any detailed knowledge.
19    Q.  Would those lights fit in a small bag?
20    A.  No, they would not.
21    Q.  Okay.  Is it important what's in the
22 bag?
23    A.  Important to?
24    Q.  Probable cause.
25    A.  Not in this instance.

---

January 28, 2015                                                                    Peter V. Ruddick
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

|   | 157 |
|---|---|
| 1 | question that the false positive rate could be as |
| 2 | high as 70 percent on this particular test, would |
| 3 | that have raised a question in your mind? |
| 4 | **A.   If the false positive rate on this kind** |
| 5 | **of test is, in fact, 70 percent, law enforcement** |
| 6 | **shouldn't be using it, and they shouldn't get** |
| 7 | **search warrants based on it.** |
| 8 | Q.   Okay. |
| 9 | **A.   I do not believe that to be the case, I** |
| 10 | **never did.  I found this process reliable.  But** |
| 11 | **your question is if I knew that, and if that was** |
| 12 | **disclosed in the affidavit, that would clearly** |
| 13 | **change my opinion about probable cause.** |
| 14 | Q.   Now in the next paragraph, in Paragraph |
| 15 | 8, you will see that the representation is made |
| 16 | that the field tests utilized consists of |
| 17 | reagents similar to those utilized by the Johnson |
| 18 | County Criminalistics Laboratory to conduct its |
| 19 | initial screening tests for marijuana.  Do you |
| 20 | see that? |
| 21 | **A.   I'm sorry I skipped ahead.** |
| 22 | Q.   Paragraph 7. |
| 23 | **A.   Yes, I see.** |
| 24 | Q.   And we've talked about that before. |
| 25 | There are representations being made that the |

|   | 159 |
|---|---|
| 1 | test did not recommend it to be used for what it |
| 2 | was being used for, and subsequently the use of |
| 3 | this test was discontinued, I mean are those |
| 4 | things you would have wanted to know, that it was |
| 5 | a different test? |
| 6 | Would you have wanted to know?  Let me |
| 7 | make this simple, okay?  Would you have wanted to |
| 8 | know at the time you reviewed this affidavit that |
| 9 | this was not the test used by the Johnson County |
| 10 | crime lab; it was an entirely different reagent? |
| 11 | **A.   Can I stop you there?** |
| 12 | Q.   Uh-huh. |
| 13 | **A.   The only thing that bothers me about** |
| 14 | **that is that would make this affidavit untrue.** |
| 15 | Q.   Uh-huh. |
| 16 | **A.   And that would mean a lot to me.** |
| 17 | Q.   Uh-huh. |
| 18 | **A.   If it just was silent, I'm not sure that** |
| 19 | **would make any difference to me.** |
| 20 | Q.   Okay. |
| 21 | **A.   But you can't say it's the same reagent,** |
| 22 | **if it's not --** |
| 23 | Q.   Okay. |
| 24 | **A.   -- or similar, if it's not.  "Similar"** |
| 25 | **is what it says.** |

---

|   | 158 |
|---|---|
| 1 | field tests used by the Deputies consist of |
| 2 | reagents similar to those used in the crime lab |
| 3 | to do the initial screening test for marijuana, |
| 4 | okay? |
| 5 | If, in fact, you knew that the field |
| 6 | test being used by the Deputies was the type test |
| 7 | never used by the crime lab, would that affect |
| 8 | your assessment?  Would you want to know that it |
| 9 | was a different -- |
| 10 | **A.   Are you saying this is a lie, because** |
| 11 | **that would be very significant?** |
| 12 | Q.   It's a different reagent.  Do you have |
| 13 | any knowledge of the difference between the DL |
| 14 | field test, Duqenois-Levine field test and the KN |
| 15 | reagent field test? |
| 16 | **A.   I do not have specific knowledge about** |
| 17 | **that.** |
| 18 | Q.   Okay. |
| 19 | **A.   And I did -- this was among the** |
| 20 | **information upon which I relied to find probable** |
| 21 | **cause, and if it's not true, it shouldn't have** |
| 22 | **been in there.** |
| 23 | Q.   Okay.  Now were you -- if you had known |
| 24 | that the crime lab did not use this particular |
| 25 | test, and that, in fact, the manufacturer of that |

|   | 160 |
|---|---|
| 1 | Q.   Okay.  Do you know anything about the |
| 2 | type of results that are generated by these field |
| 3 | tests, in terms of what the officer views? |
| 4 | **A.   No, I don't.** |
| 5 | Q.   Okay.  Turning to Paragraph 8, the |
| 6 | affiant is saying here that they located similar |
| 7 | plant material previously, but they discarded it |
| 8 | without it being tested when it was found among |
| 9 | other innocent plant material and was |
| 10 | misidentified by the affiant. |
| 11 | Does this show some confusion about what |
| 12 | this material is to you? |
| 13 | **A.   It shows some confusion about the** |
| 14 | **April 3rd material, and honestly, I don't** |
| 15 | **remember if I knew.  Maybe I did ask what that** |
| 16 | **means, "was misidentified by affiant."  I don't** |
| 17 | **know what that means --** |
| 18 | Q.   Okay. |
| 19 | **A.   -- and it's possible I asked them about** |
| 20 | **that.** |
| 21 | Q.   Okay. |
| 22 | **A.   I assume you're going to get around to** |
| 23 | **deposing him.  If I did, I did.** |
| 24 | Q.   Okay. |
| 25 | **A.   I don't recall the specifics of it, but** |

---

Transcript of the Videotaped Testimony of

# Thomas Reddin

February 18, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

February 18, 2015                                                    Thomas Reddin
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

65

1    Q.  Did they get a warrant?
2    **A.  Yes.**
3    Q.  And how was that served?
4    **A.  Went to the door, he was home, executed**
5    **the warrant.**
6    Q.  How many went?
7    **A.  I would have to look at the reports.**
8    **Probably five to seven.**
9    Q.  What were the potential charges?
10   **A.  Cultivating marijuana, possession of**
11   **marijuana, possession with intent, no drug tag**
12   **stamp, possession of paraphernalia.**
13   Q.  Did he have a grow operation?
14   **A.  Yes.**
15   Q.  How many plants?
16   **A.  20 to 30.**
17   Q.  Do you think you are recalling this
18   pretty accurately?
19   **A.  Fairly.  The plants.**
20   Q.  What made you decide to work with him
21   rather than charge him?
22   **A.  He provided a much bigger case.**
23   Q.  Okay.  Was he arrested?
24   **A.  Not that day.  That was part of it, we**
25   **are not going to arrest you as long as this pans**

---

66

1    **out, as long as his cooperation panned out.**
2    Q.  And you don't know whether you saw him
3    or someone from Johnson County saw him at the
4    store or Wingo did?
5    **A.  I'm leaning towards --**
6    MR. FERREE:  Don't speculate.
7    Objection, calls for speculation.
8    Q.  (By Ms. Pilate)  You don't know one way
9    or the other?
10   **A.  Correct.**
11   Q.  Were the seizures in his case included
12   in the total that was disseminated to the media?
13   **A.  Yes.**
14   Q.  And what city did he live in?
15   MR. FERREE:  I think we are going
16   to invoke our law enforcement privilege on that,
17   instruct you not to answer.
18   MS. PILATE:  For the city?
19   MR. FERREE:  Yes.
20   MS. PILATE:  Why?  There are lots
21   of people out there.  That makes no sense.  We
22   think we may have the address anyway.  But, you
23   know, I understand the protective order.  I just
24   want the city.
25   Q.  (By Ms. Pilate)  Is it Merriam?

---

67

1    MR. FERREE:  Same objection.
2    Q.  (By Ms. Pilate)  Olathe?
3    MR. FERREE:  Same objection, same
4    instruction.
5    MS. PILATE:  You won't even provide
6    the city that it was in?
7    MR. FERREE:  No.
8    MS. PILATE:  Well, I think that's a
9    complete misuse of the law enforcement
10   investigatory privilege so we will just have
11   to -- I'm going to have the question made clear
12   for the record so we can litigate it.
13   Q.  (By Ms. Pilate)  Do you know if anything
14   else was done in this particular investigation
15   other than garnering a tip from the Green Circle
16   and doing one or more trash pulls?
17   **A.  There would have been a couple of trash**
18   **pulls and then doing a background search on the**
19   **person.**
20   Q.  Anything else?
21   **A.  Photographed the residence.**
22   Q.  Who made the identification of the
23   substance in the trash as being marijuana?
24   **A.  I would have to look at the reports.  I**
25   **don't know who did those.  I was at one of the**

---

68

1    **trash pulls as the second officer.  But the other**
2    **one I don't know who was there.**
3    Q.  Do you know how many trash pulls there
4    were?
5    **A.  We need two to get a warrant, so we need**
6    **at least two.**
7    Q.  Is that still true?
8    **A.  Two trash pulls?**
9    Q.  Uh-huh?
10   **A.  To my knowledge.**
11   Q.  Can you get a warrant with two trash
12   pulls?
13   **A.  Yes, two positive trash pulls.**
14   Q.  That's still the case today?
15   **A.  To my knowledge.**
16   Q.  When you say to your knowledge, are you
17   someone who should have that information?
18   **A.  I don't work in that unit anymore.**
19   Q.  Okay.  What unit are you in now?
20   **A.  I'm in detention.**
21   Q.  And what caused that change to come
22   about?
23   **A.  Promotion.**
24   Q.  What do you do in detention?
25   **A.  I'm a shift commander.**

---

February 18, 2015                                                    Thomas Reddin

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

93

1  he recalls there being cases that fit into those
2  slots.
3            MR. FERREE:  Fair enough.  Go
4  ahead.
5      Q.  (By Ms. Pilate)  Do you recall cases?
6      **A.  No, there is not enough information**
7  **here.**
8      Q.  Okay.  The ones that are listed, do you
9  recall those?
10     **A.  Yes.**
11     Q.  What do you remember about M█████
12  K████?
13     **A.  As far as the search warrant, or him?**
14     Q.  Anything about his case.
15     **A.  We got to his house with a search**
16  **warrant, he had -- he didn't have an active grow**
17  **going, it was dismantled.  He had the lights and**
18  **the products needed, and a quantity of processed**
19  **marijuana at the house.**
20     Q.  Do you recall any kind of address mixup?
21     **A.  Yes.**
22     Q.  Tell me how that happened.
23     **A.  This is what we received from Trooper**
24  **Wingo.  It has █████ Lowell.  Our officers went**
25  **and recovered the trash from █████  It ended up**

94

1  **being it was not Mr. K█████ house, his was**
2  **across the street at █████.  However, in getting**
3  **that trash, it turned out that it was another**
4  **good house, so ultimately search warrants were**
5  **obtained for both residences.**
6      Q.  And what happened with the other house?
7      **A.  They obtained the search warrant, and I**
8  **wasn't at this one, but they went in the house,**
9  **recovered small amounts of marijuana.  There was**
10 **a female living there and she provided**
11 **information on her boyfriend who had moved out**
12 **recently and the items belonged to him.**
13     Q.  Was any case brought?
14     **A.  No.**
15     Q.  Was any grow operation found?
16     **A.  Not in that house, no.**
17     Q.  Do you recall all four searches done on
18 April 20, 2012?
19     **A.  Yes.  Wait.**
20     Q.  I have got the addresses here, actually.
21     **A.  Right off the top of my head I only**
22 **remember three.**
23     Q.  I believe I have got the addresses here,
24 and bear with me for a minute. .  Do we have it,
25 Kristen?  I just looked at it.  I know where it

95

1  is.  I'm sorry.  Here we go.  Okay.  I will ask
2  you if these addresses sound familiar.  █████
3  Wenonga?
4      **A.  Yes.**
5      Q.  █████ Lowell?
6      **A.  Yes.  And if that was, that's the one I**
7  **wasn't thinking of.  I couldn't remember if that**
8  **was on April 20 or not, the Lowell.  So I recall**
9  **all four.**
10     Q.  There was one at █████ Newton, and that
11 case has been brought and pled, that's
12 Mr. R█████.  And then there is another
13 address, and I know you all aren't giving
14 information about this, but we do have the
15 address, it is █████ Juniper in Gardner.
16          And matching this information up with
17 the information that was disclosed in
18 interrogatory responses and your privilege log
19 and various charts we have received, it appears
20 to me, and correct me if I'm wrong, that at none
21 of those four addresses on 4/20/14, did you find
22 any active grows.  Is that correct?
23     **A.  No active grows.**
24     Q.  And, in fact, the Hartes did not have a
25 marijuana grow at all, did they?

96

1      **A.  Correct.**
2      Q.  And the woman residing at █████ Lowell
3  did not have a marijuana grow, correct?
4      **A.  Correct.**
5      Q.  And the individual residing at Juniper
6  Street, █████ Juniper Street in fact did not have
7  a marijuana grow, correct?
8      **A.  Not active.**
9      Q.  And the individual residing at █████
10 Newton did not have an active grow, correct?
11     **A.  Correct.**
12     Q.  So no live plants were seized at any of
13 those four locations, were they?
14     **A.  Correct.**
15     Q.  Okay.  You can put aside for a moment
16 Deposition Exhibit 2, which is the spreadsheet I
17 gave you, and I'm going to go through some of the
18 E-mails in Deposition Exhibit 1.
19          Do you recognize the E-mail on the first
20 page?  It is Page 2, Wingo Page 2.
21     **A.  I can tell you it is an E-mail between**
22 **us.  I don't specifically remember this.**
23     Q.  And you are writing to Mr. Wingo, "Are
24 you guys up on the stores today?"
25     **A.  Yes.**

February 18, 2015                                                Thomas Reddin
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

97

1      Q.  And what did you mean by that?
2      A.  There is two different stores in close
3   vicinity of each other that sell hydroponic
4   equipment. I'm referring to those two stores.
5      Q.  This is March 21, 2012.  Do you see
6   that?
7      A.  Yes.
8      Q.  And why did you want to know that on
9   that date?
10     A.  Apparently my unit had some time to go
11  sit on them.
12     Q.  Were you preparing for Operation
13  Constant Gardener?
14     A.  I couldn't say if it was in preparation
15  of that or if we just had the free time to go sit
16  on the stores.
17     Q.  What do you do when you sit on the
18  stores?
19     A.  We watch for people going in, try to see
20  if we can see what they buy, if they buy
21  anything. Then see if we can see what car they
22  go to, where the car may, what state it comes
23  back to, get information on the tag, where it
24  returns to, and typically follow them.
25     Q.  And have you done this and discovered

98

1   some people were just buying gardening supplies
2   to garden?
3      A.  No.
4      Q.  You have never followed anyone who was
5   just there to buy fertilizer because they grow
6   vegetables or flowers?
7      A.  No.
8      Q.  What individuals, what types of
9   individuals have you picked out to follow; anyone
10  shopping there, or particular kinds of people
11  shopping there?
12     A.  Anyone.
13     Q.  Okay.  And why do you believe none of
14  these people were there just to buy equipment or
15  materials for growing vegetables or flowers or
16  anything else you might grow?
17     A.  I never said I didn't believe they
18  weren't there for that. That's why we follow
19  them and we do our further investigation. And as
20  it turns out, none of them we encountered were.
21     Q.  Okay.  And how many were those?
22     A.  I would have to refer to some charts,
23  but I would say we have been in close to around
24  20 houses, give or take a few, from that store.
25     Q.  When you follow them, do you confront

99

1   them at that time?
2      A.  Yes.
3      Q.  And what happens as a result of that
4   encounter?
5      A.  We typically get consent. And there has
6   been some that we haven't got consent but they
7   have let us in to the residence and you smell a
8   strong odor of raw marijuana and get what you
9   need to secure the residence and get a search
10  warrant.
11     Q.  Do you know anything about indoor
12  gardening?
13     A.  I don't indoor garden, no.
14     Q.  Is there anything that the store sells
15  that is unique to marijuana cultivation?
16     A.  They sell everything you need to grow it
17  minus the seeds.
18     Q.  And they sell the same stuff that can be
19  used to grow anything, right, not just marijuana?
20     A.  I would assume.
21     Q.  There is nothing there that is exclusive
22  to marijuana, correct?
23     A.  I would assume so.
24     Q.  Do you know what specific products are
25  there?

100

1      A.  I have never gone in the store. I know
2   they sell fertilizers and lights.
3      Q.  Okay.  What else?
4      A.  Things to grow.
5      Q.  Do you know what those things are?
6      A.  Various fertilizers, liquid and solids,
7   lights, ballasts, potting trays, stuff to check
8   ph.
9      Q.  Are you familiar with an individual out
10  in Independence who was followed or searched as a
11  result of shopping at a hydroponic grow store and
12  it turned out that individual was growing
13  tomatoes?
14     A.  I'm familiar with that case.
15     Q.  What do you know about that?
16     A.  It was one that was on the list in the
17  first Constant Gardener that Wingo provided.
18  They went to his house, knocked, he told them to
19  come on in and showed them his tomato operation.
20     Q.  So there is someone growing tomatoes,
21  right?
22     A.  Yes.
23     Q.  Do you know his name?
24     A.  No, I don't.
25     Q.  How did you learn about that case?

February 18, 2015                                                    Thomas Reddin
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

125

1  one of the canines would hit on it?
2      A.  No.  We don't put the canines on trash.
3      Q.  Did you ever discuss sending it to the
4  lab?
5      A.  No.
6      Q.  Why not?
7      A.  Because we had our positive field test.
8  So from that point the plan was to get the trash
9  again and see if we had another positive.
10     Q.  Had you ever seen something that was
11  verified to be marijuana that looked just like
12  this before?
13     A.  Nothing that looked like this, no.
14     Q.  Okay.
15         MR. FERREE:  "This" meaning
16  Exhibit 3?
17         THE WITNESS:  This, yes.
18     Q.  (By Ms. Pilate)  Well, all of
19  Mrs. Harte's teas were from Teavana and they all
20  looked a bit like that.
21     A.  I'm telling you what I saw in April did
22  not look like that.
23     Q.  Well, if we were to brew the tea that is
24  sitting up in the property room at the Sheriff's
25  Department, are you saying that you believe that

---

127

1      Q.  Which was shopping at a gardening store?
2      A.  Yes.
3      Q.  And sitting here today you think that
4  that is sufficient?
5      A.  Seeing them at the store and getting two
6  positive trash pulls, yes.
7      Q.  Has anyone at the department ever said
8  they don't think that that amount of information
9  constitutes probable cause?
10     A.  There has been a change since this, that
11  if there is time, we will send it to the lab.
12  Prior to this, that was normal operating
13  procedure.
14     Q.  Okay.  Was it feasible in April of 2012
15  to send things to the lab?
16     A.  It was feasible.
17     Q.  But you just didn't do it?
18     A.  No.
19         MS. PILATE:  We are about out of
20  our tape so I'm going to take a quick break here.
21         THE VIDEOGRAPHER:  Going off the
22  record at 2:28 p.m.
23         (Short recess was taken.)
24         THE VIDEOGRAPHER:  Going back on
25  the record at 2:48 p.m.

---

126

1  reconstituted with water that it would not look
2  like that?
3      A.  That's what I believe.  It was green
4  material.
5      Q.  And is all green material that is in the
6  kitchen trash, marijuana?
7      A.  No.
8      Q.  Did the fact that it was in the kitchen
9  trash raise any questions to you?
10     A.  No.
11     Q.  You didn't consider the possibility it
12  might be another botanical substance or food
13  stuff?
14     A.  No.  It was suspicious to us, had the
15  serrated edges, had the appearance of marijuana,
16  and tested positive, so at that point we felt it
17  was marijuana.
18     Q.  And you felt that that level of
19  information was sufficient to justify going in
20  someone's house with a warrant and five to seven
21  deputies?
22     A.  After we got another positive, yes.
23     Q.  Someone armed with --
24     A.  That, along with the other information
25  we had.

---

128

1      Q.  (By Ms. Pilate)  I would like to go back
2  to Deposition Exhibit 1, the Wingo E-mails.  At
3  the bottom of the page do you see an E-mail from
4  Jim Wingo to you dated March 20, 2012 at 11:07
5  a.m.?
6      A.  Bottom of which page?  Page Page 2?
7      Q.  Page 3.  It is the second page in the
8  exhibit but it is Bates stamped 3.
9      A.  Yes.
10     Q.  Where it says, "Here is the JoCo list."
11     A.  Yes.
12     Q.  Do you know what E-mail attached?
13     A.  That would have been the Excel
14  spreadsheet.
15     Q.  The Excel spreadsheet that we have been
16  looking at which is Exhibit 2?
17     A.  Yes.
18     Q.  And then reading up the page there there
19  is an E-mail from you to Jim Wingo stating,
20  "Great, thanks a lot.  We are going to do a
21  smaller operation on 4/20."  Does that refer to
22  Operation Constant Gardener?
23     A.  Yes.
24     Q.  2012.  Okay.  And what type of smaller
25  operation did you plan?

---

Case 2:13-cv-02586-JWL   Document 327-3   Filed 11/17/15   Page 26 of 48

Appellate Case: 16-3014   Document: 01019599309   Date Filed: 04/07/2016   Page: 88
February 18, 2015                                                    Thomas Reddin
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

129

1    A.   Just whatever agencies wanted to be
2    involved.  And depending on how -- like ours was
3    obviously going to be smaller.  He sent this list
4    and there weren't very many on it as compared to
5    the year before.
6        Q.   And then in the reply E-mail to your
7    E-mail it says, "Shawnee has asked about 4/20 as
8    well."  And it is your recollection that Shawnee
9    participated in Operation Constant Gardener 2012,
10   is that right?
11       A.   Yes.
12       Q.   Go to Bates stamp Page 5.  Do you see at
13   the bottom the E-mail from Wingo where he says,
14   "Don't really have enough new contacts to justify
15   a full throttle 420 operation but certainly got
16   names if you want to look at them."  Do you see
17   that?
18       A.   Yes.
19       Q.   So was it apparent to you that 4/20 was
20   going to be quite a bit smaller in 2012?
21       A.   Yes.
22       Q.   Do you know if any agencies had just
23   decided not to participate, for whatever reason,
24   because they simply didn't want to, or just
25   didn't want to do the same thing they done the

130

1    year before, or had some other reason?
2        A.   Not that I know of.
3        Q.   So what reason, in your mind, did
4    agencies not participate in the second year?
5        A.   Just not as many tips.
6        Q.   And then there is an E-mail from you at
7    the top of the page it says, "If have you a list,
8    I would love to have it.  I tentatively have us
9    planned on being up at the Green Circle or St.
10   John's on the 21st.  Will you guys be there then?
11   Even if you don't do a 'full blown' 420.  I am
12   planning on my guys at least making a day of it."
13   Do you see that?
14       A.   Yes.
15       Q.   Now, that was February 9 and you are
16   talking about being up at the Green Circle on the
17   21st.
18       A.   Yes.
19       Q.   Did anyone ever discuss at any point the
20   need or idea to start the investigations earlier
21   so that other investigative information could be
22   gathered other than trash pulls?
23       A.   No.  We get our trash pulls, background
24   checks on the residents and the people.
25       Q.   That's all you think you need?

131

1        A.   On a grow op, yes.
2        Q.   You don't think there is a need to get
3    utility records or do any survey or try and
4    gather any information about the people?
5        A.   Not on a grow op.
6        Q.   What makes a grow op different?
7        A.   All of the grow ops we have dealt with
8    it is not like a drug house where there is a lot
9    of high volume traffic that you would need the
10   surveillance for.  So on a grow op, all the ones
11   we dealt with, we would just be sitting and
12   watching a house.
13       Q.   Did anyone ever check out the Harte
14   residence to determine if there were any fans or
15   alterations to the house aimed at concealment of
16   a grow operation?
17       A.   Not to my knowledge.
18       Q.   Okay.  Did anyone ever tell you that
19   they had been by the Harte residence and noticed
20   that there was a window at the basement level in
21   front of the house from which one might at
22   certain times observe the interior of the
23   basement from well outside the house?
24       A.   I know they went by and took pictures of
25   it but there was no discussion about a window.

132

1        Q.   Who took pictures?
2        A.   I don't recall.
3        Q.   Was the picture used with the search
4    warrant a picture taken by one of the deputies?
5        A.   Yes.
6        Q.   Who took it?
7        A.   I don't recall.
8        Q.   Was it somebody on the investigation?
9        A.   It would have been somebody in the unit.
10       Q.   What was the purpose of getting the
11   photo?
12       A.   So if a search warrant were to develop,
13   we would have a description of the residence.
14       Q.   Did anyone ever note anything about the
15   property that was inconsistent with harboring a
16   marijuana grow?
17       A.   I don't know what would be inconsistent
18   with the house.  The houses we have been in look
19   like normal houses.
20       Q.   What about having a window that you
21   could easily see the so-called grow from outside
22   the house?
23       A.   The grows we have been in people
24   typically conceal the windows for the portion of
25   the basement or area of the residence where it

February 18, 2015                                                    Thomas Reddin
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

133

1  is, so even houses that we have gone on grows out
2  of you can see in some windows, you might not see
3  in others.  Some of them might be in a portion of
4  the house that there aren't windows.  So there is
5  nothing abnormal about this house.
6      Q.  What about the fact that from well
7  outside the house you could see into a basement
8  window and could see that what was being done was
9  inconsistent with a marijuana grow?
10     MR. FERREE:  Objection, calls for
11 speculation.
12     Q.  (By Ms. Pilate)  A marijuana grow as you
13 have described it, no specialized lighting, no
14 mylar?
15     A.  We have gotten marijuana grows out of
16 bedroom closets.  It could be anywhere in the
17 house.  So the fact that somebody could see in
18 the basement --
19     Q.  But could see a grow in the basement
20 that did not contain marijuana?
21     A.  Nobody said they saw a grow in the
22 basement.
23     Q.  But no one tried to surveil the house or
24 even look at it very closely, did they?
25     A.  They didn't sneak around the property

---

134

1  looking in windows, no.
2      Q.  When you received a call from Ed Blake
3  on 4/20/12 from the Hartes after the dog had been
4  through, was that the first communication you had
5  from anybody regarding the outcome of that
6  search?
7      A.  I believe so.  I was on another search
8  warrant, and I think it was at the end when he
9  called and said that there were just tomato
10 plants.
11     Q.  Do you know if he communicated with any
12 other supervisor?
13     A.  He had a supervisor on scene with him.
14     Q.  Who was that?
15     A.  Sergeant Cossairt.
16     Q.  Did you ever speak to Cossairt about it?
17     A.  We may have later in the day.  I don't
18 recall.
19     Q.  Did anyone ever ask Blake why the team
20 had remained in the house for approximately two
21 and a half hours when in the first two or three
22 minutes it was clear that the grow operation was
23 not marijuana but was vegetable and tomato
24 plants?
25     A.  I don't believe anybody asked him, but

---

135

1  it is certainly not unreasonable.  We have had a
2  handful of them where they were hidden rooms and
3  it took some time to find those hidden rooms.
4      Q.  Well, had you ever seen a place where
5  you had found the marijuana, so-called marijuana
6  grow and it turned out to be something else and
7  there was a hidden room with a second grow?
8      A.  No.  This is the only house that we have
9  been in that something else was growing.
10     Q.  So they were looking for a hidden room?
11     A.  They may have been.  I don't know.  I
12 wasn't there.  But the fact that they were there
13 two hours, it is not an unreasonable amount of
14 time.
15     Q.  Do you know why the warrant was executed
16 before children went to school?
17     A.  To try and get it executed while the
18 residents were still there before they leave for
19 work, makes it easier to have contact so you are
20 not breaking a door or anything.
21     Q.  Were you aware that the door was pretty
22 close to being broken?  I mean that there was
23 very intense pounding and a battering ram on the
24 scene?
25     MR. FERREE:  Objection, no

---

136

1  foundation.
2      Q.  (By Ms. Pilate)  Are you aware of a
3  battering ram on the scene?
4      A.  I know there is always one taken.  It
5  wasn't used.
6      Q.  Did you ever consider or did anyone ever
7  consider what would have happened if one of the
8  minor children, age 6, would have been the one to
9  open the door?
10     A.  Then they would have been spoken to just
11 like whoever opened the door.
12     Q.  Do you know how that was?
13     A.  I wasn't there, but I have been on
14 numerous search warrants with these people.  When
15 someone opens the door we identify ourselves, we
16 secure that person, clear the residence, and then
17 begin the search.
18     Q.  So you are saying that the 6-year-old
19 daughter would have been treated like the adult
20 was who opened the door?
21     A.  We would have identified ourselves to
22 her, asked where the parents were.
23     Q.  Okay.  Do you know how Mr. Harte was
24 treated?
25     A.  I wasn't there.  But like I said, I have

---

# Transcript of the Videotaped Testimony of

# **Mark Burns**

February 19, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

37

1   investigation.
2       Q.   Okay.  But you don't know if the
3   material was ever sent to the lab so you don't
4   know if the alert was accurate?
5       A.  I do not know.
6       Q.   Is there any other time where your dog
7   has been asked to sniff any item taken from the
8   trash?
9       A.  No.
10      Q.   Do you know why Leawood wasn't contacted
11  for their canine?
12      A.  No, I don't.  I don't know that they
13  weren't.  I don't know if their canine was
14  available.
15      Q.   Do you know if anyone was present at the
16  start of this operation from Leawood?
17      A.  I do not know.
18      Q.   Did anyone at the Sheriff's Department
19  have any communication with Leawood regarding
20  10333 Wenonga?
21      A.  I don't know specifically, but it would
22  be our normal practice to notify the local
23  agency.
24      Q.   Now, turning again to Exhibit 1, it
25  refers to a briefing at 600 hours.  Who attended

---

38

1   that briefing, as you recall?
2       A.  I would be assuming.  I don't have a
3   recollection of who all was there.  I know I was
4   there.  I would assume Sergeant Reddin was there
5   and I would assume every member of each of the
6   search teams was there.  I would assume that
7   Captain Pfannenstiel was there.  I don't remember
8   if Major Reece was there or not.  I don't know if
9   any SERT members were there.
10      Q.   What was the reason that these four
11  searches or raids were being done on this
12  particular day?  Was it to coincide with
13  Operation Constant Gardener?
14      A.  Yes.
15      Q.   And who selected the starting time?
16      A.  I don't know.
17      Q.   Was there any discussion of children
18  being present at any of the locations?
19      A.  We were aware that the Hartes had
20  children so I'm sure that there could have been
21  discussion concerning children.  I don't remember
22  the conversations.
23      Q.   Did the fact the Hartes had children
24  come up at that meeting?
25      A.  I believe so, but I don't recall

---

39

1   specifically.
2       Q.   What steps or precautions were taken to
3   ensure that the children would not suffer trauma
4   or be harmed in any way?
5       A.  I don't know.
6       Q.   Now, at the very top of that page there
7   is one more E-mail, it says, "Approximately 800
8   hours.  Need to wait until the kids go to
9   school."  And -- I'm sorry.  There is an E-mail
10  in between, it says, "What time at Gardner, if
11  you know?"  Then it says, "Having breakfast with
12  Kenny and Don Hawn at 7:30."  That appears to be
13  an E-mail from Sheriff Denning.  He is asking
14  what time at Gardner, which appears to be a
15  reference to ████ Juniper Street.  Then the
16  response is, "Approximately 800 hours.  Need to
17  wait until the kids go to school."  Do you see
18  that?
19      A.  Yes.
20      Q.   And do you know why there was a
21  consideration there that the team needed to wait
22  until the children went to school?
23      A.  I don't know even what this conversation
24  is about.  I don't know.  It seems to me like
25  this is a conversation between the Sheriff and

---

40

1   Major Reece.  I don't know why they are meeting
2   where they are meeting and what kids they are
3   referring to.  I don't know if it is Major
4   Reece's kids, I don't know if this is kids
5   involved in any of the searches.  I do not know.
6       Q.   Was there any discussion of whether
7   there were kids on Juniper?
8       A.  I don't recall any conversation.  To my
9   knowledge there were no kids there.  I don't
10  remember any conversation.
11      Q.   Does Daryl Reece have small children?
12      A.  I believe so.  I don't know how small.
13      Q.   School-aged children at home?
14      A.  I don't know.
15      Q.   Have you ever been a part of any
16  discussion at any time that a raid had to be
17  timed so that it did not occur when there were
18  children in the house?
19      A.  No.
20      Q.   Have you ever been present when any
21  concern has been expressed for the presence of
22  children in the house?
23      A.  At that briefing I would think that
24  there was discussion and we would have been
25  discussing it out of concern for the children.

---

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

93

1    A.  I'm not sure I understand the question.
2    Q.  Do you recall anything else that you
3  have learned about them other than how to do
4  them?
5    A.  I have learned how to read the results
6  of them and know the colors and the color
7  combinations that are expected for positive or
8  negative results.
9    Q.  How do you read them?
10   A.  You determine the color that is present
11 and determine whether that's a positive or a
12 negative result.
13   Q.  Do you have to do anything when you are
14 looking at it to try and ensure that your
15 assessment of the color is accurate?
16   A.  Other than determining the color and the
17 color separation if there is different colors.
18   Q.  Are you supposed to compare it to
19 anything?
20   A.  It can be compared to the color that is
21 on the box of the test kit, but we are also
22 always told that those colors don't have to match
23 exactly.  The directions tell you a specific
24 color that you are looking for and you match that
25 color.

---

94

1    Q.  Is there anything else as far as
2  lighting or background or anything like that?
3    A.  I always tried to use a white background
4  or something that will contrast with the test
5  itself is.
6    Q.  What about layering?
7    A.  As far as the -- are you talking about
8  the colors that present themselves in the test
9  kit?
10   Q.  What about layering is important?
11   A.  Different tests will produce different
12 colors and some of them will have a specific
13 requirement for what color is on top and what
14 color is on the bottom.
15   Q.  Is that something that you have to pay
16 attention to?
17   A.  Yes.
18   Q.  Is there a significance to that?
19   A.  Yes.
20   Q.  If a test is supposed to produce layers
21 and doesn't produce layers, how are you supposed
22 to read that?
23   A.  As a negative test.
24   Q.  If a test is supposed to produce a
25 result with one color on top and one on the

---

95

1  bottom, how are you supposed to read that?
2    A.  It depends on what test is on top and
3  the bottom.  The directions indicate what color
4  should be on top.  If that color is on the bottom
5  instead and there is a different color on top,
6  then that's a negative test.
7    Q.  What if the two colors are reversed?
8    A.  That's a negative test.
9    Q.  Does it have to match in color and
10 separation and what's on top and what's on bottom
11 to what's in the instructions?
12   A.  Yes.
13   Q.  Is anything else considered a negative
14 test?
15   A.  No color formation at all.
16   Q.  Any deviation from what the instructions
17 say is that considered a negative test?
18   A.  Yes, that's what I would consider a
19 negative test.
20   Q.  Do you ever photograph your results?
21   A.  Yes.
22   Q.  When do you photograph them?
23   A.  I will generally photograph them if I'm
24 on the side of a road and do a field test kit in
25 order to make an arrest or if I'm using it as

---

96

1  part of my probable cause for an arrest.
2    Q.  How long have you been doing that?
3    A.  Several years.  I wasn't trained to do
4  it that way but I started doing it that way
5  because I thought it was a good practice.
6  Probably since 2006.
7    Q.  Did you do that with respect to the
8  trash seized from ▮▮▮▮Wenonga?
9    A.  No.
10   Q.  Why not?
11   A.  It wasn't part of our normal practice to
12 take pictures of them during the trash pulls.
13   Q.  I think you noted in the affidavit that
14 the marijuana appeared to have been processed and
15 was what you called saturated plant material,
16 correct?
17   A.  Yes.
18   Q.  Do you know if the field test kit that
19 you used could be used on saturated plant
20 material?
21   A.  Yes.
22   Q.  Did it say so in the instructions?
23   A.  No, it didn't say -- what the
24 instructions reflect is that it can't be used on
25 liquids, and I didn't consider this a liquid.

---

816.474.3376                        **A546**                  depo@coopermoeller.com

February 19, 2015                                                                    Mark Burns

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

97

1     Q.  Have you since received any training
2  that has suggested that any of the kits should
3  not be used on wet materials?
4     A.  No.
5     Q.  If you received training in 2005 and
6  then from a field training officer, why were you
7  suggested for remedial training or additional
8  training with regard to field test kits?
9     A.  That came down from supervisors,
10  probably as a result of this action.
11     Q.  What supervisors?
12     A.  I don't know who made the decisions.
13     Q.  Have you been requested or required to
14  take any remedial training in the visual
15  identification of marijuana?
16     A.  No.
17     Q.  Have you been requested or required to
18  take any other remedial training in the
19  identification of marijuana?
20     A.  No.
21     Q.  So the only additional training that you
22  have received is in the use of field test kits?
23     A.  Yes.
24     Q.  Have you ever at any point received any
25  training that alerts you to the occurrence of

98

1  false positives?
2     A.  I haven't received any formal training
3  on that, no.
4     Q.  Up to this point, does that include up
5  to the present you haven't received any, quote,
6  formal training on that?
7     A.  For false positives?
8     Q.  Uh-huh.
9     A.  I don't recall if in our training
10  program from the lab they discussed false
11  positives or not.  That may have been part of
12  that training.
13     Q.  Okay.  What about the training you
14  received in 2005?
15     A.  I don't recall.
16     Q.  At the time that you did the testing in
17  this case in 2012, were you aware of the possible
18  occurrence of false positives?
19     A.  No.
20     Q.  And up to that point had you received
21  any training or information in the occurrence of
22  false positives?
23     A.  Not that I can remember.
24     Q.  When you tested the material seized from
25  the Harte's trash, what kind of field test did

99

1  you use?
2     A.  It was a Lynn Peavey KN reagent test
3  kit.
4     Q.  Who was with you?
5     A.  Sergeant Reddin was with me on one
6  occasion and Deputy Blake was with me on one
7  occasion.
8     Q.  Was Denton ever with you?
9     A.  No.
10     Q.  And what result did the test render?
11     A.  Positive.
12     Q.  What did the positive result look like?
13     A.  It was a bi-layer red, and I would have
14  to read the directions to see which one was on
15  top and which one was on bottom.
16     Q.  Is it possible you could have been
17  confused about which layer should be on top and
18  which should be on the bottom?
19     A.  No.
20     Q.  When you visually looked at the material
21  seized from the Harte's trash, did you notice any
22  fragrance or odor about it?
23     A.  No.
24     Q.  Did you attempt to detect any?
25     A.  No.

100

1     Q.  Has anyone ever told you that the
2  interpretation of these tests has an inherent
3  subjective component?
4     A.  Yes.
5     Q.  Who has told you that?
6     A.  I don't recall.  Probably through
7  various training I have had and training officers
8  and other experienced officers.
9     Q.  What is that subjective component?
10     A.  The tint or hue of color that you are
11  looking for, if you are looking for a dark blue
12  versus violet versus purple, you can consider
13  those a positive test.  The test instructions
14  themselves ask, on the KN reagent test kit that
15  we used asked for a dark red orange, I believe,
16  or red.
17     Q.  What about the timing of the color
18  change, how long is that supposed to take?
19     A.  I would have to read the instructions
20  again.  Different tests are different.  It is
21  usually a pretty immediate color.  You don't want
22  to let the test kit set around because the color
23  will change and that will cause you to read it
24  incorrectly.
25     Q.  What about the material seized from the

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

101

1  Harte's trash caused you to identify it or state
2  that it was saturated marijuana plant material?
3      **A.  It was a clump of green vegetation that**
4  **looked like it had been chopped up or processed.**
5  **Because it was saturated, my thought was that it**
6  **may have been used to extract THC.  With the**
7  **chopped leaves and stems together like that, it**
8  **looked suspicious enough to make me think that it**
9  **might be marijuana.**
10     Q.  Did you ever consider that this might be
11  some other item discarded from the kitchen?
12     **A.  Yes, I would have considered that as**
13  **well at the time.**
14     Q.  What possibilities did you consider?
15     **A.  I wouldn't have known, I didn't know**
16  **what it was other than it was a green vegetation**
17  **that had been processed.  The leaves were rolled**
18  **in on themselves and we were able to unroll some**
19  **of the leaves and see a serrated leaf which made**
20  **me think more it could be marijuana.  The stems**
21  **and the way that they were, had a similar**
22  **resemblance to that of marijuana stems.**
23     Q.  Explain how you unrolled the leaves.
24     **A.  With our fingers, probably, in our**
25  **hands, in our fingers, or on the table that we**

102

1  **were using.**
2     Q.  So you touched this material?
3     **A.  Yes.**
4     Q.  And these were pretty small pieces,
5  weren't they?
6     **A.  Yes.**
7     Q.  And how were you able to visually
8  inspect them?
9     **A.  By looking at them.  I don't know how**
10  **else I could visually inspect them.**
11     Q.  Did you get a magnifying glass or any
12  kind of visual aid?
13     **A.  No.**
14     Q.  Did you attempt to take it over to the
15  lab and have anyone there look at it?
16     **A.  No.**
17     Q.  Have you ever seen an E-mail in which
18  one of the lab analysts said macroscopically the
19  material didn't look like marijuana?
20     **A.  Yes.**
21     Q.  Do you understand the reason for that?
22     **A.  I'm sorry, the reason for the E-mail?**
23     Q.  No, the reason that the lab analyst
24  reached that conclusion?
25     **A.  She inspected the material and that was**

103

1  what she found.
2     Q.  Okay.  Have you ever discussed it with
3  her?
4     **A.  No.**
5     Q.  Do you disagree with her assessment?
6     **A.  No.**
7     Q.  So sitting here today you no longer
8  think it looks like marijuana?
9     **A.  It looks different today than it did the**
10  **day that I found it.**
11     Q.  What about the day she looked at it?
12     **A.  She looked at it several months after I**
13  **had initially found it.  It is my understanding**
14  **even then that it was dried considerably from the**
15  **time and was more of a browner color than when I**
16  **had originally seen it.  So it would have looked**
17  **different when she saw it than when I initially**
18  **saw it.**
19     Q.  Have you ever seen loose tea leaves at
20  any time in your life?
21     **A.  Not that I'm aware of.**
22     Q.  Have you ever considered or did you ever
23  consider that the material could be tea leaves?
24     **A.  I didn't consider it at that time, no.**
25     Q.  Did you consider that they could be any

104

1  other botanical substance from the kitchen, any
2  herb or any other type of green item that was
3  consumed?  Any type of vegetable, any type of
4  leaves from vegetable trimmings or any herb?  Did
5  you consider any of those possibilities?
6     **A.  Yes, I considered that, without having a**
7  **specific type of vegetation in mind, until I**
8  **tested it.**
9     Q.  Okay.  Did you have any knowledge that
10  any botanical substances that might come from the
11  kitchen could test positive on a marijuana field
12  kit test although the item was not marijuana?
13     **A.  No.**
14     Q.  At any point did you use any gloves when
15  you were examining this?
16     **A.  Yes, I was wearing gloves the entire**
17  **time.**
18     Q.  Did you take any pictures of what you
19  were looking at?
20     **A.  No.**
21     Q.  At any point in any of your prior drug
22  investigations did you ever encounter any
23  saturated material that looked like this?
24     **A.  Yes.**
25     Q.  And when have you seen that?

February 19, 2015                                         Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

**105**

1    A. That would have been a year or two
2  before on another marijuana grow investigation.
3    Q. Where was that?
4    A. Overland Park.
5    Q. Who got you involved in that matter?
6    A. It was an investigation that we were --
7    Q. In Overland Park?
8    A. Yes.
9    Q. Was that material photographed?
10   A. I don't believe so.
11   Q. People don't take pictures of what they
12  find?
13   A. Not always.
14   Q. Tell me as much as you remember about
15  when and where that was and what the result of
16  the investigation.
17   A. I don't remember the street address.
18  The result of the investigation led us to a
19  search warrant of a residence where personal use
20  marijuana and paraphernalia was found, and
21  through the investigation led us to a separate
22  house owned by the same person in Kansas City,
23  Missouri where an active marijuana grow was
24  underway.
25   Q. Do you believe this was in 2011?

---

**106**

1    A. It was probably 2010 or 2011. I'm not
2  sure which.
3    Q. Did this case start with a marijuana
4  grow store sighting?
5    A. I believe so.
6    Q. And it was in Overland Park?
7    A. I think so, yes.
8    Q. Were the people in that case charged?
9    A. They weren't charged locally. I don't
10  know if Missouri Highway Patrol has charged them
11  on the grow that was found in Kansas City or not.
12   Q. I'm sorry, you didn't think they were
13  charged?
14   A. I don't think they were charged locally.
15  I don't know if they were charged in Missouri.
16   Q. Do the names Adriano or Williamson sound
17  familiar?
18   A. No.
19   Q. Were there any pictures taken of
20  anything seized from their house?
21   A. I don't recall if there were or not. I
22  believe there probably would have been if we
23  seized anything.
24   Q. Was there any lab testing of the item
25  that was in their trash?

---

**107**

1    A. Not to my knowledge.
2    Q. Have you ever gone through any
3  proficiency testing regarding your ability to
4  visually identify marijuana?
5    A. I don't believe so, no.
6    Q. You are saying you did not note any odor
7  or fragrance about this?
8    A. Correct.
9    Q. You understand that the odor of
10  marijuana has a very characteristic thing about
11  it, right?
12   A. Yes.
13   Q. Did you attempt to detect the odor?
14   A. No.
15   Q. Why not?
16   A. Because the material was found in
17  somebody's trash. The smell of the trash was
18  fairly overwhelming in itself. The material was
19  saturated with a liquid that I did not know. I
20  didn't know if it was water or some other inert
21  material or if it was some kind of chemical that
22  wouldn't be safe for me to sniff. It didn't have
23  an odor with it on the table or in my hand and I
24  didn't attempt to get any further odor from it.
25   Q. Did you consider having your canine

---

**108**

1  sniff it?
2    A. No.
3    Q. Why?
4    A. For a couple of reasons. Again, if I
5  don't know the nature of the material or the
6  wetness and I don't feel safe sniffing it myself,
7  I don't want my dog to have to sniff it. The dog
8  is used more along the lines of a preliminary
9  test to develop probable cause to search. I
10  didn't need probable cause to search the trash I
11  had in front of me so I didn't need to involve
12  the dog.
13   Q. But you needed PC to get into the house,
14  didn't you?
15   A. Yes.
16   Q. And wouldn't a dog sniff have provided
17  further information with regard to probable cause
18  to search?
19   A. A positive alert would have provided
20  another element to it, yes.
21   Q. Now, when you were visually inspecting
22  it, how close were you to it?
23   A. Probably 12 to 18 inches.
24   Q. So you were pretty close to it anyway?
25   A. Yes.

---

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

109

1    Q.  But at no time did you attempt to detect
2    any odor?
3        A.  I didn't try to -- other than the odor
4    that would have naturally been coming from it at
5    that distance, no, I didn't put it any closer to
6    my face than I needed to to visually inspect it.
7        Q.  Have you ever smelled wet marijuana?
8        A.  Yes.
9        Q.  What does it smell like?
10       A.  The wet marijuana that I have smelled
11   didn't have the distinct odor that I would find
12   on raw marijuana.
13       Q.  What odor does it have?
14       A.  The odor that I have smelled is just
15   basically an earthy vegetation smell.
16       Q.  Where have you smelled wet marijuana?
17       A.  This would have been the material that
18   we found along that other investigation.
19       Q.  Just that one case?
20       A.  That I can remember, yes.
21       Q.  Who worked that case with you?
22       A.  Deputy Denton was involved.  I don't
23   remember who else was involved.
24       Q.  Where in Overland Park?
25       A.  I don't remember.

---

110

1        Q.  Was it north or south Overland Park?
2        A.  South.
3        Q.  And you don't know if anyone was charged
4    locally?
5        A.  I don't think anybody was charged
6    locally.
7        Q.  Did you find any plants in the house?
8        A.  No, not in the house in Overland Park.
9    Just in the house in Missouri.
10       Q.  What did you find in the house in
11   Overland Park?
12       A.  I don't remember exactly what we found.
13   I would have to go back and find that report.  To
14   my recollection we found some trace of marijuana
15   or misdemeanor personal use marijuana.  I don't
16   know what quantity.  And I think we found some
17   paraphernalia.
18       Q.  What was the grow store sighting?
19       A.  I don't remember.
20       Q.  In terms of sending you to these other
21   people in Missouri, how were they connected with
22   the other people?
23       A.  It was his property, it was the same
24   people involved.  The owner or resident of the
25   Overland Park house owned or controlled the house

---

111

1    in Kansas City, Missouri.  He took us to the
2    house to show us the operation.
3        Q.  Was marijuana being grown there?
4        A.  Yes.
5        Q.  And was anyone charged in Missouri?
6        A.  I don't know.
7        Q.  Whose car was seen at the Green Circle?
8        A.  When?
9        Q.  There was a grow store sighting in this
10   case.
11       A.  I don't know.
12       Q.  Is there any other experience, other
13   than this one occasion, where you think you found
14   wet marijuana?
15       A.  Not that I can recall right now.
16       Q.  Do you have any curriculum or
17   photographs showing you what wet marijuana looks
18   like or providing information concerning its
19   characteristics or processing?
20       A.  I don't possess any photos or
21   curriculum.  I have seen the marijuana on YouTube
22   videos that describe bubble hash and butane honey
23   oil hash processing, but I don't have any
24   materials, no.
25       Q.  Have you attended any training that

---

112

1    deals with the processing of marijuana?
2        A.  Of marijuana grows, yes, but no formal
3    training on the actual processing of marijuana.
4        Q.  Well, when you say no formal training,
5    does that mean you are saying you have not
6    received any training that has explained to you
7    the process, how it is done and the product that
8    is produced, both useable and discards?
9        A.  Unless you consider YouTube videos a
10   form of training, which that would be the
11   training I would have received on basically
12   training myself to become familiar with the
13   processes.  I haven't had a training class
14   provided by somebody in person as far as
15   processing marijuana.
16       Q.  And has anyone directed you to watch
17   these YouTube videos?
18       A.  No.
19       Q.  When did you watch these videos?
20       A.  Probably between 2010 and 2013.
21       Q.  What caused you to start watching them?
22       A.  Curiosity.  I have wanted to learn more
23   about the process of making hash.  Often on our
24   marijuana grow investigations we would find trash
25   bags full of marijuana plant material and we

---

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

141

1   vegetation which appeared to be wet marijuana
2   plant material.  This plant material was
3   thoroughly saturated by some liquid and appears
4   as though it may have been processed for the
5   extraction of Tetrahydrocannabinol, THC, from the
6   plant material.  A sample of the plant material
7   was field tested and showed a positive response
8   for the presence of THC.  The field test utilized
9   consisted of reagents similar to those utilized
10  by the Johnson County Criminalistics Lab to
11  conduct its initial screening test for marijuana.
12  This test is presumptive but not conclusive for
13  the presence of marijuana.  A similar quantity of
14  plant material of the same nature was located in
15  the trash for this residence the previous week
16  but was discarded without being tested when it
17  was found among other innocent plant material and
18  was misidentified."  Do you recall writing that?
19      A.  Yes.
20      Q.  Did anybody else review this report?
21      A.  Yes, Sergeant Reddin would have reviewed
22  it.
23      Q.  Did he approve this report?
24      A.  Yes.
25      Q.  In this report you are stating that you

---

142

1   believed this green vegetation material appeared
2   to be wet marijuana plant material?
3       A.  Yes.
4       Q.  Do you see anything in there about
5   leaves with serrated edges?
6       A.  No, it is not specifically mentioned.
7       Q.  Then you go on to say, "This plant
8   material was thoroughly saturated by some liquid
9   and it appears as though it may have been
10  processed for the extraction of
11  Tetrahydrocannabinol."  Do you see that?
12      A.  Yes.
13      Q.  You are just saying some liquid.  What
14  are the liquids it could have been?
15      A.  I don't know.
16      Q.  Did you have any idea what liquid it
17  was?
18      A.  No.
19      Q.  Then you say, "A sample of the plant
20  material was field tested and showed a positive
21  response for the presence of THC."  Do you see
22  that?
23      A.  Yes.
24      Q.  Do you state here what field test was
25  used?

---

143

1       A.  No.
2       Q.  Do you state that it is the KN reagent?
3       A.  No.
4       Q.  The next sentence says, "The field test
5   utilized consists of reagents similar to those
6   utilized by the Johnson County Criminalistics
7   Laboratory to conduct its initial screening for
8   marijuana."  Do you see that?
9       A.  Yes.
10      Q.  Do you know if the crime lab ever used
11  the KN reagent?
12      A.  It is my understanding they have, yes.
13      Q.  Do you know when they have used it?
14      A.  No.
15      Q.  Was that information that you had or
16  believed you had in 2012?
17      A.  Yes.
18      Q.  And who told you at that time?
19      A.  This was information I got from ADA
20  Sarah Hill when she suggested I add in my
21  affidavits that these were chemicals similar to
22  those or reagents similar to those used by our
23  crime lab, and that was my general understanding.
24      Q.  So she wanted you to add that language?
25      A.  She suggested that I add it, yes.

---

144

1       Q.  And she told you that the lab had used
2   the KN reagent?
3       A.  I don't believe she ever told me
4   specifically that they used the KN reagent.
5       Q.  But she wanted you to add that language?
6       A.  It was my understanding that all of the
7   test kits we used have been approved by our lab
8   and that they would contain the reagents similar
9   to those that they used.
10      Q.  Who told you that?
11      A.  I don't recall.  It was my
12  understanding.  I don't remember even if I was
13  specifically told or if it was just something
14  that was understood.
15      Q.  Is it documented anywhere?
16      A.  I don't know.
17      Q.  Well, the phrase that is used in the
18  affidavit is similar to what appears here in the
19  report.  Was that something that you used in your
20  affidavits prior to being requested by Ms. Hill,
21  or was it something you only began using at her
22  request?
23      A.  I began using it at her suggestion.
24      Q.  What year was that?
25      A.  I don't know.  I think it was 2010.

---

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

145

1    Q.  Was the KN test in use by you at that
2    point?
3        A.  I don't remember.
4    Q.  You continued to use the same language
5    throughout 2010, 2011 and 2012?
6        A.  Yes.
7    Q.  Did you use the same language regardless
8    of whether you were using the Duquenois-Levine
9    test or the KN reagent test?
10       A.  Yes.
11   Q.  So it is what is generally referred to
12   as boilerplate language, it is the same in every
13   affidavit you were doing from then on out?
14       A.  When I use field test kit, that's the
15   language I use for all of my affidavits.
16   Q.  Tell me every person with whom you had
17   any conversation regarding the KN reagent.
18       A.  I don't know if I can tell you that.
19   Q.  Did you ever ask anyone why that seemed
20   to be the kit that was being stocked?
21       A.  No.
22   Q.  In 2012 did you ever have a conversation
23   with Christopher Farkes about it?
24       A.  I don't remember.
25   Q.  Did you ever have a conversation with

146

1    Tom Reddin about it?
2        A.  I don't remember specific conversation.
3    Q.  Or Ed Blake?
4        A.  No.
5    Q.  Or Mike Pfannenstiel?
6        A.  No.
7    Q.  Do you know if Pfannenstiel was involved
8    in ordering the kits?
9        A.  I don't know.
10   Q.  Who was responsible for vetting the kits
11   and making a determination as to what would be
12   ordered?
13       A.  I don't know.
14   Q.  Who was responsible for ensuring that
15   you were properly trained?
16       A.  My supervisors, but I don't know who
17   specifically would be responsible for field test
18   kit training.
19   Q.  Let's go up the chain of command in
20   terms of who would be responsible for ensuring
21   that you were properly trained.  Would that begin
22   with Reddin?
23       A.  Yes.
24   Q.  And then beyond that, that would go to
25   Pfannenstiel?

147

1        A.  Yes.
2    Q.  And then from there would go to Reece?
3        A.  I think Baker was above Pfannenstiel at
4    the time.
5    Q.  And from Baker to Denning?
6        A.  I don't know if Sheriff Denning had any
7    hand in what training we got, but he would be at
8    the top of the chain of command, yes.
9    Q.  Did it go through the Under Sheriff?
10       A.  I don't know.
11   Q.  Somehow it got from Baker to whoever was
12   above him, or was Baker the final shot caller, do
13   you know?
14       A.  I don't know who makes the
15   determinations on that.
16   Q.  What Major is over training?
17       A.  Dale Reed.
18   Q.  Dale Reed?
19       A.  Over the training division, yes.
20   Q.  Who is the ultimate policy maker in the
21   department?  Is that Sheriff Denning?  Who
22   decides on policies ultimately?
23       A.  They ultimately go to Sheriff Denning
24   for his approval.  I don't know at what level the
25   command staff may write or propose policies.  I

148

1    don't know who makes the approvals on those.
2    Q.  Would it be fair to say that it was the
3    responsibility of your supervisors to ensure that
4    you had the training and the supplies that you
5    needed to carry out your job?
6        A.  Yes.
7    Q.  Have you ever visited the inside of the
8    Green Circle?
9        A.  No.
10   Q.  Do you know what is sold there?
11       A.  Yes.
12   Q.  What is sold there?
13       A.  Hydroponic growing equipment and
14   materials.
15   Q.  Can you say any more specifically?  Can
16   you name any specific items?
17       A.  To my knowledge they sell lighting
18   equipment, timers, grow mediums such as clay
19   pellets, Grodan, other growing mediums.  They
20   sell different chemicals, nutrients, fertilizers.
21   Q.  Are any of these specific to marijuana
22   cultivation?
23       A.  Not to my knowledge.
24   Q.  Could they also be used for growing
25   vegetables or tomatoes indoors?

February 19, 2015                                                          Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

149

1    A.  I believe so, yes.
2    Q.  Have you ever heard of the practice of
3  growing hydroponic tomatoes?
4    A.  Yes.
5    Q.  Have you ever seen hydroponic tomatoes
6  in the grocery store?
7    A.  I don't know if I have.  I never paid
8  attention to where they originated.
9    Q.  Do you know if anyone has done any study
10 of the customer base of either of the hydroponic
11 stores here in the metropolitan area?
12   A.  No.
13   Q.  We have done a rather lengthy deviation
14 here, but we started out talking about all of the
15 people with whom you have discussed the search at
16 ███████Wenonga, and you named Captain Pfannenstiel
17 and you said you had multiple conversations with
18 him and you said approximately three or four
19 concerned the field test kit.  Does that all
20 sound familiar?
21   A.  Yes.
22   Q.  What did the other conversations
23 concern?
24   A.  This case in general.
25   Q.  Can you tell me more than that?  When

150

1  you say this case in general, what aspects?
2    A.  We talked about reports, we talked about
3  appointments for depositions, we talked about
4  field tests, the lab results.
5    Q.  Did he prepare you for your deposition?
6    A.  No.
7    Q.  What was the purpose of all of these
8  conversations?
9    A.  I don't know, other than to share
10 information and keep each other informed on
11 what's going on with the case.
12   Q.  When you say share information, what was
13 the goal of the sharing?
14   A.  I don't know what his goal was.
15   Q.  Was he providing training or
16 supervision, trying to point out things that
17 could have been done differently or better, or
18 was he providing information that might need
19 in the course of being a party to this case?
20   A.  He was keeping me up to speed on what is
21 going on with the case as far as document
22 requests and things of that nature, asking me if
23 I had any reports or E-mails.  Every time, to my
24 knowledge, that a request came in he would
25 forward an E-mail or ask me personally if there

151

1  were any reports to my knowledge that I had and
2  it was just generally about preparing for the
3  case.
4    Q.  Have you ever discussed the KN reagent
5  with him?
6    A.  I don't remember.
7    Q.  Can you recall anyone specifically
8  telling you that the lab used the KN reagent?
9    A.  Other than conversations with my
10 attorneys, I don't remember any specific
11 conversations about that.
12   Q.  Now, the attorneys are something that
13 you have had since this incident, right, since
14 2012?
15   A.  Yes.
16   Q.  Prior to 2012 do you recall any
17 conversations with anyone about what reagent the
18 lab used?
19   A.  No.
20   Q.  Let's turn to Page 506.  That's a report
21 by Deputy Blake and it concerns it looks like a
22 trash pull that you and he conducted.  And it
23 says at 4/17/2012 that you and he collected two
24 white kitchen style trash bags, took them to the
25 Sheriff's Office operation building.  Could you

152

1  give the address of that, please?
2    A.  27747 West 159th Street in New Century,
3  Kansas.
4    Q.  And then you noted bag one contained a
5  receipt from Midwest Neurofeedback to Robert
6  Harte, correct?
7    A.  Yes.
8    Q.  And bag 2 contained a receipt with an
9  address of a Robert Harte, correct?
10   A.  Yes.
11   Q.  And then you go on to say --
12   A.  I don't go on to say anything.  This is
13 Deputy Blake's report.
14   Q.  Excuse me.  You are correct.  Deputy
15 Blake goes on to say, "Also inside the bag were
16 several wet pieces of green vegetation with
17 stems.  A piece of the green vegetation was taken
18 from one of the plastic bags and field tested
19 positive for marijuana."
20   A.  Yes.
21   Q.  Did Deputy Blake engage in the visual
22 examination that you did in terms of unrolling
23 leaves and looking to see what kind of edges they
24 had?
25   A.  I don't remember specifically which one

February 19, 2015                                                      Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

153

1    of us may have done that, but it was done.
2        Q.  So you don't know if he did it or you
3    did it?
4        A.  Correct.
5        Q.  Are you talking just about this week or
6    about the prior week?
7        A.  I'm talking just about this week.
8        Q.  This prior week are you saying you
9    recall doing that with, is it Sergeant Reddin at
10   that time?
11       A.  Yes.
12       Q.  You did that with Sergeant Reddin on
13   April 10?
14       A.  Yes.
15       Q.  Was Deputy Denton present with you when
16   you did that?
17       A.  No.
18       Q.  Did Deputy Denton inspect the green
19   vegetative material?
20       A.  Not to my knowledge.
21       Q.  Did you and he simply collect it?
22       A.  Yes.
23       Q.  When you and Blake did the trash pull,
24   did you and he discuss its appearance?
25       A.  I imagine we did, yes.  I don't recall

---

154

1    the specific conversation.
2        Q.  Did you tell him your conclusion or
3    findings from the previous week?
4        A.  Yes.
5        Q.  What did you tell him?
6        A.  I told him what we had found, how we
7    found a mass of processed green vegetation, that
8    I told him what we found with the leaves, I told
9    him what it looked like.  I told him we field
10   tested it and it was positive.  He may or may not
11   have been present to see the field test that
12   first week, I don't know.  And I reminded him
13   that we had seen the same type of plant material
14   the week prior.
15       Q.  Did you tell him this before he did his
16   inspection?
17       A.  I don't recall.
18       Q.  Did you tell him this before the field
19   test was done?
20       A.  I don't recall when I told him.  I think
21   I would have told him -- he would have been aware
22   of the case in general before our trash pull so
23   he probably was aware of what we found the week
24   prior.
25       Q.  Okay.  When you say the case in general,

---

155

1    what do you mean?
2        A.  The trash pulls, the tip from the Green
3    Circle store.
4        Q.  What would have caused him to be aware
5    of that?
6        A.  Conversations in the office.
7        Q.  What were you all conversing about?
8        A.  We had also started an investigative
9    file for the case.
10       Q.  And who was the case agent?
11       A.  This particular case I don't think there
12   was anybody specifically assigned to it.  These
13   cases were worked in conjunction with one another
14   and our files were maintained to where anybody
15   who is available to do either a trash pull on a
16   trash day or things of that nature could add to
17   the case file.
18       Q.  Wasn't there an individual with primary
19   responsibility?
20       A.  I don't remember who it was.
21       Q.  You are saying you don't know if it was
22   you?
23       A.  It could have been me, it could have
24   been Deputy Blake, it could have been Deputy
25   Shoop.

---

156

1        Q.  Does the person with primary
2    responsibility normally draft and sign the search
3    warrant affidavit?
4        A.  Not necessarily, no.
5        Q.  But you agree that you did that in this
6    case?
7        A.  Yes.
8        Q.  Was the material, the green vegetative
9    material visually inspected this week as it had
10   been the prior week?
11       A.  Yes.
12       Q.  And do you believe it was by you or by
13   Deputy Blake?
14       A.  I believe it was done by me and Deputy
15   Blake.
16       Q.  You think you both looked at it?
17       A.  I think so, yes.
18       Q.  What process did you engage in?
19       A.  The same process as the week before.
20       Q.  And you are saying that you again
21   unrolled the leaves?
22       A.  I believe so, yes.
23       Q.  Did you note they had serrated edges?
24       A.  I believe so, yes.
25       Q.  Is that noted here in the report?

---

February 19, 2015                                                    Mark Burns
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

157

1    A.  No, it is not.
2    Q.  Is it common -- go ahead.
3    A.  Other than to say that this one doesn't
4    say.  My previous report says "had the appearance
5    of marijuana" and that goes into my statement it
6    had the appearance of marijuana.  I just didn't
7    specifically spell out that it had the serrated
8    edges.
9    Q.  Don't you think that would have been an
10   important thing to note?
11   A.  I think it is part of the statement
12   being having the appearance of marijuana.
13   Q.  Is it important to know what about it
14   has the appearance of marijuana?
15   A.  I didn't feel that for a trash report
16   that it needed to be that detailed.
17   Q.  Isn't it true that many things are green
18   vegetative substances?
19   A.  Yes.
20   Q.  And this investigation was to find
21   evidence or see if evidence could be located that
22   would permit the issuance of a search warrant?
23   A.  Yes.  And when I saw what I thought
24   appeared to be marijuana, that's why I performed
25   the field test kit.

---

158

1    Q.  And a search warrant is a pretty
2    important thing, right?
3    A.  Yes.
4    Q.  Because you are going to go into
5    someone's home, right?
6    A.  Yes.
7    Q.  At a time when certainly they are not
8    expecting you, right?
9    A.  Yes.
10   Q.  And if they don't agree to invite you
11   in, you go in anyway, right?
12   A.  Correct.
13   Q.  And if they don't answer the door
14   quickly enough, you are going to go in anyway,
15   right?
16   A.  Yes.
17   Q.  And at 7:30 in the morning and at that
18   time of day theoretically somebody could be
19   getting dressed or be in the shower, correct?
20   A.  Yes.
21   Q.  And it would not be out of the ordinary
22   to think that a forcible entry might occur,
23   right?
24   A.  Yes.
25   Q.  And you knew that there were children,

---

159

1    correct?
2    A.  We thought that there may be children,
3    yes.
4    Q.  You certainly had probable cause to
5    believe that there were children there?
6    A.  Yes.
7    Q.  And you knew that executing a search
8    warrant was probably not going to be an in and
9    out five minute kind of thing, right?
10   A.  Yes.
11   Q.  It is a pretty serious matter, right?
12   A.  Yes.
13   Q.  Yet you did not document the serrated
14   leaves that you believe you saw, right?
15   A.  Yes.
16   Q.  And you didn't photograph this, correct?
17   A.  Correct.
18   Q.  And at that point there was no one in
19   charge of the case, right?
20       MR. FERREE:  Objection, misstates
21   his testimony.
22   Q.  (By Ms. Pilate)  There was no single
23   individual in charge of the case, is that what
24   you are saying?
25       MR. FERREE:  Same objection.

---

160

1    Q.  (By Ms. Pilate)  Well, tell me what it
2    is then.  What was the situation?  Was a single
3    person in charge?
4    A.  I think I already explained that, there
5    is a group effort in these cases.
6    Q.  So the answer is no?  I want a yes or
7    no.  Was a single person in charge?
8    A.  I would say ultimately our supervisor
9    was in charge.
10   Q.  Okay.  That was Sergeant Reddin?
11   A.  Yes.
12   Q.  Is it unusual not to have a single case
13   agent?
14   A.  No.
15       (Deposition Exhibit 7 was marked
16   for identification.)
17   Q.  I'm going to hand to you what I'm
18   marking as Burns Exhibit 7.  I'm going to ask you
19   to please look through these pages and I'm going
20   to ask you some questions about them.  I think we
21   probably could profit from a short restroom break
22   here.  Actually I think I could.  Take 10.  Is
23   that okay?
24       MR. FERREE:  Sure.
25       THE VIDEOGRAPHER:  Go off the

---

Transcript of the Videotaped Testimony of

# Christopher Farkes

February 23, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

February 23, 2015
Christopher Farkes
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

97

1    A.  I would describe it more as knocking on
2  the door.
3    Q.   While he was knocking, was Shoop doing
4  anything?
5    A.  He was holding the screen door open.
6    Q.   Was anyone counting or keeping track of
7  time?
8    A.  I don't know.
9    Q.   What happened next?
10    A.  Mr. Harte came to the door.
11    Q.   And then what happened?
12    A.  He was informed there was a search
13  warrant for the residence.
14    Q.   Was he given the warrant?
15    A.  At some point I believe he was.
16    Q.   Who told him there was a search warrant?
17    A.  I think it was Deputy Blake.  I believe
18  it was him.  I don't know.
19    Q.   What words did he use?
20    A.  I don't recall his specific words.
21    Q.   What happened next?
22    A.  We made entry of the residence.
23    Q.   Okay.  What happened with Mr. Harte at
24  that point?
25    A.  He was instructed to lay down on the

98

1  ground.
2    Q.   Did anyone touch him?
3    A.  I don't recall seeing anybody touching
4  him.
5    Q.   And how was he told to lay down?
6    A.  It would have been some sort of
7  authoritative "Get down on the ground."  I don't
8  remember the verbiage, though.
9    Q.   Who gave that command?
10    A.  I don't recall.
11    Q.   How was Mr. Harte attired?
12    A.  I don't remember.
13    Q.   Where was everybody else when he was
14  told to lay down?
15    A.  I believe Blake was looking up the
16  stairs, straight ahead there was a threshold into
17  another room, I was looking in that direction or
18  possibly there.  And off to the left there was a
19  living room area, I may have been looking both
20  those directions.  I don't know where everybody
21  else was standing.
22    Q.   So Blake is looking up the stairs.  What
23  is he looking for?
24    A.  I believe there were other people coming
25  from that direction at that point.  I'm trying to

99

1  remember the timing on that.  At some point the
2  other occupants of the house came from that upper
3  hallway down the stairs.
4    Q.   Okay.  And who were the other occupants?
5    A.  Mr. Harte's wife, there was a male child
6  and a female child.  I don't remember their ages.
7    Q.   Okay.  About how old to you did they
8  appear to be?
9    A.  Pre-teen and teen, I believe.
10    Q.   I'm sorry?
11    A.  Pre-teen and teen.  I believe the boy
12  was more teenager.  I think the girl was pre-teen
13  or early teens.  I don't remember.
14    Q.   Could she have just been six or seven
15  years old?
16    A.  I don't remember.
17    Q.   What was happening with Mr. Harte at
18  this time?
19    A.  I believe he was still on the ground.
20    Q.   When you say on the ground, how was he
21  on the ground?  Was he face down?
22    A.  Yes.
23    Q.   Where were his hands?
24    A.  I don't know.  I don't know where they
25  were.

100

1    Q.   Was he given any direction about how to
2  lay down?
3    A.  Possibly, but I don't remember.
4    Q.   Was he given any direction about where
5  to put his hands?
6    A.  Probably.
7    Q.   Did he have on a shirt?
8    A.  I don't remember.
9    Q.   Did it look to you like he had just
10  recently gotten up?
11    A.  I don't remember anything specific about
12  what he was wearing or his look.  But that time
13  of day that would be a logical assumption, but I
14  don't remember.
15    Q.   Who was engaged with Mr. Harte at that
16  point, what Deputy was assigned to him?
17    A.  I don't remember.  There were a number
18  of officers right there.  I don't know if any one
19  individual was specifically.  I don't remember.
20    Q.   Was Kilbey in the house?
21    A.  Yes.
22    Q.   Was he carrying an assault rifle?
23    A.  Yes.
24    Q.   And how was he carrying that?
25    A.  It was in a low ready position, slung

February 23, 2015                                                    Christopher Farkes
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

101

1    down like this.
2        Q.  Could you stand up and show that
3    position for the camera.
4        A.  He was in a low ready.  He is
5    right-handed so actually it would be like this.
6        Q.  So which end would be pointed down?
7        A.  The barrel.
8        Q.  The barrel.  Okay.  While the barrel was
9    pointed down, Mr. Harte was on the floor,
10   correct?
11       A.  In a different part of that area.
12       Q.  Was this all in the foyer of the house?
13       A.  There is a foyer and then living room
14   area and I think Mr. Harte was over here in the
15   foyer.
16       Q.  Where was Kilbey?
17       A.  I think he was off to my left looking
18   back that way, back towards the living room area.
19   I don't recall.
20       Q.  Who had or who supposedly had control of
21   Mr. Harte?
22       A.  I don't remember.
23       Q.  What type of commands did you hear?
24       A.  There were commands for the individuals
25   to come down the stairs.

102

1        Q.  What was being said?
2        A.  I don't recall the exact verbiage.
3        Q.  Where was everybody at that point?
4        A.  Everybody who?
5        Q.  All the deputies.  Were they all in the
6    same area, right around the foyer?
7        A.  I believe so, yes.
8        Q.  And then down the stairs is coming
9    Mrs. Harte and the children?
10       A.  Yes.
11       Q.  Then what happened?
12       A.  There is a couch off in the living room
13   here, I believe someone checked the couch to make
14   sure there were no weapons there and I think the
15   Harte family was moved to that couch area.
16       Q.  Were Mrs. Harte and the children ever
17   made to sit on the floor?
18       A.  I don't remember.
19       Q.  Who was in charge of the Hartes and the
20   children?  Who was responsible for controlling
21   them?
22       A.  Eventually I believe it was Deputy
23   Vrabac.
24       Q.  Who was it through this early part here?
25       A.  I don't remember.

103

1        Q.  Was it you?
2        A.  I don't recall that.  I don't remember.
3        Q.  Were commands being shouted?
4        A.  I wouldn't describe it as shouting.  It
5    would be --
6        Q.  Softly?
7        A.  Authoritative voice.
8        Q.  Could you demonstrate what a command
9    sounds like?
10       A.  It would be something along the lines of
11   "Sit down."
12       Q.  What else was being said?  Was Mr. Harte
13   told to get on the ground?
14       A.  Mr. Harte?
15       Q.  Uh-huh.
16       A.  Yes.
17       Q.  And who shouted that?
18       A.  I don't remember.
19       Q.  What verbiage was used?
20       A.  I don't remember the exact verbiage.
21       Q.  What else do you recall being said?
22   What other directions or commands?
23       A.  I believe there was some communication
24   between the officers as to who was going to go up
25   and who was going to go down.

104

1        Q.  Did everybody wait in that area there
2    until the Hartes were seated on the couch, or did
3    some people go immediately looking through the
4    house?
5        A.  I don't remember the timing on that.
6        Q.  Were the Hartes saying anything?
7        A.  I don't remember.
8        Q.  Were they compliant?
9        A.  Yes.
10       Q.  Anything else you recall about the
11   Hartes?
12       A.  In regards to?
13       Q.  Anything they were saying or doing?
14       A.  At which instance?
15       Q.  While all this is going on.
16       A.  No, I don't remember them.
17       Q.  Did it appear to you they had recently
18   gotten out of bed?
19       A.  Yes.
20       Q.  Do you know why this warrant was being
21   executed while the children were at home and
22   before they were in school?
23       A.  No, I don't.
24       Q.  Had you been prepared for the presence
25   of children?

February 23, 2015                                   Christopher Farkes
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

185

1    Q.  I mean anything about this make you
2  wonder who made the decision and why?
3    A.  No.  That's above my pay grade.
4    Q.  So you are not surprised to read that
5  the test that was used was the wrong field test
6  kit?
7    A.  That appears to be Captain Baker's
8  opinion there.
9    Q.  Did anyone ever tell you that?
10   A.  No.
11   Q.  Did anyone ever tell you to stop using
12  the KN reagent test?
13   A.  At one point, yes.
14   Q.  Who told you to stop using it?
15   A.  I believe it was Captain Pfannenstiel or
16  one of the supervisors passing along that.  I
17  just remember at one point they made sure there
18  were no KN tests still at the Sheriff's Office.
19   Q.  What was the stated reason for that?
20   A.  I believe it had to do with the testing
21  that was done from the lab.
22   Q.  Whose responsibility is it to make sure
23  that the correct test is used?
24   A.  Department-wide?
25   Q.  Uh-huh.

---

186

1    A.  I don't know.
2    Q.  Is it ultimately the Sheriff's decision
3  to make sure that what is done is done properly
4  with the proper tools and with the proper
5  training?
6    A.  I believe ultimately all of the
7  decisions are his responsibility, through him or
8  one of his appointees.
9    Q.  So do you feel it is up to the
10  supervisors to ensure that the proper kits and
11  proper tools are given to the deputies in the
12  field?
13   A.  I'm not sure whose decision it is, if it
14  is within the operations or lab, I don't know
15  whose decision that is.
16   Q.  But ultimately someone is in charge?
17   A.  Yes.
18   Q.  And the person in charge would be at the
19  top of the department, right?
20   A.  Ultimately.
21   Q.  And whether or not something is vetted
22  by the lab, would that be a decision of the
23  Sheriff?
24   A.  I don't know.
25   Q.  I'm talking about whether a test is

---

187

1  vetted for use and the proper research or
2  groundwork is done ahead of time by people with
3  the appropriate skills.  Making sure that is done
4  is whose responsibility?
5    A.  I would think the lab supervisor
6  supervising those individuals doing the testing.
7    Q.  But would the lab get involved without
8  someone over them telling them hey, you need to
9  be looking at these tests and making sure we are
10  doing the right thing?
11   A.  I don't know.
12   Q.  What I'm trying to figure out is whose
13  responsibility ultimately is the situation here?
14       MR. RIDGWAY:  I think he testified
15  several times that he doesn't know.
16   Q.  (By Ms. Pilate)  Who makes the policies
17  at the Sheriff's Department ultimately?
18   A.  Sheriff Denning.
19   Q.  That was probably a simpler way of
20  asking the same question.
21       (Deposition Exhibit 10 was marked
22  for identification.)
23   Q.  I'm going to hand you another E-mail
24  marked as Deposition Exhibit 10.  If you could
25  read the entire E-mail to yourself, then I will

---

188

1  ask you some questions.  There are two E-mails
2  here, one from Daryl Reece and then a response to
3  that by Frank Denning.  Have you ever seen this
4  E-mail before?
5    A.  No.
6    Q.  In this first E-mail at the bottom is
7  reference to two KORA requests.  Do you know what
8  KORA stands for?
9    A.  Kansas Open Records Act.
10   Q.  Then it says both requests were denied.
11  Do you see that?
12   A.  Yes.
13   Q.  Do you know why those requests were
14  denied?
15   A.  No.
16   Q.  And then the rest of the E-mail
17  describes the positive field tests and then later
18  the negative lab tests.  At the point that this
19  E-mail was sent March 30, 2013, did you have any
20  awareness of this situation?
21   A.  I believe so, yes, because this was
22  after the testing was done.
23   Q.  When you say the testing, what testing
24  do you mean?
25   A.  Where they are talking about learning

---

# Transcript of the Videotaped Testimony of

# **Tyson Kilbey**

February 24, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

A560

February 24, 2015                                                    Tyson Kilbey
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

89

1    A.  Yes.
2    Q.  What position were you holding it at?
3    A.  Complete low ready position like I just
4    demonstrated.
5    Q.  What is the reason for the low ready?
6    A.  It is the safest direction to point your
7    muzzle.
8    Q.  Toward the ground?
9    A.  Correct.
10   Q.  At that point Mr. Harte was on the
11   ground, correct?
12   A.  At some point Mr. Harte was on the
13   ground.
14   Q.  And you were holding your AR-15?
15   A.  I was holding my AR-15.
16   Q.  And how close were you to Mr. Harte?
17   A.  I was, of the four people that entered
18   the room, I was the farthest away and I had no
19   direct contact at any time with Mr. Harte.
20   Q.  Did you say anything to him?
21   A.  I did not.
22   Q.  What happened next?
23   A.  The first area of the house, the unknown
24   area that I cleared was the -- there was stairs
25   off to the right.  I went upstairs and I went

90

1    down the hallway.  I believe there was a bathroom
2    and some bedrooms and an attic and I cleared,
3    made sure there was no additional people in those
4    areas.
5    Q.  Had anyone who had been up there, come
6    downstairs already?
7    A.  I don't know where everybody -- I
8    couldn't see where everybody else was coming from
9    so I don't know for sure if they came from the
10   upstairs.
11   Q.  Did you see, after Mr. Harte was on the
12   ground, did you see anyone else come into the
13   living room area?
14   A.  Yes, I did.  There was other people,
15   there was other people.
16   Q.  Who were they?
17   A.  There was a female and the two children,
18   boy and girl, I think.  Again, my contact -- I
19   actually had no personal contact with any of the
20   residents.
21   Q.  At any point?
22   A.  No.
23   Q.  Now, Mr. Harte got on the ground,
24   correct?
25   A.  Yes.

91

1    Q.  Was he compliant with commands?
2    A.  Yes.
3    Q.  Do you recall what any of the other
4    people were saying or doing at that time, the
5    other occupants?
6    A.  I don't.  At that time, I don't.
7    Q.  Do you recall anything about the
8    appearance of the children?
9    A.  I don't.
10   Q.  Do you recall anything that the female,
11   adult female may have said?
12   A.  No.
13   Q.  You just remember seeing them?
14   A.  Yes.
15   Q.  Do you remember anything about the
16   appearance of any of them?
17   A.  I don't.  I saw them briefly initially
18   and then I saw them sitting on a couch in the
19   living room.
20   Q.  Okay.
21   A.  That's it.
22   Q.  Okay.  When you went upstairs, did
23   anyone go with you?
24   A.  Deputy Blake.
25   Q.  Did you clear each room together?

92

1    A.  In conjunction we cleared the rest of
2    the upstairs.
3    Q.  Did you find anybody else up there?
4    A.  I did not.
5    Q.  And how long did that take?
6    A.  That was a matter of minutes.
7    Q.  Did you note anything in the upstairs
8    that was consistent with a marijuana grow?
9    A.  I didn't.
10   Q.  Where did everyone else go at that
11   point?
12   A.  I don't know where everyone else went.
13   I know Deputy Blake and I cleared the upstairs as
14   far as people.  And then I believe Deputy Farkes
15   was positioned -- there was a basement and he was
16   positioned at the top waiting for people to help
17   him clear that area.  And I say Deputy --
18   Q.  Where was Farkes?
19   A.  There was an upstairs and then there was
20   a door leading downstairs.  I think it was Farkes
21   waiting at the basement.  But I could be mistaken
22   on that.  Somebody was waiting for help to check
23   the basement.
24   Q.  While you were upstairs, did you smell
25   anything at any point that suggested marijuana to

Transcript of Videotaped Testimony of

# Edward Blake

March 10, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816-474-DEPO | F: 816-474-3375
www.coopermoeller.com

March 10, 2015                                          Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 61

1    Q.  Is there any policy that requires you to
2    document evidence that suggests that the target
3    or suspect is not engaged in criminal activity;
4    i.e., is innocent?
5        **A.  We would write up a supplement that said**
6    **the case was closed.**
7        Q.  But what about documenting information
8    uncovered in the course of your investigation,
9    would you document that type of evidence?
10       **A.  I guess I don't understand.  Again, if**
11   **the case was closed, we would explain why it was**
12   **closed and be done.**
13       Q.  Have you ever had any training in
14   documenting information that suggests that the
15   target may be innocent?
16       **A.  No, ma'am.**
17       Q.  Now, prior to this case had you ever
18   heard of anything called a false positive in a
19   drug field test?
20       **A.  No.**
21       Q.  Never received any training on that?
22       **A.  On a false positive?**
23       Q.  Uh-huh.
24       **A.  No.**
25       Q.  Are you familiar with the reports, the

Page 62

1    police reports that were generated in the Harte
2    case?
3        **A.  Yes, ma'am.**
4        Q.  Do you recall that the material seized
5    from the Harte's trash was referred to as
6    saturated plant material?
7        **A.  Yes, ma'am.**
8        Q.  Did that plant material look like
9    anything you had ever seen before?
10       **A.  Yes, ma'am.**
11       Q.  What did it look like?
12       **A.  Like a green, wet vegetation that had**
13   **been saturated with some kind of fluid and been**
14   **processed.**
15       Q.  Where have you received training in
16   this?
17       **A.  I don't know specifically that training.**
18   **I have received training on that.**
19       Q.  Where?
20       **A.  Again, I don't know specifically.**
21       Q.  Have you ever received any training in
22   the visual identification of marijuana?
23       **A.  Yes, ma'am.**
24       Q.  And where is that?
25       **A.  I don't know specifically.**

Page 63

1    Q.  Have you ever undergone any proficiency
2    testing on the visual identification of
3    marijuana?
4        **A.  Just additional training.  I don't know**
5    **about like a test, but I have received additional**
6    **training.**
7        Q.  Do you ever take photos of what is
8    recovered in a trash pull?
9        **A.  Yes, ma'am.**
10       Q.  When do you take photos?
11       **A.  If we are going to keep it as evidence**
12   **or if it is going to be -- if it is not going to**
13   **be placed into property due to, it is going to**
14   **spoil or mold or something to that effect.**
15       Q.  Did you take any pictures in the Harte
16   case?
17       **A.  I did.**
18       Q.  What?
19       **A.  I did.**
20       Q.  What did you -- did you take photos of
21   the trash?
22       **A.  Of items within the trash.**
23       Q.  When did you take those photos?
24       **A.  The day of the trash pull.**
25       Q.  Do you know where those photos are?

Page 64

1        **A.  I would have submitted those to Records**
2    **or they would have been in the working case file.**
3        Q.  How many trash pulls were you involved
4    in?
5        **A.  On the Harte case?**
6        Q.  Uh-huh.
7        **A.  Two.**
8        Q.  You were involved in two trash pulls?
9        **A.  Yes, ma'am.**
10       Q.  Do you know the dates of those?
11       **A.  I do.**
12       Q.  When?
13       **A.  On the 3rd and then on the 17th.**
14       Q.  And on both of those occasions did you
15   take photos?
16       **A.  I don't recall without seeing the actual**
17   **case file.**
18       Q.  Do you know if you took photos on one of
19   those occasions?
20       **A.  I do.**
21       Q.  So you took photos at least once?
22       **A.  Yes, ma'am.**
23       Q.  And where did you take those photos?
24       **A.  Most likely in our operations garage or**
25   **in our DPU office.**

March 10, 2015                                                    Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 65

1    Q.  What did you take photos of?
2    A.  That was indicia of the paperwork, like
3    letters or something that would associate the
4    Hartes to that trash.
5    Q.  What else did you photograph?
6    A.  Without seeing the case, I believe that
7    was -- I can't recall anything else.
8    Q.  Did you photograph this green
9    vegetation?
10   A.  Not that I recall.
11   Q.  Why would you not photograph that?
12   A.  Because we would have kept it as
13   evidence.
14   Q.  It was wet when you got it, right?
15   A.  Yes, ma'am.
16   Q.  And things that are wet over a period of
17   time dry out, don't they?
18   A.  Yes, ma'am.
19   Q.  Did you feel any need to preserve what
20   this material looked like when you seized it?
21   A.  I did not take any pictures.
22   Q.  Did you photograph the results of the
23   field test?
24   A.  No, ma'am.
25   Q.  And why not?

Page 66

1    A.  It wasn't a common practice at that
2    time.
3    Q.  Did you conduct either of the field
4    tests on the occasions that you went?
5    A.  Yes, ma'am.
6    Q.  Which field test?
7    A.  The field test on the -- for the
8    marijuana test?
9    Q.  Did you do any tests on the 3rd?
10   A.  No, ma'am.
11   Q.  Tell me what you saw on the 3rd.
12   A.  Again, that was the same type that, it
13   was a green, wet vegetation that was kind of
14   dispersed throughout the trash, it was mixed with
15   other kitchen debris and other vegetation.
16   Q.  So it was obvious to you it was kitchen
17   trash?
18   A.  It was mixed with other kitchen trash.
19   Q.  Okay.  What kind of kitchen trash did
20   you see?
21   A.  I can't recall specifically, ma'am.
22   Q.  What observations did you make on
23   April 3 about the green vegetation?
24   A.  That it was a green, wet vegetation that
25   had been saturated in some kind of fluid.

Page 67

1    Q.  Are you familiar with the practice of
2    cooking?  People sometimes cook or boil things in
3    water?
4    A.  Okay.
5    Q.  Are you familiar with that?  I don't
6    know if you do any cooking.  I'm asking you.
7    A.  Yes, ma'am.
8    Q.  Did it occur to you that the fluid might
9    be water?
10   A.  It is a possibility, ma'am.
11   Q.  Have you ever had any training in
12   recognizing different types of green vegetation
13   and discerning marijuana from other types of
14   green vegetation?
15   A.  I have had training on what marijuana
16   looks like, ma'am.
17   Q.  Have you ever had any training in what
18   wet marijuana looks like?
19   A.  Yes, ma'am.
20   Q.  And where did you have that training?
21   A.  I don't know specifically.
22   Q.  When was that training?
23   A.  I don't know specifically.
24   Q.  Have you ever encountered so-called wet
25   marijuana in any of your cases?

Page 68

1    A.  Yes, ma'am.
2    Q.  When was that?
3    A.  I don't know specifically.
4    Q.  What year?
5    A.  I don't know, ma'am.
6    Q.  What was being done to the marijuana?
7    A.  Processed.
8    Q.  Processed for what?
9    A.  THC.
10   Q.  Explain that process to me.
11   A.  It is where the marijuana is taken out
12   of its original form, it is often compressed and
13   saturated with something to get the THC out of
14   the plant.
15   Q.  Explain to me the steps and the
16   equipment that is used.
17   A.  It is my understanding there is several
18   types of way to disperse the THC out of it.  I
19   know one is using water and ice, I have observed
20   that before.
21   Q.  Tell me how that's done.  Just tell me
22   the steps.
23   A.  I know the plant material is soaked in
24   ice water and --
25   Q.  Is anything done to the plant material

March 10, 2015                                         Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 69

1   before it is soaked?
2       A.   I don't know specifically, ma'am.
3       Q.   So it is soaked in ice water.  Then what
4   happens?
5       A.   I don't know the rest of the process on
6   that.
7       Q.   What happens to the plant along the way?
8   What's the goal of the processing?
9       A.   To extract the THC?
10      Q.   Where is the THC in the plant?
11      A.   I don't know specifically.
12      Q.   Is it your belief that the files that
13  you described in this filing cabinet where you
14  called them secondary files, do you believe those
15  files are still there today?
16      A.   I have no control over that, ma'am.
17      Q.   I'm just asking you if you know one way
18  or another.
19      A.   I do not know.
20      Q.   At what point did you move one of your
21  files that was on top of your desk into the
22  filing cabinet?  Was that when the case was
23  completed?
24      A.   Yes, ma'am.
25      Q.   So those would be closed cases?

Page 70

1       A.   Yes, ma'am.
2       Q.   In the course of your investigations did
3   you ever take photos of the house that you were
4   going to raid?
5       A.   Of the Harte family?
6       Q.   Of any house.
7       A.   Yes, ma'am.
8       Q.   On what occasions did you take those
9   photos?
10      A.   I couldn't tell you that specifically.
11      Q.   How often did you do that?
12      A.   It should have been every case.
13      Q.   Did you take photos of the house, or
14  were photos of the house obtained from Google
15  street view?
16      A.   Both.
17      Q.   What was the more common practice?
18      A.   For me I do both.
19      Q.   What did you try and find out about a
20  house before you conducted a raid there?
21      A.   Just about the occupants of the
22  residence.
23      Q.   What would you try and find out about
24  them?
25      A.   Just do background checks on them.

Page 71

1       Q.   What did that entail?
2       A.   We had different systems that you could
3   enter their information in to check the
4   backgrounds.
5       Q.   What are those systems?
6       A.   KDOR, JIMS, Regus, Alert.
7       Q.   I'm sorry?
8       A.   Alert, or Triple I.
9       Q.   What do you find out from KDOR?  Is that
10  the Kansas Department of Revenue?
11      A.   Yes, ma'am.
12      Q.   What do you find out from them?
13      A.   That's where you are going to -- you can
14  dump a tag and try to find out a residence and
15  who belongs to that.
16      Q.   You can link up the residence with the
17  tag, is that correct?
18      A.   Correct.
19      Q.   And how would you make that request?
20  Would that be over the phone?  Would you E-mail?
21      A.   Just a system that you could just enter
22  it into on a computer and it would just give you
23  instant information back.
24      Q.   So you had a link that you used, is that
25  right?

Page 72

1       A.   A program.
2       Q.   Okay.  Do you know if the Kansas
3   Department of Revenue would have any electronic
4   record of your queries?
5       A.   No idea.
6       Q.   What kind of information would you get
7   back?
8       A.   Just the type of vehicle and possibly
9   the registered owner.
10      Q.   And how did you maintain that
11  information?  Would you take a screen shot or
12  would you jot it down?  What you would do?
13      A.   Print it off.
14      Q.   What did you get from JIMS?  What does
15  JIMS stand for?
16      A.   It is the Justice System that just --
17  you could type a name in and it would give you
18  kind of information of any kind of activity that
19  the person might have been involved in, cases
20  that were held against them.  So it might have
21  speeding tickets, it might have any kind of civil
22  cases or criminal cases that they have been
23  involved with in the past.
24      Q.   So you get their court history?
25      A.   Correct.

March 10, 2015                                                    Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 73

1    Q.  What is Regus?
2    A.  You can run that to find out if they
3    have any warrants?
4    Q.  And who runs that system?
5    A.  The actual behind the scenes, I don't
6    know.  I can enter something.
7    Q.  Is that a state system, a federal
8    system, a Johnson County system?  What is it?
9    A.  I think that's a nationwide on that.  I
10   think that everybody enters information on that.
11   Q.  And it is for active warrants?
12   A.  Yes.
13   Q.  What is the Alert system?
14   A.  That's kind of what Regus took over, the
15   same kind of program.
16   Q.  Anything else that is checked?
17   A.  The Triple I.
18   Q.  What is the Triple I?
19   A.  That's just a -- I could not do that,
20   only certain people have access to that program
21   and you can give them the information, Social
22   Security number and then that would give you a
23   complete background history of a person.
24   Q.  Like what kind of information?
25   A.  Just any criminal activity that they

Page 74

1    have been involved with.
2    Q.  Anything other than criminal activity?
3    A.  Not that I'm familiar with.
4    Q.  So it looks like primarily your
5    background check consists of finding out about
6    active warrants and criminal history, is that
7    right?
8    A.  That's one of the things you could do.
9    Q.  Do you do anything else to check in to
10   background?
11   A.  You could do a surveillance.
12   Q.  Anything else?
13   A.  I believe that was what we mostly did.
14   Q.  Did you conduct any surveillance of the
15   Hartes?
16   A.  I believe I was at the residence just
17   the four times total.
18   Q.  Did you make any observations of the
19   residence?
20   A.  Identified the vehicle that the original
21   tip came in on.
22   Q.  Anything else?
23   A.  Not that I can recall.
24   Q.  Did you take any photos of the house, of
25   the Harte house?

Page 75

1    A.  Not me specifically.
2    Q.  Did you notice any features of the house
3    or any alterations or anything that you could
4    view from the street that suggested a marijuana
5    grow, such as fans, or blacked out windows, or
6    anything like that?
7    A.  Not me.
8    Q.  So you noticed no alterations to the
9    house?
10   A.  I did not note any.
11   Q.  You didn't hear any fans or smell any
12   marijuana, right?
13   A.  No, ma'am.
14   Q.  Now, when you looked at the trash on the
15   3rd and the 17th, did you see, aside from the
16   green vegetation, I'm asking you a question that
17   has to do with everything else in the trash, did
18   you see any indicia of drug activity or a
19   marijuana grow operation?
20   A.  Not that I can recall.
21   Q.  Did you know if there were children in
22   the house?
23   A.  It is a possibility that there was two
24   children.
25   Q.  Did anyone investigate that?

Page 76

1    A.  I did not.
2    Q.  Do you have access to any databases,
3    like TLO or Accurant, that give a background on
4    the person?
5    A.  I do not.
6    Q.  Does anyone in the department have
7    access to those?
8    A.  I do not know that.
9    Q.  Was there any discussion at any point
10   that the Hartes may have two minor children?
11   A.  Yes.
12   Q.  And who discussed that?
13   A.  I know that came up with the case file.
14   Q.  What do you mean came up with the case
15   file?
16   A.  That was my understanding, that there
17   was children observed with Mr. Harte at the
18   establishment.
19   Q.  Who discussed this?
20   A.  It would have been members of the DPU
21   unit.
22   Q.  Were you present?
23   A.  Yes, ma'am, I did hear that.
24   Q.  Okay.  And who was talking about it?
25   A.  Again, I do not know that specifically.

Case 2:13-cv-02586-JWL   Document 327-21   Filed 11/17/15   Page 20 of 82

Appellate Case: 16-3014    Document: 01019599309    Date Filed: 04/07/2016    Page: 113
March 10, 2015                                                        Edward Blake
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 77

1      Q.  So it is your recollection that there
2   was a conversation and there were members of the
3   DPU unit present.  Was it one other person
4   besides you, someone talking to you, or were you
5   present in a group?
6      A.  I don't recall, ma'am.
7      Q.  What was the conversation, as best you
8   recall the content of it?
9      A.  That there was children observed with
10   Mr. Harte.
11      Q.  And did that suggest anything in terms
12   of what was done or not done as far as the entry?
13   I mean what was the relevance of the children to
14   what you were doing?
15      A.  As far as the entry on the search
16   warrant?
17      Q.  Uh-huh.
18      A.  We didn't consider it a high risk entry.
19   And to have the children there it was more of a
20   well check for them, welfare check, and if there
21   is criminal activity going on at the residence
22   that gives me an opportunity to interview them or
23   look at the environment that they are in.
24      Q.  Did you make any attempt through a knock
25   and talk to find out anything about what that

Page 78

1   environment was?
2      A.  I did not.
3      Q.  Now, there were some people assigned to
4   the perimeter during this search, were there not?
5      A.  Yes, ma'am.
6      Q.  Who was assigned to the perimeter?
7      A.  I don't know specifically which members
8   were.
9      Q.  Who?
10      A.  I don't remember specifically.
11      Q.  Isn't that documented somewhere?
12      A.  Not that I'm familiar with.
13      Q.  Did Deputy Vrabac go to the back of the
14   house?
15      A.  I don't recall.
16      Q.  Do you recall anyone at the back of the
17   house who had a mini ram or a baby ram on a strap
18   around his neck and shoulder?
19      A.  I did not go to the back of the house,
20   ma'am.
21      Q.  Do you know who was back there?
22      A.  I do not.
23      Q.  There were deputies back there, right?
24      A.  Should have been.
25      Q.  How many?

Page 79

1      A.  I don't know, ma'am.
2      Q.  Who was in charge of communicating with
3   them?
4      A.  I was.
5      Q.  But you don't know who was there or how
6   many were there?
7      A.  No, ma'am.
8      Q.  What was the purpose of the deputies at
9   the back of the house?
10      A.  Just to keep an eye on it and tell us if
11   anybody, say, seen movement or if anybody would
12   come out of the back of the building.
13      Q.  Were they prepared to make entry in
14   back?
15      A.  No.  Our primary was the front.
16      Q.  But you had someone back there with a
17   smaller ram, didn't you?
18      A.  I don't recall that, ma'am.
19      Q.  Who would be in charge of a decision
20   about whether to post a perimeter team at the
21   back of the house?
22      A.  We done that, should have been done on
23   every search warrant.
24      Q.  How many people usually go to the sides
25   or back of a house?

Page 80

1      A.  Just depends on how many people you have
2   to help.
3      Q.  How many were available that day?
4      A.  Myself, Sergeant Cossairt, Deputy Shoop,
5   Deputy Smith, Deputy Vrabac, and Kilbey, so there
6   was six.  And Farkes.
7      Q.  Were those individuals all at the front
8   door with you?
9      A.  Shouldn't have been.
10      Q.  Who was at the front door with you?
11      A.  I believe Deputy Farkes was the initial
12   entry into the residence.  As far as other people
13   in the line, I don't recall, ma'am.
14      Q.  What was your position?
15      A.  Last to go in.
16      Q.  What was Farkes's job?
17      A.  He should have been the one that knocked
18   on the house, on the residence initially.
19      Q.  He had the battering ram, didn't he?
20      A.  I don't recall that, ma'am.
21      Q.  Did someone have a battering ram?
22      A.  Most likely we had one at the front of
23   the residence.
24      Q.  Now, is there such a thing as a smaller
25   ram?  Do you know what a battering ram looks

March 10, 2015                                                      Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 81

1  like?
2      A.  Yes, ma'am.
3      Q.  Were there two types of battering rams
4  at the scene that day?
5      A.  I don't recall that.
6      Q.  Have you ever seen a smaller version of
7  a battering ram?
8      A.  Yes.
9      Q.  Describe that for me.
10     A.  It is the same setup, just a smaller
11  barrel, I guess you would call it.
12     Q.  Okay.  Is there some type of strap on
13  it?
14     A.  Usually two handles.
15     Q.  I'm talking about the smaller one now.
16     A.  I don't recall a strep.
17     Q.  Who is trained on the battering ram?
18     A.  I don't recall that, ma'am.
19     Q.  Who was carrying an AR-15?
20     A.  Deputy Farkes.
21     Q.  Did he have it with him?
22     A.  As we made entry into the residence?
23     Q.  Uh-huh.
24     A.  Yes.
25     Q.  What other weapons were at the ready?

Page 82

1      A.  Deputies should have had pistols with
2  them.
3      Q.  Would they have had their hands on their
4  pistols?
5      A.  They should have.
6      Q.  What kind of pistols?
7      A.  I don't know if they were .9 millimeter
8  Glocks at that time.
9      Q.  Did you have your hand on your pistol?
10     A.  Yes.
11     Q.  Was it out of the holster?
12     A.  Yes.
13     Q.  And is that how everybody had theirs?
14     A.  Should have been.
15     Q.  Did anyone ever discuss that having a
16  number of deputies with weapons in their hands,
17  including an AR-15, might not be a way to do a
18  welfare check on a child?
19     A.  We weren't doing a welfare check, ma'am.
20     Q.  Well, you said earlier that you thought
21  this might be a good opportunity to check the
22  children's environment, kind of like a welfare
23  check.
24     A.  You asked me specifically if we talked
25  about having children there when we did the

Page 83

1  search warrant, and that's my answer.
2      Q.  Did anyone ever discuss that it might be
3  a good idea to change the time of executing the
4  warrant so that the children would not be home?
5      A.  I prefer they were, that way we could
6  interview and speak with everybody that was
7  present.
8      Q.  You would prefer that a seven-year-old
9  girl be at home?
10     A.  If that's who is involved, yes, I would
11  like to speak with them.
12     Q.  What would be your purpose in speaking
13  with the seven-year-old girl?
14     A.  Again, for a welfare check.  If she is
15  involved or if there is criminal activity going
16  on at the residence, that's an opportunity for us
17  to see it.
18     Q.  And do you think a welfare check is best
19  accomplished by deputies in raid jackets with
20  weapons?
21     A.  I never said that, ma'am.
22     Q.  Well, I'm asking you.  You said you
23  wanted to conduct this entry when the children
24  were at home, that you preferred that.  Do you
25  think that's the best way to conduct a welfare

Page 84

1  check?
2      A.  We weren't there to do a welfare check.
3  We were doing a search warrant on a residence.
4      Q.  Okay.  And children were there, right?
5      A.  Yes, ma'am.
6      Q.  And nothing was done to ensure that the
7  children would not be present when this was
8  carried out, right?
9      A.  Correct.
10     Q.  Now, certainly you have heard of many
11  different instances nationally where search
12  warrants have been executed and children have
13  been in the home and have sometimes been hurt,
14  right?
15     A.  It is a possibility.
16     Q.  Right.  And sometimes have been hurt
17  horribly and even fatally, right?
18     A.  Correct.
19     Q.  And having a child present, especially a
20  young one, injects an unpredictable factor into a
21  situation, right?
22     A.  Correct.
23     Q.  You don't know what that child is going
24  to do, right?
25     A.  I don't know what anybody is going to do

March 10, 2015                                                          Edward Blake
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 105

1    Q.  Where else was she?
2    A.  I don't recall her any other time.
3    Q.  Let's continue with discussing this
4    exhibit.  Turn to the second page.  We have got a
5    driver's license photo search.  Do you know if
6    you were the one to request that?
7    A.  I don't know specifically on this one.
8    Q.  Is this the type of thing that is
9    typically requested?
10   A.  Yes.
11   Q.  Turning the page, do you see a driver's
12   license photo search that features Mrs. Harte?
13   A.  Yes, ma'am.
14   Q.  Now, in the lower right-hand corner on
15   both of these are two different dates.  There is
16   a 3/29/12 on the photo search for Mrs. Harte and
17   4/10/12 for the photo search for Mr. Harte.  Do
18   you know why those two dates are different?
19   A.  No, ma'am.
20   Q.  Do you believe you did either one of
21   these?
22   A.  I don't recall, ma'am.
23   Q.  Then turn to the next page.  It looks
24   like that's a response from the Kansas Department
25   of Revenue, KDOR.  Is that the type of

Page 106

1    information that you get back upon a license
2    plate query?
3    A.  Yes, ma'am.
4    Q.  And it looks like this query was made
5    3/29/12, correct?
6    A.  That's what is stamped at the bottom.
7    Q.  Did you make this request?
8    A.  I don't recall.
9    Q.  Now, do you know when Mr. Wingo said he
10   saw Mr. Harte at the Green Circle?
11   A.  I don't know the specific date.
12   Q.  Do you know of any reason why that
13   information would not have been provided at the
14   time it occurred?
15   A.  I don't know what Mr. Wingo did with
16   information.
17   Q.  Were you aware that the visit to the
18   Green Circle was months earlier?
19   A.  Yes.
20   Q.  Do you know of any reason why anyone
21   would not do anything with that information for
22   seven or eight months?
23   A.  I can't speak for Mr. Wingo.
24   Q.  Was there ever any discussion as to
25   whether this information was stale?

Page 107

1    A.  I don't believe it was stale.
2    Q.  What is the growing cycle of marijuana?
3    A.  It could take eight to -- eight months
4    or so, 12 months.
5    Q.  Now, was there any reason at this
6    particular point in time why there was weekly
7    follow-up with the Harte's trash?
8    A.  I don't understand.
9    Q.  At this point -- why was the
10   investigation moving forward at this point in
11   time when nothing had been done for several
12   months?
13   A.  Sergeant Reddin said he wanted us to
14   work this case.
15   Q.  Okay.  And what did he say about it?
16   A.  Work this case.
17   Q.  That case in particular, or cases?
18   A.  We had several cases we were working at
19   the time.
20   Q.  So that was a direction from Reddin?
21   A.  He was my supervisor.
22   Q.  And you knew Operation Constant Gardener
23   was right around the corner, right?
24   A.  I have heard of that case.
25   Q.  What had you heard about it?

Page 108

1    A.  Prior to my arrival to the unit they
2    executed several search warrants during that
3    time.
4    Q.  And when does Operation Constant
5    Gardener happen?
6    A.  Usually on 4/20.
7    Q.  What was your understanding about what
8    was going to be happening on April 20 of 2012?
9    A.  We were going to execute several search
10   warrants.
11   Q.  And who was supervising that endeavor?
12   A.  Sergeant Reddin was my supervisor.
13   Q.  What did he say to you about 4/20?
14   A.  That we are going to execute several
15   search warrants.
16   Q.  What else did he say?  Anything else?
17   A.  Not that I recall.
18   Q.  Was there a meeting about this, that
19   4/20 was coming up and there was some
20   investigations to wrap up?
21   A.  I don't know if we had a time frame on
22   any case.
23   Q.  Was there a meeting about Operation
24   Constant Gardener coming up?
25   A.  Not that I recall.

March 10, 2015                                                          Edward Blake
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

| Page 109 |
|---|

1    Q.   How did Reddin communicate with you?
2  Did he speak to you alone, or was it you and some
3  other people?
4    **A.   I don't recall that specifically.**
5    Q.   But he told you we were going to execute
6  several warrants that day, that's what you
7  recall?
8    **A.   Yes, ma'am.**
9    Q.   Did he tell that to anyone else?
10   **A.   I don't recall what he said to other**
11 **people.**
12   Q.   Was there an E-mail about this?
13   **A.   I don't recall that.**
14   Q.   Let's turn to the last page of this
15 exhibit.  Are these, were these notes all written
16 by you?
17   **A.   No.**
18       MS. PILATE:  Let's take a lunch
19 break here.
20       THE VIDEOGRAPHER:  We are going off
21 the record at 12:10 p.m.
22       (Lunch recess was taken.)
23       THE VIDEOGRAPHER:  Back on the
24 record at 1:03 p.m.
25   Q.   (By Ms. Pilate)  I'm going to pick up

| Page 110 |
|---|

1  where we left off.  At the time we took a break
2  you were answering questions about warrants to be
3  served on 4/20 and you said we were going to
4  execute several warrants that day, you don't
5  recall anything else Reddin said about 4/20.  Is
6  that accurate?
7    **A.   Yes, ma'am.**
8    Q.   Had you seen any of the publicity from
9  Operation Constant Gardener in April, 2011?
10   **A.   I might have on the news, but I don't**
11 **recall any specifics that was brought in to the**
12 **office.**
13   Q.   Well, you were familiar, weren't you,
14 with certain announcements being made about total
15 numbers and people being arrested and seizures
16 and the like, were you not?
17   **A.   I can remember seeing I believe a news**
18 **brief on it, but I don't -- specifically what was**
19 **involved in that I couldn't tell you.**
20   Q.   Okay.  Are you aware of any other times,
21 in addition to Operation Constant Gardener, where
22 arrests were publicized by the Sheriff's
23 Department?
24   **A.   Not specifically.  I mean there was**
25 **cases that are publicized by the news.**

| Page 111 |
|---|

1    Q.   Have you seen news stories on cases
2  where say there was an arrest associated with a
3  marijuana grow and a photograph of items seized?
4    **A.   Not that I can recall right at this**
5  **time.**
6    Q.   So you haven't been aware of a number of
7  the stories in the press 2010 through 2012
8  regarding marijuana grows and the Johnson County
9  Sheriff's Office, you haven't seen any of those?
10   **A.   I might have saw some on the news but**
11 **couldn't tell you specifically.**
12   Q.   Was it your anticipation that there
13 similarly would be news coverage of Operation
14 Constant Gardener 2012?
15   **A.   Yes.**
16   Q.   And why did you think that?
17   **A.   I believe Sergeant Reddin or somebody**
18 **superior than I had invited our public relations**
19 **deputy to be involved.**
20   Q.   Okay.  Who is that?
21   **A.   At the time it was Deputy Erickson.**
22   Q.   What was his purpose in Operation
23 Constant Gardener?
24   **A.   I don't know what his purpose.  He was**
25 **just going to document whatever information the**

| Page 112 |
|---|

1  **Sergeant had relayed to him.**
2    Q.   Who told you about this?
3    **A.   Sergeant Reddin.**
4    Q.   And what did Sergeant Reddin tell you
5  about him?
6    **A.   That he is going to be involved with --**
7  **any information that he gives him he is going to**
8  **give to the press.**
9    Q.   He is going to be involved in what?
10   **A.   That Sergeant Reddin would provide**
11 **information to him.**
12   Q.   Okay.  So Sergeant Reddin told you with
13 regard to Tom Erickson that he was, A, going to
14 be involved, and B, Reddin would provide
15 information to him.  About what?
16   **A.   The search warrants that were executed.**
17   Q.   Now, I think you said you did not see
18 Reddin at the scene of the Harte's house, right?
19   **A.   Correct.**
20   Q.   Who provided information to Reddin about
21 what was found or not found at the Harte's house?
22   **A.   I made a phone call with him at one time**
23 **while I was there, but I don't know if Sergeant**
24 **Cossairt relayed that to him after we left or**
25 **not.**

March 10, 2015                                                Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 113

1    Q.   You made a phone call to Reddin.  What
2    did you say during that phone call?
3        A.   Kind of briefed him on what had happened
4    so far.
5        Q.   Were you still at the house?
6        A.   Yes.
7        Q.   At what point did you call him?
8        A.   It was after attempting to speak to the
9    Hartes, I went to the basement and that's when I
10   made contact with Sergeant Reddin.
11       Q.   Was that your first time in the
12   basement?
13       A.   I believe so.  I moved around and
14   looked.  I don't know how many times I went to
15   the basement.
16       Q.   What did you tell Sergeant Reddin when
17   you called him?
18       A.   At that point that the Harte family did
19   not want to discuss anything with me and we had
20   not located anything at that time.
21       Q.   What did he say?
22       A.   Just to continue to search.
23       Q.   You said you hadn't located anything.
24   Where had you been at that point in the house?
25       A.   Me specifically?

Page 114

1        Q.   Uh-huh.
2        A.   I believe at one point I walked through
3    every room just to see where -- I'm sorry.
4        Q.   At that point that you made that call,
5    do you know where you had been before that call?
6        A.   The living room, kitchen.
7        Q.   Okay.  Then you were in the basement,
8    you were calling him from the basement, right?
9        A.   Yes.
10       Q.   Did you tell him that a hydroponic
11   garden had been found but contained only
12   vegetable plants?
13       A.   I told him that yes, we found the plants
14   growing down there and that I field tested those.
15       Q.   So you were the one who did that?
16       A.   Yes, ma'am.
17       Q.   What did he say about that?
18       A.   Just continue to search.  Might have
19   been -- he didn't know if it was going to be
20   broken down already, if it was moved, if it was
21   hidden, but just to continue on.
22       Q.   What had been broken down?
23       A.   A potential grow operation.
24       Q.   But you did find a hydroponic grow, it
25   just had no marijuana.

Page 115

1        A.   That one did not.
2        Q.   Did you ever find evidence of any other
3    grow operation?
4        A.   I did not.
5        Q.   Did you ever find any indicia in the
6    house of any kind indicative of drug activity?
7        A.   I did not.
8        Q.   Any paraphernalia?
9        A.   I didn't locate any.
10       Q.   Did anyone?
11       A.   Not to my knowledge.
12       Q.   Did you ever detect the odor of
13   marijuana in the house?
14       A.   I did not.
15       Q.   Did anyone?
16       A.   It is my understanding Deputy Farkes
17   did.
18       Q.   Anyone else?
19       A.   There was somebody else but I don't
20   recall who it was.
21       Q.   And where did they supposedly detect
22   this?
23       A.   In the stairwell kind of toward the
24   attic area.
25       Q.   And did they search that area?

Page 116

1        A.   They did.
2        Q.   Did they find anything?
3        A.   No, ma'am.
4        Q.   When you were in the house, what was
5    your understanding of the basis for probable
6    cause?
7        A.   Search for criminal activity that
8    involved the growing, or use of paraphernalia for
9    marijuana.
10       Q.   But I asked you what the basis for being
11   in the house to begin with was.  What did you
12   understand the factual basis for the warrant to
13   be when you were in the house?  What did you --
14   at that time what did you understand the factual
15   basis to be?
16       A.   That we received a tip that a subject
17   had bought stuff at the Green Circle, had two
18   different positive trash pullings, and then wrote
19   up the warrant for the district attorney,
20   submitted it to the judge who signed it and said
21   we had probable cause to be in the residence.
22       Q.   Did the appearance of the saturated
23   plant material ever give you pause and make you
24   think well maybe it could be something else?
25       A.   The first, on the 3rd I did not

March 10, 2015                                                    Edward Blake
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 185

1    with a patrol recording system?
2       A.  I didn't take a patrol car there.
3       Q.  What kind of vehicle did you take to the
4    scene?
5       A.  I don't remember specifically that day.
6       Q.  How many vehicles were parked there?
7       A.  I don't recall that.
8       Q.  Other than Farkes, did you see anyone
9    else with an AR-15?
10      A.  I don't recall seeing anybody else.
11      Q.  Okay.  So the first thing you remember,
12   the first thing you remember is seeing Mrs. Harte
13   coming down the stairs with the children?
14      A.  Yes.
15      Q.  And you don't remember where Mr. Harte
16   was at that point?
17      A.  No, ma'am.
18      Q.  Was there anyone who was assigned to do
19   a welfare check of the children?
20      A.  Not specifically.
21      Q.  Okay.  What's the next thing you
22   remember?  Where did you go search?
23      A.  After I spoke with the Hartes.
24      Q.  Did you do any searching before then?
25      A.  No.

Page 186

1       Q.  Did anyone go to the basement?
2       A.  Yes, people were searching while I was
3    speaking with.
4       Q.  Who was searching?
5       A.  The other people that were remaining in
6    the house.
7       Q.  Who were they?
8       A.  The people that responded to the
9    residence would have been Deputy Shoop, Deputy
10   Smith, Deputy Farkes.  I believe Deputy Vrabac
11   remained in the living room.  Deputy or Sergeant
12   Cossairt, Deputy Kilbey.
13      Q.  Who went in the basement first?
14      A.  I do not recall that.
15      Q.  Did you see someone go in the basement
16   before you?
17      A.  No, ma'am.
18      Q.  Isn't that one of the first places that
19   the deputies went?
20      A.  I don't know where they went, ma'am.
21      Q.  Tell me at the very beginning when you
22   all first entered the house, what is the first
23   area that was searched?
24      A.  The living room area just to make sure
25   it was secure so they could remain in there.

Page 187

1       Q.  Did everyone search it or just some
2    people?
3       A.  I do not recall that.
4       Q.  While the living room was being
5    searched, were there any other areas being
6    searched at the same time?
7       A.  I do not know.
8       Q.  When did you first go to the basement?
9       A.  After I attempted to speak with both
10   Hartes and they declined to answer any questions.
11      Q.  And it is your testimony you did not go
12   to the basement before then?
13      A.  I don't believe so.
14      Q.  Isn't a basement typically where a
15   hydroponic garden is if someone is going to have
16   one?
17      A.  It is a possibility.
18      Q.  Wouldn't that be one of the first places
19   a deputy would want to check of he is looking?
20      A.  That wasn't my responsibility.  Mine was
21   to speak with the Harte family.
22      Q.  Okay.  But aren't you in charge as the
23   team leader?
24      A.  Yes, ma'am.
25      Q.  Who was assigned to look for the

Page 188

1    hydroponic garden?
2       A.  Everybody was looking for any kind of
3    criminal activity that was involved in the house.
4       Q.  Okay.  Wouldn't it be fair to assume
5    that someone went down to the basement pretty
6    quick?
7       A.  I would assume that.
8       Q.  Had you heard anything about the
9    basement before you went down there?
10      A.  I don't recall.
11      Q.  Did you ever tell the Hartes at any
12   point that seeds and stems were found on their
13   property or in their trash?
14      A.  No.  I kind of remained vague at that
15   time because I didn't know what we had, and they
16   didn't want to speak to me.
17      Q.  When you say you remained vague, didn't
18   know what we had, what do you mean by that?
19      A.  I didn't tell them specifically, like
20   you just asked, if we had seeds and stems that we
21   had found and I didn't know if anybody had
22   located anything yet is what I meant.
23      Q.  Well, weren't they asking about how you
24   all happened to be there to begin with?
25      A.  Absolutely.

March 10, 2015                                                        Edward Blake

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 241

1    A.  I was within that door shot, I could
2    give directions if needed.
3        Q.  How far is the tree from the door?
4        A.  I don't know.
5        Q.  Whose job was it to communicate with the
6    perimeter team in back?
7        A.  Mine.
8        Q.  If a problem had been encountered at the
9    primary access point of the front door, whose
10   responsibility was it to tell the perimeter team
11   to try and enter?
12       A.  I wouldn't have them enter by
13   themselves.
14       Q.  So what was their purpose?
15       A.  Keep an eye on the back in case anybody
16   exited.
17       Q.  Was that their only purpose?
18       A.  Just for safety and security.
19       Q.  Were they prepared to enter if need be
20   or make a forcible entry?
21       A.  I don't recall if they had a ram like
22   you mentioned before.
23       Q.  Okay.  But wasn't it your responsibility
24   to know that?
25       A.  I don't know if they had one or not.

Page 242

1        Q.  But wasn't -- I'm asking wasn't it your
2    responsibility to know that?  Isn't that the team
3    leader's role to know what kind of equipment
4    everybody has?
5        A.  I believe we did have a ram at the front
6    of the door.
7        Q.  There was one at the front.  Was there
8    one in the yard?
9        A.  I don't recall.
10       Q.  If Mr. Harte in fact saw one in the
11   yard, would you have any reason to disagree with
12   that?
13       A.  No.
14       Q.  And if there was a ram in front and a
15   ram in back, would you have any reason to
16   disagree that there were two rams on the
17   property?
18       A.  No.
19       Q.  What was the reason for having someone
20   armed with an assault rifle?
21       A.  That was his weapon of choice.
22       Q.  Whose weapon of choice?
23       A.  Deputy Farkes.
24       Q.  Did anyone direct him to do that?
25       A.  No.

Page 243

1        Q.  Did you say anything to him?
2        A.  I did not.
3        Q.  Was it your role to tell everybody what
4    kind of equipment they should or should not have
5    at the scene?
6        A.  No.  They have that option if they
7    wanted to carry a rifle in there.
8        Q.  So everyone could choose what they
9    wanted?
10       A.  Yes.
11       Q.  Did you ever see Deputy Kilbey with an
12   assault rifle?
13       A.  I don't recall that.
14       Q.  If he testified that he had an assault
15   rifle, would you disagree with that?
16       A.  No.
17       Q.  Have you ever had any training on
18   dangers presented during the execution of a
19   warrant when there are small children in the
20   house?  Have you ever had any training on that?
21       A.  On search warrants?  Yes.
22       Q.  What to do when there are small children
23   in the house and that that presents any
24   particular risks?
25       A.  If we believe this was a low risk search

Page 244

1    warrant, if there was a high risk, the potential
2    to get the children out of there would be there.
3        Q.  You said it was a low risk, yet there
4    was a stack at the front door, right?
5        A.  Yes.
6        Q.  And a battering ram, right?
7        A.  Yes.
8        Q.  And there was several deputies,
9    including a perimeter team, correct?
10       A.  Yes.
11       Q.  Yes?  That was equipped with a battering
12   ram, right?
13       A.  Yes.
14       Q.  And there were multiple weapons
15   available to the people there, correct?
16       A.  Yes.
17       Q.  Including an assault rifle?
18       A.  Yes.
19       Q.  And is there anything about a
20   seven-year-old seeing someone stand over her
21   father with an assault rifle that is at all
22   troubling to you?
23       A.  I can't speculate for her.
24       Q.  Have you ever had any training on trauma
25   caused to children by being exposed to these

# Transcript of Videotaped Testimony of

# **Michael Pfannenstiel**

March 11, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816-474-DEPO | F: 816-474-3375
www.coopermoeller.com

March 11, 2015                                                    Michael Pfannenstiel
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 21

1    individual officers on the working case files.
2        Q.   So there is no system for that?
3        A.   There is now.
4        Q.   What was there two years ago?
5        A.   I don't know.
6        Q.   Are you aware of any book that indexed
7    all -- any book or notebook or document of any
8    kind that indexed all DPU cases by DPU number and
9    either the name of the subject in the house or
10   the address?
11       A.   A specific DPU number book, no, I do
12   not.
13       Q.   Okay.  Have you ever asked for anything
14   like that?
15       A.   I have asked for reports in regards to
16   discovery motions.
17       Q.   Has anyone ever told you that these DPU
18   files that get a DPU number are indexed anywhere?
19       A.   No.
20       Q.   Who have you spoken to about DPU files?
21       A.   I have spoken to numerous people.
22       Q.   Who have you spoken to?
23       A.   You want them each independently named?
24       Q.   Uh-huh.
25       A.   Sheriff Denning, Major Reece, Major

Page 22

1    Baker, Lieutenant Reddin, Deputies Ed Blake,
2    Larry Shoop, Mark Burns -- I'm sorry, that's
3    Sergeant Mark Burns, Sergeant Nate Denton,
4    Detective Perry Williams.
5        Q.   Anyone else?
6        A.   In relations to DPU files that would
7    be -- administrative assistant Rita Jones.
8        Q.   Where was the DPU located?
9        A.   DPU is located at the operations
10   building at 27747.
11       Q.   Where in that building?
12       A.   Where in the building?  On the second
13   floor on the northeast corner.
14       Q.   Is that where it was located two years
15   ago?
16       A.   Yes.
17       Q.   Is there still a DPU unit?
18       A.   No, there is not.
19       Q.   And when was the DPU unit terminated?
20       A.   It got dissolved in August of 2014.
21       Q.   What was the reason for that?
22       A.   The allocation of resources.  We have
23   had two units that were undermanned.  DPU is one
24   of those, and the warrants division was the
25   other.  So to reallocate resources to strengthen

Page 23

1    one unit up to full staff, DPU was dissolved.
2        Q.   Was there any concern in August of 2014
3    as to how DPU was handling its cases?
4        A.   No, there was not.
5        Q.   Has anyone ever done any kind of review
6    as to how DPU maintained its files?
7        A.   I conducted a review after this
8    situation.
9        Q.   What did you conclude?
10       A.   I concluded that it was not up to what I
11   considered -- I came in from an investigations
12   background where my background is documentation
13   and to track down that documentation to make it
14   easier for a supervisor to find, so I implemented
15   that.
16       Q.   It was not up to what you considered,
17   you stopped in the middle.
18       A.   Not what I considered to make it easy
19   for me to find information.
20       Q.   Tell me specifically what you discovered
21   when you conducted your review of DPU.
22       A.   When I conducted my review of DPU I
23   wanted it to be much like the Investigations
24   Division; that if a case is assigned, it would be
25   assigned to a specific officer, that officer

Page 24

1    would be accountable for that information and to
2    maintain a file on that and to keep the
3    documentation up and current.
4        Q.   What was the chain of command at DPU?
5        A.   Chain of command would have been
6    Sergeant Tom Reddin at the time, myself as
7    Lieutenant, then it was Captain Doug Baker, then
8    Major Daryl Reece.
9        Q.   Where from Reece?
10       A.   Reece would be, Sheriff Denning.
11       Q.   Is Sheriff Denning the final policymaker
12   in the department?
13       A.   Yes.
14       Q.   And he is ultimately responsible for
15   policies and ensuring adequate equipment and
16   training for the department, is that correct?
17       A.   Yes.
18       Q.   I'm trying to take -- I apologize,
19   sometimes there is a pause, I'm trying to take
20   adequate questions while I'm questioning you so I
21   can kind of keep track of the flow, and that way
22   sometimes we get tired at the end of the day and
23   I certainly don't want to repeat myself, and when
24   I ask you about something you have said before, I
25   want to be able to look back and see exactly what

March 11, 2015                                               Michael Pfannenstiel
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 25

1    it is that you have said.  So I want to assure
2    you I'm listening to every word.
3        A.  No problem.
4        Q.  Does that make sense?
5        A.  That makes perfect sense.
6        Q.  I'm doing my best here.  At what point
7    did you conduct this review?  Do you know
8    approximately when?
9        A.  It would have been the latter part -- it
10   would have been in 2013.
11       Q.  What prompted it?
12       A.  This lawsuit.
13       Q.  How long had DPU existed?
14       A.  DPU has existed in its function, I would
15   say -- well, since I was involved in -- I started
16   at the Sheriff's Office in 1987.  We have done
17   drug investigations prior to 1987, so I'm
18   thinking multiple years prior to that.
19       Q.  So since sometime in the eighties?
20       A.  Yes.  Some form of DPU or special
21   investigation division has been a function of the
22   Sheriff's Office since my existence at the
23   Sheriff's Office.
24       Q.  Has it been separate from
25   Investigations?

Page 26

1        A.  Yes.
2        Q.  Was it part of Patrol?
3        A.  Yes.
4        Q.  Have you ever served in it?
5        A.  I served in a special Investigations
6    Division in '91, and also '92 to '94.
7        Q.  Have you served in that unit at any time
8    since then?
9        A.  I took over that unit, it would have
10   been the first quarter of 2012.
11       Q.  Okay.  Now, the things that I wrote down
12   or scrawled down, getting them down the best I
13   could, that you said you wanted to see in DPU and
14   that your review uncovered and you attempted to
15   address, were that you wanted individual
16   responsibility for cases?
17       A.  That would be correct.
18       Q.  We are going to discuss each one but I
19   just want to get the list here.  You wanted
20   information or reports or notes about each case
21   to be -- I wrote down the word findable.
22       A.  Yes.  If I could ask for something,
23   somebody could bring it to me within a reasonable
24   amount of time.
25       Q.  And you wanted the information in each

Page 27

1    file to be current?
2        A.  Yes.
3        Q.  Anything else?
4        A.  No.  I wanted it to be based off how we
5    ran the Investigations Division.
6        Q.  Had that ever happened before, that it
7    would be structured like Investigations, or had
8    it always kind of been its own thing?
9        A.  It has evolved through the years.  When
10   I was involved in it in 1991 and '94 it would
11   have been under an Investigations Division type,
12   as a subcategory of Investigations.  I am not
13   sure when it evolved to a patrol function.  But
14   in the first quarter of 2012 it got moved back to
15   the Investigations Division.
16       Q.  Were you in charge of Investigations?
17       A.  Yes.  I took -- I was transferred from
18   Patrol Division in December of 2011.  Right
19   before Christmas I got transferred back to
20   Investigations, December of 2011.
21       Q.  December of 2011.  Okay.  And then
22   shortly after you got transferred into that
23   position, this situation happens?
24       A.  Yes.
25       Q.  April of 2012.  So you assume

Page 28

1    responsibility in December, 2011 which is
2    essentially five months before the Harte's search
3    occurred?
4        A.  I assumed control or I assumed the
5    Lieutenant's position of Investigations in
6    December of 2011.
7        Q.  Okay.
8        A.  Then it was after, it was in the first
9    quarter of 2012 is when I took over the Directed
10   Patrol Unit.
11       Q.  So it wasn't under your purview at that
12   point?  It had to be transferred -- do you know
13   when in that first quarter?
14       A.  I would say late February, early March.
15       Q.  You're doing fine.  That's a good
16   example of what I mean when I ask a when
17   question, you can't give me a specific date but
18   you are trying to give me a time period as best
19   you can, so I appreciate that.  It will make
20   things go a lot smoother, it will make things go
21   a lot faster.
22       A.  Okay.
23       Q.  Thanks.  I appreciate that.  Thank you.
24   Prior to it being moved under you, what was the
25   chain of command?

March 11, 2015                                                                    Michael Pfannenstiel
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 221

1  left, VBK, right?
2       A.  I see those initials, yes.
3       Q.  And I will represent to you I don't see
4  on this page any communication back or any case
5  note by Ms. Kamb, or not one I would recognize as
6  that.  But I do see a case note with the initials
7  MRS next to it.  What's your understanding of who
8  MRS is, if you know who that is?
9       A.  I don't know who MRS is.
10      Q.  Do you know if that's somebody in the
11 lab?
12      A.  That would be somebody in the lab.  I'm
13 not familiar with all of the personnel in the
14 lab.
15      Q.  Okay.  Going about a third of the way
16 down on that communication do you see,
17 "Macroscopically it did not appear to be
18 marijuana"?
19      A.  I read that, yes.
20      Q.  What does that sentence mean to you?
21 What does the word macroscopically mean?
22      A.  Macroscopically?
23      Q.  Uh-huh.
24      A.  To the naked eye.
25      Q.  And does the analyst appear to be saying

Page 222

1  there that the material she is looking at does
2  not appear to be marijuana?
3       A.  Yes.
4       Q.  And she also examined it under a
5  microscope, and under a microscope it did not
6  appear to be marijuana and didn't have the
7  characteristics of marijuana, is that right?
8       A.  It does say that.
9       Q.  Did you ever hear any discussion about
10 this E-mail or any communication or whatever this
11 document is, did you ever hear any discussion of
12 this document or the information in it in
13 relation to the need for training of the deputies
14 in the recognition of marijuana?
15      A.  No.
16      Q.  Did anyone ever suggest to you that
17 perhaps the deputies needed some further training
18 in the visual recognition of marijuana?
19      A.  I was not made aware of that, no.
20      Q.  Now, at some point did you become aware
21 that the KN test was no longer used?
22      A.  I was made aware that we were no longer
23 utilizing the KN.
24      Q.  Okay.  What was your understanding of
25 the reason for that?

Page 223

1       A.  The reason for that was I would say
2  because of this issue.  I'm not sure of all of
3  the specifics behind it, though.
4       Q.  Was that as a result of any
5  recommendation made by the lab?
6       A.  I was made aware that our lab was the
7  ones that made the recommendation of what field
8  test kits to use and vendors we use.
9            (Deposition Exhibit 10 was marked
10 for identification.)
11      Q.  I'm going to hand to you what I marked
12 as Exhibit 10 and ask you if you have ever seen
13 that document before?  There is a couple of
14 copies there.
15      A.  I wasn't aware of this specific E-mail.
16      Q.  Have you never seen that E-mail before?
17      A.  No.
18      Q.  The information that is contained in the
19 E-mail toward the bottom of the page, does that
20 appear to you -- first of all, does that E-mail
21 appear to you to be from Daryl Reece?
22      A.  Yes, Daryl Reece's name is on it, yes.
23      Q.  Does it appear to be an E-mail to Frank
24 Denning?
25      A.  Yes.

Page 224

1       Q.  And does it appear to you he is offering
2  some kind of explanation or discussion of the
3  Harte case?
4       A.  Major Reece?
5       Q.  Reece, that he is addressing the Harte
6  case in his E-mail?
7       A.  Yes.
8       Q.  And it refers there to Captain
9  Pfannenstiel did meet with Ridgway, reference two
10 KORA requests, both requests were denied.  Do you
11 recall those KORA requests?
12      A.  Yes.
13      Q.  Do you recall they were denied?
14      A.  Yes.
15      Q.  Do you know why they were denied?
16      A.  I believe they were denied because of
17 law enforcement privilege.
18      Q.  And whose interpretation was that of the
19 law enforcement privilege?
20      A.  That would have been our attorneys.
21      Q.  Did anyone at any point ever consider or
22 discuss contacting the Hartes and letting them
23 know that the search at their home was the result
24 of a false positive result on a field test?
25      A.  I had a talk with our attorneys.

March 11, 2015                                                 Michael Pfannenstiel
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Page 225

1    Q.  What?
2    A.  Our attorneys I discussed -- that was
3    discussed with me with the attorney.
4    Q.  Okay.  You discussed that?
5    A.  It was brought to my attention, yes.
6    Q.  I don't want to inquire any further into
7    that.  Outside of discussions with your
8    attorneys, did you discuss that with anyone?
9    A.  No.
10   Q.  Do you see in the last couple of
11   paragraphs it says, "The field test kit showed a
12   positive for marijuana.  The sample was later
13   submitted to the lab.  The lab results showed tea
14   leaves and caffeine."  Is that your basic
15   understanding of the situation or as the facts
16   were conveyed to you?
17   A.  As the facts were conveyed to me, yes.
18   Q.  And then the last paragraph says, "After
19   learning this from the lab, we immediately
20   changed our field test kits to prevent this from
21   happening again."  Do you see that?
22   A.  Yes, I do.
23   Q.  Did that in fact occur?
24   A.  We did make the switch from the KN, yes.
25   Q.  To what test?  The DL?

Page 226

1    A.  Yes.
2    Q.  And who made that decision?
3    A.  That came from -- I'm not sure where
4    that decision came from.
5    Q.  It wasn't a decision you made?
6    A.  I was not part of that decision-making
7    process.
8    Q.  Who communicated that to you?
9    A.  Major Reece.
10   Q.  Do you know if he made the decision?
11   A.  That I don't know.
12   Q.  How did he inform you that?  Did he tell
13   you that in an E-mail or oral conversation?
14   A.  I know for sure an oral conversation.
15   Q.  What did he say?
16   A.  That we were going to be using the DL
17   test kits.
18   Q.  What did he give as the reason for that?
19   A.  That was recommended to us.
20   Q.  By?
21   A.  Well, the decision-makers to me is the
22   executive staff made the decision and that's what
23   we followed.
24   Q.  Was Reece part of that decision?
25   A.  I don't know specifically if he was part

Page 227

1    of that decision-making process or not.
2    Q.  Anyone, any knowledge as to anyone
3    specifically who was a part of those discussions?
4    A.  No, nothing from me on that.
5    Q.  And then the paragraph or the sentences
6    at the top, do those appear to you to be from
7    Frank Denning to Daryl Reece?
8    A.  They appear to be.
9    Q.  He says, "I sort of remember this
10   discussion.  Wasn't the wrong chemicals given to
11   us or something similar to that?  This continues
12   to grow in the media.  Let's talk further on
13   Monday."  Do you see all of that?
14   A.  Yes.
15   Q.  What is your understanding of the
16   reference to the wrong chemicals?  Do you think
17   that reflects something having to do with the
18   field test kit or don't you know?
19   A.  I wouldn't want to speculate on that
20   because I don't know which chemicals he is
21   talking about or referring to.
22   Q.  Okay.  Other than in meetings with
23   counsel, did you ever have any oral or written
24   communications with Frank Denning about the field
25   test kit or the chemicals used to test the

Page 228

1    suspected green vegetative substance?
2    A.  No.
3    Q.  I have got a couple larger exhibits I'm
4    going to wrap up the day with, but before we get
5    to those I'm going to ask you some smaller
6    questions and then we will go through those.
7        With respect to the Hartes and the
8    search, you told me about a phone call and then
9    you told me about a subsequent oral conversation
10   that you had with Sergeant Cossairt, right?
11   A.  Correct.
12   Q.  Did you have any other communications
13   that day with anyone else who had been at the
14   scene?
15   A.  No.
16   Q.  Did you ever have any conversation that
17   day with Tom Erickson?
18   A.  I had no contact at all with Tom
19   Erickson during that day.
20   Q.  Did you ever have contact with Tom
21   Erickson about Operation Constant Gardener?
22   A.  My conversation with Tom Erickson
23   referenced this would have been collecting
24   information for the discovery.
25   Q.  Okay.  So those have been the only

# Transcript of the Testimony of

# **Laura Vrabac-Harris**

August 4, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the
County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JKL-GLR



2001 Grand Boulevard | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

August 4, 2015                                                                Laura Vrabac-Harris
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

29

1    Q.  How was it determined that you should
2  leave the back yard and go somewhere else?
3    A.  We heard over the radio for us to come
4  to the front, and I don't know if that was on
5  Cossairt's radio, or like I said if I had a
6  radio, over mine.  That's how we knew it was time
7  to go to the front.
8    Q.  Do you recall who gave that instruction?
9    A.  That I do not.
10   Q.  With respect to Sergeant Cossairt, how
11 was he dressed?
12   A.  I don't remember.  Sorry.
13   Q.  Do you know what weapons he was
14 carrying?
15   A.  I would assume he would also have his
16 department-issued Glock on him.
17   Q.  When you were in the back yard, did you
18 have your weapon out of its holster?
19   A.  Yes, ma'am.
20   Q.  What position were you holding your
21 weapon?
22   A.  At the low ready.
23   Q.  Can you stand for us and kind of
24 simulate and describe for us where that would be?
25   A.  Yes.  I'm also right-handed so it would

---

30

1  have been on this side, so I would have just had
2  it down.
3    Q.  And I assume there is some kind of
4  safety lock on the gun, or no?
5    A.  No, not on the Glock.
6    Q.  Not on the Glock.  Okay.  So had you
7  needed to use it, it would have been ready to be
8  fired?
9    A.  Yes.  I would have still had to draw it
10 up to the ready position.
11   Q.  And just so I understand, maybe you can
12 stand up again and explain, can you do low ready
13 to ready so I can see what the difference is in
14 terms of how you hold the gun?
15   A.  Low ready, and then ready would have
16 been here.  And then if I would have been on
17 target, then you bring it up.
18   Q.  Those are the three positions?
19   A.  Uh-huh.
20   Q.  Low ready, ready, and on target meaning
21 it is aimed in front of you?
22   A.  Yes.
23   Q.  Did you notice where Sergeant Cossairt
24 had his gun while you were in the back yard?
25   A.  No, ma'am.

---

31

1    Q.  Did somebody instruct you to put your
2  gun in the low ready position, or did you just
3  know to do that on your own?
4    A.  I just did it on my own.
5    Q.  Is that training that you had when you
6  were back in the academy to do that, or how did
7  you know to do that?
8    A.  Yes, that and also just training of
9  doing building searches, just because you never
10 know what is going to happen, so.
11   Q.  Did you see any other officers in the
12 back yard of the Harte's home when you were back
13 there with Sergeant Cossairt?
14   A.  No, ma'am.
15   Q.  Do you know where the other officers
16 were at when you were in the back of the house?
17   A.  I do not.
18   Q.  And I believe you just told me that when
19 you were heading back to the back of the house
20 you did not see where any of the other officers
21 went?
22   A.  Correct.
23   Q.  Do you recall being present when any
24 verbal assignments were given to officers as to
25 where they should go when they arrived at the

---

32

1  house?
2    A.  No, ma'am.
3    Q.  I just want to make sure I have an
4  exhaustive list of all of the officers that were
5  at the Harte home for the search.  We have the
6  Leawood officer who followed you there, correct,
7  from QuikTrip?
8    A.  I believe so.
9    Q.  And you don't know his name?
10   A.  No, ma'am.
11   Q.  And do you know, did you ever see him
12 enter the Harte home?
13   A.  No, ma'am.
14   Q.  Do you know how long he stayed at the
15 Harte home?
16   A.  I do not.
17   Q.  Do you know if he was there the entire
18 time of the search?
19   A.  I don't recall.
20   Q.  Did you actually see his vehicle arrive
21 at the residence after he left QuikTrip?
22   A.  I don't remember.
23   Q.  So even though the plan was for him to
24 come to the home --
25   A.  I'm assuming.  I don't even know if that

---

Transcript of the Videotaped Testimony of

# Frank Denning

August 5, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the
County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

August 5, 2015                                         Frank Denning

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

49

1    Q.   Was there ever a practice that it had,
2    that the item that was field tested had to be
3    sent to the lab before seeking a warrant?
4    A.   At which time?  Prior?
5    Q.   Prior to seeking a warrant?
6    A.   No.
7    Q.   So the Sheriff's Office did not require
8    confirmation prior to seeking a search warrant
9    that the item was in fact what it was being
10   tested for, that it was the suspected substance?
11        MR. FERREE:  Objection.  Vague and
12   ambiguous.  I'm not sure the question is clear.
13   I object to form.
14   Q.   (By Ms. Pilate)  I will rephrase it.
15   Are you saying that the Sheriff's Office did not
16   request, prior to seeking a search warrant, did
17   not require a result on a lab test that would
18   either confirm or not that the substance was in
19   fact what it was suspected to be and had been
20   field tested for?
21   A.   That's correct.
22   Q.   Do you know if other local police
23   departments in fact required lab testing?
24   A.   I can't speak for them.  I can say that
25   when we realized that we had a kit that we

50

1    believed at the time was to be utilized only in
2    the UK, that information was shared with local
3    chiefs of police and they could make their own
4    decisions based on that.
5    Q.   Are you aware of any Assistant District
6    Attorney in the DA's office who required
7    laboratory testing prior to seeking a warrant?
8    A.   I'm not aware.
9    Q.   You never heard of that?
10   A.   No.
11   Q.   The Sheriff's Office in fact is the
12   agency that has the crime lab as part of the
13   agency, correct?
14   A.   Correct.
15   Q.   And a great deal of resources have been
16   invested in the crime lab over the years,
17   correct?
18   A.   Correct.
19   Q.   Sitting here today can you give me a
20   reason why the crime lab, which likely has the
21   expertise to identify marijuana, has scientists
22   capable of perhaps visually identifying it and
23   certainly has the capability of testing it and
24   determining the efficacy of field tests, why the
25   crime lab was not involved prior to 2013 in field

51

1    testing and examination of marijuana for search
2    warrants?
3    A.   If I think if I understand your
4    question, the crime lab is involved and it is
5    involved at later stages, for example getting
6    ready for preliminary hearing or trial.  That's
7    when the actual analysis then would be submitted.
8    Prior to that, as is current statute, the field
9    test kit is, by statute, an appropriate means to
10   detect the presence of an illegal substance and
11   chemical and that gives you the ability to obtain
12   an affidavit or write an affidavit to obtain a
13   search warrant.
14   Q.   Well, the statute applies just to
15   preliminary hearings, right?
16   A.   Right.
17   Q.   And would you agree that in many cases,
18   particularly with interdictions, when someone is
19   say stopped on a highway and something that
20   appears to be an illegal substance is seized,
21   there are usually other indicia indicating it is
22   in fact an illegal substance?
23   A.   Not always, but there can be other
24   indicia present, yes.
25   Q.   There would be things often like bricks

52

1    of vegetation wrapped in plastic and hidden in a
2    duffle bag, right?
3    A.   Could be.
4    Q.   And there are sometimes hidden
5    compartments in vehicles, right?
6    A.   Right.
7    Q.   And vehicles tend to be pretty confined
8    spaces, correct?
9    A.   Correct.
10   Q.   And if there is a large amount of say
11   raw marijuana, that might impart an odor,
12   correct?
13   A.   Correct.
14   Q.   So, in fact, there often is or typically
15   would be, I should say, other indicia that a
16   substance is in fact illegal, aside from just the
17   result on the field test, correct?
18   A.   Correct.
19   Q.   Have you ever read a magazine called Law
20   and Order?
21   A.   I'm aware of the magazine.  I have
22   probably read a few articles but it is not on my
23   reading list, no.
24   Q.   Do you know what kind of articles you
25   might have read from it?

August 5, 2015                                    Frank Denning
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

69

1   tests showed a positive for marijuana." And he
2   goes on to say, "This sample was later submitted
3   to the lab. The lab results showed tea leaves
4   and caffeine. After learning this from the lab,
5   we immediately changed our field test kits to
6   prevent this from happening again."
7        Do you see all of that?
8   A. I do.
9   Q. Was that all new information to you at
10  that point?
11  A. Yes.
12  Q. Were you surprised that you did not know
13  anything about this situation prior to that date?
14  A. No.
15  Q. And why is that?
16  A. I have 645 employees, and each one of
17  these separate divisions are run by a Major and
18  then a full command staff, such as a Captain, a
19  Lieutenant, and sometimes multiple Sergeants and
20  even sometimes even multiple Lieutenants. So I'm
21  not aware of day-to-day boots on the ground
22  activity when it comes to things such as this or
23  written affidavits or even application for
24  warrants or even the progression of say criminal
25  investigative cases. That is handled on a

70

1   day-to-day basis by those particular individuals
2   that I just mentioned.
3   Q. Well, did the possibility that field
4   test kits, which were relied on frequently, could
5   render a false positive results, was that a
6   matter that you think should have been brought to
7   your attention when it was first known?
8   A. And I think it was when we realized --
9   we had a couple of things going on at the same
10  time, one was wrong test kit, the other was they
11  both can produce false positives. So I would say
12  their notifying me was timely, it was appropriate
13  timing.
14  Q. You had no need to know prior to when
15  they told you?
16  A. Repeat, please.
17  Q. Are you saying you had no need to know
18  prior to when they notified you?
19  A. It is day-to-day business. I would say
20  they wouldn't feel that they were -- yes, they
21  wouldn't feel they would have to notify me of
22  that. They would work that out at their level.
23  Q. Would you have wanted to know, prior to
24  March of 2013, that a search had been carried out
25  at a Johnson County residence and that nothing

71

1   had been found?
2   A. No.
3   Q. You would have wanted to know that prior
4   to then?
5   A. No.
6   Q. Did anyone at any point ever discuss
7   whether someone should have apologized to the
8   Hartes for what happened to them?
9   A. I think subsequent to what information
10  that we had, I think it would have been very
11  appropriate for an apology to be made. However,
12  when I realized where we were that there were
13  already attorneys involved in the Kansas
14  Legislature making contact with the plaintiff,
15  for example, it would not be appropriate on my
16  part.
17  Q. Were you aware that some kind of
18  complaint or issue was raised through Steve
19  Howell's office within the first week after the
20  search?
21  A. I wasn't aware of that.
22  Q. So no one told you about that?
23  A. No.
24  Q. Did you ever ask how the warrant was
25  executed and how the officers were attired?

72

1   A. Eventually I would, yes.
2   Q. When was that that you asked?
3   A. I don't know. But it was probably
4   sometime in '13.
5   Q. Did you ever become aware that there
6   were children in the house?
7   A. I was made aware of that.
8   Q. When did you learn that?
9   A. Probably when I was getting a briefing
10  on the entire incident.
11  Q. Did your agency have any policy in 2012
12  about trying to avoid the execution of search
13  warrants when children were in the house?
14  A. I can't tell you if it is in policy. It
15  is in protocol that we try to identify through
16  various means whether or not there would be
17  children in the house.
18  Q. And then once that information is known,
19  what steps are taken if children are in the
20  house?
21  A. It would depend on the circumstances.
22  It wouldn't necessarily preclude us from doing a
23  search warrant, but there would be some measures
24  taken where if we could do some surveillance on
25  the house to watch the kids leave, either by

August 5, 2015                                           Frank Denning
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

85

1    A.  Hydroponics.
2    Q.  Hydroponic what?
3    A.  Material or product that would be
4    utilized for hydroponic growth, which would be
5    without soil, commonly associated with
6    cultivation of marijuana.
7    Q.  Do you know what the Green Circle sells?
8    A.  It is a hardware store.  I think it
9    sells a lot of things, but they do specialize in
10   hydroponic materials.
11   Q.  Do you know if they sell any other kind
12   of products?
13   A.  It is a hardware store so I'm assuming
14   they sell a variety.
15   Q.  So would you agree that if someone
16   walked out with a small bag from the Green
17   Circle, it might be any number of items?
18   A.  It could be.
19   Q.  Do you know if people use hydroponic
20   gardens for cultivating anything other than
21   marijuana?
22   A.  I'm sure they do.
23   Q.  Do you know what kinds of things might
24   be grown indoors?
25   A.  A variety, vegetables, just a variety of

86

1    plants.  But it usually has a common association
2    with that of marijuana.
3    Q.  Okay.  But someone shopping there
4    doesn't necessarily mean that they are growing
5    marijuana, correct?
6    A.  Correct.
7    Q.  I think you would agree that someone
8    going to a gun store and purchasing a gun doesn't
9    mean they are going to commit a crime, right?
10   A.  Correct.
11   Q.  And that people might purchase guns for
12   all kinds of reasons, right?
13   A.  Correct.
14   Q.  And similarly they might purchase
15   products, material, fertilizer, any number of
16   things, at the Green Circle and have nothing to
17   do with growing marijuana, right?
18   A.  That's correct.
19   Q.  Do you know when Mr. Harte was spotted
20   there or how old that tip was?
21   A.  I don't.
22   Q.  Do you know what other basis to probable
23   cause there was?
24   A.  I don't.
25   Q.  Now you said earlier that you were told

87

1    that caffeine could affect the test result and
2    render a false positive, right?
3    A.  Right.
4    Q.  But you weren't told about any other
5    kind of botanical, right?
6    A.  Right, that's correct.
7    Q.  Were you told that throwing away or
8    discarding an item in the trash that contained
9    caffeine could affect any items that were in
10   proximity to the item being discarded?
11   A.  Say that again.
12   Q.  Were you told that -- let me give you a
13   scenario here.  Were you ever told or did you, as
14   a result of these discussions come to understand
15   that caffeine in say tea or coffee or some kind
16   of sports drink, if discarded, could contaminate
17   or affect items that are in proximity to what was
18   thrown in the trash?
19   A.  Not when you are stating it in that
20   scenario.  What I was told was that in this
21   particular case it was indeed tea leaves that was
22   identified by the lab and that it did produce a
23   false positive.
24   Q.  If coffee grounds were thrown in the
25   trash and were wet and came into contact with a

88

1    vegetative substance, could the caffeine in the
2    coffee grounds, the damp or wet coffee grounds,
3    cause a vegetative substance that was discarded
4    in the same trash, to test positive?
5    A.  I don't know that.
6    Q.  Was that ever discussed with you?
7    A.  No.
8    Q.  Forensically speaking are you familiar
9    with the concept of contamination?
10   A.  I am not.
11   Q.  So you have never heard anything about
12   that?
13   A.  No.
14   Q.  When evidence is handled, say bodily
15   fluids or other biological evidence that is
16   recovered, are you aware that it needs to be
17   handled in a pristine manner and not contaminated
18   with anything else?
19   A.  Yes.
20   Q.  So you are somewhat familiar with the
21   concept of contamination, right?
22   A.  With the concept.
23   Q.  Okay.  And would that suggest to you
24   that one thing touching another or seeping into
25   another might affect how that other object or

August 5, 2015                                          Frank Denning
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

121

1    have been no priority, if that's what you are
2    asking.  There would be no priority on it.
3         Q.  Could someone have placed a priority on
4    it?
5         A.  I think, yes, I think if you refer back
6    to Exhibit 4, that sounds like a priority to me.
7         Q.  If it had been handled in the normal
8    course of business, how long would it have taken
9    to get that material tested?
10        A.  I don't know.  It could have been days
11   to maybe weeks.
12        Q.  But you all wanted to execute a warrant,
13   right?
14        A.  I'm sorry?
15        Q.  You all wanted to execute a warrant at
16   that point in time, right, or seek a warrant, I
17   should say?
18        A.  I'm not following what you mean.
19        Q.  Well, if it had been submitted to the
20   lab and someone had said we would like to obtain
21   a warrant, this has higher priority, can't sit
22   around for weeks because then our information
23   will be stale, could someone have shortened --
24        A.  Today they can.
25        Q.  Are you saying they could not have in

---

122

1    that time?
2         A.  No, there has been priority cases prior
3    to.  Unless it is given to the lab in that
4    manner, then it will just follow the normal
5    caseload.
6         Q.  Okay.  So you are saying that there has
7    always been the ability to place a priority on
8    something?
9         A.  Always, always.
10        Q.  And can any case officer do that when he
11   or she sends something to the lab?
12        A.  Yes, I think they could request a
13   priority.  That doesn't mean that it would be
14   necessarily honored if they were really
15   backlogged.  Depending on what discipline they
16   were wanting a rush on.  Then you would probably
17   involve laboratory management, the QA folks,
18   quality assurance, whether they would agree to
19   expedite it or put it in front of other cases.
20        Q.  If a deputy felt it was really important
21   and he felt maybe the lab was not putting the
22   degree of importance on it that it needed, could
23   he go to his supervisor and say look, can you get
24   involved in this because I really need this
25   result?

---

123

1         A.  We are a quasi-military organization and
2    he would start that chain of command going upward
3    to get what he needed.
4         Q.  Okay.  So the deputy could always go to
5    his supervisor?
6         A.  He or she could.
7         Q.  Now, you said a few minutes ago that
8    sending it to the lab was simply not part of the
9    protocol at that time.
10        A.  Well, if you are saying prior to
11   obtaining an affidavit for a search warrant.
12        Q.  Uh-huh.
13        A.  Yes.
14        Q.  Now, I have a question there.  And I
15   mean those were the words -- I wrote down "it was
16   simply not part of the protocol."  What I want to
17   ask was that a written protocol or not a written
18   protocol?
19        A.  It really wasn't.  It was just following
20   statute, what they can do with the findings and
21   the field testing in order to procure a search
22   warrant.
23        Q.  What statute are you referring to?
24        A.  I don't know the exact number but it
25   would come under the Kansas Statutes Annotated

---

124

1    that outline what kits can be used, what has been
2    approved by the KBI and so forth.
3         Q.  That applies to preliminary hearings,
4    not search warrants, doesn't it?
5         A.  Well, I think the way it is outlined you
6    can, based on your findings you can obtain --
7    write an affidavit and obtain a search warrant
8    based on those field tests.
9         Q.  Do you believe the statute mentions
10   search warrants?
11        A.  I would have to review it.  I don't
12   think it specifically mentions search warrants.
13   But you can certainly produce -- an affidavit is
14   simply presented to a judge as based on your
15   investigation and the facts that you know of at
16   the time because you have reason to believe that
17   like probable cause exists that contraband may be
18   there or present.
19        Q.  Do you have any knowledge that either
20   the statute or the regulation requires that the
21   law enforcement officer using the tests have been
22   trained by the manufacturer of that particular
23   test?
24        A.  I don't know if there is anything in the
25   statute like that.

---

August 5, 2015                                                          Frank Denning

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

197

1   A.  Right.
2   Q.  In your department no policy, no
3   protocol, written or unwritten, that required the
4   deputy to have the lab involved?
5   A.  Right.  They were following state
6   statute.
7   Q.  Well, the state statute doesn't tell
8   them you can't do these things, right?  The state
9   statute doesn't say in getting a search warrant
10  you can't have the lab involved, right?
11  A.  No, I don't think it has that
12  prohibition there.  But again, they were
13  following best business practices, they were
14  following direction from the district attorney,
15  and they were following state statute.  It
16  doesn't preclude them from submitting to the lab
17  but it doesn't mandate that they submit.
18  Q.  Do you know, have you known of any other
19  law enforcement agencies locally that have had
20  the practice of getting lab confirmation before
21  seeking a warrant?
22  A.  Kansas City, Missouri.
23  Q.  Is that the only one you know of?
24  A.  That's the only one I know of.  They
25  have their own lab like we do.

198

1   Q.  Any in Johnson County?
2   A.  Not that I'm aware of.
3   Q.  And at no point your career have you
4   been aware of that?
5   A.  Been aware of submitting it to a lab
6   before getting an affidavit for a search warrant?
7   Q.  Uh-huh.
8   A.  Correct.
9   Q.  Are you aware of what the practices were
10  when Sara Welch headed the drug unit in the DA's
11  office?
12  A.  Because I was in the drug unit at the
13  time, she insisted on three trashings before you
14  could proceed with an affidavit for a search
15  warrant.
16  Q.  What about lab confirmation?
17  A.  I wasn't aware that she insisted on lab
18  confirmation prior to the warrant, the search
19  warrant; not the warrant for arrest, but the
20  search warrant.
21  Q.  Well, would you agree that if a
22  particular substance is susceptible to a false
23  positive, that if you test it two times, 10 times
24  or 100 times on the same botanical that renders a
25  false positive, it doesn't matter whether you

199

1   have two results or 100 results, they are no more
2   probative, are they?
3   A.  But if you weren't aware that it could
4   produce a false positive, you wouldn't know that.
5   Q.  When did someone in the Johnson County
6   Crime Lab first make contact with the Kansas City
7   Crime Lab to speak with them about field tests?
8   A.  I can't give you the exact date but I
9   think it was sometime last year where I believe
10  one of the supervisory chemists, Val Kamb,
11  K-a-m-b, I believe Val made an inquiry to another
12  analyst, another chemist, and I believe that
13  person described their protocols, their
14  procedures and their training.
15  Q.  Was there any policy in 2012 or protocol
16  or practice of requiring training to the
17  manufacturer of the specific field test?
18  A.  I wasn't aware of any.
19  Q.  In 2012 was there a policy, either
20  written or unwritten, on the preparation of
21  safety plans in connection with dynamic entries
22  or search warrant entries?
23  A.  I believe there was a protocol set out
24  for that, yes.
25  Q.  Is it a written policy?

200

1   A.  I have seen safety plans but I don't
2   know if it is part of the policy.  I have just
3   seen safety plans in the past.
4   Q.  Where have you seen them?
5   A.  They are done on every incident where we
6   are doing entries in residences or any type of
7   structure, because it is sort of a plan as to
8   positioning of officers and what intel data you
9   might or might not have or suspect, rather.
10  Q.  It is done with every entry?
11  A.  My understanding it is supposed to be
12  done on every entry, yes, they have a safety
13  plan.
14  Q.  Who prepares it?
15  A.  Usually the person in charge of leading
16  the, whether it be a warrant or search warrant or
17  whatever it would be, that officer in charge, so
18  it is probably at a Lieutenant or Captain level.
19  Q.  What kind of information is gathered for
20  it?
21  A.  It has various components in there as
22  far as the location of the residence.  It might
23  even now have the ability to embed photos, actual
24  photos of the location, what we know about the
25  layout of say the surroundings of the target or

August 5, 2015                                            Frank Denning
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

201

1    whatever that might be, a house, a building or
2    whatever.
3        Q.   What happens to the safety plans after
4    the search is executed or the search warrant is
5    executed?  Where would you find one?
6        A.   There are many copies that are probably
7    distributed among those that are participating.
8    Those will probably be destroyed.  I have asked
9    about specific safety plans and what are done.
10   The original, the one that probably the officer
11   in charge is using is supposed to be part of the
12   file.
13       Q.   Is there a policy on that?
14       A.   I don't recall one, but that's another
15   question that needs to be answered.  I will have
16   to look for you.
17       Q.   Have you ever asked for a safety plan
18   and not been able to get one?
19       A.   No, ma'am.
20       Q.   In your experience has the original been
21   available in the file?
22       A.   Not to my experience.  That's what I
23   have been told.
24       Q.   Do you know one way or another whether
25   that practice is followed, whether the original

202

1    is put in the file?
2        A.   I don't know if it is being followed.
3    And I would have to say with what I do know, that
4    it hasn't been practiced or followed every time.
5        Q.   Why is that?
6        A.   I do not know the answer to that.
7        Q.   Have you asked questions?
8        A.   Not yet.
9        Q.   How have you discovered that it hasn't
10   been practiced or followed every time?
11       A.   Through this exercise.
12       Q.   Has that come up in discussions that you
13   have had or is as a result of reading deposition
14   testimony?
15       A.   I haven't read deposition testimony.
16       Q.   But you discovered it in the course of
17   being involved in this case?
18       A.   Right.  When I have looked at different
19   documents, glanced over them and what is a safety
20   plan and what do we do with them, I did ask that
21   question of Major Reece, what do we do with
22   safety plans; do we have them, not have them,
23   retain them, not retain them.
24       Q.   What did he tell you?
25       A.   The answer I gave you was a direct quote

203

1    from him.  "We destroy the copies and we keep the
2    original in file."
3        Q.   What further discussion did you have?
4        A.   My question was what if there are not
5    original safety plans in file?  Answer, there
6    should be.  Question, what if there isn't?
7    Answer, then we are not following search.
8        Q.   Has anyone investigated to see if
9    policy --
10       A.   It is underway.
11           (Deposition Exhibit 15 was marked
12   for identification.)
13       Q.   I'm going to hand you what I have marked
14   as Deposition Exhibit 15.  I will ask you if you
15   have ever seen that document before?
16       A.   I can't say that I have seen this
17   specific document but I have seen documents that
18   are similar.
19       Q.   What is this, please?
20       A.   This would be what the DPU calls their
21   safety plan.  So this is some of the information
22   that would be needed for dissemination to the
23   teams that were involved in whatever operation we
24   are about to do.
25       Q.   Did the DPU have a different safety plan

204

1    than other departments or units?
2        A.   I don't know.  Other departments meaning
3    other agencies?
4        Q.   No, I mean in your agency.  This is the
5    DPU safety plan.  Did patrol or investigations,
6    did they have a different safety plan?
7        A.   No.  This would all be handled by entry
8    team so it would be the same.
9        Q.   The same thing?
10       A.   The same thing.
11       Q.   Theirs just happens to say Directed
12   Patrol Unit?
13       A.   Correct.
14       Q.   Could you please turn to Page 2 of the
15   document.  About four lines down do you see
16   Officer Safety Consideration, Considerations?
17       A.   I do.
18       Q.   Do you see where it says, "At least one
19   school age child in the residence.  Execution
20   time set to allow time for children to be off to
21   school and before target leaves."  Do you see
22   that?
23       A.   I do.
24       Q.   Do you have any idea what the safety
25   plan, if there was one done, would have said in

Transcript of the Videotaped Testimony of

# Frank J. Denning

Vol. II

August 19, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



COOPER MOELLER
court reporting & videography

2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

A588

August 19, 2015                                                     Frank J. Denning

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

285

1   Erickson is I just sent out the notice. Do you
2   see that?
3       A.  I do.
4       Q.  Okay. Then I want you to flip to the
5   very first page of that exhibit, 15477, and do
6   you see an e-mail there from you to Daryl Reece
7   and Douglas Baker?
8       A.  I do.
9       Q.  And it indicates that you just got off
10  the phone with Tom, and I think your phone
11  records, which looked at, reflected a
12  conversation. Correct?
13      A.  Correct.
14      Q.  Okay. And then the e-mail goes on to
15  say, "Apparently, there's been some stuff on the
16  Missouri side yesterday and a little today, news
17  presence in Gardner. Reluctantly I will go
18  forward with the news conference at 1400 hours."
19  Do you see that?
20      A.  I do.
21      Q.  Okay. Now, did Tom Erickson provide you
22  some information on any raids on the Missouri
23  side or any other information?
24      A.  Apparently from what I'm saying here,
25  that referring to the stuff on the Missouri side

286

1   yesterday could have been -- you know, these
2   were, again, on both sides of the state line,
3   these search warrants were being executed, so it
4   probably had something to do with that, but to
5   remember specifically what was said between he
6   and I, I have no recall.
7       Q.  Okay. When you state, "Reluctantly I
8   will go forward with the news conference at 1400
9   hours," why do you use the word reluctantly
10  there? What were you meaning?
11      A.  I think overall the success of the drug
12  raids, those search warrants were just not --
13  they weren't significant, and I just felt like it
14  would be -- I mean, what are you going to talk
15  about if they weren't productive? But since he
16  had already called for it, I responded just as a
17  matter of courtesy to explain, you know, why we
18  were doing it on that day and with the
19  cooperation of the other agencies who were
20  helping with the investigation and the search
21  warrants.
22      Q.  Okay. Now, there were some -- let me
23  ask you this. Do you recall any large plants
24  being used at the press conference?
25      A.  I don't.

287

1       Q.  Okay. So no one showed you those or
2   said anything about where any plants came from?
3       A.  No. No.
4       Q.  Okay. Did anyone at that point mention
5   the word Leawood to you? Did you know anything
6   about a raid in Leawood?
7       A.  I did not.
8       Q.  And when did you first hear, to the best
9   of your recollection, about Leawood? I thought
10  you said earlier, three or four days after, but
11  if I wrote that down incorrectly, please correct
12  me.
13      A.  No. I think it could have been three or
14  four days. It could have been longer. I don't
15  know, but I first heard about it --
16      Q.  Uh-huh.
17      A.  -- from Stephanie Sawyer Clayton and
18  then followed by --
19      Q.  Okay.
20      A.  -- Representative Ruben.
21      Q.  Okay. And how did you hear about it
22  from Ms. Clayton?
23      A.  If I recall, I -- she wanted to talk
24  about some issues, and I actually met her at her
25  home.

288

1       Q.  Uh-huh.
2       A.  And I had my chief financial officer
3   with me, and there was some discussion. It
4   wasn't specific to the Hartes. I did not know
5   the name at the time, but she was wanting to get
6   some ideas of legislative changes --
7       Q.  Uh-huh.
8       A.  -- for affidavits and disclosures and
9   how we were conducting --
10      Q.  Uh-huh.
11      A.  -- certain drug raids.
12      Q.  Okay.
13      A.  And then we talked about a few other
14  items of interest to her as well.
15      Q.  Did you know at that point about the
16  Hartes?
17      A.  I did not.
18      Q.  How many times did you talk to her?
19      A.  You know, I can't recall. I've known
20  her when she ran for office the first time, and
21  so there's been conversations both, you know --
22      Q.  Uh-huh.
23      A.  -- business and not business, so.
24      Q.  Uh-huh. And did she contact you because
25  of some individuals who lived in the district

August 19, 2015                                                    Frank J. Denning

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

309

1    buckets of water with ice in it and relatively
2    large quantities of marijuana?
3        A.  I'm not.
4        Q.  Do you know if the quantity of plant
5    material found in the Hartes' trash would be
6    consistent with any of the techniques for THC
7    extraction?
8        A.  I'm not aware of any of that.
9        Q.  Okay.  If there were -- assume for
10   purposes of this question that there were, and
11   this has been told to us, but assume for purposes
12   of this question since you weren't here for the
13   other deposition testimony that there were some
14   last minute changes in the Operation Constant
15   Gardener teams that were dispatched on April
16   20th, 2012.  And in fact, as you know, a series
17   of raids were carried out that day.  Do you think
18   it would have been better to wait until the
19   people who had actually worked on these cases
20   were available to serve on those teams and carry
21   out those raids rather than going ahead and
22   trying to get it all done on April 20th, 2012?
23       A.  Let me see if I understand your
24   question.  So you're alluding to or stating that
25   you're aware of some changes were made in team

---

310

1    assignments?
2        Q.  Correct.
3        A.  And that because of that or as a result
4    of that you're attempting to say that those
5    officers who were initially involved in the trash
6    pool should have been the ones doing the actual
7    raid?  Is that what you're saying?
8        Q.  Well, I will tell you, it has been
9    represented to us, for instance, that Nate Denton
10   and Perry Williams were pulled off of their
11   assignments with respect to Operation Constant
12   Gardener.  It's my understanding they were on
13   another priority investigation, and as a result,
14   there were a lot of shifts or reassignment very
15   close in time to when the raids were carried out.
16   Wouldn't it have been better to wait until those
17   individuals were able to resume their positions
18   with their teams?
19       A.  No.  I mean, the training is basically a
20   standard for those that are participating in
21   those types of operations.
22       Q.  Well, I guess my question is why not --
23   why not wait until more investigation is done and
24   people like Deputy Denton and Deputy Williams are
25   available rather than trying to do a number of

---

311

1    raids all in one day?  Why not wait?  Why did it
2    have to be done on 4-20?
3            MR. FERREE:  I'm going to object,
4    because you're assuming facts not in evidence
5    that Nate Denton and Perry Williams had anything
6    to do with the investigation of the Harte case,
7    which they did not.
8        Q.  (By Ms. Pilate)  I'm not saying they
9    did.  I'm saying that there were shifts in
10   assignments on these teams as a result of Nate
11   Denton and Perry Williams being pulled off to
12   work on another investigation.  There's been
13   testimony on that.
14       A.  And that's not uncommon.  Because
15   probably where they were changed and switched to
16   is they did the operation in Gardner, Kansas on
17   that very day.  And the reason why all those
18   teams were assembled, because all of those search
19   warrants had already been acquired from the
20   court.  As you know, there's time restrictions on
21   those.
22       Q.  Uh-huh.
23       A.  And in fact, it was an effort regarding
24   Operation Gardener or that specific day, April
25   the 20th, to send a message to the drug using

---

312

1    community that we were actively participating in
2    executing those search warrants to recover that
3    contraband.
4        Q.  Okay.  So in your opinion, all those
5    warrants had to be carried out the same day?
6        A.  All of those warrants were appropriately
7    received from the court, and they were to be
8    carried out on that particular day because of the
9    number of warrants and because of that particular
10   day, April 20th, being the marijuana users
11   holiday.
12       Q.  So when you say send a message to the
13   drug community, how are you sending that message?
14       A.  I think it was intended to send the
15   message that, you know, they're celebrating the
16   use of an illegal substance, and we're saying
17   we're still here.
18       Q.  Okay.
19       A.  We will enforce those laws in the state
20   of Kansas.
21       Q.  So the purpose was to send a message
22   through the media.  Correct?
23       A.  I don't know if that was the intent of
24   the operations.  The intent of the operations was
25   to remove illegal substances from the street.

---

August 19, 2015                                                    Frank J. Denning
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

313

1    Q.  Okay.  You could do that any day.
2  Right?  You could have done that April 19th,
3  April 25th, May 1st.  Correct?
4    A.  That's correct.
5    Q.  Okay.  So you were doing all these raids
6  in one day.  Right?
7    A.  Right.
8    Q.  And the warrants were all obtained close
9  in time to each other?
10   A.  Uh-huh.
11   Q.  And you know, I think we're all aware
12  that warrants have to be served within a certain
13  amount of time, but there's some control over the
14  service of warrants in terms of when you choose
15  to get a signature on a warrant.  Correct?
16   A.  But we chose that specific day for that
17  operation.
18   Q.  Okay.  And you chose April 20th for that
19  operation?
20   A.  That's correct.
21   Q.  Okay.  And you said to send a message to
22  the drug using community.  Right?
23   A.  Correct.
24   Q.  Okay.  And the way you sent that message
25  is by communicating with the public.  Right?

314

1    A.  Right.
2    Q.  And you do that through the media.
3  Correct?
4    A.  Right.
5    Q.  Okay.
6    A.  And making arrests.
7    Q.  And that's communicated to the media.
8  Correct?
9    A.  Correct.
10   Q.  Okay.  Sitting here today, do you
11  believe that there's anything in the Harte case
12  that should have been done any differently?
13   A.  No.
14   Q.  You can't think of one thing that should
15  have been done differently?
16   A.  As far as the operation, as far as the
17  affidavit, as far as the search warrant, we
18  followed statute and protocol.
19   Q.  Okay.  And is this protocol written down
20  anywhere?
21   A.  Again, I think we're referring to
22  statutes, and we're referring to our standard
23  operating procedures.
24   Q.  Okay.  Are your SOPs, your standard
25  operating procedures, written down anywhere?

315

1    A.  I'm sure they are.
2    Q.  Okay.  Okay.  Now, when you say the
3  protocol, the protocol being what, two positive
4  field tests are sufficient to support a warrant?
5    A.  To support an affidavit for a warrant.
6    Q.  Okay.  And do you believe that to be
7  true in the absence of any other information
8  supporting probable cause or --
9         MR. FERREE:  Objection, misstates
10  the evidence.
11   Q.  (By Ms. Pilate) Okay.  Well, let's
12  start over, then.  Tell me, in your view, what
13  the protocol is?
14   A.  When they're conducting these types of
15  investigations they're following what they have
16  been trained to do, and also in statute, when
17  they're doing the pulls, the trash pulls, they're
18  doing field tests and they take the results of
19  those with reports, they go to the district
20  attorney or the assistant district attorney who
21  is assigned the narcotics cases, and those are
22  reviewed by those officers and by the assistant
23  district attorney and then he or she will take
24  those to affidavit form, approach the court for
25  search warrants.  In a nutshell, that's the

316

1  protocol.
2    Q.  Okay.  Does the -- is there anything
3  that is part of that protocol about the number of
4  positive field tests that you need, if any?
5    A.  You know, that's probably changed over
6  the years.  I've been aware of some requiring
7  three, some say two.
8    Q.  What was -- what was the protocol in
9  2012?
10   A.  I'm assuming two, and I say assuming
11  because I don't know.
12   Q.  Okay.  Now, are two -- at that time, in
13  2012, were two positive field tests deemed by the
14  department, I'm not talking about the DA, but by
15  you-all, was that a sufficient basis to go seek a
16  search warrant in the absence of any other
17  information that supported probable cause, just
18  two positive field test results?
19   A.  That's the standard that's outlined by
20  the DA.  That's what we're following.
21   Q.  So has anyone in the DA's office said to
22  you if you have two positive field tests, even
23  without any other information, that's enough?
24   A.  I haven't been told that.
25   Q.  Okay.  Well, what -- what is the

# Transcript of the Videotaped Testimony of

# **James W. Cossairt**

August 19, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

August 19, 2015                                           James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

13

1    A. Uh-huh.
2    Q. Who was your direct supervisor back in
3    April of 2012?
4    A. I'm trying to think. I believe it was
5    Mike Pfannenstiel. I was lieutenant at the time.
6    We've had several -- several -- several
7    lieutenants over the last I want to say five
8    years in that division, so.
9    Q. Okay. And who decided that you should
10   be involved in the search of the Hartes' home on
11   April 20th of 2012?
12   A. That would have been Lieutenant Mike
13   Pfannenstiel.
14   Q. And so he would have given you that
15   assignment?
16   A. Uh-huh.
17   Q. Is that how that works?
18   A. Correct.
19   Q. And there's been testimony in this case
20   that a briefing meeting occurred on the morning
21   of April 20th, 2012. Did you attend that
22   briefing?
23   A. Yes, I did.
24   Q. Okay. And who was the primary
25   spokesperson at that briefing?

14

1    A. I believe it was Mark Burns, and there
2    may have been several people that spoke, but as I
3    remember right, Mark Burns was the main speaker.
4    Q. Okay. And at the time that he was
5    giving that morning briefing, what division or
6    department was he in?
7    A. Direct -- we changed our name. I think
8    it was directed patrol.
9    Q. Directed patrol. And what had the name
10   prior or -- been prior to that?
11   A. I'm trying to think. Well, I guess it
12   would have been directed patrol for a significant
13   amount of time.
14   Q. You had started to say something about a
15   drug unit. Had there been a drug division at
16   some point separate?
17   A. No, it would have been the DPU guys.
18   Q. When you say DPU, what are you -- does
19   that stand for?
20   A. That's just the drug patrol.
21   Q. Drug patrol unit?
22   A. Drug patrol, yeah.
23   Q. And was Mr. -- I'm sorry, was it captain
24   or lieutenant or Sergeant Burns at the time, do
25   you know?

15

1    A. Deputy Burns.
2    Q. Deputy Burns, okay. And do you know why
3    he was leading the briefing that morning?
4    A. I think he was involved in -- in the
5    investigations that we were all going to do the
6    search warrants on.
7    Q. What information was conveyed to you at
8    that morning briefing?
9    A. They went over each of the search
10   warrants, each of the houses that we were going
11   to conduct search warrants on that morning, and
12   then they would kind of just indicate kind of how
13   they got to this point, the fact that we had a
14   signed search warrant by a judge. They went
15   over, you know, if there were vehicles, you know,
16   what vehicles they suspected to be at the house.
17   Q. How many houses were being searched that
18   day?
19   A. Yeah, I don't recall for certain. I'm
20   thinking maybe four or so.
21   Q. Did Captain Pfannenstiel speak at that
22   morning briefing?
23   A. I'm sure he had a little bit to say.
24   Q. Do you recall there being any media
25   coverage at the briefing in the morning?

16

1    A. I do not.
2    Q. Did you witness Captain Pfannenstiel
3    speaking to the media that morning at all?
4    A. No.
5        MS. KINGSTON: Can you mark that
6    Exhibit 1.
7        (Cossairt Exhibit 1 was marked for
8    identification by the reporter.)
9    Q. (By Ms. Kingston) I'm going to hand you
10   what we've marked as Cossairt Deposition
11   Exhibit 1. If you look at this e-mail it's dated
12   April 19th of 2012, and there's a list of four
13   different addresses for searches that are to be
14   performed on April 20th. Looking at those
15   addresses, were you involved in the search of any
16   of those particular homes?
17   A. The one on -- the one on Leawood, on
18   10333 Wenonga in Leawood, and then 19004 Lowell,
19   in Johnson County, in rural Johnson County.
20   Q. Okay. So looking at this e-mail and
21   seeing that there are four different addresses
22   listed, does that refresh your memory as to
23   whether or not there were four searches being
24   conducted on the 20th that were discussed at that
25   morning briefing, or potentially were there more

August 19, 2015                                              James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

17

1   searches that were happening that day?
2        A.   This looks about right, and if there
3   were others I'm not -- I don't recall any others.
4        Q.   Okay.  So it's your testimony that this
5   morning briefing there would have been discussion
6   about all four of those homes, just in terms of
7   what vehicles be present at the homes and
8   which homes were being searched?
9        A.   Yes.
10       Q.   Okay.  And you mentioned there's
11  discussion how search warrants had been obtained
12  for all the residences that were going to be
13  searched.  Did you get any background information
14  about why search warrants were obtained for any
15  of these addresses at that morning briefing?
16       A.   Typically they -- they indicate that
17  they, you know, pulled trash and had positive
18  hits on items in the trash.  As far as how much
19  detail they went into what that stuff looked like
20  or that kind of stuff, I don't -- I don't have
21  any independent recollection, but -- but yeah,
22  they would have gone into a little bit of detail
23  on each -- on each of the houses, especially like
24  the one where SERT was going to make the entry,
25  they would have discussed that a little bit

18

1   further.  Actually, I could be -- my recollection
2   is a little -- that they may have had after we
3   discussed this stuff, as far as making --
4   regarding the house on Juniper Street in Gardner,
5   they may have had kind of a separate more
6   in-depth briefing after we left.
7        Q.   Okay.  How long did that morning
8   briefing that you attended last?
9        A.   It would have lasted until probably
10  close to either -- between 6:45 and 7:00,
11  probably.
12       Q.   Okay.  And it started at what time?
13       A.   Six in the morning.
14       Q.   And how many officers were present for
15  the meeting?
16       A.   There probably would have been close to
17  fifteen, maybe, and that would have included
18  Lieutenant Pfannenstiel and Sergeant Reddin.
19  Well, I'm trying to figure out if the SERT -- I
20  don't recall the SERT guys being there at that
21  time, so.
22       Q.   Okay.  When did you find out that you
23  were going to be involved in searches of homes on
24  April 20th of 2012?
25       A.   It probably would have been that

19

1   previous Monday.  Lieutenant Pfannenstiel at some
2   point would have said, you know, hey, are you
3   available to help out on Friday with some search
4   warrants and stuff like that, just to confirm my
5   availability and make sure I didn't have court
6   or, you know, vacation day or whatever, so.
7        Q.   And you think that would have been on
8   then what, April 16th, that Monday?
9        A.   Yeah.
10       Q.   And what department or division was
11  Lieutenant Pfannenstiel in at that time?
12       A.   He would have been the lieutenant over
13  investigations and DPU, and that's kind of the
14  connection between Sergeant Reddin and myself,
15  is, you know, if their division needed help we
16  would pull investigators for that.  If we needed
17  help, we'd pull from them to help us out.
18       Q.   What division is Sergeant Reddin in?
19       A.   He's in DPU.  Yeah, he was the sergeant
20  over DPU at the time.  And so our captain --
21  Lieutenant Pfannenstiel was our mutual
22  supervisor.
23       Q.   Okay.  When Captain Pfannenstiel
24  approached you about whether you're available to
25  participate in the searches, were there other

20

1   people around that he was asking at the same time
2   or was it just a one-on-one conversation with
3   you?
4        A.   I don't -- I don't -- I don't
5   specifically recall the time that he asked, but
6   he probably would have either sent out an e-mail.
7   The way our division is set up is a lot of the
8   detectives are in cubicles that, you know, you
9   can just kind of walk in and talk to everybody
10  that's there.  You know, either he or I may have
11  gone in there and said, hey, who else is
12  available to help on Friday with these search
13  warrants, and then, you know, we would use kind
14  of whoever is available to do that.
15       Q.   And I want to understand --
16       A.   But I don't --
17       Q.   -- make sure I understand what you're
18  saying.  Are you saying that Captain Pfannenstiel
19  approached you and you may have went out and
20  approached other officers?
21       A.   I may have, or he may have done it
22  himself just to -- just to get the names down and
23  make sure that we had enough people to cover the
24  search warrants.
25       Q.   Did the two of you have any discussions

August 19, 2015                                    James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

49

1   front view?
2       A.  Front view.
3       Q.  Okay.  Do you know when the pictures
4   were taken?
5       A.  I do not.
6       Q.  Okay.  Do you know who took them?
7       A.  No.
8       Q.  The operations plan, I take it, then, is
9   in writing, a written document?
10      A.  It's something that you basically create
11  on the computer, and then you just print it off.
12  And those are generally destroyed after -- after
13  the search.
14      Q.  Okay.  When you saw it did you see it on
15  a computer or hard copy of it?
16      A.  Hard copy.
17      Q.  And who gave you the hard copy?
18      A.  I don't know.  They just passed out the
19  briefing.
20      Q.  Okay.  So you got a hard copy of the
21  operations plan for the Hartes' home at the
22  briefing?
23      A.  Yes.  That's correct.
24      Q.  Who else got a copy of it?
25      A.  The -- I'm trying to think how they did

50

1   that.  Probably just the other officers that were
2   going to be involved in that search.
3       Q.  Okay.  So you're saying everybody on the
4   search team for the Harte home got a copy of the
5   operations plan?
6       A.  They should have, yes.
7       Q.  Did you give it to them?
8       A.  No.
9       Q.  Okay.  Who did you get your copy from?
10      A.  That would probably be from Burns or
11  Blake.
12      Q.  And is an operation plan different than
13  a safety plan?
14      A.  I would say a safety plan can be
15  included in an operations plan.  A safety plan
16  isn't always -- I mean, I think our
17  investigations division typically will include,
18  you know, where the nearest hospital is and that
19  kind of thing, but it's not -- it's not -- it
20  hasn't always been done --
21      Q.  Okay.
22      A.  -- as far as search warrant.
23      Q.  So the operations plan for the Harte
24  home did not include a safety plan?
25      A.  I don't believe so.

51

1       Q.  And what in the operations plan
2   mentioned the possibility of children in the
3   home?
4       A.  Probably just under comments or --
5       Q.  What were the comments?
6       A.  Just that there was, I think, I don't
7   know if it said two young children or there was
8   two children in the house.  That's all I recall.
9       Q.  Okay.  So it's your testimony prior to
10  actually even leaving the Johnson County
11  Sheriff's Office sometime around 7:00 a.m. or
12  thereafter you knew that there were two children
13  in that home or the possibility of two children
14  in that home?
15      A.  Yes.
16      Q.  Why did you choose to conduct the search
17  of the Harte home before those children left for
18  school?
19      A.  There really wasn't any conscious
20  decision to, I guess, to wait or, you know, when
21  we got to QuikTrip we kind of got ourselves
22  organized and went to serve a search warrant.
23      Q.  Did you get an operations plan for the
24  Lowell Street search?
25      A.  Yeah.  There would have been a packet

52

1   for each of the search warrants.
2       Q.  Okay.  Was there anything in the
3   operations plan for the Lowell Street address
4   that indicated there were children in the home?
5       A.  Not that I recall.
6       Q.  Okay.  You could have gone to the Lowell
7   Street address and searched there first that
8   morning.  Correct?
9       A.  Correct.
10      Q.  Okay.  But you chose not to.  Is that
11  correct?
12      A.  That's correct.
13      Q.  And when you made that decision, you
14  knew that there were a possibility of children
15  being in the Harte home.  Is that correct?
16      A.  Correct.
17      Q.  Was there any information in the
18  operations plan about Mr. and Mrs. Harte?
19      A.  Not that I recall.
20      Q.  No descriptions of them or information
21  about their occupations or anything about them
22  personally?
23      A.  No.
24      Q.  Okay.
25      A.  Yeah.  I don't even recall there

August 19, 2015                                                James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

73

1    answered or if you just assumed that they would
2    know if no one answered?
3        A.  No, they're trained and well versed in
4    that.
5        Q.  So you didn't give them instructions?
6        A.  No.
7        Q.  How long did it take for the officers of
8    the entry team to secure or clear the house?
9        A.  I mean, their -- their primary goal is
10   just make sure there's no additional persons
11   inside the house.  So they're moving fairly
12   quickly.  I would say just, you know, a couple
13   minutes maybe.
14       Q.  And what did you do next then?
15       A.  At that point, I mean, the officers kind
16   of know what to -- Schoop was assigned -- I guess
17   during the briefing they had -- they usually
18   assign an evidence officer and a photography
19   officer, so before we start the search the
20   photography officer, you know, starts on the
21   outside of the house and takes photographs or
22   video and then he moves through the house taking
23   pictures of the bedrooms, you know, just all over
24   the house.  And again, the Harte house was to me
25   was quite extensive.

74

1        And then I generally -- I asked Eddy
2    Blake if he wanted to -- if he would at least
3    just go over with residents why we were there.
4    You know, kind of give them just a little bit of
5    background, or you know, if he wanted to
6    interview them, that was fine.  You know, if he
7    wanted to start that process, and so he ended up
8    visiting with Mr. Harte and Mrs. Harte.
9        Q.  Were you present for his visit with
10   them?
11       A.  No.  But he briefed me after each --
12   after each interview.
13       Q.  Okay.  And what did he tell you, or
14   first of all, who did he interview?
15       A.  Mr. Harte.
16       Q.  First?
17       A.  Yes.
18       Q.  Okay.  And what did he tell you about
19   his interview with Mr. Harte?
20       A.  That he was read Miranda, and he refused
21   to answer any questions.  And then Eddy Blake had
22   asked him if he could speak with his 13-year-old
23   son, and he declined to allow Eddy Blake to visit
24   with his son.
25       Q.  So it was Officer Blake who told you

75

1    that the son was 13?
2        A.  I don't know when I -- when I learned
3    that he was 13.
4        Q.  Did you learn that after the search of
5    the home or during the search?
6        A.  That I don't recall.
7        Q.  Okay.  Anything else that Officer Blake
8    shared with you about his discussions with
9    Mr. Harte?
10       A.  No.
11       Q.  Did Officer Blake interview any of the
12   other family members?
13       A.  He attempted to interview Mrs. Harte.
14       Q.  What did he tell you about his attempted
15   interview with her?
16       A.  She was also read Miranda and declined
17   to answer any questions.
18       Q.  Was anyone else present for these
19   interviews besides the interviewee and Officer
20   Blake?
21       A.  I don't believe so.
22       Q.  And where did the interviews take place
23   in the home?
24       A.  I believe he just took them just right
25   at -- there's a -- I would call it like a formal

76

1    living room, right inside the door where the --
2    once the house was cleared the family members
3    were allowed to move over to a couch and a chair,
4    I believe.  I think the 13-year-old, or the boy
5    sat in the chair and the rest of the family sat
6    on the couch.  But then right, if you keep going
7    in straight from the front door, there's the
8    dining room and kitchen.  I think it was just
9    right there in the dining room.
10       Q.  Is the room that you're describing they
11   were interviewed in on the front side of the
12   house or the back side of the house?
13       A.  Back side of the house.
14       Q.  So next to the kitchen?
15       A.  Yes.
16       Q.  And whose decision was it to have the
17   family members sit in that front living room
18   while the search was being conducted?
19       A.  It would have just been mine.  We
20   usually just have them sit somewhere so that
21   they're not interfering with the search, or you
22   know, we just have some sort of scene security,
23   and then I assigned Laura Vrabac to stand by with
24   the family if I was for some reason called away.
25   Again, just because the size of the house was so

August 19, 2015                                                James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

113

1  for the dog's experience and stuff like that
2  through the house, I was fine with that, too.
3     Q.  Okay.  Are you the one that spoke to the
4  Overland Park officer when he arrived with the
5  drug dog about what to look for or to what to
6  search?
7     A.  I believe I spoke to him out in the
8  front yard, along with maybe Chris Farkas was out
9  there maybe.
10    Q.  What was said to him?
11    A.  Just that we were there for -- regarding
12 a search warrant for drugs and paraphernalia, and
13 that we had an odor in kind of a difficult area,
14 and I think I asked Chris Farkas to escort him in
15 to show him where it was at.
16    Q.  And prior to the officer and the drug
17 dog arriving at the scene, you had found nothing
18 in the home that indicated that you had found no
19 live -- no drugs in the home.  Correct?
20    A.  Correct.
21    Q.  And you had found no drug paraphernalia
22 in the home.  Correct?
23    A.  Correct.
24    Q.  How long was the officer and the drug
25 dog in the home?

114

1     A.  I don't have any idea.
2     Q.  Okay.  Would you have any reason to
3  dispute the officer's records with respect to the
4  time that he logged that he was at the home?
5     A.  No.
6     Q.  Okay.  Absent --
7     A.  Okay.
8     Q.  If you have something to add?
9     A.  No.  Do you have the times that he --
10 that he wrote down, how long he was there?
11    Q.  We do have the report.  Would you like
12 to see that, or do you need to see it?
13    A.  If I could.
14    Q.  Sure.  We will get that for you.
15       MR. FERREE:  Would now be a time to
16 take a break and put the lunch order in?
17       MS. KINGSTON:  Sounds good.
18       THE VIDEOGRAPHER:  We're going off
19 the record at 12:05 p.m.
20       (Recess.)
21       (Cossairt Exhibit 3 was marked for
22 identification by the reporter.)
23       THE VIDEOGRAPHER:  We're back on
24 the record at 12:09 p.m.
25    Q.  (By Mr. Kingston)  I'm going to hand you

115

1  what we've marked Exhibit 3, and I'll represent
2  to you this was a copy of the canine unit report.
3  And if you turn to the second page, in the
4  narrative section at the bottom.
5     A.  I don't have the second page.
6     Q.  Sorry.  Oh, I'm so sorry.  I'll get you
7  a copy that actually has two pages.  Larry can
8  share with you there.
9     A.  Uh-huh.
10    Q.  It says on 4-20-12 at approximately
11 0865 hours I was dispatched to ███ Wenonga,
12 Leawood, to assist Johnson County Sheriff's
13 Office with a search of a residence for
14 narcotics.  So the report does reflect the --
15    A.  The arrival time?
16    Q.  -- the dispatch time of being just a
17 little bit before 9:00 o'clock.  There is nothing
18 in the report that indicates what time he left,
19 and so any question to me would be, do you have
20 any estimate as how long he was at the home?
21    A.  I sure don't.
22    Q.  You left the home at 9:55?
23    A.  Yeah, but I don't -- right, but I have
24 no idea how long.  You know, if he was there for
25 10 minutes or 20 minutes.  I don't know exactly

116

1  what all -- what all he searched, and again, I
2  may have been, while he was doing his drug search
3  with the dog I may have gone back up to finish
4  searching the master bedroom or I was there with
5  the family, but I have no recollection of when he
6  left.
7     Q.  Okay.  Do you know what time he arrived
8  at the home?
9     A.  I would say the 8:56 is probably.  I
10 have no reason to discount that.
11    Q.  Do you have any recollection of how long
12 he had been gone before the search concluded?
13    A.  No.
14    Q.  Okay.  So sitting here today you don't
15 know how long the drug dog searched the home?
16    A.  I do not.
17    Q.  And you don't know specifically what
18 areas the drug dog searched other than you gave
19 specific instructions to search that stairwell
20 area?
21    A.  Right, and when a drug dog shows up like
22 that to assist another agency, like I said, I
23 asked Farkas to escort him in there.  It's kind
24 of common practice for Farkas to stay with him
25 throughout the search, and then, you know, I

August 19, 2015                                                James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

117

1    would say Farkas might have a better idea or be
2    able to narrow down a time frame as to how long
3    he was in the house and what areas were searched.
4        Q.  Had any officers given you any
5    indication that there was any area of the drug
6    dog search other than that area near the
7    stairwell where they felt they smelled marijuana?
8        A.  Not that I'm aware of.
9        Q.  So as far as you're concerned, you would
10   have been happy if the drug dog came in, checked
11   that area and then made a determination of
12   whether or not there was anything there, and then
13   if not, then he could have left?
14       A.  Yes.
15       Q.  Okay.
16       A.  But I'm also aware that with canines
17   sometimes it's nice to give them some extensive
18   search times and depending on their, I guess,
19   tenure with -- with the department.
20       Q.  For like giving them additional
21   training?
22       A.  Right.  Either training or just
23   experience.
24       Q.  Okay.  Do you know the name of the
25   officer that came?

118

1        A.  I do not.
2        Q.  Okay.  Do you know the name of the dog?
3        A.  No.
4        Q.  Okay.
5           MS. PILATE:  This is a clean, two
6    page copy.  Do you want to substitute it for his?
7           MS. KINGSTON:  I'm sorry about
8    that.
9        Q.  (By Ms. Kingston) Okay.  So we have a
10   clear record.
11       A.  Oh, you know what?  I'm sorry, I
12   apologize, my fingers aren't working.  There is
13   two pages here.  Let me make sure of the
14   narrative on that.
15          MS. PILATE:  I was already all
16   ready to cop to a photocopy.
17          THE WITNESS:  I saw the staple,
18   but.
19       Q.  (By Ms. Kingston) I felt bad that I had
20   given you one that didn't have those pages.
21       A.  My apologies.
22       Q.  Oh, no problem, no problem.  Okay.
23       Q.  Whose decision was it to conclude that
24   the search should come to an end?
25       A.  It's when the officers told me that

119

1    everywhere in the basement was searched and
2    everywhere on the main floor was searched and
3    everywhere upstairs was searched.  Once we were
4    confident we had looked and searched the best of
5    our abilities, then we were done.
6        Q.  Okay.  Am I correct in saying, though,
7    that you had done a thorough search of the home
8    prior to the drug dog being come in -- being
9    brought in?
10       A.  There were parts of the house that were,
11   I would just say extremely cluttered when we were
12   there, you know, and I mean, the master bedroom
13   was one area that -- and that's one of the
14   reasons I went in there, was just because there
15   was so much.  There was clothes everywhere.  You
16   could hardly see the carpet.  You know, I don't
17   know that I could say today that that room was
18   thoroughly searched.  I mean, we did the best we
19   could, but short of taking all the clothes out,
20   and I mean, there was just stuff everywhere.  But
21   I would say we did.  We searched that house to
22   the best of the ability of the officers that were
23   there.
24       Q.  And had you done a search of the entire
25   home for drugs before the drug dog was brought

120

1    in?
2        A.  No.
3        Q.  What areas had not been searched at the
4    time the drug dog was brought in?
5        A.  We were still searching bedrooms
6    upstairs and the basement.
7        Q.  So are you the one that made the
8    decision to end the search after the officers
9    reported --
10       A.  Yes.
11       Q.  -- back to you that they finished?
12   Okay.  And at any point in time while you were
13   searching the Harte home or at the Hartes' home
14   while the search was being conducted did you ever
15   consider that the basis for the search warrant
16   that had been obtained to give probable cause was
17   maybe faulty somehow?
18       A.  I would say no, but I guess I --
19   personally it was -- I thought somebody should --
20   should maybe go back and look at some of that
21   stuff a second time.
22       Q.  And did you tell anybody that?
23       A.  I'm trying to think if I had a
24   conversation with -- I mean, it's highly possible
25   that I had a conversation with Lieutenant

August 19, 2015                                                      James W. Cossairt
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

121

1   Pfannenstiel just, you know, one-on-one, but I
2   don't have any independent recollection of when
3   that took place.
4       Q.  Okay.  Would it have been close in time
5   to the April 20th date?
6       A.  Yeah.  It would have been later in that
7   day, although it probably would have been maybe
8   the next day, or that was Friday.  It probably
9   would have been maybe Monday.
10      Q.  Okay.  And what did the two of you
11  discuss?
12      A.  Like I said, I don't have any
13  independent recollection, but I mean, like I
14  said, it just --
15      Q.  Tell me the gist of what you discussed,
16  even if you can't remember specifics.
17      A.  I just don't have any -- I don't recall.
18  I just thought to myself that maybe, you know,
19  the results of the test kits, you know, should
20  have been maybe looked at again, or you know, I
21  don't know.  And again, it's not my -- you know,
22  my job started with the briefing and pretty much
23  ended with the end of the search warrant being
24  served.  You know, the information was given to
25  Sergeant Reddin, and like I said, Eddy Blake was

---

122

1   there, Larry Schoop was there.  You know, it's
2   the ball is kind of back in their court as far as
3   what's -- what should be done with the case, and
4   you know, if they had thoughts of, you know,
5   re-looking at something or whatever, but like I
6   said, I do know that they -- the test kits showed
7   positive, you know, and the trashings, and then I
8   remember seeing a report in Deputy Blake's, they
9   went back and retested some stuff and it still
10  came back positive, so.
11      Q.  You weren't personally involved in the
12  testing?
13      A.  Yeah.  Like I said, the ball was back in
14  DPU's court.
15      Q.  Did Captain Pfannenstiel give you any
16  kind of response to the conversation, that you
17  recall?
18      A.  No.
19      Q.  Do you know if any kind of rechecking or
20  anything was done in response to your comments?
21      A.  I know they were sending stuff to the
22  crime lab to be checked.  I mean, just from my --
23  you know, the conversations that were taking
24  place at the Harte residence, you know, I kind of
25  gathered that this could lead to some sort of a

---

123

1   court situation or a lawsuit situation, so I
2   think everybody was -- like I said, we sent
3   samples back to the -- you know, back to the lab
4   to get checked, and check the test kits and that
5   kind of thing, so.
6       Q.  Were you involved in any of the post
7   checking that occurred?
8       A.  No.  Not at all.
9       Q.  All right.  So this was just
10  information from --
11      A.  Yeah, just secondhand information.
12      Q.  What happened at the Harte home that led
13  you to a conclusion that this would be a
14  situation that would lead to some sort of a court
15  situation?
16      A.  Just their wanting answers that at the
17  time -- at that time we just couldn't give them
18  or didn't feel comfortable giving them, you know,
19  based on the investigation.  I just -- I just got
20  the impression that it would go -- it could
21  easily go that way.
22      Q.  I guess I'm just trying to clarify
23  that's an opinion you informed versus somebody in
24  the Harte family saying we're going to sue the
25  sheriff's office?

---

124

1       A.  Yeah.  I don't recall them saying
2   anything --
3       Q.  Okay.
4       A.  -- specific to that.
5       Q.  The opinion that you formed that this
6   may lead to a court situation, did you form that
7   opinion while you were at the Hartes' home?
8       A.  It was probably sometime over the
9   weekend.
10      Q.  Okay.
11      A.  You know, just kind of rehashing the
12  conversations that we had and --
13      Q.  Okay.  I think earlier I had started to
14  question you about any conversations you recall
15  having with the -- Mr. or Mrs. Harte --
16      A.  Uh-huh.
17      Q.  -- at the home.  Is there anything, any
18  other conversations that you haven't told me
19  about that you had with them while you were at
20  their home?
21      A.  No, not that I can --
22      Q.  And I didn't get a chance to ask you and
23  I want to, what about conversations with the
24  children, did you have any conversations with
25  them at the home that we haven't talked about?

---

August 19, 2015                                           James W. Cossairt

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

125

1    A.  Not specifically, but I mean, as I
2  recall, they -- the daughter was, you know,
3  sitting quietly next to mom.  Mom was in the
4  middle, dad was, you know, looking at them over
5  to the far right, and then it seemed like there
6  was -- there was a time I think the 13-year-old
7  was also on the couch, but I think he moved over
8  to a chair for quite a bit of the time.  But they
9  were, you know, pretty much just sitting there
10  quietly, but I didn't really -- like I said, dad
11  had asked us not to talk to the boy individually,
12  and I mean, I just didn't have any -- I don't
13  know.  I might have asked him, you know, what
14  grade are you in.  You know, how is school going,
15  or you know, something like that, but I didn't --
16    Q.  Just casual conversation?
17    A.  -- I didn't have any, you know, long
18  conversations with him or the girl, but the girl
19  just sat quietly next to mom, and just seemed
20  like it was fine throughout the search.
21    Q.  Okay.  Did you communicate to anyone at
22  the sheriff's department sometime after the
23  search at the Harte home that you thought maybe a
24  lawsuit would arise or could arise out of this
25  search?

---

126

1    A.  At some point I think I mentioned
2  something to Lieutenant Pfannenstiel about that.
3    Q.  And what was his response?
4    A.  You know, I think it was more of like a
5  wait and see, or -- and again, I don't think it
6  was too loo -- I don't know.  I can't recall the
7  specific dates, but I know the Hartes were
8  attempting to contact the sheriff's office to get
9  copies of reports and stuff like that, and again,
10  I don't know the time frame from the search to
11  when we started getting those requests.  But I
12  just, you know, the results of the search and
13  then all those phone calls just kind of led me to
14  believe that -- and again, I think he was of the
15  same opinion, that this may end up in a lawsuit
16  type situation.
17    Q.  And what makes you say that?
18    A.  Just --
19    Q.  Something he said back to you?
20    A.  No.  Just -- just with the phone calls,
21  you know, I mean, it's not -- I guess it's just
22  not common for -- for people to call, and from
23  what I understand, I don't know exactly the
24  correct way to say it, but I guess they were
25  quite vocal about, you know, hey, we want these

---

127

1  records and we want them now kind of a deal.  And
2  again, you know, through talking with attorneys
3  and stuff like that, and I guess the sheriff's
4  decision was they weren't going to get them as
5  quickly as they wanted them, so.  And again, all
6  that's just -- I don't know exactly how all that
7  played out.
8    Q.  I was going to ask, were you directly
9  involved in the decision whether to give them
10  records or not?
11    A.  No.  No.  No.
12    Q.  When you mentioned that you thought you
13  told Lieutenant Pfannenstiel that there may be a
14  lawsuit that arose -- arises or arose out of the
15  Harte search on April 20th, would that have been
16  in that follow-up conversation you had with him
17  after the home was searched, the one you thought
18  probably occurred on Monday, or would that have
19  been a later time that you would have expressed
20  that belief?
21    A.  Which conversation are you referring to?
22    Q.  Well, he originally said that was
23  probably the Monday after the search that you
24  would have talked to him about, you know, maybe
25  checking to see what evidence had been obtained?

---

128

1    A.  It could have been during that -- it
2  could have been during that conversation or one
3  later that day.
4    Q.  Okay.
5    A.  His office and my office are right next
6  to each other, so we frequently have
7  conversations.
8    Q.  Did you offer any apology to the Hartes
9  before you left their home?
10    A.  Again, I'm -- I'm kind of a fill in at
11  this point during the search for Tom Reddin.  I
12  don't know all the details of the search, and not
13  having all the details I didn't know if an
14  apology was, you know, warranted or necessary.  I
15  mean, there's -- there's times, like I said, when
16  we damaged people's doors, and to be honest, I'm
17  not really sorry we had to do that if you're not
18  going to open up the door.  Yeah, just -- I just
19  didn't feel like that I had all the information
20  necessary to either offer an apology or just, you
21  know, fully explain, you know, and answer their
22  questions, you know.  I just didn't feel like it
23  was my position to do that when DPU, it's not my
24  unit and it's not my case, you know.  I'm just
25  filling in to supervise a search of a residence.

---

# Transcript of the Videotaped Testimony of

## **Sgt. James L. Wingo, Ret.**

August 25, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

**A601**

August 25, 2015                                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

41

1       A.  Yes.
2       Q.  Is that considered to be a more
3   successful way?
4       A.  I wouldn't say any way is more
5   successful than the other.  I think it just
6   depends on the gardener.
7       Q.  So their expertise is important?
8       A.  And it's like anything else, it's what
9   they put into it.
10      Q.  Okay.
11      A.  The effort that's put into the
12  production.
13      Q.  Okay.
14      A.  It depends on the grower.
15      Q.  And I know there's like a lighting
16  component with growing marijuana.  What did you
17  learn about the lighting?
18      A.  Well, lights are -- plants need light to
19  grow.
20      Q.  Did you learn what kind of lights were
21  used to grow marijuana?
22      A.  Yes.
23      Q.  What lights are mostly used to grow
24  marijuana?
25      A.  There are different types, like HID,

42

1   high intensity discharge lights, sodium lights.
2   Lights have their different benefits.  They are
3   used at different times.
4       The length of time that they are on and
5   off is different during different growing
6   periods, the power use of them, how to power
7   them.  There's different types of reflectors to
8   spread light, so things like that.
9       Q.  Okay, any other components to the
10  gardening or the growing of marijuana besides the
11  lighting and the soil and the hydroponic type?
12  What other things are involved?
13      A.  Air quality.  Plants need air, light and
14  food.
15      Q.  Okay.
16      A.  And so those things, if you can provide
17  those and keep the pests off of them, and there
18  are different amounts and different times to do
19  that, to apply those.
20      Q.  When you say air are you talking about
21  like ventilation?
22      A.  Plants, obviously, they take in $CO_2$ and
23  release oxygen.  So think about being in a
24  confined space such as this, if you have a bunch
25  of plants, they are going to suck up all the $CO_2$

43

1   and release a lot of oxygen, and if you have more
2   oxygen than you do $CO_2$, the plant can't grow as
3   well.
4       That's why in some grows they will add
5   carbon dioxide to the air so the plant can take
6   it in, so those are the things it needs.  It
7   needs good air quality, as well.  It can effect
8   the plant's growth.
9       Q.  I noticed in some of the training
10  materials that I looked through that you used,
11  that there were a lot of photos.  Are those the
12  photos that you took yourself or the ones you got
13  from the internet or a combination of both?
14      A.  The majority would be ones I took
15  myself.
16      Q.  And those would be from your grow
17  operations that you ran across in your time with
18  the Highway Patrol?
19      A.  Yes.
20      Q.  All right.  With respect to
21  investigating a marijuana grow operation I want
22  to kind of switch focus and talk about that.  Are
23  there -- do you need a break?  Sorry.
24      A.  No, I'm just checking to see how much
25  time you've taken.

44

1       Q.  What are -- well, let me back up and ask
2   you this.  Have you been involved in searches for
3   suspected marijuana grow operations?
4       A.  Yes, ma'am.
5       Q.  And that's been the entire time you have
6   been with the Narcotics Unit with the Highway
7   Patrol; is that correct?
8       A.  Yes.
9       Q.  Okay.  And how many investigations do
10  you think you have conducted into suspected
11  marijuana grow operations during the time you
12  were with the Highway Patrol?
13      A.  Well over 100.
14      Q.  And are there certain techniques that
15  you use to determine if someone is engaged in an
16  indoor marijuana grow operation?
17      A.  Yes.
18      Q.  Okay, what specifically are you looking
19  for?  What techniques are you using?
20      A.  We will take either tips, we would do
21  surveillance at hydroponic stores, and we would
22  get information from other law enforcement
23  agencies that document sales of hydroponic
24  growing equipment.
25      Q.  Anything else you do to try to find

August 25, 2015                                           Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

45

1    information as to whether a marijuana growing
2    operation is in place?
3        A.  Using informants.
4        Q.  You mentioned getting tips.  Those would
5    be what, just anonymous calls that would come in?
6        A.  We get a lot of anonymous calls, they
7    come into the hotline, and then we're tasked with
8    investigating those.
9        Q.  Following up on those?
10       A.  Yeah, following up on those, that
11   information from citizens, whatever.
12       Q.  You mentioned surveilling hydroponic
13   stores.  What were the stores that you would
14   surveil in the area that you worked in?
15       A.  There were two, the Green Circle Garden
16   Center and the Grow Your Own store.
17       Q.  And where was the Green Circle Garden
18   Center?
19       A.  Initially it was at about 97th and
20   Metcalf, in that area, and then they moved to the
21   River Market area.
22       Q.  Same owners or do you know?
23       A.  I don't know the gentleman's name that
24   owned it in Overland Park, but he sold it to his
25   daughter, who then moved it to the River Market

46

1    area, and I don't know at what point she took
2    control.
3        Q.  Do you know her name.  We're not doing
4    well with names today, are we?
5        A.  I knew at one time.  I couldn't tell you
6    her name right now.
7        Q.  What about the name of the former
8    owners?
9        A.  No; I mean it was her dad.  I don't
10   remember what his name was.
11       Q.  Do you recall what year it moved down to
12   the River Market area?
13       A.  In 2009, maybe.
14       Q.  And what's the idea of surveilling
15   hydroponic stores?  Was that something that you
16   were taught to do as a technique, or is that
17   something that you developed?
18       A.  Well, originally I know other officers
19   had done that --
20       Q.  Okay.
21       A.  -- and I was asked to assist back in --
22   it may have been 2006, 2007 I was asked to assist
23   with a surveillance, but then I continued to do
24   that in late 2007.
25       Q.  When you said other officers were doing

47

1    that, did you mean Highway Patrol officers or
2    other jurisdictions?
3        A.  Yes.
4        Q.  Do you know how long the Highway Patrol
5    had been monitoring hydroponic stores before you
6    became involved in 2006 or '07?
7        A.  It was in early 2000 from what I
8    understand.
9        Q.  Okay, and you mentioned the other store
10   was Grow Your Own; is that correct?
11       A.  Yes.
12       Q.  And where was it located?
13       A.  It was on St. John.
14       Q.  Was that in Kansas City, Missouri?
15       A.  Yes, about a half mile east of Gladstone
16   Boulevard on St. John's.  I can't remember the
17   intersecting street.
18       Q.  And I think I understand the
19   surveillance practice but why don't you explain
20   it to me.  What, you go to the hydroponic store
21   and you do what?
22       A.  Just sit and watch to see who comes in,
23   who comes out, trying to obtain license plates
24   and information on what it is they are buying.
25       Q.  And you're sitting in an unmarked car

48

1    then?
2        A.  Yes.
3        Q.  Okay, and on an average surveillance
4    day, how long would you spend watching a store?
5        A.  About three or four hours.
6        Q.  And did you figure out a time of day
7    that there seemed to be more traffic at the
8    stores?
9        A.  They opened at -- I can't remember if
10   they opened at 10:00 or 11:00.  They either
11   opened at 10:00 or 11:00, so we would try and be
12   there at opening --
13       Q.  Okay.
14       A.  -- and then stay until about 2:00 or
15   3:00.
16       Q.  Why did you pick those times versus a
17   different time of the day?
18       A.  Because that's when they opened, and I
19   tried to leave downtown before rush hour started.
20       Q.  Fair enough.  So would you go on these
21   surveillance on your own, or would you have
22   somebody with you in the car?
23       A.  Usually I'd be on my own in my car, but
24   sometimes there would be other officers;
25   sometimes it would just be myself.

August 25, 2015                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

49

1    Q.  When you say "other officers," do you
2  mean in your car or in their own cars?
3    A.  Their own cars.
4    Q.  Okay, and this would be a personal car
5  of yours --
6    A.  No.
7    Q.  -- or it would be a State vehicle, an
8  unmarked car that you would use?
9    A.  Yes.
10   Q.  And how often during the time that you
11 were in the Narcotics Unit, did you actually do
12 surveillance on the hydroponic stores?  Was that
13 daily a couple of times a week; how often would
14 you do that?
15   A.  Initially up until about 2011 it was
16 usually at least three times a week.
17   Q.  And did you pick those days or did you
18 have a set like, "I did it Monday, Wednesday,
19 Friday"?
20   A.  I'd just go if I had time.
21   Q.  Okay, and what happened after 2011?
22   A.  We ran an operation that I'm sure you're
23 aware, the Operation Constant Gardener, that I
24 passed out all the information that I had from
25 all the customers between 2007 to 2011 that

50

1  hadn't already been contacted to other officers,
2  and after that operation, their businesses slowed
3  dramatically, so we would spend less time there.
4    Q.  And what do you attribute the slowness
5  in business after that?
6    A.  Lack of -- their customers were
7  incarcerated and their indoor grows ceased.
8    Q.  Do you attribute it to the success of
9  your operation then?
10   A.  Yes.
11   Q.  Okay, you mentioned that when you were
12 doing surveillance you would be watching who went
13 in and out of the store.  Would you be taking
14 notes of describing the description, the physical
15 description of the individuals who would go into
16 the store?
17   A.  Yes, ma'am.
18   Q.  And you did that on, what, kind of like
19 a legal pad, a notebook?
20   A.  It would depend.  Sometimes I'd do it on
21 a legal pad, and sometimes if I had time I would
22 just enter it directly into an Excel spreadsheet
23 that I had.
24   Q.  Okay, and you had a computer in your
25 car?

51

1    A.  Yes.
2    Q.  Okay, and what else would you record
3  besides the physical appearance of the individual
4  going in the store?
5    A.  I would try and get the number of
6  occupants, sex, approximate age, vehicle
7  description, license plate, if I could tell what
8  it was they purchased --
9    Q.  Okay.
10   A.  -- and the date and the time.
11   Q.  With respect to their license plate did
12 you also write down the make and model of the
13 vehicle?
14   A.  Yes.  Did I not say that?
15   Q.  You hadn't yet.
16   A.  I'm sorry.
17   Q.  That's okay, and you said with regards
18 to writing information about their purchases, I
19 assume sometimes you could actually visually see
20 what they were carrying out, and sometimes it
21 would probably be concealed in some kind of bag?
22   A.  Yes.
23   Q.  Okay, so how would you -- you would just
24 record what, that they had a bag with them?
25   A.  What they bought.  If I could see what

52

1  they bought, I would write it down.
2    Q.  And if you couldn't see what was in the
3  bag, you just noted what, small bag, medium sized
4  bag, large bag?
5    A.  Yes.
6    Q.  Did you ever go into the store to
7  question who was working there as to what was
8  purchased by any individual?
9    A.  No.
10   Q.  Were you not allowed to do that?
11   A.  I guess I could have.  I don't know if
12 it was allowed, but I didn't.
13   Q.  And why not?
14   A.  I didn't want the store involved in my
15 investigation.
16   Q.  Okay.  Did you ever obtain any sales
17 records from the store for any of the individuals
18 as to what was purchased?
19   A.  No.
20   Q.  Could you have done that?
21   A.  I probably could have.
22   Q.  And again, you didn't because you didn't
23 want the store involved, is that what --
24   A.  Correct.
25   Q.  And why didn't you want the store

August 25, 2015                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

53

1  involved?
2      A.  I didn't want them involved in our
3  investigation.  I didn't want anything that we
4  did to reflect back upon the store.
5      Q.  That would have negatively affected
6  their sales, is that what you mean?
7      A.  Or safety.
8      Q.  Okay.  After you'd record it, either on
9  your legal pad, this information, would all of
10  the information eventually get into your Excel
11  spreadsheet?
12      A.  Yes.
13      Q.  Okay, and then what did you actually do
14  with the Excel spreadsheet?
15      A.  I just kept it.
16      Q.  Okay.  Did you go back and do -- pull
17  any information from the license plates or --
18      A.  Yes, I would.
19      Q.  That's what I'm trying to have you walk
20  me through what -- the process.  So you did the
21  surveillance, you gathered information?
22      A.  I kept trying to get information on the
23  registered owner of the vehicle.
24      Q.  And you do that by calling --
25      A.  Calling, yes.

54

1      Q.  Who specifically, what department do you
2  call?
3      A.  I would call my secretary, and have --
4  or a secretary at Jeff City, sometimes it would
5  be a dispatcher at Troop A if they were a
6  unavailable, but for the most part it would be
7  one of your secretaries, narcotics secretaries.
8      I would have them run the license plate,
9  see if they could find the owner of the vehicle,
10  see if they could send me a driver's license
11  photo of the owner, to see if I could match that
12  photo to the person that came in.
13      Q.  Okay.
14      A.  And if I could then I obviously
15  identified the person that went into the store.
16      Q.  And then once that person was
17  identified, I assume then you had their address?
18      A.  Well, I had an address.
19      Q.  The one that was on their driver's
20  license or the address that their car had been
21  licensed to?
22      A.  At some point, yes.
23      Q.  And then did you go to the home of the
24  addresses that you received?
25      A.  Sometimes.

55

1      Q.  How did you decide when you were going
2  to go and when you weren't going to go?
3      A.  It was very random.  I mean it depended
4  on what they bought, how many times they
5  purchased, did they have a criminal history, did
6  they have any warrants, did they have manpower,
7  what was going on that day, what we were going to
8  do later on that day; it just depended on a lot
9  of factors.
10      Q.  Was there any correlation between the
11  frequency of somebody shopping in a store, and
12  the likelihood that they may be engaged in a grow
13  operation?
14      A.  I would personally say that it would
15  increase the potential.  It depended on what it
16  is they are buying.  There's a lot of different
17  factors on that, as well.
18      Q.  So somebody who shopped there more
19  frequently could increase the potential that they
20  may be engaged in an indoor grow operation; is
21  that fair?
22      A.  The potential.
23      Q.  Okay, and in your experience was there a
24  correlation between the frequency and leading
25  usually to an indoor grow operation?

56

1      A.  I would say better than 95 percent of
2  the time.
3      Q.  Okay.  So a high correlation, right?
4      A.  Yes.
5      Q.  All right.  And you mentioned that you
6  would check criminal records, things like that.
7  So after you got a name, then you ran that name
8  through, what, some database to see if there was
9  a criminal history?
10      A.  If I've got a driver's license and it
11  matched the person coming in then --
12      Q.  The description you took down?
13      A.  The description, I would know then, when
14  we would run a criminal history, to see if they
15  had a previous criminal history for marijuana,
16  growing marijuana.
17      Q.  Okay.  So then you would go sometimes to
18  the address that you received?
19      A.  Sometimes.
20      Q.  Okay, and what would you do then when
21  you got to the home?
22      A.  It would depend on whether or not I had
23  a search warrant.
24      Q.  Okay.  If you didn't have a search
25  warrant and were just kind of investigating, what

August 25, 2015                                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

57

1    would you do?
2        A.  Just knocked on the door, identify
3    myself and ask if I can come in.
4        Q.  I've heard that referred to as a "knock
5    and talk;" is that correct?
6        A.  Yes.
7        Q.  And is that a technique that you use
8    sometimes when gathering information for an
9    investigation?
10       A.  No.  That's what I used to see if people
11   will give me permission to come in and get their
12   marijuana plants.
13       Q.  And how effective was that for you in
14   terms of the investigations that you did, just
15   knocking and talking to people?
16       A.  If I would have to put a percentage on
17   it, without knowing exactly what it would be, I
18   would say 75 percent of the time.
19       Q.  It was effective?
20       A.  Yes.
21       Q.  Okay, and walk me through that process.
22   You would knock on the door and identify yourself
23   as someone with the Highway Patrol?
24       A.  Uh-huh.
25       Q.  And what would you tell them?

---

58

1        A.  I would identify myself and I would
2    usually have a uniform officer with me, and once
3    they answered the door, I would identify myself
4    to them, and tell the person that I had some bad
5    news for them, and asked them if we could come
6    in, and if they allowed us in, we'd go in, I
7    would tell them that unfortunately we were there
8    to get their marijuana plants, and more often
9    than not they would tell us they had marijuana
10   plants and allow us to go get them.
11       Q.  Okay.  So it sounds like you would be
12   very confident in expressing to them when they
13   let you in, that you believed there were
14   marijuana plants there, just to see what kind of
15   reaction you would get?
16       A.  Well, also more often than not you can
17   smell it, when you get inside.
18       Q.  So once you were in, that helped you
19   immensely in terms of being able to decide?
20       A.  Yes.
21       Q.  And what is the smell?  Is the smell of
22   growing marijuana different than the smell of
23   like actually somebody who is smoking a joint?
24       A.  Yes.
25       Q.  How would you describe the odor of a

---

59

1    grow operation, for someone like me who hasn't
2    smelled it before?
3        A.  I can explain it like this.  In the
4    Springtime, early Spring, I'm sure you've driven
5    down the street where somebody has cut their
6    grass for the first time.
7        Q.  Yes.
8        A.  Hey, that smells like fresh cut grass.
9    That's how it is with marijuana.  It smells --
10   marijuana, to me, in and of itself is a
11   descriptor.  It's growing marijuana.  It has a
12   unique odor.
13       Q.  Is it a strong odor?
14       A.  Why yes.  Sometimes you get faint
15   whiffs, but you can still detect it.
16       Q.  And I take it the larger the grow
17   operation, the stronger the odor?
18       A.  Not necessarily.  It typically has to do
19   with their ventilation.
20       Q.  Okay.  So if you're trying to mask the
21   fact that you've got a grow operation, you going
22   to try to ventilate it so that smell is not as
23   strong; is that correct?
24       A.  Yes.  I have been in very large grows
25   that you couldn't smell it at all, because they

---

60

1    had it ventilated, or there are units to
2    eliminate the odor that people use quite
3    frequently if they can't vent it properly to
4    disguise -- to eliminate the odor as much as they
5    can, so you have those.  They are called carbon
6    filters, they use to filter out the odor.
7        Q.  Okay.  I'm envisioning like some kind of
8    situation where you're venting by running some
9    pipe out of your house, or something.  Is that
10   another technique that is used?
11       A.  Yes.
12       Q.  And can you visually see some kind of
13   tubing or pipe, just by doing a visual inspection
14   of the home?
15       A.  No.
16       Q.  Okay.  They are usually masked by what,
17   a bush or something?
18       A.  Maybe it's going up a chimney, another
19   flue or something.
20       Q.  Okay, so just all kinds of ways to get
21   the smell out of the house?
22       A.  Yes.
23       Q.  When you would go to the houses before
24   you would knock, did you like kind of just look
25   around the property a little bit?

---

August 25, 2015                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

61

1      A.   Sometimes.
2      Q.   Okay, and how often when you were
3   conducting investigations into potential grow
4   operations were you going and doing these knock
5   and talks?  I mean it sounds like you did it
6   often, but I don't want to put words in your
7   mouth.
8      A.   We did it frequently.
9      Q.   Okay.
10     A.   Typically for the most part they would
11  be our last resort.  It would be if we couldn't
12  gain any information any other way, typically
13  that would be our last resort.
14          We would just go knock on the door and
15  say, "Hey, we're here."
16     Q.   And you would do those knock and talks
17  before you would have gone to obtain a search
18  warrant?
19     A.   If I had a search warrant.
20     Q.   You wouldn't need to do the knock and
21  talk?
22     A.   Typically I would treat, even with a
23  search warrant, I would treat it similarly --
24     Q.   Okay.
25     A.   -- without, before disclosing the fact

62

1   that I had a search warrant, I would ask for
2   permission.
3      Q.   So in situations where you didn't have a
4   search warrant, you would still do knock and
5   talks just to see what you could find out?
6      A.   Yes.
7      Q.   And when you mentioned that you thought
8   there was about a 75 percent effective rate for
9   the knock and talks would those be occasions
10  where you actually didn't have a search warrant
11  yet?
12     A.   Yes.
13     Q.   Did you ever conduct surveillance of a
14  home, just in terms of like literally staking it
15  out, sitting there and watching activities to see
16  who comes and goes, to gather information?
17     A.   Yes.
18     Q.   How often did you employ that technique
19  to determine whether or not someone was engaged
20  in a marijuana grow operation?
21     A.   I'm not sure I did that, in terms of
22  marijuana grow operations.  We would surveil a
23  house, maybe walk by, maybe walk up to it.
24     Q.   Okay.
25     A.   But as far as sitting there to see who

63

1   was coming and going, I don't think we did that
2   very often.
3      Q.   Okay.  What about talking to the
4   neighbors?  Is that something that you did to
5   determine if there was a grow operation?
6      A.   I tried that one time, and I don't --
7   didn't do that any more.
8      Q.   What happened?
9      A.   The neighbor was a retired Kansas City
10  firefighter and I gave him my card and he turned
11  around and gave it to his next-door neighbor.
12     Q.   So it tipped you off right away?
13     A.   Yeah; it wasn't very successful.
14     Q.   Okay.  When you did training for other
15  law enforcement agencies or even internally
16  within your own agency, did you train on the
17  effectiveness of the knock and talk techniques?
18     A.   I told them that was one of the
19  techniques we utilized.
20     Q.   And you recommended it as a technique
21  for them to use?
22     A.   I recommended it as a last resort, just
23  like we do; if we can't get in any other way just
24  ask.  Sometimes you get permission.
25     Q.   With respect to just taking a look at

64

1   the address that you were given, or surveilling
2   the home, did you sometimes notice alterations to
3   the house that were just visible to the eye that
4   made you suspect that there was potentially a
5   grow operation there?
6      A.   Sometimes.
7      Q.   What would be some of the things that
8   you would notice that would make you maybe think
9   that there was something suspicious going on?
10     A.   Basically a covering of windows.
11     Q.   I assume like a black-out or a curtained
12  window?
13     A.   Yes.
14     Q.   And why was that significant?
15     A.   Well, it's -- if you have a large amount
16  of lights in an indoor growing operation, and a
17  window at night where anybody can look in it,
18  it's not a good idea if you are a grower and you
19  don't want people to know what you are doing.
20          So we would frequently see those in
21  windows that you wouldn't typically expect to be
22  covered.
23     Q.   Covered, and that could be an indicator
24  that they are covering up a grow operation?
25     A.   It could be, yeah, it could be; not

August 25, 2015                                               Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

65

1    necessarily, but it could be.
2        Q.  And then we've already talked about how
3    you could visually maybe see a ventilation system
4    of some kind that they had installed?
5        A.  You really can't see the ventilation.  I
6    don't remember actually saying, "Hey, there's
7    ventilation."
8        Q.  Could you hear like fans running or
9    something like that, that would indicate that?
10       A.  Oh, yes.
11       Q.  And that would just be by getting close
12   to the house and listening?
13       A.  Yeah.
14       Q.  I saw in some of your training materials
15   the mentioning of utility records, so somebody
16   who is running a grow operation, those lights on
17   those plants are running 24/7?
18       A.  No.
19       Q.  How often are they lighting?
20       A.  It depends on the stage.
21       Q.  Okay.  Do you provide more light early
22   on or later in the growing process?
23       A.  You provide more light early on, and
24   decrease the amount of light later in the stage
25   and --

66

1        Q.  Is there a --
2            THE WITNESS:  Before you ask that,
3    I think now is a good time --
4            MR. SANKAR:  Yeah.  Do you want to
5    take a break?
6            THE WITNESS:  -- to see a man about
7    a horse.
8            MS. KINGSTON:  Absolutely.
9            THE VIDEOGRAPHER:  Off the record,
10   10:51.
11           (Brief recess taken.)
12           THE VIDEOGRAPHER:  We are back on
13   the record at 10:59.
14       Q.  (BY MS. KINGSTON)  We're back on the
15   record after a break, and we have been talking
16   about some of the ways that you conduct your
17   investigations to determine whether or not
18   someone is engaged in a grow operation.
19           You've mentioned the knock and talk
20   technique and you've described it as being one of
21   last resort, which kind of begs the question of
22   me, what are the first resort techniques then?
23       A.  We'll do surveillance of a residence, do
24   trash pulls.  Trash pulls seem to be one of our
25   most effective techniques.

67

1        Q.  Describe that technique for me.
2        A.  People place their trash at the curb,
3    and we come by and get it and look through it.
4        Q.  You take the whole bag back with you to
5    the station?
6        A.  More often than not.
7        Q.  Okay.  How many bags will you take out
8    of their trash container, if it's out on the
9    street?
10       A.  I would get it all.
11       Q.  You'd take it all.  Okay, and so you
12   literally then load it up, take it back to where?
13       A.  The nearest dumpster.
14       Q.  Okay, and you go through it there at the
15   dumpster then?
16       A.  Yeah, or a lot of it would depend on
17   weather conditions --
18       Q.  Sure.
19       A.  -- lighting, things like that, how much
20   was there.  Sometimes we'd take it back to Troop
21   A.  Sometimes we'd go to the nearest dumpster.
22   It just kind of depended.
23       Q.  And what are you looking for in the
24   trash?
25       A.  Remnants of an indoor grow.

68

1        Q.  And what would those remnants be, like
2    actually vegetation?
3        A.  It would be actual plant material, other
4    boxes of grow equipment, notes, used marijuana
5    cigarette, or partial marijuana cigarettes.
6        Q.  What about drug paraphernalia, like a
7    pipe or anything used to smoke it?
8        A.  I mean that's more indicative of use, as
9    opposed to -- I mean it helps but I'm looking
10   more for something to indicate that it's being
11   grown there, because even though they may be
12   using there, they may not be growing there.  They
13   may be growing at a different location.
14       Q.  And so if you just get indications in
15   the trash of marijuana or drug use, do you pass
16   those along to someone else, or do you still
17   follow up on those investigations or do you kind
18   of let it go?
19       A.  We'll still follow up.  It's not an
20   either/or thing.
21       Q.  And if you see plant material in the
22   trash, what do you do with it?
23       A.  Well, it depends on what state it's in,
24   I guess, as well.  If it's freshly groomed
25   material I guess you could say we would field

August 25, 2015                                              Sgt. James L. Wingo, Ret.

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

69

1    test it, and put it in evidence.
2        Q.   Okay, and so you actually, wherever
3    you're at, you bag it right then and take it back
4    to headquarters?
5        A.   Yeah, we photograph it, place it in
6    evidence.
7        Q.   Okay.  Do you conduct any testing on the
8    material?
9        A.   We do a preliminary field test.
10       Q.   Okay, and you do that actually wherever
11   you're at out in the field, or do you do that
12   with the sample once you get back to
13   headquarters?
14       A.   It could be either/or.
15       Q.   Did you have a practice that you used
16   more than another?
17       A.   No.
18       Q.   Okay, and what field test kits were you
19   using?
20       A.   Oh, we had two different ways.  We had
21   some little pouch thingies that you could put a
22   sample in, seal it, crush some vials that are
23   inside, shake them and observe the color change.
24       We also had a -- some that had a little
25   tray that you could put a little sample in and

70

1    then add a liquid to it and observe the chemical
2    change.
3        Q.   Do you know the name of the tray sample,
4    like what kind of test that was or who the
5    manufacturer was?
6        A.   No.
7        Q.   What did you call that particular kind
8    of test?
9        A.   Field test.
10       Q.   They were all field tests.  If you had
11   to distinguish between the field test where you
12   crushed the vials, and the field test with the
13   tray, did you have a way of distinguishing those?
14       A.   No.
15       Q.   Okay, and what tests were you using when
16   you said you would put them in a pouch and crush
17   the vial?
18       A.   Just the field test.
19       Q.   You don't know who manufactured that
20   test?
21       A.   No.
22       Q.   Who made the determination as to what
23   field test kits were ordered for the department
24   to use?
25       A.   I don't know.

71

1        Q.   With respect to the test, the field test
2    kit where you put it in the pouch, how would you
3    determine if it was a positive test result?
4        A.   I would observe the color change of the
5    liquid that was inside the vials.  Once you
6    crushed them, they interacted with the plant
7    material, and there would be a little color chart
8    on the sample -- on the field test kit itself,
9    and you would just look at the difference between
10   the positive color and whatever color that the
11   liquid happened to change to.
12       Q.   With respect to the field test kits that
13   you used what was the color that indicated a
14   positive result?
15       A.   I can't remember if it was an orange or
16   a purple.  I can't remember.
17       Q.   Do you recall the field test kits that
18   you used while you were with the Highway Patrol
19   offered the same ones every time, the color was
20   always either orange or purple, or did you use
21   kits that had different colors that indicated a
22   positive?
23       A.   I can't -- well, I want to say they were
24   kind of a purplish color.  I'm trying to
25   remember.  I did so many, I don't remember.

72

1        Q.   Sure.
2        A.   It's -- you know, the easiest thing to
3    do is just each time, just follow the sampling.
4        Q.   The directions you mean that were given
5    with the kit?
6        A.   Yeah, yes.
7        Q.   And the kits that you used to do field
8    tests, and I'm talking about the ones that are in
9    the pouch, was the testing determined by the
10   layering of the color change, or do you recall?
11       A.   I think you would have some layering
12   there.  Boy, I can't remember.  It seems like
13   there is some layering in there.  There even may
14   be some layering of the color on the sample
15   itself, on those.
16       Q.   And once again --
17       A.   I'd have to look at it.
18       Q.   -- the instruction sheet would tell you
19   the significance of the layering, if there was,
20   in the coloring?
21       A.   Yeah, it's on the pouch.  The directions
22   are on the pouch.
23       Q.   Do you know what the reagent was in the
24   test kits that you used?
25       A.   No.

August 25, 2015                                           Sgt. James L. Wingo, Ret.

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

**73**

1    Q.  Did you receive any training in using
2    field test kits while you were with the Highway
3    Patrol?
4       **A.  Other than showing how they are used,**
5    **which is again self-explanatory, that's -- I**
6    **don't remember any specific training, but I feel**
7    **confident that I could say I was shown, but I**
8    **couldn't tell you when or by whom or when that**
9    **was.**
10   Q.  During the time you've worked for the
11   Highway Patrol, how many field test kits do you
12   think you've actually used?
13      **A.  Hundreds.**
14   Q.  Hundreds, okay.  Do you feel comfortable
15   with your ability to read a positive result from
16   a field test kit?
17      **A.  If I follow the directions, it's pretty**
18   **self-explanatory.**
19   Q.  Did you have a practice of testing the
20   material with the field test kit more than one
21   time?
22      **A.  The same material?**
23   Q.  Right.
24      **A.  I can't specifically remember any event**
25   **where I did that.**

---

**74**

1    Q.  Do you have a practice of sending the
2    material to the crime lab for analysis?
3       **A.  Yes.**
4    Q.  And tell me about that practice.  How
5    does that work?
6       **A.  It's submitted into evidence, and we**
7    **fill out a lab analysis request.  It's done**
8    **electronically.  It goes on to our evidence**
9    **officer.  He takes it to Jeff City for analysis**
10   **and brings it back.**
11   Q.  Are you having the crime lab review
12   materials that come back positive on a field test
13   or also ones that come back negative on a field
14   test?
15      **A.  In regards to like some powders, you**
16   **could get a weak, something that would seem like**
17   **it was a weak positive, so we would send those**
18   **down.**
19   Q.  Okay.
20      **A.  But typically, if I didn't get a**
21   **positive field test, I wouldn't send it down.**
22   Q.  So either a positive or a weak positive,
23   you would send those to the crime lab?
24      **A.  Yes.**
25   Q.  And was that a matter of routine?

---

**75**

1       **A.  For me it was.**
2    Q.  Do you know if it was something that was
3    taught to you as the policy or the procedure for
4    the Missouri Highway Patrol?
5       **A.  No.**
6    Q.  To your knowledge did other officers do
7    the same thing that you did?
8       **A.  I don't know.**
9    Q.  And why was that your practice, to send
10   it to the crime lab?
11      **A.  Before we would file charges, official**
12   **charges, we would have those lab results ready**
13   **and present them to the Prosecutor before we**
14   **would actually charge somebody.**
15   Q.  Okay, and you got those lab results
16   before you would approach a judge to get a search
17   warrant signed off on?
18      **A.  No.**
19   Q.  Okay.  What was the process then?
20      MR. SANKAR:  For a search warrant
21   or for the --
22   Q.  (BY MS. KINGSTON)  Yeah, before you went
23   to get a search warrant from a judge, would you
24   have the crime lab test results back?
25      **A.  No.**

---

**76**

1    Q.  And when you say no, you would get the
2    search warrants before you got the crime lab
3    results?
4       **A.  Yes, ma'am.**
5    Q.  And was that a matter of always you did
6    it that way or --
7       **A.  Yes, ma'am.**
8    Q.  Okay.  I misunderstood that earlier
9    because I thought you said the reason that you
10   sent it to the crime lab is so you could have
11   that information to go get the search warrant.
12      **A.  No; before we can file charges.**
13   Q.  Oh, before you file charges.  I'm sorry,
14   I misunderstood.
15      **A.  Yeah.**
16   Q.  There were times that you did
17   investigations where you got those crime lab
18   results before you obtained a search warrant,
19   correct?
20      **A.  No.**
21   Q.  How long did it take for the crime lab
22   to get the results back to you after they had
23   been requested, do you know?  It doesn't sound
24   like you were the one doing the request but --
25      **A.  Anywhere from six months to a year.**

---

August 25, 2015                                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

137

1    house that is referred to here.
2        Q.  Regardless of whether or not the
3    affidavit was actually presented to a judge, do
4    you have any reason to believe that the
5    information that you have reported in this
6    affidavit is not accurate?
7        A.  No.
8        Q.  It should be accurate?
9        A.  That's accurate.
10       Q.  And that's what I wanted to know.  With
11   respect to your credentials that are indicated in
12   the first paragraph of the affidavit, is that
13   information accurate?
14       A.  Yes.
15       Q.  Okay, and this was back in April of 2011
16   that you made those representations, correct?
17       A.  Yes.
18       Q.  So I'm assuming between 2011 and when
19   you retired in 2014 that you probably
20   participated in additional investigation,
21   correct?
22       A.  Yes, ma'am.
23       Q.  So that number would go even higher than
24   500, correct?
25       A.  Yes, ma'am.

138

1        Q.  And would the number of hours of
2    training you have had since 2011 have increased?
3        A.  Yes, ma'am.
4        Q.  Okay.  In Paragraph B you've talked
5    about the cost of some of the specialized items
6    used in an indoor grow operation, correct?
7        A.  Yes, ma'am.
8        Q.  And we've talked about how oftentimes
9    the amount of money that people are spending at
10   the store can be an indicator that they are
11   actually growing marijuana, correct?
12       A.  Yes, ma'am.
13       Q.  All right.  What in this case made you
14   want to follow the individual after the purchase
15   was made at the garden store, versus just
16   recording plate information and the other things
17   you did?
18       A.  Well, it was the second time that he had
19   been there, and I think we had air support for
20   the surveillance we were doing, and so we
21   thought:  "Well, we'll just see where he goes."
22       Q.  Tell me about the aerial surveillance
23   that you would have had.
24       A.  It's an airplane.
25       Q.  Who's plane is it?

139

1        A.  The Highway Patrol's.
2        Q.  And how often is that available to you
3    for searches?
4        A.  On these --
5            MR. SANKAR:  Do you mean
6    surveillance?
7        Q.  (BY MS. KINGSTON)  Surveillance, sorry.
8    Thank you.
9        A.  Yeah.  On occasion when we're doing an
10   operation we would frequently have aerial
11   surveillance available.
12       Q.  When would you make a decision to call
13   in aerial surveillance?
14       A.  Actually it wasn't my -- whenever he was
15   available we would, and we were having an
16   operation, we would use him.
17       Q.  When you say "him" who are you referring
18   to?
19       A.  Our Pilate.
20       Q.  Do you know his name?
21       A.  Bruce Johnson.
22       Q.  Okay, and what would you use him to do,
23   just follow the vehicle?
24       A.  Yeah, yes, ma'am.
25       Q.  Anything else?

140

1        A.  No, ma'am.
2        Q.  So if you lost him on the road you could
3    have the Pilate help you re-find the car?
4        A.  Well, we would use him as the primary
5    person and we would --
6        Q.  You would just show up then wherever the
7    car had stopped?
8        A.  Sometimes.
9        Q.  Sorry, I didn't mean to interrupt you.
10       A.  Sometimes we would, sometimes we would
11   just back off.
12       Q.  Okay, and in this particular instance,
13   it looks like Patrolman Scott went to the
14   residence and spoke to the owner, and under the
15   auspices of telling him that he was looking for a
16   lost dog?
17       A.  Yes, ma'am.
18       Q.  Is that a technique you sometimes use?
19   You don't tell them really what you're looking
20   for?  You're hoping just to get a visual inside
21   the house or an odor, like you did in this case
22   with marijuana?
23       A.  Well, and that's the point of it is --
24   it's a technique I developed, is making up a
25   flyer for a lost dog and going through the

August 25, 2015                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

141

1   neighborhood passing it out, and if we can get
2   the residence we're looking at to have somebody
3   come and open the door, quite frequently if they
4   have an indoor grow you can smell it, and that's
5   just a technique we use.
6       Q.  Okay, and you developed the dog search
7   cover story; is that correct?
8       A.  I did.
9       Q.  And where did you get that from?
10      A.  I just made it up.
11      Q.  You made it up, okay, and how effective
12  was that?  It was in this case apparently?
13      A.  It's very effective --
14      Q.  Okay.
15      A.  -- because we don't look like police
16  officers, and we're not trying to arouse
17  suspicion; just trying to get an odor whiff.
18      Q.  With respect to the search of the Harte
19  family home is there any reason that an officer
20  could not have gone up and used that same
21  technique prior to searching the home?
22          MR. SANKAR:  Sorry.
23      Q.  (BY MS. KINGSTON) Any reason that
24  you're aware of?
25          MR. SANKAR:  My objection is it

---

142

1   calls for Mr. Wingo to give an opinion on another
2   investigation of which he did not participate in,
3   nor did he participate in the search of the home.
4   He has not been designated here as an expert to
5   give any such opinion.
6           MR. FERREE:  Calls for speculation
7   and conjecture.  I join the objection.
8       Q.  (BY MS. KINGSTON) You may go ahead and
9   answer if you remember the question.  If not --
10      A.  I do like the speculation and conjecture
11  thing, because I have no idea what could or could
12  not have been done.
13      Q.  Do you have any reason sitting here
14  today to believe that they couldn't have gone up
15  and done that?
16          MR. FERREE:  Same objection.
17          MR. SANKAR:  Same objection.
18      A.  I don't know.  I have no idea.
19      Q.  (BY MS. KINGSTON) And my question is a
20  little different.  I'm not asking you what they
21  could or couldn't have done.  I'm asking you
22  whether you have any facts or knowledge as to a
23  reason they could not have done that?
24          MR. FERREE:  Same objections.
25          MR. SANKAR:  Same objection.

---

143

1       A.  I have no facts or knowledge about
2   anything.
3       Q.  (BY MS. KINGSTON) All right.  Let's
4   talk a little bit about Operation Constant
5   Gardener.  When did the Missouri Highway Patrol
6   start participating in that operation?
7       A.  It's an operation that I came up with to
8   be done on April 20th of 2011.
9       Q.  Okay.  So you developed the Operation
10  Constant Gardener?
11      A.  Yes, ma'am.
12      Q.  Okay, and when did you develop it?
13      A.  I think I started toying with the idea
14  somewhere in the Fall of 2010, about then.
15      Q.  Okay, and is there something that
16  happened that brought the idea to your attention?
17      A.  No single thing.
18      Q.  Okay.  What were some of the different
19  factors that led to you formulating that idea?
20      A.  Well, I had hundreds of people that were
21  coming in to the store from Wichita, Kansas, to
22  Leavenworth, Kansas, to Columbia, Missouri, to
23  Springfield, Missouri, to near the Iowa line,
24  from many, many different jurisdictions, and
25  those I had accumulated over three years of

---

144

1   surveillance at the hydroponic store.
2       So an operation targeting indoor
3   marijuana growers on April 20th as far as I knew
4   had never been done before, so I wanted these
5   individuals to be looked at to either say they
6   are not marijuana growers or they are marijuana
7   growers, and either way, I felt that these other
8   jurisdictions should look at them so --
9       Q.  How many tips did you have at this
10  point?
11      A.  Several hundred.
12      Q.  Okay.
13      A.  So I communicated that information, to
14  different jurisdictions, and asked if they would
15  be interested in participating in this operation
16  to be done on April 20th, 2011, and either
17  develop information that there's an indoor grow
18  going there, or at least knock on the door and
19  see if you can determine by a knock and talk
20  whether or not they are indoor marijuana growers
21  or outdoor marijuana growers or not, and so
22  that's what I did.
23      Q.  Okay.  Why did you decide to use
24  April 20th as the date?
25      A.  Because that is the big nationwide

---

August 25, 2015                                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

145

1    celebration date for people that use marijuana.
2    It's like their Christmas Day.
3         Q.  Okay.  When did that Operation Constant
4    Gardener first start?
5         A.  April 20th, 2011.
6         Q.  Okay, and was it an operation that was
7    in existence on April 20th of 2012?
8         A.  Not for me.
9         Q.  Do you know if it was in existence for
10   any other law enforcement agencies?
11        A.  If any other agencies called it that,
12   that was my operation, and I did it in 2011.
13   What anybody else did after that, that's their
14   own deal, but --
15        Q.  I think my question was did you have
16   knowledge that other law enforcement agencies
17   were participating.
18        A.  I had knowledge that other agencies were
19   going to try and seize indoor marijuana grow
20   operations on April -- beyond April 20th, 2011,
21   yes.
22        Q.  And those agencies were sometimes
23   seeking your expertise in the operation, in
24   executing the operation, correct?
25             MR. SANKAR:  Note my objection to

---

146

1    form.  You can answer.
2             I'm sorry, I'm objecting to the term
3    "expertise" but you can go ahead.
4         A.  I'm sorry I just wanted -- could you ask
5    it again?
6             MR. SANKAR:  I'm sorry.
7         Q.  (BY MS. KINGSTON)  Sure, other law
8    enforcement agencies were contacting you to get
9    knowledge and information about how to conduct
10   the operation for themselves, correct?
11        A.  No.
12        Q.  Okay.  You're saying that nobody was
13   contacting you to ask questions about your
14   Operation Constant Gardener?
15        A.  They were wanting to know if I had
16   information about people coming to the store, but
17   not how to conduct the operation.
18        Q.  Okay.  You're saying nobody made any
19   contact with you to ask you any questions about
20   how you conducted Operation Constant Gardener in
21   April of 2011?
22        A.  How I conducted it?
23        Q.  Any questions about the operation.
24   You're saying nobody contacted you?
25        A.  In 2011?

---

147

1         Q.  No.  Any time after April 20th, 2011 are
2    you telling me that no law enforcement agency, no
3    member of any law enforcement agency ever
4    contacted you to get information about your 2011
5    Constant Gardener Operation?
6             MR. SANKAR:  Note my objection to
7    the question as vague.
8         A.  I'm thinking if they were participating
9    in it, then I don't think any agency that did not
10   participate in it had any questions about it.
11        Q.  (BY MS. KINGSTON)  How many --
12        A.  I believe if somebody, another agency
13   asked me about it, it may have been somebody that
14   participated.  I don't --
15        Q.  And I'm not narrowing my question to
16   just who operated before and who didn't, but
17   people were contacting you as a point of
18   reference about the operation, correct?
19        A.  It would be other agencies involved.
20        Q.  Sure.
21        A.  So --
22        Q.  But it's your operation?
23        A.  Yeah.
24        Q.  And they are contacting you, correct?
25        A.  Yes.

---

148

1         Q.  You are the point of reference for the
2    operation?
3         A.  Yes, ma'am.
4         Q.  Okay, that's what I'm trying to figure
5    out.  You did not run it in 2012 for the State
6    Highway Patrol, correct?
7         A.  I didn't run it for anybody.
8         Q.  Okay, fair enough.  Why not?
9         A.  Because I didn't have enough names.
10        Q.  Okay.  Had you been doing approximately
11   three days a week of surveillance at gardening
12   stores after April 20th of 2011?
13        A.  Yes.
14        Q.  And did you continue to do that up
15   through April 20th of 2012?
16        A.  Yes.
17        Q.  And you're saying for that year period
18   of time you didn't have enough potential suspects
19   to warrant doing the operation in the State of
20   Missouri; is that correct?
21        A.  Correct.
22        Q.  What was the statistical decrease
23   between April 20th of 2011 and April 20th of
24   2012, in the number of suspects that you had?
25        A.  I don't know.  It was significant.  It

---

August 25, 2015                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

149

1    was pretty significant.  I couldn't give you the
2    volume, but there was quite a bit.
3        Q.  Did you keep track?
4        A.  I did, but I couldn't tell you what it
5    was.
6        Q.  How did you keep track of those numbers?
7    Like was it on a computer system?
8        A.  I would do exactly as we had done
9    before, is I would put the people that went to
10   the store, and we talked about the spreadsheet
11   and everything, would do that exactly the same,
12   but the numbers were significantly lower from
13   after April 20th, 2011.
14       Q.  And you attribute that you told me
15   before to the success of your April 20th, 2011
16   operation?
17       A.  As far as I could tell, that's what it
18   was.
19       Q.  Did that operation get media attention?
20       A.  Yes, ma'am.
21       Q.  Okay.  Did you seek media attention for
22   that operation?
23       A.  Yes, ma'am.
24       Q.  Okay, and why did you do that?
25       A.  Well, it's -- it was a very big

---

150

1    operation.  Nobody had ever done that.  I had 20
2    some odd different law enforcement agencies on
3    one day seeking out indoor marijuana grow
4    operations.
5            As far as I knew, in this area, it had
6    never been done before.
7        Q.  Okay.
8        A.  And I knew it was going to be
9    successful, I knew we were going to get a lot of
10   indoor grows, and the Highway Patrol likes
11   positive public publicity.
12       Q.  And that's what I'm saying, it was good
13   publicity for the department --
14       A.  Yes, ma'am.
15       Q.  -- and that's a good thing, correct?
16   I'm sorry did you say yes?  I just didn't hear
17   you.
18       A.  Oh, I thought you were correcting
19   yourself.
20       Q.  No, I was just confirming.
21       A.  Yes.
22       Q.  All right.  I know you don't have
23   statistics in front of you, but what's your best
24   estimate of the percentage of decrease between
25   2011 and 2012 in terms of your spreadsheet?

---

151

1        A.  In terms of customers?
2        Q.  Yeah.  Are we talking like over a 50
3    percent drop or more than that?
4        A.  There were days when we would see maybe
5    one or two customers in a three or four-hour
6    period.
7        Q.  And I don't know how that compared to
8    prior year.
9        A.  Quite a bit less.
10       Q.  How many would you have on a day in a
11   prior year?
12       A.  A lot of times it would depend.
13   Sometimes they would have more than 20 a day.
14       Q.  Okay.  So it sounds like it's more than
15   a 50 percent decrease, based on those numbers
16   anyway?
17       A.  I would say that.
18       Q.  Do you think it would be fair to say it
19   was over 50 percent?
20       A.  Yes.
21       Q.  Okay.  So when you were seeing shoppers
22   between 2011 and 2012 you were entering that
23   information in your spreadsheet?
24       A.  Yes, ma'am.
25       Q.  And what was your practice with regards

---

152

1    to submitting that information to the
2    jurisdictions where the resident who was shopping
3    at the store was?
4        A.  It would vary depending on what they
5    bought and where they were.  Sometimes they would
6    do nothing.  Sometimes I would contact an agency.
7    Sometimes they would just keep it because you
8    never know when somebody would begin an
9    investigation on a possible indoor grow, and they
10   would call me up and say, "Hey, do you have any
11   information about so-and-so?  Has he been to the
12   store?"
13       Q.  Okay.
14       A.  And I would check, and if I had seen I
15   him I would let him know.  If I hadn't, I would
16   let him know.
17       Q.  Okay.  So with respect to April 20th,
18   2012 were you aware that another agencies that
19   had participated in Operation Constant Gardener
20   in 2011 were going to do the operation on their
21   own in 2012?
22       A.  I knew they were going to go out and
23   look for some indoor grows on April 20th, 2012,
24   yes, ma'am.
25       Q.  All right, and because you knew that,

---

August 25, 2015                                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

157

1  14, and ask you if you recognize this exhibit.
2  **A.  It looks like part of the spreadsheet.**
3  Q.  Okay, and I will represent to you that
4  the information on the spreadsheet is not -- it's
5  been redacted, meaning of some of it has been
6  marked through.
7  **A.  That's what I'm --**
8  Q.  The only one that's left is the one
9  that's relevant to this particular case regarding
10  the Hartes.
11      So this is the spreadsheet that you
12  would send out to Johnson County Sheriff's Office
13  would look like, correct?
14  **A.  Yes.**
15  Q.  It would have name, date, address,
16  vehicle, purchase, and subject information
17  headings?
18  **A.  Yes, ma'am.**
19  Q.  And in this case the name that was
20  listed is the name of the person who the car is
21  registered to, or the name of the person who
22  actually went to the hydroponics store?
23  **A.  That would be who the car was registered**
24  **to.**
25  Q.  Okay, and you have the date which in

158

1  this case for the Hartes is August 9th of 2011,
2  correct?
3  **A.  Yes, ma'am.**
4  Q.  Does the 2:15 reflect the time of day?
5  **A.  Yes, ma'am.**
6  Q.  And the address is listed as the address
7  for the owner of the vehicle; is that correct?
8  **A.  Yes, ma'am.**
9  Q.  All right.  And then a description of
10  the vehicle and the license number, correct?
11  **A.  Yes, ma'am.**
12  Q.  And then you do is that a description of
13  the purchase?
14  **A.  Yes.**
15  Q.  So in this case it just says "small
16  bag"?
17  **A.  Yes.**
18  Q.  And you don't have any information as to
19  what was in that bag, correct?
20  **A.  No, ma'am.**
21  Q.  All right, and then tell me what you've
22  written with respect to suspect info.
23  **A.  A white male with kids.**
24  Q.  Okay, and you know it's more than one
25  kid because it's plural.

159

1  **A.  Yes, ma'am.**
2  Q.  Is that the most descriptive as you
3  would ever get in terms of identifying children,
4  just say kids?  You didn't ever describe the kids
5  in more detail or their ages or anything?
6  **A.  No, I don't think so.**
7  Q.  Usually it would -- and this doesn't
8  have anything about the age of the white male,
9  correct?
10  **A.  That's correct.**
11  Q.  It doesn't have any physical description
12  of the white male?
13  **A.  That's correct.**
14  Q.  Would that information typically be in
15  the suspect sheet, or no, would you just put the
16  race and sex?
17  **A.  Well, and this is all the information I**
18  **had because it was a guy and the tags ran back to**
19  **a gal, so it could be anybody.  I don't know.**
20      **It was just he was a white guy with**
21  **kids.  That's the only information I had.**
22  Q.  And I think my question was more geared,
23  you'd said earlier that when you were taking
24  notes about buyers who went into the store that
25  you would note the physical description.

160

1      Age would be one of the things that you
2  would note.  Did you typically put that in your
3  spreadsheet?
4  **A.  Sometimes.**
5  Q.  Okay.  In this case you didn't?
6  **A.  That's correct.**
7  Q.  Okay.  Are there times that you thought
8  it was more relevant to put into the spreadsheet
9  than others?
10  **A.  There's no rhyme -- I don't know.  They**
11  **just -- if I had a bigger descriptor, I probably**
12  **would.  Sometimes I do; sometimes I don't.**
13  Q.  Do you recall how many other names were
14  on the Johnson County list that you gave in
15  March of 2012?
16  **A.  I don't.  I don't know how many I had on**
17  **there.**
18  Q.  Do you recall it just being information
19  on one sheet versus multiple pages of
20  information?
21  **A.  I really don't remember.**
22  Q.  Okay, and in the e-mail that we marked
23  as Exhibit 13, that previous e-mail, if you could
24  go back to that --
25  **A.  Yes, ma'am.**

August 25, 2015                                              Sgt. James L. Wingo, Ret.

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

161

1   Q.  -- Sergeant Reddin let you know when he
2   wrote back that they were doing an operation on
3   4/20, correct?
4   **A.  Yes, ma'am.**
5   Q.  And he described it as a smaller
6   operation; is that correct?
7   **A.  Yes.**
8   Q.  And then you wrote back and said, "I
9   think we will, too."
10  **A.  Yes, ma'am.**
11  Q.  Do you mean you were going to conduct a
12  small operation, as well?
13  **A.  I mean we were going to go knock on a**
14  **few doors.**
15  Q.  Okay.  Did you do that?
16  **A.  Yes, ma'am.**
17  Q.  But you did not consider that to be
18  Operation Constant Gardener for 2012?
19  **A.  No, ma'am.**
20  Q.  Okay, and then you let Sergeant Reddin
21  know that Shawnee had asked about April 20th, as
22  well, correct?
23  **A.  Yes.**
24  Q.  And what did you mean when you say, "I
25  think we've only had one from there, so if you

---

162

1   could let them know, I would appreciate it"?
2   **A.  That meant only one customer who had**
3   **been from Shawnee.**
4   Q.  And they were asking you to pass that
5   tip along to the Shawnee Department?
6   **A.  Yes, ma'am.**
7   Q.  Do you know if he did that?
8   **A.  I have no idea.**
9   Q.  Was there a Constant Operation Gardener
10  initiative in 2013?
11  **A.  Not for me.**
12  Q.  Was there one for the Highway Patrol in
13  2014?
14  **A.  Not for me.**
15  Q.  Okay, and do you know if there was one
16  for 2015?
17  **A.  Not that I'm aware of.**
18  Q.  Okay.  Did the Highway Patrol do some
19  searches on April 20th of 2013 on a smaller scale
20  than the full scale?
21  MS. PILATE:  You mean 2012.
22  Q.  (BY MS. KINGSTON)  I'm sorry, no,
23  actually I did mean 2013, after the 2012 -- I've
24  already asked you about 2012.  I'm asking you
25  whether or not there was any searches conducted

---

163

1   on April 20th of 2013.
2   MR. SANKAR:  Note my objection.  I
3   think that mischaracterizes what he's saying
4   about whether or not they did an operation on
5   2012.  Can you answer the question?  Do you need
6   it read back to you?  Can we have that question
7   read back?
8   (Whereupon, the previous question was read by the
9   reporter as follows:
10  "QUESTION:  I'm asking you whether
11  or not there was any searches conducted on
12  April 20th of 2013.")
13  **A.  In 2013, I don't think we did anything**
14  **in 2013, that I can think of.  I don't think so.**
15  Q.  (BY MS. KINGSTON)  What we know so far
16  is you did the full scale operation in 2011,
17  correct?
18  **A.  Yes.**
19  Q.  You did some smaller operation in 2012?
20  **A.  We just went to one house and knocked on**
21  **the door.**
22  Q.  Okay.  Well, in your e-mail you
23  described it, you think that you'll do a small
24  operation, too, and it turned out to be really
25  small.  You did one search, or one knock and

---

164

1   talk.
2   **A.  Yes.**
3   MR. SANKAR:  Again, note my
4   objection.  I think that mischaracterizes his
5   testimony.  You can answer.
6   **A.  Yeah, we went and knocked on one door on**
7   **April 20th of 2012.**
8   Q.  (BY MS. KINGSTON)  Did you have a search
9   warrant?
10  **A.  No.**
11  Q.  Was it a knock and talk?
12  **A.  Yes.**
13  Q.  Did you get entry?
14  **A.  Yes.**
15  Q.  Did you find anything?
16  **A.  Yes.**
17  Q.  Did you publicize what you found?
18  **A.  No.**
19  Q.  Any media attention at all from any
20  media searches that the Highway Patrol conducted
21  for narcotics in April of 2012?
22  **A.  No.**
23  Q.  And as far as you know, no searches or
24  knock and talks done on April 20th, 2013, that
25  would be considered to be some kind of Operation

---

August 25, 2015                                        Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

165

1    Constant Gardener operation?
2       A.   I don't think we did anything on that
3    date.
4       Q.   Anything in 2014 on April 20th?
5       A.   No.
6       Q.   Okay.  So to your knowledge Operation
7    Constant Gardener for the State of Missouri
8    occurred one time and that was April 20th of
9    2012?
10      A.   Yes, ma'am.
11      Q.   Or excuse me, April 20th of 2011?
12      A.   2011.
13      Q.   Right.  I didn't mean to misstate that.
14      A.   I'm so confused.
15      Q.   Do you know of any law enforcement
16   agencies that made you aware that they were
17   conducting some kind of narcotics operation on
18   April 20th of 2013?
19      A.   None that I can think of.
20          (Exhibit 15 was marked by the
21   reporter for identification.)
22      Q.   (BY MS. KINGSTON)  Okay.  Let me hand
23   you what we're marking as Exhibit 15.  Have you
24   seen this document before?
25      A.   Yes.

166

1       Q.   What is this document?
2       A.   This is the press release that was sent
3    out after our operation on April 20th of 2011.
4       Q.   Did you prepare the release?
5       A.   No.
6       Q.   Did you provide information that went
7    into the release?
8       A.   Yes, ma'am.
9       Q.   Okay, and who did you provide that to?
10      A.   Sergeant Collins Stosberg.
11      Q.   And what is his job with the Highway
12   Patrol?
13      A.   He's a public information officer.
14      Q.   All right.  And were you keeping him
15   updated on the results of your Operation Constant
16   Gardener?
17      A.   Yes, ma'am.
18      Q.   Okay.  With respect to the agencies that
19   are involved in the operation that are listed at
20   the bottom of the first page, and going on to the
21   second page, to your knowledge is that a list of
22   all of the agencies that participated in
23   Operation Constant Gardener in 2011?
24      A.   Well, I would feel really bad if I left
25   somebody out.

167

1       Q.   You attempted to make sure it was an
2    exhaustive list?
3       A.   Yes, ma'am.
4       Q.   And it's described in the document as
5    being approximately 30 law enforcement agencies.
6    Does that sound right?  That paragraph begins,
7    "On April 20th of 2011..."
8       A.   Yes.
9       Q.   And the Johnson County was one of the
10   agencies that participated, correct?
11      A.   Johnson County, Kansas, yes, ma'am.
12      Q.   Okay, and since this is your Operation
13   Constant Gardener Program, your idea, would it be
14   fair to say that the Missouri Highway Patrol is
15   the one that introduced the operation to these
16   law enforcement agencies?
17      A.   Yes, ma'am.
18      Q.   And that would include introducing it to
19   the Johnson County Sheriff's Office, correct?
20      A.   Yes, ma'am.
21      Q.   And have you personally on behalf of the
22   Missouri Highway Patrol provided training
23   regarding indoor marijuana grow operations to
24   Johnson County law enforcement officers?
25      A.   Yes, ma'am.

168

1       Q.   And how many times have you done that?
2       A.   Once.  Well, I did one for the
3    Prosecutor's Office.
4       Q.   So you've done it twice?
5       A.   Yes, ma'am.
6       Q.   Once for the law enforcement officers
7    and then again for the prosecutors?
8       A.   Yes, ma'am.
9       Q.   Okay, and do you recall the date that
10   you conducted the training for the law
11   enforcement officers?
12      A.   It was somewhere in the Summer of 2011.
13      Q.   Okay, and did you bring -- did you
14   prepare training material for that training
15   session?
16      A.   In -- I did a PowerPoint presentation.
17      Q.   Okay, and you prepared that PowerPoint
18   presentation?
19      A.   Yes.
20          (Exhibit 16 was marked by the
21   reporter for identification.)
22      Q.   (BY MS. KINGSTON)  Okay.  I'm going to
23   hand you what we're marking Exhibit 16 and ask
24   you if you recognize this document?
25      A.   Yes, I do.

August 25, 2015                                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

169

1    Q.  And did you write this letter?
2    A.  Yes, ma'am.
3    Q.  You are the one that was the author of
4    the letter, in terms of who signed it at the
5    bottom?
6    A.  Yes, ma'am.
7    Q.  And I know there's no date that appears
8    on the cover letter, correct?
9    A.  Correct.
10   Q.  But you're talking about something
11   that's going to occur, a briefing that you're
12   going to hold on April 4th of 2011, correct?
13   A.  Yes, ma'am.
14   Q.  So it is fair to say that this letter
15   was prepared sometime before April 4th of 2011?
16   A.  Yes, ma'am.
17   Q.  Do you know what date it was prepared?
18   A.  I don't know the date.
19   Q.  If we look on the second page of this
20   exhibit there's an e-mail, and I know that you're
21   not one of the individuals, or actually is that
22   your e-mail address for Jim?
23   A.  Yes, ma'am.
24   Q.  So you are actually a recipient.  Are
25   you the one that sent this e-mail to Nate Denton

---

170

1    at the Johnson County Sheriff's Office on
2    March 11th of 2011, correct?
3    A.  Yes, ma'am.
4    Q.  And it's regarding the subject Operation
5    Constant Gardener, yes?
6    A.  Yes, ma'am.
7    Q.  And the attachment that you're sending
8    them is the front page of Exhibit 16, right?
9    A.  I think so.
10   Q.  Okay, and you're asking Nate to make
11   sure that Mark gets this out to everybody.  Which
12   Mark are you referring to?
13   A.  Maybe Mark Burns.
14   Q.  Okay, and this is your invitation for
15   the Johnson County Sheriff's Office to be part of
16   Operation Constant Gardener, correct?
17   A.  Yes, ma'am.
18   Q.  And you sent these out to a number of
19   law enforcement agencies?
20   A.  Yes, ma'am.
21   Q.  Okay.  Since I understand lunch is here,
22   why don't we take a break and have something to
23   eat.
24   A.  For the record, I'm for that.
25       THE VIDEOGRAPHER:  Off the record

---

171

1    1334.
2       (Noon Recess)
3    Q.  (BY MS. KINGSTON)  We're back on the
4    record after a lunch break, and I put back in
5    front of you Exhibit 14, because I wanted to ask
6    you a few questions about the surveillance that
7    you had.
8       MR. FERREE:  Back on at what time?
9       THE VIDEOGRAPHER:  At 1459.
10   Q.  (BY MS. KINGSTON)  You've noted that on
11   August 9th of 2011 was the date that a vehicle
12   registered to Mrs. Harte went to the Green
13   Circle, correct --
14   A.  Yes.
15   Q.  -- and just so the record is clear the
16   Green Circle location that that vehicle was at
17   was which one?
18   A.  Well, it's on like 12 East Missouri, I
19   think is the address.
20   Q.  The one in the River Market?
21   A.  Yes, ma'am.
22   Q.  Okay, and with respect to the vehicle
23   that's identified in that exhibit, did you follow
24   that vehicle when it left the Green Circle Store?
25   A.  No, ma'am.

---

172

1    Q.  Okay, and did you have any further
2    surveillance of what we now know as being
3    Mr. Harte or his children with respect to any
4    time after the August 9th date?
5    A.  No, ma'am.
6    Q.  What efforts, if any, did you make to
7    determine what Mr. Harte had purchased from the
8    Green Circle?
9    A.  I tried to see through the bag he was
10   carrying.
11   Q.  And can you describe the bag for me?
12   A.  It was a little plastic bag.
13   Q.  What color was the plastic?
14   A.  It was white.
15   Q.  And would you describe the bag as being
16   see-through?
17   A.  It wasn't clear, but it was opaque, and
18   sometimes I can see what it is that they get, if
19   it's the right item.
20   Q.  And how did you try to see what was
21   inside?
22   A.  With my binoculars.
23   Q.  Okay, so you sat in your car and used a
24   pair of binoculars to try to see?
25   A.  Yes.

---

August 25, 2015                                         Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

173

1    Q.  And you weren't able to determine what
2  was in the bag; is that correct?
3    A.  No, ma'am.
4    Q.  When you said you described the bag as a
5  small bag, can you give me the measurements of
6  the bag?
7    A.  Like a small Wal-Mart bag, maybe a
8  little smaller, I don't remember exactly, but it
9  was small, similar to like a Wal-Mart bag.
10    Q.  Okay.  When you're talking about a
11  Wal-Mart bag, are you talking about one of the
12  plastic bags?
13    A.  Yes, ma'am.
14    Q.  And it had handles, the Wal-Mart plastic
15  bag?
16    A.  I don't -- it may have had handles.  I
17  don't remember.
18    Q.  Did you make any search to see whether
19  or not that particular license plate number had
20  appeared at any of your other searches while you
21  were at the Green Circle or any other hydroponic
22  store?
23    A.  Yes, and I can -- as I'm entering, I
24  have an auto-fill feature, so if they had been in
25  before, something in that block had been entered

---

174

1  before, it would start to fill in, and I would
2  know that it was something, and plus, it's
3  alphabetized.
4    Q.  Did you get any other hits for that
5  license number?
6    A.  No.
7    Q.  So according to your surveillance
8  records you only showed one time that that
9  vehicle had been at the store, correct?
10    A.  That's correct.
11    Q.  All right.  And what, if any, efforts
12  did you take to learn about how many times Mr. or
13  Mrs. Harte had shopped at the Green Circle, or
14  any other hydroponics store?
15    A.  I may have just answered that.  When I
16  go to enter the information in the spreadsheet, I
17  have an auto fill feature, and if I have entered
18  that information before, it will start to fill
19  in, I'll know that.  Also it's alphabetized, so I
20  would see the name in there prior.
21        (Exhibit 17 was marked by the
22  reporter for identification.)
23    Q.  (BY MS. KINGSTON)  Okay.  All right, I'm
24  going to hand you what we're marking as Exhibit
25  17 and do you recognize this e-mail exchange?

---

175

1    A.  Yes, ma'am.
2    Q.  And this is an e-mail exchange between
3  you and Tom Reddin who's with the Johnson County
4  Sheriff's Department, correct?
5    A.  Yes, ma'am.
6    Q.  And it appears to me that Sgt. Reddin
7  e-mailed you on August 19th of 2011 and the
8  subject is the Green Circle; do you see that?
9    A.  Yes, ma'am.
10    Q.  And he says, "Jim, how is it going?
11  Haven't heard from you in awhile.  How is
12  business looking at the Green Circle and the St.
13  John's store?  My guys are starting to have
14  withdrawals.  Is it worth taking a day or two
15  soon and sitting up there," and he signs it
16  "Tom," and can you read your response into the
17  record?
18    A.  "Yeah, starting to get busy up there.
19  We've had several new Johnson County-ers in.  Get
20  with me next week and I'll get you the info."
21    Q.  Okay, and when you say you've had
22  several new Johnson County-ers in, you are
23  talking about at the Green Circle, correct?
24    A.  Yes, ma'am.
25    Q.  And you're telling Mr. Reddin that the

---

176

1  store is starting to get busy, correct?
2    A.  Yes, ma'am.
3    Q.  And was that the truth?
4    A.  Yeah; I wouldn't lie about that.
5    Q.  And did you in August of 2011 pass along
6  to Mr. Reddin or anyone else with the Johnson
7  County Sheriff's Office the list of new Johnson
8  County-ers that had been shopping at the store?
9    A.  Not that I remember.
10    Q.  And why didn't you do that?
11    A.  Well, my guess is he didn't get back
12  with me.
13    Q.  Who didn't get back with you?
14    A.  Tom Reddin.
15    Q.  Do you know that for sure?
16    A.  I don't.  I don't know why.
17    Q.  Is there a reason that he would have to
18  get back with you before you would give him the
19  names of the shoppers?
20    A.  Yes, ma'am.
21    Q.  Why is that?
22    A.  Well, I'm not going to give it to him
23  until he's ready to have it.
24    Q.  Did you have any reason to believe he
25  wasn't ready to have it?

---

August 25, 2015                                          Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

177

1      A.  Well, I don't specifically remember him
2   asking for it the following week or any time
3   close to this time period.  My best guess is if I
4   didn't, it was because he didn't get back with
5   me, and that happens.
6          People get busy, and they get off doing
7   other things, and when he wants the information,
8   I'll give it to him.
9      Q.  Okay.  He did tell you that the guys
10  that he's working with were having withdrawals,
11  right?
12     A.  Yes, ma'am.
13     Q.  Did you understand is that to mean --
14  what did you understand that to mean?
15     A.  Looking for something to do maybe.
16     Q.  Okay.
17     A.  Looking for some drug investigations to
18  start.
19     Q.  Did that give you an indication as to
20  whether or not they were ready to have some new
21  information given to them?
22     A.  Well, what I took from this is they were
23  wanting to come up and do surveillance on the
24  store themselves.
25     Q.  Is that mutually -- I'm sorry, I didn't

---

178

1   mean to cut you off.
2      A.  I'm sorry, that's what I took it to
3   mean.  They wanted to come up there and sit on
4   the stores themselves.
5      Q.  Is that specific to them coming up and
6   watching, and you also giving them information
7   from when you've watched?  Can you do both?
8      A.  Yes.
9      Q.  In this case, though, you don't have any
10  recollection of giving them the names of the new
11  Johnson County residents that were shopping at
12  the Green Circle back in August of 2011; is that
13  correct?
14     A.  I do not.
15     Q.  And would you agree with me that a law
16  enforcement agency has more time to investigate a
17  possible drug or a marijuana grow operation if
18  they receive information that may lead them to
19  that grow operation sooner rather than later?
20         MR. SANKAR:  Note my objection to
21  form, vagueness.  You can answer.
22         THE WITNESS:  I can?
23         MR. SANKAR:  Yes, you can.
24     A.  I don't -- could you please ask that
25  again.

---

179

1      Q.  (BY MS. KINGSTON)  Yeah I will gladly do
2   that because it wasn't a very well worded
3   question.
4          With respect to narcotics
5   investigations, sometimes those investigations
6   take time, correct?
7      A.  Yes, ma'am.
8      Q.  Okay, and in your experience the more
9   information you can get sooner, is that better
10  with respect to making progress on an
11  investigation?
12     A.  Sometimes.
13     Q.  Okay.  Is there ever a time that getting
14  information sooner makes an investigation worse?
15  I mean if you're getting a tip that somebody is
16  engaged in an indoor grow operation wouldn't you
17  rather have that information sooner rather than
18  later?
19     A.  I would think sooner would be good.
20     Q.  And sooner would give you more time to
21  do an investigation, correct?
22     A.  Yes, ma'am.
23     Q.  Is it helpful to have a sufficient
24  amount of time to do an investigation?
25     A.  Time is always a good thing to have.

---

180

1      Q.  Do you agree with me with the general
2   principle that sometimes when you don't have
3   enough time and you have to rush through things,
4   that mistakes sometimes are made?
5          MR. FERREE:  Objection, vague and
6   ambiguous.
7      A.  I would think in any endeavor, that
8   could be true.
9      Q.  (BY MS. KINGSTON)  When is the next time
10  you talked with Tom Reddin after your
11  August 19th, 2011 e-mail exchange?
12     A.  I have no idea.
13     Q.  Do you socialize with Sergeant Reddin
14  outside of work?
15     A.  No, ma'am.
16     Q.  Do you socialize with any of the Johnson
17  County officers outside of work?
18     A.  No, ma'am.
19     Q.  When's the last time you spoke with
20  Sergeant Reddin?
21     A.  I think it was at that mediation thing.
22     Q.  Okay.  When is the last time you spoke
23  with Chris Farkes?
24     A.  I have no idea.
25     Q.  Do you recall the last time that you

---

August 25, 2015                                                 Sgt. James L. Wingo, Ret.

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

181

1    spoke with Mark Burns?
2        A.  Well, if he was at that mediation
3    thingie, it would have been then.
4        Q.  You don't recall if he was there or not?
5        A.  No.
6        Q.  What about the last time you spoke with
7    Officer Blake?  When would that have been?
8        A.  Who?
9        Q.  Officer Blake, do you know him, from
10   Johnson County?  Doesn't ring a bell?
11       A.  Not off the top of my head.
12       Q.  If you could pull out Exhibit 16, which
13   was marked.  There it is.  We talked about this
14   earlier.  It's the letter that you sent out
15   inviting the Johnson County Sheriff's Office to
16   be part of a briefing that you were holding on
17   April 4th of 2011, and I wanted to ask you about
18   the last paragraph you wrote.
19           You said that, "This is going to be a
20   significant media event."  When you're talking
21   about "this," what are you referring to?
22       A.  The operation.
23       Q.  Constant Gardener?
24       A.  Yes, ma'am.
25       Q.  And why did you believe it would be a

182

1    significant media event?
2        A.  I thought there were going to be a lot
3    of indoor grows seized over a wide area that had
4    never been done before.
5        Q.  And the Highway Patrol had plans to
6    publicize those search results, correct?
7        A.  Yes, ma'am.
8        Q.  And had you been in discussions with the
9    media representative for the Highway Patrol about
10   making sure that happened?
11       A.  Yes, ma'am.
12       Q.  And whose idea was it to contact the
13   media with respect to the 2011 Operation Constant
14   Gardener?
15       A.  Well, I think it came up in talks with
16   the staff when I began putting this together and
17   getting their okeydokey, if you will, to run the
18   operation.
19           It would be a public media event.  I
20   mean it would be something that the Highway
21   Patrol would want to publicize.
22       Q.  It was a selling point that you were
23   using?
24       A.  That's not what I was using, but I could
25   care less personally whether the media was there

183

1    or not, but I think the staff thought that that
2    would be a great idea.
3           (Exhibit 18 was marked by the
4    reporter for identification.)
5        Q.  (BY MS. KINGSTON)  I'm going to hand you
6    what we've marked as Exhibit 18.  Do you
7    recognize this series of e-mail exchanges?
8        A.  Yes, ma'am.
9        Q.  And it appears to be that Sergeant
10   Reddin is reaching out to you on January 12th of
11   2011 and asking you if you would hold a training
12   class for Johnson County on indoor marijuana
13   grows; is that correct?
14       A.  Yes, ma'am.
15       Q.  And he admits to you in the e-mail that
16   he wrote to you that their office doesn't have a
17   wealth of training on indoor grow operations,
18   correct?
19       A.  They're all pretty new to indoor grows.
20   Yes, it looks like they were new to indoor grows.
21       Q.  And they don't have a wealth of
22   information, correct?
23       A.  Yes.
24       Q.  All right, and they are looking for
25   formal training, correct?

184

1        A.  Yes, ma'am.
2        Q.  And he's reaching out to you to provide
3    that training for the department, yes?
4        A.  Yes, ma'am.
5        Q.  And did you agree?
6        A.  Yes, ma'am.
7        Q.  Okay.  In your response on January 13th
8    of 2011 you said, "Tom, yeah, I have been trying
9    to build a PowerPoint on an MJ class."  Is that
10   "MJ" marijuana?
11       A.  Yes, ma'am.
12       Q.  And you had mentioned that you had given
13   one to the Johnson County Prosecutor's Office, so
14   that would have been the first one you gave,
15   correct?
16           Does that refresh your recollection as
17   to which order you gave the training?
18       A.  Yes.
19       Q.  And then there's a continued discussion
20   about how long the training session would be,
21   correct?
22       A.  Yeah, it was sometime later.
23       Q.  And on May 12th you're letting him know
24   that you did a four-hour class for an Iowa --
25   what's the NA stand for?

August 25, 2015                                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

185

1     A.  Narcotics Association.
2     Q.  Okay, and you did a four-hour training
3   class for the Iowa Northern -- or excuse me, the
4   Narcotics Association Conference, and you're
5   asking him how many hours he wants, correct?
6     A.  Yes.
7     Q.  And I don't have it here, but do you
8   recall how many hours he told you he wanted you
9   to train his officers?
10    A.  I think we just did a four-hour class.
11  That's really all I had set up for.
12    Q.  Okay, and you brought your PowerPoint
13  materials to that training class; is that
14  correct?
15    A.  Yes, ma'am.
16    Q.  And do you recall when that class was,
17  the date of that training?
18    A.  I think you asked me that before and it
19  was in the summer of 2011, maybe June,
20  something-something.
21    Q.  Okay.  Are you familiar with the
22  PowerPoint training presentation that you gave to
23  the Johnson County Sheriff's Office?
24    A.  I was well aware in 2011.  I was more
25  familiar with it then than I am now.

186

1     Q.  Fair enough.  Do you recall that after
2   your training session with the Johnson County
3   Sheriff's Office that you made any changes to
4   your PowerPoint slides?
5     A.  Oh, I'm sure I did.
6     Q.  Okay.  Do you recall what those changes
7   were?
8     A.  I have no idea.
9         (Exhibit 19 was marked by the
10  reporter for identification.)
11    Q.  (BY MS. KINGSTON)  I'm going to hand you
12  what we've marked as Exhibit 19.  Do you
13  recognize this as being two pages from your
14  marijuana grow operation training PowerPoint
15  presentation?
16    A.  This was for the briefing that I did for
17  Operation Constant Gardener.
18    Q.  Okay.  And is that the same PowerPoint
19  that you used when you trained the Johnson County
20  Sheriff's Office?
21    A.  No.
22    Q.  Okay.  The Johnson County Sheriff's
23  Office training materials that you used, did it
24  include these two PowerPoint presentation pages?
25    A.  No.

187

1     Q.  Okay, they weren't in there.  And the
2   PowerPoint that -- the pages from the PowerPoint
3   that we've marked as Exhibit 19, those are from
4   the training that you did on April -- let me get
5   that date, 4th?
6     A.  I didn't do any.
7         MR. SANKAR:  Hold on.  I'd note my
8   objection.  I think that mischaracterizes what
9   he's said; he said the briefing on April 4th.
10    Q.  (BY MS. KINGSTON)  Okay.  Well, when was
11  the training for the Operation Constant Gardener?
12    A.  I didn't do any.
13    Q.  You developed a PowerPoint for the
14  Operation Constant Gardener?
15    A.  Just for the briefing.
16    Q.  Okay, and that briefing was on
17  April 4th?
18    A.  Yes, ma'am.
19    Q.  Okay.  With respect to that PowerPoint
20  presentation, and the one that was given on
21  April 4th of 2011, you indicated in the second
22  line of the first page that, "Being a customer
23  does not mean guilty of growing marijuana."
24        Are you talking about being a customer
25  of a hydroponic garden store?

188

1     A.  Yes.
2     Q.  And did you emphasize that at the
3   briefing?
4     A.  It was the Number 2 topic.
5     Q.  And you agree then that just because you
6   shop at a hydroponic store does not mean that you
7   are growing marijuana, correct?
8     A.  Absolutely.
9     Q.  All right.  And then the next line it
10  says, "You treat info as a tip that has to be
11  followed up."  What did you mean by that?
12    A.  I mean just that.  It's not any
13  indication of guilt.  All it is is a tip.  This
14  person came to this store on this date, and this
15  is what we saw.
16    Q.  Okay.
17    A.  Develop your own information.
18    Q.  All right.  And we talked earlier about
19  tips that sometimes the Highway Patrol would
20  receive regarding possible drug grow operations,
21  and you said that, you know, whether you followed
22  up or were able to follow up on all of those tips
23  depended on a lot of different factors like
24  manpower and just where the jurisdiction the tip
25  was in, and things like that.  Do you recall that

August 25, 2015                                          Sgt. James L. Wingo, Ret.

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

193

1      A.   Yes, and actually I will clarify that.
2   I was never informed that they had done any
3   follow-up.  Whether they did anything or not, I
4   don't know about that, but I'm confident I never
5   received any feedback that they were successful
6   in any information that I gave them.
7      Q.   Going back to Exhibit 19 then, the
8   fourth line of this front page, you were
9   recommending to the law enforcement attendees at
10  your April 4th briefing that they could try trash
11  pulls, sneak and peak, lost dog, and utility
12  checks; is that correct?
13     A.   Yes, ma'am.
14     Q.   What's a sneak and peak?
15     A.   Just walking up to the house and turn
16  around and see what you can see and visually
17  inspect the back.  Sometimes they grow weed in
18  their back yards, as crazy as that is.
19         I can specifically remember one we did
20  just west of the Plaza, like two blocks west of
21  the Plaza, the guy was growing weed in his
22  backyard.  Now who does that in the city?  But
23  well, sometimes it happens.
24     Q.   Are the trash pulls, sneak and peak,
25  lost dog and utility checks all techniques that

194

1   you recommended as ways to conduct investigations
2   for marijuana grow operations?
3      A.   These are some of the things we use, of
4   how we do it.  Yeah, I think I mentioned those.
5      Q.   And those are things that you
6   recommended to them at the training briefing, or
7   in the briefing, correct?
8      A.   Yes.
9      Q.   Lost dog, that's what we talked about
10  earlier where you would go up and hand out a
11  flier about a lost dog?
12     A.   My little dog Dempsey.
13     Q.   Oh, the dog's name that you had lost was
14  Dempsey?
15     A.   Yes.
16     Q.   What kind of dog was Dempsey?
17     A.   He was a little Jack Russell and he was
18  probably scared, because he'd run away from home.
19     Q.   Okay, and then the utility checks, we
20  talked about that, right?
21     A.   Yes.
22     Q.   Okay.  The next line, what does it mean,
23  "If you run from tags they may not check bag to
24  name on the list"?
25     A.   That was me not doing a really good

195

1   spell check on my spelling.
2      Q.   Is it supposed to be check back?
3      A.   Yes, ma'am.
4      Q.   All right, and then the second page, you
5   talk about if you find a suspect has moved,
6   contact you with the new address and you will
7   pass it on.  What did you mean by that?
8      A.   Well, say for example somebody had an
9   Overland Park address and they'd turn around and
10  they'd find out that, no, the guy is living in
11  Lee's Summit.
12         I would usually then contact Lee's
13  Summit and say, "Hey, the guy has moved over to
14  here."
15     Q.   Okay.  So you're willing to basically
16  take that information and pass it to the agency
17  where the guy or where the woman is now living?
18     A.   Yes, ma'am.
19     Q.   And then the third bullet down, or not
20  bullet, but paragraph, you talked then about
21  trying to get admission by just getting written
22  consent, correct, from the parties?
23     A.   Yes.
24     Q.   Is that something that you recommended
25  at the briefing?

196

1      A.   Yes, ma'am.
2      Q.   And then you mentioned that if you have
3   a significant seizure and want media exposure, to
4   let you know, and why did you tell them to let
5   you know that?
6      A.   Because we were going to be doing a
7   briefing I think at 1:00 o'clock there in Lee's
8   Summit, and we could notify the media then if
9   they have got something really good.
10         (Exhibit 20 was marked by the
11  reporter for identification.)
12     Q.   (BY MS. KINGSTON)  I'll hand you what
13  we're marking as Exhibit 20.  Do you recognize
14  this page as being one from your PowerPoint
15  slides?
16     A.   Yes, ma'am.
17     Q.   Did you use this at the April 4th, 2011
18  briefing?
19     A.   I don't know.
20     Q.   Did you use the slide at the training
21  session that you did for Johnson County officers
22  in the summer of 2011?
23     A.   Oh, I'm sorry, what was the first
24  question?
25     Q.   Did you use this PowerPoint slide in

August 25, 2015                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

205

1         MS. KINGSTON:  I am very much well
2    aware that June came after April.  In fact,
3    that's my point, that after his success from the
4    Constant Operation Gardener Program, an operation
5    he was sharing the techniques used in that
6    program with the Johnson County officers on
7    June 20th.
8         That was my question, and that does not
9    misstate any dates or orders of that information.
10        MR. SANKAR:  It's the same.
11    Q.   (BY MS. KINGSTON)  So now going back to
12   the question I asked, the principles that you
13   outlined in Exhibit 20, those principles are what
14   for you led to successes with Operation Constant
15   Gardener on April 20th of 2011, correct?
16    A.   They were part of our success, yes.
17    Q.   Right, the whole idea of surveilling
18   hydroponic grow stores?
19    A.   Yes, ma'am.
20    Q.   Getting that information, leading you to
21   residents where grow operations may be taking
22   place?
23    A.   Yes, ma'am.
24    Q.   And you had successes with the knock and
25   talks?

---

206

1     A.   Yes, ma'am.
2     Q.   That concept, was that something that
3    you shared with the Johnson County officers in
4    June of 2011?
5     A.   Yes, ma'am.
6     Q.   All right.
7         (Exhibit 21 was marked by the
8    reporter for identification.)
9     Q.   (BY MS. KINGSTON)  All right.  I'm going
10   to hand you what we've marked as Exhibit 21.  Do
11   you recognize this slide as one that was in your
12   presentation materials at the briefing on
13   April 4th of 2011?
14    A.   Yes, ma'am.
15    Q.   And sitting here today do you know if
16   this slide was used at the June 24, 2011 training
17   session with Johnson County?
18    A.   It may very well be that you had like a
19   thousand of these but I will tell you on all
20   thousand of them, I don't remember which one I
21   used on that training briefing.
22        I think I made this.  Did it look
23   exactly like this when I did it?  I don't know,
24   but it looks like I made this.
25    Q.   So at least with respect to the

---

207

1    April 4th, 2011 briefing, you shared with those
2    in attendance that checking utilities was one
3    possible way to confirm grow operations, correct?
4     A.   It's like on Exhibit 19 like right
5    there it says, "Utility checks," so I mentioned that.
6     Q.   So you mentioned it twice in your
7    briefing on April 4th then, once in the slide
8    that's marked, Exhibit 19, and then again in the
9    Exhibit 21 slide?
10        MR. FERREE:  Well, I object.
11    A.   I didn't do this on April 4th.
12    Q.   (BY MS. KINGSTON)  Oh, you didn't.
13   Okay, I apologize.  I misunderstood what you said
14   then.  Thank you for correcting me.  When was
15   Exhibit 21 used?
16    A.   This, this is a PowerPoint presentation
17   that I made for indoor growth.  Now whether it's
18   exactly what I did for Johnson County in 2011, I
19   don't know, but this -- I did this.
20        Now whether -- all those that you have,
21   whether this is exactly what I did for Johnson
22   County, I can't tell you for sure, because I
23   changed stuff all the time.
24    Q.   At the Johnson County training session
25   did you tell the officers that checking utilities

---

208

1    was one way to confirm possible grow activity?
2     A.   Very possibly.
3     Q.   Okay.  Let me hand you what we're
4    marking as Exhibit 22.
5         (Exhibit 22 was marked by the
6    reporter for identification.)
7     Q.   (BY MS. KINGSTON)  What's funny?
8         MR. SANKAR:  Is this a good time
9    for a break, if that's possible?
10        MS. KINGSTON:  Sure.
11        MR. SANKAR:  Thank you.
12        THE VIDEOGRAPHER:  Off the record
13   at 1542.
14        (Recess)
15        THE VIDEOGRAPHER:  We're back on
16   the record at 1553.
17    Q.   (BY MS. KINGSTON)  Okay, before the
18   break we were looking at Exhibit 22.  Do you
19   recall whether or not this page of the slide was
20   used at the April 4th, 2011 briefing?
21    A.   It very well could have been.
22    Q.   Do you recall whether or not this page
23   from the PowerPoint presentation was used for
24   your June, 2011 training with the Johnson County
25   Sheriff's Office?

---

August 25, 2015                                    Sgt. James L. Wingo, Ret.
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

257

1    under-covering indoor grow operations; is that
2    your testimony?
3         A.  My testimony is I don't remember what
4    all I covered in that --
5         Q.  Okay.
6         A.  -- but I'm pretty sure I covered the
7    growing and the equipment.
8         Q.  And you covered techniques such as
9    knocking and talking, correct?  You've already
10   told us you did that, right?
11        A.  I said I could very well have.  I could
12   very well have.  I don't specifically remember
13   what I gave during that presentation.
14        Q.  From 2007 until 2013 how many times did
15   you conduct surveillance at the Green Circle?
16        A.  You may have asked me that earlier.  It
17   was several.
18        Q.  Is that when you told me you may have
19   averaged three times a week?
20        A.  Yes, ma'am.
21        Q.  Okay.
22        A.  But after 2011, we reduced that quite a
23   bit.
24        Q.  Okay.  How many times from 2007 until
25   2013 did you pass along tips to other law

258

1    enforcement agencies from your surveillance of
2    the hydroponic gardening stores?
3         A.  I couldn't give you a number; a lot.
4         Q.  Are we talking hundreds, or less than
5    that?
6         A.  I don't know, a lot.  I couldn't give
7    you a specific number.  I apologize.
8         Q.  That's all right, and just because
9    you're using the word "a lot" I don't mean to
10   imply that you and I have the same definition of
11   "a lot," so what's "a lot" to you?
12        A.  I'd say over 50, well over 50.
13        Q.  And with respect to your surveillance of
14   hydroponic gardening stores, roughly what
15   percentage of the tips that you obtained from
16   that surveillance did you actually follow up on?
17        A.  Well, from 2007 until 2011, April 20th
18   of 2011, in terms of follow-up, I would say 100
19   percent.
20        Q.  Because you ran everybody's license
21   essentially?
22        A.  Well, because I passed that information
23   at least off to other agencies, because that was
24   the information we had developed in that time,
25   and then gave that information to other agencies.

259

1         So we had either already followed up on
2    things that we had done, or things that we
3    didn't, I gave to other agencies.
4         From 2011 to 2013 it would be a much
5    smaller number.
6         Q.  Okay, like?
7         A.  But I couldn't give you a percentage on
8    that.
9         Q.  You couldn't even say if it was half the
10   time?
11        A.  Probably less than that.
12        Q.  Okay, and just to clarify, when you said
13   that you were doing surveillance about three
14   times a week, that would have been true for every
15   week from 2007 through the April 20th, 2011 date?
16        A.  On average, yes.
17        Q.  Okay.  All right, and then you said that
18   you kept spreadsheets on all of the individuals
19   that you saw shopping at the store.
20        By the end of 2000, or by April 20th of
21   2011, how many pages of spreadsheets did you have
22   of names?
23        A.  Well, there was a lot.  I'm trying to
24   remember how many we had per page and then divide
25   that by a few hundred.  There were a lot of

260

1    pages.
2         I would guess maybe I had -- well,
3    eventually what I did was create individual pages
4    for individual cities or counties, depending on
5    where they were from so --
6         Q.  When did you start doing that?
7         A.  I think in 2008 or '09, maybe, but like
8    the agencies that were invited, I probably had a
9    separate sheet for each of those jurisdictions.
10   There were quite a few, 20, 30, something like
11   that.
12        Q.  20 or 30 pages and that would be from
13   2007 through April 20th of 2011?
14        A.  Yes.
15        Q.  Okay.  I don't have any further
16   questions for you at this time.  Thank you.
17        A.  Yea.
18        MR. SANKAR:  I've got some
19   questions.
20        EXAMINATION
21   BY MR. SANKAR:
22        Q.  Mr. Wingo, you were shown Exhibit 30
23   which you have in front of you.  Do you mind
24   taking a look back at that exhibit for a moment,
25   please.

Transcript of the Videotaped Testimony of

# Larry D. Shoop

September 3, 2015

Adlynn K. Harte, et al. v. The Board of Commissioners of the
County of Johnson, Kansas, et al.

Case No. 13-cv-02586-JWL-GLR



2001 Grand Blvd. | Suite 204
Kansas City, Missouri 64108
Ph: 816.474.3376 | F: 816.474.3375
depo@coopermoeller.com

September 3, 2015                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

89

1    Q.  Did he talk about field test kits?
2    A.  No, absolutely not.
3    Q.  Did he talk about how to conduct an
4  investigation of a suspected marijuana grow?
5    A.  No, besides maybe just the tips and
6  stuff that we get.
7    Q.  What do you mean?
8    A.  Just in general, some of the tips and
9  stuff.  I know at that time I think he provided
10  us with a list of the current tips and stuff
11  that -- so I don't think there was any kind of
12  training on getting tips, just kind of what to
13  look for.
14    Q.  What do you mean what to look for?
15    A.  Specifically because I know we discussed
16  a lot of the Green Circle type stuff, the
17  fertilizers and that kind of stuff on what to
18  look for, what stuff people would buy during
19  certain grow processes.
20    Q.  What did he tell you about the weight to
21  be attached to someone shopping at the Green
22  Circle, how important is that?  What is that an
23  indicator of it?
24    A.  You mean how much to put on the case,
25  just people shopping there.

---

90

1    Q.  Yes.  What is the value of that from an
2  investigative standpoint?
3    A.  That store was actually very valuable to
4  us.  We worked that -- not that we worked that a
5  whole lot.
6      I know that we got a lot more tips from
7  Wingo than we actually were able to obtain
8  ourselves, but on the very few times we went up
9  there to work, we felt that predominantly most of
10  their clientele at that store was doing some kind
11  of illegal grow operation.
12    Q.  Okay.  When you say most of your
13  clientele, what percentage?
14    A.  It's hard to tell.  I can say that we
15  have never -- we've had cases that didn't come to
16  fruition that we had no idea about, that we
17  weren't able to build cases on, but I couldn't
18  tell you anyone that was actually legally buying
19  stuff from that store.
20      I can tell you that every case we worked
21  from that store that we built on had a grow
22  operation, or some other type of illegal use.
23    Q.  You're not aware of any tips that didn't
24  go anywhere?
25    A.  Oh, there was a number of tips that

---

91

1  didn't go anywhere, but they didn't go anywhere
2  because we found that they were legally using
3  those products, except for the Harte case.
4    Q.  Okay.  When you say legally using those
5  products, what do you mean?
6    A.  In other words, we didn't have -- we
7  didn't catch somebody coming out of there with
8  fertilizer and find out that they had a florist's
9  shop or something like that.
10      All of the cases that we found that they
11  were buying stuff there that we worked, resulted
12  in a marijuana case or resulted in no case at
13  all.
14    Q.  Okay.  Which resulted in no case at all?
15    A.  There was a case and I think this came
16  from the tip, Wingo tip that we worked, where we
17  were able to get a positive off of trash.
18      We were working two different houses
19  because they were brothers.  We were able to get
20  a positive off trash at one residence but we
21  wasn't able to get a positive off the trash the
22  next week.
23      Under the DA's guidelines we had to have
24  two positive trashings and they needed to be
25  consecutive and recent.

---

92

1    Q.  So you're saying that you don't think
2  anyone shops at the Green Circle for the purpose
3  of growing anything legitimately indoors?
4    A.  There could be, but we have no cases
5  besides the Harte case where actually somebody
6  was actually doing that legally.  All the other
7  cases that we worked, there was some indication
8  of it or we couldn't -- we didn't have enough to
9  go forward with a case on it.
10    Q.  So you're not aware of any houses that
11  were hit other than the Hartes, where nothing was
12  found?
13    A.  We had none like that in my experience.
14  We had no cases like that.
15    Q.  You mean your personal experience?
16    A.  Yes.
17    Q.  Do you know what they sell at the Green
18  Circle?
19    A.  Fertilizers, grow lights, seed pods or
20  seed -- yeah, seed pods, starter pods, soils,
21  pretty much anything that you would need besides
22  any plants.  I don't think they had any kind of
23  plants there that I can recall.  It was all just
24  stuff to grow plants.
25    Q.  Are you aware of any other products that

---

September 3, 2015                                                                 Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

113

1   seminar that Mr. Wingo taught?
2       A.   No, like I said, that was a pretty brief
3   seminar. Those I would have probably learned in
4   Shawnee.
5       Q.   Four hours is pretty brief?
6       A.   It's a pretty brief training. You have
7   to think police takes breaks every hour, and so,
8   you know, a four-hour training ends up, by the
9   time you BS and stuff, ends up being two or three
10  hours maybe, two hours maybe; your taxpayers'
11  money at work.
12      Q.   So a four-hour training is really more
13  like two to three?
14      A.   Yes.
15      Q.   And you believe all you learned about
16  was fertilizer, grow lights, mylar and some
17  things about Green Circle?
18      A.   That's all I can positively tell you
19  about --
20      Q.   Okay.
21      A.   -- that I recall.
22      Q.   As far as marijuana grow operations you
23  said you're familiar with two components of them,
24  two being water pumps, clay pellets, mylar. How
25  common is mylar? Do you see it all the time,

---

114

1   most of the times?
2       A.   I have never seen mylar used in anything
3   but a marijuana grow operation.
4       Q.   Okay. Has mylar been present in all the
5   marijuana grows that you have seen?
6       A.   Most, yes.
7       Q.   When you say "most," what do you mean?
8       A.   If they were 75 percent, maybe 80
9   percent of the grow operations, people would
10  invest in mylar.
11      Q.   Okay. Are steps ever taken to conceal a
12  marijuana grow from being seen say through a
13  window?
14      A.   Yes.
15      Q.   And what have you seen?
16      A.   Usually they will black the windows out
17  to do that, and a lot of that is because they are
18  running lights throughout the night.
19      Q.   Okay, and how often have you seen
20  blacked out windows?
21      A.   On marijuana grows, again probably 70 or
22  85 percent of the time.
23      Q.   Okay.
24      A.   When they don't black out the windows,
25  it's because they are using some type of an

---

115

1   interior room or something where they don't need
2   to black the windows out.
3       Q.   Okay. What about ventilation?
4       A.   Yes. They will run fans, both fans to
5   cool their high intensity lights, and then fans
6   just to ventilate the room.
7       Q.   And in what percentage of marijuana
8   grows have you seen special ventilation?
9       A.   Again, probably 75 or 80 percent.
10      Q.   Is a typical marijuana grow a pretty
11  elaborate operation?
12      A.   Specify "elaborate." I mean I have seen
13  some small marijuana grows that were half the
14  size of this table that were elaborate grows.
15      Q.   Uh-huh?
16      A.   They may have only had 7 or 8 plants in
17  them, but they were very elaborate, and I have
18  seen ones that take up the whole room.
19      Q.   Okay.
20      A.   Typically that's what we find, is a
21  small contained room with a grow. We have had a
22  few very small grows that were people just trying
23  to do them in their closet, but those are fairly
24  rare.
25      Q.   Okay. What are the common rooms to have

---

116

1   a marijuana grow in?
2       A.   Everywhere. We've seen it in bedrooms,
3   basements, hidden rooms.
4       Q.   Have you ever had one in front of a
5   window or near a window that could be seen
6   through?
7       A.   No. They would have them blacked out.
8       Q.   Okay. How do you blackout a window?
9       A.   Just a curtain of some type, it doesn't
10  have to be too much, just to allow somebody out
11  to look in or the light not to escape.
12      Q.   Okay. Have you ever obtained utility
13  records?
14      A.   No.
15      Q.   Okay. In terms of how you've done a
16  marijuana grow investigation, what kinds of
17  information have you pursued?
18      A.   I'll run -- first of all, the tip, of
19  course, gets generated. I'll usually run a
20  background check on all the individuals involved,
21  which it can have great merit and then it can
22  have none.
23          If they have no record then it just
24  doesn't mean they have -- I'll say it doesn't
25  mean they have been caught yet, but they just

---

September 3, 2015                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

157

1     A.   That that store was predominantly used
2   for illegal, purchasing of illegal equipment to
3   grow marijuana.
4     Q.   The equipment itself was illegal?
5     A.   No, the equipment itself was totally
6   legal, just its purpose after the fact of being
7   purchased.
8     Q.   All right.  So you don't remember ever
9   saying anything about the Green Circle?
10    A.   No.
11    Q.   Did he say anything --
12    A.   Besides that's a typical spot that he
13  uses, no.
14    Q.   He said that was a typical spot he used?
15    A.   Again, it was an assumption that that
16  was.  I can't remember if he specifically said --
17  we knew, in fact, I contacted him there one time,
18  at least while he was on surveillance there, but
19  whether or not he said that's a gold mine or
20  anything like that, no, I can't say he said
21  anything to that effect.
22    Q.   Okay.  Did he talk about operation
23  Constant Gardener?
24    A.   Not that I'd remember any specifics on
25  it, no.

---

158

1     Q.   Did he talk about the tips that he
2   compiled or a spreadsheet?
3     A.   He did supply Sergeant Reddin with some
4   tips that day.
5     Q.   That day?
6     A.   I believe it was that day.
7     Q.   How -- why do you believe it was that
8   day?
9     A.   Because we got in there shortly after a
10  fresh amount of tips from him.
11    Q.   Okay, and was this in 2011?
12    A.   This was directly after the training.  I
13  think it was 2012.
14    Q.   Let's look at your exhibit.  If you'll
15  look at Exhibit 9 you'll see it's dated June 21,
16  2011.
17    A.   Okay, it could have been.  I thought we
18  had gotten some fresh tips from him then.  It may
19  not have been.
20    Q.   Do you think it was on another day?
21    A.   It could have been, but most of his
22  interactions were with Sergeant Reddin, and not
23  directly with me or directly with anybody else.
24    Q.   Did you go to any meetings concerning
25  Operation Constant Gardener in 2011?

---

159

1     A.   Not that I recall.
2     Q.   Have you ever been at any other
3   presentation where Wingo spoke, other than that
4   training?
5     A.   Not that I can recall.
6     Q.   So the training to your knowledge is the
7   only time that you've heard him speak?
8     A.   Besides a couple of times face -- well,
9   at least one time face-to-face, in the area of
10  Green Circle, though.
11    Q.   What did you do with him at the Green
12  Circle?
13    A.   I think we were actually going to go up
14  there and do some surveillance and we actually
15  ran into him up there doing some.  I think we may
16  have talked for a few minutes.
17         I think it was, if I recall right, it
18  was Sergeant Burns and myself that was up there.
19    Q.   And what was the nature of the
20  conversation?
21    A.   We just talked about how he was doing
22  today, if he had any tips, that kind of stuff,
23  but I couldn't tell you any specifics.
24    Q.   Have you talked to him since this
25  lawsuit was filed?

---

160

1     A.   No.
2     Q.   Okay.  Well, let's turn to the events of
3   the day in question.  You've already told us
4   about attending a briefing in the morning of --
5   and would you agree it was April 20th, 2012?
6     A.   Yes.
7     Q.   Okay.  What's the next thing you recall
8   that day that you did?
9     A.   We left and the first search warrant of
10  the day was going to be the Wenonga address.
11    Q.   Okay.  Do you know how Wenonga was
12  picked to be first?
13    A.   No.
14    Q.   Who made that determination?
15    A.   That would have probably -- again
16  speculation, either Sergeant Reddin or Deputy
17  Blake.
18    Q.   Okay, and you rode out there with Blake?
19    A.   Yes.
20    Q.   What kind of car?
21    A.   We were in a minivan.
22    Q.   Uh-huh.  Was it marked or unmarked?
23    A.   Unmarked.
24    Q.   What color was it?
25    A.   I believe it was gray.

---

September 3, 2015                                                    Larry D. Shoop

Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

173

1    Sergeant Cossairt.
2        Q.  Okay.  Had you ever done a tactical
3    entry with him?
4        A.  Not that I recall.
5        Q.  Okay, so you were all at the front door,
6    right?
7        A.  Uh-huh.
8        Q.  Where is your hand?  Do you have it on
9    your Glock at that point?
10       A.  I don't recall.
11       Q.  What are you doing at the front door?
12       A.  Waiting for somebody to come to the
13   front door.
14       Q.  Okay.  Who knocks?
15       A.  I believe it was Farkes that was
16   knocking on the front door.
17       Q.  Okay.  Is anyone saying anything?
18       A.  There's an announcement of "Sheriff's
19   Office," and that's typical.
20       Q.  Who did that?
21       A.  That would have been the guy knocking on
22   the front door, so I'm going to assume Farkes.
23       Q.  And was there a screen door that someone
24   opened?
25       A.  I can't remember if that house had a

---

174

1    screen door on it or not.
2        Q.  What did Farkes say?
3        A.  Just, "Sheriff's Office."
4        Q.  Okay.  How many times did he knock?
5        A.  I'm not sure.  It was probably 15, 20
6    seconds before somebody came to the door.
7        Q.  Okay, and Kilbey you believe was behind
8    you?
9        A.  In that area, either behind me, he could
10   have been in front of me.  Like I said, as what I
11   recollect, I was second, third, somewhere in that
12   area.
13       Q.  Did you ever see the Leawood officer in
14   the proximity of the front door?
15       A.  No.
16       Q.  How close did you park to the house, or
17   did Blake park, too?
18       A.  We parked down the street on the
19   opposite side of the road, probably about at
20   least two houses down.
21       Q.  North or south?
22       A.  Can I look at a map, if you have one?
23       Q.  I'm sorry, I don't.  It's closer towards
24   103rd Street or the other direction?
25       A.  I'm not sure.  It would have been on

---

175

1    the -- if you're facing the house, it would have
2    been on the left side of the house.
3        Q.  If you're facing, okay, I think that's
4    north.  I mean left would be north, if you're
5    facing the house.  Is that what you're talking
6    about?
7        A.  Yeah, so it was at least two houses
8    down --
9        Q.  Okay.
10       A.  -- and on the opposite side of the
11   street.
12       Q.  How did Farkes knock?  Was it a "tap
13   tap," was it a "pound pound"?  How did he knock
14   on the door?
15       A.  Loud enough to awaken somebody if he
16   needed to.  It would have been (witness
17   indicating).
18       Q.  Okay, and how did he say -- was it
19   "Sheriff's Office"?
20       A.  "Sheriff's Office."
21       Q.  And so he pounded the door loudly a
22   number of times?
23       A.  Uh-huh.
24       Q.  And then how did he say, "Sheriff's
25   Office"?  Did you yell that, speak it softly?

---

176

1        A.  It would have been loud enough for
2    occupants to hear.
3        Q.  Okay.  Did he say anything else?
4        A.  Not that I recall.
5        Q.  What was the next thing that happened?
6        A.  The door was opened by a male later
7    identified as Mr. Harte.
8        Q.  Okay.  Did someone give him directions?
9        A.  Yeah, and it was something to the effect
10   of, "We have a search warrant, stand back," and
11   then I think they kind of directed with motion to
12   lay on the ground.
13       Q.  Did anyone say, "Down on the ground"?
14       A.  They would have probably said, "Sit down
15   on the ground," or, "Lay on the ground."
16       Q.  Who's "they"?
17       A.  I want to say it was Farkes since he was
18   the lead guy that I remember being at the effect.
19       Q.  So you believe Farkes was giving the
20   command?
21       A.  To Mr. Harte, yes.
22       Q.  "We have a search warrant, stand back."
23   Did he say, "Get down"?
24       A.  "Get down" or, "Lay on the ground" --
25       Q.  Okay.

---

September 3, 2015                                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

177

1    A.  -- or, "Lay on the floor," something to
2    that effect.
3    Q.  Okay.  And what tone of voice did he say
4    this?  Was he loud?
5    A.  Probably in the tone of voice that I
6    just did it, "Lay on the ground, get on the
7    ground."
8    Q.  Okay.  And where were you at this point?
9    A.  I had moved off to Farkes' left which
10   would have been closer to the living room/kitchen
11   area.
12   Q.  Okay, and what were you doing there?
13   A.  The other officers had came in and had
14   started to go up the stairs towards the
15   residential living area type of thing, so my job
16   was to secure that, just to stay focused on the
17   living room/kitchen area, in case somebody came
18   out of that area, until they were able to secure
19   what was behind us.
20   Q.  Okay.  When these commands were given,
21   did Mr. Harte get on the ground?
22   A.  Yes.
23   Q.  Did you see another occupant of the
24   house?
25   A.  No.  I believe all the other occupants

---

178

1    came from up in the living area, up the stairs,
2    or into that -- I think there was a downstairs,
3    too, kind of.  They came off of that, to the
4    right.
5    Q.  Okay.
6    (Exhibit 11 was marked by the
7    reporter for identification.)
8    Q.  (BY MS. PILATE)  Okay, I'm going to hand
9    you an exhibit I'm marking as Shoop Exhibit 11.
10   A.  No.
11   Q.  I think there's a short report from you
12   on top that probably has nothing to do with the
13   photos that follow, but the photos that follow
14   are in the sense of I don't think you're saying
15   you took them.
16   A.  Right.
17   Q.  They are photos that follow our photos
18   of the Harte house, but I'll go ahead and ask
19   you.  Do you know anything about those photos?
20   Did you take them?
21   A.  No.
22   Q.  Okay.  And the second to the last page
23   of that exhibit I'm going to ask you to look at
24   that, and then mark with a pen, and the reason I
25   direct you to the last page is I think that

---

179

1    probably has the best view of the front door --
2    A.  Okay.
3    Q.  -- and I'd like you to indicate on there
4    where people were.
5    A.  Okay.  I was here, and Farkes was here,
6    knocking.
7    Q.  Okay, what I'd like you to do is to put
8    the initials of the person where you believe they
9    were.  Like Chris Farkes would be "CF."
10   A.  Okay.
11   Q.  And then I want you to put the initials
12   of each person.
13   A.  Okay.  The other ones I will just have
14   to put in a general area because I'm not sure.
15   Q.  Okay.  You and Lucky Smith have the same
16   initials?
17   A.  Okay, I've got Shoop here, too.  I'll
18   put Lucky.
19   Q.  Okay, that's good.
20   A.  And like I said, this is the general
21   area.  That's all I can be.
22   Q.  Do you have any idea where Ed Blake was?
23   A.  No, just somewhere in this area.
24   Q.  Okay.  Did he have any means of
25   communicating with the group?

---

180

1    A.  They would have been within talking
2    distance, at that point.
3    Q.  Okay.  Who was he communicating with?
4    Who would he relay his commands to?
5    A.  If he needed to relay anything, it would
6    have been, he could have talked to all of us at
7    that point.
8    Q.  Okay.  Did you ever hear anything from
9    him?
10   A.  No, not that I recall.
11   Q.  Did he give any commands that you
12   recall?
13   A.  I don't think he needed to.
14   Q.  Okay.  Inside the house, did you see
15   Tyson Kilbey when he first came in?
16   A.  Yes, I think I remember Kilbey.  Like I
17   say, he came in either directly before me or
18   after me, and if I recall right, he was one of
19   the initial officers that kind of helped guide
20   the people down the stairs.
21   Q.  Okay.  When you saw him, did you see an
22   assault rifle?
23   A.  Not that I recall.  Like I say, I
24   thought Farkes had it, but there's a chance that
25   Kilbey would have had it, too.

---

September 3, 2015                                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

                                                          181

1    Q.  But you believe someone did?
2    A.  Yeah.
3    Q.  Now when Mr. Harte was told to get on
4    the ground, did you see him do that?
5    A.  Yes, he complied.
6    Q.  Okay, and what position did he get into?
7    A.  He just laid face-down.
8    Q.  Okay.  What was he wearing?
9    A.  I can't recall.  I don't think that he
10   had a shirt on, but I can't recall.
11   Q.  Okay.  Did he have on shoes?
12   A.  I can't recall.
13   Q.  He got face-down on the ground?
14   A.  Yes.
15   Q.  Where did he put his hands?
16   A.  They were just out.  They were just
17   splayed out, from what I remember.
18   Q.  You don't recall seeing them behind his
19   neck?
20   A.  No.
21   Q.  Would there typically be a direction
22   given as to where to put hands?
23   A.  Not really.  I mean as long as they are
24   visible, we don't usually do anything.  If we are
25   going to secure them, we ask them to put them

                                                          182

1    behind their back, but our goal wasn't to secure
2    any of these people, or didn't feel the need to.
3    Q.  Okay I'm handing you a blank piece of
4    paper and actually I'm going to put Exhibit 12 on
5    there because, it's going to end up being an
6    exhibit in this deposition, and put a -- I'll
7    give you a couple of pieces of paper beneath that
8    so you have something to write on.
9    A.  Uh-huh.
10   Q.  And I would like you to draw what you
11   saw when you came in the door like very simple.
12   You can do like a square for the foyer area or
13   the entry hallway, and I would just like you to
14   depict where people were there to the best of
15   your recollection.
16   A.  Okay, front porch.
17   Q.  Okay?
18   A.  The door, and I'm not sure which way the
19   door swings.
20   Q.  Okay.
21   A.  Living room, I think there was a wall
22   right here.
23   Q.  Uh-huh.
24   A.  Living room, this went into the kitchen
25   area.

                                                          183

1    Q.  Uh-huh.
2    A.  Then there was stairs that went up I
3    think right here.  This would be Farkes.
4    Q.  Uh-huh.
5    A.  This would be me.
6    Q.  Uh-huh.
7    A.  This would be Mr. Harte.
8    Q.  Uh-huh.
9    A.  And then from there I think that both
10   Kilbey and Smith went up the stairs.
11   A.  The rest of the people, I couldn't tell
12   you.
13   Q.  Okay.
14   A.  Those are all that I remember.
15   Q.  Okay.  So was it Farkes who had control
16   of Mr. Harte?
17   A.  I think it was initially Farkes that
18   stayed with Mr. Harte and he wasn't on the --
19   laid down on the ground for a few seconds before
20   he was able to stand up.
21   We would let him stand up and make his
22   way over to the living room.
23   Q.  Okay.  Do you recall a period where
24   Mr. Harte and Mrs. Harte and the children were
25

                                                          184

1    seated on the floor in the foyer?
2    A.  I don't recall that time, no.  The couch
3    and everything was right over here and I think as
4    soon as we made sure everybody was -- that we had
5    everybody in the house there, then they were all
6    let sit in the living room.
7    Q.  So you're saying they never sat
8    cross-legged on the floor in the foyer or you
9    simply don't recall it?
10   A.  I don't recall it.  They may have came
11   downstairs and immediately asked to sit right
12   there with Mr. Harte, but it wasn't for a few
13   seconds.
14   Q.  Are you saying that they were asked that
15   or they were told to sit there?
16   A.  I'm sure they were told.  It wasn't in a
17   yelling fashion or anything like that.  It would
18   be, "Please sit down here in the foyer or please
19   cross your legs or please have a seat right here,
20   something to that effect, and probably about that
21   loud.
22   Q.  Uh-huh.  And at what point did you have
23   your hand on your gun and have your gun out?
24   A.  I'm speculating, but most of the time I
25   would have had my gun out on the initial entry

Case 2:13-cv-02586-JWL   Document 327-11   Filed 11/17/15   Page 48 of 61

Appellate Case: 16-3014   Document: 01019599309   Date Filed: 04/07/2016   Page: 179
September 3, 2015                                                Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

185

1    until we had everybody at least not -- I don't
2    want to say secured but at least accounted for
3    and I would have been watching the living room
4    and kitchen area.
5        Q.  Okay.  When did you first see
6    Mrs. Harte?
7        A.  20, 30 seconds after we entered the
8    residence.
9        Q.  Okay, and where did you first see her?
10       A.  If I recall right she was coming from
11   the residential area, and it could have been -- I
12   know there was a bedroom I think down here, too.
13   It could have been -- it didn't have to be from
14   the upstairs.  It could have been from down
15   there.  But it was from that direction.
16       Q.  She was coming either up the stairs or
17   down the stairs?
18       A.  No, from the upstairs or from the other
19   bedroom.
20       Q.  She was coming from the bedroom areas?
21       A.  Yes.
22       Q.  Okay, and how was she attired?
23       A.  I don't recall.
24       Q.  Did it look like they had just gotten
25   up?

186

1        A.  Yes.
2        Q.  When did you first see children?
3        A.  Within the first 30 seconds.
4        Q.  And where did you see them?
5        A.  They came from the residential area up
6    the stairs.
7        Q.  Okay, and what kind of children did you
8    see?  What ages?
9        A.  A teenage boy and then a young girl that
10   was, like I said, 5-ish.
11       Q.  Okay.  Did you ever see the teen boy
12   with his hands up as he came down the stairs?
13       A.  I don't recall.
14       Q.  And did the young girl come from the
15   same direction?
16       A.  Yes.
17       Q.  And who directed them?
18       A.  I can't remember.  I mean it would have
19   been Smith or Kilbey that probably directed them
20   to go down to us and then one of us probably
21   directed them to either sit like you said or to
22   go into the living room and sit.
23       Q.  What commands did you give to any of the
24   Hartes?
25       A.  None that I can be specific on.

187

1        Q.  Well, what do you believe you did?
2        A.  If I would have did anything it would
3    have been, you know, "Please sit down here," or
4    when we moved him over to the living room area,
5    "You guys can have a seat on the couch."
6        Q.  So you think if you said anything at all
7    it's, "Please sit down here"?
8        A.  Yeah, "Please take a seat here," you
9    know, or, "You guys can come on over and sit on
10   the couch," once we cleared that area.
11           We typically don't let people sit down
12   on furniture and stuff until we have kind of
13   checked it and made sure it's safe, there's no
14   weapons or anything in the furniture.
15       Q.  Okay.  Who checked the couch?
16       A.  I can't remember who would have did
17   that.
18       Q.  And if you would have said, "Please sit
19   down here," what would that have indicated, the
20   floor or the couch?
21       A.  Probably initially, like you said,
22   probably that floor area until we could look
23   through the couches and stuff like that to make
24   sure there was no weapons in there.
25       Q.  Did you give any commands to Mr. Harte?

188

1        A.  Not that I recall.
2        Q.  Who do you recall giving commands to
3    Mr. Harte?
4        A.  I believe it was Farkes.
5        Q.  Do you recall Kilbey giving any
6    commands?
7        A.  No.  I'm sure he did, but no, I don't
8    recall him specifically.
9        Q.  What about Smith?
10       A.  I'm sure he did, but I don't recall him
11   specifically.
12       Q.  Were the Hartes compliant?
13       A.  Yes.
14       Q.  Tell me what, if anything, you remember
15   the Hartes saying.
16       A.  I know there was a lot of questions
17   throughout the entire process.  At that initial
18   point, I can't remember specifically.  I know
19   there was a lot of questions of, "Why are you
20   guys here, and what's this about?" and that would
21   be typical for anyone.
22       Q.  Okay, tell me specifically what
23   questions you remember.
24       A.  I don't, not on this initial.
25       Q.  Okay.  Do you recall questions later?

September 3, 2015                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

189

1    A.  Yes.
2    Q.  What do you recall?
3    A.  I know both the Hartes, Mrs. Harte
4  specifically was kind of asking what led us to
5  the house, you know, and what gave us the reasons
6  to go into the house.  I remember those questions
7  specifically from her.
8    Q.  Can you paraphrase them as best you can?
9    A.  "What's the search warrant for?  Why do
10  you guys think that there's drugs in the house?"
11    Q.  Okay.  Did she appear to be upset or
12  concerned?
13    A.  Not upset as much as concerned of why we
14  were there, and how we got to be there.
15    Q.  And what was she told?
16    A.  She was told it was for marijuana.
17    Q.  Who told her that?
18    A.  I can't remember exactly.  I had talked
19  to her a little bit about that, and it may have
20  been me.
21    Q.  Did you use the word narcotics?
22    A.  I could have used the word narcotics.
23    Q.  Okay.  What did you tell her about
24  narcotics?
25    A.  Well, throughout, and we're talking

---

190

1  about longer on in the investigations when I had
2  the chance to stand there, and Sergeant Cossairt
3  I think was trying to explain things a little bit
4  to her, too, I told her that there had been
5  narcotics, and I may have said marijuana or
6  narcotics, either one, came from this residence.
7    And I said, "I can't explain the exact
8  circumstances of how we came about that, but we
9  were positive that narcotics came from this
10  residence."
11    I said, "If you want to later on go and
12  search Google or something like that, you would
13  probably find out different tactics that officers
14  use for a search warrant, and probably come to
15  that assumption," but it was something to that
16  effect.
17    Q.  Okay.
18    A.  I just couldn't tell them at the time,
19  "We do trashings."
20    Q.  Okay.  I want to ask you about each one
21  of those things, and I want to make sure I got
22  them down right.  Could you read back to me his
23  answer, please.
24  (Whereupon, the previous answer was read by the
25  reporter as follows:

---

191

1    "ANSWER:  Well, throughout, and
2  we're talking about longer on in the
3  investigations when I had the chance to stand
4  there, and Sergeant Cossairt I think was trying
5  to explain things a little bit to her, too, I
6  told her there may had been narcotics, and I may
7  have said marijuana or narcotics, either one,
8  came from this residence."
9    "And I said, 'I can't explain the exact
10  circumstances of how we came about that, but we
11  were positive that narcotics came from this
12  residence.'"
13    "I said, 'If you want to later on go and
14  search Google or something like that, you would
15  probably find out different tactics that officers
16  use for a search warrant, and probably come to
17  that assumption,' but it was something to that
18  effect.")
19    Q.  And where were you when you said these
20  things?
21    A.  Right there in the living room area.
22    Q.  And they were on the couch?
23    A.  Yes.
24    Q.  Okay.  So four things, you said you used
25  the word marijuana or narcotics, one or the

---

192

1  other, you may have said narcotics came from this
2  residence, that's Number 1; Number 2, I can't
3  explain the exact circumstances; Number 3, but
4  we're positive that narcotics came from this
5  residence, and you also told her, this is the
6  fourth thing that she could search Google and
7  find out different tactics that officers use.
8    A.  Yes.
9    Q.  Those are the four things you told her?
10    A.  Something to that effect, yes.
11    Q.  Did you tell either her or Mr. Harte
12  anything else?
13    A.  No, well, I take that back.  I did.
14  Once we concluded that we couldn't find anything,
15  and we were still under the assumption that what
16  we pulled out of the trash was, in fact,
17  marijuana or narcotics I said that, "Hey, when we
18  leave, you guys might want to have a sit-down,
19  just be honest with each other and talk about
20  some activity, and stuff.  You know, if you --" I
21  didn't want to accuse them of anything, but I
22  thought if they sat down and had they had a talk
23  about drug use and stuff, they would probably
24  find out how we came across that.
25    Q.  A talk with who?

---

September 3, 2015                                                      Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

193

1    A.  Each other.
2    Q.  Did you say anything about their son?
3    A.  No, I didn't, I didn't lead to that.  I
4    mentioned just that the whole family should, and
5    the reason being it very well could have been the
6    son that was using it, it very well could have
7    been one of the son's friends, or it very well
8    could have been the adults.
9        I wasn't going to accuse their teenage
10   son of using marijuana.  That wouldn't have been
11   appropriate.
12   Q.  Okay.  Did anyone suggest to take the
13   teenage son to the pediatrician?
14   A.  No, not that I recall.
15   Q.  You didn't say that?
16   A.  No.
17   Q.  You never heard that?
18   A.  No.  For like a urinalysis or something
19   like that?  No, I didn't suggest that.
20   Q.  Take him to the pediatrician to look at
21   possible drug use.
22   A.  No; somebody may have suggested that,
23   but it wasn't I.
24   Q.  It wasn't you?
25   A.  No.

194

1    Q.  You never heard anyone say that?
2    A.  No.
3    Q.  Okay.  So you recall Mrs. Harte asking
4    questions about, "What's this about?  Why are you
5    here?" that type of thing.
6        Did Mr. Harte ask you any questions?
7    A.  I don't recall Mr. Harte saying a whole
8    lot about it.  The son did a little bit.  He
9    wasn't argumentative or anything like that.  He
10   was kind of more of an inquisitive teenage boy,
11   maybe just a little bit of, "Why are you guys
12   doing this," and, "Why is this happening?"  He
13   was being that way, too.
14       We didn't have to intervene, or we
15   didn't have to tell him to stop, or anything like
16   that.  Mom at one time kind of told him to be
17   quiet, they are only doing what they think is
18   right, something to that effect.
19   Q.  Okay, do you recall Mrs. Harte saying
20   anything else during the time you were there?
21   A.  No.
22   Q.  Do you overhear anything the Hartes said
23   to each other?
24   A.  No.
25   Q.  Did you hear any conversations with any

195

1    other law enforcement officers?
2    A.  With the Hartes?
3    Q.  Uh-huh.
4    A.  No.  I know that I passed by Officer
5    Blake a few times, at least when he was talking
6    to Mr. Harte initially, but I didn't hear any
7    kind of the gist of what the conversation was
8    about.  I mean I know the conversation was about
9    narcotics, but I didn't get any particulars.
10   Q.  If it was marijuana why would you use
11   the word narcotics?
12   A.  I don't know.  Just a typical word that
13   we use for investigations.  I mean I guess we
14   could be specific and say marijuana, but
15   sometimes we'll just use the word "narcotics."
16   Q.  Were you present when the Hartes were
17   moved to the couch?
18   A.  In that general area, yes.
19   Q.  And what were you doing?
20   A.  Pretty much at that point I was just
21   standing by waiting for officers to begin their
22   search and waiting for my go ahead, that the
23   house was clear, so that I could do my pre-video.
24   Q.  Did you see where Mrs. Harte and the
25   children were before they were seated on the

196

1    couch?
2    A.  No.  Once the officers ascertained that
3    there was nobody left in the house then like I
4    said, my job was doing the pre-video, so I would
5    have bolted out and got the camera to do the
6    pre-video.
7    Q.  Did you see Kilbey and Smith go up the
8    stairs?
9    A.  I saw officers go up the stairs and I
10   believe it was Kilbey and Smith.
11   Q.  Did you see them do that before
12   Mrs. Harte and the children came downstairs?
13   A.  Before the children came downstairs, I
14   cannot recall if they did or not.  They may have
15   directed those kids down the stairs just by
16   saying, "Come on down the hallway and come down
17   the stairs."
18       I don't remember if they actually had to
19   go up and wake them up and direct them down.
20   Q.  What did they do when they went
21   upstairs?
22       MR. FERREE:  He said he doesn't
23   know they went upstairs.
24   A.  Just assuming.
25   Q.  (BY MS. PILATE)  Oh, well, I thought you

September 3, 2015                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

197

1    said -- whoever went upstairs, what did they do
2    when they went up there?
3              MR. FERREE:  Objection, vague and
4    ambiguous, misstates his testimony.
5              MS. STOPPY:  Join.
6         Q.  (BY MS. PILATE)  Did someone go up the
7    stairs?
8         A.  I'm sure that Kilbey and Smith went up
9    the stairs at some point.
10        Q.  Where did they go when they first
11   entered the house?
12        A.  They went towards the stairs, and I
13   can't remember if they actually went up and
14   directed people down or if they actually directed
15   people down from the bottom of the stairs.
16        Q.  Okay.  Did they not go upstairs at that
17   point?
18        A.  Within a short time they would have went
19   upstairs.  Whether they directed the children
20   down --
21        Q.  Okay.
22        A.  -- or whether they had to go up and
23   direct them down, they would have went up the
24   stairs at that point.
25        Q.  What I'm asking you is what they did

198

1    when they went upstairs.
2         A.  I have no idea.
3         Q.  Okay.
4         A.  I assume they cleared the rooms and made
5    sure that nobody else was there.  That would be
6    our standard practice anyway.
7         Q.  At what point did someone go downstairs?
8         A.  Probably about the same timeframe.  I
9    just couldn't tell you who that was, and it could
10   have been Smith and Kilbey came back down the
11   stairs once they cleared it and went to the
12   downstairs area.
13        Q.  Okay.  Did people go upstairs before
14   downstairs or do you think at the same time,
15   different people went different directions?
16        A.  It could have been at the same time that
17   people went different directions.
18        Q.  Were you involved in the search at all?
19        A.  A very little bit.  I did look through
20   some stuff but my -- I'll put it this way I
21   walked around and when guys were searching the
22   rooms and stuff like that, but that wasn't my
23   primary job.
24            I might have went in and assisted them
25   with looking in a few things, but the bulk of my

199

1    time was supposed to be waiting to do pictures.
2         Q.  Okay.  So where did you wait?
3         A.  Most of my time was in the living room,
4    but I walked through most of the entire house at
5    one point or another.
6         Q.  And what did you do when you were
7    walking through?
8         A.  Just asking the guys if they had got
9    anything yet, walked downstairs, I know, and
10   looked at the grow operation that he had down
11   there; otherwise, most of my time was in the
12   living room.
13        Q.  Is it a grow operation or a vegetable
14   garden?
15        A.  It was a vegetable grow operation.
16        Q.  Okay.  It wasn't a marijuana grow
17   operation?
18        A.  No.
19        Q.  Okay.
20        A.  We didn't find any indication of that.
21        Q.  Okay.  When did you go downstairs?
22        A.  It was somewhere during the initial part
23   of the -- right after the sweep was made.  We
24   made sure no occupants were there.
25        Q.  Okay, so shortly after arriving at the

200

1    house, you went downstairs?
2         A.  Yeah, within a few minutes and then like
3    I said, my job was pre-video, so I would have had
4    to have walked around the entire house, at least.
5         Q.  Okay.  Who took the first look at the
6    hydroponic garden in the basement?
7         A.  I don't know.  It was one of the initial
8    sweeping guys.  I'm not sure who it was.
9         Q.  Okay, and who first went in the basement
10   to search?
11        A.  I'm not sure who it was.
12        Q.  When was the conclusion reached that it
13   was a vegetable garden and not a marijuana grow
14   operation?
15        A.  It was, I don't know, within the search
16   for quite awhile.  I mean it was initially going
17   through there, there were some plants that were
18   suspicious, but probably within the first 15 or
19   20 minutes probably we realized we wouldn't have
20   a massive grow operation, as we had speculated.
21        Q.  Why had you speculated a massive grow
22   operation?
23        A.  Upon initially seeing all of that
24   equipment, we thought we would have a good grow
25   operation.

September 3, 2015                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

201

1    Q.  Seeing what equipment?
2    A.  All the hydroponic stuff that he had
3    downstairs.
4    Q.  Well, do you know how many pots there
5    were in the garden?
6    A.  There was probably only four or five
7    active growing plants, I think, something along
8    that.
9    Q.  And that, to you, is a massive grow
10   operation?
11   A.  There was the potential to have all
12   kinds of pots in there, so during most search
13   warrants when we come to it, if we found a lot of
14   empty spaces, those plants would have been
15   drying, or those plants would have been in some
16   other state of process.
17   Q.  Were there empty spaces?
18   A.  There was quite a few empty spaces on
19   the hydroponic spots, holes that did not have
20   pots in them.
21   Q.  That's your recollection?
22   A.  Yes.
23   Q.  How many empty spaces?
24   A.  I couldn't tell you.
25   Q.  And how many pots had something in them?

---

202

1    A.  Oh, there was probably maybe up to half
2    a dozen or something.  The pots had something in
3    them.
4    Q.  And then beyond those half dozen pots
5    that had something, it's your testimony there
6    were quite a few empty spaces?
7    A.  Yeah.
8    Q.  By empty spaces, what do you mean?
9    Empty pots?
10   A.  No, that could have had pots.  There
11   were kind of holes in the PVC that could have had
12   pots them.
13   Q.  Okay, and what conclusion was reached
14   about what was growing in the basement?
15   A.  After the entire process, that it was
16   some type of vegetables.  I think it was a mix of
17   different vegetables.
18   Q.  Well, after someone first inspected
19   them, who would that have been?
20   A.  One of the initial guys that went
21   downstairs, but I don't -- their initial job was
22   just to clear the building.
23   Q.  Okay.
24   A.  It would have been probably, oh, like I
25   said, about 15 or 20 minutes before we got a

---

203

1    chance to really take a look at the --
2    Q.  Okay, so after 15 or 20 minutes you get
3    a chance to take a look --
4    A.  Yeah.
5    Q.  -- and what conclusion is reached about
6    the hydroponic garden?
7    A.  That there wasn't any actively growing
8    marijuana plants.
9    Q.  Okay, so then after that point what were
10   you looking for?
11   A.  Residual, and I know I had made mention
12   to a few of the officers that especially, you
13   know, Tyson and Kilbey which hadn't been on a lot
14   of narcotics ones, to make sure that we looked
15   around the basement, because I was positive we
16   were going to find remnants of a grow operation
17   that was -- that had been there at one point.
18       In other words we were going to find a
19   leaf or a plant or stems or something that
20   indicated that there was plants growing there at
21   one time.
22   Q.  And why were you quote "positive" that
23   you were going to find remnants of a grow
24   operation?
25   A.  Because of the amount of time and money

---

204

1    and resources that had been put into that.  I
2    just could not believe that they were growing
3    tomato plants.
4    Q.  Did you know that this was an
5    educational project for a 12 year-old boy --
6    A.  No idea.
7    Q.  -- built from commonly available,
8    inexpensive materials?
9    A.  Not at the time.
10       MR. FERREE:  Objection, no
11   foundation.
12   Q.  (BY MS. PILATE)  Okay, I'm just asking
13   him.
14       So did you direct people, anything about
15   where to search?
16   A.  No, I just reminded them, "Hey, look
17   around the entire basement, stuff like that, and
18   especially around these, because we will find
19   some remnants of a grow operation."  That was my
20   assumption.
21   Q.  And what would those remnants be?
22   A.  Typically even when people clean up grow
23   operations, we will find leaves that they have
24   failed to sweep up, or stems that they had failed
25   to get rid of, stuff like that, that they had

---

September 3, 2015                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

205

1   just failed to clean up after theirself.
2       Q.   Why did you not just consider the
3   possibility that they might just be growing
4   vegetables?
5       A.   Mainly like I said, because of the
6   extent of resources that had been spent on that.
7       Q.   But you saw no mylar, right?
8       A.   No.
9       Q.   Did you see any specialized ventilation
10  equipment?
11      A.   No, not besides the regular -- I'm sure
12  there was fans and stuff around, but nothing that
13  was specific.
14      Q.   You're sure there were fans around?
15      A.   No, I'm not positive, but I didn't see
16  any ventilation that's typical of a marijuana
17  grow operation.
18      Q.   Okay.  I want you to tell me all of the
19  things sitting here today that caused you to
20  believe that it was going to be a massive grow
21  operation.
22      A.   The PVC pipe.
23      Q.   Okay.
24      A.   The way it was laid out for a hydroponic
25  grow.

---

206

1       Q.   Uh-huh.
2       A.   The pumping systems for a hydroponic
3   grow, and then although they weren't the high
4   dollar lights, the fluorescent lighting and
5   stuff.
6       Q.   And what do you believe that PVC pipe
7   cost?
8       A.   I'm not sure what the cost was of the
9   PVC.
10      Q.   And what do you believe the pumping
11  system cost?
12      A.   Again, I'm not sure.
13      Q.   And what do you believe the fluorescent
14  lighting cost?
15      A.   I mean I could take a guess that all of
16  that would have been $500 or $600, plus all the
17  labor involved with it.
18      Q.   Well, what if the labor was people doing
19  it themselves?
20      A.   That's still time and resources and
21  stuff.  Again, back to that, I've never seen
22  people spend that much time and that much
23  resource to grow a few dozen tomato plants.
24      Q.   What if it's a hobby?
25      A.   I have just never seen that before

---

207

1   most -- you know, it's not very typical for you
2   to see that.
3       Q.   That's based on your own lack of
4   experience in this area?
5       A.   Or experience in this area.  The lack of
6   vegetable growing experience, maybe.
7       Q.   Okay.  I mean surely you're familiar
8   with people spending a lot of money on gardens,
9   backyard gardens, right?
10      A.   For a purpose, yes.
11      Q.   Okay.
12      A.   And most of that purpose is to save
13  money when going to the grocery store.
14      Q.   Uh-huh.
15      A.   I mean people don't -- yeah, there's
16  people that have a great hobby of growing
17  tomatoes, but most of those people throw a couple
18  of plants in their backyard so they can do it as
19  cheap and inexpensive as possible, so they could
20  have tomatoes.
21      Q.   You're not aware of gardening
22  organizations where people devote a great deal of
23  time and effort to learning how to be good
24  gardeners and share tips, and it's a hobby?
25  You're not aware of gardening as a hobby?

---

208

1       A.   Yes, there is gardening as a hobby, but
2   most people that put in a garden do it so they
3   can save a little extra money, make sure they
4   enjoy it, but they don't spend hundreds of
5   dollars and hundreds of hours working on
6   something to grow a few dozen tomato plants.
7       Q.   So that's your belief, that most people
8   do it to save money?
9       A.   Yes.
10      Q.   What about to get higher quality
11  produce?
12      A.   I'm sure there's people out there that
13  have specific diets that want to have organic
14  gardens and I guess a lot of this is personal
15  experience.  I'm going to do as it cheaply and
16  inexpensively as possible.
17      Q.   So you're basing that on how you would
18  do something?
19      A.   How I would do it, and how I've seen
20  most people do it.
21      Q.   At what point was it concluded that
22  nothing had been found?
23      A.   For the grow operation it was probably,
24  oh, I would say, maybe within an hour, maybe an
25  hour-and-a-half, we were fairly certain that we

---

September 3, 2015                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

209

1  were not going to find the marijuana grow
2  operation that we had hoped or remnants of a
3  marijuana grow operation as we'd hoped.
4      Q.  Uh-huh.  What happened at that point?
5      A.  We probably switched just a little bit,
6  and being that the warrant covers all marijuana
7  in all forms, that we were going to -- we had
8  marijuana found in the trash, that we were going
9  to find some kind of use of marijuana in the
10 house, and so we switched more mainly -- not the
11 guys that wasn't looking at the time but the
12 search was more specific to a personal type of
13 use.
14     Q.  Then you switched to looking to personal
15 use and hoped to find a small amount that someone
16 was going to what, smoke, use?
17     A.  Not really, hoped to find something to
18 legitimatize why we found dope in the trash.  We
19 were still under the assumption we had found a
20 large amount of dope in the trash.  Somebody had
21 used marijuana in that house, and so we should
22 find marijuana in that house.
23     Q.  Nobody at any point questioned whether
24 the field test had been done properly or
25 interpreted properly?

---

211

1  is a hydroponic grow operation that has tomato
2  plants in it."
3      Q.  Okay, so did you call him or did he call
4  you?
5      A.  I think he called me.  I just can't
6  recall when that was.
7      Q.  And you told him, "All we have is a full
8  on hydroponic garden with vegetables"?
9      A.  All we had was a full-on hydroponic
10 grow, and all we have found right now is a few
11 vegetable plants.
12     Q.  Okay, and he said you're lying to me?
13     A.  Yes.
14     Q.  And that was the end of the
15 conversation?
16     A.  He thought I was pulling his leg, and
17 then he called Deputy Blake, I think, to confirm
18 that.
19     Q.  Okay.  He called Blake, and when did
20 these phone calls occur?
21     A.  I can't recall.
22     Q.  Okay.  What happened next?
23     A.  That's pretty much it.  I mean once we
24 determined that we didn't have any kind of
25 personal use, marijuana, we filled out the search

---

210

1      A.  No.
2      Q.  Did anyone communicate with the
3  commander at any point?
4      A.  At some point I think somebody had
5  called Sergeant Reddin to go, "Hey, we don't have
6  a grow operation.  We have it looks like
7  vegetables being grown here, but we're still
8  searching for marijuana."
9      Q.  Okay, and what did he say?
10     A.  He couldn't believe it, that we had an
11 entire hydroponic grow operation in a basement
12 that was vegetables, and actually that was a
13 conversation that I had with him.
14     Q.  Okay, so you talked to him on the phone?
15     A.  Yeah at one point I think we had talked
16 to him on the phone.
17     Q.  You and who?
18     A.  At one point myself and Sergeant Reddin
19 had talked, and I said, "Hey, all we have is a
20 full on hydroponic grow operation that appears to
21 have tomato plants in it and he pretty much said,
22 "You're lying to me."
23     And I said, "Okay," and then shortly
24 after that he called Deputy Blake, I think, and
25 Deputy Blake said, "Yeah, all we have right now

---

212

1  warrant return, I did the post video and we left.
2      Q.  Okay, at what point did you decide there
3  was no grow operation?
4      A.  That we had no active grow operation,
5  like I said, probably within, oh, 20 or 30
6  minutes; that we had no dismantled grow
7  operation, it was probably a good hour and-a-half
8  into the investigation.
9      Q.  Okay.  Was a K-9 brought there?
10     A.  I can't remember if there was one or
11 not.  I thought somebody had mentioned possibly
12 bringing one in, but I can't remember if one was
13 ever sought.
14     Q.  Did anyone ever say they smelled or
15 thought they smelled marijuana?
16     A.  Somebody at the bottom of the stairs
17 thought they had smelled something at one point.
18     Q.  Who was that?
19     A.  I cannot remember.  I want to say I
20 thought it was Detective Smith, and I think we
21 focused on that area a little harder during the
22 search.
23     Q.  What area was that?
24     A.  That was towards the bottom of the
25 basement stairs, somebody had said they mentioned

---

September 3, 2015                                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

213

1    something, and we searched a little bit and
2    decided that whatever was there wasn't there or
3    it was a faint odor enough that we couldn't
4    detect it.
5        Q.  Okay, and you think that may have been
6    Smith?
7        A.  I think so.
8        Q.  Did you ever smell anything?
9        A.  No.
10       Q.  You don't recall the K-9 there?
11       A.  I just remember them talking about
12   getting one, but I don't remember it being there.
13       Q.  Okay.  Other than what you've told me,
14   did you hear any other, what you've already told
15   me today, any other conversation made or words
16   spoken by any one of the Hartes?
17       A.  No.  The little girl, I don't think she
18   said anything.  She pretty much was oblivious.
19   She was playing at the living room coffee table
20   the whole time we were there.
21       Q.  Okay.  Did you ever receive any training
22   at any point that people grow things with
23   hydroponic equipment, other than marijuana?
24       A.  No.
25       Q.  When did you take the post-search video,

---

214

1    what time?
2        A.  I can't recall.  It was probably within,
3    oh, five or ten minutes of us leaving the house.
4        Q.  Okay.  Who made the decision to leave?
5        A.  That would have been Deputy Blake, but I
6    can't remember the exact.
7        Q.  Okay.  At what point did it move from
8    looking for a grow operation to looking for
9    personal use?
10       A.  There were always people going around
11   the residence looking, you know, for places that
12   would have personal use-type marijuana during the
13   entire investigation, but probably it was an hour
14   and-a-half or so before the focus was strictly on
15   the personal use, or not the grow operation
16   stuff, but actually manufacture of marijuana
17   somewhere in the house.
18       Q.  Was anything ever found at any point
19   that suggested either use or processing or
20   manufacturing of marijuana?
21       A.  No.
22       Q.  And at the point moved to personal use,
23   what was being done to search for personal use
24   marijuana?
25       A.  They were pretty much just doing the

---

215

1    search as they would normally do it.  It's just a
2    matter we thought in the back of our mind, "We're
3    going to end up finding personal use."
4        Q.  Where were they looking for that?  Where
5    were they looking?
6        A.  Typically those are anywhere, it can be
7    refrigerators, drawers, closets, bags, coffee
8    tables, end tables.  I mean people keep their
9    marijuana pretty much anywhere.
10       Q.  So everywhere in the house?
11       A.  Yes.
12       Q.  And you were just looking for at that
13   point even a small personal use?
14       A.  Yes.
15       Q.  Although to that point there had been no
16   evidence found that they were using marijuana,
17   correct?
18       A.  Correct.
19       Q.  You mentioned earlier the advantages of
20   having an AR15 rifle available.  I'd like to know
21   why in a house, why having a Glock available or
22   multiple Glocks as it were would not be
23   sufficient?
24       A.  Just like I said, the rifle has a longer
25   accuracy.  If you ever had the point where you

---

216

1    had some kind of situation where somebody was
2    taking someone as a hostage, that makes for a
3    more accurate shot if you have to do that.
4        Mainly it's just another tool that you
5    can use.  You know, like I said preferably, you
6    know, if we have somebody assigned to a taser, we
7    all had tasers at that point, but we'll have
8    somebody assigned a taser.
9        Just the more different resources you
10   can have, the better.  Typically in a house we
11   don't want everyone to have a rifle, just because
12   it does have drawbacks, too.
13       Q.  Well, if there was any belief that
14   someone might possibly need to use a rifle, I
15   guess I'm curious as to why there wasn't more
16   information gathered about the Hartes before you
17   even went there.
18       A.  To us, a rifle is just another tool in a
19   handbag.  It's not a matter of -- it's a more
20   sophisticated weapon.  It will hurt someone as
21   much as a Glock will, it just has a little bit
22   different function.
23       I know it looks a little bit more
24   menacing than the handgun does, but I don't want
25   to be shot with either one of them.

---

September 3, 2015                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

217

1    Q.  Was there ever any thought given that
2    such a weapon might not be a small nice thing to
3    have around a small impressionable child?
4    A.  I think any weapon you don't want to
5    have around a small impressionable child.
6    Unfortunately, we're not given that option.  We
7    have to utilize weapons in a safe manner, and try
8    not to have any of these weapons around to
9    traumatize a kid.
10       But like I had mentioned, this kid was
11   oblivious to what we were doing.  She was
12   oblivious to any weapons, and the young man, the
13   teenager didn't seem to be at all caring about
14   weapons either.
15   Q.  Well, that was your assessment.  You
16   would agree that you don't know how either of
17   those children have felt about it since, right?
18   A.  But at the time they showed no emotion
19   whatsoever to those weapons, and I have seen
20   traumatized people initially and these kids had
21   showed no initial traumatization to any kind of
22   weapons.
23   Q.  Are you an expert in trauma?
24   A.  No, but I've seen enough traumatic
25   situations to know how people would react to

---

218

1    those.
2    Q.  You would agree you have had no contact
3    with the Harte children since then and you have
4    no idea, do you, what's going on with them right
5    now, do you?
6    A.  No.
7    Q.  What is the range of a Glock versus an
8    AR15 rifle?
9    A.  Typically when we go out to the range we
10   will try not to shoot the Glock more than I think
11   25 yards.  Anything other than that, we'll try to
12   go into the rifle.
13       We'll shoot the rifle as close as, oh,
14   ten yards plus, so usually anything closer
15   than -- closer than ten yards, we probably don't
16   shoot the rifle near as much, unless it's just
17   kind of a dangerous type of situation.
18   Q.  Okay.  So the Glock, the range would be
19   up to 25 yards.  The rifle, you wouldn't shoot at
20   anything closer than ten yards?
21   A.  Usually at the range, we'll practice
22   shooting emergency situations closer, but
23   typically when we start to shoot accuracy and
24   stuff, we step back to ten yards.
25       Here to that wall, I mean that's

---

219

1    probably a little closer to ten yards.  That's
2    probably closer than -- to about seven.  I don't
3    think we shoot the rifle usually any closer than
4    this.
5    Q.  Did you ever hear anybody tell the
6    Hartes at any point that they were allowed to
7    leave?
8    A.  I can't recall them saying specifically,
9    but typically they are not held for anything,
10   they can leave if they wanted to, but I don't
11   remember somebody saying, "You can go."
12   Q.  What do you mean "typically they are not
13   held;" what do you mean by that?
14   A.  The search warrant, when we search
15   houses, we're only searching the property and
16   vehicles and stuff involved sometimes specified
17   in the warrant.
18       As for the people, they are free to go
19   unless we have any kind of charges.  If we get
20   into the house and we immediately find marijuana,
21   then yes, they are going to be detained, but in
22   this circumstance we didn't immediately find
23   anything, so they would have been free to go.
24   Q.  So were they not free to go until you
25   discerned that you hadn't found anything?

---

220

1    A.  No.  Had they have walked out of the
2    house, most of the time as soon as we secure the
3    house, we know all the occupants we have in
4    there, then we don't hold anybody.
5        If they would say I want to up and
6    leave, they could have up and left.
7    Q.  Do you know if Mrs. Harte asked that
8    specific question and was given a different
9    answer?
10   A.  I have no idea.
11   Q.  During the search did you hear any of
12   the search officers talking to each other about
13   what they were or were not finding?
14   A.  Yeah, I mean constantly we're always
15   assessing that, and being the photograph and
16   video officer, I'm always going to be going in
17   and saying, "Hey, have you guys found anything
18   yet?" and they would say, "No."
19   Q.  If you had this situation to do over
20   again, would you do anything differently?
21   A.  No, I'd absolutely do the same thing.
22   Given the tip and the positive test on the drug
23   kits, this would have been another search warrant
24   that we would do the same way.
25   Q.  Do you think the policy change is good,

---

September 3, 2015                                                    Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

221

1    to require things to be sent to the lab?
2        A.  I think the policy change kind of
3    crippled us in investigations a little bit.
4    We're not able to speedily do warrants and I know
5    it's kind of overwhelmed the lab more.
6            You know, if it could all function and
7    everything goes to the lab and they can get it
8    done without any kind of a problem, that's great,
9    but most of the time that can't happen.  I still
10   think the test kits are a very reliable source.
11       Q.  Have you ever done any reading about the
12   test kits?
13       A.  No, besides the instructions on how to
14   use them, no.
15       Q.  So you have never done any research to
16   determine how reliable or unreliable they are?
17       A.  No.
18       Q.  Okay.  I'm going to do a quick check
19   with Kristi, and then I think we'll be able to
20   wrap up.  We're at 2:35 right now.
21           THE VIDEOGRAPHER:  Off the record
22   at 2:34.
23           (Recess)
24           THE VIDEOGRAPHER:  Back on the
25   record at 2:44 p.m.

222

1        Q.  (BY MS. PILATE)  Okay, I want to circle
2    back and ask you a question about the plants in
3    the basement.  I may have misheard you but I
4    thought you said something at some point about
5    how some plants in the house looked suspicious.
6    Did I hear you correctly or did I mishear that?
7        A.  No.  I mean there was some that needed a
8    closer look at.
9        Q.  What needed a closer look at?
10       A.  There was a couple of plants when you
11   first come down the stairs that were obviously
12   not marijuana.  They had a bigger leaf on them.
13           But there was some at the far end, and I
14   think those may have been actual tomato plants or
15   something, that can very similarly like marijuana
16   from a distance.
17       Q.  When you got up close to them, could you
18   see that they were not marijuana plants?
19       A.  Yes, upon closer inspection you could
20   tell that they were not marijuana plants.
21       Q.  Okay, and then I want to return again to
22   Mr. Wingo.  He said he gave some fresh tips.
23   Would this be after Operation Constant Gardener
24   2011?
25       A.  I can't really recall on those.  I mean

223

1    most of the tips and stuff that he provided went
2    through Sergeant Reddin.
3        Q.  Okay.  At what point did you leave the
4    house to go get the video equipment in your car?
5        A.  For the initial search, for the initial
6    pre-one?
7        Q.  Yes.
8        A.  Probably within ten minutes of entry or
9    so.
10       Q.  Okay.  Within about ten minutes, and was
11   that the first time you saw the Leawood officer?
12       A.  I remember when I was going back, I
13   noticed his car there.  It could have been there
14   prior, but that's the first time that I would
15   have noticed it.
16       Q.  Did you see it at any other time?
17       A.  No, the next time I looked, he was gone.
18       Q.  Okay, and when was that?
19       A.  It was some time during the
20   investigation, but I couldn't tell you when.
21       Q.  So you just saw him one time?
22       A.  Yeah.
23       Q.  Do you believe that someone should have
24   apologized to the Hartes?
25       A.  No.

224

1        Q.  And why is that?
2        A.  And that's because our initial
3    assumption, still even when we left that
4    residence, we were under the assumption that
5    there was marijuana that came from that
6    residence.
7            Only afterwards were we -- did we find
8    out we erred in that, that the test kits and
9    stuff gave us a false.
10       Q.  What about at the point that was
11   realized?
12       A.  That would have been above us.  That
13   would have been the administration, and I can't
14   speak to how administration handles things.
15       Q.  Well, I'm asking you your opinion.
16       A.  You know, I don't know.  I don't know
17   how the Hartes would have took it.  I know that
18   it was still an on-going investigation, maybe
19   after everything was settled, but at that point
20   it was looked like it was going to be a legal
21   issue, so I don't know if there was any point at
22   the time that you could have went in and said,
23   "Hey, we're sorry," and this could have went
24   away.
25       Q.  What about when the lab tests were done

September 3, 2015                                                          Larry D. Shoop
Adlynn K. Harte, et al. v. The Board of Commissioners of the County of Johnson, Kansas, et al.

---

225

1  and it was discovered conclusively that what was
2  in the trash was not marijuana?
3      **A.  I don't know at what point after that**
4  **this became -- it turned into a civil issue, you**
5  **know, where the Sheriff's Office had to end up**
6  **gathering their information and worrying about a**
7  **civil case.**
8      Q.  Uh-huh.
9      **A.  I don't know at what point after that**
10 **that happened.**
11     Q.  Were you informed of the results of the
12 lab tests that occurred a week to ten days later?
13     **A.  I'm sure somebody had come and said,**
14 **"Hey, those tests were negative," and stuff like**
15 **that.  "We need to maybe look at what test kits**
16 **we were using."**
17     Q.  So did you say anything at that point?
18     **A.  No.**
19     Q.  Did you suggest to anyone, "Maybe we
20 ought to apologize to the residents of that
21 home"?
22     **A.  No.  I mean I think there was a**
23 **consensus between some of us that had we went and**
24 **apologized, that things would have been better.**
25         **Do I feel sorry for the Hartes?  You**

---

226

1  **know, yeah.  They wasted a couple of hours of**
2  **their time that day, but that's about the extent**
3  **of it.  You know, "Hey, we're sorry for wasting**
4  **your time.  We hope you still have confidence**
5  **that the Sheriff's Office is going to do the**
6  **right thing."**
7          **Do I feel sorry that we wasted it?  We**
8  **wasted a ton of man hours working on this case,**
9  **based on some faulty test kits, and that probably**
10 **miffed me more than anything.**
11         **But should we apologize?  You know what,**
12 **it's a bad thing that happened.  Like I said,**
13 **"I'm sorry we wasted a couple of hours of your**
14 **time but the Sheriff's Office followed all of the**
15 **procedures that they should have followed."**
16     Q.  So it's your testimony that what
17 happened, happened as a result of the policies,
18 practices and procedures of the Sheriff's Office?
19     **A.  No.**
20         MR. FERREE:  I'd object, calls for
21 a legal conclusion and speculation.
22     Q.  (BY MS. PILATE)  Okay.  You're saying
23 you followed the practices of the Sheriff's
24 Office so you don't think that anything wrong was
25 done, right?

---

227

1      **A.  If I had to do it all over again,**
2  **absolutely.  I wish we had not used those test**
3  **kits.  I wish we would have had something besides**
4  **those kits, something that wouldn't have gave us**
5  **the error that it gave us.**
6      Q.  Well, do you have any knowledge as to
7  whether all field test kits for marijuana are
8  subject to false positives?
9      **A.  No.**
10     Q.  You have no knowledge?
11     **A.  Like I said, this was the first time I**
12 **ever heard of a false positive.**
13     Q.  You said you followed the protocols or
14 the policies or the practices of the department,
15 correct?
16     **A.  Yes.**
17     Q.  So would you say those protocols or
18 policies or practices of the department were
19 responsible for what occurred?
20     **A.  No, given again, it would have ended up**
21 **the same way.  I mean the training was there in**
22 **place on the test kits, the policies were adhered**
23 **to.  It's just a matter of the test kits.**
24         **Had those test kits not gave us what**
25 **they gave us, if they would have been right and**

---

228

1  **assumed that that was not marijuana, then we**
2  **wouldn't be here.**
3      Q.  Okay.  Well, who was responsible for
4  providing training on test kits and letting all
5  of you know the limitations of the test kits?
6      **A.  The Sheriff's Office is, and they did**
7  **that.**
8      Q.  Okay.  But you're saying prior to 2012
9  you didn't know about that.
10     **A.  The false positives, no.**
11     Q.  Okay.  I just have one more thing here.
12 I'm going to ask you if you recognize these
13 e-mails.
14     **A.  Yes.**
15     Q.  And what are they, please?
16     **A.  These are e-mail correspondence, it**
17 **looks like Eddie Blake and Sergeant Reddin and me**
18 **and it looks like my name is probably on most of**
19 **these, since you're handing them to me.**
20     Q.  Okay.
21     **A.  Yeah.**
22     Q.  So after the situation with the Hartes,
23 there was still regular surveillance going on at
24 the Green Circle?
25     **A.  Yes.**

---

# Exhibit 46

## Declaration of Robert Harte

I, Robert Harte, being of lawful age hereby declare as follows:

1. My name is Robert Harte, and I am one of the Plaintiffs in this case. I was present during the entire raid and search of our home on April 20, 2012 by the Johnson County Sheriff's deputies.

2. At no point during the raid of our home did any deputy inform us that we were free to leave. On the contrary, we were held under armed guard for the duration of the raid.

3. At no point during the raid of our home did any deputy inform us that our house would be left as the law enforcement officers found it.

4. At no point during the raid of our home did any deputy tell us that the search would not be like searches commonly seen on television, where homes are ransacked and left in disarray.

5. At no point during the raid did any deputy tell us that we were free to take our children to school.

6. At no point during or after the raid did any deputy escort me or my wife, Addie Harte, through the house for inspection of our home and belongings for damage after the law enforcement officers concluded the raid. I was escorted by officers on three occasions during the raid—to open a gun safe, into the kitchen where a deputy read me my Miranda rights, and when I was given permission to use the bathroom by Deputy Cossairt. After the search, I was not escorted to the basement to inspect anything. Had any deputy done so, I would have immediately seen that my firearms were left out unsecured even though they had been previously locked up in the safe.

7. In preparing to attempt to grow tomatoes and other vegetables in our basement, I had obtained two books, "Hydroponic Tomatoes for the Home Gardener," by Howard Resh, and "Hydroponic Gardening: A practical guide to growing plants without soil," by Lon Dalton and Rob Smith. Copies of the front cover of both books are attached to this Declaration as Attachment A, (P-000731) and Attachment B (P-000564)

8. My son, J.H., and I built our indoor hydroponic garden as an educational activity we could do together. Our garden was never equipped with Mylar, special ventilation, a $CO_2$ device, or black out coverings on the windows. The fluorescent lights, purchased at Wal-Mart, were ordinary fluorescent lights and were very inexpensive.

9. Because the hydroponic garden was an educational project that I undertook with our son, I snapped a couple of photos while we were constructing it. Those photos are attached to this Declaration as Attachment C[1] (P-000190) and Attachment D (P-000191).

10. On the very day of the raid, shortly after the officers departed our home, I also took photographs of what our hydroponic garden looked like at that time. As is easily seen from these photographs,

---

[1] The facial features of J.H. have been blurred to protect the minor child's identity. No other edits to Attachment C (P-000190) have been made.

1

we were not very successful in our attempt to grow plants indoors. The photos of the garden taken after the raid on April 20, 2012 are attached as Attachment E (P-000188), Attachment F (P-000189), Attachment G (P-000297), and Attachment H (P-0004396).

11. As one can readily observe from the photographs, there was a clear, non-obscured basement window directly above the garden. That window is also visible in still photos captured from the "search video" taken by the deputies during the raid of our home. Those still photos are attached as Attachment I (P-1774-1775).

I declare under the penalty of perjury that the foregoing is true as far as I know.

Dated this _____12_____ day of November 2015.

Robert Harte

2

**A646**



# Hydroponic Tomatoes

### For the Home Gardener

### Howard M. Resh

P-000731

Attachment B

# HYDROPONIC GARDENING

## A practical guide to growing plants without soil



### Lon Dalton/Rob Smith

Revised Edition

P-000564

Attachment C



P-000190A

Attachment D



P - 000191

**A650**

Case 2:13-cv-02586-JWL    Document 327-25    Filed 11/17/15    Page 8 of 13

Attachment E



P - 000188

Attachment F



P - 000189

Attachment G



P - 000297





P-001774



P-001775

## DECLARATION OF BRADLEY KUSTIN

My name is Bradley Kustin, I am of lawful age and sound mind, and I hereby declare:

1. I reside in Bradenton, Florida. I am the brother of Adlynn "Addie" Harte and the brother-in-law of Robert "Bob" Harte.

2. I obtained a bachelor's degree from New York University in 1981, and was subsequently hired by the New York City Police Department.

3. After passing the police academy, I worked for two or three months as a police officer trainee. At the academy, however, I had become interested in criminal law and procedure, and I applied for entry to law school, eventually giving up my position with the police department.

4. I am a licensed attorney in the states of New York and Florida. I graduated from St. John's University School of Law in 1984.

5. Serving in the United States Navy's Judge Advocate General's Corps after law school, I worked for about one year in criminal defense and I estimate that I tried between 30 and 70 courts martial. I also handled appellate work in the military justice system.

6. In the Navy JAG corps I also worked in environmental law, advising the Navy on a Superfund site in New Jersey. Later, in private practice, I was a trial attorney doing both defense and plaintiffs work in personal injury cases and other matters. For approximately the past 13 years, I have been a mediator in civil matters.

7. Although I do not recall the exact time that I received the first telephone call from Addie during the morning of April 20, 2012, it's my understanding that telephone company records show that the earliest call between our phone numbers on that date began at 7:52 a.m.

8. During our phone call, her first words to me were in the nature of, "You're not going to believe this." She then described being detained at her kitchen table as heavily armed police officers in military-style gear searched her home, held her husband at gunpoint, detained her children in the living room, and monitored and restricted her movements in the house. At this point, she seemed to believe that the deputies were part of a SWAT team and had made a forced entry to the house. She seemed upset and bewildered about what was happening and why it was happening.

9. I was flabbergasted by the deputies' conduct. It was already evident that the deputies had entered the wrong home to search for a marijuana grow operation. I thought the fact that they continued to search the house even though they had found no marijuana was terrible.

10. I told Addie to ask the officers whether she was free to leave. Addie left the phone to ask the question, and when she returned to the phone, she said the officers had told her she could not leave. When she told me this, I believed she and her family were under arrest.

11. Addie told me the police wanted her to answer questions. Believing her to be under arrest, I reminded her to be extremely respectful but to decline to answer questions or make a statement. I suggested she say something in the nature of: "I come from a family of law enforcement and government people, and we have incredible respect for you and police in general, but even with that respect, I cannot give you any statement at this time."

12. As soon as I told her that, she got off the phone. The call lasted less than 10 minutes. I waited for her to call me back, but it was hours later before we spoke again.

13. Although we live many miles apart, I remain close to my sister and her family, and I am aware that this episode caused them significant grief, anxiety, and emotional trauma.

I declare under the penalty of perjury that the foregoing is true according to my knowledge, information, and belief.

NOVEMBER 16 2015
Date                          Bradley A. Kustin

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Robert M. Bernstein
Robert M. Bernstein