**No. 16-3014**

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

————————————

ADLYNN K. HARTE; ROBERT W. HARTE; J.H., A MINOR, BY AND THROUGH HIS PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE; L.H., A MINOR, BY AND THROUGH HER PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE,

*Plaintiffs-Appellants*,

v.

THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON, KANSAS; FRANK DENNING, SHERIFF, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY; MARK BURNS, DEPUTY, IN HIS INDIVIDUAL CAPACITY; EDWARD BLAKE, DEPUTY, IN HIS INDIVIDUAL CAPACITY, MICHAEL PFANNENSTIEL, DEPUTY, IN HIS INDIVIDUAL CAPACITY

[*Caption Continued On Inside Cover*]

————————————

On Appeal from the United States District Court
for the District of Kansas, Judge John W. Lungstrum
No. 2:13-cv-02586

————————————

## BRIEF FOR APPELLANTS

————————————

CHERYL A. PILATE                    JEFFREY M. HARRIS
MELANIE S. MORGAN                   ROBERT M. BERNSTEIN
MORGAN PILATE LLC                   BANCROFT PLLC
926 Cherry Street                   500 New Jersey Avenue, NW
Kansas City, MO 64106               Seventh Floor
(816) 471-6694                      Washington, DC 20001
cpilate@morganpilate.com            (202) 234-0090
                                    rbernstein@bancroftpllc.com

*Counsel for Plaintiffs-Appellants*

ORAL ARGUMENT REQUESTED

April 7, 2016

JAMES COSSAIRT, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LARRY SHOOP, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LUCKY SMITH, DEPUTY, IN HIS INDIVIDUAL CAPACITY; CHRISTOPHER FARKES, DEPUTY, IN HIS INDIVIDUAL CAPACITY; THOMAS REDDIN, LIEUTENANT, IN HIS INDIVIDUAL CAPACITY; TYSON KILBEY, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LAURA VRABAC, DEPUTY, IN HER INDIVIDUAL CAPACITY; JIM WINGO, SERGEANT, MISSOURI HIGHWAY PATROL, IN HIS INDIVIDUAL CAPACITY,

*Defendants-Appellees*,

and

NATE DENTON, DEPUTY, IN HIS INDIVIDUAL CAPACITY,

*Defendant*.

## ISSUES PRESENTED

On April 20, 2012, shortly before 7:30 a.m., Johnson County deputies raided the suburban Kansas City home of Bob and Addie Harte and their seven-year-old daughter and thirteen-year-old son. One deputy pointed an assault rifle at Bob Harte, shirtless and face-down on the floor, as other officers stormed the family home with guns drawn. The Hartes were held under armed guard for two-and-a-half hours while officers searched every corner of their home, looking first for marijuana and then for evidence of any criminal activity. They found nothing. The officers had procured a search warrant by noting in an affidavit that Bob was observed leaving an indoor-gardening store eight months earlier and by representing that loose, floral tea leaves found in the Hartes' trash field-tested positive for marijuana. The Hartes sued the officers under 42 U.S.C. §1983, claiming that the perjured search-warrant affidavit, search beyond the scope of the warrant, and tactical raid violated the Fourth Amendment. The District Court entered summary judgment for the deputies, concluding that that the existence of a search warrant shielded the officers from liability.

The issues presented by this case are:

1. Whether substantial record evidence that the deputies intentionally or recklessly submitted a perjured search-warrant affidavit requires them to stand trial.

2. Whether substantial record evidence that the deputies' search of the home and detention of the family exceeded the scope of the warrant requires them to stand trial.

3. Whether substantial record evidence that the deputies conducted an intimidating tactical raid, pointed a gun at Bob Harte, and detained the family under armed guard requires them to stand trial.

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF PRIOR OR RELATED APPEALS ............................................ ix

INTRODUCTION ............................................................................... 1

JURISDICTION ................................................................................. 3

STATEMENT OF THE CASE ................................................................... 4

    A.    "4/20 Will Be Something To Fear:" Operation Constant Gardener 2011 ......................................................... 4

    B.    The Department Commits to a Day of Raids on April 20, 2012 .................................................................... 8

    C.    Sergeant Reddin Orders His Deputies To "Work [the Hartes'] Case." ......................................................... 10

    D.    "Screaming and Loud Banging:" The Deputies Raid the Hartes' Home ............................................................ 14

    E.    The Tea Leaves "Did Not Look Anything Like Marijuana." ............. 20

    F.    "Upsetting" but not "Utterly Intolerable:" The District Court Denies the Hartes Legal Redress ......................................... 24

SUMMARY OF THE ARGUMENT ............................................................. 26

STANDARD OF REVIEW ...................................................................... 27

ARGUMENT .................................................................................... 27

I.    This Court Should Reverse The Judgment Below Because The District Court Repeatedly Failed To View The Facts In The Light Most Favorable To The Hartes ...................................................... 27

II.    The Deputies Violated The Fourth Amendment When They Procured A Search Warrant Through Misconduct, Searched And Detained The Hartes As If They Possessed A General Warrant, And Launched A Tactical Raid On A Nonviolent Family ................................. 33

A.   The Deputies' Deliberate Falsehood or Reckless Disregard for the Truth in the Search-Warrant Affidavit Violated the Fourth Amendment ............................................................................. 34

B.   The Deputies Violated the Fourth Amendment by Unreasonably Prolonging the Search and Detention Beyond the Terms of the Warrant ..................................................................... 42

C.   The Deputies Violated the Fourth Amendment by Pointing an Assault Rifle at Bob, Deploying a Tactical Team on a Nonviolent Family, and Detaining the Hartes Under Armed Guard ................................................................................................ 46

III.   Sheriff Denning And The County Are Liable Under *Monell* Because The Deputies' Misconduct Occurred As Part Of Department Practice And For Failure To Train And Supervise ...................................................... 52

IV.   The Deputies And County Are Liable Under State Law .............................. 56

CONCLUSION ...................................................................................................... 59

STATEMENT ON ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Allen v. Muskogee*,
　　119 F.3d 837 (10th Cir. 1997) ............................................................52

*Baska v. Scherzer*,
　　156 P.3d 617 (Kan. 2007) ................................................................57

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
　　602 F.3d 1175 (10th Cir. 2010) ................................................ 29, 32

*Bruning v. Pixler*,
　　949 F.2d 352 (10th Cir. 1991) ...........................................................37

*Chidester v. Utah Cty.*,
　　268 F. App'x 718 (10th Cir. 2008) ............................................. 48, 52

*City of St. Louis v. Praprotnik*,
　　485 U.S. 112 (1988) ...........................................................................52

*Clanton v. Cooper*,
　　129 F.3d 1147 (10th Cir. 1997) .........................................................37

*DeLoach v. Bevers*,
　　922 F.2d 618 (10th Cir. 1990) .................................................... 36, 37

*Eaton v. Lexington-Fayette Cty. Gov't*,
　　811 F.3d 819 (6th Cir. 2016) ..............................................................39

*Estate of B.I.C. v. Gillen*,
　　710 F.3d 1168 (10th Cir. 2013) .........................................................29

*Florida v. Jardines*,
　　133 S. Ct. 1409 (2013) .......................................................................33

*Franks v. Delaware*,
　　438 U.S. 154 (1978) .............................................. 34, 35, 38, 42

*Fuerschbach v. Sw. Airlines Co.*,
　　439 F.3d 1197 (10th Cir. 2006) .........................................................29

*Galbreath v. Okla. City*,
  568 F. App'x 534 (10th Cir. 2014) .......................................................29

*Graham v. Connor*,
  490 U.S. 386 (1989) ......................................................... 46, 47, 49

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ...........................................................46

*Harman v. Pollock*,
  446 F.3d 1069 (10th Cir. 2006) .......................................................40

*Holland ex rel. Overdorff v. Harrington*,
  268 F.3d 1179 (10th Cir. 2001) ................................................. *passim*

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015) ...........................................................31

*Kaul v. Stephan*,
  83 F.3d 1208 (10th Cir. 1996) .......................................................35

*Kyllo v. United States*,
  533 U.S. 27 (2001) ...........................................................46

*Malley v. Briggs*,
  475 U.S. 335 (1986) ...........................................................2

*Maresca v. Bernalillo County*,
  804 F.3d 1301 (10th Cir. 2015) ................................................. 28, 48

*Martin v. Cty. of Pueblo*,
  909 F.2d 402 (10th Cir. 1990) .......................................................52

*Maryland v. Garrison*,
  480 U.S. 79 (1987) ......................................................... 40, 46

*Maryland v. Kulbicki*,
  136 S. Ct. 2 (2015) ...........................................................35

*Mena v. Simi Valley*,
  156 F. App'x 24 (9th Cir. 2005) .......................................................45

*Meyer v. Bd. of Cty. Comm'rs of Harper Cty.*,
    482 F.3d 1232 (10th Cir. 2007)............................................................................36

*Michigan v. Summers*,
    452 U.S. 692 (1981).............................................................................. 42, 44, 45

*Monell v. Department of Soc. Servs. of N.Y.*,
    436 U.S. 658 (1978).............................................................................. 24, 52, 56

*Muehler v. Mena*,
    544 U.S. 93 (2005)...........................................................................................45

*Payton v. New York*,
    445 U.S. 573 (1980)................................................................................... 33, 47

*Riley v. California*,
    134 S. Ct. 2473 (2014)......................................................................... 42, 44, 46

*Salmon v. Schwartz*,
    948 F.2d 1131 (10th Cir. 1991) .................................................................. 37, 38

*Seifert v. Wyandotte Cty.*,
    779 F.3d 1141 (10th Cir. 2015) .................................................................. 27, 32

*Snell v. Tunnell*,
    920 F.2d 673 (10th Cir. 1990)......................................................... 32, 35, 37, 42

*Soldal v. Cook Cty.*,
    506 U.S. 56 (1992)...........................................................................................43

*Stewart v. Donges*,
    915 F.2d 572 (10th Cir. 1990).................................................................... 37, 42

*Stonecipher v. Valles*,
    759 F.3d 1134 (10th Cir. 2014) ............................................................ 36, 38, 40

*Teague v. Overton*,
    15 F. App'x 597 (10th Cir. 2001).....................................................................37

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014).................................................................. 28, 30, 31, 32

*United Proteins, Inc. v. Farmland Indus., Inc.*,
    915 P.2d 80 (Kan. 1996) ......................................................................57

*Valadez v. Emmis Commc'ns*,
    229 P.3d 389 (Kan. 2010) ..................................................................58

*Whitewater v. Goss*,
    192 F. App'x 794 (10th Cir. 2006) .............................................. 50, 51

**Constitutional Provision**

U.S. Const. amend. IV ...........................................................................34

**Statutes**

28 U.S.C. §1291 ....................................................................................3

28 U.S.C. §1331 ....................................................................................3

28 U.S.C. §1367 ....................................................................................3

42 U.S.C. §1983 ...................................................................................24

Kan. Stat. Ann. §21-5706.....................................................................47

**Regulations**

32 C.F.R. §147.2(c)(8) .........................................................................40

**Other Authorities**

1 Wayne R. LaFave, Searches & Seizures §1.10(a) (5th ed. 2015).........................33

Andy Marso, *JoCo Couple Tells Legislators Story of Police Raid*,
    Topeka Cap.-J. (Jan. 15, 2014), http://bit.ly/1qsNmvi ......................60

*Bel Aire police mistake sunflower plants for marijuana*, Associated
    Press, Sept. 17, 2005 ........................................................................41

*Careers & Internships*, CIA (May 7, 2009), http://1.usa.gov/1Xi6Pcm.................40

Heather Hollingsworth, *Kansas Couple: Indoor Gardening Prompted
    Pot Raid*, Associated Press (Mar. 29, 2013),
    http://yhoo.it/1TCxgKL ....................................................................60

Jacob Sullum, *If You Don't Want a SWAT Team at Your Door, You Shouldn't Be Drinking Tea*, Reason (Mar. 26, 2014), http://bit.ly/1l4SEVY ............................................................................60

*JOCO Sheriff Participates in 4/20 Marijuana Raid*, Gardner News, Apr. 20, 2012), http://bit.ly/1ULDs2y ................................................55

*Kansas Couple Says They Were Targeted During Drug Sweep Because of Equipment They Bought for Indoor Gardening*, N.Y. Daily News (Mar. 29, 2013), http://nydn.us/25LF3e8.........................................60

*Kansas Family's $25G Probe Pins Fruitless SWAT Team Raid on Science Project or Tea*, Fox News (Mar. 26, 2014), http://fxn.ws/23ilSpS ...........................................................................60

Karen Dillon, *Open-records Advocates Decry Effort in Legislature to Potentially Curtail Public Access to Police Reports*, Lawrence Journal-World, Mar. 16, 2016, http://bit.ly/1PdG96c .........................................49

Nick Wing, *When Probable Cause Looks More Like 'Meh, Maybe?' Cause*, Huffington Post (Dec. 23, 2015), http://huff.to/1YfmaKY ...................60

Radley Balko, *Why the 'Wet Tea Leaves' Drug Raid Was Outrageous*, Wash. Post (Jan. 11, 2016), http://wapo.st/1Oe9Nvd .........................................60

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related cases.

## INTRODUCTION

On April 20, 2012, shortly before 7:30 a.m., Addie Harte was asleep in bed when she heard screaming and loud banging at her suburban Kansas City home, banging so hard that the walls were rattling.  She thought a criminal had broken into the house she shared with her husband Bob and their two young children.  Terrified, she jumped out of bed and began to run downstairs.  On the staircase, she stopped, seeing her husband face-down in the foyer, with an assault rifle held over him—by a police officer in tactical gear.  Commands were flying.  "Get down!"  "Hands behind your head!"  Addie watched as deputies, all with Glocks drawn, flooded her home.  For two-and-a-half hours that morning, the deputies held Addie and her family under armed guard on a sofa, in front of a large picture window, as neighbors looked on incredulously from outside.

A tactical-style team of the Johnson County Sheriff's Office ("JCSO") was looking for a marijuana-grow operation.  Within twenty minutes, the deputies concluded that none existed.  The only garden in the house contained indoor tomato and vegetable plants that Bob was growing as a science project with his thirteen-year-old son.  But the deputies invaded and probed every corner of the house for more than another two hours, first looking for any trace of marijuana, and then, when that proved unsuccessful, for "any kind of criminal activity that was involved in the house."

1

What was the basis for the deputies' suspicions?  *Eight months earlier*, Missouri State Highway Patrol Trooper Jim Wingo observed Bob and his children leaving an indoor-gardening store with a small bag.  Based solely on this, Wingo flagged Bob as a suspected marijuana grower and recorded his license-plate number.  In March 2012, Wingo passed along this tip to JCSO.  By that time, the department had already committed to conducting a day of raids on suspected marijuana growers on April 20, which the deputies viewed as "a day celebrated by the marijuana sub-culture as a holiday."  With less than a month before the planned raid, deputies rummaged through the Hartes' trash and discovered loose, floral tea leaves.  The deputies, under pressure to obtain a search warrant before April 20, falsely represented to a judge that the tea field-tested positive as marijuana.  The tea leaves, according to JCSO's own crime lab, "did not look anything like marijuana."  But armed with a warrant, the deputies proceeded with their raid as planned.

The law requires police officers to stand trial for their constitutional violations when they are "plainly incompetent."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Plain incompetence does not begin to describe the conduct of the Johnson County Sheriff's Office and of Trooper Wingo in this case.  The deputies acted with cavalier disregard for the rule of law at every turn: in choosing their targets first and investigating second, in intentionally or recklessly submitting a perjured search-warrant affidavit, and in launching a swat-style raid on a home occupied by two

2

former CIA employees with no criminal history, and their two young children. An enormous summary-judgment record—consisting of thousands of pages of depositions and hundreds of pages of e-mails and reports—substantiates all this. Yet, the District Court entered summary judgment for the deputies, believing that their botched investigation and failed raid were all just a "serious mistake." In so concluding, the District Court committed the cardinal sin of summary judgment by repeatedly drawing factual inferences in favor of the officers, repeatedly failing to view the facts in the light most favorable to the Hartes, and repeatedly deciding disputed factual issues.

The conduct of the deputies in this case is outrageous, shocking, and anathema to the Fourth Amendment. Actual engagement with the voluminous record leads to no other conclusion. At the very least, a reasonable jury could find the deputies liable for violating the Fourth Amendment. Because the facts did not support entering summary judgment for the deputies, this Court must reverse and remand for trial.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§1331 and 1367. It entered final judgment for all defendants on December 18, 2015, and the Hartes timely appealed. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE CASE

### A.  "4/20 Will Be Something To Fear:" Operation Constant Gardener 2011.

In early 2011, Sergeant Tom Reddin, of the Johnson County Sheriff's Office, had a problem:  His deputies were having a hard time preparing their cases.  A660.  Reddin was particularly concerned about his officers' ability to testify on "indoor marijuana grows."  *Id.*  He felt that his deputies lacked "not only for knowledge" but also "for court credibility" in this area.  *Id.*  Reddin and the Johnson County deputies were "all pretty new at indoor grows."  *Id.*  Sergeant Reddin reached out for assistance to someone whom he thought could help—Missouri Highway Patrol Trooper Jim Wingo.

Trooper Wingo, who preferred to go only by "Wingo," was obsessed with weeding out marijuana in the greater Kansas City area.  Beginning in 2007, Wingo would spend three days a week parked in his patrol car monitoring indoor-gardening stores.  A603-04.  For three to four hours a day, Wingo would "just sit and watch to see who comes in, who comes out, trying to obtain license plates and information on what it is they are buying."  A603.  He used binoculars to peer into customers' shopping bags.  A618.  Although Wingo never obtained any sales records from the stores, he would record the physical appearance and "sex, approximate age, vehicle description, license plate," and make and model of the vehicle for every customer he saw exiting the gardening store.  A604.

Every individual whom Wingo observed leaving a gardening store, regardless of what was purchased, became a marijuana-grow suspect. Wingo compiled every customer's personal information in an Excel spreadsheet, and he used each customer's vehicle information to obtain a driver's license photograph and address. A605. Then, he would "frequently" drive to a customer's house, knock on his door, and request permission to enter to search for marijuana plants. A606-07. He would also dig through gardening customers' trash to look for "actual plant material" or a "used marijuana cigarette." A608. If Wingo found suspected plant material, he sometimes conducted a "a preliminary field test" and submitted any positive samples to a crime lab for further analysis. A609-10. Wingo also developed a "technique" in which he "ma[de] up a flyer for a lost dog" to persuade his suspects to open the front door so that he could smell inside their homes. A611-12. Wingo would falsely claim that he had lost "[his] little dog Dempsey," a Jack Russell terrier who "was probably scared, because he'd run away from home." A623. He also "frequently" investigated gardening-store customers through "aerial surveillance." A611. Over a four-year period, from 2007 to 2011, Wingo monitored and investigated "100 percent" of the individuals that he observed leaving indoor-gardening stores. A625.

In March 2011, Wingo sent a letter to law-enforcement agencies in the Kansas City area inviting them to participate in "Operation Constant Gardener," a large-scale, one-day raid of the homes of gardening-store customers. A667. He explained

that he had been "conducting surveillance" of gardening stores for fourteen years, and he invited the agencies to a briefing on April 4, 2011, where Wingo planned to supply each agency "with the names of those customers that are within [its] jurisdiction." *Id.* Wingo gave each agency "two weeks" to conduct a "brief investigation" in order "to obtain probable cause for a search warrant." *Id.* Wingo envisioned that on April 20, 2011, the various agencies would conduct one massive, coordinated raid throughout the Kansas City area. *Id.* Wingo chose April 20 as the date of his raid because he believed that the "number 420 is a significant number to the marijuana user community." *Id.* April 20 "is the big nationwide celebration date for people that use marijuana," Wingo explained. "It's like their Christmas Day." A612-613.

Two days after the all-agency briefing, Wingo (who orchestrated the entire "operation" from his personal e-mail account) e-mailed everyone who attended to "encourag[e]" the agencies to "[s]eal" any search warrants obtained "for the 42-Olympics." A670. Wingo even offered to assist the agencies in sealing their search-warrant records. *Id.*

Sergeant Reddin, who oversaw the Johnson County Sheriff's Office's narcotics unit, was an enthusiastic backer of Wingo's planned raid. On April 13, 2011, he e-mailed Wingo to inform him that JCSO had conducted a positive trash pull on a suspect earlier that morning. A671. "Sucks," Wingo responded, "[that]

6

you gotta have a hit on more than one [trash] pull" to obtain a search warrant in Johnson County. *Id.* On April 19, the day before the planned raid, Reddin confirmed with Wingo that JCSO would devote thirteen officers to Operation Constant Gardener. A674-75.

On April 21, after the coordinated raid of gardening-store shoppers' homes occurred as planned, Wingo wrote to the participating agencies to commend them on an "event" that was "absolutely an outstanding success." A676. Wingo noted that "media coverage was 99% positive on this which is pretty darn good." *Id.* He proposed creating, for the following year's operation, "a telethon type billboard with a large green marijuana plant filling up as the pledges come in, making T-Shirts and whatnot." *Id.* He also stated if his operation continued for additional years, then "4/20 will be something to fear rather than something to celebrate." *Id.*

But Operation Constant Gardener was not a universal success. A Kansas City newspaper reported that one law-enforcement agency targeted the home of a local emergency responder "and found tomato plants." A165. "What I saw today was not protection," the resident told the local news. "This was harassment, all because of where I made a purchase." *Id.* Johnson County Assistant District Attorney Sarah F. Hill made light of the incident, writing to Wingo: "And a tomato grow discovered….why did Independence [police] have to pick on him. ☺" A678.

**B.      The Department Commits to a Day of Raids on April 20, 2012.**

It was against this backdrop that Sergeant Reddin again reached out to Wingo for help in May 2011.  Reddin explained that his department had "a couple of … grows go to a preliminary hearing," and he requested that Wingo lead a class to train his deputies "for court credibility purposes."  A659.  Reddin arranged for Wingo to lead a four-hour class on marijuana grow-operations for Johnson County deputies in June 2011.  *Id.*  On June 21, 2011, Wingo conducted the four-hour class, where he touted the success of his recent day of raids on gardening-store customers' homes.  A624.  Deputy Larry Shoop recalled that because the "police tak[e] breaks every hour," Wingo's "four-hour training end[ed] up, by the time you BS and stuff … being two or three hours maybe."  A628.  "Your taxpayers' money at work," Shoop quipped.  *Id.*

On August 19, 2011, Reddin e-mailed Wingo, explaining that JCSO had not "heard from you in a while."  A689.  Reddin asked Wingo how "business [was] looking" at the indoor-gardening stores, and he stated that his "guys [were] starting to have withdrawals."  *Id.*  Reddin inquired whether his own deputies should join Wingo in monitoring the stores.  *Id.*  Wingo understood that the Johnson County deputies were bored and "looking for some drug investigations to start."  A620.

After the new year, Reddin again e-mailed Wingo to ask whether Wingo was planning "another 420 operation this year."  A690-91.  Wingo responded that

8

because he had been conducting surveillance on gardening stores only "three days a week," he did not "really have enough new contacts to justify a full throttle 420 operation." A690. Wingo nevertheless offered to share his list of gardening-store customer names. *Id.* On February 9, Reddin replied that he "would love to have" the list. *Id.* He explained that he was committed to "420" and "at least making a day of it." *Id.*

Around this time, Reddin also became increasingly interested in having his deputies stake out gardening stores themselves to monitor customers. A692. Reddin described his surveillance program: "We watch for people going in, try to see if we can see what they buy, if they buy anything. Then see if we can see what car they go to … get information on the tag, where it returns to, and typically follow them." A540. Deputy Shoop felt that JCSO's surveillance program was valuable because no one "was actually legally buying stuff from that [Green Circle store]." A627. This was a store that Sheriff Denning described as a general "hardware store" that "sells a lot of things." A584. Wingo and the Johnson County deputies became so fixated on staking out gardening stores that they sometimes bumped into one another

at the same store, each sitting in their patrol car conducting surveillance.[1]  A629 (Shoop dep.).

On March 20, 2012, Wingo e-mailed Reddin a spreadsheet of names of gardening-store customers residing in Johnson County.  One customer on that list was a man that Wingo had observed leaving the Green Circle store eight months earlier, on August 9, 2011.  A615, A618.  In his spreadsheet, Wingo described his suspect as a white man with kids carrying a "small bag."  A695.  Sitting in his patrol car with binoculars, Wingo "tried to see through the bag [that the man] was carrying" but was unsuccessful because "it was opaque."  A615, A618.  According to Wingo's surveillance records, he had never previously observed this individual leaving a gardening store.  A619.  The man whom Wingo identified that day was Bob Harte, who was shopping for supplies for an indoor hydroponic garden that he was building as an educational project with his son, J.H.  A645-54.

### C.     Sergeant Reddin Orders His Deputies To "Work [the Hartes'] Case."

Bob and Addie met in 1989 while they both worked for the CIA in Washington, D.C.  A729.  They were different in some respects.  She was raised Jewish; he, Catholic.  A724.  She voted Democrat; he, Republican.  *Id.*  But Bob and

---

[1] Having multiple deputies spend several days a week conducting surveillance of gardening stores "didn't seem like a great use of resources" to the Johnson County criminal judges.  R.327-16 at 21 (Ruddick dep.).

Addie shared a love of family, and so, in 1999, they left the Beltway to raise their children in suburban Kansas City. A729. In 2012, the Hartes' son J.H. was in seventh grade, and L.H., their Chinese-American daughter, was in kindergarten. A729-31. The Hartes were proud of their "multi-racial, multi-faith" and "multi-political party family." A724. As former CIA employees, the Hartes respected government, and Addie was a graduate of the Leawood, Kansas, citizen's police-academy. A723. Addie at that time worked as an attorney at Waddell & Reed, an asset-management company, and Bob worked as a stay-at-home dad. A731. Neither Bob nor Addie had any criminal record.

On March 20, 2012, the day that Wingo shared Bob Harte's name with Reddin, Bob and Addie Harte became Johnson County narcotics suspects. Sergeant Reddin thanked Wingo for sharing his spreadsheet and informed Wingo that JCSO would conduct an "operation on 4/20," regardless of the status of any pending investigations at that time. A693. After JCSO received Wingo's tip regarding the Hartes, Reddin ordered his deputies "to work this case." A569 (Blake dep.). With less than one month before the planned raid on the Hartes' home, the officers began their investigation.

First, on April 3, 2012, Deputies Edward Blake and Mark Burns collected the Hartes' trash to look for evidence. Blake observed "a green, wet vegetation that was

kind of dispersed throughout the trash" and "mixed with other kitchen debris and other vegetation." A564. But he saw no indicia of drug activity. A566, A702.

One week later, with the clock ticking until Reddin's planned raid, Deputy Burns returned to the Hartes' home to collect their trash for inspection once more. In one of the Hartes' trash bags, Burns observed amid the kitchen trash "a clump of green vegetation that looked like it had been chopped up or processed." A548; R.327-18 at 29, 32. Burns asserted in an investigation report that the vegetation "appeared to be wet marijuana plant material." A700. But Burns took no photographs of the vegetation. A548, A555. Although Burns also happened to be the department's designated K-9 officer and kept a trained drug-sniffing dog at his house, he made no effort to have his canine sniff the material. A549. Instead, Burns represented in his police report that, once back at JCSO's office, he field-tested the vegetation and that it tested positive for marijuana. A700. Burns "generally" photographed field-test results, but in this case, no photographic evidence exists that Burns ever conducted the test. A546. Burns also noted in his report that "plant material of the same nature" had been found in the Hartes' trash one week earlier—when no one thought it was remotely suspicious. A700. At this time, however, just ten days before the department's planned raid, Burns claimed that the same vegetation looked like marijuana.

On April 17, 2012, three days before the department's planned raid, JCSO still had insufficient evidence to move forward with searching the Hartes' home. The district attorney required two positive trash pulls for a search warrant. A538 (Reddin dep.). So, early that morning, Deputy Blake and Deputy Burns again collected the Hartes' trash and again noted that the kitchen trash contained "green vegetation." A701. Blake asserts that he took photographs of *some* items in the Hartes' trash— but not the green vegetation. A563-64. Blake again represented in his report that the material field-tested positive for marijuana, A701, but he, like Burns, took no photographs of the field-test results. And neither described the visual appearance of the field-test results. *Id.*

Johnson County had invested significant resources over many years in building a sophisticated crime lab. A582 (Denning dep.). Yet the department's day of drug raids was planned for April 20, and so, as Blake explained, JCSO had "no intention of sending [the samples from the Hartes' trash] to the lab," as they did not wish to wait for results. A198. Sergeant Reddin knew that it was "feasible" for him to send the materials to the crime lab, but he chose not to do so. A541.

Later on April 17, Deputy Burns completed an affidavit for a search warrant for the Hartes' home. Burns represented in the affidavit that the Green Circle, where Wingo had spotted Bob Harte shopping *eight months earlier*, sold equipment "commonly used in the cultivation of marijuana." A708. Burns so represented even

13

though he knew that nothing sold at the Green Circle was specific to marijuana cultivation. A552. Burns failed to note in the affidavit that the plant material came from kitchen waste, that it emitted no odor consistent with marijuana, and that it resembled only a "lump of green vegetation" that was "hard to identify." R.327-18 at 29. Burns claimed in his affidavit that JCSO had twice field-tested the "green vegetation," which tested positive for marijuana. A708-09. Burns also falsely stated in his affidavit that the "field test utilized consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana." A708. Burns, in fact, had no knowledge of the reagents used by the crime lab, but he included this boilerplate in all his drug affidavits at the urging of Assistant District Attorney Sarah Hill. A551-52.

Based on Burns's representations, a judge issued a search warrant. A705. Had the judge known that the Johnson County crime lab in fact used a substantially different drug test, the judge would have considered Burns's search-warrant affidavit "untrue." A536 (Ruddick dep.).

### D.    "Screaming and Loud Banging:" The Deputies Raid the Hartes' Home.

On the morning of the scheduled raid of the Hartes' home, various Johnson County deputies convened at the department to strategize. A594. According to Sheriff Denning, it was "protocol that [the officers] try to identify through various means whether or not there would be children in the house" before executing a

14

search warrant. A583. In the Hartes' case, the deputies were well aware that the Hartes had children. A545 (Burns dep). But the deputies, deviating from standard practice, *intentionally timed their raid* of the Hartes' home so that it would occur while the Hartes' young children were home. Sergeant Reddin wanted to execute the search warrant before J.H. and L.H. left for school in order to maximize the possibility that Bob and Addie would be home "before they le[ft] for work." A543. Additionally, Deputy Blake, who was the assigned "team leader" for the raid, "prefer[red]" to conduct the raid while the Hartes' young children were home because he felt that the presence of children would provide an opportunity to combine executing a warrant with a "welfare check" and an "opportunity to interview" the children. A176, A567-68.

Department procedure also required the deputies to develop a "safety plan" before "every entry." A586 (Denning dep.). In the Hartes' case, the deputies apparently neglected to formulate a safety plan and could not produce any evidence of one. A595 (Cossairt dep.). Sheriff Denning acknowledges that JCSO's failure to have adequately developed a plan to account for the Hartes' physical safety constituted a violation of department policy. A587. On April 19, the day before the planned raid, Lieutenant Michael Pfannenstiel e-mailed his deputies to staff the raiding team. A176. Sergeant Cossairt would serve as the ranking officer, Deputy

15

Blake would serve as team leader, and they would be assisted by Detective Smith and Deputies Shoop, Farkes, Vrabac, and Kilbey. *Id.*

On April 20, 2012, shortly before 7:30 a.m., Lisa Jameson, a resident of Wenonga Lane in Leawood, Kansas, looked outside her front door and saw police officers, clad in "black swat-type uniforms" and brandishing firearms and a battering ram, running across her yard toward the Hartes' front door. A725. Suddenly, Addie Harte, who was asleep, "heard screaming and loud banging, so hard that the walls were rattling" and as if the "front door was coming off the hinges." A729. Bob answered his front door, but before he could say anything, the deputies ordered him to "get down on the ground." A557, A630-31. As Bob lay face-down, bare-chested on the floor of his home, five deputies "flooded the foyer of the Hartes' residence." A104, A631-32. They wore "thick bulletproof vests" and had their 9 millimeter Glocks drawn out of the holster. A104, A568. No one had directed Deputy Kilbey to carry an assault rifle, but Sheriff Denning viewed his department as "a quasi-military organization," and the AR-15 assault rifle was Kilbey's "weapon of choice" that morning. A573, A585. Like the rest of the raid team, Kilbey held his firearm in the "low ready" position, pointing the barrel of the assault rifle down toward the ground, where Bob Harte lay. A558.

Addie jumped out of bed and ran down the stairs in her nightgown. A729. She saw armed officers "dressed in tactical gear" spreading through her house. *Id.*

16

"Commands were flying, 'Get down!', 'Hands behind your head!'" *Id.* Addie saw an officer in "swat-style gear and a bulletproof vest" holding an assault rifle over her husband's body. *Id.* Two more officers entered the Hartes' home, and the deputies ordered Addie and her children to "sit against the wall with [their] legs crossed." A730. The deputies then ordered the Hartes to sit on their living-room couch under armed guard, in front of a large window facing the street. A730. Neighbors could see into the Hartes' home and observed their detainment. A725.

For the next two-and-a-half hours, the deputies kept the Hartes on their couch under armed guard. A730. Deputy Blake attempted to interview Bob, Addie, and J.H., the Hartes' thirteen-year-old son. A596 (Cossairt dep.). Addie asked an officer if she was free to leave, and the officer informed her that she could not leave the house. A730. The deputies acknowledge that no one ever informed the Hartes that they were free to leave. A641.

Within twenty minutes of entering, the deputies concluded that the Hartes' home did not contain a marijuana-grow operation and that the only plants growing in the house were tomatoes. A636. But the deputies continued searching the house for more than another two hours, looking for "a leaf or a plant or stems or something that indicated that there was plants growing there at one time." A637. Within an hour, the deputies abandoned their efforts to find even a *remnant* of a defunct grow operation and began to search for evidence of "even a small personal use." A639-

17

40.  Even when it was clear to the deputies that they would not find any items described in the search warrant, they kept combing through the Hartes' home and belongings to "loo[k] for *any kind of criminal activity* that was involved in the house." A572 (emphasis added).  At one point, Deputy Blake called Sergeant Reddin to report that the only plants growing at the house were tomatoes, but Reddin ordered Blake "to continue to search."  A571.

The deputies found no evidence of drugs or drug paraphernalia.  A597.  Nonetheless, after about ninety minutes of searching the Hartes' residence, they called in a canine to search the house.  A177-78.  The canine officer stated in his report that the house had been "thoroughly searched" prior to his arrival and that he "did not notice the odor of marijuana" anywhere in the residence.  A178.  As the deputies were leaving the Hartes' home, Deputy Shoop suggested to the Hartes, for good measure, that the "whole family" "have a sit-down" and "just be honest with each other and talk about" their "drug use."  A634-35.

Back at headquarters, the supervising commanders were irate.  "You're lying to me," Sergeant Reddin said, when Deputy Shoop reported the news to him.  A639.  "SON-OF-A-BITCH!!!," Reddin wrote in an e-mail to Lieutenant Pfannenstiel.  A179.  Pfannenstiel responded:  "Nothing????????????????????????".  That evening, however, Reddin e-mailed his deputies to commend them on a "great job

today" and to let them know that he was "proud" of their "very professional" work. A183.

The Sheriff's Office had also issued a press release, inviting the media to a "press conference on Operation Constant Gardener II" in order "to commemorate the success" "in taking down indoor marijuana grows in Johnson County" on April 20. A171-75. But as Sheriff Denning acknowledged in an e-mail that afternoon to his command staff, the "drug raids [were] not going well at all," and he requested that the department "cancel this press conference." A182. The department's press officer responded that he had already alerted the media of the press conference. Sheriff Denning responded: "Reluctantly I will go forward with the news conference at 1400 hours." A589.

At the press conference, Sheriff Denning did not inform the media that his department's drug raids were "not going well at all." He delivered a different message. The Johnson County Sheriff's Office, in fact, uncovered not a single active marijuana-grow operation on April 20, 2012, and it seized no live marijuana plants during the entire day. A539. But videos of Denning's press conference show him speaking in front of a pile of marijuana plants, warning about the dangers of marijuana. A184-97.[2]

---

[2] Video recordings of broadcast news clips on the press conference were filed conventionally in the District Court. *See* R.329.

**E.     The Tea Leaves "Did Not Look Anything Like Marijuana."**

In the aftermath of the raid of the Hartes' home, the officers had different reactions.  Sergeant Cossairt and Lieutenant Pfannenstiel suspected that a lawsuit was imminent.  A599-600.  Deputy Shoop's view was different.  For him, the Hartes "wasted a couple of hours of their time that day, but that's about the extent of it."  A643.  "We wasted a ton of man hours working on this case," Shoop explained, "and that probably miffed me more than anything."  *Id.*

The Hartes subsequently sought to obtain the record underlying the search warrant of their home through the Kansas Open Records Act.  A559.  But as Sergeant Cossairt explained, "the Sheriff's decision was [that] [the Hartes] weren't going to get [the records] as quickly as they wanted them."  A600.  JCSO did not release the records until the Hartes initiated open-records litigation in state court.  A64-65.

After the district attorney's office passed along a complaint about JCSO's handling of the raid, the Sheriff's department also submitted the vegetation found in the Hartes' trash to the county crime lab for testing.  A198-99.  But in the lab's view, chemical testing was seemingly superfluous, as the vegetation "did not appear to be marijuana" to the naked eye and "did not look *anything like marijuana leaves or stems*."  A198 (emphasis added).  The crime lab's official report confirmed that the material was not a controlled substance and noted that the plant samples lacked the

cysolithic hairs and glandular hairs that are the distinctive features of marijuana leaves.  A201.

All agree that the "green vegetation" found in the Hartes' trash were tea leaves from Teavana products, which are sold at hundreds of retail stores, and since late 2012, at thousands of Starbucks locations nationwide.  A249.  Expert chemical testing of these teas using the same field test utilized by JCSO in April 2012 consistently produced negative results.  A254-57.  In fact, according to Michael Bussell, the Hartes' drug-testing expert, "the results of these tests revealed the exact opposite of what a positive test should have revealed."  A256.  A result should have produced a red-orange *bottom band* on the field test, whereas the Teavana products showed a red-orange *top band*.[3]  *Id.*  Bussell concluded that the "only commonalty between the teas tested and marijuana was that the teas contained green vegetation in differing amounts."  A256.  "None of the teas had serrated leaves or hair-like fibers … consistent with … marijuana." *Id.*  The tea products also contained "pieces of apparent fruit, peels, petals, and/or flowers."  *Id.*  Additionally, the teas "had absolutely no similarities to the odor of marijuana," as they "smelled strongly of flowers and/or fruit."  A257.  In Bussell's view, the teas smelled more like "potpourri

---

[3] One of the tea products produced a false positive when tested with a reagent different than that used by the police in April 2012.  A258.  Bussell determined that even then, a trained police officer should have recognized the false positive, as "the visual and odor characteristics … were not at all consistent with marijuana."  *Id.*

rather than marijuana," and he concluded that it was "hard to imagine" that any police officer "could mistake any of those teas for marijuana based on their fragrance." *Id.*

Again using the same field tests utilized by JCSO in April 2012, Bussell also tested the *actual* "green vegetation" that the deputies found in the Hartes' kitchen trash. These tests were all negative. R.329.[4]

In the months following the raid, JCSO also looked into the marijuana field tests that it had been using for years. These tests utilized a chemical called the KN reagent. A *single inquiry* to the manufacturer, a company actually located in Johnson County, revealed that scientists "don't know much about these KN reagents" and that JCSO was in "uncharted territory" in using the KN-reagent test for marijuana.[5] A202-03. Within an hour of receiving the manufacturer's e-mail, Captain Douglas Baker e-mailed command staff informing them that JCSO had been using "the wrong field test kit" and ordered his staff immediately to "discontinue" KN-reagent tests.

---

[4] Video recordings of Bussell administering these field tests were filed conventionally in the District Court, R.329, and also submitted conventionally to this Court. The accompanying affidavit submitted on disc with those videos is included in the attached Addendum.

[5] As it turned out, the Office began using the KN-reagent field tests in 2010 because it believed they would be effective for testing K2, a synthetic cannabinoid. A162-64. At that time, the Office's crime lab explained to Sergeant Reddin and others that the KN-reagent test "use[d] a different chemical test than the typical [marijuana] field test kit." A162.

*Id.*  This change was consistent with the recommendation of the department's own crime lab.  A577.  Major Reece reported to Sheriff Denning that JCSO had not been using "the same test kits the Lab use[d]."  A205.  Sheriff Denning confirmed in an e-mail to Major Reece that the department had been using "the wrong chemicals."  A578.

The department also instituted policy overhauls as a result of the failed raid, banning the use of the KN-reagent test and directing deputies to send suspected controlled substances to the lab.  A205-09.  JCSO eventually instituted a formal policy under which test-kit results could not provide the sole basis for a search-warrant affidavit.  A208.  Under the new policy, deputies could not apply for a search warrant before submitting a controlled-substance sample to the crime lab.  *Id.*  The new policy also categorically banned the use of tests using the KN reagent.  *Id.*  It also mandated training in the use of field tests for deputies.  A207-08.  During the department's first field-test-kit training, Deputy Blake—who had conducted the April 17, 2012, "trash pull" on the Hartes' garbage—failed his "basic competency test" and required "remedial" training.  A210-211.  Following the botched raid, JCSO also dissolved its specialized narcotics unit, a unit that had previously existed for thirty years.  A575-76.

Not everything changed at the department after the Harte raid.  As late as January 2013, JCSO continued to devote its resources to staking out indoor-

gardening stores for six hours a day.  During one such stake-out, Deputy Shoop

proposed that the deputies could either "gather intel" on customers or simply "go for

the jugular."  A204.  "Jugular always works good," Sergeant Reddin responded.  *Id.*

### F.    "Upsetting" but not "Utterly Intolerable:" The District Court Denies the Hartes Legal Redress.

In November 2013, the Hartes sued the Johnson County Board of

Commissioners, Sheriff Denning, Trooper Wingo, and various department deputies

for the raid on their home.  The Hartes' July 21, 2014, amended complaint raised

claims under 42 U.S.C. §1983, alleging that the defendants violated their Fourth

Amendment rights to be free from unreasonable searches and seizures.  They also

brought a claim for unconstitutional practices and for failure to train and supervise

under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978),

and various state-law claims.

Wingo moved to dismiss the unreasonable-search claim against him on the

ground that he did not cause or contribute to the alleged constitutional violation.  The

District Court denied Wingo's motion, concluding that the allegations indicated that

Wingo was the key catalyst behind the "SWAT-style entry and search of the Hartes'

residence."  A91.  The District Court determined that Wingo "spearheaded the

creation of Operation Constant Gardener, had trained many Johnson County deputies

regarding indoor marijuana grow operations, actively recruited participating

agencies … and aggressively promoted the idea that those who shopped at

hydroponic gardening stores were likely involved in illegal drug activity." A92. The Court held that the Hartes sufficiently alleged that Wingo "likely understood—as the architect of the operation that officers utilizing the [March 2012] 'tip' would not have sufficient time or resources to conduct a traditional investigation using accepted investigative techniques and that investigative 'shortcuts' would likely be necessary." A96-98. Relying on Tenth Circuit authority, the District Court concluded that Wingo "set in motion a series of events" leading to "the alleged constitutional violations" and that he was, therefore, a proper defendant for the unreasonable-search claim. A97.

In September 2015, after extensive discovery, both Wingo and the Johnson County defendants moved for summary judgment. The summary-judgment record consisted of thousands of pages of deposition transcripts and hundreds of pages of e-mails, police reports, and other documents. The briefing amounted to hundreds of pages. Notwithstanding this voluminous record, the District Court granted both motions and entered judgment for the defendants within two weeks of the close of briefing and the filing of the final portions of the record.

The District Court found it dispositive of the entire case that the deputies procured a search warrant. *See* A153 (resolution of all claims "largely turned on the court's resolution of the unlawful search" as supported by probable cause). It determined that the search-warrant affidavit's statement that "the material found in

the Hartes' trash … field-tested positive [as marijuana] is a hurdle that is all but impossible for plaintiffs to overcome." A111. The District Court stated that there was no evidence in the record to permit a jury to conclude that the deputies lied about performing tests or acted recklessly in performing the tests. As it later made clear, it viewed the defendants' conduct merely as a "serious mistake"—"a mistake that resulted in an early morning raid on the home of innocent citizens (including children) by numerous armed officers." A160. The District Court also found that there was no evidence in the record that JCSO "made any 'unreasonable mistakes' in connection with the search of plaintiffs' residence." A128. The court acknowledged that the defendants' conduct may be "upsetting" to the Hartes, but it concluded that this conduct was not "utterly intolerable" enough for the case to proceed to a jury. A145. The Hartes timely appealed. A156.

## SUMMARY OF THE ARGUMENT

The facts of this case are complicated, but the law is not. The District Court's repeated failure to view the facts in the light most favorable to the Hartes provides a straightforward basis for reversal. The Supreme Court requires reversal when district courts violate that cardinal rule of summary judgment. Viewing the facts in the light most favorable to the Hartes, the deputies violated the Fourth Amendment by intentionally or recklessly submitting a perjured affidavit to procure their warrant. This misconduct, by itself, rendered the subsequent search and detention unlawful.

And the deputies then further violated the Fourth Amendment because the search and detention exceeded the express terms of the warrant.  A reasonable jury could also conclude from the voluminous record that the force involved in pointing an assault rifle at Bob, raiding a family suspected at worst of possessing some marijuana, and detaining the Hartes and their young children under armed guard was not just excessive but outrageous.  The deputies are also liable under state law because their conduct lacked proper authorization.

## STANDARD OF REVIEW

This Court reviews de novo a district court's entry of summary judgment. *Seifert v. Wyandotte Cty.*, 779 F.3d 1141, 1150 (10th Cir. 2015).  This Court must view the record in the light most favorable to the Hartes, the nonmoving parties, and draw all reasonable inferences in their favor.  *Id.*

## ARGUMENT

**I.    This Court Should Reverse The Judgment Below Because The District Court Repeatedly Failed To View The Facts In The Light Most Favorable To The Hartes.**

This case presents a clear and straightforward ground for reversal:  The District Court committed the cardinal sin of summary judgment by failing to view the facts in the light most favorable to the Hartes.  At every turn, the District Court went out of its way to decide contested factual issues in favor of the deputies, the moving parties.  This was exceedingly improper and is reversible error.

27

**A.**    The Supreme Court has been emphatic that courts must "view the evidence at summary judgment in the light most favorable" to the nonmoving party "with respect to the central facts of [a] case." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). This is a "fundamental principle." *Id.* at 1868. In *Tolan*, a §1983 case involving an excessive-force claim against a police officer, the lower court "resolve[d] genuine disputes of fact in favor of the party seeking summary judgment," and a unanimous Supreme Court reversed. *Id.* at 1866. Here, as in *Tolan*, engagement with the record leads "to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 1867-68. Here, as in *Tolan*, the lower court's treatment of the facts "reflects a clear misapprehension of summary judgment standards." *Id.* at 1868. Here, as in *Tolan*, the opinion below cannot stand.

This Court has not hesitated to enforce the "fundamental principle" of summary judgment. For instance, in *Maresca v. Bernalillo County*, the Court held that summary judgment was inappropriately entered for police officers on an excessive-force claim when there were "genuine disputes of facts" about whether the officers "pointed loaded guns" at plaintiffs. 804 F.3d 1301, 1313-16 (10th Cir. 2015). In numerous cases under §1983, this Court has reversed district courts that have strayed from that bedrock summary-judgment rule. *See, e.g.*, *Galbreath v.*

28

*Okla. City*, 568 F. App'x 534, 541-42 (10th Cir. 2014) (reversing district court for failure to view facts in light most favorable to nonmoving party); *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1174-75 (10th Cir. 2013) (same); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1185, 1190-91 (10th Cir. 2010) (same); *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1209 (10th Cir. 2006) (same).

**B.**     Here, the District Court's opinion is a textbook violation of summary-judgment principles that requires reversal.

First, the District Court concluded that Deputies Burns and Blake in fact field-tested the tea leaves found in the Hartes' trash and accurately reported their results. A102. The District Court stated it is a "fact" that the deputies "obtained positive test results in two consecutive weeks on the plant material." A114. But a reasonable jury could find that the deputies never conducted any tests, lied about the results, or were so poorly trained that they misinterpreted the results. Substantial record evidence suggests these possibilities. Although the Hartes need not *prove* their case at this juncture, the summary-judgment record is, if anything, *most consistent* with lying. It is undisputed that no photographic or documentary evidence exists of field-test results—even though Burns "generally" photographed such results. A546. Burns, JCSO's K-9 officer, also made no effort to have the canine in his custody sniff the plant material. A549. Blake, for his part, testified that he *did* photograph the Hartes' trash—just not the plant material or the field-test results obtained from it.

What is more, the deputies were investigating the Hartes under a deadline. Sergeant Reddin had committed his department to a "420" raid—but he lacked suspects. A690. After Wingo gave JCSO Bob Harte's name on March 20, 2012, Reddin ordered his deputies to "work [the Hartes'] case." A569. On April 3, less than three weeks before the planned raid, deputies searched the Hartes' kitchen trash and found "a green, wet vegetation" that they concluded was innocuous. A564. Then, a week later, and eleven days before the planned raid, the deputies decided that the vegetation was actually marijuana. And again, on April 17, in need of a second positive trash pull to move forward with their planned raid in three days' time, the deputies again asserted that the vegetation must be marijuana. A jury could reasonably infer, "in context," that the deputies manipulated the investigation in order to procure a search warrant by their April 20 deadline. *Tolan*, 134 S. Ct. at 1867.

Further supporting a jury's possible finding of misconduct, all agree that the vegetation was tea leaves. The crime lab took one look at the plant material and concluded that it did not resemble "*anything like* marijuana" and that "it did not appear to be marijuana" to the naked eye. A198 (emphasis added). Additionally, expert field-testing on the tea leaves using the same field test used by the deputies repeatedly produced negative results. According to expert Michael Bussell, the tea leaves looked and smelled absolutely nothing like marijuana. A256-58. Numerous

30

images of the tea—videotaped and photographed at different time intervals following brewing—are in the record, and they depict peels, fruit, petals, and flowers.  A264-366.

The District Court's conclusion that "[n]o reasonable jury could infer" from this substantial evidence that the deputies "lied about the test results," A112, is an argument that is "hard to take seriously," *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015). The District Court also stated—with no explanation—that the negative test results produced from independent field testing were "not sufficient" for a jury to find that the deputies lied.  A113.  And, for the District Court, a false positive obtained in independent testing on one of the teas *from a different chemical test* than that purportedly used by the deputies "undercu[t]" the Hartes' "theory" that the deputies lied.  *Id*.  These statements are not those of a district court applying the rule that all "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tolan*, 134 S. Ct. at 1863.  The District Court improperly acted as the factfinder.

To be sure, the deputies can point to evidence that they conducted the field tests and obtained positive results—namely, their own statements and their representations in the search-warrant affidavit.  Even if "the record," which contains no proof that field tests were ever conducted, "*might* support such an inference, the record and the reasonable inferences to be drawn therefrom must be taken in the light

31

most favorable to Plaintiffs for purposes of summary judgment." *Brammer-Hoelter*, 602 F.3d at 1185 (emphasis added). It suffices here that the expansive summary-judgment record creates a "triable issue of fact" about the officers' misconduct. *Seifert*, 779 F.3d at 1150. Even if defendants have "contrary evidence," whether the Hartes can prove their claims is a matter "that is left for a trial." *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990).

Second, the District Court accepted at face value the deputies' account that they spent the two-and-a-half hours in the Hartes' house doing nothing but looking for marijuana—a grow operation, "'remnants' of a grow operation," or "evidence of personal use of marijuana." A127. The District Court credited Deputy Shoop's statement that the deputies departed as soon as they "determined that no evidence of personal use marijuana existed in the residence." A128. But the District Court failed to acknowledge one of the deputies' own statements that when they did not find even a trace of marijuana, they began to "loo[k] for *any kind of criminal activity* that was involved in the house." A572 (emphasis added). When "reasonable inferences [are] drawn in favor of the nonmoving party," *Tolan*, 134 S. Ct. at 1868, the record indicates that the deputies exceeded the scope of their warrant by searching for far more than a grow operation or even a single marijuana leaf.

Third, the District Court repeatedly emphasized that no deputy pointed a gun at Bob. A133, A134, A138, A139. For the District Court, this was "undisputed."

A104.  Addie, in fact, stated that she saw an officer "holding an assault rifle over [her] husband."  A729.  Addie's brother, whom Addie briefly telephoned during her detention, stated that Addie reported that an officer "held her husband at gunpoint."  A657.  Bob also testified that his eyes were locked on the assault rifle as he flung himself onto the floor: "At that time, at that instant going down I'm like that's an M-16, AR-15, and I'm on the ground."  A718.  And multiple officers (including Deputy Kilbey himself) testified that Kilbey pointed his assault rifle in the "low ready" position toward the ground, where Bob lay.  A558, A561.  Viewing the facts in the light most favorable to the Hartes, the record indicates that Deputy Kilbey pointed his assault rifle at Bob.

## II.     The Deputies Violated The Fourth Amendment When They Procured A Search Warrant Through Misconduct, Searched And Detained The Hartes As If They Possessed A General Warrant,  And Launched A Tactical Raid On A Nonviolent Family.

This case implicates not some "uncertain and ever-changing" corner of Fourth Amendment jurisprudence but the very core of the Fourth Amendment.  1 Wayne R. LaFave, Searches & Seizures §1.10(a) (5th ed. 2015).  For "when it comes to the Fourth Amendment, the home is the first among equals."  *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).  "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton v. New York*, 445 U.S. 573, 585 (1980).  Here, the deputies obtained a search warrant to enter the Hartes' home through intentional or reckless disregard for the truth.  Once inside the

33

home, they overstayed whatever authorization they may have had. And they executed the warrant with an overwhelming, shocking display of force that cannot possibly be considered reasonable against two former CIA employees with no criminal history suspected, at worst, of a nonviolent minor offense.

### A.      The Deputies' Deliberate Falsehood or Reckless Disregard for the Truth in the Search-Warrant Affidavit Violated the Fourth Amendment.

The Fourth Amendment forbids officials from issuing warrants "but upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV. This requirement, the "bulwark of Fourth Amendment protection," takes "as its premise" "the affiant's good faith." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). "When the Fourth Amendment demands a factual showing sufficient to compromise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Id.* at 164-65 (alteration marks omitted). Forty years ago, the Supreme Court held in *Franks* that a material false statement either intentionally or recklessly included in a search-warrant affidavit violates the Fourth Amendment. *Id.* at 155-56. The Fourth Amendment does not tolerate "official misconduct in the drafting of the affidavit." *Id.* at 167-68. A search warrant procured by "deliberate falsehood or … reckless disregard for the truth" lacks probable cause and confers no legal authority to act. *Id.* at 171.

The District Court applied *Franks* "in name only" and barely mentioned the governing Supreme Court precedent.[6] *Maryland v. Kulbicki*, 136 S. Ct. 2, 2, (2015). For the District Court, the fact that the search-warrant affidavit represented that plant material field-tested positive was "a hurdle that is all but impossible for plaintiffs to overcome." A111. That approach is flatly contrary to the Supreme Court's holding that search-warrant affidavits are not "beyond impeachment." *Franks*, 438 U.S. at 165. And the District Court's approach strains this Court's holding that a "state officer *is not* automatically shielded from Section 1983 liability merely because a judicial officer approves a warrant." *Kaul v. Stephan*, 83 F.3d 1208, 1213 n.4 (10th Cir. 1996).

A *Franks* claim survives summary judgment when plaintiffs show "deliberate falsehood o[r] reckless disregard for the truth" and that the improper statements were material to the issuance of the warrant. *Franks*, 438 U.S. at 171-72; *accord Snell*, 920. F.2d at 698. In other words, a *Franks* claim cannot succeed if "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 171-72. In this case, the materiality factor is not at issue, as all agree the misrepresentations about field-testing induced a state judge to

---

[6] In fact, the District Court's *only* citation to *Franks* was for the undisputed proposition that *negligent* conduct is not actionable. A114.

issue the warrant.  Indeed, the state judge himself actually testified in this case that the mere fact that Bob had been seen leaving an indoor-gardening store "wouldn't be significant to me standing alone."  A535.  The dispositive issue is simply whether the deputies intentionally *or* recklessly misrepresented the field-test statements in the affidavit.

In light of the substantial evidence supporting misconduct, this issue must go to a jury.  The District Court, citing *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014), stated that "a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances."  A109.  But that is only true "*when there is no dispute over the material facts*."  *Stonecipher*, 759 F.3d at 1142 (emphasis added).  This Court has "long recognized that it is a *jury question* in a civil rights suit whether … the officers made the misrepresentations in an application for [a] … warrant."  *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990) (emphasis added).[7]

Time and again, this Court has required officers to stand trial in the face of substantial evidence of misconduct in procuring a warrant.  *Meyer v. Bd. of Cty. Comm'rs of Harper Cty.*, 482 F.3d 1232, 1240 (10th Cir. 2007) (district court "erred

---

[7] The leading academic commentary concurs.  *See* Stephen W. Gard, *Bearing False Witness: Perjured Affidavits and the Fourth Amendment*, 41 Suffolk U.L. Rev. 445, 447 (2008) ("allegations of perjurious warrant affidavits present pure issues of fact to be resolved by the trier of fact").

in disregarding evidence which would have supported a jury finding that one or more of the officers deliberately lied" in affidavit); *Teague v. Overton*, 15 F. App'x 597, 601 (10th Cir. 2001) (affirming denial of summary judgment when evidence suggested officer "lied in the probable cause affidavit"); *Clanton v. Cooper*, 129 F.3d 1147, 1154 (10th Cir. 1997) (affirming denial of summary judgment because of evidence of a "classic *Franks* violation"); *Bruning v. Pixler*, 949 F.2d 352, 360 (10th Cir. 1991) (affirming denial of summary judgment when "factfinder could infer that [officers] made the statements and omitted the information with reckless disregard for the truth"); *Salmon v. Schwartz*, 948 F.2d 1131, 1140 (10th Cir. 1991) (affirming denial of summary judgment because of "genuine issue of material fact" on whether an "officer of reasonable competence would have requested the warrant" with information available); *DeLoach*, 922 F.2d at 622 (officer had to stand trial in light of "evidence from which the jury could conclude that [officer] made intentional or reckless misstatements in her [warrant] affidavit"); *Snell*, 920 F.2d at 698, 701 (case must go to jury when plaintiffs "have come forward with specific evidence tending to show that [warrant-affidavit] allegations … were fabricated and that the defendants knew that such allegations were untrue"); *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir. 1990) (affirming denial of summary judgment for officer "because there was a factual dispute material to a determination of whether the defendant recklessly omitted a critical fact from the [warrant] affidavit").

The District Court's failure to cite a *single* decision from this line of cases—included by the Hartes in the summary-judgment briefing, R.324 at 59—or *any* other case from this Court's *Franks* jurisprudence is astonishing.   Indeed, the District Court lifted the entirety of its five-paragraph legal analysis nearly verbatim from this Court's decision in *Stonecipher*, which itself makes clear that disputed issues of fact should have compelled denial of defendants' motions for summary judgment. *Compare* A108-10, *with Stonecipher*, 759 F.3d at 1141-42.

As explained in Part I, substantial record evidence creates a triable issue of fact about whether the deputies intentionally misrepresented statements about field-testing in the search-warrant affidavit.[8]   But even if no such evidence existed, the Hartes would still be able to present their *Franks* claim to a jury because of significant evidence that the deputies acted with "reckless disregard for the truth" or "reckless misconduct" in procuring a warrant.   *Franks*, 438 U.S. at 169.   A factfinder can infer "reckless disregard for the truth … where the circumstances provide obvious reasons for doubting the truthfulness of the allegations."   *Salmon*, 948 F.2d at 1140.

---

[8] And there is no question that Burns failed to note in the affidavit that the plant material came from kitchen waste, that it emitted no odor consistent with marijuana, and that it resembled only a "lump of green vegetation" that was "hard to identify."  R.327-18 at 29.

Here, even if the deputies in fact obtained false positives, record evidence indicates that they acted with reckless disregard for the truth. The KN-reagent test that the deputies used was not recommended for marijuana testing by the manufacturer, and a simple inquiry would have revealed as much. In fact, when the department did bother to inquire, it immediately halted use of the KN-reagent test. Readily available sources would have suggested to the deputies that their "test" yielded a false-positive rate *around 70%*, especially with kitchen botanicals. *See* A506-12. "Procedures that generate results that are not close to accurate in the overwhelming majority of cases may themselves cause testing to be unreasonable in the Fourth Amendment sense." *Eaton v. Lexington-Fayette Cty. Gov't*, 811 F.3d 819, 822 (6th Cir. 2016) (Sutton, J.) (quotation marks and citations omitted).

The deputies also stated in the search-warrant affidavit that the "field test utilized consists of reagents similar to those utilized" by the crime lab. A708. Not only is this false, but Deputy Burns *had no idea* which reagents were used by the crime lab, as he included this boilerplate statement in all his drug affidavits at the urging of Assistant District Attorney Sarah Hill. A550-51. Beyond this, the deputies had virtually no training on marijuana field-testing and identification of discarded marijuana parts—"unless," in Deputy Burns's words, "you consider YouTube videos a form of training." A550.

And while the failure "to investigate a matter *fully*, to exhaust *every possible lead*" does not always prove recklessness, *Stonecipher*, 759 F.3d at 1142 (emphasis added), the deputies here undertook *no investigation whatsoever* beyond misrepresenting that floral tea field-tested as marijuana.  They did not undertake routine records checks, did not look at utility records, and did not conduct a minute of surveillance on the Hartes or their house.[9]  A228-35.  "[E]ven *minimal surveillance* would have revealed" that the Hartes' tomato "grow operation" was visible through a large, unobscured basement window.  A229.  An actual investigation would have revealed that the "suspects" were former CIA employees with no criminal record, hardly the profile of leaders of a marijuana-grow operation.[10]  *Even the field-test instructions*, which the deputies claimed to have followed, were unequivocal: positive test results only "will give you probable cause to take the sample in to a qualified crime laboratory for definitive analysis."  A391.

---

[9] In another case, for instance, even after undercover officers *personally* purchased *heroin* from drug-ring leaders, they still undertook substantial steps before concluding they had probable cause to apply for a search warrant: conducting surveillance on the house, performing a records search on the property, checking criminal history, inspecting utility records, examining credit history, and obtaining social-security numbers.  *Harman v. Pollock*, 446 F.3d 1069 (10th Cir. 2006); *see also Maryland v. Garrison*, 480 U.S. 79, 81 (1987) ("a reasonable investigation, include[ed] a verification of information obtained from a reliable informant, an exterior examination of the [residence], and inquiry of the utility company").  Here, the officers did not even do a single one of those things.

[10] Marijuana users may not work for the CIA.  *Careers & Internships*, CIA (May 7, 2009), http://1.usa.gov/1Xi6Pcm; 32 C.F.R. §147.2(c)(8).

But the deputies were not interested in undertaking a *real investigation* because they wanted targets for Operation Constant Gardener, which was planned well *before* the search warrant was signed. The ineptitude of the Johnson County Sheriff's Office in this case reached almost cartoonish proportions.

The record also abounds with evidence from which a jury could infer reckless misconduct. The District Court dismissed JCSO's choose-your-targets-first, investigate-second approach. It brushed aside the fact that JCSO operated under a self-imposed April 20 deadline chosen purely for publicity purposes. It downplayed substantial evidence that the plant material looked and smelled nothing like marijuana. And in concluding that there was "no evidence in the record" to support reckless misconduct, the District Court repeatedly credited as true all testimony by Reddin, Burns, and Blake. A117-18, A121-22. This is the exact opposite of what summary judgment demands. Under the deputies' theory, they could field-test roses, pumpkins, or sunflowers[11]—but so long as the tests produced positive results, tactical raids are fair game and they are free from standing trial. The law, however,

---

[11] In fact, Kansas police actually raided a suburban Wichita home (owned by the former town mayor) after representing that sunflowers (depicted on the state flag) found at the home were marijuana. *Bel Aire police mistake sunflower plants for marijuana*, Associated Press, Sept. 17, 2005.

does not permit officers to "denude the probable-cause requirement of all real meaning."[12]  *Franks*, 438 U.S. at 168.

> ### B.    The Deputies Violated the Fourth Amendment by Unreasonably Prolonging the Search and Detention Beyond the Terms of the Warrant.

The Hartes' second claim also derives from the heart of the Fourth Amendment: the requirement that a search warrant "particularly describ[e]" the "things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's prohibition on "the reviled 'general warrants'" was "in fact one of the driving forces behind the Revolution itself."  *Riley v. California*, 134 S. Ct. 2473, 2494 (2014).  The deputies in this case exceeded the scope of the warrant by rummaging for—in their own words—"any kind of criminal activity that was involved in the house."  A572.  Sheriff Denning testified that searching for "any kind of criminal activity" was "proper."  R.327-1 at 49.  This was a quintessential Fourth Amendment violation—for which the deputies must stand trial.  Likewise, the Fourth Amendment limits officers' authority to detain a family only "while a *proper* search is conducted."  *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (emphasis added).  Substantial record evidence indicates that the deputies detained the Hartes well beyond what the

---

[12] The officers' qualified-immunity defense also fails, as the District Court never even questioned that the law on *Franks* violations was clearly established.  Nor could it.  *Snell*, 920 F.2d at 676 (misconduct in obtaining a warrant "clearly violates the Fourth Amendment"); *Stewart*, 915 F.2d at 581.

Fourth Amendment tolerates.  For this, too, the law requires the deputies to face a jury.

As an initial matter, "if the police officers' presence in the home *itself* entailed a violation of the Fourth Amendment," then *any* search and *any* detention is unconstitutional.  *Soldal v. Cook Cty.*, 506 U.S. 56, 66 n.10 (1992) (emphasis added).  Because a reasonable jury could conclude that the entire raid on the Hartes resulted from a search-warrant obtained through misconduct, a reasonable jury could also find that *any* search of the Hartes' home was invalid and that *any* detention of the Hartes was unconstitutional.

But even setting aside the deputies' misconduct in obtaining the warrant, the deputies undoubtedly exceeded the *scope* of the warrant.  Their warrant prohibited them from searching for anything except "[m]arijuana in all forms" and marijuana-related "[d]rug [p]araphernalia."  A705.  Within twenty minutes of the raid, the deputies knew that they would not find the grow operation that they were hoping for.  A636.  They then began hunting for evidence of a *remnant* of a grow operation, and when that proved unsuccessful, through "drawers, closets, [and] bags" for evidence of even a single joint.  A639-40.  Determined not to leave empty-handed, the deputies concede that that they began to "loo[k] for *any kind of criminal activity* that was involved in the house."  A572 (emphasis added).  This is as shocking as it is reprehensible.  The Founders enacted the Fourth Amendment to prevent "British

officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley*, 134 S. Ct. at 2494. However much the deputies of Johnson County may wish that they possessed the authority of British officers in colonial America, the Fourth Amendment prohibits such conduct.

And even after the deputies called headquarters to report that they found nothing, their marching orders from Sergeant Reddin were clear: "Jus[t] continue to search." A571. After ninety minutes, the desperate deputies called in a canine, whose handling officer noted that the house had already been "thoroughly searched" and that he did not detect even "the odor of marijuana" anywhere. A178. The deputies also acknowledged that the canine may have remained longer than necessary because "it's nice to give [dogs] some extensive search times" for "training or just experience." A598. The summary-judgment record contained a wealth of evidence for a reasonable jury to conclude that the deputies acted as if they possessed a general warrant and thus violated the Fourth Amendment.

Worse still, all this searching for "any kind of criminal activity" occurred while the Hartes were confined to the couch under armed guard. Detention of residents is only lawful "while a *proper* search is conducted." *Summers*, 452 U.S. at 705 (emphasis added). Because a jury could conclude that *any* search was not "proper," it could also conclude that *any* detention was improper. *Id.* Even supposing, though, that *some* detention were permissible, the Court has never

approved of a "prolonged detention" of this kind. *Id.* at 705 n.21. In fact, the Court has expressly recognized that the "*duration* of a detention can, *of course*, affect" its reasonableness under the Fourth Amendment, and it allowed a claim for an unreasonably long detention to go forward. *Muehler v. Mena*, 544 U.S. 93, 100, 102 (2005) (emphasis added).[13]

Here, the record indicates that the deputies detained the Hartes for two-and-a-half hours, while they searched for "any kind of criminal activity" and afforded the dog some extra "training [and] experience." Addie asked if she was free to leave, and a deputy told her "no".[14] A730. At one point, Lisa Jameson, a neighbor, tried to take the Hartes' two young children to school, but the deputies forbade the children from leaving the house. A725. The confinement of the Hartes far transcended the officers' limited authority to detain "while a proper search is conducted." *Summers*, 452 U.S. at 705. What occurred was not just wrong but

---

[13] The District Court stated that the "Court held Ms. Mena's detention for the duration of the two- to three-hour search was reasonable under *Summers*." A140. This is false. The Court allowed the unreasonable-duration claim to proceed. And on remand from the Supreme Court, the Ninth Circuit concluded that officers, while executing a warrant, detained a resident for an improperly long time, in violation of the Fourth Amendment. *Mena v. Simi Valley*, 156 F. App'x 24, 27 (9th Cir. 2005).

[14] During the raid, Addie spoke briefly by phone with her brother, whose testimony corroborates Addie's account: "Addie … said the officers had told her she could not leave." A657.

egregiously wrong. And the well-developed factual record requires the deputies to stand trial for their Fourth Amendment violation.

On this claim, the District Court also stated, in conclusory fashion with no analysis at all, that the right at issue was not clearly established. A131. But this case is not about some obscure corner of Fourth Amendment jurisprudence. *E.g.*, *Kyllo v. United States*, 533 U.S. 27, 27 (2001). In fact, the "particularity requirement is set forth in the text of the Constitution" itself. *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). And the "manifest purpose of this particularity requirement was to prevent general searches" like what occurred here. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The prohibition on "wide-ranging exploratory searches" beyond the scope of the warrant has been clearly established since 1791. *Id.*; *see Riley*, 134 S. Ct. at 2494.

**C.    The Deputies Violated the Fourth Amendment by Pointing an Assault Rifle at Bob, Deploying a Tactical Team on a Nonviolent Family, and Detaining the Hartes Under Armed Guard.**

If ever there were a case when police force could be called "excessive," this is it. Courts evaluate excessive-force claims under the Fourth Amendment's objective "'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In doing so, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks omitted). They look to the "severity

of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Id.*

Here, the Hartes' Fourth Amendment interests were robust, as "[f]reedom from intrusion into the home … is the archetype of the privacy protection secured by the Fourth Amendment." *Payton*, 445 U.S. at 587. In contrast to this weighty interest, marijuana possession is misdemeanor conduct under state law, Kan. Stat. Ann. §21-5706(b)(3), (c)(2)(A), and not illegal at all in other places, including within this Circuit. The offense at issue was anything but severe. And there was not an iota of evidence that the Hartes posed a threat to anyone or might resist arrest. (Former CIA employees with no criminal history are hardly the type.)

Under the normal Fourth Amendment analysis, the deputies' conduct was not only unreasonable but outrageous. At its core, this case involves "force inspired by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience that deserves redress" under the Fourth Amendment. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1198 (10th Cir. 2001) (Henry, J., dissenting in part).

In rejecting the Hartes' excessive-force claim, the District Court emphasized *four times* that no deputy pointed a gun at any member of the family. A133, A134, A138, A139. As explained in Part I, though, substantial record evidence indicates that Deputy Kilbey pointed an AR-15 assault rifle in the "low ready" position at Bob

47

Harte.  The District Court placed such great emphasis on this fact because it could not escape the law that pointing a loaded gun at a person can constitute excessive force.  *Maresca*, 804 F.3d at 1313-14 (plaintiffs "presented evidence that the officers pointed loaded guns directly at them"); *Chidester v. Utah Cty.,* 268 F. App'x 718, 728-29 (10th Cir. 2008) ("clearly established that law enforcement officers may not point weapons at suspects that pose no threat"); *Holland*, 268 F.3d at 1192 ("pointing of firearms directly at persons inescapably involves the immediate threat of deadly force").  The deputies cannot deny the law, and to the extent that they "den[y] that any officer ever pointed a weapon directly at any member of the [Harte] family, th[i]s creat[es] a genuine dispute of material fact" that they can press at trial.  *Maresca*, 804 F.3d at 1314.

Additionally, the Johnson County officers, whose Sheriff operated the department as a "quasi-military organization," deployed a seven-officer tactical-style team, complete with "thick bulletproof vests," a battering ram, an assault rifle, and 9-millimeter Glocks drawn from the holster—all because they ostensibly thought a person had some pot.  A103-04, A567, A585.  Deputy Kilbey brandished the assault rifle purely because it was his "weapon of choice" that morning.  A573. And the deputies *deliberately timed this raid* before the start of the school day to ensure that a seven-year-old girl and thirteen-year-old boy would be home so a deputy would have an "opportunity to interview" the children.  A567-68.  And they

did so without any safety plan, in violation of department policy.  A587.  In a house that they knew contained young children, the deputies brandished firearms that did not even have safety locks.  A580.  This was not just excessive but outrageous.  There is a reason that the raid on Bob and Addie and their children has "raised a national outcry."[15]

The District Court "assumed" that this Court has adopted a per se rule "that it is reasonable to send armed special agents … during the execution of a narcotics warrant."  A138.  That approach defies the law as much as it does common sense.  As an initial matter, any such per se rule would violate the Supreme Court's holding that an excessive-force analysis "requires careful attention to the facts and circumstances *of each particular case*."  *Graham*, 490 U.S. at 396; *accord Holland*, 268 F.3d at 1190 (claims that use of a tactical team was excessive require balancing of interests).  This Court's prior cases approving the use of a tactical team in certain situations certainly does not mean that the police have carte blanche to bring tanks to a dispute about, say, petit larceny.

In *Holland*, this Court approved the use of a tactical team in executing a warrant for a suspect wanted for *multiple violent beatings* when the officers knew

---

[15]  Karen Dillon, *Open-records Advocates Decry Effort in Legislature to Potentially Curtail Public Access to Police Reports*, Lawrence Journal-World, Mar. 16, 2016, http://bit.ly/1PdG96c.

that the suspect had a violent criminal history, that firearms were likely to be found at the residence, that other residents of the property also had violent criminal histories, and that the property at issue was a "60-acre compound."  268 F.3d at 1190-91.  Even in that extreme circumstance, however, a divided panel recognized that the "decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens."  *Id.* at 1190.  And the majority limited its holding to the actual *decision* to use the tactical team—not to the "specific conduct" that occurred during the raid.  *Id.* at 1191.  Judge Henry dissented, explaining that his "conscience … [was] shocked by the planning that this kind of raid may very well have involved."  *Id.* at 1198 (Henry, J., dissenting).  The concerns that animated the decision to conduct a tactical raid on a 60-acre "compound" full of firearms and demonstrably violent persons are light-years away from those that led to a raid on suburban former CIA employees suspected, at worst, of possessing marijuana.

The District Court also relied heavily on *Whitewater v. Goss*, 192 F. App'x 794 (10th Cir. 2006), where a divided panel, in a one-paragraph analysis, rejected an excessive-force claim stemming from the decision to deploy a tactical team in executing a warrant.  *Id.* at 796-97.  That decision is not only unpublished but has never, in ten years, been endorsed or even cited again by this Court.  In all events,

the decision only concerned a municipal-liability claim asserted against the Sheriff for her role in authorizing the tactical team.[16]  *Id.* at 797-96.  The decision addressed only "the initial decision to deploy a SWAT team" and not the "*actua[l]* us[e of] excessive force while executing the search."  *Id.* at 800 (Lucero, J., dissenting).

Finally, the act of confining the Hartes to their sofa under armed guard was excessive.  Addie stated her family was "made to sit there for the vast majority of the 2.5 hour raid, with an armed officer standing guard over us for every passerby to see."  A730.  Her family's "every move was under the direction of an armed officer." *Id.*  It was "clear" to her that if her family "did not comply with every command that these officers were prepared to use the multitude of firearms available to them." A731.

The District Court, however, found no record evidence that the deputies "threatened" the Hartes, and it repeatedly emphasized that no deputy "ever touched them."  A133; A134 (officers "did not touch anyone"); A138 (no officers "touched plaintiffs"); A139 (no officers "touched any of the plaintiffs").  *Graham* claims under §1983 contain no harmful-touching requirement.  Just the opposite.  This Court has repeatedly and emphatically rejected the view that touching is necessary for an excessive-force claim to go to trial.  The "interests protected by the Fourth

---

[16] The Hartes' operative pleading did not assert the excessive-force claim directly against Sheriff Denning.

Amendment are not confined to the right to be secure against physical harm." *Holland*, 268 F.3d at 1195. Rather, they include "liberty, property and privacy interests—a person's 'sense of security' and individual dignity." *Id.*; *accord Chidester*, 268 F. App'x at 728; *Martin v. Cty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990) (affirming denial of summary judgment when defendants "have not identified a single case stating that proof of physical contact is an essential element of an excessive force claim"). The District Court's no-touching theory is untethered to the law.

### III. Sheriff Denning And The County Are Liable Under *Monell* Because The Deputies' Misconduct Occurred As Part Of Department Practice And For Failure To Train And Supervise.

Sheriff Denning and Johnson County also must stand trial in this case because the deputies' misconduct, botched investigation, and tactical raid occurred as part of a pattern of deputy behavior and department practices. Municipalities are directly liable under §1983 for injury resulting from the "execution of a government's policy" or "custom," *Monell*, 436 U.S. at 694, which the Court has described as a "widespread practice," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The Sheriff and the County are also liable under failure-to-train and failure-to-supervise theories. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997) (under this theory, "evidence of a single violation of federal rights, accompanied by a

showing that a municipality has failed to train its employees to handle recurring situations … sufficient to trigger municipal liability”).

In the ordinary case, a *Monell* claim is difficult to show, as it can be hard to muster evidence that one incident of police misconduct occurred pursuant to a larger practice.  But this is no ordinary case.  Here, a mountain of summary-judgment evidence indicates that the botched investigation and raid on the Hartes occurred as part of a multi-year scheme that was, essentially, a publicity stunt.

Representatives of JCSO attended Wingo’s April 4, 2011, briefing and thereafter became enthusiastic participants in the practice of raiding the homes of customers of indoor-gardening stores—a scheme that they called Operation Constant Gardener.  After Wingo “encourag[ed]” the agencies to “seal” search warrants related to the scheme, Sergeant Reddin, who operated the narcotics unit, responded enthusiastically to a report that JCSO had already started targeting the shoppers on Wingo’s list.  A670.  Reddin quickly became a booster in Wingo’s scheme, and on the day before Wingo’s planned metro-wide day of 2011 raids, he informed Wingo that JCSO would commit thirteen officers to raiding the homes of gardening-store shoppers.  A674-75.  In the weeks and months after the raid, the department remained in touch with Wingo about ongoing surveillance of indoor-gardening stores and intermittent raids on the homes of shoppers.  A684, A687-89.

In 2012, as JCSO prepared to take the lead in Operation Constant Gardener II, not only *should* it have known that home raids might uncover only tomato plants but it *actually knew* this: a Kansas City newspaper had reported that one raid on the home of an emergency responder turned up only "tomato plants." A165. The "tomato seizure" became a running e-mail joke among the officers and Assistant District Attorney Sarah F. Hill. A678-79, A682. Additionally, although JCSO prepared to target fourteen homes during the 2011 raids, it only made three arrests. A672, A677.

By February 9, 2012, the department had committed to another round of "420" raids and to "at least making a day of it." A690. But the operation lacked targets. JCSO wrote to Wingo, explaining that it "would love to have" his list of shoppers. *Id*. On March 20, 2012, the department received its list of shoppers/suspects from Wingo—leaving one month to investigate and obtain warrants before the planned raids. By April 5, 2012, three weeks before the raids, JCSO had already prepared its press release, titled: "Law Enforcement Celebrates 420 with Multitude of Arrests." A171. For Sheriff Denning, the goal was to "send a message" to the "drug using community." A590-91.

Then, before the raids even began, JCSO invited reporters to a "press conference on Operation Constant Gardener II" in order "to commemorate the success" "in taking down indoor marijuana grows in Johnson County" on April 20.

A172-75.  In other words, the department planned a media event to tout its "success" in deploying potentially lethal tactical teams into family homes—before any raids occurred.  On the afternoon of the raids, Denning informed command staff that the "drug raids are not going well at all."  A182.  "[C]ancel this press conference," he said.  *Id.*  But the media was already summoned.  "Reluctantly," Denning e-mailed, "I will go forward with the news conference at 1400 hours."  A589.  The department did not let facts get in the way of a good publicity stunt.  Although the deputies seized no live marijuana plants that day, A539, videos of the press conference show Denning speaking in front of a pile of marijuana plants.  "They consider this a holiday to use marijuana openly," Denning told reporters, "so we've decided to celebrate that day with them."[17]

Throughout this time, any drug field-tests that JCSO would have used were improper for testing marijuana.  A single inquiry to a knowledgeable forensics specialist revealed that JCSO was in "uncharted territory" in using the KN reagent to test for marijuana.  A203.  The department had begun using this non-standard test in 2010 to test synthetic cannabinoids, but even then, JCSO was cautioned by its crime lab that the KN-reagent test "use[d] a different chemical test than the typical [marijuana] field test kit."  A162.  After the Harte raid, the department immediately

---

[17] *JOCO Sheriff Participates in 4/20 Marijuana Raid*, Gardner News, Apr. 20, 2012), http://bit.ly/1ULDs2y.

ordered deputies to cease using "the wrong field test kit" and to "discontinue" KN-reagent tests. A202. Sheriff Denning acknowledged to his subordinate that the department had been using "the wrong chemicals." A578. The department undertook what the District Court acknowledged was a "significant change in policy." A160. Under the new policy, deputies could not apply for a search warrant before submitting a controlled-substance sample to the crime lab. A208. The new policy also categorically banned the use of tests using the KN reagent. *Id.* It also mandated training in the use of field tests for deputies. A207-08. And following the botched raid, JCSO also dissolved the specialized narcotics unit, which had previously existed for thirty years. A575-76.

The raid on the Harte family was not just part of a "custom," *Monell*, 436 U.S. at 694—but part of a game, where the goal was to produce as big a haul of drugs and arrests as possible. Investigations needed to be complete before April 20 so JCSO would have something to "celebrate" with the media at its press conference, planned weeks in advance. But what is relevant for now, at any rate, is that the Hartes have produced a bevy of evidence requiring the County and Sheriff to stand trial.

## IV.    The Deputies And County Are Liable Under State Law.

The deputies and county must stand trial for the state-law claims because of the substantial summary-judgment evidence that they were operating under a

56

warrant procured through intentional or reckless misconduct.[18]  As the District Court

acknowledged, the deputies' conduct satisfied the elements of trespass, assault, and

false arrest and imprisonment.  *See United Proteins, Inc. v. Farmland Indus., Inc.*,

915 P.2d 80, 83-84 (Kan. 1996) (trespass); *Baska v. Scherzer*, 156 P.3d 617, 622

(Kan. 2007) (assault); *Thompson v. Gen. Fin. Co.*, 468 P.2d 269, 280 (Kan. 1970)

(false arrest and imprisonment).  The District Court, however, found that the deputies

were shielded from immunity because they committed the intentional torts while

executing a warrant.  But as explained above, the record permits a reasonable jury

to conclude that the deputies intentionally or recklessly filed a perjured search-

warrant affidavit, negating the sole authorization for their actions.

It is undisputed that the deputies raided the Hartes' home and intended to do

so.  Further, men clad in riot gear brandishing pistols, an assault rifle, and a battering

ram before 7:30 a.m. gave the Hartes significant reason to fear for their safety.  Bob

Harte cowered on the floor while Deputy Kilbey stood above him with the assault

rifle, and the whole family sat under armed guard during the search.  It was "clear"

to Addie that the officers were "prepared to use the multitude of firearms available

to them."  A731.  Whether the deputies had authorization for otherwise actionable

---

[18] Under Kansas law, the County is also liable on the state-law claims under
respondeat superior.

claims of trespass, assault, and false arrest and imprisonment is a triable issue of fact.

A reasonable jury could also find the deputies liable for intentional infliction of emotional distress.  The record indicates that: "(1) [t]he conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe."  *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 476 (Kan. 2010).  A reasonable jury could conclude that the deputies, recklessly or intentionally, used a perjured search-warrant affidavit to justify a raid that terrorized the Hartes.  The summary-judgment record demonstrates that the deputies recklessly disregarded the Hartes' emotional wellbeing to execute a publicity stunt.  On manufactured grounds, they probed a family home and detained under armed guard a mother, father, and two children, all of whom feared grievous bodily harm if they disobeyed orders.  More outrageous still, the police *intentionally* timed their raid *so that the children would be there*.  The raid inflicted significant trauma on Bob, Addie, and their little boy and girl, and they have been medically diagnosed with post-traumatic stress disorder.  A731.  This case presents a casebook illustration of conduct that shocks the conscience.

**CONCLUSION**

This Court should reverse the judgment below and remand for trial.

Respectfully submitted,

CHERYL A. PILATE                       s/Robert M. Bernstein
MELANIE S. MORGAN                      JEFFREY M. HARRIS
MORGAN PILATE LLC                      ROBERT M. BERNSTEIN
926 Cherry Street                      BANCROFT PLLC
Kansas City, MO 64106                  500 New Jersey Avenue, NW
(816) 471-6694                         Seventh Floor
cpilate@morganpilate.com               Washington, DC 20001
                                       (202) 234-0090
                                       rbernstein@bancroftpllc.com

*Counsel for Plaintiffs-Appellants*

April 7, 2016

## STATEMENT ON ORAL ARGUMENT

Oral argument will assist the panel in resolving this matter, as this is a factually complicated case with a voluminous record and numerous, independent claims based on different legal authority. This case is also of exceptional importance, evidenced by the national media attention and outrage that it has attracted,[*] because it presents important issues concerning drug field-testing and police militarization.

---

[*] *E.g.*, Radley Balko, *Why the 'Wet Tea Leaves' Drug Raid Was Outrageous*, Wash. Post (Jan. 11, 2016), http://wapo.st/1Oe9Nvd; Nick Wing, *When Probable Cause Looks More Like 'Meh, Maybe?' Cause*, Huffington Post (Dec. 23, 2015), http://huff.to/1YfmaKY; Jacob Sullum, *If You Don't Want a SWAT Team at Your Door, You Shouldn't Be Drinking Tea*, Reason (Mar. 26, 2014), http://bit.ly/1l4SEVY; *Kansas Family's $25G Probe Pins Fruitless SWAT Team Raid on Science Project or Tea*, Fox News (Mar. 26, 2014), http://fxn.ws/23ilSpS; Andy Marso, *JoCo Couple Tells Legislators Story of Police Raid*, Topeka Cap.-J. (Jan. 15, 2014), http://bit.ly/1qsNmvi; *Kansas Couple Says They Were Targeted During Drug Sweep Because of Equipment They Bought for Indoor Gardening*, N.Y. Daily News (Mar. 29, 2013), http://nydn.us/25LF3e8; Heather Hollingsworth, *Kansas Couple: Indoor Gardening Prompted Pot Raid*, Associated Press (Mar. 29, 2013), http://yhoo.it/1TCxgKL.

60

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 13,999 words as determined by the word counting feature of Microsoft Word 2013.

Dated: April 7, 2016

s/Robert M. Bernstein
Robert M. Bernstein

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made;

(2)    the hard copies submitted to the clerk are exact copies of the ECF submission;

(3)    the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Kaseya Antivirus, updated December 31, 2015, and according to the program is free of viruses.

Dated: April 7, 2016

s/Robert M. Bernstein
Robert M. Bernstein

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2016, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit

by using the CM/ECF system.  I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Robert M. Bernstein
Robert M. Bernstein

# ADDENDUM

## TABLE OF CONTENTS

Michael Bussell Declaration (Nov. 16, 2015)[*] ........................................................1a

Order and Memorandum, 13-2586-JWL (D. Kan.) .................................................2a

Judgment, 13-2586-JWL (D. Kan.) ........................................................................53a

---

[*] Filed conventionally in the District Court (R.329) on CD marked as "Exhibit 60" with accompanying videos.

## <u>Declaration of Michael D. Bussell</u>

I, Michael D. Bussell, being of lawful age hereby declare as follows:

1. My name is Michael D. Bussell. I am an investigator and I own Archangel Investigations, LLC, an investigation agency that provides services to attorneys, insurance companies, corporations, and the general public. I have been involved with law enforcement since 1997. I served from 1997 to 1998 as a Patrol Officer for the Olathe, Kansas Police Department. I then served from 1998-2013 with the Lenexa, Kansas Police Department. I began in that department as a Patrol Officer, then achieved the ranks of Master Police Officer and Corporal before finishing my career as a detective.

2. I was retained in 2014 to render an expert opinion in the matter of *Adlynn Harte et al., v. The Board of Commissioners of the County of Johnson, Kansas et al.*

3. On May 28, 2015, I tested the plant material seized from the Hartes' trash at the Johnson County Sheriff's Office Operations Building located at 27747 West 159th Street, New Century, Kansas. Present were counsel for Plaintiffs, counsel for all Defendants and Johnson County Sheriff Office personnel. The Sheriff's Office had two (2) plant vegetation samples in evidence that were seized from the Hartes' trash in April of 2012.

4. I performed four (4) tests on those two (2) samples in evidence in the presence of above mentioned counsel. Each test that I conducted was videotaped by counsel for Plaintiffs and counsel for Defendants. Video recordings of that testing are attached as Exhibit 60a-60d to Plaintiffs' Response to the Johnson County Defendants' Motion for Summary Judgment, as well as Exhibit Z to Defendant Wingo's Motion for Summary Judgment.

5. I utilized the QuickCheck Pouch using the KN reagent (manufacturer's item number 10121) on each of the two samples of the Harte trash in evidence. This is the test that the Johnson County Sheriff's Office utilized in April 2012 on the Hartes' trash. Both of these tests were negative for the presence of Tetrahydrocannabinol (THC), the illegal substance in marijuana.

6. I then tested the two (2) samples using the Lynn Peavey Marijuana QuickCheck Pouch that uses the Duquenois-Levine (D-L) reagent (manufacturer's item number 10120). Both of these tests were negative for the presence of Tetrahydrocannabinol (THC), the illegal substance in marijuana.

7. At the direction of counsel, I have reviewed the videos of the testing I performed on the evidence samples at the Johnson County Sheriff's Office Operations Building. The videos that are Exhibit 60a-60d to Johnson County Defendants' Motion for Summary Judgment (and alternatively marked as Exhibit Z to Defendant Wingo's Motion for Summary Judgment) are the video recordings of the field testing that was done at the Johnson County Sheriff's Office Operations Building on May 28, 2015.

I declare under the penalty of perjury that the foregoing is true as far as I know.

Dated this _16_ day of November 2015.

Michael D. Bussell

1

**1a**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

Adlynn K. Harte et al.,

       Plaintiffs,

v.                                  Case No. 13-2586-JWL

Board of Commissioners of the
County of Johnson County, Kansas et al.,

       Defendants.

**MEMORANDUM & ORDER**

In August 2011, plaintiff Robert Harte was observed by law enforcement leaving a hydroponics store in Kansas City, Missouri with a small bag of merchandise. More than seven months later, that information, along with Mr. Harte's license plate number, was provided by law enforcement to the Johnson County Sheriff's Office. Sheriff's deputies subsequently collected trash from plaintiffs' residence and, on two separate occasions, discovered what they described as saturated plant material. On both occasions, a field test of the substance tested positive for the presence of marijuana. Based on the fact that Mr. Harte had been observed at the hydroponics store months earlier and that the field tests yielded positive results, deputies submitted an application and supporting affidavit for a search warrant for plaintiffs' residence to a Johnson County district judge, who issued the search warrant. The warrant was executed on April 20, 2012. No evidence of marijuana or other contraband was uncovered during the search.

Plaintiffs filed this action against various defendants alleging violations of 42 U.S.C. § 1983 for unlawful search, unreasonable execution of the search and excessive force in violation

of the Fourth and Fourteenth Amendments. Plaintiffs also assert a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Finally, plaintiffs assert numerous state law claims against defendants, including trespass, assault, false arrest, abuse of process, intentional infliction of emotional distress and false light/invasion of privacy.

This matter is presently before the court on defendants' motions for summary judgment on all of plaintiffs' claims.  As explained in more detail below, defendants' motions are granted in their entirety.[1]

## I. Facts

Consistent with the applicable standard, the following facts are uncontroverted, stipulated by the parties, or related in the light most favorable to plaintiffs, the non-moving parties.  On August 9, 2011, defendant Missouri State Highway Patrol Sergeant Jim Wingo observed plaintiff Robert Harte leaving the Green Circle hydroponics store in Kansas City, Missouri.  Mr. Harte was carrying a small bag and was accompanied by two children.  More than seven months later, on March 20, 2012, Sergeant Wingo provided to the Johnson County Sheriff's Office a spreadsheet of Johnson County residents who were seen shopping at the Green Circle hydroponics store.  That spreadsheet included information that led Johnson County Sheriff's deputies to Mr. Harte's residence—including the make and model of Mr. Harte's vehicle and his license plate number.  The spreadsheet was provided by Sergeant Wingo to assist the Sheriff's Office in its "Operation Constant Gardener" initiative, a concerted effort by the Sheriff's Office

---

[1] Plaintiffs' motion to exclude or limit certain opinion testimony is also ripe for resolution. Because the court concludes that summary judgment on qualified immunity grounds is appropriate, that motion is moot.

2

to conduct numerous drug raids on April 20 of each year to coincide with the date that has become an unofficial holiday among marijuana users.

On April 3, 2012, Johnson County Sheriff's Office Deputies Mark Burns and Edward Blake collected trash from a trash receptacle at the curb outside of the Leawood, Kansas address associated with the vehicle that Robert Harte had driven to the Green Circle. The deputies found indicia of occupancy for the Hartes as well as wet, saturated plant material. Because the deputies believed that the material was "innocent plant material," they did not field test that material. One week later, on April 10, 2012, deputies Mark Burns and Nate Denton collected trash from the curb at the Hartes' residence. The deputies transported three trash bags back to the Johnson County Sheriff's Office operations building for inspection. In the Hartes' kitchen trash, Deputy Burns discovered approximately one cup of saturated green vegetation similar to what he had seen the prior week. Deputy Burns testified that the vegetation was "hard to identify" and that he considered that the substance might be some type of consumable herb or vegetable. But because the material was thoroughly saturated and "processed," Deputy Burns testified that he "thought" it might have been processed for the extraction of THC. Deputy Burns further testified that, in light of his uncertainty, he brought the substance to his supervisor, Sergeant Reddin. Deputy Burns and Sergeant Reddin both testified that they unrolled some of the leaves and observed at least one serrated leaf, which heightened Deputy Burns' suspicion that the substance was marijuana. At that point, Deputy Burns field tested a sample of the material and obtained a positive result for the presence of THC. Deputy Burns utilized a KN reagent field test manufactured by Lynn Peavey.

3

**4a**

On April 17, 2012, deputies Mark Burns and Edward Blake again collected trash from the curb at plaintiffs' residence.  They again transported trash bags back to the Sheriff's Office operations building and, once again, discovered in the kitchen trash approximately ¼ cup of saturated plant material consistent with what they had seen on April 3, 2012 and April 10, 2012. Deputy Blake field tested a sample of the plant material using the Lynn Peavey KN reagent field test.  That test yielded a positive result for the presence of THC.  That same day, deputy Burns drafted an affidavit for search warrant of the Hartes' residence.  In the warrant affidavit, deputy Burns averred that a white male subject driving a vehicle registered to Adlynn Harte had been observed leaving the Green Circle in August 2011 with small bag of merchandise; that the Green Circle sells hydroponic grow equipment and materials commonly used in the cultivation of marijuana; that deputies conducted a trash pull at the Hartes' residence on April 10, 2012 in which they discovered "a sizable quantity (approximately 1 cup) of green vegetation which appeared to be wet marijuana plant material (leaves and stems)."  Deputy Burns averred that the material "was thoroughly saturated by some liquid and, based on the Affiant's law enforcement training and experience, it appeared as though it may have been processed for the extraction of tetrahydrocannabinol (THC) from the plant material."  Deputy Burns averred that he field tested a sample of the plant material which showed a positive response for the presence of THC.  He continued:

> The field test utilized consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana.  This test is presumptive but not conclusive for the presence of marijuana.

Deputy Burns noted in the affidavit that a similar quantity of plant material was discovered in the April 3, 2012 trash pull but that the material was discarded without testing because it was "misidentified" by the affiant as "innocent plant material."

In further support of the search warrant application, deputy Burns averred that another trash pull was conducted at the Hartes' residence on April 17, 2012 and that deputies discovered "approximately ¼ cup of saturated marijuana plant material (leaves and stems) which was consistent with the material found in the previous weeks." Deputy Burns averred that Deputy Blake field tested a sample of that plant material which showed a positive result for the presence of THC. Finally, Deputy Burns detailed in the affidavit his experience in investigating indoor marijuana grow operations and, more generally, his experience in law enforcement and narcotics investigations.

Later that day, Deputy Burns met with Johnson County Assistant District Attorney Laura Smith, who reviewed and approved the search warrant affidavit. Deputy Burns and ADA Smith both brought the affidavit to Johnson County District Judge Peter Ruddick. Judge Ruddick signed the warrant on April 17, 2012. The warrant permitted the residence to be searched for "Marijuana in all forms to include, but not limited to, marijuana plants and plant material, marijuana seeds, marijuana in any stages of growth and/or processing; Drug Paraphernalia used to cultivate and/or process marijuana to include, but not limited to, packaging material, trimmers, scales, dryers, and hanging systems, and drug paraphernalia used to introduce drugs into the body; and, indicia of occupancy."

On April 20, 2012, seven deputies from the Johnson County Sheriff's Office executed the search warrant at plaintiffs' residence: Sergeant James Cossairt; Deputy Edward Blake; Deputy

Larry Shoop; Deputy Lucky Smith; Deputy Christopher Farkes; Deputy Tyson Kilbey; and Deputy Laura Vrabac.  At the time of the execution of the warrant, the residence was occupied by plaintiffs Robert and Adlynn Harte and their two minor children.  According to Mrs. Harte, she awoke on the morning of April 20, 2012 to the sounds of "screaming and loud banging, so hard that the walls were rattling."  Viewed in the light most favorable to plaintiffs, the evidence reflects that five deputies pounded on the door shortly before 7:30am (Sergeant Cossairt and Deputy Vrabac went to the backyard of plaintiffs' residence) and that Mr. Harte opened the door at the command of the deputies.  At that point, all five deputies flooded the foyer of the Hartes' residence.  One of those deputies was wearing a standard patrol uniform and the others were wearing thick bulletproof vests with black t-shirts bearing the word "SHERIFF" in white letters on the back. [2]  All deputies were armed and were carrying their weapons at the "low-ready" position.[3]  One deputy carried an AR-15 rifle and the others carried Glocks.  The deputies ordered Mr. Harte to lie down on the ground and he complied without hesitation.  At the same time, Mrs. Harte appeared at the landing at the top of the stairs leading down into the foyer.  Mrs. Harte avers that she observed a deputy standing over her husband while holding an assault rifle.  It is undisputed, however, that no deputy ever pointed a weapon at Mr. Harte or at any other plaintiff.  Moreover, it is undisputed that none of the deputies ever touched any of the plaintiffs in any respect.

---

[2] Sergeant Cossairt, who entered the foyer after the initial entry, was wearing khaki pants and a sweater.

[3] According to Deputy Tyson Kilbey, the "low ready" position involves gripping the weapon with the dominant hand and pointing the muzzle or barrel of the weapon "at a very steep angle towards the ground."  This evidence is not disputed.

Within minutes, the deputies had cleared the house and moved Mr. and Mrs. Harte, since joined by their children in the foyer, into the living room.  The deputies then began to search the residence for evidence of marijuana.  For the duration of the two-and-one-half hour search, plaintiffs were kept under "armed guard" in the living room and were required to seek permission to use the restroom, handle their phones or, in the case of the children, use gaming devices.  Within 15 to 20 minutes of commencing the search, the deputies realized that they would not discover a massive marijuana grow operation as they had suspected.  In fact, they discovered that the hydroponic garden did not contain any live marijuana plants and, instead, contained only tomato plants.  Nonetheless, the deputies continued to search the residence for evidence of a dismantled marijuana grow operation and, finally, for evidence of "personal use" of marijuana.  Ultimately, the deputies concluded their search at approximately 10:00am.  No evidence of marijuana or other contraband was found.  At some point, the Sheriff's Office discovered that the plant material in the Hartes' trash was nothing more than loose tea leaves that had been brewed by Mrs. Harte and discarded in the kitchen trash.

Over the next two days, various news outlets in Kansas City reported on "Operation Constant Gardener" and touted its success.  The Sheriff's Office also conducted a press conference covered by the media in which it announced the success of the operation, including the seizing of drugs, cash and firearms at the homes of "average Johnson County families" in places like "Leawood."  The Sheriff's Office did not clarify in these reports that at least one search did not uncover any contraband.   According to plaintiffs, then, neighbors who witnessed the raid on plaintiffs' home and later saw the news reports about the raids were left with the impression that contraband was discovered at plaintiffs' home.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014); *see* Fed. R. Civ. P. 56(a). A factual dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* A factual issue is material "if under the substantive law it is essential to the proper disposition of the claim." *Id.* The nonmoving party "is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).

When, as here, the defendants have asserted quailed immunity at the summary judgment stage, the court's factual analysis relative to the qualified-immunity question is distinct:

> [T]he objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court.

8

**9a**

*Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015). (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir.2009) (Holmes, J., concurring)).  The "universe of facts" is comprised of uncontested facts and contested material facts favorable to the party claiming injury.  *Weigel v. Broad*, 544 F.3d 1143, 1156 (10th Cir. 2008) (O'Brien, J., dissenting).  After the universe of relevant facts is distilled from the record, the court determines whether those facts "demonstrate" the violation of a clearly established constitutional right.  *Id.*

## III.   Constitutional Claims

In the pretrial order, plaintiffs have asserted four § 1983 claims—a claim for unlawful search; a claim for unreasonable execution of the search; a claim for excessive force; and a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Plaintiffs' claim for unlawful search is asserted against all individual defendants, including defendant Wingo, based on each defendant's personal participation in the unlawful search or that defendant's direction, supervision or setting in motion a series of events that caused the constitutional deprivation.  Plaintiffs' claims for unreasonable execution of the search and excessive force are asserted against all individual defendants except for defendant Wingo. Plaintiffs' *Monell* claim is asserted against the Board of Commissioners of Johnson County and Sheriff Denning.

The individual defendants each assert a qualified immunity defense.   Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010).   When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to show that: (1) the

defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).  The court maintains the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  If the plaintiff, however, fails to establish a violation of the law, then the court need not reach the issue of whether the law was clearly established.  *Reynolds v. Powell*, 370 F.3d 1028, 1029 (10th Cir. 2004).

A.     *Unlawful Search*

In the pretrial order, plaintiffs assert that defendants violated plaintiffs' Fourth and Fourteenth Amendment rights by conducting a search of plaintiffs' home in the absence of probable cause.  More specifically, plaintiffs contend that defendants cannot rely on the warrant that was issued by the state court judge because defendants misrepresented or omitted material facts to the judge in obtaining the warrant.  In the context of a qualified immunity defense on an unlawful search claim, the court determines whether a defendant violated clearly established law "by asking whether there was 'arguable probable cause'" for the challenged conduct.  *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)).  Arguable probable cause "is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."  *Id.* (citing *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007)).  A

defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed" to perform the search.  *See id*.

A neutral judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'"  *Id*. (quoting *Messerschmidt v. Millender*, ——U.S. ——, 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984))).  But the fact that a judge has issued a warrant authorizing the search "does not end the inquiry into objective reasonableness."  *Id*. at 1141-42 (quoting *Messerschmidt*, 132 S Ct. at 1245).   If "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," the warrant offers no protection.  *Id*. at 1142 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Qualified immunity will not be granted "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id*. (quoting *Messerschmidt*, 132 S. Ct. at 1245).

Similarly, a warrant offers no protection to officers who misrepresent or omit material facts to the judge who issued the warrant.  *Id*.  The burden is on the plaintiff to "make a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant.  *Id*. (quoting *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990)).  This test is an objective one:  when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances.  *Id*. (citing *Cortez*, 478 F.3d at 1120–21 ("The conduct was either objectively reasonable under existing law or it was not.")).  Qualified immunity applies equally to

reasonable mistakes of law and fact. *Id*. (citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009)).

To establish reckless disregard in the presentation of information to a judge, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations . . . and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id*. (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)). "[T]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to betoken negligence at most." *Id*. (quoting *Beard*, 24 F.3d at 116; *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000) (holding that omissions are made with reckless disregard if an officer withholds a fact that any reasonable person would have known a judge would wish to know and that assertions are in reckless disregard of the truth if they are made "with a high degree of awareness of the statements' probable falsity" (internal quotation marks and alterations omitted)).

With this legal framework in mind, the court turns to plaintiffs' arguments. In their submissions, plaintiffs do not contend that the warrant affidavit is "so lacking in indicia of probable cause" that the judge should not have issued the warrant. Rather, plaintiffs contend that Deputy Burns misrepresented and omitted material facts to Judge Ruddick and that a "reconstructed" affidavit that included the omitted facts and excised the misrepresentations would have lacked probable cause. *See Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015) (if an officer includes false statements in a warrant affidavit or recklessly omits information, court

12

**13a**

measures probable cause by removing false information, including omitted information and inquiring whether modified affidavit establishes probable cause); *Wilson*, 212 F.3d at 789 (after finding omissions or misrepresentations, court must engage in "reconstructive surgery" and assess whether the omissions and statements were material to the finding of probable cause).

*Assertions*

In his affidavit, Deputy Burns averred that he field tested the plant material that officers discovered on April 10, 2012 and the field test "showed a positive response for the presence of THC." Similarly, Deputy Burns averred that Deputy Blake field tested the plant material that officers discovered on April 17, 2012 and the field test "showed a positive response for the presence of THC." The fact that Deputy Burns' affidavit states that the material found in the Hartes' trash on two consecutive weeks field-tested positive for the presence of THC is a hurdle that is all but impossible for plaintiffs to overcome. As courts have recognized, a reasonably trustworthy field test that returns a positive result for the presence of drugs is a sufficient basis, in and of itself, for probable cause. In *Lamping*, for example, the Sixth Circuit held that even if other statements concerning probable cause were removed from a warrant application, probable cause nonetheless existed for the search of the plaintiff's residence based solely on the officer's statement that a substance found in plastic baggies field-tested positive for drugs such that the plaintiff's "sole hope" was to attempt to raise a material issue about whether the officer's statement about the results of the test was deliberately or recklessly false. *See Lamping*, 30 Fed. Appx. at 580; *Simms v. McDowell*, 2009 WL 3160353, at *5 (W.D. Ky. Sept. 25, 2009) (positive field test described in warrant application provided sufficient probable cause for

warrant).  To overcome the obstacle created by the positive field tests, plaintiffs contend (as they must) that the representations concerning the positive test results are either deliberately false (plaintiffs allege that the tests in fact came back negative but Deputy Burns reported that the tests were positive) or simply wrong because the deputies misinterpreted the results of the test through their own negligence (that is, the tests in fact came back negative but the deputies interpreted the results as positive due to lack of training or their failure to follow the manufacturer's instructions).

In support of their argument that Deputy Burns deliberately lied about the test results, plaintiffs rely primarily on evidence that their expert, Michael D. Bussell, field tested the same plant material seized from plaintiffs' trash and obtained a negative result using the same Lynn Peavey KN reagent field test that the deputies used in testing the plant material.  No reasonable jury could infer from this evidence that Deputy Burns lied about the test results.  Mr. Bussell's field test was conducted in May 2015, more than three years after the material was seized and tested by the defendants.  There is no evidence in the record from which a jury could conclude that the plant material was sufficiently the same in terms of its chemical makeup in May 2015 as compared to April 2012 such that Mr. Bussell's negative test result could support a further inference that Deputy Burns must have obtained a negative field test in April 2012.  The multiple inferences required to support a finding that Deputy Burns lied are simply too attenuated from the evidence.

Plaintiffs also highlight that Mr. Bussell, in May 2015, brewed and field tested several varieties of tea blends commonly used by Mrs. Harte in April 2012 and that he consistently obtained negative results using tests with the KN reagent.  As Mr. Bussell's expert report

14

**15a**

indicates, however, he actually obtained a false positive result on a sample of "Snow Geisha" brewed tea leaves using a field test kit with the Duquenois-Levine reagent—a test that plaintiffs assert is far superior and more accurate than the test utilized by the deputies in April 2012. The fact that plaintiff's expert obtained a false positive result when testing brewed tea leaves undercuts plaintiffs' theory that Deputy Burns must have lied about obtaining a positive test result in April 2012. Rather, it shows that false positives can occur when field testing tea leaves. And the fact that Mr. Bussell at other times obtained negative results on various brewed tea samples using the KN reagent is not sufficient to permit the inference that Deputy Burns lied about the April 2012 test results.

Moreover, other evidence submitted by plaintiffs further dispels any inference that Deputy Burns lied about the April 2012 test results. Specifically, plaintiffs highlight certain case notes from Melinda Spangler, a laboratory technician with the Johnson County Sheriff's Office Crime Laboratory. Ms. Spangler indicates that, in August 2012, she field tested the samples obtained from plaintiffs' trash using the same field test kits that the deputies used and that she also obtained positive results from that testing on both samples. Plaintiffs have not challenged Ms. Spangler's findings in any respect or suggested that Ms. Spangler lied in reporting her results. In the absence of any other evidence suggesting that the deputies in April 2012 in fact obtained negative test results but falsely reported positive test results in the warrant application, plaintiffs have not made a "substantial showing of deliberate falsehood" on the part of Deputy Burns. *See Stonecipher*, 759 F.3d at 1142.

As an alternative to their theory that Deputy Burns lied in the affidavit about obtaining positive field test results, plaintiffs contend that Deputy Burns and Deputy Blake in fact

15

obtained negative results but misinterpreted the test and read the results wrong.  Even assuming that the deputies negligently reported inaccurate test results, that conduct would not invalidate the warrant.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (allegations of negligence or innocent mistake are not sufficient to invalidate a warrant).   Plaintiffs, then, are left with the fact that deputies obtained positive test results in two consecutive weeks on the plant material obtained from plaintiffs' trash.  While it is uncontroverted that those positive test results were "false" positives in that the plant material did not contain THC and subsequent laboratory tests returned negative results, the fact that the field test results were not accurate does not undermine the validity of the warrant application where there is no evidence that Deputy Burns or Deputy Blake recklessly disregarded information suggesting that the field tests were unreliable or inaccurate.  *See Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 971 (7th Cir. 2003) (affirming grant of qualified immunity to officers; the fact that post-search lab tests came back negative such that field tests results were "false positives" did not undermine probable cause where potential unreliability of field tests was determined only after the warrant was obtained and there was no evidence officer thought the field tests were unreliable when he applied for the warrant); *Lamping v. Walraven*, 30 Fed. Appx. 577, 580 (6th Cir. 2002) (affirming grant of qualified immunity to officer where search affidavit was based on false positive field test results; false positives do not "retroactively eliminate probable cause" at the time the warrant was issued; post-search lab tests returning a negative result, without more, cannot support an inference that the officer lied about field test results and there was no evidence that officer knew the field test results were false when he signed the affidavit); *Herron v. Lew Sterrett Justice Center*, 2007 WL 2241688, at *3 (N.D. Tex. 2007) (negative laboratory test after false positive field test does not

16

**17a**

negate the existence of probable cause at the time of arrest); *Hines v. Port Authority of New York and New Jersey*, 2000 WL 420555, *4-5 (S.D.N.Y. 2000) (field tests showing the white powdery substance tested positive for heroin were sufficient to establish probable cause, although laboratory eventually found substance negative for heroin); *Pennington v. Hobson*, 719 F. Supp. 760, at 767-69 (S.D. Ind. 1989) (granted qualified immunity to arresting officers; probable cause to arrest existed where field test indicated powder was cocaine even though subsequent laboratory test identified powder as aspirin and record contains no evidence defendants were disingenuous in performing field test).

Here, there is no evidence in the record from which a jury could reasonably conclude that Deputy Burns or Deputy Blake recklessly disregarded information that the test results were unreliable or inaccurate. Deputy Burns testified that, at the time he tested the plant material he discovered in plaintiffs' trash, he had no knowledge that anything other than marijuana could test positive on a marijuana field test kit and that he was "not aware" of the possible occurrence of false positive test results. Deputy Blake's testimony on those issues is substantially the same. Moreover, Sheriff Denning testified that, since he came to the Johnson County Sheriff's Office in 1978, the Office has conducted "thousands" of field tests and the only false positive results of which he is aware are the results at issue in this case. There is no basis to conclude, then, that Deputy Burns or Deputy Blake should have known that the field test kits they were using tended to yield false positive results or that the particular test results they obtained in connection with this case were not reliable. To the extent plaintiffs suggest that Deputy Burns was reckless in his haste to apply for a warrant in light of the looming April 20, 2012 Operation Constant Gardener raids, there is no evidence that Deputy Burns, assuming he was rushed, failed to

follow his ordinary procedure when he sought the warrant.   Significantly, Deputy Burns testified that, regardless of the planned April 20 raids, he would not have sent the plant material to the lab for confirmation of the field test because, in April 2012, the Sheriff's Office standard practice concerning trash pulls was to obtain a warrant on the basis of field tests in light of the "freshness of the probable cause" unique to trash pulls.   According to Deputy Burns, he had no knowledge in April 2012 that anyone in the Sheriff's Office ever submitted material from a trash pull to the lab for testing.[4]   Based on the evidence in the record, then, no reasonable jury could conclude that Deputy Burns, at the time he applied for the warrant, had any particularized reason to doubt the accuracy of the two consecutive field test results that he and Deputy Blake obtained on the material from the plaintiffs' trash.   For these reasons, the court, in analyzing whether probable cause existed for the warrant, will not excise the statements concerning the two positive field test results.

In their submissions, plaintiffs identify three other alleged misrepresentations in Deputy Burns' warrant affidavit.   In paragraph 6 of the affidavit, Deputy Burns states that, on April 10, 2012, officers found "a sizable quantity (approximately 1 cup) of green vegetation which appeared to be wet marijuana plant material (leaves and stems)."   Plaintiffs challenge that portion of the statement in which Deputy Burns indicates that the substance "appeared to be wet marijuana" and contend that no reasonably competent officer would have believed that the substance "appeared to be" marijuana.   In support of their argument, plaintiffs assert that their expert, Mr. Bussell, opined that bits of fruit and flowers could be readily seen in the varieties of

---

[4] In light of this lawsuit, the Sheriff's Office has changed its policy and now requires deputies to send any suspected drug material found in a trash pull to the lab for confirmation before seeking a warrant.

tea leaves that he brewed and that Ms. Spangler, the lab analyst, indicated in her case notes in August 2012 that the substances found in plaintiffs' trash "macroscopically . . . did not appear to be marijuana." This evidence is not sufficient to show that Deputy Burns, at the time he drafted the affidavit, "entertained serious doubts" about the truth of his statement.

To begin, there is no evidence that the plant material looked the same in August 2012 when Ms. Spangler observed it as it did when it was thoroughly saturated in April 2012 when Deputy Burns observed it. There is also no evidence that Mr. Bussell necessarily brewed and observed the same tea blend that Deputy Burns discovered in plaintiffs' trash. Moreover, Deputy Burns readily admitted in his deposition that the plant material was "hard to identify" and that, while he never considered that the substance could be tea leaves because he had never in his life seen loose tea leaves, he did consider that the substance might be some type of consumable herb or vegetable. Because the material was thoroughly saturated and "processed," Deputy Burns testified that he "thought" it might have been processed for the extraction of THC. Deputy Burns further testified that, in light of his uncertainty, he brought the substance to his supervisor, Sergeant Reddin. Deputy Burns and Sergeant Reddin both testified that they unrolled some of the leaves and observed at least one serrated leaf, which heightened Deputy Burns' suspicion that the substance was marijuana. As explained by Deputy Burns, his suspicions were essentially confirmed—and he ruled out kitchen herbs or vegetables—once he tested the substance and obtained a positive result for the presence of THC. For these reasons, the evidence highlighted by plaintiffs is not sufficient to conclude that Deputy Burns, at the time he signed the warrant affidavit, seriously doubted whether the material "appeared to be wet marijuana." There is no basis, then, to excise this statement from the affidavit.

19

**20a**

In paragraph 10 of the warrant application, Deputy Burns refers to the April 17, 2012 trash pull and states that one of the trash bags contained "approximately ¼ cup of saturated marijuana plant material (leaves and stems) which was consistent with the material" found on April 10, 2012.  Plaintiffs content that this statement was made with reckless disregard for the truth because Deputy Burns represented that the material "was in fact marijuana, not just something that looked like marijuana."   The court disagrees.  When read in the context of the entire affidavit, it is clear that Deputy Burns was not representing to the judge that the material was "in fact" marijuana, but that the material was presumed to be marijuana based on its appearance and the results of the field test.  Indeed, in paragraph 11 of the affidavit, Deputy Burns states that the test was "presumptive but not conclusive for the presence of marijuana," which undermines any suggestion that Deputy Burns was representing to the judge that the material was conclusively marijuana.  The court, then, will not remove this statement from the affidavit in assessing whether probable cause exists for the warrant.

Finally, plaintiffs challenge a statement made by Deputy Burns in paragraphs 7 and 11 of the affidavit—that the field test utilized by him (and the one used by Deputy Blake) "consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana."  According to plaintiffs, this statement is untrue because the crime lab uses the KN reagent "for a completely different purpose—thin layer chromatography."  Plaintiffs have not demonstrated that Deputy Burns' statement is false.  Valerie Kamb, a crime lab supervisor, testified that Deputy Burns' statement was accurate and that the lab was using the KN reagent as part of its marijuana testing protocol at that time.  According to Ms. Kamb, the lab was not using the KN reagent "in a pouch form" like Deputy Burns had used in the field,

20

but in connection with a different type of initial screening called thin layer chromatography. Because the uncontroverted evidence demonstrates that the crime lab, at the time of Deputy Burns' statement, utilized the KN reagent as part of its screening test for marijuana, plaintiffs cannot make a substantial showing that the statement is false. The statement, then, is properly considered in assessing whether the warrant was based on probable cause.

*Omissions*

Plaintiffs have identified several omissions from Deputy Burns' affidavit and they contend that a judge would have wanted to know about the information that was withheld. In the first paragraph of the affidavit, Deputy Burns states that the Green Circle "sells hydroponic grow equipment and materials commonly used in the cultivation of marijuana" and that he knows that information from "personal past experience." Plaintiffs assert that Deputy Burns recklessly omitted from this paragraph that he had never been inside the Green Circle "and had little idea what it sold or whether, in fact, it bore any relationship to marijuana growing." While Deputy Burns testified that he had never been inside the store, the testimony referenced by plaintiff does not support the assertion that he had "little idea" about what was sold at the Green Circle. Deputy Burns testified that he had knowledge that the Green Circle sold lighting equipment, timers, grow mediums such as clay pellets, and nutrients and fertilizers. Plaintiffs direct the court to no evidence suggesting that Deputy Burns' assessment of what was sold at the Green Circle was inaccurate or that he otherwise lacked personal knowledge of what items were sold at the Green Circle. Thus, the fact that Deputy Burns did not assert in the affidavit that he had never been inside the Green Circle is of no consequence. Stated another way, no reasonable

person would believe that a judge would want to know, in deciding whether to sign the warrant, that Deputy Burns had never been inside the store. This, of course, is particularly true in light of the fact that Deputy Burns, in his affidavit, reported that the deputies had obtained positive field test results on two separate occasions, which independently established probable cause regardless of Mr. Harte's sighting at the Green Circle.[5]

Plaintiffs next highlight that the search warrant affidavit omits the fact that the "green vegetation" discovered in the trash was, more specifically, discovered in the kitchen trash. According to plaintiffs, a reasonable person who discovered the vegetation in the kitchen trash would have concluded that the vegetation was something discarded "from the kitchen" as opposed to marijuana—particularly when coupled with the fact that the vegetation lacked the characteristic odor of marijuana (another omission identified by plaintiffs).[6] But in the light of the two positive field test results obtained by the deputies, it is difficult to ascertain the relevance of the specific nature of the trash in which the plant material was discovered. Thus, even if Deputy Burns had included in his affidavit that the material was discovered in the

---

[5] In their response to defendants' facts, plaintiffs also suggest that Officer Burns should have included the "growth cycle" for marijuana in light of the fact that Mr. Harte was observed at the Green Circle nearly 8 months prior to the trash pulls. Plaintiffs highlight Sergeant Wingo's testimony that the growth cycle for marijuana is 60 to 90 days. There is no evidence that Officer Burns had any knowledge of the growth cycle for marijuana and, accordingly, he cannot have recklessly omitted that information. *See United States v. Comer*, 565 Fed. Appx. 729, 731-32 (10th Cir. 2014) (record did not support finding that investigator recklessly omitted informant's criminal history from warrant affidavit where there was no evidence that investigator had knowledge of informant's criminal history). Moreover, the omission is not material in light of the fact that the deputies had obtained positive results from field testing of very recently saturated and recently "processed" vegetation.

[6] In the court's view, there is nothing inherently unusual about discarding processed marijuana in the kitchen trash (as opposed to some other trash receptacle in a residence) and, for that reason, the fact that the vegetation was discovered in the kitchen trash is not material.

kitchen trash, that statement would not have defeated probable cause, which was independently established by virtue of the field tests.

Plaintiffs also contend that Deputy Burns recklessly omitted the fact that the plant material lacked the distinct odor of marijuana and was "hard to identify." It is undisputed that Deputy Burns, upon initially observing the saturated plant material, did not know whether the substance was marijuana. But because any uncertainty dissipated when he field tested the material and obtained a positive result, no reasonable officer would have included details about his initial uncertainties in the warrant application—those facts simply had no relevance once the tests came back positive. These facts, then, are not ones which would have made a difference to a judge. And plaintiffs' evidence does not permit any other conclusion. Plaintiffs' expert opines that a reasonable, trained narcotics officer would never have confused the distinct odor of marijuana with the "fruity and floral" fragrance of the brewed tea leaves. This opinion fails to controvert Deputy Burns' testimony—referenced by plaintiffs in their submissions—that he did not even attempt to smell the plant material because the smell of the trash itself was "overwhelming" and that he did not expect wet marijuana to have the distinct odor that he would associate with raw marijuana. According to Deputy Burns, wet marijuana, in his experience, has an "earthy" smell. Plaintiffs have directed the court to no evidence casting doubt on Deputy Burns' testimony. Thus, the fact that Deputy Burns did not disclose in the affidavit that the material "did not emit any odor consistent with marijuana"—even putting aside the fact that the positive field tests independently established probable cause in any event—is not information that a reasonable person would think that a judge would want to know in determining whether to sign the warrant under the circumstances described by Deputy Burns.

The same holds true with respect to plaintiffs' contention that Deputy Burns recklessly omitted from his affidavit that the plant material was "hard to identify." Because any uncertainty that Deputy Burns had concerning the nature of the vegetation in the Hartes' trash was wiped away as soon as he obtained a positive field test, there is no basis to conclude that Deputy Burns, at the time he signed the affidavit, believed that the material was "hard to identify" or that he entertained any "serious doubts" about the nature of the material. In other words, there was simply no reason to include those facts in light of the field test results and, because of those results, no judge would have cared that Deputy Burns was uncertain as to the nature of the substance upon his initial observation of it. Again, plaintiffs' evidence does not demonstrate that the information should have been included. It is undisputed that Deputy Burns initially considered that the substance might be an herb or vegetable and, in fact, he did disclose in the affidavit that he believed on April 3, 2012 that the material was "innocent plant material." Deputy Burns testified that, in light of his uncertainty, he and Sergeant Reddin unrolled some of the leaves and observed at least one serrated leaf, which heightened his suspicion that the substance could be marijuana. As explained by Deputy Burns, his suspicions were essentially confirmed—and he ruled out kitchen herbs or vegetables—once he tested the substance and obtained a positive result for the presence of THC. At the time he signed the warrant affidavit, then, the fact that the substance was initially "hard to identify" was not relevant—he had subsequently obtained two positive field test results. For these reasons, plaintiffs have not established that Deputy Burns recklessly omitted from the affidavit that the substance was "hard to identify."

Plaintiffs further highlight that Deputy Burns omitted from his affidavit any mention of observing serrated leaves in the substance found in plaintiffs' trash. Presumably, any mention of this fact by Deputy Burns would have served only to strengthen the case for probable cause. To the extent plaintiffs mean to suggest that Deputy Burns and Sergeant Reddin lied in their depositions about observing serrated leaves, there is no evidentiary basis to support that suggestion except that the information was omitted from Deputy Burns' affidavit. The nefarious inference that plaintiffs draw, however, is not reasonable for the same reasons Deputy Burns' other omissions do not change the probable cause calculus—Deputy Burns reasonably left out details about his observations that were not material after deputies obtained positive field test results on two separate occasions. As explained earlier, there is no basis to conclude that Deputy Burns or Deputy Blake lied about obtaining those results or were otherwise reckless in reporting those results. In the absence of such evidence, there is no basis to conclude that Deputy Burns lied about observing serrated leaves in the vegetation they found.

Finally, plaintiffs contend that Deputy Burns recklessly omitted from the affidavit that he lacked formal training in using the Lynn Peavey KN reagent field test that he used in April 2012 and that those particular field test kits are "known to yield false positives" at a very high rate in connection with common kitchen herbs, spices and caffeine. Plaintiffs have failed to come forward with facts suggesting that Deputy Burns' failure to disclose his lack of "formal" training on the field test kit that he used was reckless. The affidavit states that Deputy Burns had been employed as a deputy sheriff for 15 years at the time of the affidavit with more than 8 years of experience participating in narcotics investigations. The affidavit reveals that Deputy Burns had extensive on-the-job experience as well as additional training in drug law enforcement and

25

investigations.  Against this backdrop, there is nothing in the record to suggest that a judge would have wanted to know that Deputy Burns lacked "formal" training on the specific field test he used in April 2012.  Moreover, the affidavit reflects that Deputy Blake performed the field test on the material discovered during the April 17, 2012 trash pull and plaintiffs do not identify any omissions with respect to Deputy Blake's training.  In fact, the record, as highlighted in plaintiffs' submissions, reflects that Deputy Blake had used the Lynn Peavey KN reagent field test "hundreds" of times during his career and had been trained on the use of that test by a field training officer.  For these reasons, too, if Deputy Burns had disclosed his lack of formal training, that information would not have altered the probable cause analysis.

While the court does not doubt that a judge would have wanted to know that the field test kits that Deputy Burns and Deputy Blake were using tended to yield false positive results "at a high rate," there is simply no evidence that Deputy Burns or Deputy Blake had any knowledge of that information.  In fact, as plaintiffs point out in their submissions, Deputy Burns testified that, at the time he tested the plant material he discovered in plaintiffs' trash, he had no knowledge that anything other than marijuana could test positive on a marijuana field test kit and that he was "not aware" of the possible occurrence of false positive test results.  Deputy Blake's testimony on those issues is substantially the same.  Moreover, Sheriff Denning testified that, since he came to the Johnson County Sheriff's Office in 1978, the Office has conducted "thousands" of field tests and the only false positive results of which he is aware are the results at issue in this case.  There is no basis to conclude, then, that Deputy Burns or Deputy Blake should have known that the field test kits they were using tended to yield false positive results.  And even assuming that Deputy Burns or Deputy Blake should have known, as plaintiffs

suggest,[7] that a false positive is at least a theoretical possibility, plaintiffs have not shown that Deputy Burns recklessly omitted that information from the affidavit, where he clearly stated on two occasions that the rest result was "presumptive" but "not conclusive" for the presence of marijuana and neither Deputy Burns nor Deputy Blake had any particularized knowledge concerning the likelihood of obtaining a false positive under the circumstances presented.  *See Molina ex rel. Molina*, 325 F.3d at 971 (rejecting argument that officer should have discussed in the search warrant affidavit the fact that field tests were unreliable; plaintiffs presented no evidence that officer had reason to know that field tests were unreliable when he applied for the warrant).  For all of these reasons, then, plaintiffs cannot establish that Deputy Burns recklessly failed to disclose that the field test kit utilized by Deputy Burns and Deputy Blake tended to yield false positive results at a high rate.  *See United States v. Comer*, 565 Fed. Appx. 729, 731-32 (10th Cir. 2014) (record did not support finding that investigator recklessly omitted informant's criminal history from warrant affidavit where there was no evidence that investigator had knowledge of informant's criminal history).

Based on the totality of the circumstances, plaintiffs have not shown that the warrant lacked probable cause and, thus, defendants' search of plaintiffs' residence was lawful and no constitutional violation occurred.[8]  Summary judgment on qualified immunity grounds is

---

[7] Plaintiffs reference the testimony of lab analyst Valerie Lamb, who testified that it is "well known" that false positives "exist."

[8] Plaintiffs generally contend, without attacking any specific portion of the warrant affidavit, that the deputies improperly bypassed other avenues of establishing probable cause in their haste to create a "media spectacle" concerning Operation Constant Gardener.  These allegations fail to establish a knowing or reckless disregard for the truth.  *See Stonecipher*, 759 F.3d at 1142 ("[T]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a

appropriate in favor of defendants Blake, Burns, Cossairt, Denning, Denton, Farkes, Kilbey, Pfannenstiel, Reddin, Shoop, Smith, Vrabac and Wingo on plaintiffs' claims for unlawful search. *See Stonecipher*, 759 F.3d at 1145.[9]

B.    *Unlawful Seizure*

Plaintiffs further claim that, even if there was probable cause to initiate the search, probable cause evaporated during the course of the search such that the continued search and detention of plaintiffs was unlawful.  Specifically, plaintiffs contend it was unreasonable for officers to continue to search the residence once they discovered the hydroponic garden contained only tomato plants.  In support of their argument, plaintiffs highlight Deputy Shoop's testimony that the deputies knew "within the first 15 or 20 minutes" that they would not find "a massive grow operation."  Plaintiffs urge that any probable cause dissipated once deputies realized that the hydroponic garden contained only "scrawny tomato plants" but that deputies, in violation of plaintiffs' constitutional rights, continued to search for evidence of a dismantled grow operation and, then, "personal use" amounts of marijuana.  Defendants move for summary

---

knowing or reckless disregard for the truth.  To the contrary, it is generally considered to be token negligence at most."); *United States v. Fiscus*, 64 Fed. Appx. 157, 162 (10th Cir. 2003) (no Fourth Amendment violation for valid search regardless of officers' motivation in conducting the search).

[9]  In the absence of an underlying constitutional violation, plaintiffs' claims against any individual (such as defendants Denning and Wingo) who is alleged to have supervised, directed or set in motion the constitutional violation necessarily fail.  *See Gray v. University of Colo. Hosp. Auth.*, 672 F.3d 909, 918 n.7 (10th Cir. 2012) (no liability under section 1983 for failure to supervise without underlying constitutional violation); *Apodaca v. Rio Arriba County Sheriff's Dept.*, 905 F.2d 1445, 1447–48 (10th Cir. 1990) (claim under section 1983 for failure to train or supervise an officer requires a constitutional violation by the officer).

28

**29a**

judgment on qualified immunity grounds.  Because plaintiffs have failed to establish a violation of law, defendants are entitled to summary judgment.

As explained earlier, probable cause existed for the search warrant such that deputies were permitted to search plaintiffs' residence for those items listed in the warrant.[10]  The warrant expressly authorized the deputies to search for "marijuana in all forms to include, but not limited to, marijuana plants and plant material, marijuana seeds, marijuana in any stages of growth and/or processing; drug paraphernalia used to cultivate and/or process marijuana to include, but not limited to, packaging material, trimmers, scales, dryers, and hanging systems, and drug paraphernalia used to introduce drugs into the body; and indicia of occupancy."[11]  Thus, while the deputies did not find a "massive" grow operation, they continued to search plaintiffs' residence for a total of almost two-and-one-half hours for evidence of "remnants" of a grow operation or evidence of personal use of marijuana.  According to Deputy Shoop, the hydroponic garden discovered in the basement by the deputies had several "empty spaces on the hydroponic spots, holes that did not have pots in them" such that the deputies expected,

---

[10] Plaintiffs suggest in their submissions that the deputies cannot rely on the warrant to justify their continued search because the deputies had not even read the warrant or the affidavit in support of the warrant.  Plaintiffs have not pointed to any case law establishing that the deputies—who undisputedly had been briefed that the search included marijuana in all forms—had an independent duty to read the warrant or affidavit.  *See Wigley v. City of Albuquerque*, 567 Fed. Appx. 606, 609-10 (10th Cir. 2014)

[11] Plaintiffs do not contend that the warrant was overbroad.  They contend, however, that the deputies exceeded the scope of the warrant because Deputy Blake testified that "[e]verybody was looking for any kind of criminal activity that was involved in the house."  When read in context, however, it is clear that Deputy Blake was not suggesting that agents were looking for criminal activity beyond activity related to the growing or use of marijuana.  Moreover, there is no evidence that any agent searched the home for any criminal conduct not related to marijuana. Stated another way, there is no evidence that the deputies conducted a general exploratory search of plaintiffs' residence or searched plaintiffs' computers, telephones or mail, for example.

29

**30a**

consistent with their experience, to find marijuana plants in some other state of processing somewhere else in the residence. Deputy Shoop further testified that within 60 or 90 minutes, the deputies were "fairly certain" that they were not going to find remnants of a grow operation but, because they were operating under the assumption that marijuana had been discovered in the trash, they continued to search the residence for evidence "of some kind of use of marijuana." According to Deputy Shoop, once the deputies determined that no evidence of personal use marijuana existed in the residence, they executed the warrant return and exited the residence.

In support of their claim, plaintiffs analogize the facts here to those presented in *Maresca v. Bernalillo County*, 804 F.3d 1301 (10th Cir. 2015), in which the Circuit held that the plaintiffs were entitled to summary judgment against a deputy for unlawful arrest because they were arrested without probable cause due to the deputy's "unreasonable mistake" of believing that the plaintiffs' vehicle was stolen. *Id.* at 1310. According to the Circuit, the deputy unreasonably failed to use "readily available exculpatory evidence" (including the computer screen in her patrol vehicle evidencing that the description of the stolen car did not match the plaintiffs' vehicle in any respect) demonstrating that probable cause to arrest the plaintiffs did not exist. *Id.* at 1310-11. Plaintiffs here contend that the deputies ignored "readily available exculpatory evidence" that plaintiffs were "law-abiding citizens" such that any search beyond the hydroponic garden in the basement was unreasonable.

*Maresca* plainly has no application to the facts here. There is no evidence that the deputies made any "unreasonable mistakes" in connection with the search of plaintiffs' residence. They had permission to search the residence for "marijuana in all forms" based on a

30

**31a**

warrant for which there was probable cause.  Nothing they encountered inside the residence could reasonably be considered "exculpatory evidence."  In fact, deputies found evidence of a hydroponic garden and empty spots that might reasonably have held marijuana plants.  Considering their belief (and there is no evidence that the belief was not honest or reasonable) that marijuana had been discovered in plaintiffs' trash, the court cannot say that the deputies acted unreasonably by searching the residence for two-and-one-half hours.  The fact that the search ultimately did not uncover marijuana does not mean that probable cause to search for marijuana necessarily dissipated at some point during the search.

In that regard, the court finds the Circuit's decision in *Lawmaster v. Ward*, 125 F.3d 1341 (10th Cir. 1997), particularly instructive.  In that case, federal agents, based on information from a confidential informant that the plaintiff owned an unregistered machine gun, obtained a search warrant authorizing a search of the plaintiff's home for the unregistered machine gun; any other firearms required to be registered with the Bureau of Alcohol, Tobacco and Firearms; any machine gun parts; any indicia of occupancy; and any documents or property referring to the purchase, ownership, maintenance or transfer of any firearms required to be registered under federal law.  *Id*. at 1344.  Due to safety concerns, the agents searched plaintiffs' residence while it was unoccupied.  *Id*.  Pertinent to the issue before this court, the agents discovered in a gun vault several firearms including the specific firearm matching the informant's description but concluded that none of the firearms were machine guns.  *Id*. at 1345.  Nothing was seized.  *Id*. The plaintiff filed a *Bivens* action alleging, among other things, that the agents violated his Fourth Amendment rights based on their unreasonable execution of the search.  *Id*. at 1347-48. The agents moved for summary judgment based on qualified immunity.  *Id*. at 1347-48.

In support of his Fourth Amendment claim, the plaintiff argued that once the agents realized that the gun described in the warrant was not an illegal machine gun, the agents "should have immediately halted their search" and unreasonably continued to search the plaintiff's home. *Id*. at 1348. The Circuit disagreed and held that the agents did not violate the Fourth Amendment by continuing to search the home after discovering that the specific firearm was not an illegal machine gun. *Id*. at 1348-49. As explained by the Circuit:

> As we have stated, probable cause existed permitting the Agents to search Mr. Lawmaster's home for the objects listed in the warrant. Whether evidence of a crime is actually found in the home is irrelevant to the issue of whether probable cause existed to search. Here, the Agents did not act unreasonably in continuing their search even after discovering the first Colt AR–15 .233 caliber gun they found was not an illegal machine gun. The illegal gun could have been hidden somewhere else in the house. We hold the Agents did not act unreasonably, and did not violate Mr. Lawmaster's Fourth Amendment right by continuing to search after discovering the Colt AR–15 .233 caliber gun was not an illegal machine gun.

*Id*. at 1348-49. Similarly, the deputies here did not act unreasonably by continuing to search for marijuana—as permitted by the language of the warrant—after they discovered that the hydroponic garden did not contain marijuana plants. To be sure, marijuana could have been virtually anywhere else in the residence. Plaintiffs have pointed to no evidence sufficient to "undo the preexisting probable cause calculus." *Hernandez v. Story*, 459 Fed. Appx. 697, 699 (10th Cir. Jan. 25, 2012) (rejecting argument that probable cause dissipated as investigation progressed where the plaintiff showed, at most, that additional facts "possibly" negated preexisting probable cause).

Finally, even assuming that probable cause dissipated at some point during the deputies' search of plaintiffs' residence, it is "far from clear that every reasonable officer . . . would have thought so." *Id*. Plaintiffs have not directed the court to any case law clearly indicating that the

lack of probable cause in this case was "beyond debate." *Id.* at 700 (citing *Ashcroft v. al–Kidd*, ––– U.S. ––––, 131 S. Ct. 2074, 2083 (2011)).   Because plaintiffs have not cleared qualified immunity's second hurdle, summary judgment is appropriate regardless of whether plaintiffs have established a constitutional violation.   *See id.* (at second step, plaintiff must prove that officers "clearly lacked probable cause" to continue search; plaintiff cannot rely on general Fourth Amendment cases concerning the need for probable cause).

C.   *Excessive Force*

In the pretrial order, Plaintiff's excessive force claim is asserted under the Fourth and Fourteenth Amendments.   In their summary judgment submissions, however, plaintiffs' excessive force claim is asserted only under the Fourth Amendment.   The court, then, evaluates plaintiffs' excessive force claim under the Fourth Amendment objective reasonableness standard.   *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (determining which amendment applies to an allegation of excessive force requires consideration of where the plaintiff finds himself in the criminal justice system; any force leading up to and including arrest is actionable under the Fourth Amendment, while the Fourteenth Amendment governs any claim of excessive force brought by a pretrial detainee).

Under the objective reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989), "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.   "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." *Id*. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97.

Viewed in the light most favorable to plaintiffs, the evidence demonstrates that seven deputies were dispatched to execute the search warrant on plaintiffs' residence. According to plaintiffs' evidence, one of the deputies was dressed in khaki pants and a sweater; one was dressed in a "typical police uniform" and the rest were wearing thick, black bulletproof vests. It is not disputed that these deputies were wearing black t-shirts marked with the word "SHERIFF" in white lettering on the back. While the deputies appeared to plaintiffs to constitute a "tactical team," the deputies were not wearing helmets, hoods, kneepads or camouflaged clothing. Each deputy carried a Glock and one deputy also carried an AR-15 rifle. Upon arriving at plaintiffs' residence, two of the seven deputies went to the back of plaintiffs' residence and the remaining five deputies approached the front door of the home. They knocked on the door so loudly that the walls of the house "rattled" and, as soon as Mr. Harte opened the front door, those five deputies flooded the foyer of the residence. Plaintiffs' evidence reflects that four deputies had their Glocks drawn and held at the low-ready position and that Deputy

Kilbey had an AR-15 drawn and at the low-ready position.  Deputies commanded Mr. Harte to lie on the floor with his hands behind his head and he responded immediately without resistance.  Mrs. Harte avers that when she arrived at the staircase from the upstairs of the home, she observed a deputy holding an assault rifle while standing over her husband.

Within minutes, the deputies had secured the home and the two deputies who had gone to the back of the house joined the other deputies in the foyer.  Plaintiffs were moved to the living room, where they were detained for the duration of the search "under armed guard."  Plaintiffs do not contend that the assault rifle was displayed at any point after the initial entry.  While they were detained in the living room, plaintiffs had to ask permission to use the restroom; to reach for their phones and to use their phones; and to provide gaming devices to their children.  While plaintiffs do not contend that any officer ever touched them, threatened them or pointed a weapon at them, Mrs. Harte avers that "[i]t was clear if we did not comply with every command that these officers were prepared to use the multitude of firearms available to them."  According to plaintiffs, the officers' show of force was "overwhelming" and far greater than what was necessary under the circumstances.

In support of their argument, plaintiffs rely on the Tenth Circuit's unpublished decision in *Ealum v. Schirard*, 46 Fed. Appx. 587 (10th Cir. 2002).  The facts in that case, however, readily distinguish it from the facts presented here.  In *Ealum*, officers entered a residence occupied by a grandmother and four minor children.  *Id.* at 589-90.  The officers did not have a warrant.  *Id.* at 589.  The facts alleged by the plaintiffs reflected that one officer pushed a 12-year-old child to the floor and held him there with his knee and, later, physically restrained that child on the couch; another officer "trained his firearm" on a six-year-old child; the officers

35

**36a**

"kicked" a puppy from the couch; and that officers continuously pointed their weapons around the residence. *Id.* at 589-90. The officers moved for summary judgment on qualified immunity grounds as to the plaintiffs' excessive force claim and the district court denied that motion. *Id.* at 592-93. On appeal, the Circuit affirmed the district court's decision in the absence of any existing grounds to justify the officers' conduct. *Id.* at 592-93. By sharp contrast, it is undisputed that the deputies in this case, who entered the home on a valid warrant, did not point their weapons at anyone at any time and did not touch anyone at any time. And unlike the facts described in *Ealum*, plaintiffs in this case were not "herded" into the living room "at gunpoint." *See id.* at 592. *Ealum*, then, is not persuasive authority to the court in analyzing whether the officers' conduct was unreasonable.

Plaintiffs also direct the court to *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) in support of their excessive force claim. Like *Ealum*, the *Cortez* case presents significant facts not present here. In *Cortez*, officers executed a warrantless search of a residence in the middle of the night after receiving an allegation of child molestation levied against the male occupant of the residence, Rick Cortez. *Id.* at 1112-13. Despite the fact that Mr. Cortez's wife, Tina Cortez, was not the target of any investigation, officers entered her home in the middle of the night without a warrant; seized her by the arm and physically separated her from the telephone that she was using in an attempt to make a call; physically escorted her from the house; took the keys to the house and locked her out of the house; and placed her in the locked back seat of a patrol car. *Id.* at 1113, 1130.

The Tenth Circuit held that Tina Cortez alleged a constitutional violation concerning excessive force sufficient to survive summary judgment. *Id.* at 1130. According to the Circuit,

no evidence suggested that a reasonable officer would suspect that Mrs. Cortez posed a threat in that she was unarmed, gave no indication of flight, and was never the target of the investigation. *See id*. In so concluding, the Circuit focused on the "extra force" used against Mrs. Cortez beyond holding her arm—escorting her outside in the middle of the night and keeping her in a locked patrol car for nearly an hour. *See id*. at 1130-31. The facts and circumstances confronting the deputies in this case are substantially different from those confronting the officers in *Cortez*. The deputies here entered plaintiffs' home on a valid narcotics warrant during the day and they were not targeting one specific individual. Moreover, the officers' use of force in *Cortez* was much different than that utilized here—deputies in this case never physically touched any of the plaintiffs and never removed them from the home or locked them in a patrol car or any other secure location. *Cortez*, then, does not advance plaintiffs' claim.

Putting aside plaintiffs' cases, then, the court finds it most helpful to separate plaintiffs' claim into its distinct parts—the decision to employ a "tactical team"[12] to execute the search warrant; the conduct of the tactical team at the time of the initial entry; and the detaining of plaintiffs in the living room "under armed guard" for the duration of the search. *See Ealum*, 46 Fed. Appx. at 594-95 (the decision to use SWAT team and the conduct of SWAT team once inside residence are "better analyzed separately" for purposes of excessive force claim). In terms of the decision to use a SWAT-style team to execute the warrant, plaintiffs have not shown that the decision was an unreasonable one. In *Holland ex rel. Overdorff v. Harrington*,

---

[12] While defendants urge that the deputies executing the warrant were not members of a special tactical team, the evidence viewed in the light most favorable to plaintiffs is sufficient to permit a reasonable jury to conclude that the group of deputies executing the search constituted a special unit or team as opposed to, for example, a group of patrol officers.

**38a**

268 F.3d 1179, 1188 (10th Cir. 2001), the Tenth Circuit analyzed whether the decision to use a SWAT team to accomplish a "dynamic entry" in the context of a search of a residence implicated Fourth Amendment concerns. *Id*. at 1189. As the *Holland* court recognized, "[t]he decision to deploy a SWAT team to execute a search warrant involves the decision to make an overwhelming show of force—force far greater than normally applied in police encounters with citizens." *Id*. at 1190.  Because the reasonableness of a search and seizure depends not only on when a seizure is made, but also how it is carried out, "the decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." *Id.* (citation omitted).  The Circuit in *Holland* ultimately determined that the force invoked by the decision to deploy a SWAT team to effectuate a dynamic entry was not excessive where the deputies executing a misdemeanor arrest warrant planned to encounter several persons in addition to the suspect and believed there would be firearms in the residence. *Id*. at 1191.  In that case, the Circuit upheld the decision to use a SWAT team as reasonable despite evidence that the seven members of the team executed the warrant at night and the members were wearing full camouflage clothing with no identifying markings and hoods showing only their eyes. *Id*. at 1183, 1197.

In *Whitewater v. Goss*, 192 Fed. Appx. 794 (10th Cir. 2006), the Circuit, albeit in an unpublished decision, extended *Holland* and held that the use of a SWAT team—even under a blanket rule requiring the deployment of a SWAT team for all searches in narcotics cases—did not constitute excessive force in the absence of evidence that the decisionmaker knew the team would use excessive force, intended to cause harm, or instructed the team to use excessive force.

*Id.* at 797.   In that case, thirteen members of the County's SWAT team, dressed in full camouflage, "stormed" the residence of a 61-year-old man at daybreak and the only identified basis for the use of the SWAT team was the "potential presence of marijuana" at the residence. *Id.* at 799-800.   Nonetheless, the Circuit affirmed the district court's grant of summary judgment on qualified immunity grounds and held that the use of the SWAT team in itself did not violate the plaintiffs' constitutional rights. *Id.* at 797; *accord Ealum*, 46 Fed. Appx. at 595 (decision to use SWAT team not unreasonable even though deputy who made the decision knew that children were in the residence; deputy was aware that there was an adult in the residence and that "some years earlier" there were firearms in the residence).

Turning back to this case, the evidence viewed in the light most favorable to plaintiffs reflects that the decision to send five armed and identified deputies wearing bulletproof vests to execute a search warrant during the day was not in and of itself unreasonable. *Whitewater* appears to permit the use of SWAT teams in executing any search warrant in a narcotics case absent specific evidence that the decisionmakers knew that the team would use excessive force, instructed the team to use excessive force or intended to cause harm.   There is no such evidence in the record before the court.   Moreover, the Circuit in *Whitewater* upheld as reasonable the deployment of a SWAT team (based, as here, on the potential presence of marijuana) that was certainly more intimidating than the team deployed in this case—the team consisted of 13 members dressed in full camouflage.   While *Whitewater* is not a published decision, it nonetheless leads this court to believe that the Circuit, if faced with the facts presented here, would conclude that the decision to the use a SWAT-style team was not a violation of plaintiffs' Fourth Amendment rights.   Even the arguably more restrictive *Holland* case seems to assume

39

that it is reasonable to send armed special agents (as opposed to patrol officers) during the execution of a narcotics warrant. And because *Holland* approved the use of a team at night wearing full camouflage, no identifying markings and hoods showing only their eyes, the Circuit surely would approve the use of the team in this case which, again, was much less intimidating than the one utilized in *Holland*. In light of the foregoing, the court concludes that the use of a SWAT-style team in this case was not excessive. *See Santistevan v. City of Colorado Springs*, 983 F. Supp. 2d 1295, 1318-19 (D. Colo. 2013) ("The Court is aware of, and Plaintiff cites, no cases in which the Tenth Circuit has found that the deployment of a SWAT team to execute a search warrant amounted to excessive force.").

The court turns, then, to the conduct of the tactical team upon initial entry into plaintiffs' residence. Because Mr. Harte opened the door for the deputies, the deputies did not break down the door; they simply "flooded" the foyer upon entry with guns drawn at the low-ready position. Plaintiffs concede that the situation was "secure" within minutes and that, during that time, no deputies pointed a weapon at plaintiffs or otherwise touched plaintiffs. In analyzing these facts, *Holland* is again instructive. In *Holland*, the Circuit recognized that the "display of weapons and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force" and may violate the Fourth Amendment if done excessively or unreasonably. 268 F.3d at 1192-93. As explained by the Circuit:

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive or unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

*Id*. at 1193.

Here, it is undisputed that plaintiffs complied immediately with the deputies' instructions. At that point, it would have been unreasonable for deputies to point their weapons at plaintiffs or otherwise escalate the situation. But there is simply no evidence that the deputies' conduct at that point was unreasonable. Plaintiffs concede that no deputy ever pointed a weapon at any of the plaintiffs or ever touched any of the plaintiffs. The deputies simply continued to hold their weapons at the low-ready position. Because *Holland* suggests that officers may hold their weapons "in a fashion ready for immediate use" even after a person submits to the officers' authority, *Holland* certainly supports the conclusion that the deputies here were not unreasonable in maintaining their weapons at the low-ready position for the "minutes" it took to secure the residence. The deputies, then, are entitled to qualified immunity on this aspect of plaintiffs' excessive force claim.

Within minutes of the deputies' initial entry, plaintiffs were directed to sit on the couch in the living room "with an armed officer standing guard" over them for the remainder of the two-and-a-half hour search. Plaintiffs concede that they had some freedom of movement during this time and were not physically restrained in any way. Again, there is no evidence or allegation that any officer ever directed a weapon at any of the plaintiffs. Rather, plaintiffs' evidence demonstrates that one or two deputies remained in the living room with plaintiffs at all times and those deputies were armed. The record is not clear whether these deputies' weapons were holstered during this time or whether the deputies maintained their weapons at the low-ready position. Nonetheless, because the deputies had a warrant to search plaintiffs' residence, then the deputies were plainly permitted to detain plaintiffs and were authorized to use "reasonable force" to effectuate that detention. *See Muehler v. Mena*, 544 U.S. 93, 99-100 (2005). In

41

*Muehler*, during a SWAT team raid of 1363 Patricia Avenue, officers handcuffed and detained Ms. Mena, who was found asleep in her bed at that location.  The Court held Ms. Mena's detention for the duration of the two- to three-hour search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.  Id. at 99-100.  Pertinent here, the Court held that the officers' use of force in handcuffing Ms. Pena for the duration of the search was reasonable.  *Id*. at 100.  Clearly, the use of force in this case was both minimal and reasonable.  Unlike the facts in Mena, plaintiffs were never handcuffed and their freedom of movement was not fully restricted.  The mere fact that the deputies in the living room were armed is not sufficient to render the use of force unreasonable under these circumstances.  *See Santistevan*, 983 F. Supp. 2d at 1321-22 (no excessive force where evidence reflected that officer stood next to the plaintiff and "guarded" her with his gun; officer never pointed weapon at the plaintiff; he was simply armed at the time.

In sum, the court concludes based on the uncontroverted facts that the force utilized by the individual defendants on the scene was objectively reasonable and not excessive.  Plaintiffs, then, have not established a constitutional violation and the individual defendants are entitled to qualified immunity on plaintiffs' excessive force claim.  Summary judgment on this claim is granted.

D.    Monell *Claim*

Because there was no underlying constitutional violation by any of the deputies, neither the Board of Commissioners of Johnson County nor Sheriff Denning may be held liable under §

42

**43a**

1983.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (citing *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  Summary judgment is required, then, on plaintiffs' claim that the Board of Commissioners and Sheriff Denning are liable under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

## IV.   State Law Claims

With respect to plaintiffs' Kansas state-law claims, plaintiffs have invoked the court's supplemental jurisdiction under 28 U.S.C. § 1367 on the grounds that plaintiffs' federal claims and their state law claims derive from a common nucleus of operative fact.  While supplemental jurisdiction clearly exists in this case, the court may decline to exercise supplemental jurisdiction where, as here, it has dismissed all claims over which it has original jurisdiction.  *See* 28 U.S.C. § 1367(c).  The exercise of jurisdiction under § 1367 is a matter for the court's discretion, and the court is charged to act "in the manner that best serves the principles of economy, convenience, fairness and comity" that underlie supplemental jurisdiction.  *See City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997).  Because none of the parties have asked the court to decline to exercise supplemental jurisdiction, and because the parties have completed discovery and the trial of this matter is set for just over two months away, the court concludes that exercising supplemental jurisdiction in this case will further the interests of economy and convenience.  The court, then, proceeds to consider the parties' arguments concerning plaintiffs' state law claims.

*A.     Trespass*

Plaintiffs assert a claim of trespass against all defendants except defendant Wingo. Trespass is the unauthorized entry upon the land of another. *See Robinson v. Armstrong*, 118 P.2d 503, 505 (1941). Because the alleged trespass in this case occurred during the execution of a valid warrant supported by probable cause, and because there is no evidence that the deputies exceeded the scope of the warrant, there is simply no trespass by the defendants. Summary judgment is granted in favor of the defendants on this claim. *See Restatement (Second) of Torts* § 210 cmt. h (1965) (one who enters land in the possession of another pursuant to the authority of a valid search warrant is privileged to enter the land for the purpose of executing the warrant).

## B. Assault

Plaintiffs assert a claim of assault against the individual defendants based on the conduct of the deputies upon initial entry into plaintiffs' residence and once plaintiffs had been moved to their living room for the duration of the search. However, conduct that would otherwise subject a person to liability in tort for assault does not constitute tortious conduct if the actor is privileged to engage in such conduct. *See Restatement (Second) of Torts* § 10 (1965). An officer executing a valid search warrant is privileged to use reasonable force to effectuate the detention of the occupants of the residence. *Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692 (1981). Thus, because the deputies in this case did not act unreasonably or excessively for purposes of the Fourth Amendment when executing the warrant, the deputies cannot be held liable for assault under Kansas law. *See Dauffenbach v. City of Wichita*, 657 P.2d 582 (Kan. App. 1983) (under state tort law, officer making arrest has the right to use reasonable force to effect the arrest) (citing *Restatement (Second) of Torts* 132 cmt. a (1965)

44

(officer not liable in tort unless force used is excessive)).   Summary judgment in favor of defendants is granted on plaintiffs' assault claim.

C.      *False Arrest*

Plaintiffs assert a common law claim against defendants for false arrest or false imprisonment under Kansas law.   False imprisonment or false arrest is "the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being restrained fears to disregard."   *Mendoza v. Reno County*, 681 P.2d 676, 678 (Kan. 1984).   Defendants move for summary judgment on this claim on the grounds that they are legally excused for restraining plaintiffs' personal freedom in light of the lawful search of plaintiffs' residence pursuant to the warrant.   Defendants are clearly correct and summary judgment in their favor is granted.   *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981) (detention during execution of search warrant is justified); *Muehler v. Mena*, 544 U.S. 93, 99 (2005) (officer's authority to detain incident to a search is categorical); *Porter v. Stormont–Vail Hosp.*, 621 P.2d 411, 416 (1980) (any imprisonment arising from execution of valid warrant does not constitute false imprisonment under Kanas law).

D.      *Abuse of Process*

Plaintiffs also assert abuse of process claims against defendants.   In Kansas, the elements of an abuse of process claim are a knowingly illegal or improper use of the process done for the purpose of harassing or causing hardship which results in damage to the plaintiff.   *McShares, Inc. v. Barry*, 970 P.2d 1005, 1015 (Kan. 1998) (citing *Porter v. Stormont–Vail Hosp.*, 621 P.2d

45

411 (1980) (citations and quotations omitted)); PIK—Civil 4th 127.80.   As noted in the comments to the pattern instruction, if the act of the prosecutor is in itself regular, the motive, ulterior or otherwise, is immaterial.  *See* PIK—Civil 4th 127.80, cmt (quoting *Porter*, 621 P.2d 411 (1980)).   In their submissions, plaintiffs contend that defendants are liable for abuse of process because they applied for the warrant solely to support their media campaign and their scheduled April 20, 2012 press event.

In support of their argument, plaintiffs contend that defendants knew that a search of plaintiffs' home would not uncover evidence of criminal activity and yet they obtained the warrant based on signification omissions and misrepresentations in the warrant affidavit.  As explained above, plaintiffs have not made the requisite showing that the affidavit contained material misrepresentations or omissions.  Because the warrant was based on probable cause, any additional motive the deputies may have had in pursuing the warrant is not material.  *See id.* Moreover, even assuming the deputies were motivated solely by the Sheriff's Office media campaign and its efforts related to Operation Constant Gardener, plaintiffs nonetheless must point to an irregular or improper act.  *See Porter*, 621 P.2d at 416 (abuse of process claim requires both an ulterior purpose and an irregular or improper act).  Plaintiffs have not done so. Finally, plaintiffs do not suggest or come forward with evidence that defendants, even assuming they were motived by the Sheriff's Office media campaign, pursued the warrant or executed the search to harass or cause hardship to plaintiffs.  Summary judgment on their abuse of process claims, then, is appropriate.

E.      *Intentional Infliction of Emotional Distress*

In the pretrial order, plaintiffs allege that all defendants, except defendant Wingo, intentionally caused plaintiffs severe emotional distress.  To establish a cause of action for intentional infliction of emotional distress (or outrage) under Kansas law, a plaintiff must show that the conduct of the defendant was intentional or in reckless disregard of the plaintiff; the conduct was extreme and outrageous; a causal connection exists between the defendant's conduct and the plaintiff's mental distress; and the plaintiff's mental distress is extreme and severe.  *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981).   As explained by the Kansas Supreme Court in *Roberts*, liability for the tort of outrage "may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to be beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*.

Based on the court's conclusions that no constitutional violations occurred in this case and that the individual defendants' conduct in searching and effecting the search of plaintiffs' residence was lawful and reasonable for Fourth Amendment purposes, it would be incongruous for the court to find that the same conduct amounted to an extraordinary transgression of the bounds of decency so as to give rise to an intentional infliction of emotional distress claim.  The court does not doubt that the events of April 20, 2012 were upsetting to plaintiffs, but no reasonable jury could conclude that any defendant's conduct was utterly intolerable in a civilized society as to require the law to intervene.  All defendants are entitled to summary judgment on the merits of this claim.

F.    *False Light*

**48a**

Plaintiffs' final claim is that defendants placed plaintiffs before the public in a false light by widely reporting through local news outlets the collective results of Operation Constant Gardner II without clarifying that at least one search did not uncover any contraband. According to plaintiffs, defendants' failure to clarify that at least one search did not uncover any criminal activity led plaintiffs' neighbors who had seen the raid at plaintiffs' home to assume that plaintiffs' residence in fact contained marijuana or other contraband.   Kansas law recognizes a cause of action for false light invasion of privacy.  *See Dominguez v. Davidson*, 974 P.2d 112, 121 (Kan. 1999).  As explained in the Restatement (Second) of Torts, one who "gives publicity" to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if:

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977); *Dominguez*, 974 P.2d at 121 (citing *Rinsley v. Frydman*, 559 P.2d 334 (1977)).  For purposes of a false light claim, "publicity" means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Dominguez*, 974 P.2d at 121 (quoting *Ali v. Douglas Cable Communications*, 929 F. Supp. 1362, 1383 (D. Kan. 1996)).  A communication to a small group of persons is not an invasion of privacy.  *See Restatement (Second) of Torts* § 652D cmt. a (publicity means that the communication reaches or is sure to reach the public; it is not an invasion of privacy to communicate a fact about the plaintiff to a single person or even a small group of persons).

48

**49a**

Defendants move for summary judgment on this claim on the grounds that plaintiffs have not come forward with evidence of "publicity" sufficient to permit a reasonable jury to return a verdict in their favor. As explained by defendants, plaintiffs' publicity theory does not focus on those people who saw the local news coverage of the April 20, 2012 drug raids. It is undisputed that the news outlets did not mention plaintiffs by name, address or even neighborhood. And unlike some other residences, plaintiffs' residence was not depicted on the news. At most, the news agencies reported that drug raids had occurred "in good neighborhoods" in places like "Leawood, Kansas" at the homes of "average Johnson County families." It is undisputed, then, that plaintiffs were not placed before the general news-viewing public in connection with coverage of the April 20, 2012 raids. Rather, plaintiffs' publicity theory focuses, as it must, exclusively on those neighbors who saw the raid unfold at plaintiffs' residence and, thereafter, saw the news coverage of the raids, leaving the implication that contraband had been discovered at plaintiffs' residence. According to defendants, there is no evidence in the record as to how many neighbors saw both the raid and the news coverage and, even assuming that all of plaintiffs' neighbors saw both the raid and subsequent news coverage, such evidence does not constitute widespread disclosure for purposes of maintaining a false light publicity claim.

In support of their claim and, more specifically, the "publicity" element of their claim, plaintiffs rely on *Watson v. City of Kansas City*, 185 F. Supp. 2d 1191 (D. Kan. 2001). In *Watson*, the court, examining the pleadings in the context of a Rule 12(b)(6) motion, held that the plaintiffs had alleged facts sufficient to survive a motion to dismiss their false light claim. *Id*. at 1209-10. Specifically, the plaintiffs alleged that the defendants executed search warrants at their residence on two separate dates; that the defendants were on their property on both dates

49

**50a**

for extended periods of time; and that, on both occasions, a "crowd of gawking people standing at locations across the street, down the street, and driving by" observed the defendants' conduct. *Id.* at 1209.  The plaintiffs further alleged that they lived on a "highly traveled street."  *Id.*

As plaintiffs acknowledge, *Watson* is of course readily distinguishable because of the procedural context of that case—a Rule 12(b)(6) motion as opposed to a summary judgment motion.  But even the allegations in *Watson* are not present here.  Plaintiffs come forward with no evidence that a "crowd" of neighbors on their cul-de-sac or in their neighborhood witnessed the raid; no evidence concerning whether other non-neighboring individuals witnessed the raid; and no evidence that their street was highly traveled.  In fact, there is no evidence in the record concerning the approximate number of neighbors who witnessed the raid, let alone evidence concerning the number of neighbors who witnessed the raid and thereafter viewed the news coverage of the raid.  In such circumstances, defendants are correct that no reasonable jury could conclude that defendants "gave publicity" to a matter concerning plaintiffs that placed them in a false light.  *See Smith-Utter v. Kroger Co.*, 2009 WL 790183, at *5 (D. Kan. Mar. 24, 2009) (summary judgment required in favor of defendants on the plaintiff's false light claim even where plaintiff was wrongly accused of presenting stolen check at grocery store; "even if dozens of people" saw the arrest, not widespread disclosure for purposes of publicity); *Hunter v. The Buckle, Inc*., 488 F. Supp. 2d 1157, 1179-80 (D. Kan. May 29, 2007) (evidence that "possibly more than twenty people" saw the plaintiffs handcuffed and paraded out of store does not constitute widespread communication for purposes of false light publicity claim; summary judgment granted in favor of defendants); *Green v. City of Wichita*, 47 F. Supp. 2d 1273, 1278-79 (D. Kan. 1999) (summary judgment granted on false light claim where the defendants, in

50

**51a**

enforcing City's housing code, placed placards on plaintiffs' rental properties but only a "small handful" of people saw defendants entering plaintiffs' property).  Summary judgment in favor of defendants is appropriate on this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Jim Wingo's motion for summary judgment (doc. 281) is **granted**; defendants Edward Blake, Mark Burns, James Cossairt, Frank Denning, Nate Denton, Christopher Farkes, Tyson Kilbey; Michael Pfannenstiel, Thomas Reddin, Larry Shoop, Lucky Smith, Laura Vrabec and the Johnson County, Kansas Board of Commissioners' motion for summary judgment (doc. 285) is **granted**; and plaintiffs' motion to exclude or limit certain opinion testimony (doc. 287) is **moot**.

**IT IS SO ORDERED.**

Dated this 18th day of December, 2015, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

51

**52a**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ADLYNN K. HARTE, ROBERT W. HARTE, J.H., a minor, by and through his parents and next friends, ADLYNN K. HARTE and ROBERT W. HARTE, and  L.H., a minor, by and through  her parents and next friends, ADLYNN K. HARTE and ROBERT W. HARTE,**　　　　　　　　　　　　　　　) ) ) ) ) ) ) ) | **CIVIL ACTION**<br><br>**No. 13-2586-JWL** |

　　　　　　　　　　　　**Plaintiffs,**　　)

**v.**　　　　　　　　　　　　　　　　　　　)

**THE BOARD OF COMMISSIONERS OF
THE COUNTY OF JOHNSON, KANSAS**;
and **FRANK DENNING,** Sheriff,
in his official and individual capacity;
**MARK BURNS,** deputy,
in his individual capacity;
**EDWARD BLAKE,** deputy,
in his individual capacity;
**MICHAEL PFANNENSTIEL,** deputy,
in his individual capacity;
**JAMES COSSAIRT,** deputy,
in his individual capacity;
**LARRY SHOOP**, deputy,
in his individual capacity;
**LUCKY SMITH**, deputy,
in his individual capacity;
**CHRISTOPHER FARKES**, deputy,
in his individual capacity;
**THOMAS REDDIN**, lieutenant,
in his individual capacity;
**NATE DENTON** , deputy,
in his individual capacity;
**TYSON KILBEY**, deputy,
in his individual capacity;
**LAURA VRABAC**, deputy,
in her individual capacity;
**JIM WINGO**, sergeant,
Missouri Highway Patrol,
in his individual capacity,

　　　　　　　　　　　　**Defendants.**

**53a**

## JUDGMENT

**The court has ordered that:**

Pursuant to the Memorandum and Order filed on December 18, 2015, the plaintiffs shall take nothing, the action is dismissed on the merits and the defendants **THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON, KANSAS, FRANK DENNING, MARK BURNS, EDWARD BLAKE, MICHAEL PFANNENSTIEL, JAMES COSSAIRT, LARRY SHOOP**, **LUCKY SMITH CHRISTOPHER FARKES**, **THOMAS REDDIN**, **NATE DENTON** , T**YSON KILBEY**, **LAURA VRABAC**, and **JIM WINGO**,  shall recover costs from the plaintiffs **ADLYNN K. HARTE, ROBERT W. HARTE,  J.H., a minor, by and through his parents and next friends, ADLYNN K. HARTE and ROBERT W. HARTE, and  L.H., a minor, by and through  her parents and next friends, ADLYNN K. HARTE and ROBERT W. HARTE.**

**IT IS SO ORDERED.**

**Dated this 18th day of December, 2015, in Kansas City, Kansas.**


**s/  Sharon Scheurer**
**By Deputy Clerk**
**TIMOTHY M. O'BRIEN**
**Clerk of the District Court**