Case No. 16-3014

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ADLYNN K. HARTE, ET AL.,
PLAINTIFFS-APPELLANTS,

V.

THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON,
KANSAS, ET AL.,
DEFENDANTS-APPELLEES,

AND

NATE DENTON, DEPUTY, IN HIS INDIVIDUAL CAPACITY,
DEFENDANT.

On Appeal from the United States District Court
for the District of Kansas, Judge John W. Lungstrum
No. 2:13-cv-02586

## BRIEF FOR *AMICUS CURIAE* CATO INSTITUTE
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Ilya Shapiro
   *Counsel of Record*
Randal J. Meyer (admission pending)
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

## RULE 26.1 DISCOLSURE STATEMENT

*Amicus Curiae* Cato Institute, a nonprofit corporation organized under the laws of Kansas, has no parent companies, subsidiaries, or affiliates and does not issue shares to the public.

<u>/s/ *Ilya Shapiro*</u>                                    <u>April  14, 2016</u>

*Attorney for amicus*

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ..................................................................iii

STATEMENT OF PRIOR OR RELATED CASES ...................................1

STATEMENT OF INTEREST ...............................................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ......................................................................................3

I.  THE ROUTINE USE OF MILITARY-STYLE RAIDS IN
    CRIMINAL INVESTIGATIONS IS A SERIOUS AND
    COMMON PROBLEM ......................................................................3

II. THE FOURTH AMENDMENT WAS DESIGNED TO
    PROTECT THE HOME AND ITS OCCUPANTS AGAINST
    THE SORT OF FORCE EMPLOYED HERE ....................................7

    A. The Officers Violated the Common-Law Knock-and-
       Announce Rule that Generally Entitles Owners to
       Peaceable Entry  upon a Showing of Compliance.......................7

    B. In the Ensuing Search, the Officers Converted a Specific
       Warrant into a General Warrant, the Chief Evil that the
       Fourth Amendment Seeks to Prevent.......................................16

III. TENTH CIRCUIT RULINGS ON DECISIONS TO CONDUCT
     MILITARY-STYLE RAIDS REQUIRE CLARIFICATION IN
     LINE WITH SUPREME COURT PRECEDENT AND THE
     COMMON LAW..............................................................................21

CONCLUSION .................................................................................30

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)........31

CERTIFICATE OF SERVICE.............................................................32

# TABLE OF AUTHORITIES

## Cases

*Bell v. Oakley*, 2 M. & Slew. 259 (C.P. 1814) .................................. 19, 20

*Boyd v. United States*, 116 U.S. 616 (1886) ........................................... 17

*Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008) ................ 27

*Chidester v. Utah County*, 68 Fed. App'x 718 (10th Cir. 2008) ............. 27

*City of W. Covina v. Perkins*, 525 U.S. 234 (1999).................................. 17

*Ealum v. Schirard*, 46 Fed. App'x 587 (10th Cir. 2002) ......................... 25

*Entick v. Carrington*, 19 How. St. Tr. 1029 (1765) ............... 11, 17-18, 19

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................ 15

*Harman v. Pollock (I)*, 446 F.3d 1069 (10th Cir. 2006) ................... 25, 26

*Harman v. Pollock (II)*, 586 F.3d 1254 (2009) ................................. 25, 26

*Harte v. Bd. of Comm'rs*, (D. Kan. Dec. 18, 2015) (No. 13-cv-02586) ..... 14

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001)............. 23, 24, 29

*Holland ex rel. Overdoff v. Harrington*,
    268 F.3d 1179 (10th Cir. 2001) ............................................................ 12

*Hudson v. Michigan*, 547 U.S. 586 (2006) ............................... 8, 9, 11, 14

*Illinois v. Krull*, 480 U.S. 340 (1987) ..................................................... 17

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)...................... 15

*Latta v. Keryte*, 118 F.3d 693 (10th Cir. 1997) ...................................... 24

*Los Angeles v. Patel*, 135 S. Ct. 2443 (2015) .................................... 21, 28

*Miller v. United States*, 357 U.S. 301 (1958) .........................................8-9

*Money v. Leach*, 3 Burr. 1742, 97 Eng. Rep.1075 (K.B.1765)........... 18, 19

*Parton v. Williams*, 3 Bar. & Ald. 330 (1820) (Abbott, CJ.) .................. 20

*Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005) ................................. 25

*Price v. Messenger*, 2 Bos. & Pul. 159,
    126 Eng. Rep. 1213 (C.P. 1800).................................................... 19, 20

*Riley v. California*, 134 S. Ct. 2473 (2014) ............................................ 17

*Sanford v. Nicholas*, 13 Mass. 286 (1816) ....................................... 16, 19

*Semayne's Case*, 5 Co. Rep. 91[a], 77 Eng. Rep. 194 (K.B. 1603)... *passim*

*Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146 (10th Cir. 2006) ............... 25

*Steagald v. United States*, 451 U.S. 204 (1981) ..................................... 10

*Tennessee v. Garner*, 471 U.S. 1 (1985) ..................................... 23, 27, 29

*Weeks v. United States*, 232 U.S. 383 (1914) ........................................... 7

*Whitewater v. Goss*, 192 Fed. App'x 794 (10th Cir. 2006) ...................... 27

*Wilkes v Woods*, 98 Eng. Rep. 489 (1763) ................................... 16, 17-18

*Wilson v. Arkansas*, 514 U.S. 927 (1995) ....................................... *passim*

## Constitutional Provisions

U.S. Const. amend. IV ............................................................... 16, 18, 21

## Other Authorities

ACLU, *War Comes Home: The Excessive Militarization of American Policing* (2014), https://goo.gl/Ji39tO ................. 3, 4, 5, 6

Cato Institute, Botched Military Police Raids, http://www.cato.org/raidmap .................................................. 5

Charles Francis Adams, ed., *The Works of John Adams* (1854) ............ 18

Declaration of Adlynn Harte, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) ..................................................... 14

Declaration of Bradley Kustin, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) ............................. 14, 15

Deposition of Edward Blake, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) ............................................... 13, 20

Deposition of James Cossairt, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) (Ex. 13) ......................... 12, 13, 20

Deposition of Robert Harte, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) ..................................................... 14

Edward Coke, *Institutes of the Lawes of England* (Lawbook Exchange, Ltd. 2002, first published 1644) ..................................... 7

Federalist No. 48 (Madison) ..................................................................... 8

Government Accountability Office, *RECOVERY ACT: Department of Justice Could Better Assess Justice Assistance Grant Program Impact* (Oct. 15, 2010) ........................................................ 6

Henry Roscoe, *A Digest on the Law of Evidence on the Trial of Actions as Nisi Prius* (2d ed. 1832) .................................................. 20

Joel Bishop, *Commentaries on the Law of Criminal Procedure* (1836) ............................................................................................. 10

Joseph Chitty, *A Practical Treatise on the Criminal Law* (1819) .......................................................................... 11, 16-17, 19

Josiah Quincy, Jr., Report of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Mass. Bay Between 1761 and 1772 With an Appendix Upon the Writs of Assistance (Samuel M. Quincy, ed., 1865) ..................................... 18

Justice Policy Institute, *Recovery Money for Byrne JAG Won't Stimulate Greater Public Safety* (2010), http://goo.gl/0fwPJm ........ 6

Legal Papers of John Adams (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) ..................................................................................... 18

Matthew Hale, *Historia Placitorum Coronae* (W.A. Stokes & E. Ingersoll, eds., 1st Am. Ed., 1847, first published 1739) ....... *passim*

Peter B. Kraska, *Militarization and Policing—Its Relevance to 21st Century Police*, 1 Policing 501 (2007) ................................... 3, 5

Radley Balko, *Overkill: The Rise of Paramilitary Police Raids in America* (2006) ................................................................................ 4

Radley Balko, *Rise of the Warrior Cop: The Militarization of America's Police Forces* (2014) .......................................... 3, 4, 6, 20

Search-Warrant Affidavit and Search Warrant for Harte Residence, Appellants' Br. ............................................................. 20

Steven Gray, *A 7-Year-Old's Killing: Detroit's Latest Outrage*, Time, May 18, 2010, http://goo.gl/HWHBJm .................................. 7

Thomas Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547 (1999) .................................................... 16, 17, 19

*WSU Fraternity Suspended after SWAT Raid*, Seattle Times, Jan. 27, 2009, http://goo.gl/duiP18 .......................................................... 4

## STATEMENT OF PRIOR OR RELATED CASES

There are no known prior or related appeals to this matter.


## STATEMENT OF INTEREST[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato has participated as amicus curiae in numerous cases before this court and others. Cato also works to defend individual rights through publications, lectures, conferences, public appearances, and other endeavors, including through its Project on Criminal Justice and the annual *Cato Supreme Court Review*. This case is of central concern to Cato because it implicates the safeguards that the Fourth Amendment provides against the use of military-style raids in criminal searches and seizures.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

It has become common for police to investigate minor, nonviolent offenses—typically involving drugs—by conducting raids, often at night, with assault weapons, flash-bang grenades, and battering rams. These military-style tactics threaten harms to both civilians and police officers that are vastly disproportionate to their purported justifications.

Yet the Fourth Amendment, as interpreted by the Supreme Court through centuries-old common law, restricts the level of force that may be used in executing a search warrant. In the foundational *Semayne's Case*, which the Supreme Court considers to be good authority, Lord Coke announced the appropriate standard for determining if improper force has been used in executing a warrant at a residence. *Semayne's Case*, 5 Co. Rep. 91[a], 91b, 77 Eng. Rep. 194, 195-96 (K.B. 1603). Moreover, as our Founders had a great disdain for general warrants, it is axiomatic that exceeding a warrant's scope likewise unconstitutional.

Alas, Tenth Circuit precedent on the reasonableness of dynamic raids is unclear. This case presents an opportunity to harmonize this Court's law with the Fourth Amendment's common-law background, thus protecting the safety and property of both officers and civilians.

## ARGUMENT

### I. THE ROUTINE USE OF MILITARY-STYLE RAIDS IN CRIMINAL INVESTIGATIONS IS A SERIOUS AND COMMON PROBLEM

The military-style raid in this case is representative of a broader and deeply troubling trend. SWAT-team deployments have increased more than 1400 percent since the 1980s. Peter B. Kraska, *Militarization and Policing—Its Relevance to 21st Century Police*, 1 Policing 501, 507 (2007), http://goo.gl/I1hu3g. Between 1980 and 2005, the average annual number of domestic paramilitary raids increased from 3,000 to between 50,000 and 60,000. Radley Balko, *Rise of the Warrior Cop: The Militarization of America's Police Forces* 237, 308, xi-xii (2014).

This dramatic rise in the deployment of SWAT teams has been accompanied by an equally dramatic expansion of the circumstances in which they are used. SWAT teams and tactical units were originally created to address high-risk situations, such as terrorist attacks, hostage crises, and other inherently dangerous circumstances where the police had specific reasons to believe that such tactics were justified. ACLU, *War Comes Home: The Excessive Militarization of American Policing* 31 (2014), https://goo.gl/Ji39tO; Balko, *Rise of the Warrior Cop*,

3

*supra* at 62-63, 80, 249. Today, however, these high-risk situations account for only a small fraction of SWAT deployments. ACLU, *War Comes Home*, *supra* at 31. SWAT teams are now used primarily to serve low-risk search warrants, with nearly two-thirds of deployments in 2011 and 2012 carried out for drug searches. *Id.* at 2-3, 31.

SWAT teams now commonly conduct raids relating to a variety of other nonviolent offenses (such as gambling and underage drinking) and administrative violations (including, in one case, "barbering without a license"). Balko, *Rise of the Warrior Cop*, *supra* at 280-89. They have been known to conduct raids in such unlikely settings as college fraternity houses and VFW charity poker games. *Id.* at 282, 284; *WSU Fraternity Suspended after SWAT Raid*, Seattle Times, Jan. 27, 2009, http://goo.gl/duiP18. Police even deploy SWAT teams to provide their officers with additional "practic[e]" by conducting raids on "low-level offenders." Balko, *Rise of the Warrior Cop*, *supra* at 211.

The over-deployment of SWAT teams greatly increases the threat of harm to both civilians and officers. *See, e.g.*, Radley Balko, *Overkill: The Rise of Paramilitary Police Raids in America* 43-82 (2006) (collecting cases), http://goo.gl/cj9hRm. In military-style raids, police

often fail to announce themselves before storming a residence. Kraska, *Militarization and Policing*, *supra* at 507-08; Balko, *Overkill*, *supra* at 43-82. These tactics frequently lead to avoidable confrontations, especially when the targets of the search may understandably believe they are experiencing a home invasion. There is an "alarming tendency of paramilitary policing to escalate, rather than ameliorate, the risk of violence." ACLU, *War Comes Home*, *supra* at 39 (emphasis omitted).

Botched paramilitary raids are now distressingly common, resulting in serious and even fatal injuries to children, adults, and household pets. *See generally* Cato Institute, Botched Military Police Raids, http://www.cato.org/raidmap (interactive map). In one highly publicized raid, two-year-old Bou Bou Phonesavanh suffered life-threatening injuries, including a hole in his chest, when a SWAT team tossed a flash-bang grenade into his crib. See ACLU, *War Comes Home*, *supra* at 14-15. In another, seven-year-old Aiyana Stanley-Jones was killed when a weapon accidentally discharged during a nighttime raid. *See id*. at 21; Steven Gray, *A 7-Year-Old's Killing: Detroit's Latest Outrage*, Time, May 18, 2010, http://goo.gl/HWHBJm.

These types of incidents have sparked growing public concern. Yet

SWAT-team deployments show no signs of diminishing. Indeed, they are likely to continue to increase due to the federal incentives involved. See Balko, *Rise of the Warrior Cop*, *supra* at 300-04, 335-36; ACLU, *War Comes Home*, *supra* at 16, 24-26. For example, the Justice Department's Byrne Justice Assistance Grant Program allocates money to local police based on the total number of arrests that they make; thus, conducting more raids using paramilitary tactics, even of low-risk, low-level offenders' homes, can secure additional funds. Justice Policy Institute, *Recovery Money for Byrne JAG Won't Stimulate Greater Public Safety* 4 (2010), http://goo.gl/0fwPJm; *see also* Government Accountability Office, *RECOVERY ACT: Department of Justice Could Better Assess Justice Assistance Grant Program Impact*, App. II, at 55-56 (Oct. 15, 2010); ACLU, *War Comes Home*, *supra* at 26.

In addition, the "1033 Program"—named after a section of the National Defense Authorization Act—allocates military equipment to local departments at little or no cost, and the Justice Department's Equitable Sharing Program allows local police to share in the profits of seized assets. See ACLU, *War Comes Home*, *supra* at 16, 24-25; Balko, *Rise of the Warrior Cop*, *supra* at 152-54, 219-22, 244, 301-02. Police

departments thus incur little cost in creating SWAT teams and obtain substantial financial benefits from using them as often as possible.

Under this incentive structure, military-style police raids can be expected to become evermore routine unless citizens can rely on courts to hold police accountable when they violate the Fourth Amendment.

## II. THE FOURTH AMENDMENT WAS DESIGNED TO PROTECT THE HOME AND ITS OCCUPANTS AGAINST THE SORT OF FORCE EMPLOYED HERE

### A. The Officers Violated the Common-Law Knock-and-Announce Rule that Generally Entitles Owners to Peaceable Entry upon a Showing of Compliance

English common law—as incorporated into Fourth Amendment jurisprudence—holds that "a man's house is his castle." *Weeks v. United States*, 232 U.S. 383 390 (1914); 3 Edward Coke, Institutes of the Lawes of England, ch. 73, at 161 (Lawbook Exchange 2002; first published 1644). To protect the home's sanctity, common law requires police to "knock and announce" their presence when executing warrants. Indeed, "the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).

7

In this case, in light of the defendants' *pro forma* observance of the knock-and-announce rule, holding that the defendants reasonably executed the search without using excessive force would reduce the Fourth Amendment to a mere "parchment barrier." Federalist No. 48 (Madison). Under the common-law background of the Fourth Amendment, the officers "unreasonably" presumed the necessity of— and exercised force sufficient to have—"br[oken] the house," the 17th-Century term for the force associated with dynamic entry.

The Fourth Amendment, per the Supreme Court, incorporates the 400-year-old common-law rule that an officer executing a search or arrest warrant must first attempt to obtain peaceable entry by knocking and announcing. This was best expressed by Lord Coke in *Semayne's Case*. 5 Coke's Rep. 91[a], 77 Eng. Rep. 194 (K.B.1603). In order for a search to be reasonable, before entering a residence "law enforcement officers must announce their presence and provide residents an opportunity to open the door." *Hudson v. Michigan*, 547 U.S. 586, 589 (2006). This requirement was "woven quickly into the fabric of early American law" through state constitutions, statutes, and common-law decisions. *Wilson*, 514 U.S. at 933; *see also Miller v. United*

*States*, 357 U.S. 301, 313 (1958) ("The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application."). One of the primary concerns of the knock-and-announce rule was to avoid unnecessary confrontation and property damage. *Hudson*, 547 U.S. at 594 ("[the Fourth Amendment knock-and-announce rule protects] human life and limb, . . . property, [and] those elements of privacy and dignity that can be destroyed by a *sudden entrance*." (emphasis added)).

In *Semayne's*, case, Lord Coke made a clear statement of the law regarding the breaking of a home. 5 Coke's Rep. 91[a], 77 Eng. Rep. 194. Examining other contemporaneous British authorities confirms the definitive status of the statement of the law in *Semayne's Case*. *E.g.*, 2 Matthew Hale, *Historia Placitorum Coronae* 116-17 (W.A. Stokes & E. Ingersoll, eds., 1st Am. Ed., 1847, first published 1739) (citing *Semayne's Case*, 5 Co. Rep. at 93[a]). The Supreme Court, in 1995 and 2006, expressly affirmed the continuing importance of the operative language and evaluative rubric established in *Semayne's Case*. See *Hudson*, 547 U.S. at 594 (citing *Wilson*, 514 U.S. at 931-32) (quoting *Semayne's Case*, 5 Co. Rep. at 91b, 77 Eng. Rep. at 195-196)); *Wilson*,

514 U.S. at 931-32 (quoting *Semayne's Case*, 5 Co. Rep. at 91b, 77 Eng. Rep. at 195-196)) ("To this rule, however, common-law courts appended an important qualification: 'But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . '"); *see also Steagald v. United States*, 451 U.S. 204, 217-20 (1981) (applying *Semayne's Case* to analyze a Fourth Amendment claim on the sanctuary of the home).

The three-part *Semayne* inquiry is simple. First, there is a "presum[ption]" that upon proper notice by the officer of the reasons and authority for the officers visit, "that [inhabitants] will obey it." *Semayne's Case*, 5 Coke's Rep. at 91[b]-92[a], 77 Eng. Rep. at 196; *see also Wilson*, 514 U.S. at 931-32. Second, that only upon "notification, demand, and refusal" of the inhabitants to peaceably comply may officers use the "extrem[e]" force associated with "breaking the house." *Semayne's Case*, 5 Coke's Rep. at 91[b]-92[a] & n.g., 77 Eng. Rep. at 195-196; 2 Hale, *supra*, at 116-17 ("refused or neglected"); *id.* at 116 n.20 (collecting cases); 1 Joel Bishop, *Commentaries on the Law of Criminal Procedure* ch. 39, § 652 & n.4, at 461 (1836) (collecting English

sources on the "illegality" of the "extreme violence" of breaking the house absent proper warrant); see also 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 46 (1819) ("[I]t is absolutely necessary that a demand of admittance should be made and refused," before using the force of breaking doors). Third, if law enforcement officers fail to comply with this process, exceed the warrant, or perform a search based on a defective warrant, they are "trespasser[s]" who made be held personally liable as such. *Semayne's Case*, 5 Coke's Rep. at 91[b]-92[a] & n.g, 77 Eng. Rep. at 195-96.; 2 Hale, *supra*, at 116-17; see also *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765) (holding officer liable for trespass on a defective general warrant). With the exception of the abrogation of the third prong by modern constitutional amendment, this statement of law in assessing knock-and-announce practice is appropriate and practicable today. See *Hudson*, 547 U.S. at 594 (quotations omitted); *Wilson*, 514 U.S. at 931-32 (quotations omitted).

The deployment of a military-style tactical team presumptively violates the first prong of the *Semayne* test—the presumption of peaceful obedience upon proper notice. *Id.* at 931-32 (quoting *Semayne's Case*, 5 Co. Rep. at 91b, 77 Eng. Rep. at 195-196) ("[I]f he had notice, it

is to be presumed that he would obey it . . .'")). Here, the police officers decided to employ a SWAT-style team, with weapons drawn, to carry out the search warrant. When tactical teams and dynamic raids are used to "execute a search warrant," it "necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens." *Holland ex rel. Overdoff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001). The use of tactical teams comes after a determination that it is appropriate under the circumstances to use that "overwhelming" force, which inherently is a violation of the presumption of peaceable compliance. See Deposition of James Cossairt, at 32, 40, 59, 72, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586) (Ex. 13) (discussing the presumptive use of a battering ram—"we would bring one, if we were doing a [drug] search warrant."); *id.* at 60 (discussing the futility of the policy).

The only way in which the use of a SWAT team could not violate that presumption is upon a sufficient evidentiary showing before a magistrate that a dynamic entry reduces a significant risk of harm. In this case, the warrant did not authorize a no-knock raid or the use of paramilitary force—something the police could have sought but that a

12

judge likely would not have authorized given that the only evidence of criminality was an ounce of misidentified tea leaves and a visit to a gardening store. Routine police work, such as observing the residence, likely would have revealed that there was a low risk to officers in making an arrest. Moreover, the family residence could have been searched while the occupants were outside the home, eliminating any need for a breach or the attendant risks. The Hartes' home was obviously not a gang safe house, but the hardware and tactics employed by the police treated it as if it were. The police thus violated *Semayne*'s first prong, which the Supreme Court expressly validated in *Wilson*.

The officers also violated the second *Semayne* prong: their method of entry employed all of the force of "breaking the house" except actually breaking the door. This was not a peaceful entry. Shortly before 7:30 a.m., an armed team showed up at the Hartes' doorstep. See Cossairt Dep. at 32, 49, 50, 72, 105. Deputy Farkes knocked and announced and Mr. Harte opened the door, indicating his compliance with the search. Deposition of Edward Blake, at 97-98, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586). Rather than asking Mr. Harte to step aside and assist them in performing their search, as

common law would have them do, the officers ordered a shirtless Mr. Harte to lie on the ground, pointed an assault rifle at him, and flooded into the home.[2] Declaration of Adlynn Harte, at para. 6, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586); Deposition of Robert Harte, at 137, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586); Declaration of Bradley Kustin, at para. 8, *Harte v. Bd. of Comm'rs of Johnson, Kansas* (2016) (No. 13-cv-02586). The family was detained for three hours while officers poured over their home. The team did not wait for a "refusal" or "neglect" before drawing its weapons or entering the home in the same violent manner as if compliance had been withheld. See *Semayne's Case*, 5 Coke's Rep. at 91[b]-92[a] &n.g., 77 Eng. Rep. at 195-196; 2 Hale, *supra*, at 116-17.

Thus, the second *Semayne* prong cuts against the defendants; *pro forma* compliance with the knock-and-announce rule followed by all the force of a dynamic entry does not satisfy the common law. *Hudson*, 547 U.S. at 594. To be sure, the officers "knocked and "announced" in a

---

[2] Although the district court found it "undisputed . . . that no deputy ever pointed a weapon at Mr. Harte or at any other plaintiff," that determination is flatly contradicted by the record and is a genuine issue of material fact. *Compare Harte v. Bd. of Comm'rs*, at 6 (D. Kan. Dec. 18, 2015) (No. 13-cv-02586) ("Mrs. Harte avers that she observed a deputy standing over her husband while holding an assault rifle") *with* decl. of Addlynn Harte,

literal sense—and only a literal sense—but "knock and announce" is not a *pro forma* requirement but a substantive rule covering the nature of the officers' conduct in obtaining entry. Such entry must be reasonable and apply reasonable force under the circumstances—one cannot use the force equivalent to "breaking the house" without actual noncompliance. Here, mere *pro forma* compliance was not reasonable.

As to the third *Semayne* prong, while the state-action doctrine and qualified immunity have abrogated the personal liability for officers' trespass by shifting the burden onto the state for damages, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974), the first two prongs of the Coke test remain as relevant today as they did in 1600—as the Supreme Court has recognized. Moreover, analysis under the third prong of the *Semayne* test collapses into analysis of whether officers exceeded the scope of a specific warrant, and thus is implicitly discussed *infra* Part II.B.

This court ought to hold that robust and meaningful application of the knock-and-announce rule—presuming compliance and requiring the employment of peaceable means before utilizing force—is required for

---

at para. 6; decl. of Bradley Kustin at para. 8.

law enforcement officers' searches to be "reasonable" under the Fourth Amendment. That right has been clearly established for four centuries. The nature of home ownership has not so changed as to render *Semayne* inapplicable, and the nature of crime has not changed to where routine police work cannot tell the difference between a large grow-house and a private suburban home where a family drinks tea and grows tomatoes.

### B. In the Ensuing Search, the Officers Converted a Specific Warrant into a General Warrant, the Chief Evil that the Fourth Amendment Seeks to Prevent

The Fourth Amendment protects citizens from searches or seizures under general warrants—non-particularized warrants. U.S. Const. amend. IV; Thomas Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 558 n.12 (1999). This rule in part stems from a long history of colonists' considering general warrants to be anathema. *Id.* at 560-68. To preserve a meaningful bright line between specific warrants relying on a magistrate's authority and general warrants relying on officers' discretion under the common law, courts held officers who exceeded the bounds of a specific warrant personally liable for trespass. *Wilkes v Woods*, 98 Eng. Rep. 489, 498-99 (1763); *Sanford v. Nicholas*, 13 Mass. 286, 289-90 (1816); 1 Chitty,

*supra* at 54 & n.m; Davies, *supra* at 578-82. Here, the officers' conduct was trespassory under the common-law rubric, exceeding the scope of the probable-cause warrant and thereby violating the plaintiff's Fourth Amendment rights with a general-warrant-type discretionary search.

The Supreme Court has long recognized that two English cases, *Entick v. Carrington* and *Wilkes v. Wood*, and one colonial case—the *Writs of Assistance Case*—provided a major part of the common-law background to the framing of the Fourth Amendment. *Boyd v. United States*, 116 U.S. 616, 624-27 (1886); *see also City of W. Covina v. Perkins*, 525 U.S. 234, 247 (1999) (Thomas, J., concurring) (describing *Entick* and *Wilkes* "two celebrated cases that profoundly influenced the Founders' view of what a 'reasonable' search entailed"); *Illinois v. Krull*, 480 U.S. 340, 362-64 (1987) (O'Connor, Brennan, Marshall, Stevens JJ., dissenting) (noting that, although Otis lost that *Writs of Assistance Case*, "history's court has vindicated Otis. The principle that no legislative Act can authorize an unreasonable search became embodied in the Fourth Amendment."); *see also Riley v. California*, 134 S. Ct. 2473, 2494 (2014).[3]  Those Supreme Court treatments—and the specific

---

[3] In *Entick* and *Wilkes*, Lord Camden, Chief Justice of the Common

17

references to cases either invalidating general warrants or vindicating cases where they were held valid—make it abundantly clear that the Fourth Amendment requires a specific warrant, "particularly describ[ing] the place to be searched, and the persons or things to be seized," so as to prevent inherently unreasonable general warrants from issuing. U.S. Const. amend. IV. The "historical evidence also

---

Pleas, addressed actions for trespass against the King's Messengers in executing a general warrant issued by Secretary of State Lord Halifax to search for the authors of seditious tracts. 19 How. St. Tr. 1029 (1765); 98 Eng. Rep. 489 (1763). The court invalidated the general warrant as violating the rights of Englishmen and allowed the action for trespass to proceed. *Entick*, 19 How. St. Tr. at 1070 ("I cannot help observing in this place, that if the secretary of state was still invested with a power of issuing this warrant, there was no occasion for the application to the judges . . . he could not issue the general search warrant . . . ."); *Wilkes*, 98 Eng. Rep. at 498-99. ("The defendants claimed a right, under precedents, to force persons houses, break open escrutores, seize their papers, &c. upon a general warrant . . . and therefore a discretionary power given to messengers to search wherever their suspicions may chalice to fall. If such a power is truly invested in a Secretary of State . . . it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject."); *see also generally Money v. Leach*, 3 Burr. 1742, 97 Eng. Rep.1075 (K.B.1765).

The *Writs of Assistance Case,* a.k.a. *Paxton's Case* or *The Petition of Lechmere*, was the case that "breathed into this nation the breath of life." 10 Charles Francis Adams, ed., The Works of John Adams 276 (1854). There is no report of the case, but the arguments are recorded in a few sources. Josiah Quincy, Jr., Report of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Mass. Bay Between 1761 and 1772 With an Appendix Upon the Writs of Assistance (Samuel M. Quincy, ed., 1865); Petition of Lechmere, *in* 2 Legal Papers of John Adams 123-34 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965). In that case, Otis argued that "an officer may break [a house], upon process and oath . . . [only] by a Specific Warrant.). Quincy, *supra*, App. at 471.

demonstrates that the Framers believed that the orderly and formal process associated with specific warrants . . . provided the best means of preventing violations of the security of person or house" and that "the Framers expected that [specific] warrants would be used" for all non-felony-in-fact arrests and searches. Davies, *supra* at 552, 554 n.4, 577.

To protect the boundary between a specific warrant and a general warrant, courts found that an officer commits a trespass when he exceeds the scope of a specific search or arrest warrant. *Sanford v. Nicholas*, 13 Mass. 286, 289-90 (Mass. 1816) (noting that though it is "probable that very small damages" may be found for searches outside of the specific term of a warrant, trespass damages may be found in a new trial for a warranted search that exceeded its bounds by not describing "the kind of goods to be searched" for.); *Money*, 3 Burr. 1742, 1 Black W. 555, 55-63; 1 Chitty, *supra*, at 54 & n.m ("[T]he officer must strictly observe the directions of the warrant, and if he be directed to seize stolen sugar, and he seize tea, he will be a trespasser.") (citing *Price v. Messenger*, 2 Bos. & Pul. 159, 162, 126 Eng. Rep. 1213, 1215 (C.P. 1800); *Bell v. Oakley*, 2 M. & Slew. 259, 260-61 (C.P. 1814); *Entick v. Carrington*, 19 How. St. Tr. 1029, 1070 (C.P. 1765)); 2 Hale, *supra*, at

114 n.17 (citing *Price*, 2 Bos. & Pul. at 162; *Bell*, 2 M. & Slew. at 261); *see also* Henry Roscoe, *A Digest on the Law of Evidence on the Trial of Actions as Nisi Prius* 456 (2d ed. 1832) (collecting cases); *see also Parton v. Williams*, 3 Bar. & Ald. 330, 336 (1820) (Abbott, C.J.).

Here, the officers exceeded the scope of their warrant, converting them into trespassers. The warrant was issued specifically to search for "marijuana" and "drug paraphernalia." Search-Warrant Affidavit and Search Warrant for Harte Residence, Appellants' Br., at App., vol. 4, at A705 (Ex. 43). Yet, as team leader Deputy Blake stated, "everybody" began to search for "any kind of criminal activity that was involved in the house." Blake Dep. at 188. Searching for "any kind of criminal activity" is a far greater sweep than a warrant to search for "marijuana" and "drug paraphernalia" permits. Warrant, at A705.

Moreover, according to Sergeant Cossairt, the deputies left the canine units in the house longer than was necessary to give them "training or just experience," exposing the families to the terror of armed police searches with dogs for longer than was necessary to establish their innocence. Cossairt Dep. at 117; *see also* Balko, *Rise of the Warrior Cop*, *supra* at 211 (noting that this unconstitutional

practice is now commonplace). Undoubtedly, the officers exceeded the scope of their warrant to the point of fully converting it into a general warrant when they looked in all the Hartes' "house[], papers, and effects," U.S. Const. amend. IV, for "any criminal activity"—a fishing expedition which then turned into *a training exercise*.

## III. TENTH CIRCUIT RULINGS ON DECISIONS TO CONDUCT MILITARY-STYLE RAIDS REQUIRE CLARIFICATION IN LINE WITH SUPREME COURT PRECEDENT AND THE COMMON LAW

This Court has been wavering in Fourth Amendment cases dealing with the facial reasonableness of decisions to authorize dynamic raids (breaking the house).[4]  The common-law background to the Fourth

---

[4] The conduct of officers during a specific raid as applied to the plaintiffs—such as questions regarding the reasonableness of the search and the use of force—as opposed to the policy-type decision to employ them, is subject to normal *Garner* and *Wilson* analysis. Those rights are clearly established at law, and the Hartes' claims regard the conduct of the deputies during the raid. This Court has not yet clearly established, however, whether decisions to use such raids as a matter of course when executing drug search warrants are facially challengeable. Such a challenge would require a facial Fourth Amendment ruling, *see Los Angeles v. Patel*, 135 S. Ct. 2443 (2015) (facial Fourth Amendment review is clearly permissible), because challenges a policy-type decision. *Semayne's Case* creates a three-step as-applied rubric, evaluating the totality of presumptions officers make, their use of force, and the extent to which said force exceeded the scope of warranted authority. A policy-type decision to presume *forcible non-compliance* rather than *peaceable compliance* would facially fail the first *Semayne* prong—and thus a right ought to be clearly established for future challenges, lest another family be subjected to sudden entry before this issue is corrected.

Amendment, as recognized by the Supreme Court, provides a rubric for this court to solidify its doctrine. See *supra* Part II.A (describing dynamic raids and the common law knock-and-announce rule as recognized in *Wilson* and *Hudson*); II.B (describing the common-law trespass of executing a warrant beyond its terms). In a world where military-style raids are being conducted at unprecedented levels, against citizens who pose no reasonable threat to law enforcement, this Court should clarify its precedent on such actions by relying on the standard in *Semayne's Case* and a magistrate's review of a warrant.

*Semayne's Case* establishes that, presumptively, peaceable means must be employed except upon a refusal to comply peaceably. This is a reasonable presumption for a free society not living under a system of martial law, but it is rebuttable in instances where officers face immediate threats or make a sufficient evidentiary showing rebutting the presumption that the occupants will comply with the warrant (thereby obtaining permission for a no-knock raid). The operative language of the *Semayne* rule was endorsed by the Supreme Court in *Wilson v. Arkansas*. *See supra* Part II. Adherence to this rule would harmonize this Circuit's dynamic raid precedents, provide meaningful

pre-raid review by competent magistrates, and allow for law enforcement to use dynamic raids in circumstances where such violence is in fact necessary. Moreover, the adoption of a *presumption* of reasonableness under the Fourth Amendment—as opposed to a bright line rule—does not violate the Supreme Court's express command in *Tennessee v. Garner* that the Fourth Amendment reasonableness inquiry requires analyzing whether "the totality of the circumstances justified a particular sort of search or seizure." 471 U.S. 1, 9 (1985).

This Court was first faced with the question of the prima facie reasonableness of deciding to use a SWAT-style raid in *Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001). There, a SWAT team used a dynamic raid to arrest a person accused of a violent crime, who had a prior history of violence, and who was at a house full of "several" other people with histories of violence. *Id.* at 1190-91. The Court noted that

> [t]he decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens. Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes 'dynamic entry' a viable law enforcement tactic in dealing with difficult and dangerous situations.

*Id.* at 1190. The court expressed concern with "placing that decision

beyond Fourth Amendment scrutiny altogether" rather than examining its "reasonableness." *Id.* By relying on out-of-circuit district court precedent, however, the Court found that, because the officers did not specifically intend to harm the occupants, the search was reasonable. *Id.* at 1189-90. The Court also did not address whether it was deciding on a facial or as-applied challenge to the decision to use a SWAT team.

*Holland* is an uncertain opinion that rests on shaky precedential grounds. Not only did the Court express concern that decisions to allow dynamic raids should not be "beyond Fourth Amendment scrutiny," but Judge Henry dissented in part, noting that his "conscience, although not as shockable as it once was, is shocked by the planning that this kind of raid may very well have involved. Such planning would constitute force inspired by 'unwise, excessive zeal amounting to an abuse of official power that shocks the conscience' that deserves 'redress[] under the [Fourteenth Amendment].'" *Id.* at 1198 (Henry, J., concurring in part and dissenting in part) (citing *Latta v. Keryte*, 118 F.3d 693, 702 (10th Cir. 1997) (internal quotation marks omitted)).

This Court subsequently further muddied the already unclear meaning of *Holland*. In one unpublished case the following year, the

Court read *Holland* as demanding a general reasonableness inquiry rather than adopting any specific standard. See *Ealum v. Schirard*, 46 Fed. App'x 587, 595 (10th Cir. 2002). Then, in 2005, the Court distinguished on factual grounds another case where a SWAT team was used. *Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005). Following that, in 2006, the Court interpreted *Holland* in a footnote to mean that the use of a dynamic raid "to enter a private residence to arrest a person for a misdemeanor could be challenged under the Fourth Amendment." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1153, n.1 (10th Cir. 2006).

This Court again wavered in two iterations of *Harman v. Pollock*. *Harman v. Pollock (I)*, 446 F.3d 1069 (10th Cir. 2006) (per curiam); *Harman v. Pollock (II)*, 586 F.3d 1254 (10th Cir. 2009). Those cases presented the issue of whether a residential search based on a defective drug warrant—though supported by routine police work—constituted excessive force under the Fourth Amendment. An agent for the Utah Bureau of Criminal Investigations suspected drug dealing at 44 West, 2700 South, Salt Lake City. Probable drug dealing was then shown through surveillance and undercover purchases. *Harman I*, 446 F.3d at 1072-74. The resulting warrant was defective, however, in that it

allowed the garage attached to the property to be searched but did not specify whether the apartment on top of the garage, could also be searched. A SWAT team performed a nighttime raid "with their weapons drawn." *Id.* at 1074-75. When an initial search of the apartment revealed personal-use quantities of marijuana, the occupants were detained for two hours until the SWAT team determined that they were "not involved in drug dealing." *Id.* at 1075-76.

In both *Harman I* and *Harman II*, this Court found the search to be a "close" case for purposes of a §1983 excessive-force claim. Together, these cases establish a boundary that the officers here exceeded.

The *Harman I* court found that, although the entry into the garage apartment was an objectively reasonable mistake, the matter was "close." 446 F.3d at 1080, 1081. The case was remanded on the question of the qualified immunity of the officers regarding the two-hour detention. *Id.* at 1082-83. On remand, the district court found that, because there was marijuana in plain view, there was reasonable suspicion to detain and search. *Harmon II*, 586 F.3d at 1259-60. This Court then held that the search and detention was reasonable.

Continuing this Court's habit of "close cases," in 2008, this Court

26

found that a SWAT officer's tackling of a submissive home occupant during a dynamic raid was objectively unreasonable force. *Chidester v. Utah County,* 268 Fed. App'x 718, 727-28 (10th Cir. 2008). The *Chidester* court noted that this was an "exceedingly close case." *Id.* at 727. The decision also produced a dissent without opinion from Judge Hartz. *Id.* at 730 (Hartz, J., dissenting).[5]

There is thus a difficult and confusing development of dynamic-raid case law in this Circuit. *Holland* attempted to set a standard—that the pre-raid decision to employ SWAT-style force is reasonable *per se* absent a showing of specific intent to harm—that was subsequently muddied. Moreover, *Holland* applies its rubric to one raid (as-applied) instead of setting up any facial standard on the decision to employ SWAT-level force as a policy. In *Harmon I* and *II*, this Court struggled

---

[5] Two other cases implicate this Court's dynamic-raid jurisprudence. *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008); *Whitewater v. Goss*, 192 Fed. App'x 794 (10th Cir. 2006). *Buck* is distinguishable in that it involved a protest, not a home raid—different policing circumstances with different reasonableness considerations. *Buck*, 548 F.3d at 1274-75. *Whitewater*—an unpublished opinion—approved of the sheriff's "blanket policy" of employing SWAT teams and raids in executing drug warrants as not *per se* unreasonable. 192 Fed. App'x at 798-99. That holding cannot be squared with *Garner*, which requires a totality-of-the-circumstances analysis in determining if the force used was proper. *See* 471 U.S. at 9. The *Semayne* inquiry, by contrast, coheres with *Garner* in that it creates a rebuttable presumption taking into account all of the facts leading to the raid.

with its wavering *Holland* standard, further muddying the waters on case facts less egregious than the facts here. The Court has noted that many of these cases are "close," indicating a significant difficulty with applying *Holland*'s standard for the decision to use military-style force in a particular raid or as a matter of policy.

In addition, the *Holland* standard precludes plaintiffs from facially challenging the policy-type decision to employ SWAT-style teams as a matter of course in executing drug-search warrants. *See generally Los Angeles v. Patel*, 135 S. Ct. 2443 (2015) (making facial Fourth Amendment review of policy decisions available to plaintiffs). While this Court has clearly left open standard *Garner*-type, as-applied excessive force claims and as-applied decisional review under *Holland*, it ought not to prelude from facial review the preemptive, policy-type decision to use paramilitary raids in drug search cases—something which the combination of *Patel* and *Semayne's Case* would require.

By expressly applying the *Semayne* three-step inquiry, in line with Supreme Court precedent, the Tenth Circuit can clarify its previous dynamic-raid jurisprudence and protect "the right to be secure against physical harm" and rights to "liberty, property and privacy

interests—a person's 'sense of security' and individual dignity," *Holland*, 268 F.3d at 1195. There have been many "close" cases, and, as paramilitary raids on homes continue to be distressingly common, this court should help ensure that thousands of future families do not have to endure the same indignities as the Hartes.

Law enforcement would still have the option of a dynamic raid—breaking the house—available upon rebutting before a judge the *Semayne* presumption of peaceable compliance. But police departments should be constrained from haphazardly using paramilitary tactics to execute routine drug-search warrants before performing routine police work and putting that evidence before a magistrate—an important check on officers' discretionary power. As Part I discusses, *supra*, in a free society dynamic raid tactics should not be standard operating procedure. Along with the numerous harms they inflict on individuals and communities subject to these raids, they increase the risk of injury to both officers and home occupants—something which is not reasonable under the Fourth Amendment. *See, e.g., Garner* at 471 U.S. at 21 (requiring a reasonable use of force in apprehending suspects).

# CONCLUSION

This Court should reverse the court below, clarify the applicable standard under the Fourth Amendment for assessing the reasonableness of dynamic raids, and remand for a factual determination consistent with that standard.

Respectfully submitted,

Ilya Shapiro
    *Counsel of Record*
Randal J. Meyer (admission pending)
Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

April 14, 2016

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)

Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. Type-Volume Limitation: Any Reply or Amicus brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word-processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 6,378 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements**: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with serifs included using Microsoft Word 2010 in 14 point Century Schoolbook.

/s/ *Ilya Shapiro*                                    Dated: April 14, 2016

Attorney for *amicus curiae* Cato Institute

**CERTIFICATE OF SERVICE**

The undersigned, attorney of record for *amicus*, hereby certifies that on April 14, 2016, an identical electronic copy of the foregoing amicus brief was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ *Ilya Shapiro*                                    Dated: April 14, 2016

Attorney for *amicus curiae* Cato Institute