No. 16-3014

# United States Court of Appeals
# For the Tenth Circuit

———————————

ADLYNN K. HARTE, ET AL.

*Plaintiffs-Appellants*,

v.

THE BOARD OF COMMISSIONERS OF THE COUNTY
OF JOHNSON, KANSAS, ET AL.

*Defendants-Appellees*

———————————

On appeal from the United States District Court
For the District of Kansas, Judge John W. Lungstrum
No. 2:13-cv-02586

———————————

**BRIEF OF THE MARIJUANA POLICY PROJECT
AS AMICUS CURIAE IN SUPPORT OF THE APPELLANTS**

———————————

Kate M. Bell
Marijuana Policy Project
2370 Champlain Street, NW
Suite 12
Washington, D.C. 20009
202.462.5747
kbell@mpp.org

Tejinder Singh
Goldstein & Russell, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
202.362.0636
tsingh@goldsteinrussell.com

## CORPORATE DISCLOSURE STATEMENT

The Marijuana Policy Project is a 501(c)(4) advocacy organization. It has no

parent corporation and no stock, and therefore no publicly traded owner.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................... iii

BRIEF OF THE AMICUS CURIAE ......................................................1

Interest of the Amicus ........................................................................1

Summary of Argument.......................................................................2

Argument............................................................................................5

I.   The Field Test In This Case Is So Inaccurate That No Reasonable
     Officer Could Rely On It To Establish Probable Cause Without A
     Corroborating Investigation..........................................................5

II.  Deputy Burns' Warrant Application Omitted Information About
     The Inaccuracy Of The Field Test, And Misleadingly Implied It
     Was Sufficiently Accurate To Support Probable Cause, In
     Violation Of *Franks v. Delaware*.................................................14

Conclusion........................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Evans*,
   514 U.S. 1 (1995) ................................................................13

*Beard v. City of Northglenn*,
   24 F.3d 110 (10th Cir. 1994) ..............................................17

*Bruner v. Baker*,
   506 F.3d 1021 (10th Cir. 2007) ................................... 16, 21

*DeLoach v. Bevers,*
   922 F.2d 618 (10th Cir. 1990) ............................................16

*Eaton v. Lexington-Fayette Urban Cty. Gov't,*
   811 F.3d 819 (6th Cir. 2016) ................................................6

*Felders ex rel. Smedley v. Malcom*,
   755 F.3d 870 (10th Cir. 2014) ..............................................5

*Florida v. Harris*,
   133 S. Ct. 1050 (2013) .........................................................5

*Franks v. Delaware*,
   438 U.S. 154 (1978) ..................................................... passim

*Herring v. United States*,
   555 U.S. 135 (2009) ...........................................................13

*Hudson v. Michigan*,
   547 U.S. 586 (2006) ...........................................................13

*Illinois v. Gates*,
   462 U.S. 213 (1983) .............................................................6

*Lamping v. Walraven*,
   30 F. App'x 577 (6th Cir. 2002).........................................16

*Molina ex rel. Molina v. Cooper*,
   325 F.3d 963 (7th Cir. 2003) ......................................... 13, 14

*Pierce v. Gilchrist*,
   359 F.3d 1279 (10th Cir. 2004) ..........................................15

*Poolaw v. Marcantel*,
   565 F.3d 721 (10th Cir. 2009)............................................20

*Skinner v. Ry. Labor Execs. Ass'n,*
   489 U.S. 602 (1989) .............................................................6

*Stewart v. Donges*,
   915 F.2d 572 (10th Cir. 1990) .............................................................................14

*Strickland v. City of Dothan*,
   399 F. Supp. 2d 1275 (M.D. Ala. 2005), *aff'd sub nom. Strickland v. Summers*,
   210 F. App'x 983 (11th Cir. 2006).......................................................................19

*United States v. Brown*,
   631 F.3d 638 (3d Cir. 2011) .............................................................................16

*United States v. Corral-Corral*,
   899 F.2d 927 (10th Cir. 1990) .........................................................................15

*United States v. Glover*,
   755 F.3d 811 (7th Cir. 2014) ...........................................................................18

*United States v. Horn*,
   185 F. Supp. 2d 530 (D. Md. 2002) .................................................................13

*United States v. Leon*,
   468 U.S. 897 (1984) .........................................................................................15

*United States v. Ludwig*,
   641 F.3d 1243 (10th Cir. 2011).........................................................................6

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir. 1996) ...................................................................... 17, 21

*United States v. Vigeant*,
   176 F.3d 565 (1st Cir. 1999) ............................................................................21

*Wilson v. Russo*,
   212 F.3d 781 (3d Cir. 2000) .............................................................................17

## Other Authorities

Radley Balko, *A Partial List of Things That Field Testing Drug Kits Have
   Mistakenly Identified As Contraband*,
   The Washington Post (Feb. 25, 2015), http://tinyurl.com/BalkoList..................10

False Positive Drug Tests Exposed,
   YouTube, https://www.youtube.com/watch?v=djXVnmrlKvE...........................11

S.H. Johns et al., *Spot Tests: A Color Chart Reference for Forensic Chemists*,
   24 J. Forensic Sci. 631 (1979)...........................................................................11

Alan Harris, *A Test of a Different Color: The Limited Value of Presumptive Field
   Drug Tests and Why That Value Demands Their Exclusion from Trial*,
   40 S.W. L. Rev. 531 (2011)..................................................................................8

John Kelly et al., *The Non-Specificity of the Duquenois-Levine Field Test for Marijuana*,
5 Open Forensic Sci. J. 4 (2012) .........................................................................11

John Kelly,
False Positives Equal False Justice (2008)........................................ 10, 11, 23, 24

Jessica Lussenhop, *Why Harris County, Texas, Leads the U.S. in Exonerations*,
BBC News (Feb. 12, 2016) ...............................................................................23

Lynn Peavey, QuickCheck Narcotic Identification (Drug Test) Kits,
https://www.lynnpeavey.com/product_info.php?products_id=947 ......................7

National Institute of Justice, Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse,
Standard 0604.01 (2000) ............................................................................ 12, 20

Alysia Santo, *Jolly Ranchers, Sage and Breath Mints*,
The Marshall Project (April 2, 2015), https://www.themarshallproject.org/2015/04/02/jolly-ranchers-sage-and-breath-mints ...............................................22

R.A. Velapoldi & S.A. Wicks, *Use of Chemical Spot Test Kits for the Presumptive Identification of Narcotics and Drugs of Abuse*,
19 J. Forensic Sci. 636 (1974) ...........................................................................12

# BRIEF OF THE AMICUS CURIAE[1]

## Interest of the Amicus

The Marijuana Policy Project (MPP) was founded in 1995 with the goal of reforming marijuana laws. It is a non-profit 501(c)(4) advocacy organization that has members in Kansas and works to change laws there as well as all the other states. MPP advocates replacing marijuana prohibition with regulation, and is concerned about defending the civil rights of individuals charged with marijuana related crimes.

MPP has funded research about the scientific validity of field drug tests, including the KN reagent test used by the officers in this case to support their search warrant affidavit. The research documented extensively the propensity for these tests to produce false positive results when used to test a variety of innocent items, from chocolate to soap to herbs. These false positives are used to deny innocent people their liberty. MPP and its members are concerned not only that they might be subject to such deprivations, but also that their tax dollars are spent arresting and prosecuting innocent people based on these deeply flawed tests. MPP thus has a specific interest in the ruling in this case—and more broadly in ensuring that draconian raids based on shoddy science don't happen again.

---

[1] No party's counsel authored this brief in any part, nor did any person other than MPP or its counsel contribute money intended to fund preparing or submitting this brief.

This brief is filed on the authority of the accompanying motion for leave to file. The Hartes and Sergeant Wingo have consented to this filing; the remaining defendants have not and have indicated that they will oppose the motion.

## Summary of Argument

This brief argues that: (1) the KN reagent field test that the officers described in the warrant application in this case is so inaccurate that it cannot establish probable cause for a search warrant without a corroborating investigation; and (2) the facts of this case, in the light most favorable to the plaintiffs, are sufficient to show that in addition to making other material falsehoods, the affiant omitted information about the inaccuracy of the test, and indeed implied it was sufficiently accurate to support probable cause, and thus acted with at least reckless disregard for the truth or falsity of his statements in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).

It is well-settled that unreliable investigative techniques cannot establish probable cause. A police officer cannot obtain a warrant based on his naked intuition that a particular substance is marijuana. He cannot obtain a warrant by using his adorable but untrained pet schnauzer to sniff out marijuana. And he cannot obtain a warrant by using a chemical test that actually returns a positive result for every green plant. If an officer submits a warrant application honestly

stating that he used any of these methods as the basis for probable cause to search a home, the reviewing judge should reject the application out of hand.

It is also clear that if an officer relies on such methods in a warrant application without disclosing—or while obfuscating—their shortcomings, that omission would be misleading to a judge reviewing the application. Moreover, given the obvious problems with these investigative techniques, and their salience to the probable cause inquiry, such an omission should be deemed at the very least reckless—which under *Franks* constitutes a Fourth Amendment violation. Any lesser alternative would allow police officers to mislead the judiciary using junk science.

The field drug test in this case is not quite as bad as these deliberately hyperbolic hypotheticals. But it is shockingly close. According to the officers in this case, the test twice falsely identified tea leaves as marijuana. In other demonstrations, the test has confused a startling array of innocent substances for marijuana, including chocolate and typical house plants. Rampant false positive results in this and similar field tests have been documented in the forensic science literature since the 1970s, and the instructions printed by the test manufacturer itself caution that a positive test result only provides probable cause to test the sample in a crime lab—not cause to seek a search warrant. The officers nevertheless relied on the test as the principal evidence in support of their

application for a search warrant of the Hartes' home. That reliance was unjustifiable, and the officers' attempt to conceal the test's shortcomings violated *Franks*.

Unfortunately, inaccurate field tests are frequently used in this way. The problem persists, in part, because police officers profess ignorance about the flaws with the tests and courts permit the officers to use that professed ignorance to defeat suppression motions or civil liability. But the officers' obliviousness is unjustifiable in the face of clear, abundant evidence proving that these tests are inaccurate. Indeed, relying on the tests while ignoring and failing to report such evidence is the very definition of recklessness.

This Court should therefore reverse the district court, hold that there was no probable cause for the search, and further hold that the evidence was sufficient to allow the question of the officers' recklessness to go to a jury. We also respectfully request that the Court's opinion state unequivocally that where an officer knows, or a reasonable officer should have known, that a field test frequently returns false positive results, the results cannot be used in a warrant affidavit unless the affidavit also includes a clear statement about the accuracy of the test, including the potential for false positive results. Such a ruling would put police officers on notice that in future warrant applications they must give the court accurate information or risk violating the Fourth Amendment.

4

**Argument**

I.    **The Field Test In This Case Is So Inaccurate That No Reasonable Officer Could Rely On It To Establish Probable Cause Without A Corroborating Investigation.**

To invade the sanctity of a private home, the police must obtain a warrant founded on probable cause. "A police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks omitted).

The probable cause inquiry must account for "the totality of the circumstances." *Id*. This means that "officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (quotation marks omitted). In this case, there were only two pieces of evidence possibly indicating probable cause to search the Hartes' home for evidence of marijuana: Mr. Harte's single trip to a gardening store eight months before the warrant issued, and the field tests of the Hartes' kitchen trash. All of the other relevant facts were exculpatory—including that the tea leaves in the Hartes' trash did not look or smell like marijuana, A198, A256-57, and that the officers themselves previously had determined them not to

5

be marijuana, A564, A709. As between the two pieces of potentially inculpatory evidence, the judge who issued the warrant acknowledged that the trip to the gardening store was not important "in this instance," while the accuracy of the field test results was key to the probable cause determination. A535-36.

Unreliable investigative techniques cannot, by themselves, produce evidence sufficient to constitute probable cause. For example, this Court has held that "it surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable." *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011). And the Supreme Court has held that when the police seek to base probable cause on a tip from an informant, the informant's reliability is "highly relevant" to whether the tip constitutes probable cause. *Illinois v. Gates*, 462 U.S. 213, 231 (1983). *See also Eaton v. Lexington-Fayette Urban Cty. Gov't*, 811 F.3d 819, 822 (6th Cir. 2016) ("Procedures that generate results that are not close to 'accurate in the overwhelming majority of cases,' may themselves cause testing to be unreasonable in the Fourth Amendment sense.") (quoting *Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 632 n.10 (1989)).

To understand why the KN reagent field test is not reliable enough to establish probable cause, we must first describe how the test works. The test unit itself is a small pouch containing multiple ampoules, which are internal capsules that contain chemicals (reagents) that change color when they react with other

substances. *See* A391 (instructor's manual for the Lynn Peavey QuickCheck test). The basic idea of the test is that the officer in the field can place a small amount of the tested substance in the pouch, and then break the ampoules in a set order at set intervals. The reagents in the ampoules will flow down into the pouch and react with the test substance, and the contents of the pouch will change color as a result of those chemical reactions. *Id*. Different reactions will produce different colors (or not). The contents of the pouch may also ultimately arrange themselves into different colored layers, depending on how the pouch is configured. *See* D. Ct. Dkt. #327-26, at 2[2] (packaging for the marijuana QuickCheck test). The test kits include a color square showing an ideal positive result that officers can compare to actual test results in the field. *Id*. The tests are cheap and disposable: the public can buy KN marijuana tests online for approximately $2.45 per pouch. *See* Lynn Peavey, QuickCheck Narcotic Identification (Drug Test) Kits, https://www.lynnpeavey.com/product_info.php?products_id=947.

For the test to work, the officers must correctly conduct and interpret it. This introduces the possibility of user error. The instruction manual for the Lynn Peavey KN Reagent test (D. Ct. Dkt. #327-27),[3] explains, for example, that the "tests are

---

[2] Materials from the district court docket are cited as "D. Ct. Dkt. #." Page numbers refer to the ECF file stamping in the blue header at the top of the page.

[3] This manual is reproduced in part on pages A390-95 of the Hartes' appendix. However, not all of the pages we cite appear there.

*extremely* sensitive," so that if officers put in too much of the substance they "risk 'flooding' the reaction, and [] may not get an accurate reading." *Id*. 6. It explains that in order to use the marijuana test, the officer must make sure to "break the ampoule, not crush . . . just enough to release the reagents inside." *Id*. 11. It then provides that ampoules should be broken in a set order at set intervals, with agitation in between, after which time the officer must stop and allow the reagents to separate into layers. *Id*. 12. Any deviation from these procedures can compromise the test results.

In addition, whether the colors change properly, or arrange themselves in the correct layers, "is clearly up to interpretation and subject to the influence of actual conditions"; one officer may see a positive result while another might deem the result inconclusive—and external factors such as lighting can play a role. *See* Alan Harris, *A Test of a Different Color: The Limited Value of Presumptive Field Drug Tests and Why That Value Demands Their Exclusion from Trial*, 40 S.W. L. Rev. 531, 542-43 (2011).

User error can also contaminate the test, resulting in a false positive. The test manufacturers design the tests to produce a desired reaction with certain illicit substances. But there is no way for them to guarantee that the reagents in the ampoules will not also react with other, completely innocent substances. As we explain below, many of these tests react with everyday substances including

chocolate, spices, soaps, herbs, and other plants; thus, if an officer recently had a candy bar or touched a eucalyptus leaf, his hand might accidentally introduce one of those substances into the pouch—indeed, if he had just washed his hands, attempting to eliminate contaminants, the soap he used might itself contaminate the sample. Or if, as in this case, the sample came from kitchen trash, some common herb, spice, or food product might have left residue on the tested material, resulting in a false positive. These risks make it important to ensure that officers are properly trained in the use of the tests, and they also show why officers and courts cannot rely on the tests as the sole or primary basis for probable cause.

The most important point in this brief is that even if field tests are used 100% correctly, they are fundamentally flawed because they routinely return false positive results. That is, a false result might not come from inadvertent contamination; it might instead come from the fact that the police suspect that some innocent substance (*e.g.*, tea leaves) is in fact a drug, may test it to confirm their suspicions, and may receive a false positive result because the test is incapable of distinguishing reliably between innocent and illicit substances. Journalist Radley Balko published a partial list of items that field tests have mistaken for illegal drugs, including vitamins, sage, chocolate chip cookies, motor oil, spearmint, soap, tortilla dough, deodorant, billiards chalk, patchouli, flour, eucalyptus, breath mints, loose-leaf tea, and Jolly Rancher candies. *See* Radley

9

Balko, *A Partial List of Things That Field Testing Drug Kits Have Mistakenly Identified As Contraband*, The Washington Post (Feb. 25, 2015), http://tinyurl.com/BalkoList.

This list is only the tip of the iceberg. In 2008, a two-year study of field drug testing, funded in part by MPP and conducted by forensic drug expert John Kelly and former FBI chief scientist and narcotics officer Dr. Frederic Whitehurst, concluded that "the extensive array of lab and field drug tests used today, while intended to aid the government in law enforcement, too often mislead police with false results that punish Americans with wrongful prosecutions and incarcerations." John Kelly, False Positives Equal False Justice 1 (2008), *available at* https://www.mpp.org/issues/criminal-justice/false-positives/ (also reproduced in black-and-white at A473). The study was intended as "a siren alerting policy makers at all levels of government to end the use of field drug tests which have been proven to be unreliable." *Id*.

The study found particular fault with the "Duquenois-Levine and KN Reagent tests" that are most frequently used today. *Id*. It showed that the KN reagent test, even when used according to manufacturers' directions by trained scientists in a controlled environment, returned false positive results for a large number of innocent substances. In fact, out of 42 samples of innocuous substances, 33 tested positive for marijuana using the KN reagent test, including samples of

10

organic vanilla extract, organic anise extract, vine flower essences, chicory flower essences, olive flower essences, organic peppermint, patchouli, rose absolute, ginkgo, American ginseng, St. John's Wort lemon balm, bergamot, eucalyptus, cinnamon leaf, basil, lemon grass, lavender, clove buds, clove oil, organic cypress, organic oregano, ginger, and frankincense. *Id*. 31-37.

In 2009, MPP publicized these research findings in a video posted to the Internet. Filmed at the National Press Club in Washington, D.C. on March 3, 2009, and uploaded to the public a day later, the video shows field tests returning false positives in real time while analyzing substances including oregano, Tylenol, Hershey's bars—and even plain air. *See* False Positive Drug Tests Exposed, YouTube, https://www.youtube.com/watch?v=djXVnmrlKvE.

Although MPP has been at the forefront of calling out false positive field test results, it surely has not been alone. The same researchers who prepared the 2008 report published a separate article documenting further false positive tests and collecting academic citations dating back to the 1970s that identified false positives as a severe problem with field drug tests. *See* John Kelly et al., *The Non-Specificity of the Duquenois-Levine Field Test for Marijuana*, 5 Open Forensic Sci. J. 4, 7 (2012) (collecting cites); *see also* S.H. Johns et al., *Spot Tests: A Color Chart Reference for Forensic Chemists*, 24 J. Forensic Sci. 631, 631 (1979) (determining that reagent-based field tests "must be considered inconclusive for purposes of

positive identification."); R.A. Velapoldi & S.A. Wicks, *Use of Chemical Spot Test Kits for the Presumptive Identification of Narcotics and Drugs of Abuse*, 19 J. Forensic Sci. 636, 636 (1974) ("[F]alse positives can be obtained . . . making definitive test interpretations essentially impossible."). Thus, the consensus view among forensic scientists is that such tests are unreliable.

The United States government itself has acknowledged that field testing is not sufficiently reliable, on its own, to identify drugs. The National Institute of Justice (NIJ), in the United States Department of Justice, has issued procurement standards for field drug test kits like the one used here. *See* NIJ, Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse, Standard 0604.01 (2000), *available at* https://www.ncjrs.gov/pdffiles1/nij/183258.pdf. The NIJ requires such kits to be accompanied by "[a] statement that the kit is intended to be used for presumptive identification purposes only, and that all substances tested should be subjected to more definitive examination by qualified scientists in a properly equipped crime laboratory." *Id*. 7. In fact, the manufacturer of the test at issue in this case included such a statement in instructions that were sent to the defendants. The instructor's manual states: "*Keep in mind that these tests are only presumptive in nature*. A positive test will give you probable cause to take the sample in to a qualified crime laboratory for definitive analysis." A391. In sum, the evidence against the reliability of these field drug tests is overwhelming.

12

Such an inaccurate test should not be used to infringe a person's Fourth Amendment rights. *Cf. United States v. Horn*, 185 F. Supp. 2d 530, 557 (D. Md. 2002) (holding that standardized field sobriety tests were not admissible as scientific evidence because of their "alarmingly high error rate"). This case can be contrasted with *Herring v. United States*, 555 U.S. 135, 146-47 (2009), in which the Court noted that "[i]n a case where systemic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system." (citing *Arizona v. Evans*, 514 U.S. 1, 17 (1995) (O'Connor, J., concurring) ("Surely it would *not* be reasonable for the police to rely . . . on a recordkeeping system . . . that routinely leads to false arrests"), and *Hudson v. Michigan*, 547 U.S. 586, 604 (2006) (Kennedy, J., concurring in part and concurring in the judgment) ("If a widespread pattern of violations were shown . . . there would be reason for grave concern")). Here, ample evidence of systematic errors belies any claim to good faith reliance on field test results.

The only case cited by the district court for the proposition that officers can rely on an unreliable field test to support a probable cause determination, *Molina ex rel. Molina v. Cooper*, 325 F.3d 963 (7th Cir. 2003), is inapposite for two reasons. First, in that case an informant corroborated the field test results. *See id.* at 969-71. Second, the defendant failed to "present[] evidence to show that [the officer] thought the field tests were unreliable when he applied for the warrant." *Id*.

13

at 971. Here, by contrast, the test stands virtually alone—and the instructions for the test, which the officers claim to have followed, state that the test only gives probable cause to submit in item to the lab, a step that the officers could have taken, but chose not to. In addition, there is evidence that the officers were not being truthful when they claimed they did not know the tests rendered false positives or were reckless in their disregard of the unreliability of the tests.

While the tests may be valid for ruling out the presence of drugs, a positive result should not be entitled to any meaningful weight from police officers, reviewing judges, or this Court. A test that gives a false positive on 33 out of 42 tests of common botanicals may lead police to inaccurately target innocent people 79% of the time. That cannot rise to the level of probable cause.

## II. Deputy Burns' Warrant Application Omitted Information About The Inaccuracy Of The Field Test, And Misleadingly Implied It Was Sufficiently Accurate To Support Probable Cause, In Violation Of *Franks v. Delaware*.

It is clearly established that searches pursuant to a warrant obtained using deliberately or recklessly false or misleading statements violate the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). This rule applies with equal force to "omissions as well as affirmative misstatements." *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990). Thus, the elements of a *Franks* claim are: (1) that a warrant affidavit includes a false or misleading statement or omission; (2) that the misrepresentation was material to the probable cause

14

determination; and (3) that the misrepresentation was deliberate or reckless. *See* 438 U.S. at 155-56.[4]

The Hartes argue convincingly (Hartes' Br. 13-14) that Deputy Burns' affidavit in this case contains numerous material falsehoods and misleading omissions. They also argue (at 29-32), correctly, that the record contains sufficient evidence to permit a jury to find that the officers never actually performed the field tests, or inaccurately reported the results in order to manufacture probable cause. And these arguments highlight a serious problem with field tests: dishonest officers can simply use their existence as a veil for perjury, if they are so inclined.

But even if the officers used the tests in this case, and even if the tests returned positive results, Deputy Burns nevertheless violated *Franks* by reporting these results without including accurate information about the reliability of the

---

[4] The rule against police deception in warrant affidavits is strong. This Court has held that *Franks* violations defeat qualified immunity. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest."). Additionally, one well-established exception to the general rule that suppression is not required when officers rely in good faith on a defective warrant is "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*); *United States v. Corral-Corral*, 899 F.2d 927, 933 (10th Cir. 1990) (same).

15

tests—indeed, while misrepresenting that the field test is essentially the same as the test used in the crime laboratory. *See* Hartes' Br. 39.

For this claim, the first and second *Franks* elements are easily satisfied. Burns omitted information about the accuracy of the test generally, and misrepresented its comparability with crime lab tests. It is also beyond dispute that these statements were material to the probable cause determination; indeed, the judge who issued the warrant so testified. A536.[5] Thus, the only question is whether there is enough evidence in the record for a reasonable jury to conclude that Burns' misrepresentations were deliberate or reckless. The evidence in this case far exceeds that standard.

"[R]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." *Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007) (quoting *DeLoach v. Bevers,* 922 F.2d 618, 622 (10th Cir. 1990)). As the court explained in *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011):

---

[5] Without the field tests, one observation of Mr. Harte shopping for gardening supplies eight months before the warrant issued clearly did not provide probable cause for the search. This case is similar to *Lamping v. Walraven*, 30 F. App'x 577, 580 (6th Cir. 2002) (unpublished), where the court held that if "[p]robable cause would . . . be eliminated if the statement about the field test results was excised from the affidavit," and the plaintiff could show that the affiant's "statement about the results was a deliberate lie or was recklessly false . . . probable cause would not exist and [the officer] would not be protected by qualified immunity." (citation omitted).

> An assertion is made with reckless disregard when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind.

*See also Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (adopting the same test for recklessness as the Third Circuit and noting that a plaintiff can show "recklessness by inference" when officers omit obviously relevant facts).

Here, the affidavit's statement that the field test and the crime lab test use similar reagents was either completely false (as alleged by the Hartes, who note that "Burns had no idea which reagents were used by the crime lab," Hartes' Br. 39), or at a minimum highly misleading, because to the extent the crime lab might have used the chemicals in the KN reagent test, it did so in an entirely different type of test. A118-19. As in *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996), this is information that, even if not false, "was almost calculated to mislead," and thus shows a lack of good faith on the part of the affiant. Indeed, the field test manufacturer told the sheriff's office that they were in "uncharted territory," and were using the "wrong" test kit for marijuana. A202-03. The sheriff's office's crime lab *agreed with that assessment*, and so the suggestion that the field test met the standards of the crime lab is patently false. A202.

More broadly, the ample and credible evidence documenting accuracy problems with field tests, including the KN reagent test, furnishes an "obvious basis" for any officer to doubt the test results. The most telling evidence is that the test manufacturer itself—in a manual that was delivered to the sheriff's office years before the search in this case, and which the officers presumably read—declined to state that the test furnishes probable cause for a search warrant; instead, it stated that the test only establishes "probable cause to take the sample in to a qualified crime laboratory for definitive analysis." A391. This is the equivalent of a certifying organization for drug dogs acknowledging that the dogs it trains cannot reliably distinguish drugs from food, or of an informant admitting that he has a terrible memory.[6] In other words, it is the sort of red flag that would support an inference of recklessness if an officer failed to mention it in a warrant affidavit. *Cf. United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014) (holding that warrant "affidavit's omission of all information about the informant's credibility is sufficient to raise an inference of reckless disregard for the truth").

---

[6] The testimony of Sheriff Denning that, since he came to the Johnson County Sheriff's Office in 1978, the office has conducted "thousands" of field tests and the only false positive results of which he is aware are the results at issue in this case is not credible. Given the irrefutable evidence of the number of substances that produce false positives, Sheriff Denning either did not follow up on these tests or he is lying.

Separately, Deputy Burns either misrepresented or omitted key information relating to his competency to perform and interpret the field test. By citing his "training and experience" in narcotics investigation, Burns indicated to the reviewing judge that, at a minimum, he had read and followed the instructions for the test he was administering. Indeed, conducting a test in accordance with the instructions for doing so has been held to be essential where the officer relies on such a test in a probable cause determination. For example, in *Strickland v. City of Dothan*, 399 F. Supp. 2d 1275, 1289 (M.D. Ala. 2005), *aff'd sub nom. Strickland v. Summers*, 210 F. App'x 983 (11th Cir. 2006) (unpublished), the court held that:

> It is imperative that police officers—who are expected to interact with, and potentially arrest, individuals who may be intoxicated—have correct knowledge of how to demonstrate and interpret the field-sobriety tests on which the liberty of those individuals may depend. It is not objectively reasonable to rely on a performance in a field-sobriety test for a finding of probable cause for a DUI arrest when the test has been administered incompetently.

Here, Deputy Burns stated in the warrant affidavit that he had training and experience identifying marijuana, stated that the test used similar reagents to the lab test, and stated that the test was positive for marijuana. A708-09. These statements plainly imply that Burns knew how to conduct the KN reagent test, and that the test had a reasonable level of accuracy at identifying marijuana. In fact, however, Burns had received no formal training whatsoever in conducting the test, A123, and no training about the possibility of false positives, A547. Given that the

19

instructions clearly indicate that the test is sensitive—stating that the ampoules must be broken but not crushed, for example—the fact that Burns had not received training is a glaring omission. Indeed, it runs contrary to the NIJ guidance, which states that "users of the kit should receive appropriate training in its use and should be taught that the reagents can give false-positive as well as false-negative results." NIJ, Standard 0604.01, *supra*, at 7.[7]

The district court made much of the fact that the affidavit stated that the test was "presumptive but not conclusive." While this is true, the use of the word "presumptive" was misleading in this context. To a judge reviewing a warrant affidavit, that word would imply that the test was sufficiently accurate to allow the judge to presume that the substance was marijuana for the purpose of a probable cause determination, although not sufficiently accurate to prove the substance was marijuana beyond a reasonable doubt. But that is not the sense in which the manufacturer used the phrase "presumptive." Instead, it meant only that "[a]

---

[7] Deputy Blake's training was similarly inadequate. Before the raid of the Hartes' home, neither Burns nor Blake had received any substantial training in the KN reagent test. At most, they had seen a quick demonstration by a field training officer. Moreover, both testified that they had never received any training about false positive results. A547, A563. But even if Blake had been adequately trained, the officers testified that both tests, together, were key to finding probable cause—so his training alone would be insufficient. A538. And even if both deputies had been properly trained, that is not dispositive where the test is so unreliable. Training, knowledge, and experience must be relevant and cannot be used to "nullify" Fourth Amendment requirements. *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009).

positive test will give you probable cause to take the sample in to a qualified crime laboratory for definitive analysis." A391. Deputy Burns, however, did not explain that limitation. Such a significant omission, like omitting information about the unreliability of an informant, is improper and eliminates the protections offered by seeking a warrant. *See United States v. Vigeant*, 176 F.3d 565, 573-74 (1st Cir. 1999) (good faith exception does not apply where affiant recklessly omitted information on informant's unreliability); *Reilly*, 76 F.3d at 1280 (good faith does not protect searches by officers who fail to disclose all potentially adverse information to issuing judge).

If Deputy Burns truly did not know that this test was inaccurate, that fact demonstrates a shocking lack of professionalism on his part because accurate information has been available to him for years. But instead of holding the officers to account for their lapse, the district court's decision effectively condones the officers' alleged blindness by allowing them to use it as a defense to liability. On the facts of this case, that defense should have been rejected because Burns' omission of critical facts about the accuracy of field tests at least amounts to a reckless disregard for the truth, which is enough to violate *Franks*. *See, e.g.*, *Bruner*, 506 F.3d at 1027-28 (acknowledging that in an appropriate case, excluded evidence may be "so compelling that its mere omission constitutes sufficient evidence of recklessness").

At the very least, officers should not be able to hide behind professed ignorance about the flaws in this investigative technique, and reviewing judges should not grant warrant affidavits based solely or principally on the KN reagent test. Thus, we respectfully request that this Court include in its opinion language making it clear that unreliable field drug tests like this one are entitled to little weight—and certainly cannot, without more, establish probable cause for a search warrant of a home or for an arrest. That way, officers in the future cannot plausibly claim to be ignorant of that fact.

**Conclusion**

The use of field drug tests to support search and arrest warrants is a scourge. All over the country, people are being searched and arrested as a result of erroneous field tests, with real consequences for their jobs, relationships, and reputations. The military-style raid on the Hartes' home is but one vivid example of the potential for error and abuse. As the Hartes point out, the tea that allegedly tested positive in this case is sold at thousands of stores and coffee shops nationwide. Hartes' Br. 21. And it is by no means the only common consumer product that produces false positives. "Sage has been mistaken for marijuana; motor oil for heroin; jolly ranchers for meth; and breath mints for crack. In February [2015], a Minnesota man spent months in jail after his vitamin powder tested positive for amphetamines." Alysia Santo, *Jolly Ranchers, Sage and Breath*

*Mints*, The Marshall Project (April 2, 2015), https://www.themarshallproject.org/ 2015/04/02/jolly-ranchers-sage-and-breath-mints. Honor students have been jailed for carrying flour. *See* Kelly, False Positives, *supra*, at 2. And well-known musicians have been jailed for carrying soap. *Id.*

Of course, these are only the famous cases: the ones where the citizens had the wherewithal to publicize what happened to them and to pursue redress in court. Others have not been so fortunate. For example, for the last two years, Harris County, Texas has led the nation in exonerations. *See* Jessica Lussenhop, *Why Harris County, Texas, Leads the U.S. in Exonerations*, BBC News (Feb. 12, 2016), http://www.bbc.com/news/magazine-35543898. Seventy three of the exonerated defendants had been convicted of drug offenses—for substances that were later found not to be drugs. *Id.* In many cases, the defendants were arrested on the basis of inaccurate field tests, and these innocent people pleaded guilty in order to avoid the risk of felony charges or of being stuck in jail pending a trial—which resulted in the lab work in their cases being shuffled to the bottom of the pile. *Id.* The violations only came to light because a prosecutor with integrity prioritized review of these cases. However, in many other jurisdictions, prosecutors destroy drug evidence as soon as defendants plead, making further lab work that might result in similar exonerations far less likely. *Id.* Thus, it is a virtual certainty that there are American citizens in prison today because of false positive field drug tests.

Unless the police curb the use of these inaccurate tests, or unless the courts at a minimum require that the test results be accompanied by more reliable evidence of crime before a warrant can issue, this gross injustice will only continue. To give just one easy example: we know that chocolate falsely tests positive as marijuana. We also know that it is commonplace for people to make edible goods containing marijuana, including brownies and chocolate chip cookies. So now, police officers have an incentive to test every baked good they can get their hands on, and the inaccurate tests they use are overwhelmingly likely to produce false positive results. The potential that somebody's snack will land her in jail is both real and terrifying—because it could happen to literally anybody.[8] Of course, it almost goes without saying that those most affected will not be just anybody—they will be poorer people and racial minorities, who have always borne the disproportionate burden of marijuana prohibition. Especially for those who cannot afford to litigate, the consequences will be severe and permanent.

---

[8] Something similar has already happened. In 2008, a couple traveling with two pounds of raw chocolate were interrogated for hours after a field drug test determined that their chocolate contained hashish. *See* Kelly, False Positives, *supra*, at 3. They were told that they faced "life in prison" if they did not confess, and each was told that the other had confessed. After spending approximately $20,000 on legal bills, they were able to show with lab testing that the chocolate in fact contained no hashish. *Id*. Even more shocking, three weeks later, one of the couple was arrested again carrying chocolate, and again for the same reason. *Id*.

This case presents the Court with a valuable opportunity to make an important statement in support of the Fourth Amendment. Field drug testing is a ubiquitous and pernicious threat to everybody's civil rights. Disguised as precise scientific instruments, many field tests are in fact so error-prone that not even their manufacturers believe that they establish probable cause for a search. By holding as much, this Court can send a strong signal to police officers across the nation that they need more reliable evidence of crime before they can invade the sanctity of our homes.

For the foregoing reasons, as well as those set forth by the Hartes, the judgment of the district court should be reversed.

Respectfully submitted,

s/Tejinder Singh

Goldstein & Russell, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
202.362.0636
tsingh@goldsteinrussell.com

Kate M. Bell
Marijuana Policy Project
2370 Champlain Street, NW
Suite 12
Washington, D.C. 20009
202.462.5747
kbell@mpp.org

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29

    and 32(a)(7)(B) because this brief contains 6325 words, excluding the parts

    of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.

    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

    this brief has been prepared in a proportionally spaced typeface using

    Microsoft Word 2010 in Times New Roman size 14 point font.

s/Tejinder Singh

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

    (1) all required privacy redactions have been made per 10th Cir. R. 25.5;

    (2) if required to file additional hard copies, that the ECF submission is an exact

        copy of those documents;

    (3) the digital submissions have been scanned for viruses with the

        most recent version of a commercial virus scanning program, Avira

        Antivirus, updated on April 13, 2016, and according to the program are free

        of viruses.


                        s/Tejinder Singh

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Tejinder Singh