No. 16-3014

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

————————————

ADLYNN K. HARTE; ROBERT W. HARTE; J.H., A MINOR, BY AND THROUGH HIS PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE; L.H., A MINOR, BY AND THROUGH HER PARENTS AND NEXT FRIENDS, ADLYNN K. HARTE AND ROBERT W. HARTE,

*Plaintiffs-Appellants*,

v.

THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON, KANSAS; FRANK DENNING, SHERIFF, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY; MARK BURNS, DEPUTY, IN HIS INDIVIDUAL CAPACITY; EDWARD BLAKE, DEPUTY, IN HIS INDIVIDUAL CAPACITY, MICHAEL PFANNENSTIEL, DEPUTY, IN HIS INDIVIDUAL CAPACITY

[*Caption Continued On Inside Cover*]

————————————

On Appeal from the United States District Court
for the District of Kansas, Judge John W. Lungstrum
No. 2:13-cv-02586

————————————

## REPLY BRIEF FOR APPELLANTS

————————————

CHERYL A. PILATE
MELANIE S. MORGAN
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO 64106
(816) 471-6694

JEFFREY M. HARRIS
ROBERT M. BERNSTEIN
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
rbernstein@bancroftpllc.com

*Counsel for Plaintiffs-Appellants*

ORAL ARGUMENT REQUESTED

June 22, 2016

JAMES COSSAIRT, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LARRY SHOOP, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LUCKY SMITH, DEPUTY, IN HIS INDIVIDUAL CAPACITY; CHRISTOPHER FARKES, DEPUTY, IN HIS INDIVIDUAL CAPACITY; THOMAS REDDIN, LIEUTENANT, IN HIS INDIVIDUAL CAPACITY; TYSON KILBEY, DEPUTY, IN HIS INDIVIDUAL CAPACITY; LAURA VRABAC, DEPUTY, IN HIS INDIVIDUAL CAPACITY; JIM WINGO, SERGEANT, MISSOURI HIGHWAY PATROL, IN HIS INDIVIDUAL CAPACITY,

*Defendants-Appellees*,

and

NATE DENTON, DEPUTY, IN HIS INDIVIDUAL CAPACITY,

*Defendant*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ......................................................................................... 3

I.   Numerous Disputes About Genuine Issues Of Crucial Fact Preclude Judgment For The Officers And Require Jury Resolution. ........................... 3

II.  The Defendants Violated Well-Established Fourth Amendment Principles By Submitting A Falsified Affidavit, Exceeding The Scope Of The Warrant, And Raiding A Family Home With An Overwhelming Amount Of Force. ................................................................. 10

     A.   The Deputies and Wingo Are Liable Under *Franks v. Delaware* for Official Misconduct Related to the Drafting of an Affidavit ................................................................... 10

          1.   This Court has long recognized that intentional or reckless disregard for the truth in a search-warrant affidavit violates the Fourth Amendment. ................................ 10

          2.   Wingo is every bit as liable for *his* direct role in facilitating, encouraging, and instigating the constitutional *Franks* violation. ............................................... 14

     B.   The Deputies Are Liable for Searching the Hartes' Home and Seizing the Hartes as if They Possessed a General Warrant. ............. 17

     C.   The Deputies and Wingo Are Liable Under *Graham v. Connor* for Pointing an Assault Rifle at Bob, Deploying a Tactical Team on a Nonviolent Family, and Detaining the Hartes Under Armed Guard.................................................................. 20

III. Sheriff Denning And The County Are Liable Under *Monell* For An Unconstitutional Pattern of Behavior. ............................................. 23

IV.  The Deputies And County Are Not Entitled To Summary Judgment On The State-Law Claims. .......................................................... 27

CONCLUSION ..................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Bruning v. Pixler*,
  949 F.2d 352 (10th Cir. 1991).............................................................................11

*Buck v. City of Albuquerque*,
  549 F.3d 1269 (10th Cir. 2008).........................................................................16

*Dodds v. Richardson*,
  614 F.3d 1185 (10th Cir. 2010).........................................................................16

*Franks v. Delaware*,
  438 U.S. 154 (1978)............................................................................... 10, 13

*Garrett v. Hibler*,
  80 F. App'x 82 (10th Cir. 2003).........................................................................16

*Graham v. Connor*,
  490 U.S. 386 (1989)...........................................................................................21

*Groh v. Ramirez*,
  540 U.S. 551 (2004)...........................................................................................18

*Horton v. California*,
  496 U.S. 128 (1990)...........................................................................................19

*Kolbe v. Hogan*,
  813 F.3d 160 (4th Cir. 2016).............................................................................28

*Lawmaster v. Ward*,
  125 F.3d 1341 (10th Cir. 1997).........................................................................18

*Malley v. Briggs*,
  475 U.S. 335 (1986)...........................................................................................15

*Martinez v. Carson*,
  697 F.3d 1252 (10th Cir. 2012).........................................................................16

*Michigan v. Summers*,
  452 U.S. 692 (1981)...........................................................................................20

*Mink v. Knox*,
  613 F.3d 995 (10th Cir. 2010) ................................................................ 16, 18

*Monroe v. Pape*,
  365 U.S. 167 (1961) ................................................................................ 15

*Muehler v. Mena*,
  544 U.S. 93 (2005) .................................................................................. 20

*Pauly v. White*,
  814 F.3d 1060 (10th Cir. 2016) .............................................................. 15, 16

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ............................................................................... 3

*Poolaw v. Marcantel*,
  565 F.3d 721 (10th Cir. 2009) ................................................................ 13, 16

*Riley v. California*,
  134 S. Ct. 2473 (2014) ........................................................................... 18, 19

*Salmon v. Schwartz*,
  948 F.2d 1131 (10th Cir. 1991) .............................................................. 12

*Sanchez v. Hartley*,
  810 F.3d 750 (10th Cir. 2016) ................................................................ 11

*Stewart v. Donges*,
  915 F.2d 572 (10th Cir. 1990) ................................................................ 11

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014) ........................................................................... 3, 8

*United States v. Dazey*,
  242 F. App'x 563, (10th Cir. 2007) ......................................................... 27

*United States v. Edwards*,
  103 F.3d 90 (10th Cir. 1996) .................................................................. 20

*United States v. Leon*,
  468 U.S. 897 (1984) ............................................................................... 10

*Utah v. Strieff*,
-- S. Ct. --, No. 14-1373, 2016 WL 3369419 (June 20, 2016).....................25, 27

*Walker v. City of Orem*,
451 F.3d 1139 (10th Cir. 2006) ..........................................................20

*Warren v. Prison Health Servs., Inc.*,
576 F. App'x 545 (6th Cir. 2014).........................................................12

*Wilkins v. DeReyes*,
528 F.3d 790 (10th Cir. 2008)............................................................11

*Wilson v. Montano*,
715 F.3d 847 (10th Cir. 2013)............................................................16

**Statutes**

42 U.S.C. §1983 ................................................................................15

Kan. Stat. Ann. §21-5705(d)(7)(A)......................................................22

Kan. Stat. Ann. §22-2902(a)(1)(B) ..................................................... 26

**Rule**

Fed. R. Civ. P. 56(a) ...........................................................................3

**Other Authorities**

Andy Marso, *Bill to Open Affidavits Goes to Governor*,
Topeka Cap.-J. (May 2, 2014), http://bit.ly/1tsTuoW ..........................28

Brenda Jarvis Lowry et al., *Common Weeds of the Yard and
Garden* (2011) .................................................................................14

Karen Dillon, *Open-records Advocates Decry Effort in Legislature to
Potentially Curtail Public Access to Police Reports*,
Lawrence J.-World, Mar. 16, 2016, http://bit.ly/1PdG96c .................28

Let's Move!, *SURPRISE! The First Lady Visits Unsuspecting Local
Gardeners*, http://1.usa.gov/1VT5t72 ................................................24

Radley Balko, *Why the 'Wet Tea Leaves' Drug Raid was Outrageous*,
Wash. Post (Jan 11, 2016), http://wapo.st/1Oe9Nvd ..........................28

Resi Gerritsen & Rudd Haak, *K9 Scent Training* (2015) ........................................7

Restatement (Second) of Torts §46 cmt. d.................................................................27

Ron Mistafa, *K9 Explosive Detection* (1998) ..........................................................7

William C. Thompson, *Painting the target around the matching profile*, Law, Probability and Risk (July 28, 2009)............................................25

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Johnson County Sheriff's Office, aided and encouraged by Trooper Wingo, conducted a tactical raid on an innocent family home after adhering to a backwards choose-its-targets-first, investigate-second approach to law enforcement. Rather than confessing wrong in this case or even apologizing to the Hartes, the deputies now launch ad hominem attacks on the family whose home the deputies targeted for raiding and ransacking. JCSO Br.18-20. Apparently not content to place Bob Harte in the crosshairs of an AR-15 just once, the deputies once again train their fire on the Hartes personally, suggesting that this whole case is just a ploy for "national media attention" and that the Hartes have "done nothing but thrive" since their home was targeted and raided. *Id.* at 1, 19. According to the deputies, the Hartes have somehow duped the "national media," as well as "Kansas legislators," into believing that falsifying a search-warrant affidavit, conducting a general-warrant search, and raiding a family home without probable cause offend our Constitution. JCSO Br.1.

The deputies' thoroughly fact-intensive brief reads, if anything, more like a response to a summary-judgment motion *by the Hartes* than a legal explication of why the deputies need not stand trial for their constitutional violations. Unable to argue that the record, viewed in the light most favorable to the Hartes, entitles them to judgment as a matter of law, the deputies instead fight the record at every turn,

disputing fact after fact. But no amount of factual contortionism can save the deputies from an absolutely damning record—which speaks for itself and easily demonstrates why they are not entitled to summary judgment.

What do the deputies make of the field-test instructions' explicit directive that positive test results only provide a basis "to take the sample in to a qualified crime laboratory"? A391. "Unauthoritative" and "nonsensical." JCSO Br.37. What about Captain Baker's e-mail informing the JCSO command staff that the department had been using "the wrong field test kit"? A202-03. Simply an exercise in being "overly cautious." JCSO Br.16.

And the deputies' deposition statement that they had exceeded the scope of the warrant by "looking for any kind of criminal activity that was involved in the house"? A572. "Ambiguous," "vague," and "out of context." JCSO Br.39, 48. And what about the deputies' statement that they may have authorized a canine to remain longer than necessary in the Hartes' home because "it's nice to give [dogs] some extensive search times" for "training or just experience"? A598. Also "out of context," according to the deputies. JCSO Br.48. These unpersuasive attempts to explain away palpably incriminating parts of the record are not the arguments of a party able to prevail at summary judgment.

A major theme of the deputies' brief is their attempt to fashion their own ignorance into some kind of bulwark to hide behind. But qualified immunity turns

on *objective reasonableness*.  The doctrine is not intended to incentivize deputies to remain as ill-informed as possible about all aspects of their jobs in order to wield their ignorance as a weapon after they violate well-established constitutional rights. Rather, the form of immunity that the Court affords law-enforcement officers is, by its nature, *qualified*—and not absolute—precisely because of "the need to hold public officials accountable when they exercise power irresponsibly."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Because the deputies and Wingo have done just that, the judgment below must be reversed, and they must stand trial for their misconduct.

## ARGUMENT

### I.     Numerous Disputes About Genuine Issues Of Crucial Fact Preclude Judgment For The Officers And Require Jury Resolution.

The District Court was required "to view the evidence at summary judgment in the light most favorable to [the Hartes] with respect to the central facts of this case."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  This Court has repeatedly reversed district courts that have "neglected to adhere to th[is] fundamental principle."  *Id.* at 1868; Opening Br.28-29.  Here, the deputies' thoroughly fact-intensive brief is riddled with disputes and disagreements about nearly all the material facts in this case.  This should have precluded the District Court's granting their summary-judgment motion.  *See* Fed. R. Civ. P. 56(a).  And it requires this Court to reverse.

The deputies assert, tersely, that the Hartes have not demonstrated "a genuine dispute about any material fact." JCSO Br.23. In light of page after page of fact-intensive arguments in the deputies' own brief, this contention is untenable. The massive record in this case easily establishes not just disputes about material facts but the deputies' liability. At this stage in the proceedings, however, the deputies' refusal to accept record-supported factual inferences in the Hartes' favor mandates reversal.

***First***, the deputies, relying on little more than their own say-so, argue that they, in fact, field-tested the floral tea leaves that they found in the Hartes' trash and that this looseleaf tea tested positive for marijuana. JCSO Br.7-8. Overwhelming record evidence, however, supports contrary conclusions: that the deputies never conducted any field tests—or that they lied about the results or recklessly misinterpreted those results.

By February 9, 2012, JCSO had committed to "making a day" of raids on April 20, 2012—but it lacked targets. A690. By mid-March, after the department had received information about the Hartes from Wingo, Sergeant Reddin ordered his deputies "to work this case." A569. By April 5, 2012—*two weeks before the department's planned raid*—the department had already drafted a news release titled "Law Enforcement Celebrates 420 with Multitude of Arrests." A171. That press

release asserted that the department would "celebrat[e] 420 by serving search warrants, seizing marijuana and arresting … people." *Id.*

Moreover, when Deputies Blake and Burns originally discovered loose tea leaves in the Hartes' trash on April 3, 2012, they concluded that it was innocuous vegetation. A564. It was not until ten days before their long-planned day of raids that the deputies reversed course and decided that the *exact same vegetation* now "appeared to be wet marijuana plant material." A700. After waiting eight months from Bob Harte's visit to the indoor-gardening store, the deputies decided they could not wait a few more days to send the tea leaves to the lab for proper testing. Instead, the deputies argue that Burns, relying on his "training and experience," summarily determined that the tea leaves were saturated marijuana plant material. JCSO Br.5. But Burns himself, in a portion of his deposition ignored by the deputies, acknowledged that he had no real training in identifying "saturated" marijuana— "unless," Burns explained, "you consider YouTube videos a form of training." A550.

As explained below in Part III, the KN-reagent field tests that the deputies claim to have used at the time were not the tests customarily used and accepted for testing marijuana. But even if they were, the deputies concede that they had no training whatsoever on how to use the tests. JCSO Br.36. This is immaterial, the deputies argue, because they are "taught to simply follow the explicit instructions that come with the kit." *Id.* at 36-37. Yet that excuse fails, as the test's instructions

5

were unequivocal: positive test results will, at most, "give you probable cause *to take the sample in to a qualified crime laboratory for definitive analysis*." A391 (emphasis added); *see* Marijuana Policy Project Br.12. Assuming the deputies actually conducted any tests, they apparently were not taught well enough how to follow "the explicit instructions." JCSO Br.36.

Moreover, there is not a scintilla of evidence that the deputies *actually conducted* field tests on the tea leaves—despite ample opportunities on multiple occasions to photograph the results or document what the results looked like. Burns photographed field-test results on other occasions—but not here. A546. And Blake actually testified that he took photographs of some "items within the [Hartes'] trash." A563. But after photographing some items in the Hartes' trash, Blake apparently decided to put away his camera rather than photograph the most important item in the trash. According to the deputies, Blake took pictures of the non-relevant items in the trash—but not the tea leaves—because he intended to keep the vegetation "stored in the evidence department." JCSO Br.7. Even this excuse, however, contradicts Blake's own testimony: Blake testified that he should have photographed all items that he intended to "keep … as evidence." A563. And Burns was actually the department's designated K-9 officer and had a trained drug-sniffing dog at his ready. A549. But the deputies argue that Burns's drug-sniffing dog did not sniff the tea leaves because "canines are not trained to sniff garbage," JCSO

Br.7—a contention that is entirely unsupported by the record.[1]  In fact, Burns himself testified that he sometimes used his own canine to sniff trash.  R.327-18 at 9.

Beyond the deputies' utter failure to photograph or document their supposed field tests in any fashion, there is also the fact that everyone (other than the deputies) to have viewed the tea leaves in the Hartes' trash has concluded that they look absolutely nothing like marijuana.  *See* A264-366 (photographs of tea).  Expert Michael Bussell reported that "the only similarity" that the tea "had to marijuana was the fact that it was vegetation and it was green in color."  A235.  For Bussell, "the presence of fruit and flowers" in the tea leaves was a major clue.  *Id.*  And Bussell tested the *actual* "green vegetation" found in the Hartes' trash by using the same field tests that the deputies claim to have used—and the results were all negative.  R.329; Opening Br. 22 n.4.  Even JCSO's own crime lab immediately concluded that the tea leaves did not resemble "*anything like* marijuana" and "did not appear to be marijuana" to the naked eye.  A198 (emphasis added).  The deputies' brief places heavy reliance on "botany," JCSO Br.32, but it does not require a Ph.D. in botany to appreciate that red, orange, and yellow flowers and petals are not marijuana.  *See* A264-366.

---

[1] And false.  *See* Resi Gerritsen & Rudd Haak, *K9 Scent Training* x (2015); Ron Mistafa, *K9 Explosive Detection* 100-105 (1998) (explaining that canines frequently search garbage cans).

*Second*, the deputies repeatedly argue that nobody "had a gun pointed at them" during the raid on the Hartes' home. JCSO Br.21; *see id.* at 1, 14, 39. The deputies' principal piece of evidence for this contention is the deposition statement of Bob Harte, who was face-down and shirtless in the foyer at the time that the deputies flooded his home with an AR-15 and other firearms in the low-ready position. *See* JCSO Br.43. The deputies are free to present this evidence to a jury. But because there is a triable issue of fact on this point, the Hartes deserve the opportunity to present the jury with contrary evidence. Deputy Kilbey himself testified that he pointed his assault rifle in the "low ready" position toward the ground, where Bob Harte was laying at the time. A558, A561. Addie Harte testified that she saw an officer "holding an assault rifle over [her] husband." A729. And Addie's brother recalled Addie describing how an officer "held her husband at gunpoint." A657. To the extent that the deputies wish to argue that this evidence, for whatever reason, is not credible, they may do so—to a jury. But when all "reasonable inferences [are] drawn in favor of the nonmoving party," the record certainly supports the conclusion that Kilbey pointed his AR-15 at Bob. *Tolan*, 134 S. Ct. at 1868.

*Third*, the deputies, citing Sergeant Cossairt's deposition, repeatedly maintain that the Hartes were not, in fact, held under armed guard while the deputies searched their house for any criminal activity but were told that "they were all free to leave."

JCSO Br.13, 46.  The deputies can certainly present this theory at trial if they believe that a jury would find it credible.  But Addie Harte's deposition testimony is exactly the opposite: "I turned to … Officer Blake, and I said 'Am I allowed to leave?'  And he said, 'No, not at this time.'"  JCSA479.  Addie's declaration testimony is identical: "At no point during the raid of our home did any deputy inform us that we were free to leave."  A730.  And Addie's brother, who spoke with Addie during the raid, corroborated:  "Addie … said the officers had told her she could not leave."  A657.  And Lisa Jameson, a neighbor, reported that she tried to take the Hartes' young children from the house but that the deputies forbade the children from leaving.  A725.

* * *

The deputies contend that the Hartes lack evidence "raising a genuine dispute about any material fact," but that is preposterous in light of the abundance of incriminating evidence in the record.  JCSO Br.23.  Unsurprisingly, the deputies' fact-intensive brief sounds more like a closing statement to a jury than it does a summary-judgment argument.  The deputies fail to elaborate on what part of the overwhelming record evidence undermines the Hartes' account.  If anything, it is the deputies who lack evidence to support their theory of the case.[2]  This record strongly

---

[2] For instance, the deputies assert—with no record citations—that they "did not arbitrarily delay in producing the search warrant affidavit in response to the Hartes' open records request."  JCSO Br.19.  But according to Sergeant Cossairt himself,

9

substantiates the Hartes' legal claims and shows why summary judgment for the deputies was unwarranted.   Moreover, the existence of these material disputes demonstrates why this case must go to a jury.

## II.    The Defendants Violated Well-Established Fourth Amendment Principles By Submitting A Falsified Affidavit, Exceeding The Scope Of The Warrant, And Raiding A Family Home With An Overwhelming Amount Of Force.

### A.    The Deputies and Wingo Are Liable Under *Franks v. Delaware* for Official Misconduct Related to the Drafting of an Affidavit.

#### 1.    This Court has long recognized that intentional or reckless disregard for the truth in a search-warrant affidavit violates the Fourth Amendment.

As the Hartes explained in their opening brief, the Fourth Amendment "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause." *Franks v. Delaware*, 438 U.S. 154, 168 (1978).   Law-enforcement officers violate the Fourth Amendment when they mislead a magistrate by including "information in an affidavit that [they] knew was false or would have known was false except for [their] reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984).  This decades-old principle of Fourth Amendment law is one that this Court has applied countless times. Opening Br.36-37.  Like the District Court, the deputies make no effort whatsoever

---

Sheriff Denning's "decision was [that] [the Hartes] weren't going to get [the search-warrant records] as quickly as they wanted them."  A600.

10

to engage with this Court's robust jurisprudence requiring officers to stand trial in light of evidence of intentional or reckless perjury in an affidavit. Indeed, like the District Court, the deputies do not meaningfully cite a *single* case from this Court's *Franks* jurisprudence.

The legal principles supporting the Hartes' *Franks* claim have been clearly established for decades, and the defendants do not contend otherwise. *See* Opening Br.36-37; *Sanchez v. Hartley*, 810 F.3d 750, 758-59 (10th Cir. 2016) (law "was firmly established as of 1986"); *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008) ("clearly established that false evidence cannot contribute to a finding of probable cause"); *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991) (*Franks* "law was clearly established"); *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990) (law "was clearly established" that *Franks* extends to material omissions).

Rather than engaging with Supreme Court and Tenth Circuit authority underpinning the Hartes' constitutional claim, the deputies respond to arguments that the Hartes never make. They spend pages of their brief, for instance, discussing the probable-cause standard. *See* JCSO Br.24-25. But that misses the mark altogether: The Hartes' actual legal claim, arising under *Franks*, is that the deputies intentionally or recklessly submitted a falsified search-warrant affidavit. As explained in Part I, substantial evidence suggests that the deputies either never field-tested the tea leaves

or lied about the results in order to procure a search warrant before their self-imposed April 20, 2012, deadline.

The deputies contend that the self-imposed warrant deadline, the failure to conduct any investigation, the lack of photographs of field testing or of the actual wet tea leaves, the crime lab's incredulity at seeing the tea leaves, the orange flowers and petals, and the failure to have a canine sniff the trash are all just "circumstantial evidence" and "spin."    JCSO Br.27.    But labeling the extensive record "circumstantial evidence" does not get the deputies very far, as "a fact-finder may infer [recklessness]" from so-called "'circumstantial evidence.'" *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 559 (6th Cir. 2014).  This Court has squarely held that the factfinder can infer "reckless disregard for the truth … where the circumstances provide obvious reasons for doubting the truthfulness of the allegations" in an affidavit.  *Salmon v. Schwartz*, 948 F.2d 1131, 1140 (10th Cir. 1991).  And if procuring a warrant under a self-imposed deadline in order to conduct a tactical raid isn't an "obvious reason" to infer recklessness, nothing is.

The deputies further contend that they cannot be liable because they were universally ignorant about marijuana identification, ignorant about field testing, and ignorant about false positives.  JCSO Br.36.  Even assuming—and it is an enormous assumption—that the deputies "lack[ed] subjective bad faith," they are still liable under the Fourth Amendment because "the inquiry is an objective one." *Poolaw v.*

*Marcantel*, 565 F.3d 721, 735 (10th Cir. 2009). Officers may not use their own ignorance to "misle[a]d the magistrate" and then "remain confident that the ploy was worthwhile." *Franks*, 438 U.S. at 168.

And because the deputies themselves call attention to the supposed lack of "direct or written evidence" in this case, JCSO Br.27, it is highly telling that the deputies have exactly zero evidence that they *ever conducted the field tests at all*. What is certain from the evidence is that Blake, after inspecting the Hartes' trash and supposedly conducting a field test, held a camera in his hand and photographed *some* items in the Hartes' trash but—for whatever reason—chose to put away his camera rather than photograph the tea leaves or the putative field test showing a positive result. A563-64. What is also certain is that no deputy described the visual appearance of the supposed field-test results in police reports. A701. And also certain is that when the county crime lab actually viewed the tea leaves, it concluded that the vegetation "did not look anything like marijuana leaves or stems." A198.

On appeal, the deputies make much of the "serrated edges" that they supposedly observed on the tea leaves. JCSO Br.6, 26, 32-33. They place so much stock in this that they ask this Court to take "judicial notice" of their "serrated-edges theory." *Id.* at 6, 32. There is nary a word about these now crucially-important "serrated edges" in any of the police reports that the deputies filed after collecting the Hartes' trash. *See* A700-03. Nor were there any attempts to photograph this

supposedly telltale sign of marijuana.[3]  If these "serrated edges" were really as noteworthy as the deputies all now claim in their depositions, surely they would have recorded their observations *somewhere* at the time.  At the very least, there is a factual dispute over the validity of the deputies' post hoc "serrated-edges defense," and the Hartes should have the opportunity to challenge that newfound, convoluted theory before a jury.

> **2.    Wingo is every bit as liable for *his* direct role in facilitating, encouraging, and instigating the constitutional *Franks* violation.**

Because Trooper Jim Wingo violated the Hartes' Fourth Amendment rights, he must stand trial alongside the Johnson County deputies.  Wingo's primary argument is simply a response to a strawman:  He devotes nearly half his brief to defending against "supervisory liability" and "vicarious liability."  Wingo Br.8, 10-11, 15-16, 20.  But the Hartes never sought to hold Wingo liable under this theory—which is why the words "supervisory" and "vicarious liability" appear nowhere in the Hartes' opening brief.

Wingo also attempts to extricate himself from the egregious *Franks* violation in this case because it was not his signature that appeared on the perjured search-

---

[3] Serrated edges provide little meaningful information in identifying a plant, as they exist on many plants.  Brenda Jarvis Lowry et al., *Common Weeds of the Yard and Garden* 7, 49, 51, 59, 99 (2011) (serrated edges on thistle, clover, catnip, elm, etc.)

warrant affidavit.  Wingo Br.7.  That kind of not-guilty-because-I-didn't-pull-the-trigger argument reflects a profound misunderstanding of §1983 and this Court's holdings on causation.

Section 1983 holds liable two categories of state actors: those who directly violate a person's constitutional rights and those who "caus[e persons] to be subjected" to civil-rights violations.  42 U.S.C. §1983.  Wingo's brief utterly avoids mention of the actual language of §1983.  But the "causes to be subjected" provision of §1983 is not surplusage.  As the Supreme Court and this Court have repeatedly recognized, "causes to be subjected" means exactly what it says.

It is a foundational principle of modern civil-rights law that "a man [is] responsible for the natural consequences of his actions."  *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *accord Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) ("we read §1983 as recognizing the same causal link" as "the common law").  This Court has not hesitated to hold liable "anyone who 'causes' any citizen to be subjected to a constitutional deprivation."  *Pauly v. White*, 814 F.3d 1060, 1072 (10th Cir. 2016) (alteration marks omitted).  In this Circuit, the "requisite causal connection is satisfied if the defendan[t] *set in motion* a series of events that the defendan[t] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights."  *Id.* (emphasis added).

15

In recent years, this Court has repeatedly found §1983's causation requirement satisfied despite possibly intervening factors. *Id.*; *Wilson v. Montano*, 715 F.3d 847, 858 (10th Cir. 2013) ("[p]ersonal involvement does not require direct participation"); *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (defendants liable if constitutional violation "would not have occurred but for their conduct"); *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010); *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (§1983 causation merely requires "showing an affirmative link"); *Poolaw v. Marcantel*, 565 F.3d 721, 732-33 (10th Cir. 2009); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008) ("direct participation" in the constitutional violation "is not necessary"); *Garrett v. Hibler*, 80 F. App'x 82, 86 (10th Cir. 2003) (state actor liable "just by getting the process [of a constitutional violation] underway").

Wingo's brief consists of the same failed causation arguments that the District Court rejected in this case when it denied Wingo's motion to dismiss. Although the District Court ultimately ruled for Wingo at summary judgment, it did not do so on causation grounds, and it never retreated from its early, well-reasoned holding that Wingo was sufficiently linked to the *Franks* violation in this case to impose liability. Surveying Tenth Circuit law, the District Court determined that "[d]irect participation in the constitutional violations … is not necessary." A95. The District Court held that Wingo must face liability "as the architect of the operation." A96-

16

97.  Wingo "provided the tip about Mr. Harte just four weeks prior to the scheduled April 20, 2012 raids" and thus "likely understood" that "officers utilizing the 'tip' would not have sufficient time … to conduct a traditional investigation … and that investigative 'shortcuts' would likely be necessary." *Id.*

The extensive record in this case fully substantiates the District Court's causation holdings.  The idea of targeting gardening-store customers for home raids originated squarely with Wingo.  A667.  And it was Wingo who initially orchestrated the city-wide day of raids, explaining to law-enforcement agencies that they would have "two weeks" to conduct a "brief investigation" in order "to obtain probable cause for a search warrant." *Id.*  It was Wingo who encouraged JCSO to "[s]eal" the records related to the raids—which is exactly what JCSO did.  A670.  And it was Wingo who turned violent tactical raids on innocent families into a competition, proposing "a telethon type billboard with a large green marijuana plant filling up as the pledges come in."  A676.  It was Wingo who promised the JCSO deputies that "4/20 will be something to fear." *Id.*  Wingo's fingerprints are all over the perjured search-warrant affidavit in this case, and under well-established §1983 principles, he is every bit as liable for the *Franks* violation.

## B.  The Deputies Are Liable for Searching the Hartes' Home and Seizing the Hartes as if They Possessed a General Warrant.

The deputies make almost no effort to defend the bestowal of qualified immunity to them on the Hartes' general-warrant claim.  JCSO Br.46-49.  As the

Hartes explained, general warrants are "reviled" by the Fourth Amendment. *Riley v. California*, 134 S. Ct. 2473, 2494 (2014); Opening Br.42-46. They are so reviled, in fact, that the "particularity requirement is set forth in the text of the Constitution" itself. *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). This Court has described the kind of search conducted by the deputies as a "specific evil … abhorred by the colonists." *Mink*, 613 F.3d at 1003; *see Lawmaster v. Ward*, 125 F.3d 1341, 1351 (10th Cir. 1997) ("the law is well established [that] officers may only engage in conduct that reasonably furthers the purpose for which they are in the home"); Cato Institute Br.17-20. On this claim, the deputies struggle to fight the law as much as they fight the facts.

First, the deputies suggest that their search was tolerable because "there is no evidence any deputy looked in an improper place." JCSO Br.47. This strawman argument is thoroughly irrelevant. The Hartes never argued that the search was improper on this basis. Searches have spatial as well as *temporal* limitations, and deputies can just as easily engage in a "general exploratory rummaging of a person's belongings" by remaining too long in a home as they can by looking in improper places. *Mink*, 613 F.3d at 1010.

Next, the deputies contend that they are permitted "to look for evidence of any criminal activity" during a search. JCSO Br.47. Although the Fourth Amendment's "plain-view doctrine" does not require deputies to shield their eyes when they

"inadvertently com[e] across an incriminating object," this doctrine certainly does not authorize them to conduct a search *with the intent* of looking for evidence of *any* criminal activity. *Horton v. California*, 496 U.S. 128, 135 (1990). In fact, the Supreme Court has expressly disavowed the deputies' contention. *Compare Riley*, 134 S. Ct. at 2494 (Fourth Amendment prohibits "an unrestrained search for evidence of criminal activity"), *with* JCSO Br.47 (defending "look[ing] for evidence of any criminal activity" during a search).

The evidence that the deputies conducted a general-warrant search is overwhelming. The deputies acknowledge that they rummaged through the Hartes' home for evidence of "any kind of criminal activity that was involved in the house." A572. After ninety minutes, the deputies called in a canine—a decision that the dog's handling officer questioned because the house had already been "thoroughly searched" and because he did not detect even "the odor of marijuana" anywhere. A178. And even then, the deputies acknowledge that they may have allowed Rex to remain longer than necessary because "it's nice to give [dogs] some extensive search times" for "training or just experience." A598.

How do the deputies respond to this damning evidence? They attack all these statements as "ambiguous," "vague," and "out-of-context." JCSO Br.39, 48. This would be a weak argument as a factual matter, even if the deputies were making it to a jury. But their reliance on it in support of a summary-judgment motion is

19

farcical. A jury should determine if the evidence was "ambiguous," and a reasonable jury could certainly find that this supposedly "vague" and "out-of-context" evidence demonstrates a general-warrant search. JCSO Br.39.

Nor do the deputies make any effort whatsoever to defend their "prolonged detention" of the Hartes beyond the point when they concluded that there was no marijuana in the house. *Michigan v. Summers*, 452 U.S. 692, 705 n.21 (1981). The Supreme Court has conferred only "limited authority" to officers to detain residents "while a *proper* search is conducted." *Id.* at 705 (emphasis added). It has also recognized that the "*duration* of a detention can, *of course*, affect" its reasonableness. *Muehler v. Mena*, 544 U.S. 93, 100 (2005); *accord Walker v. City of Orem*, 451 F.3d 1139, 1153 (10th Cir. 2006) ("excessively prolonged detention" unconstitutional); *United States v. Edwards*, 103 F.3d 90, 93-94 (10th Cir. 1996) (*Summers* authorizes only limited detentions). As explained in Part I, substantial record evidence indicates that the Hartes, including their two young children, were forbidden from leaving their home for two-and-a-half hours. The deputies offer no response.

### C. The Deputies and Wingo Are Liable Under *Graham v. Connor* for Pointing an Assault Rifle at Bob, Deploying a Tactical Team on a Nonviolent Family, and Detaining the Hartes Under Armed Guard.

As to the Hartes' excessive-force claims, the deputies do not contest the familiar, well-established legal principles at issue. Police force is excessive when

"the nature and quality of the individual's Fourth Amendment interests" outweigh "the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As the Hartes explained, their Fourth Amendment interests in freedom from intrusion into their family home outweigh any interest in investigating marijuana possession against a family who demonstrably had no criminal history. Opening Br.56-47. The deputies do not argue otherwise. Instead, the deputies— once again—argue the facts as if this case were already before a jury.

First, the deputies present a paradigmatic jury argument inappropriate to warrant summary judgment: that "the Hartes' appellate counse[l] distort[ed] the record about a gun being pointed at Mr. Harte." JCSO Br.43. As explained above, substantial record evidence indicates that Deputy Kilbey pointed his assault rifle in the "low ready" position in the direction of Bob Harte. A558, A561. If deputies believe that evidence in the record supports a different account, they are free to make that argument to the actual jury. It was entirely inappropriate for this critical issue of material fact to be decided at summary judgment.

Second, the deputies are also liable under *Graham* for deploying a seven-officer tactical-style team to a family with no criminal history suspected, at worst, of possessing some marijuana. Opening Br.48-51. In fact, the deputies acknowledge that they *intentionally timed their raid*—assault rifles, battering rams, and all—when

a seven-year-old girl and thirteen-year-old boy would be home because it would be convenient to have an "opportunity to interview" the children.  A567-68.

The deputies defend their so-called "narcotics search" on the ground that this Court has never condemned the use of tactical teams to investigate the smallest of misdemeanors.  JCSO Br.44.  That logic would of course incentivize law enforcement to use the most aggressive and violent tactics to address the most trivial offenses.  That is an unattractive rule that this Court has never adhered to.

Nor is it any defense for the deputies, in ipse dixit fashion, to label the raid the execution of a "felony narcotics warrant."  JCSO Br.41-42.  Even affording *the deputies* the benefit of every reasonable inference—the opposite of what Rule 56 compels—absolutely nothing about their non-investigation would have rendered the search warrant a "felony narcotics warrant."  As the Hartes explained, marijuana possession is misdemeanor conduct under state law.[4]  Opening Br.47.

Finally, the deputies attempt to justify their actions on the ground that they had "little to no knowledge about the occupants."  JCSO Br.42.  But that is exactly backwards.  The law does not, and cannot, reward this kind of deliberate ignorance and willful blindness.  The deputies *chose* to conduct no investigation into the

---

[4] JCSO notes that cultivating more than four marijuana plants is a felony under Kan. Stat. Ann. §21-5705(d)(7)(A).  JCSO Br.42.  JCSO has never argued, however, that there was a shred of evidence that they had reason to believe that the Hartes possessed more than four marijuana plants.

Hartes' background.  Far from justifying a tactical raid on the Hartes' home, the deputies' ignorance about the occupants of the home only underscores that they failed to conduct even a modicum of investigation before raiding the Hartes' home on "4-20."  This Court should not protect law-enforcement officers who willfully fail to investigate *at all* and who then cite "ignorance" in their defense.

### III.   Sheriff Denning And The County Are Liable Under *Monell* For An Unconstitutional Pattern of Behavior.

This Court will rarely see a more clear-cut case of *Monell* liability.  The reckless, shoddy, and essentially do-nothing investigation reflects grossly inadequate training and unconstitutional practices within the department.  It is hardly surprising that JCSO's actions and pattern of unconstitutional behavior led to a falsified search-warrant affidavit and botched investigation in this case.  Opening Br.52-56.

Consider, for instance, the department's shocking practice of targeting individuals as marijuana growers solely because they shopped at indoor-gardening stores.  One need not be an expert in criminal justice to see why this is both a terrible idea and one that runs roughshod over thousands of people's civil liberties.  Rather than disavowing this draconian dragnet, the deputies (and Wingo) double-down, defending the tactic on the ground that it has, in the past, uncovered some marijuana

users.  JCSO Br.2-3, 51; Wingo Br.12-13.  Even assuming this is true,[5] the problems

with the deputies' logic are legion.

For one thing, the deputies make outlandish factual claims about their dragnet,

often without an iota of support in the record.  For instance, they contend that

possession of a "small bag of merchandise" by a gardening-store shopper indicates

that the shopper "will … soon" grow marijuana.  JCSO Br.4.  But this "fact" would

likely come as a surprise to the many civic-minded Americans who support indoor

gardening—including the First Lady.  *See* Let's Move!, *SURPRISE! The First Lady*

*Visits Unsuspecting Local Gardeners*, http://1.usa.gov/1VT5t72 (discussing First

Lady's support for indoor gardening).

Beyond that, there is also the disturbing testimony of Wingo—who trained the

deputies to conduct "Operation Constant Gardener"—that he targeted and

investigated "100 percent" of the individuals observed leaving indoor-gardening

stores over a five-year period.  A625.  It is little wonder that JCSO, pursuing this

tactic, uncovered some marijuana.  No doubt they also would have uncovered some

marijuana had they targeted all college students or Grateful Dead fans—or, for that

matter, all left-handed people, church-goers, or Capricorns.[6]  Such dragnets would

---

[5] *Contra* A539 (deputies uncovered not a single active marijuana-grow operation
on April 20, 2012, and they seized no live marijuana plants).

[6] The deputies' logic—"We targeted all indoor-gardening shoppers and
uncovered some marijuana, so our tactic was therefore justified."—is a classic

be a gross infringement of civil liberties. *Utah v. Strieff*, -- S. Ct. --, No. 14-1373, 2016 WL 3369419, at *8 (June 20, 2016) ("dragnet searches … expose police to civil liability" (citing *Monell*)). And it is no different here. The deputies suggest that their discovery of nothing but tomato plants during the raid on the Hartes was "at best, a solitary incident." JCSO Br.51. That assertion is directly contradicted by the record. *See* A165 (Kansas City newspaper discussing discovery of nothing but tomato plants during 2011 raid of indoor-gardening shopper)[7]; *see also* R.324 at 8-12 (unsuccessful raids not atypical).

Consider, as well, JCSO's practice of using an improper field test to screen non-synthetic marijuana. The deputies assert, without record citations, that the Hartes' opening brief "misrepresents record evidence" to "create a sham genuine fact issue." JCSO Br.51-52. But the Hartes emphatically did not "misrepresent" that a forensic specialist informed JCSO that it was in "uncharted territory" in using the KN-reagent test to screen suspected marijuana. A203. Nor did the Hartes

---

example of what logicians call the "Texas sharpshooter fallacy"—the "name … given to the tendency to assign unwarranted significance to random data by viewing *post hoc* in an unduly narrow context. The name is derived from the story of a legendary Texan who fired his rifle randomly into the side of a barn and then painted a target around each of the bullet holes. When the paint dried, he invited his neighbors to see what a great shot he was." William C. Thompson, *Painting the target around the matching profile*, Law, Probability and Risk, 1 (July 28, 2009), http://bit.ly/1UqlXVX.

[7] The newspaper presciently cautioned: "Tomato growers be warned: Police are watching you." A165.

"misrepresent" that JCSO's own investigation determined that the department had been using "the wrong field test kit." A202. And the Hartes also did not "misrepresent" that Sheriff Denning indicated that his department had been using "the wrong chemicals." A578. *Contra* JCSO Br.52 ("it is a perfectly acceptable test"). Faced with this record, the deputies suggest that JCSO "initially thought" that the KN-reagent test was flawed but then, apparently, later recanted this view. JCSO Br.52. The deputies' statement is belied by JCSO's ultimate decision to prohibit use of the KN-reagent test under all circumstances. A208. And if the deputies feel that anyone would credit their weak and ever-shifting explanation, they may present that theory to the jury.[8] The Hartes, at the very least, have more than amply demonstrated genuine issues of material fact that would require their *Monell* claim to proceed to trial.

---

[8] The deputies' brief makes several other false assertions about the KN-reagent test. First, the deputies contend that "the crime lab approved its use in 2010." JCSO Br.52. In fact, the crime lab—discussing the possibility of using the KN-reagent test only to screen *synthetic* cannabinoids—stated that the test "use[d] a different chemical test than the typical [marijuana] field test kit." A162. The crime lab even noted that the test's components "are not very good." A162.

Second, the deputies note that Kansas regulations approve the use of the KN-reagent test "to bind felons over for trial at preliminary hearings." JCSO Br.52. Although true, this irrelevant fact has no bearing whatsoever on whether the test is approved for testing marijuana. Moreover, although the deputies cite a regulation, they ignore the *statutory requirement* that field tests can only be used at preliminary hearings if they were conducted by officers "trained in the use of such field test by a person certified by the manufacturer." Kan. Stat. Ann. §22-2902c(a)(1)(B). It is undisputed that the deputies lacked such training.

## IV.  The Deputies And County Are Not Entitled To Summary Judgment On The State-Law Claims.

As the Hartes explained, the deputies and county are liable under state law because the deputies' conduct satisfied the elements of trespass, assault, and false arrest and imprisonment, and a reasonable jury could conclude that the deputies lacked justification.  Opening Br.56-58.  The deputies offer no response at all.  These claims, however, are substantial, as "individuals subject to unconstitutional searches or seizures historically enforced their rights through tort"—as the Hartes seek to do here.  *Strieff*, 2016 WL 3369419, at *4 (S. Ct.).  The deputies simply state that they addressed the Hartes' state-law claims "in previous sections" of their brief, JCSO Br.54—but do not cite anywhere in their brief discussing the state-law claims.[9]

The Restatement famously defined the tort of intentional infliction of emotional distress as an offense in which "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  Restatement (Second) of Torts §46 cmt. d.  In this case, the recitation of the facts has stirred cries of "Outrageous!" not just by average members of the community but by the Kansas Legislature and persons across the

---

[9] The deputies may not rely solely on an "argument headin[g]"—"No state law liability"—to defend summary judgment in their favor on the state-law claims when their "brief's text … entirely omits argument on the issue."  *United States v. Dazey*, 242 F. App'x 563, 566 n.1 (10th Cir. 2007).

country.[10]  A reasonable jury could conclude from the evidence that the deputies took a high-capacity assault rifle[11] into a family home, knowing it contained young children, after falsifying a search-warrant affidavit—all because Bob Harte had bought indoor-gardening supplies for a science project with his son.

## CONCLUSION

The deputies state, with no elaboration, that the Hartes have not "cite[d] any record evidence raising a genuine dispute about any material fact."  JCSO Br.23.  An overwhelming summary-judgment record—consisting of thousands of pages of deposition transcripts and hundreds of pages of e-mails, police reports, expert reports, photographs, and other documents—suggests otherwise.  The deputies' unfounded contention is further belied by their thoroughly fact-intensive brief which struggles on every page to explain away incriminating facts.  A reasonable jury could

---

[10] *See, e.g.*, Radley Balko, *Why the 'Wet Tea Leaves' Drug Raid was Outrageous*, Wash. Post (Jan. 11, 2016), http://wapo.st/1Oe9Nvd (this case has "generated quite a bit of … outrage"; describing "so much outrage" over this case); Karen Dillon, *Open-records Advocates Decry Effort in Legislature to Potentially Curtail Public Access to Police Reports*, Lawrence J.-World, Mar. 16, 2016, http://bit.ly/1PdG96c (this case has "raised a national outcry"); Andy Marso, *Bill to Open Affidavits Goes to Governor*, Topeka Cap.-J. (May 2, 2014), http://bit.ly/1tsTuoW; Opening Br.60.

[11] The AR-15, which Deputy Kilbey pointed at Bob Harte, is an "exceptionally lethal weapon[n] of war" that "functions almost identically to the military's fully automatic M16."  *Kolbe v. Hogan*, 813 F.3d 160, 193 (4th Cir. 2016) (King., J., dissenting), *reh'g granted*, 2016 WL 851670 (4th Cir. Mar. 4., 2016).  Sheriff Denning views his department as a "quasi-military organization," and Kilbey brought the AR-15 assault rifle to the raid for no other reason than it was his "weapon of choice" that morning.  A573, A585.

28

conclude that these deputies intentionally or recklessly perjured an affidavit to procure a warrant; searched the Hartes' home and seized the family as if they held a general warrant; and deployed outrageous, excessive force throughout their raid. This misconduct violated well-established constitutional principles that this Court has faithfully applied on numerous occasions. This Court should vacate the judgment below and remand for the defendants to stand trial.

Respectfully submitted,

s/Robert M. Bernstein
JEFFREY M. HARRIS
ROBERT M. BERNSTEIN
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
rbernstein@bancroftpllc.com

CHERYL A. PILATE
MELANIE S. MORGAN
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO 64106
(816) 471-6694

*Counsel for Plaintiffs-Appellants*

June 22, 2016

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 6,998 words as determined by the word counting feature of Microsoft Word 2013.

Dated: June 22, 2016

s/Robert M. Bernstein
Robert M. Bernstein

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made;

(2)     the hard copies submitted to the clerk are exact copies of the ECF submission;

(3)     the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Kaseya Antivirus, updated June 22, 2016, and according to the program is free of viruses.

Dated: June 22, 2016

s/Robert M. Bernstein
Robert M. Bernstein

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Robert M. Bernstein
Robert M. Bernstein